DENNIS J. HERRERA, State Bar #139669
City Attorney
CHERYL ADAMS, State Bar #164194
Chief Trial Attorney
SEAN F. CONNOLLY, State Bar #152235
JAMES F. HANNAWALT, State Bar #139567
KELLY COLLINS, State Bar #277988
Deputy City Attorneys
Fox Plaza
1390 Market Street, Sixth Floor
San Francisco, California 94102-5408
Telephone:    (415) 554-3863 [Connolly]
Telephone:    (415) 554-3913 [Hannawalt]
Telephone:    (415) 554-3914 [Collins]
Facsimile:    (415) 554-3837
Email:         sean.connolly@sfcityatty.org
Email:         james.hannawalt@sfcityatty.org
E-Mail:        kelly.collins@sfcityatty.org

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO,
OFFICER CHARLES AUGUST, OFFICER NICHOLAS
CUEVAS, OFFICER WINSON SETO, OFFICER
ANTONIO SANTOS, OFFICER SCOTT PHILLIPS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GWENDOLYN WOODS, individually and as Successor in Interest to Decedent MARIO WOODS,<br><br>Plaintiff,<br><br>vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO; a municipal corporation; CHARLES AUGUST, Police Officer for the City and County of San Francisco; NICHOLAS CUEVAS, Police Officer for the City and County of San Francisco; WINSON SETO, Police Officer for the City and County of San Francisco; ANTONIO SANTOS, Police Officer for the City and County of San Francisco; SCOTT PHILLIPS, Police Officer for the City and County of San Francisco; and DOES 1-50, individually and in their official capacities as Police Officers for the City and County of San Francisco, inclusive,<br><br>Defendants. | Case No. 15-cv-05666 WHO<br><br>**DECLARATION OF OFFICER CHARLES AUGUST IN SUPPORT OF DEFENDANTS MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:  September 26, 2018<br>Time:         2:00 p.m.<br>Place:        Courtroom, 2, 17th Floor<br><br>Trial Date:   November 5, 2018 |

I, Charles August, declare as follows:

1. I am a police officer employed by the City and County of San Francisco. I was so employed and on duty on December 2, 2015, the date of the incident on which I understand this action is based. I have personal knowledge of the content of this declaration, based on my direct participation in and observation of the events, and if called upon to testify, I could and would competently testify to its truth.

2. On the afternoon of December 2, 2015, my partner Brandon Thompson and I were on duty, in full uniform, at Potrero Housing substation when I heard the broadcasts by the DEM dispatcher and Officer Margreiter about a search for a stabbing suspect in the area of Third and Le Conte Streets in San Francisco. I heard the stabbing suspect described as a black male wearing a black baseball cap, black hooded sweatshirt or jacket, tan pants and a black backpack. Officer Thompson and I got in our police car and drove to the area to search for the stabbing suspect.

3. Officer Thompson drove. I was in the front passenger seat. We drove southbound on Third Street heading toward Third and Le Conte. At Third and Fitzgerald Streets, I saw a man matching the description of the stabbing suspect broadcast earlier by Officer Margreiter. The man matching the description of the stabbing suspect was standing near other people at a bus stop on the southeast corner of Third and Fitzgerald Streets. I told Officer Thompson something along the lines of "that looks like him." Officer Thompson turned the car around and pulled to the curb on the south side of Fitzgerald Street a few yards east of Keith Street, a few feet from the man I believed was the stabbing suspect.

4. When Officer Thompson pulled to the curb, I was in the passenger seat closest to man I later learned to be Mario Woods. Woods was wearing a black baseball cap with a white emblem, large black hooded jacket, tan pants, and a black backpack.

5. I opened my car door and stepped out onto the sidewalk. Woods glared at me, produced a knife with the point facing me and, while holding it tightly in his right hand said, "I'm not going with you." The knife looked sharp and long enough to cause me or anyone else serious injury, especially since I had heard over the radio that the stabbing victim was injured seriously enough to be treated at San Francisco General Hospital. Attached as Exhibit A is a photograph of a knife I believe

to be the one Woods produced when I came into contact with him. Attached as Exhibit B is a photograph of what I believe to be the same knife depicted in Exhibit A, next to a ruler, showing the length of the blade as approximately four and one half inches. The fact that Woods matched the suspect description, had a knife in his hand, and was immediately resistant with his demeanor and words, led me to believe Woods was the man was the stabbing suspect. His attitude and comments also immediately made me believe that he would not be cooperative and heightened my concerns for everyone's safety.

6. After seeing the knife and Woods' non-compliant demeanor, for reasons of my own safety and the safety of my partner, I took my department issued firearm out of the holster and raised it toward Woods. I ordered Woods to drop the knife while I held him at gunpoint. Woods said to me "You're going to have to squeeze that." I believed he was indicating that I was going to have to use my firearm to shoot him, and that he did not intend to voluntarily comply with my orders to drop the knife. When a suspect verbally refuses specific orders, it makes me believe that he heard and understood the orders. It also requires that I adjust my approach because the level of threat that he poses to me and everyone else in the area goes up. I did not immediately use force to take him into custody, however. Rather, I continued to order Woods to drop the knife.

