# Exhibit L

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

GWENDOLYN WOODS, individually)
and as Successor in Interest )
to Decedent MARIO WOODS,      )
                              )
            Plaintiff,        )
                              )
       vs.                    ) CASE NO.:  3:15-05666-WHO
                              )
CITY AND COUNTY OF            )
SAN FRANCISCO; a municipal    )
corporation, et al,           )
                              )
            Defendants.  )      CERTIFIED COPY
_____)

VIDEO DEPOSITION OF OFFICER SHAUN NAVARRO

TUESDAY, APRIL 17, 2018

REPORTED BY:  ANGELICA R. GUTIERREZ, CSR NO. 13292

1

```
 1                      I N D E X

 2

 3         EXAMINATION BY:                        PAGE

 4         MR. POINTER                              7

 5                        --o0o--

 6

 7         Appearance Page                          3

 8         Exhibit Page                             4

 9         Location                                 5

10         Reporter's Certificates                139

11         Deponent Signature Page                140

12         Deponent Signature Waiver              141

13         Witness Letter                         142

14         Changes and/or Corrections             143

15         Attorney's Notes                       144

16

17                        --o0o--

18

19

20

21

22

23

24

25

                                                     2
```

```
 1                              APPEARANCES

 2


 3        FOR THE PLAINTIFF:

 4             LAW OFFICES OF JOHN L. BURRIS
               Airport Corporate Centre
 5             7677 Oakport Street, Suite 1120
               Oakland, California 94621
 6             510-839-5200

 7             BY:  ADANTE POINTER, ATTORNEY AT LAW

 8


 9        FOR THE DEFENDANTS:

10             OFFICE OF THE CITY ATTORNEY
               1390 Market Street, 6th Floor
11             San Francisco, California 94102
               415-554-3863
12
               BY:  SEAN CONNOLLY, DEPUTY CITY ATTORNEY
13                  JAMES HANNAWALT, DEPUTY CITY ATTORNEY

14


15        ALSO PRESENT:  STEVEN CATHY, CLVS
                          sacramento Legal video Center
16

17

18                             --o0o--

19

20

21

22

23

24

25

                                                              3
```

1

2                           INDEX OF EXHIBITS

3       PLAINTIFF'S              DESCRIPTION                    PAGE

4          1                     Report                         58

5          2                     Map                            81

6        2A                      Map                            83

7        2B                      Map                            83

8

9

10                              --o0o--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1           Pursuant to Notice of Taking Deposition and on

2      Tuesday, April 17, 2018, commencing at the hour of 10:46

3      a.m., thereof, at the Law Offices of John L. Burris, 7677

4      Oakport Street, Suite 1120, Oakland, California, before

5      me, ANGELICA R. GUTIERREZ, CSR No. 13292, a Certified

6      Shorthand Reporter and Deposition Officer of the State of

7      California, there personally appeared:

8

9                     OFFICER SHAUN NAVARRO

10

11     called as a witness by the Plaintiff, who having been duly

12     sworn by me, to tell the truth, the whole truth and noting

13     but the truth, testified as hereinafter set forth:

14

15                       ---O0O---

16

17

18

19

20

21

22

23

24

25

                                                                5

DEPOSITION OF OFFICER SHAUN NAVARRO

1    For example, you're tired, you haven't had enough rest,

2    you're thinking about your shift or what just happened

3    on your shift?

4        A.   No.  I would say I'm pretty focused on this

5    right now.

6        Q.   All right.  Thank you.  Okay.  Now, you

7    currently work for the San Francisco Police Department,

8    correct?

9        A.   Yes.

10       Q.   Have you worked for any other law enforcement

11   agencies?

12       A.   No.

13       Q.   Okay.  So this is your -- the San Francisco

14   Police Department was your first and only law

15   enforcement agency that you have been employed by?

16       A.   Yes.

17       Q.   Okay.  And when did you first start working

18   for SFPD?

19       A.   I came in June 25th of 2007.

20       Q.   Okay.  And it's your understanding that the

21   shooting death of Mario Woods took place December 2nd

22   of 2015, correct?

23       A.   Yes.

24       Q.   Okay.  And so approximately how many years had

25   you been an officer prior to the shooting death of

                                                              20

1    Mario Woods?

2          A.    Sorry.   I have to do quick math in my head.

3          Q.    That's why I said estimate, because I'm not a

4    mathematician either.

5          A.    I guess that would make it --

6                MR. CONNOLLY:   I would represent to the

7    witness, eight years.

8                THE WITNESS:   Well, I would say about seven to

9    eight years.

10               MR. POINTER:   Q.   Okay.   And at the time of

11   the incident concerning Mr. Woods, you were a patrol

12   officer; is that correct?

13         A.    Yes.

14         Q.    Okay.   And had that been your -- I don't know

15   what you call it -- status or rank during that time of

16   seven or eight years as a patrol officer?

17         A.    Yes.

18         Q.    Okay.   And you attended San Francisco Police

19   Department Academy?

20         A.    Yes.

21         Q.    Okay.   Is that the only police academy you

22   have attended?

23         A.    Yes.

24         Q.    Okay.   And you are POST certified, correct?

25         A.    Yes.   POST-certified academy.

                                                          21

1           If you want to show him the policy and ask him

2     about it, that's fine.  We can march through it that

3     way.  But Adante, I can't allow the witness to answer a

4     question that is unfair because it does not represent

5     the San Francisco Police policy at the time of this

6     incident, nor does it reflect the law.  It can't be

7     answered.

8           MR. POINTER:  Sure it can.  But this isn't for

9     you to answer, Counsel, but I appreciate you trying to

10    direct the witness --

11          MR. CONNOLLY:  No, I'm not.  I'm trying to

12    protect the witness from trick questions.  So let's

13    just be clear where we stand on this, okay?  I'm trying

14    to protect the witness from what I believe is a trick

15    question.  And I'm saying --

16          MR. POINTER:  Well, you believe it to be a

17    trick question, but you are not the witness.  The

18    witness --

19          MR. POINTER:  Q.  Do you think -- is this a

20    trick question, officer?

21          MR. CONNOLLY:  Do not answer.  I will object

22    as argumentative.

23          MR. POINTER:  It's not.  It's not

24    argumentative.

25          MR. CONNOLLY:  You don't have to respond.

24

1    So if you remember the question, you can answer it.

2    And it may depend on the circumstances, it may

3    depend -- you may ask for further clarification if you

4    can answer that question.  If you recall, you can

5    answer.

6              THE WITNESS:  The best way I'm comfortable

7    answering it would be, I was trained that one of the

8    reasons why we would use lethal force -- I don't even

9    know if it's worded like that exactly, and that's why

10   it's confusing to me.  I'm sorry.  I'm just thinking

11   about the question again.  I think the answer would be:

12   I disagree with that statement that you made.

13             MR. POINTER:  Q.  Okay.  So you weren't

14   trained that way.  I understand.  Were you trained that

15   different levels of resistance required different

16   levels of force?

17        A.   Yes.

18        Q.   Were you also trained that different levels of

19   noncompliance require different levels of force?

20        A.   Yes.  If any force at all, yes.

21        Q.   You would also agree that you have been

22   trained that it's a crime for an officer to, under

23   color of authority, without lawful necessity, assault

24   or beat any person, and that's codified in Penal Code

25   149?

                                                          26

DEPOSITION OF OFFICER SHAUN NAVARRO

1           A.   Sorry.   Sometimes I'm overthinking these

2      questions.   Yes.

3           Q.   Sure.   You would also agree that an officer

4      that does that, that violates Penal Code 149, should be

5      prosecuted, correct?

6                MR. CONNOLLY:   Objection.   Asked and answered.

7      Incomplete hypothetical.   Calls for speculation.

8      Irrelevant.

9                THE WITNESS:   My answer to that would be:

10     It's depends on the situation.

11               MR. POINTER:   Q.   Okay.   So an officer that

12     violates -- it's your testimony that an officer that

13     violates Penal Code 149 should or should not be

14     criminally prosecuted?

15               MR. CONNOLLY:   Again, I'm going to object as

16     incomplete hypothetical.   It depends on the

17     circumstances and it's argumentative because his

18     opinion is irrelevant.   It's up to district attorney to

19     decide that.

20               THE WITNESS:   Yeah, I think, you know, my job

21     would be to enforce the law.   As far as -- I'm so

22     confused -- I'm sorry.   You said prosecute for that?

23               MR. POINTER:   Yeah.

24               THE WITNESS:   If that Penal Code were

25     violated, my job would be to enforce the law --

                                                          27

1           MR. POINTER:   Q.   Arrest --

2           A.   Arrest.   And, as far as prosecution, I don't

3     really have an opinion on what would, you know --

4     who -- I guess the district attorney would make that

5     decision.

6           Q.   Because, I take it, you wouldn't make any

7     distinction of the fact that it was a police officer,

8     right, as to whether or not they should be criminally

9     prosecuted, right?   For that Penal Code, doesn't it

10    have to be a police officer?

11          A.   Yes.

12          Q.   So that's what I'm getting at.   I'll withdraw

13    the question.   I'm not trying to confuse you, so let me

14    clarify.   What I'm trying to understand here is in the

15    course of your function.   And you're tasked with

16    enforcing the law, correct?