7. I knew Officer Thompson had also gotten out of the car. I heard Officer Thompson broadcast over the radio our location and that we were in contact with the stabbing suspect, who was brandishing a knife.

8. Woods began walking away from me around the corner, heading south toward Gilman. I followed him at a distance of about fifteen feet with my gun pointed at him. I continued to order him to drop the knife. At that point, I hoped that when other officers arrived, we could convince Woods with a show of force to comply and drop the knife.

9. Woods then abruptly stopped, turned around to face me, and dropped the backpack he was wearing. I interpreted Woods' actions as a sign he was preparing to stab or fight officers rather than drop the knife and submit to arrest. Woods then turned and continued walking south toward Gilman. I followed a few steps behind him with my gun drawn and continued to order Woods to drop the knife. At that point, although I perceived Woods as a threat, I did not view the threat that he posed

Decl August ISO MSJ
Woods v. CCSF, et al.; Case No. 15-cv-05666 WHO
3
n:\lit\li2016\160554\01290182.docx

was imminent because there was nobody close by in the direction he was walking. I believed that once backup arrived, Woods would surrender and be taken into police custody peacefully.

10. Officers Navarro, Seto, Cuevas, and Phillips arrived soon after as backup. Other officers also arrived, who I later learned included Officer Cody Barnes, Officer Antonio Santos, Officer Jesse Ortiz, Officer Jennifer Traw, and Officer Percy Hernadez. As a group, we tried to contain Woods by forming a perimeter around him, creating a semi-circle between Woods and the civilian bystanders in the area. Meanwhile, Woods continued to grip the knife in his right hand and move about on the sidewalk. I ordered Woods several times to drop the knife. I also heard other officers order Woods to drop the knife. I again hoped that Woods would realize that with so many officers present he would not be able to escape, would drop the knife, and comply with our commands.

11. One of the officers who arrived had a "less lethal" shotgun, which we use under certain circumstances to subdue an uncooperative, armed suspect. I saw Officer Navarro shoot Woods a total of four times with what I believed to be 40 millimeter high-velocity less lethal projectiles. It appeared to me that each of those projectiles hit Woods below the waist.

12. I also saw Officer Traw shoot Woods with beanbag projectiles fired from a less lethal shotgun.

13. I also saw Officer Ortiz attempt to spray Woods with Oleoresin Capsicum (pepper spray).

14. I did not observe the projectiles or pepper spray have any effect on Woods. He did not drop the knife nor did he submit to arrest as a result of their deployment. Based on Woods' lack of response to these events, I believed that he was willfully disregarding commands by officers to drop the knife and surrender. Wood's failure to respond or comply continued to raise my level of concern about the safety of the officers and the civilians present in the area. Woods turned to me multiple times as commands were given to him and told me I was going to have to shoot him. I responded in a calm voice asking Woods to drop the knife and surrender. Woods did not comply.

15. After I realized that the less lethal force options did not cause Woods to comply, I heard an officer warn Woods that if Woods did not drop the knife the officer would shoot him. Woods still did not drop the knife or give any indication that he intended to submit to an arrest.

Decl August ISO MSJ
Woods v. CCSF, et al.; Case No. 15-cv-05666 WHO
4
n:\lit\li2016\160554\01290182.docx

16. Instead of complying with our repeated commands, even after being shot with projectiles and pepper sprayed, and after being warned an officer might use lethal force, Woods turned to the north and began closing the distance between him and me. At the time he advanced northbound heading back in the direction of the bus stop where I believed there were civilians, I was standing in the northernmost position in the police semi-circle. In response to Woods' movement, which I interpreted as his attempt to escape, I simultaneously sidestepped and backpedaled to put myself closer to the building line and keep a distance between myself and Woods. I wanted to block Woods' escape by preventing him from breaching our perimeter and gaining access to people I could hear behind me. I believed I was the only officer between Woods and the civilians behind me. Woods did not stop or change his path of travel in response to my movement. Woods still gripped the knife in his right hand with the tip pointed in my direction and the blade facing upward, as he continued to move toward me, faster than I was backing up, closing the distance between us. I then believed that Woods would not stop, and that when he reached close enough, he would stab me, or get around me and stab one of the people who I believed to be nearby. Therefore, when Woods came so close to me that I perceived an imminent threat of serious injury or death, I shot Woods in defense of myself and the people behind me. I believed that Wood's actions left me without any other reasonable option, and that my use of deadly force complied with the law. I did not have any intent to deprive Woods of any of his rights, nor did I act with malice. My sole purpose was to protect myself and others.

17. At no point, either prior to or following my arrival on scene, was I informed or did I believe Woods was suffering from a mental health crisis. Woods' actions demonstrated a willful failure to follow commands and resist arrest. At no time did it appear to me that Woods did not understand the commands given to him.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that I executed this declaration on August 7, 2018, at San Francisco, California.

CHARLES AUGUST