17          A.   Yes.

18          Q.   Okay.   If someone breaks the law in front of

19    you, okay, you're tasked with arresting that person,

20    correct?

21          A.   Yes.

22          Q.   Okay.   I just asked you, if an officer breaks

23    that Penal Code, what would you be tasked with doing?

24    And that would be?

25          A.   Arresting that officer.

28

1     Q.    Okay.   And when you arrest somebody, what

2   process does that set in place?   The criminal justice

3   process, correct?

4     A.    Yes.

5     Q.    Okay.   Part of what you do as a police

6   officer --

7         MR. CONNOLLY:   I'm sorry.   Maybe there's

8   confusion.   I thought the witness -- I think the

9   witness expected to come and answer questions about

10  being witness to an incident, he wasn't going to get a

11  bunch of questions about hypothetical situations in the

12  criminal justice --

13         MR. POINTER:   Yeah.   And Mario Woods didn't

14  expect to die on the corner that day in a hell of

15  bullets.

16         MR. CONNOLLY:   Thereon, police officers

17  wouldn't have --

18         MR. POINTER:   Well, yeah, that's your position

19  as somebody who's defending the city when you should be

20  defending the people just as equally.   And the only

21  person that died here was Mario Woods.   You are alive

22  to have your position.   He's not.   So forgive me if I'm

23  taking this serious and I plan to take this officer to

24  the --

25         MR. CONNOLLY:   I'm taking it quite serious --

29

1          MR. POINTER:  No, I don't know if you are.

2               MR. CONNOLLY:  I'm taking it quite seriously.

3               MR. POINTER:  I don't think you are, in a way

4     that I would like to see it.

5               MR. CONNOLLY:  This is not a political

6     soapbox --

7               MR. POINTER:  No, I'm not -- if it was a

8     political soapbox, trust me, we'd be here all day

9     because I can talk about it all day.

10              MR. CONNOLLY:  Let's get serious.

11              MR. POINTER:  The only person who's dead is

12    Mario Woods.  And I'm talking about facts.  All I'm

13    trying to figure out is, are we enforcing the law

14    equally or are we doing it in a disproportionate way --

15              MR. CONNOLLY:  Why don't you ask the officer

16    that --

17              MR. POINTER:  -- can we get him down here --

18              MR. CONNOLLY:  I would be happy -- I'm not

19    doing anything --

20              MR. POINTER:  -- you have given more testimony

21    than the officer already --

22              MR. CONNOLLY:  -- the more rise you are going

23    to get out of me --

24              MR. POINTER:  You think it's ridiculous to ask

25    him whether or not an officer -- whether or not it's

30

1    training that an officer who violates the Penal Code is

2    supposed to be arrested?

3              MR. CONNOLLY:   And he answered that question.

4              MR. POINTER:   Q.   What was the answer,

5    officer?

6         A.   I'm sorry.   I wasn't listening.

7         Q.   No, you tell me.

8              MR. CONNOLLY:   What's the question?   You asked

9    this question -- he said -- he's already answered the

10   question.   Let's move on -- please don't answer for the

11   officer.

12             MR. POINTER:   I'm not.   I mean, I have been

13   very relaxed, I think, restrained, allowing you to kind

14   of -- I know what you need to do as a counsel getting

15   started.   I know it's early, but at this point, we have

16   to be a little bit more restrained in terms of the

17   speaking objections and my responding to them, okay?

18             MR. CONNOLLY:   And that applies to both of us.

19             MR. POINTER:   It does.

20             MR. CONNOLLY:   Okay.

21             MR. POINTER:   Q.   You've also been trained

22   that an officer can be held civilly responsible if they

23   violate someone's rights, correct?

24        A.   Yes.

25        Q.   And you have been trained that an officer can

31

1   be held criminally responsible if they violate

2   somebody's rights, correct?

3        A.   Yes.

4        Q.   Okay.  You've been trained on how to respond

5   to a person who is having mental health issues but is

6   armed, correct?

7             MR. CONNOLLY:  I'm sorry.  I didn't hear the

8   whole question, Counsel, the end of it.  I didn't hear

9   you.

10            MR. POINTER:  Let's go back.

11            MR. POINTER:  Q.  You have been trained on how

12  to respond to a person who is experiencing mental

13  health issues but is also armed, correct?

14       A.   Yes.

15       Q.   Okay.

16       A.   I received training.

17       Q.   And you have received training prior to the

18  incident concerning Mario Woods, correct?

19       A.   Yes.

20       Q.   In fact, there's an order and/or a policy of

21  the police department that instructs you on how to

22  respond a person who's experiencing mental health

23  issues but is armed, correct?

24       A.   That, I don't know.

25       Q.   Okay.  As you sit here today, you are not sure

                                                        32

1    either way, correct?

2         A.   Not sure either way about that order prior to

3    the Mario Woods incident?

4         Q.   Yes.

5         A.   Yeah.  As I sit here today, I don't remember

6    if there was an order.

7         Q.   Do you have any recollection of receiving

8    training as it relates how to respond to a call

9    concerning a person who's experiencing mental health

10   problems but is armed, prior to the incident concerning

11   Mario Woods?  I'm just asking about your training prior

12   to that incident.

13        A.   I don't recall any specific training regarding

14   both, but I have had -- definitely before the Mario

15   Woods incident -- training regarding dealing with

16   people with mental illness and also dealing with people

17   with weapons.

18        Q.   So if I understand you correctly, the training

19   that you recall that you received prior to the incident

20   concerning Mario Woods, was a training that had to deal

21   with responding to people with mental health and there

22   was a separate training that dealt with responding to

23   people who are armed?

24        A.   Yeah.  As of right now, that's the training

25   that I'm thinking of.

33

1          Q.    Okay.

2          A.    I don't recall training right now that

3     incorporates both.

4          Q.    Okay.  Do you recall ever reading any written

5     document -- whether that's a handout, a flyer, a

6     manual -- as it relates to responding to a call where

7     you have a person who's experiencing mental health

8     problems and is armed?

9          A.    Reading some material that has --

10         Q.    -- been provided to you by your employer, the

11    San Francisco Police Department?

12         A.    Not at this moment, no.

13         Q.    Now, I understand during this incident

14    concerning Mario Woods, you were armed with, using my

15    term, a "number of weapons", correct?

16         A.    Yes.

17         Q.    Okay.  I mean, you had your firearm on you,

18    right?

19         A.    I did have my firearm on me.

20         Q.    But you never pulled it out of your holster,

21    right?

22         A.    That, I don't recall.

23         Q.    Okay.  You said you reviewed your statement

24    you gave to Homicide, right?

25         A.    Yes.

34

DEPOSITION OF OFFICER SHAUN NAVARRO

1        Q.    Okay.  Do you recall saying that in your

2    statement?

3        A.    I don't recall saying that.

4        Q.    Okay.  And as you sit here today, you just

5    don't have a memory, right?

6        A.    Correct.

7        Q.    Okay.  So you may have pulled it out, you may

8    not have pulled it out, you just don't know; is that

9    correct?

10       A.    Let me see.  I guess it depends on what part

11   of the incident.  Because I refer to the incident as,

12   you know, when we were setting up a perimeter at a

13   different location and then the shooting incident as

14   well.  If you are talking about the specific shooting

15   incident, that timeframe, I don't recall pulling it

16   out.

17       Q.    Okay.  Fair enough.  So -- and that's a

18   perfect example.  If we think we are talking past each

19   other and you are not sure, you can clarify to me what

20   you mean, or just ask me and I'll try to make it plain

21   or a little bit more simple, okay?

22       A.    Okay.

23       Q.    So, yeah, I was asking -- just -- thanks.  I

24   was asking you whether or not, during the time where

25   you, actually, personally, were there on the scene with

35

DEPOSITION OF OFFICER SHAUN NAVARRO

1     Mario Woods, did you ever pull your firearm?

2         A.   Not that I recall.

3         Q.   Okay.  And what kind of firearm did you carry?

4         A.   At that timeframe, I had a 40-millimeter

5     launcher, also referred to as an extended range impact

6     weapon.

7         Q.   And you also carried, I take it, your

8     .40 caliber firearm, correct?

9         A.   Yes, on my holster.

10        Q.   Okay.  And you never pulled your .40 caliber

11    firearm during the course of the incident where you

12    were personally dealing with Mario Woods, correct?

13        A.   Correct.  Not that I recall.

14        Q.   Okay.  The weapon that you essentially

15    deployed or armed yourself with and pointed at Mario

16    Woods was the ERIW, correct?

17        A.   Yes.

18        Q.   Okay.  And that weapon fires less-lethal

19    ammunitions, correct?

20        A.   Yes.

21        Q.   And you have received training in that and

22    using that weapon prior to the incident concerning

23    Mr. Woods, correct?

24        A.   Correct.

25        Q.   Okay.  And did you receive that training in

36

1    the academy or on-the-job training, essentially, after

2    you were a patrol officer and patrolling the streets?

3         A.   I received it during specialist training of

4    the specialist team member.

5         Q.   And what is a specialist team?

6         A.   It's part of special operations group in San

7    Francisco and that group consists of the tactical team,

8    the specialist team and the hostage negotiation team,

9    and the specialist team's primary mission is

10   containment.

11        Q.   And when you say "containment", I don't know

12   if that's a term of art meaning it means something more

13   than just like a container to hold your food or

14   something.  So what do you mean by "containment"?

15        A.   Okay.  I think the best way to explain it for

16   me -- or the easiest way would be in a scenario like a

17   search warrant.  Those three components, the hostage

18   negotiation would try to establish contact with, let's

19   say, a barricade suspect.  The specialist team would be

20   tasked, and our mission would be to contain, like, the

21   objective.  Like, if it's a house.  And then the

22   tactical team, essentially our SWAT team, would be

23   tasked with if they have to breach the house and go

24   inside.  That's the best way I think I can explain.

25        Q.   So containment team sounds like you are tasked

                                                              37

1    with maintaining some type of perimeter?

2         A.   Maintain some type of perimeter -- yes, to

3    keep the threat inside and to keep others out of the

4    inner perimeter.

5         Q.   Okay.  Part of the goal of keeping people

6    out -- of setting up this perimeter is, as you said,

7    contain or limit the suspect's ability to harm other

8    people, correct?

9         A.   Yes.  I would agree with that.

10        Q.   Okay.  Keep the other people, i.e., the

11   public, safe from that suspect, right?

12        A.   Yes.

13        Q.   Okay.  And the tactical team, as you said,

14   they are tasked with if they have to breach or

15   essentially go in and extract or confront the suspect,

16   right?

17        A.    In the simplest terms, I think that's the best

18   way to describe it.  I would agree with that, yes.

19        Q.   Okay.  And then the hostage team, they

20   actually establish contact or communication with the

21   suspect or the person, correct?

22        A.   Again, in the simplest terms, that's how I

23   would describe it.

24        Q.   Sure.

25        A.   But they have other tasks as well, obviously,

38

1    but that's the easiest way for me to describe it.

2         Q.   I understand.   And all three of those teams

3    work together?

4         A.   Yes, they are all part of the special

5    operations group.

6         Q.   I take it, the goal is to make sure that the

7    person is brought into custody, correct?

8         A.   I guess, yes.   The main goal would be to solve

9    a situation peacefully.

10        Q.   Okay.   Without the use of lethal force,

11   correct?

12        A.   Yeah.   I would agree with that, yes.

13        Q.   I mean, that's --

14        A.   That's how you want to resolve situations.

15        Q.   Makes sense to me.   Now, I understand that you

16   had been working out of the Bayview Station or in the

17   Bayview District for approximately three years before

18   the incident concerning Mr. Woods; is that correct?

19        A.   Approximately three years, yes.

20        Q.   And prior to that, what district had you

21   worked in?

22        A.   Richmond District.

23        Q.   And the Richmond District, where is that

24   located in San Francisco?   Could you give me a general

25   sense of the boundaries?

                                                          39

DEPOSITION OF OFFICER SHAUN NAVARRO

1      A.    Sure.  It would be the northwest part of San

2  Francisco, the northernmost part probably being, like,

3  near the Golden Gate Bridge area.

4      Q.    Okay.

5      A.    And the southern boundary would be just below

6  Golden Gate Park.

7      Q.    Okay.  Thank you.  Now, my understanding is

8  that on the day of the incident concerning Mr. Woods,

9  you started your shift at approximately 4 o'clock; is

10  that true?

11     A.    Yes.

12     Q.    Okay.  Is there a particular name for that

13  shift?

14     A.    Yes.  We call it swing shift.

15     Q.    Okay.  And that day, it's my understanding

16  that you were partnered up with Winston Seto; is that

17  true?

18     A.    Officer Seto, yes.

19     Q.    Seto, okay.  And that was someone you had been

20  partnered with frequently, correct?

21     A.    He was my regular partner at the time, yes.

22     Q.    Okay.  And I'm just going to ask you some

23  questions in terms of how you started the shift, okay?

24     A.    Okay.

25     Q.    So I want you to direct your attention to

                                                        40

1    that.  Do you understand that?

2        A.   Yes.

3        Q.   Okay.  So where did you start your shift at?

4    Were you already out in the field, do you just drive

5    from home and just get in the patrol car?  How does it

6    work?

7        A.   So 4 o'clock is lineup, which is basically

8    where we take roll, get our assignments for the day,

9    and get a briefing of what's going on in the law

10   enforcement world, I guess, so to speak.  So at

11   4 o'clock, we're expected to be already in uniform, and

12   we do the lineup in the lieutenant's office.

13       Q.   Okay.  And so if I understand you correctly,

14   on the day of this lineup, you were in the lieutenant's

15   office, you received your assignments, correct?

16       A.   Yes.

17       Q.   You are in the lieutenant's office during

18   lineup and you receive updates as it relates to what's

19   going on in law enforcement?

20       A.   Yes.

21       Q.   Okay.  And, I take it, they also take

22   attendance in the lieutenant's office to figure out if

23   everybody made it who is supposed to be there on that

24   shift?

25       A.   Yes.

41

1     lieutenant or the sergeant comes in and says, hey, this

2     is our new officer-involved shooting training video

3     that has been put together by our defensive tactics

4     department or the range master, or something along

5     those lines, and hits play and then you watch it.  Or

6     is it more like, hey, guys, I have a video -- there's a

7     video we're going to show you today, and you just hit

8     play and you watch it, then just going out to patrol?

9     Do you understand?

10        A.   I do understand.  And I -- we have -- we have

11    both types of videos.  We have videos, like, training

12    that they would show and it's, you know, coworkers

13    and/or officers and -- that are putting on a training,

14    you know, and it looks like it's SFPD training.  And we

15    also have videos that are shown that are just, you

16    know, law enforcement-related within the nation even.

17        Q.   So, for example, it sounds like you may

18    actually watch a video that's like a YouTube video of

19    something that happened, like, hey, look at this.  Did

20    you see this take place?

21        A.   Yes.

22        Q.   Okay.  Fair enough.  So you mentioned that you

23    are in lineup, you're monitoring the radio, correct?

24        A.   Uh-hum.

25        Q.   You have to say yes or no.

51

DEPOSITION OF OFFICER SHAUN NAVARRO

1    A.   Yes.   Sorry.

2    Q.   It's okay.  No problem.  Everyone does it,

3    including the attorneys, even though we try to pretend

4    like we don't.

5    A.   Okay.

6    Q.   So you're in lineup, you're monitoring the

7    radio, something on the radio caught your attention,

8    correct?

9    A.   Correct.

10    Q.   All right.  What was that?

11    A.   I remember an incident going on the radio, I

12    believe there was a Code 33 that was called.

13    Q.   What -- oh, go ahead.

14    A.   Which means there's an emergency and to clear

15    the channel, and whoever is speaking has the time and

16    the air on the radio.

17    Q.   Okay.  Do you know who put out the Code 33?

18    A.   I do now, after the fact.

19    Q.   Okay.  Well, we'll go into both.  So who do

20    you know -- who do you now know as being the person who

21    put out the Code 33?

22    A.   My understanding, it's Officer Mark Rider.

23    Q.   Okay.  The date when this was taking place,

24    you didn't know that it was Officer Mark Rider,

25    correct?

52

1       A.   The reason I am having trouble with this

2  question is because I just -- I was just focused on

3  listening to the traffic, I wasn't trying to identify

4  who was speaking.

5       Q.   Okay.

6       A.   I might have known, I just couldn't -- I

7  wasn't really thinking about it like that.

8       Q.   Okay.  All right.  So you're in lineup, you

9  hear an officer put out a Code 33, which means, clear

10 the air, that officer now has priority on the air,

11 correct?

12      A.   Correct.

13      Q.   That, to you, signals, in your mind, there's

14 an emergency situation taking place, correct?

15      A.   Yes.

16      Q.   I take it you listen more closely from that

17 point going forward?

18      A.   Yes.

19      Q.   Okay.  You're already in your uniform, right?

20      A.   Uh-hum.

21      Q.   You are in lineup in the lieutenant's office?

22      A.   Yes.

23      Q.   Okay.  After you hear the Code 33, what do you

24 do next?

25      A.   I'm listening for more information.  I find

                                                           53

1    out that it's a stabbing suspect in the area of Third

2    and Le Conte.  And I start thinking about what I need

3    to do next.

4         Q.   Okay.  And what did you determine you needed

5    to do next, if anything?

6         A.   I remember whoever is in charge, I don't

7    remember if it was Lieutenant Lozada exactly or the

8    sergeants, but someone basically saying, you guys go

9    out there.  Like, dismissing the lineup and telling us

10   to go help out for this incident.

11        Q.   Okay.  And on the date of this incident when

12   you are in lineup, were all the sergeants present?

13        A.   I don't remember.

14        Q.   Okay.  Do you remember if Sergeant Raymond

15   Cruz was present?

16        A.   I don't remember.

17        Q.   Do you remember if Sergeant Michelle Primiano

18   was present?

19        A.   I don't remember.

20        Q.   Do you remember if any of the sergeants were

21   present?

22        A.   At that particular time during lineup, I don't

23   remember.

24        Q.   Is it typical for them to be present during

25   lineup?

54

1    out that it's a stabbing suspect in the area of Third

2    and Le Conte.  And I start thinking about what I need

3    to do next.

4         Q.   Okay.  And what did you determine you needed

5    to do next, if anything?

6         A.   I remember whoever is in charge, I don't

7    remember if it was Lieutenant Lozada exactly or the

8    sergeants, but someone basically saying, you guys go

9    out there.  Like, dismissing the lineup and telling us

10   to go help out for this incident.

11        Q.   Okay.  And on the date of this incident when

12   you are in lineup, were all the sergeants present?

13        A.   I don't remember.

14        Q.   Okay.  Do you remember if Sergeant Raymond

15   Cruz was present?

16        A.   I don't remember.

17        Q.   Do you remember if Sergeant Michelle Primiano

18   was present?

19        A.   I don't remember.

20        Q.   Do you remember if any of the sergeants were

21   present?

22        A.   At that particular time during lineup, I don't

23   remember.

24        Q.   Is it typical for them to be present during

25   lineup?

54

1           MR. POINTER:  Q.  All right, officer.

2     Continuing on with your deposition, all the same rules

3     apply.  Do you understand that?

4           A.   Yes.

5           Q.   Okay.  So do you recall what your call sign

6     was the date of the incident?

7           A.   Yes.

8           Q.   What was it?

9           A.   3 Charlie, 1-4 David.

10          Q.   And that's a call sign that's assigned to both

11    you and your partner, correct?

12          A.   Yes.

13          Q.   Okay.  And do you recall what car you were

14    driving that day?

15          A.   I believe it was 137.

16          Q.   Okay.  And who, if anybody, was your patrol

17    sergeant?

18          A.   That day?

19          Q.   Yes, officer.

20          A.   I don't recall.

21          Q.   I'm going to show you a document that we'll

22    have marked as the first exhibit to your deposition.

23    Let's see if that might refresh your recollection.

24               (Exhibit 1 was marked for

25               identification.)

                                                        58

DEPOSITION OF OFFICER SHAUN NAVARRO

```
 1        perimeter was broken down or goes away because these
 2        people were not the suspects; is that right?  Or let me
 3        withdraw that.
 4                  Ultimately, the perimeter goes away or is not
 5        maintained, right?
 6             A.   Correct.
 7             Q.   What was the basis for that, that you are
 8        aware of?
 9             A.   My understanding was that there was a -- there
10        was a break in the perimeter where the suspect could
11        have escaped and the perimeter was compromised.  So the
12        officer who created the perimeter decided that -- to
13        call off the perimeter.
14             Q.   Okay.  Can you give me your best estimate as
15        to how much time had passed between hearing the initial
16        call, the Code 33, and then the break in the perimeter
17        taking place?  Not the break in the perimeter taking
18        place, but -- strike that.  Withdraw.
19                  Can you give me your best estimate as to how
20        much time passed between when you first heard the Code
21        33 and when you then heard the transmission, or it was
22        communicated to you, to disband or no longer maintain
23        the perimeter?
24             A.   Okay.  It's not a good estimate, but I believe
25        it's no more than 30 minutes.
```

66

DEPOSITION OF OFFICER SHAUN NAVARRO

1     MR. CONNOLLY:  Objection.  Irrelevant.

2     THE WITNESS:  I don't 100 percent know --

3     MR. POINTER:  Okay.

4     THE WITNESS:  -- until I -- until an

5  investigation is complete.

6     MR. POINTER:  Q.  Right.  And the

7  investigation -- while you were searching for this

8  person, the investigation was not complete, correct?

9     A.   No.

10    Q.   Okay.  At some point in time, you said that

11 the perimeter was compromised and you -- and you

12 essentially was no longer maintained, correct?

13    A.   Correct.

14    Q.   Okay.  You then receive additional information

15 that one of your fellow officers has located somebody

16 who meets the description -- or matches the description

17 of the reported stabbing suspect, correct?

18    A.   I wouldn't put it like that.

19    Q.   Okay.

20    A.   I heard on the radio that the stabbing suspect

21 was located.

22    Q.   Okay.  So in your mind state, and in your

23 mind, you are thinking the person who was described as

24 committing the crime has been found, right?

25    A.   In my mind, the suspect has been located.

77

1     Q.   Okay.  So the suspect is located.  And when we

2     say "suspect", that means that they haven't been

3     convicted of anything, correct?

4          MR. CONNOLLY:  Objection.  Irrelevant.  Calls

5     for legal conclusion.

6          THE WITNESS:  Yeah, my understanding is

7     suspect and a conviction is different.

8          MR. POINTER:  Q.  Right.  I mean, these are

9     terms you use every day, right?  This isn't, like, new

10    terms for you, are they?

11    A.   Correct.  I've heard these terms before.

12    Q.   Right.  So the suspect has been located.  I

13    understand that you and your partner -- you are riding,

14    your partner is driving on Third Street when you

15    receive this information, right?

16    A.   Yes.  I'm the passenger and my partner is

17    driving on Third Street.

18    Q.   Okay.  Prior to leaving the Bayview Station,

19    it's my understanding that either you or your partner

20    grab the ERIW; is that right?

21    A.   Yes.  We brought the ERIW with us prior to

22    leaving the station.

23    Q.   Okay.  Is that what you do every time you're

24    on patrol, or did you take it specifically because of

25    the information you received about this stabbing that

78

1    you are searching for the suspect?

2        A.   We do it pretty much every time we go on

3    patrol.

4        Q.   Okay.  When you grabbed it on the day

5    concerning Mario Wood's death, did you grab it with the

6    understanding that you thought you would need to use it

7    because of what information you had received?

8        A.   Not necessarily, no.

9        Q.   Okay.  So it's just essentially, if I

10   understand you correctly, you taking the ERIW out with

11   you guys when you guys go out on patrol is a pretty

12   normal thing, right?

13       A.   True, yes.

14       Q.   Okay.  You hear this information during lineup

15   about this reported stabbing, and you and your partner

16   are going to go out and search for the stabbing

17   suspect, either you or your partner grab the ERIW and

18   go search for him, right?

19       A.   Yes.

20       Q.   Okay.  You are driving down Third Street.  You

21   hear that an officer has located the stabbing suspect,

22   right?

23       A.   Okay.  I'm sorry.  I'm a little confused.

24   We're jumping around.  So we were at the station.  We

25   passed the perimeter part and now we're at when the

79

DEPOSITION OF OFFICER SHAUN NAVARRO

1    shooting occurred?

2         Q.    Yes.

3         A.    Okay.  Can you say that question again?  I was

4    a little confused.

5         Q.    Sure.  No problem.  I was trying to bring you

6    back.

7         A.    Okay.

8         Q.    So in the story, I went backwards and I was

9    trying to get back to where we were at.  Okay.

10             Some point in time, you and your partner are

11   riding up Third Street, and you hear that the stabbing

12   suspect has been located, correct?

13        A.    Correct.

14        Q.    All right.  What happens next, if anything?

15        A.    What I remember was there was a marked

16   patrol -- at least one marked patrol vehicle in front

17   of us.  I remember the officer on the radio said,

18   you're passing us.  And that, in my mind, clicked to,

19   look to my right.  And I saw an officer, Officer

20   August, with his firearm pointed at a suspect, who was

21   holding a knife --

22        Q.    Okay.

23        A.    -- to my right side.

24        Q.    All right.  Now, let's pause there for a

25   second.  What I would like to have you do, I have some

                                                          80

```
 1          Q.    And Officer August was already out of his
 2    patrol car, correct?
 3          A.    Yes.
 4          Q.    And he had his firearm drawn, correct?
 5          A.    Yes.
 6          Q.    And he had it pointed at the suspect -- or
 7    Mr. Woods, right?
 8          A.    Yes.  In that area or in that direction.
 9          Q.    Okay.  And what, if anything, did you observe
10    Mr. Woods to be doing when you first saw him?
11          A.    I do remember him holding a knife.
12          Q.    Okay.  Do you remember what he was doing with
13    the knife?
14          A.    Just holding it down by his side.
15          Q.    Okay.  So you didn't see him lunging with the
16    knife at anybody, right?
17                MR. CONNOLLY:  Objection.  Vague as to time.
18                THE WITNESS:  At that time, no.
19                MR. POINTER:  Q.  At any time, did you see him
20    lunge towards anybody with the knife?
21          A.    No.
22          Q.    At any time that you were observing Mr. Woods
23    until the time he was shot and killed, did you see him
24    swing the knife at anybody?
25          A.    During the time with Mario Woods, I did see
```

84

1          THE WITNESS:  I don't remember hearing Mario

2     Woods say anything.

3               MR. POINTER:  Q.  Now, when you got out of the

4     car, you were armed with your ERIW, correct?

5          A.   Yes.

6          Q.   Okay.  Now, you had never used that before

7     during the course of being -- of discharging your

8     duties on the street as a police officer, right?  Let

9     me ask it a different way.

10              You trained on the ERIW, right?

11         A.   Yes.

12         Q.   Okay.  Prior to the incident concerning Mario

13    Woods, had you ever fired it at anybody?

14         A.   I'm trying to remember.  I don't think so, no.

15         Q.   Okay.  I'll make the representation, that is

16    what you told investigators during the course of your

17    interview of this incident.  Does that refresh your

18    recollection?

19         A.   It doesn't, no.

20         Q.   Okay.  Now, your partner actually uses the

21    ERIW during the course of being a member of the

22    tactical team, right?

23              MR. CONNOLLY:  Objection as phrased.  Calls

24    for speculation.  But if you can answer that...

25              THE WITNESS:  So I just want to clarify, my

96

1    partner was a member of the specialist team -- tactical

2    team, and I do recall him using it on duty on the

3    street.

4                MR. POINTER:  Q.  Okay.  So when you went to

5    the scene -- strike that.

6                When you got out of the car and you grabbed

7    the ERIW, you hadn't used it before, but you knew and

8    had seen your partner use it in a situation before,

9    correct?

10        A.   Yes.

11        Q.   Okay.  When you left and got out of the car,

12   you elected to grab the ERIW and you took with you four

13   rounds or four ammunitions for it, correct?

14        A.   Well, when I left the vehicle, I made the

15   decision to use the 40-millimeter and it had four

16   rounds with it.

17        Q.   Okay.

18        A.   Yes.

19        Q.   Was it attached to it?

20        A.   I believe it had a side saddle.

21        Q.   Okay.

22        A.   Or one round was in the chamber and the other

23   three on side saddle.

24        Q.   Okay.  Do you know how many rounds were in the

25   car, total?

                                                          97

1       A.    I did not take the original rounds out of the

2   car.

3       Q.    By the way, where did you leave the car?

4   Where was it parked?

5       A.    Right on Third Street between Gilman and

6   Fitzgerald, I believe.

7       Q.    Did Officer Seto bring the car to a stop on

8   the same side of Third Street as Mario Woods was

9   standing on?

10      A.    Yes.

11      Q.    Okay.  Did he pull it up next to any of the

12  bus stops?

13      A.    There was a bus stop in that area, yes.

14      Q.    Okay.  Was there any conversation between you

15  and Officer Seto about what you two planned to do prior

16  to you getting out of the car?

17      A.    Yes.

18      Q.    What was that conversation?

19      A.    What I recall, 'cause we had just broken the

20  perimeter, and we did have ERIW, knowing that we were

21  dealing with a suspect with a weapon.  When we got back

22  in the car, the ERIW was in the main part of the car

23  where it's not normally kept.  It's usually in the

24  trunk, but because the suspect still outstanding, you

25  know, we decided to keep it in the front, just in case

                                                    100

1    he did pop up we would have it readily available.

2              I remember what I heard, that they located the

3    suspect.  I also heard that they needed an ERIW.  So I

4    communicated to my partner that I'm going prepare the

5    ERIW for him as he was driving.  I put one round in the

6    chamber.  I turned on the EO tech, which is a sight

7    that's attached to the ERIW to help with more accurate

8    shots.  And I communicated to him that, you know, when

9    we get on scene that I would hand it to him, and I

10   would be his lethal cover officer.

11             However, plans changed the way it unfolded,

12   given the circumstances that happened.

13        Q.   Was there any conversation between you and

14   your partner as it relates to changing what your

15   initial plan was in terms of you having the ERIW and

16   deploying it and him being lethal cover?

17        A.   I remember as it was unfolding and I saw Woods

18   to my right with a knife, and making a decision that I

19   was just going to take it out.  That I communicated to

20   my partner that I'm going to take it.

21        Q.   Okay.  Did he have a response back?

22        A.   I don't remember.

23        Q.   Okay.  Now, when you and your partner get out

24   of the car, I take it, you approached the area where

25   Mr. Woods was at?

                                                        101

1        A.   I got out of the car.  I wouldn't use the word

2   "approach", but I put myself in a position -- in a

3   position where I felt it was safe enough from him being

4   armed with a knife.  And that's it.

5        Q.   And when you say "put yourself in a position,"

6   does that mean you remained 20 feet or more away from

7   him?

8        A.   Approximately.  Approximately.

9        Q.   You recall -- sorry.  I'm sorry?

10        A.   Just approximately 20 feet away.

11        Q.   Do you recall from your interview that's the

12   same thing you told San Francisco investigators?

13        A.   I don't recall exactly, no.

14        Q.   Okay.  So did you get any closer than 20 feet

15   to Mario Woods during this entire incident?

16        A.   I believe I did 'cause it was kind of an

17   evolving, moving, fluid situation and I might have

18   gotten closer than 20 feet, yes.

19        Q.   Do you have your best estimate as to how close

20   is the closest you got prior to him being shot and

21   killed?

22        A.   I think during that incident the closest I got

23   was probably approximately 15 -- no less than 10 feet.

24        Q.   Did you see any officer get closer than you?

25        A.   I don't know exact distances, but it seemed

102

```
 1      like we were all about the same distance around,

 2      approximately.

 3           Q.   Okay.  And so when you -- strike that.

 4                You get out of the car, walk in the direction

 5      of Mr. Woods, correct?

 6           A.   I couldn't say that I walked in the direction.

 7      I might have walked to the right of him, like, to the

 8      right of my car, but I wouldn't say it was towards

 9      Officer Woods -- officer --

10           Q.   Okay.

11           A.   I'm sorry.  I'm misspeaking -- suspect.

12           Q.   Okay.  So I'm just trying to understand, and

13      you can explain with whatever words you want to use.

14      When you got there, you pulled up, you grabbed the

15      ERIW, got out of your car, you'd seen Officer August

16      with Mr. Woods at gunpoint essentially, correct?

17           A.   Pointing the firearm at him, yes, in his

18      direction.

19           Q.   Okay.  They are on the sidewalk, correct?

20           A.   They are on the sidewalk, yes.

21           Q.   I take it, you went over in that direction,

22      right?

23           A.   I wouldn't use that exactly --

24           Q.   Okay.  So I'm -- let me just ask it this way

25      and you tell me what you did.  You get out of your car
```

103

1          A.   At that point in time, when I arrived, he was

2     walking southbound, which is towards Le Conte.

3          Q.   Okay.  When you got out of the car, your car

4     was towards Fitzgerald, essentially it was close to

5     Fitzgerald, right?

6          A.   It was closer to Gilman actually.

7          Q.   To Gilman.  Okay.  Okay.  Gotcha.  So as

8     Mr. Woods is walking towards Gilman, was he -- can you

9     describe how he was moving?  Was he running?  Was he

10     charging?  Jumping?  Skipping?  What was he doing?

11          A.   I would describe it as a walk.

12          Q.   Okay.

13          A.   Just regular walk.

14          Q.   Sure.  And Officer August still had him under

15     at gunpoint at this time, correct?

16          A.   Officer August, yes, pointed his firearm at

17     him.

18          Q.   And you also saw your partner pointing his

19     firearm at him, correct?

20          A.   Not at that time, no.

21          Q.   Okay.  What was your partner doing, if

22     anything, during this time?

23          A.   I don't know, exactly.  I'm assuming he was

24     positioning himself somewhere.

25          Q.   Okay.  So what took place next, if anything?

                                                              105

1      A.   I observed him with a knife in the hand, so I

2  said, "Drop the knife."  He didn't comply with my

3  commands, so I delivered a less lethal round to what we

4  call Zone 2, which is essentially below the waist.

5      Q.   Okay.  When you say "Zone 2" is anything

6  "below the waist," are you essentially saying, legs

7  down?

8      A.   Not necessarily.  So we have certain areas

9  that we're not allowed -- or prohibited areas --

10     Q.   Such as the groin area?

11     A.   Such as the groin area, correct.

12     Q.   And why are you trained to avoid that area?

13     A.   It's a vulnerable area.

14     Q.   It causes extreme injury, correct?

15     A.   I believe so, yes.

16     Q.   Potentially death, right?

17     A.   I don't know.

18     Q.   Okay.  What other areas are you trained to

19  avoid?

20          MR. HANNAWALT:  In Zone 2?

21          THE WITNESS:  Just prohibited areas?  Is that

22  what you mean?

23          MR. POINTER:  Q.  Yes.

24     A.   I mean, we have a policy on it.  I don't know

25  everything off the top of my head, but the neck, spine,

106

DEPOSITION OF OFFICER SHAUN NAVARRO

1     kidneys, groin -- what else...

2          Q.    How about the eyes?

3          A.    I'm not sure if eyes is specifically -- maybe

4     the head area.  I need to see that policy to be exact

5     on the areas.

6          Q.    Okay.

7          A.    Prohibited areas.

8          Q.    Okay.  So you fire a round at Mr. Woods,

9     right?

10         A.    Correct.

11         Q.    Okay.  What happens next?

12         A.    The reaction I got was, he began walking in

13    the other direction, which is northbound Third Street

14    towards Officer August.

15         Q.    Okay.  So he walked away from your general

16    direction and back in the other direction, right?

17         A.    Correct.

18         Q.    Okay.  The ERIW is essentially a pain

19    compliance weapon, correct?

20         A.    I don't know if it's called -- I don't know if

21    I would say a "pain compliance weapon".

22         Q.    Well, you know it causes pain if somebody is

23    hit with it, right?

24         A.    I believe so.

25         Q.    You've seen training videos on it?

                                                          107

1       A.   I have, yes.

2       Q.   You've seen it used in the field before too,

3    correct?

4       A.   Yes.

5       Q.   Okay.  All right.  You use it as part of the

6    weapons that you have and you use in order to get

7    somebody to comply, right, to listen -- to follow your

8    orders, correct?

9       A.   Yes.  One of the tools we use to get somebody

10   to comply.

11      Q.   So why did you fire it at Mario Woods?

12      A.   I fired at Mario Woods because he was armed

13   with a knife and I gave him commands to drop the knife

14   and he didn't comply.

15      Q.   And so by firing it at him and you're hoping

16   to hit him, you're hoping to gain his compliance with

17   your command to drop the knife, correct?

18      A.   Sorry.  I -- yeah -- my goal was to get

19   compliance for him to drop the knife, yes.

20      Q.   Okay.  Did he drop the knife?

21      A.   No.

22      Q.   Okay.  What happened next?

23      A.   Like I said earlier, he started -- at first

24   shot, he started walking towards Officer August,

25   northbound Third Street, turned around.

                                                         108

DEPOSITION OF OFFICER SHAUN NAVARRO

1    Q.   All right.  So he changed direction from

2  walking towards your general direction and walking in

3  the opposite direction, right?

4    A.   Yes, essentially.

5    Q.   Okay.  So he's going back to towards Officer

6  August, who has his gun out, right?

7    A.   Yes.

8    Q.   Okay.  And then what happened?

9    A.   I delivered three more rounds of the ERIW.

10  Between each round, I gave orders to drop the knife,

11  saw that there was no compliance in dropping the

12  knife --

13    Q.   I'm stopping you there.  So if I understand

14  you correctly, you fired three more rounds and between

15  each round, you gave him an order to drop the knife,

16  right?

17    A.   Yes.

18    Q.   Okay.  So that would be at least four times

19  where you, yourself, personally, told him to drop the

20  knife, right?

21    A.   Yes.

22    Q.   Okay.  Now, where did you target your shots,

23  which zone?

24    A.   All of them in Zone 2.

25    Q.   Okay.  So it hits, essentially, below the

109

1    waist or the legs?

2         A.   Correct.

3         Q.   Okay.  Did those shots make contact with

4    Mr. Woods?

5         A.   Yes.

6         Q.   Okay.  Each one of them?

7         A.   Yes.

8         Q.   Okay.  And you could tell that while you were

9    out there on the scene that day?

10        A.   Yes.

11        Q.   Okay.  What happened next, if anything?

12        A.   I'm -- I remember saying, I'm out of rounds.

13   And there was an officer that assisted me in trying to

14   get more rounds.

15        Q.   That was Officer Wilgus, correct?

16        A.   Yes.

17        Q.   Now, at the time you fired the -- essentially

18   rounds two, three, and four, you and other officers had

19   formed somewhat of a semicircle around Mr. Woods,

20   correct?

21        A.   Yes.

22        Q.   Okay.  Who was in the semicircle?

23        A.   At the time, I don't remember who it was,

24   exactly.

25        Q.   You have since learned who was in the

110

1      semicircle, right?

2         A.   Yes.

3         Q.   Okay.  Who?

4         A.   I learned that -- let's see, just in any

5      order?

6         Q.   Well, to the extent that you could tell us

7      from your right to the left, that would be great.

8         A.   I don't remember which order exactly.  I just

9      remember who -- or I learned who was in that semicircle

10     or in that area.

11         Q.   Okay.  Well, let's start with that.

12         A.   My partner, Officer Seto, Officer August,

13    officer Cuevas, Officer Barnes, Officer Santos, Officer

14    Trah, Officer Hernandez, Officer Ortiz, and there was,

15    I forget what the officer's name is.

16         Q.   Did you include Officer August?

17         A.   I don't know if I did, but he belongs in there

18    as well.

19         Q.   Okay.  And while you were -- while you and the

20    fellow officers have this semicircle and interacting

21    with Mr. Woods, you guys are all relatively about the

22    same distance away from him, correct?

23         A.   Yes, I would say so.

24         Q.   Okay.  And I take it -- you mentioned that you

25    at least yelled at him to drop the knife four times,

                        111

1       right?

2           A.   I remember giving commands before each

3       deployment of the ERIW, yes.

4           Q.   Which would have been four times?

5           A.   Yes.

6           Q.   Okay.  Four commands to drop the knife?

7           A.   I might have even said it was more than once

8       between, but yes, at least four times.

9           Q.   And other officers were also yelling out

10      orders at Mr. Woods too; is that right?

11          A.   Yes.

12          Q.   Okay.  Did you warn Mr. Woods that if he

13      didn't drop the knife, you would fire the ERIW at him?

14          A.   I don't remember.

15          Q.   Okay.  Did you hear anybody warn Mr. Woods

16      that if he didn't drop the knife, they would shoot him?

17          A.   I don't remember exactly.

18          Q.   Okay.  When you say "not exactly," do you

19      remember words, similar words or words to that effect,

20      or you just don't recall at all?

21          A.   I remember words and commands being given.  I

22      just don't remember what was said, exactly.

23          Q.   And you don't remember words like that saying,

24      essentially a warning, if you don't drop the knife,

25      we're going to shoot you?

                                                              112

1       A.   Not exactly.  It happened so fast, I don't

2   remember exactly what was said.

3       Q.   I understand.  But you have a memory of the

4   incident though, correct?

5       A.   I do, yes.

6       Q.   Okay.  You just don't remember that though,

7   correct?

8            MR. CONNOLLY:  Objection.  Misstates

9   testimony.

10           THE WITNESS:  I don't remember, exactly.  I

11  don't remember -- I remember people giving commands,

12  but I don't know what commands exactly were said.

13           MR. POINTER:  Q.  I understand.  And that's

14  the point, this is the fun part of hanging out with

15  lawyers.  Okay.

16           Given it's your deposition, I'm here to -- I'm

17  entitled to your best memory and your best

18  recollection.  If you don't remember something,

19  perfectly fine answer.  If you think you remember

20  something but you are not sure, that's also a fine

21  answer.  I'm asking you just what you remember, okay?

22           So if you tell me, like right here, "Well, I'm

23  not exactly sure," then I'm trying to figure out, is it

24  that you don't have a memory at all or if you have a

25  slight memory, and then I'll ask you about whatever

                                                        113

```
 1        that memory was?

 2            A.   Okay.

 3            Q.   So that way we don't keep dancing.  You just

 4        tell me, I don't remember or I don't know, didn't hear

 5        it; perfectly fine answers.

 6                 MR. CONNOLLY:  Is that a question?

 7                 MR. POINTER:  Yeah, absolutely.

 8                 MR. CONNOLLY:  Okay.  I think that doesn't

 9        sound like a question to me, but this is a

10        question/answer process, so...

11                 Asked and answered, if that's a question.

12                 THE WITNESS:  Sorry.  I don't remember the

13        question.

14                 MR. POINTER:  Sure.  I wouldn't either after

15        all that talking.

16                 MR. POINTER:  Q.  All I want to know is, when

17        you were out there and, as you testified, you gave

18        Mario Woods at least four orders to drop the knife and

19        your fellow officers who are standing to the right and

20        left of you -- did you hear anybody give him a warning

21        or the words to the effect that if he didn't drop the

22        knife, he would be shot?

23                 MR. CONNOLLY:  Objection.  Asked and answered.

24                 THE WITNESS:  I have a recollection of

25        officers giving commands.  I just don't remember what
```

114

1     was said, exactly.

2          MR. POINTER:  Q.  So you have a memory of

3     commands, but you can't tell us whether -- what was

4     exactly said, right?

5          A.   Yes.

6          Q.   Okay.  Now, while you are standing with your

7     fellow officers and giving commands and you fire the

8     ERIW a number of times, I believe even Officer Ortiz,

9     he tried to spray his, what I call pepper spray, but I

10    think it's called OC spray, all right, and the other

11    officers to the left and right of you who have lethal

12    covers, they have their guns out pointed at Mario

13    Woods, who -- whether you or any other officer -- was

14    the officer in charge or the commanding officer?

15         A.   Of the incident?

16         Q.   Yes.

17         MR. CONNOLLY:  Objection.  Assumes facts not

18    in evidence.  Lacks foundation.

19         THE WITNESS:  I wouldn't describe anybody as a

20    commanding officer of the incident.  It hadn't gotten

21    to that point yet.  It unfolded quickly.

22         MR. POINTER:  Q.  I understand.  But what I'm

23    trying to figure out is, you were responding to the

24    scene, you're there with your fellow officers, did you

25    recognize anybody as being even the lead officer?

                                                      115

1      MR. CONNOLLY:  Objection.  At this point, I'm

2    going to object because the form of the question lacks

3    foundation and assumes facts not in evidence.

4      MR. POINTER:  Okay.

5      THE WITNESS:  Yeah, I wouldn't describe

6    anybody at the incident at the time of the shooting as

7    being lead officer.

8      MR. POINTER:  Q.  So who was providing any

9    direction or instruction to you?

10    A.   To me?

11    Q.   Yes.

12    A.   Myself.  Just my training and experience and

13   picking a role.

14    Q.   Was there any coordination between yourself

15   and the other officers?  Meaning, did you have a

16   conversation or communicate in any way what the other

17   officers asked or what anybody's particular role was

18   going to be?

19      MR. CONNOLLY:  So objection.  Vague.  That

20   question has partially been asked and answered, so.

21   Maybe vague as to time.  He's already talked about his

22   discussions with Seto.

23      MR. POINTER:  Come on.  These talking

24   objections, I mean --

25      MR. CONNOLLY:  Ask better questions.

116

DEPOSITION OF OFFICER SHAUN NAVARRO

1         MR. POINTER:  No.  Great questions.  I just

2    want to get an answer out of the witness.  Oh my

3    goodness.  Trust me, the judge would love them.

4         MR. CONNOLLY:  I object to your

5    characterization too.

6         THE WITNESS:  I guess the best way to answer

7    this would be from our training and experience, we kind

8    of know what roles we are going to take, what we are

9    going to do, how we are going to kind of coordinate how

10   it generally occurs in certain situations, what we do.

11        MR. POINTER:  Q.  And a part of your training

12   is making sure that you effectively communicate with

13   your fellow officers, right?

14        A.   Yes.

15        Q.   And part of it is also effectively

16   communicating with the person you are trying to either

17   bring into custody or gain compliance from, correct?

18        A.   Yes.

19        Q.   Okay.  So my understanding is that, as we

20   talked about, you and the fellow officers are in a

21   semicircle -- use my term, "multiple officers" are

22   yelling or giving commands to Mr. Woods, correct?

23        A.   Yes.

24        Q.   Okay.  No one officer had been designated as

25   the person to be the point of contact for Mr. Woods,

117

1    correct?

2        A.   Not at that time, no.

3        Q.   Okay.  At any time?

4        A.   It unfolded so quickly, we never had a chance.

5        Q.   Okay.  So that's a different answer, but I

6    understand you.  What I want to know is, at any point

7    in time, was one particular officer designated to be

8    the point of contact between the officers and

9    Mr. Woods?

10       A.   Not during the incident, no.

11       Q.   Okay.  During the incident, was any officer

12   designated as being the person to coordinate the group

13   of officers' actions?

14       A.   No.

15       Q.   Was any officer, during the incident,

16   designated to be the person -- strike that.

17            So you and the officers are there in a

18   semicircle.  We described already you had fired the

19   ERIW.  Officer Ortiz had deployed his pepper spray or

20   OC spray.  At some point in time, Mr. Woods went to his

21   knees, right?

22       A.   Yes.

23       Q.   Okay.  And then he stood back up, right?

24       A.   Like -- kind of winced.  It wasn't -- I don't

25   know if he had -- his knee actually touched the ground,

                                                          118

1      but yes, he kind of went down and then he kind of got

2      back up.

3            Q.   He, at least, hunched over or bent over?

4            A.   Yeah, I would describe it like that.

5            Q.   That was after he had been shot with a less

6      lethal ammunition, right?

7            A.   Correct.

8            Q.   Okay.  Then what happened after he stood up?

9            A.   I don't remember if this happened before or

10     after, but there was one more ERIW deployment by

11     another officer, and that was Officer Trah.  I observed

12     that.  And then I remember he was walking, again,

13     northbound on Third Street.

14           Q.   So towards the Fitzgerald side of the block of

15     Third Street?

16           A.   Yes.

17           Q.   Okay.  That would have been away from where

18     you were standing, correct?

19           A.   At that point, I was pretty much centered on

20     him, so -- and I was trying to maintain my distance.

21           Q.   Okay.  So as he moved, you moved.  Is that

22     fair to say?

23           A.   Yes.

24           Q.   Okay.  And once you were out of -- strike

25     that.

                                                           119

1          What do you call the projectile or ammunition

2     or whatever that comes out of the ERIW?

3          A.    Foam baton.

4          Q.    Okay.  So after you are out of the foam

5     batons, you see the OC spray didn't work, didn't cause

6     him to drop the knife, what communications, if any, did

7     you have with your fellow officers as to what was the

8     plan at that point?

9          A.    I don't think we were given the opportunity.

10    We didn't have the chance yet to speak and communicate.

11         Q.    Okay.  What I'm -- I understand that that's

12    your position.  I'm just trying to find out what, if

13    any, communication was had between you and your fellow

14    officers to determine what you were going to do next,

15    given that you were out of ERIWs or the foam batons, an

16    officer had used pepper spray, and then Officer Trah

17    had also fired some type of less lethal ammunition at

18    Mr. Woods.  Was there -- I'm just trying to figure out

19    was there any communication, not whether there was

20    time.  Just, was there any communication?

21              MR. CONNOLLY:  Objection.  Vague as to the

22    word "communication" and what that means; visual,

23    verbal, otherwise.

24              THE WITNESS:  As far as verbal communication,

25    what I recall -- I think I mentioned earlier -- was

                                                      120

1    communicating to Officer Wilgus to get more rounds.

2              MR. POINTER:  Understood.

3              THE WITNESS:  Other than that, I don't recall

4    exactly -- I don't recall any other communication from

5    me to anybody else.

6              MR. POINTER:  Q.  Anybody else to you?

7         A.   I'm sorry.  Let me just try to clarify this.

8    So that verbal communication, I remember happening.

9    And I didn't communicate with anybody else about -- I

10   forget how you phrased it.  Sorry.

11        Q.   Sure.  All I'm trying to figure out is,

12   after -- I think we can agree there were five less

13   lethal rounds fired at Mr. Woods and OC spray.  Was

14   there any communication between the officers as to what

15   you guys were going to do next?

16             MR. CONNOLLY:  Objection.  Vague as to

17   communication; verbal, visual, otherwise.

18             MR. POINTER:  Q.  Any communication.

19        A.   I can't speak for all the other officers.  For

20   myself, I'll speak about verbal communication.  Aside

21   from Officer Wilgus, I was not able to make a game plan

22   or coordinate or have a conversation about what to do

23   next.

24        Q.   Now, I'm listening to your answer.  You said

25   you were not able to -- I understand that that's your

                                                    121

1      position.  I just want to know, was there?

2          A.   For me, aside from officer -- my verbal

3      communication with Officer Wilgus, there was no other

4      verbal communication.

5          Q.   Okay.  Did anybody direct -- what you

6      understood to be direct verbal communication at you,

7      other than Officer Wilgus to say that he was going to

8      get more of the foam batons?  Did anybody say what was

9      going be the plan?

10         A.   No.

11         Q.   Okay.  Was there any communications that you

12     are aware of, between yourself and any other officer

13     present in that semicircle, as to what the plan was

14     going to be to bring Mario Woods into custody, at any

15     point in time?

16         A.   From what I recall, no verbal communication.

17             MR. CONNOLLY:  Okay.  So your answer is no.

18     I'm going to object.  Are you done with your answer?

19             THE WITNESS:  No.  But I would call our

20     training and us, kind of -- for lack of a better

21     phrase -- "vibing" off of each other and just dealing

22     with the scene, knowing how each other works, as you

23     know essentially some order of communication.  And

24     there was a plan in our training on how you deal with a

25     suspect with a knife.

                                                        122

DEPOSITION OF OFFICER SHAUN NAVARRO

1        MR. POINTER:  Q.  Okay.  So what was the plan

2    when you got out of your car and walked over in the

3    general direction of where Mr. Woods was at?

4        A.   The plan was to -- if he had a knife and he

5    was given orders and he didn't comply -- was to deploy

6    the ERIW and have Officer Seto as my lethal cover

7    officer.

8        Q.   And, in fact, you guys had been directed --

9    strike that.

10        In fact, before you even got to the scene, you

11    had heard an officer over the radio say, "Bring ERIW,"

12    right?

13        A.   I don't know if it was said like that exactly.

14    I think it might have been that, we don't have an ERIW.

15    So I took that as I need to bring the ERIW.

16        Q.   Okay.  So that's the semblance of a plan

17    coming together?  Officers are saying what they need on

18    the scene, you then bring what's needed to the scene,

19    right?

20        A.   Yes.

21        Q.   Okay.  Once you are at the scene, you

22    testified there was no conversation between yourself or

23    the other officers as to what the plan was going be in

24    terms of dealing with Mario Woods, right?  There was no

25    conversation about it, correct?

                                                           123

1        A.   Again, I can only speak for myself.  I didn't

2   have a verbal conversation with any of the officers

3   there as far as a plan at to what to do next.  I don't

4   know if the other officers, you know, had a

5   conversation between themselves.  I can't recall that.

6        Q.   Fair enough.  I don't want you to guess or

7   speculate about what somebody else did that you weren't

8   there to see or hear about or told about.  So keeping

9   that in mind, you did not hear any other officers

10   discuss a plan about how they were going to deal with

11   bringing Mario Woods into custody, right?

12           MR. CONNOLLY:  Objection.  Asked and answered.

13           THE WITNESS:  I did not hear any other

14   conversations as to what to do next.

15           MR. POINTER:  Q.  Okay.  And so when you got

16   out of the car and you have the four foam batons,

17   Officer Seto is going have lethal cover, and you

18   already see Officer August with his gun drawn and

19   pointed at Mario Woods, what was the plan, if any, if

20   the ERIW didn't work?

21        A.   My plan, as I understood to myself given our

22   training and experience, essentially the goal is always

23   to peacefully have, you know, a suspect taken into

24   custody and dropping the knife and gaining compliance.

25   And obviously, him not be a threat to anybody else.

                                                          124

1    That was the plan.  When the foam batons failed in

2    gaining compliance, you know, I did think it was going

3    turn into an OIS at that point 'cause it escalated to

4    that point.

5         Q.   Because he failed to drop the knife?

6         A.   That it could have happened, yes.

7         Q.   So if I understand you correctly, in terms of

8    what you were thinking, if he didn't drop the knife, it

9    was going to be an officer-involved shooting --

10        A.   I wouldn't say it like that, exactly.

11             MR. CONNOLLY:  Objection.  Misstates

12   testimony.

13             MR. POINTER:  Okay.

14             THE WITNESS:  That an OIS may happen because

15   he didn't drop the knife, yes.

16             MR. POINTER:  Q.  Okay.  So as you are part of

17   the semicircle, Officer Wilgus -- you communicate with

18   Officer Wilgus you are out of rounds, Officer Wilgus is

19   going to go get more rounds, you're still there.  Did

20   you transition to your gun?

21        A.   No.

22        Q.   Okay.  You are still there on the scene,

23   you're still holding the ERIW.  Mr. Woods starts

24   walking -- I would say northbound on...

25        A.    Third Street.

1      Q.   Towards Fitzgerald direction?

2      A.   Yes.

3      Q.   I believe you said you are maintaining

4   distance, and you are kind of mirroring him going down

5   the street.  Is that fair?  Is that fair to say?

6      A.   "Parallelling" him is probably a better word

7   for me.

8      Q.   That's fine.  So you are parallelling him,

9   maintaining a safe distance away from him, correct?

10     A.   Yes.

11     Q.   Okay.  And then what happens?

12     A.   And then I hear gunshots.

13     Q.   Okay.  Were you watching Mario when you heard

14  these gunshots?

15     A.   Yes, I saw the suspect when the shooting

16  occurred.

17     Q.   Okay.  So you are looking at Mr. Woods when he

18  gets shot, correct?

19     A.   Yes.

20     Q.   Okay.  You heard -- I believe you said you

21  told investigators you heard somewhere between 15 to 25

22  shots?

23     A.   I don't remember exactly the number I told

24  them.

25     Q.   What do you recall?

126

1          A.    I do recall about approximately 20 shots.

2          Q.    Okay.  Prior to those shots going off, did you

3     hear anybody warn Mr. Woods that he would be shot?

4              MR. CONNOLLY:  Objection.  Asked and answered.

5     We went through this in painstaking detail.

6              THE WITNESS:  No.

7              MR. POINTER:  Q.  Okay.  Prior to --

8     immediately before Mr. Woods was shot, did one or more

9     officers get closer to Mr. Woods?

10         A.    I would say the other way around.  I would say

11    that the suspect got closer to an officer.

12         Q.    When you say "the suspect", you are referring

13    to Mr. Woods, right?

14         A.    Yes.

15         Q.    Okay.  So you were saying that Mr. Woods

16    approached an officer?

17         A.    Was walking towards an officer, yes.

18         Q.    Mr. Woods started walking in the direction

19    down Third Street towards Fitzgerald prior to the

20    officer being in his path, right?

21         A.    No.

22         Q.    Okay.  That officer that we're talking about

23    is Officer August, correct?

24         A.    Yes.

25         Q.    Okay.  Just want to make sure we're --

                                                           127

1      A.   One of the officers because in the semicircle

2      in the way --

3      Q.   Okay.  The officer that you are talking about

4      in terms of Mr. Woods moving towards, is Officer

5      August, correct?

6      A.   Yes.

7      Q.   Okay.  So it's your testimony that Mr. Woods

8      moved towards Officer August, correct?

9      A.   Yes.

10     Q.   Okay.  When Mr. Woods started walking towards

11     the direction of Fitzgerald and Third Street, was

12     Officer August still part of the semicircle, correct?

13     A.   Yes.

14     Q.   Did he step away from the semicircle?

15     A.   Not that I recall.

16     Q.   Okay.  So did he maintain -- by "he", I mean

17     Mr. August -- was he still in the same position in the

18     semicircle when he ultimately shot Mr. Woods?

19     A.   Same position.  So again the semicircle kind

20     of moved, so I don't know exactly which position he was

21     in and I was focused on Mr. Woods.  So I didn't keep

22     track of exactly, you know, where he was.

23     Q.   So is it fair to say you don't know where

24     Officer August was at when he shot Mr. Woods?

25     A.   No, I don't think that's fair at all to say.

128

1    I knew where he was at.  I just don't know exactly

2    where he was at.  I don't know if that's fair to say.

3        Q.   Well, what I'm trying to figure out, simply

4    put, is -- we can play the video.

5        A.   Yeah.

6        Q.   When Mr. Woods -- there was a point in time

7    when the semicircle was formed, less lethal weapons

8    were fired.

9        A.   Yes.

10       Q.   Mr. Woods was hit, right?

11       A.   Yes.

12       Q.   He went to his knees at one point in time

13   during that, correct?

14       A.   Yes.

15       Q.   He then started walking towards in the

16   direction along the sidewalk on Third Street towards

17   Fitzgerald, correct?

18       A.   Yes.

19       Q.   Okay.  You mentioned how you were parallelling

20   Mr. Woods as he essentially was -- started walking away

21   from where he was at when he was shot, right?

22       A.   Yes.

23       Q.   Okay.

24       A.   Or when he was shot with the ERIW.

25       Q.   Yeah, with the ERIW.  How many steps did

129

1       Mr. Woods take, as your best estimate, before he was

2       shot with gunfire?

3           A.   My best estimate, approximately ten steps or

4       less.

5           Q.   Okay.  And those steps were essentially --

6       there was -- the backdrop of where he was walking were

7       some buildings, right?

8           A.   Yes.

9           Q.   Okay.  He's walking towards Fitzgerald in the

10      semicircle that Officer August is a part of that's

11      parallelling him, right?

12          A.   Yes, moving with him.

13          Q.   Okay.  Moving with him.  Did officer -- did

14      you see Officer August step away from the semicircle

15      towards Mr. Woods?

16          A.   Step away from the semicircle towards

17      Mr. Woods?  I did not see that.

18          Q.   Okay.  Did you see Officer August essentially

19      leave from the semicircle?

20          A.   No.

21          Q.   Okay.  Did you hear any orders or did you hear

22      anybody order one or more officers, including Officer

23      August, to leave the semicircle, to change position?

24          A.   Not that I recall, no.

25          Q.   Did you hear Officer August -- you're familiar

                                                            130

1    with his voice, correct?

2        A.   Yes.

3        Q.   Did you hear Officer August tell any officers,

4    hey, I'm leaving the semicircle.  I'm going to

5    reposition or do something?

6        A.   I did not hear that.

7        Q.   Prior to you hearing gunshots, can you

8    describe the manner in which Mr. Woods was moving?  Was

9    he running?  Was he charging at the officer?

10       A.   I wouldn't say he was running or charging.  He

11   was walking in what I would describe as a little bit

12   faster than a normal walk, maybe a brisk walk.

13       Q.   So he was walking briskly like a fast-paced

14   walk?

15       A.   Not like a super-fast pace walk, but not

16   running, not jogging, but not like a very slow walk to

17   me.  It was a little bit more faster than that.

18       Q.   Okay.  And I believe you said that you -- were

19   you scared while this was all taking place?

20       A.   There was a moment where I was scared, yes.

21       Q.   Okay.  Was it the scaredest you've been up to

22   that point as a police officer?

23            MR. CONNOLLY:  Objection.  Vague.

24            THE WITNESS:  I have to recall all the

25   incidents of when I was scared as a police officer.  I

131

```
1    STATE OF CALIFORNIA     )
                              ) ss.
2    COUNTY OF CONTRA COSTA  )

3

4         I, Angelica R. Gutierrez, a licensed Certified

5    Shorthand Reporter, duly qualified and certified as such

6    by the State of California;

7         That prior to being examined, the witness named in

8    the foregoing deposition was by me duly sworn to testify

9    to the truth, the whole truth, and nothing but the truth;

10        That the deposition was by me recorded

11   stenographically at the time and place first herein

12   mentioned, and the foregoing pages constitute a full,

13   true, complete and correct record of the testimony given

14   by the said witness;

15        That I am a disinterested person, not being in any

16   way interested in the outcome of said action, nor

17   connected with, nor related to any of the parties in said

18   action, or to their respective counsel, in any manner

19   whatsoever.

20

21                    DATED:  April 17, 2018

22

23        ___/s/Angelica R. Gutierrez_____

24           ANGELICA R. GUTIERREZ, CSR No.  13292

25
```

139