# Exhibit M

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

```
GWENDOLYN WOODS, individually)
and as Successor in Interest )
to Decedent MARIO WOODS,     )
                             )
            Plaintiff,       )
                             )
        vs.                  ) CASE NO.:  3:15-05666-WHO
                             )
CITY AND COUNTY OF           )
SAN FRANCISCO; a municipal   )
corporation, et al,          )
                             )
            Defendants.  )    CERTIFIED COPY
_____)
```

VIDEO DEPOSITION OF OFFICER JESSIE ORTIZ

TUESDAY, APRIL 18, 2018

REPORTED BY:  KELLY L. MCKISSACK, CSR #13430

1

```
 1                         I N D E X

 2

 3         EXAMINATION BY:                          PAGE

 4         MR. POINTER                                7

 5                         --o0o--

 6

 7         Appearance Page                            3

 8         Exhibit Page                               4

 9         Location                                   5

10         Reporter's Certificates                  100

11         Deponent Signature Page                  101

12         Deponent Signature Waiver                102

13         Witness Letter                           103

14         Changes and/or Corrections               104

15         Attorney's Notes                         105

16

17                         --o0o--

18

19

20

21

22

23

24

25

                                                      2
```

```
 1                              APPEARANCES

 2

 3        FOR THE PLAINTIFF:

 4             LAW OFFICES OF JOHN L. BURRIS
               Airport Corporate Centre
 5             7677 Oakport Street, Suite 1120
               Oakland, California  94621
 6             (510) 839-5200

 7             BY:  ADANTE POINTER,  ATTORNEY AT LAW

 8

 9        FOR THE DEFENDANTS:

10             OFFICE OF THE CITY ATTORNEY
               1390 Market Street, 6th Floor
11             San Francisco, California 94102
               415-554-3863

12             BY:  JAMES HANNAWALT, DEPUTY CITY ATTORNEY

13

14        ALSO PRESENT:  STEVEN CATHY, CLVS
                          Sacramento Legal video Center

15

16                              --o0o--

17

18

19

20

21

22

23

24

25

                                                             3
```

1                           INDEX OF EXHIBITS

2

3     PLAINTIFF'S             DESCRIPTION                    PAGE

4

5     1          Printout of Google Maps; 1 page            29

6     2          Diagram of 2900 Block of Keith Street;     84
                 1 page

7

8

9                              --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          Pursuant to Notice of Taking Deposition, and

2     on Wednesday, April 18, 2018, commencing at the hour of

3     10:05 a.m., thereof, at 7677 Oakport Street, Suite 1120,

4     Oakland, California, before me, KELLY MCKISSACK, CSR

5     No. 13430, a Certified Shorthand Reporter and Deposition

6     Officer of the State of California, there personally

7     appeared:

8

9               OFFICER JESSIE ORTIZ,

10

11    called as a witness by the Plaintiff, who having been

12    duly sworn by me, to tell the truth, the whole truth and

13    nothing but the truth, testified as hereinafter set

14    forth:

15

16               --o0o--

17

18

19

20

21

22

23

24

25

5

1  conversations you've had with your counsel.  So if I ask

2  any questions and you respond, I'm not asking about any

3  of those attorney-client privileged communications.  I'm

4  sure your counsel will object anyway if you should or if

5  I should ask a question that would cause you to have to

6  give me that type of confidential information.  Okay?

7      A.   Okay.

8      Q.   And then, finally, undoubtedly, in depositions

9  there are objections.  So I may ask a question, and your

10  counsel may object to the question for any number of

11  reasons.

12          There's no umpire here.  There's no judge here

13  to call the ball or the strike or to say who's right or

14  wrong.  So you're still to answer my question, unless

15  your counsel specifically tells you not to answer the

16  question.  Okay?

17      A.   Okay.

18      Q.   All right.  So, Officer Ortiz, how long have

19  you been a member of the San Francisco Police

20  Department?

21      A.   I've been a member since April of 2006.

22      Q.   Have you worked in law enforcement prior to

23  becoming a member of SFPD?

24      A.   I have not.

25      Q.   Okay.  Or had you, for example, served in the

11

1    military?

2         A.   I have not.

3         Q.   Okay.  So since April of 2006 have you been a

4    patrol officer?

5         A.   No.  I was in the academy.  I've been a patrol

6    officer since November of 2006.

7         Q.   Okay.  And you said you went to the academy.

8    You went to San Francisco Police Department's academy?

9         A.   Yes, sir.

10        Q.   Okay.  And it's a POST-certified academy,

11   correct?

12        A.   That is correct.

13        Q.   And you're a POST-certified police officer,

14   correct?

15        A.   Yes, sir.

16        Q.   So you're familiar with Police Officer

17   Standard of Training, i.e., POST?

18        A.   Yes, sir.

19        Q.   And you reviewed the learning domains while

20   you were in the academy?

21        A.   Yes, sir.

22        Q.   And you've also familiarized yourself with

23   San Francisco Police Department's policies and general

24   orders, correct?

25        A.   That is correct.

12

1      Q.   And that's something that you would keep in

2   mind while you're conducting your affairs as a police

3   officer, correct?

4      A.   That is correct.

5      Q.   So I'm going to direct your attention and your

6   memory to the date of the incident concerning Mario

7   Woods.  I'll represent to you that was December 2nd of

8   2015.  Do you -- do you agree?

9      A.   Yes.

10      Q.   Okay.  Now, my understanding is that you were

11   on patrol that day?

12      A.   I was.

13      Q.   Okay.  Do you remember what your assignment

14   was?

15      A.   Yes.

16      Q.   What was it?

17      A.   I worked out of Bayview, Hunters Point-Bayview

18   Station.  And I am assigned to a specialized unit of

19   housing.  And so I work out of Alice Griffith, also

20   referred as Two Rock.  And it's an area off of Gilman.

21   It's about three, four blocks.  And I'm responsible for

22   that area.  That's, like, kind of like my foot beat

23   area.

24      Q.   Okay.  And you were assigned to patrol that

25   area or that neighborhood of the city along with other

13

```
 1    police officers, true?
 2         A.   That is correct.
 3         Q.   And do you remember who your sergeant was that
 4    day?
 5         A.   Yes.  Sergeant Dean Hall.
 6         Q.   Okay.  Now, do you recall what time you
 7    started your shift that day?
 8         A.   It was an early start.  I think I started at
 9    either 06 or 07.  Because I remember I was -- I was
10    getting off.  I was supposed to get off early.  Or
11    not -- we were getting off early that day.
12         Q.   Okay.  And when you say you remember you were
13    getting off early that day, do you mean that was at or
14    about the time you had the incident or your encounter
15    with Mr. Woods?
16         A.   Correct.
17         Q.   Okay.  So it was towards the end of your
18    shift?
19         A.   Yes.  Normally our -- we start a shift at 11
20    to 10.  I'm a midday officer.  I'm sorry.  11:00 a.m.
21    till 2100 hours.  But I remember we were -- we started
22    early for whatever reason.  And we were supposed to get
23    off -- we were off probably within 10, few, 10 to 15
24    minutes before the call came out.
25         Q.   Okay.  Now, before we get into actually what
```

14

1    happened, I'm going to kind of step back a little bit.

2         On that particular day you were dressed in police

3    uniform?

4         A.   Yes, sir.

5         Q.   Much like what you have on today?

6         A.   Yes, sir.

7         Q.   What equipment did you have with you?

8         A.   My -- my gun belt, my radio, my -- my police

9    firearm.

10        Q.   What kind of gun were you carrying?

11        A.   SIG Sauer 226.

12        Q.   It's a .40 caliber?

13        A.   Yes, sir.

14        Q.   Okay.  And what other weapons did you have on

15   you?  For example, were you carrying a baton?

16        A.   I was.  I was carrying a baton that day.

17        Q.   What kind of baton were you carrying?

18        A.   I had the RCB baton, which is not this one.

19   This is the wooden baton.

20        Q.   Is that an extendable?

21        A.   Yes, sir.

22        Q.   Okay.  And do you know how many inches was the

23   one that you were carrying on that day?

24        A.   Should be 21 inches.

25        Q.   And you were -- you also had pepper spray or

                                                            15

1    what is also referred to as OC spray, correct?

2         A.   Yes.  That is correct, sir.

3         Q.   Any other weapons that you were carrying?

4         A.   No.  Oh, usually I have -- I don't remember

5    which knife I had that day.  Usually I have some kind of

6    a knife on me.

7         Q.   Okay.  And were you also wearing a bulletproof

8    vest of some sort?

9         A.   Yes, sir.

10        Q.   Okay.  And is that something that all officers

11   are required to wear?

12        A.   It depends.

13        Q.   All patrol officers?

14        A.   Patrol officers, yes.

15        Q.   Just let me make sure I have that clear.  It's

16   your understanding that all patrol officers are required

17   to wear bulletproof vests?

18        A.   That is correct.

19        Q.   And they're issued by the police department,

20   correct?

21        A.   That is correct.

22        Q.   At that point in time of the day of the

23   incident concerning Mario Woods, you weren't wearing

24   body cameras, right, or you were not wearing a body

25   camera?

16

1     A.   That is correct.

2     Q.   And that day were you assigned a partner?

3     A.   Yes, I was.

4     Q.   Who was your partner?

5     A.   Officer Eddy Martinez.

6     Q.   Were you guys riding together in a double car?

7     A.   Yes.

8     Q.   Okay.  And so going back to the incident

9  itself, tell me how you first learned that there was an

10  incident that you were going to respond to that

11  ultimately concerned Mario Woods?

12     A.   I remember there was -- I was at the station

13  with Officer Martinez and a call comes out.  That point

14  I didn't raise no suspicions for us to go because we

15  were about to get off.  And then I heard

16  Officer Margreiter say that the possible suspect was

17  still on scene.

18         At that point I was just about to go, hey, we

19  should go.  So we end up going.  We left from Bayview

20  Station.  And we went to the area where Margreiter had

21  broadcast the suspect's information.  And at that point

22  we were -- I remember going.  As we were going there,

23  they wanted to set up a perimeter.  I remember walking

24  around and searching the overpass to the freeway, to the

25  101 freeway.  And I don't remember how long we searched.

17

1    I just remember at some point the perimeter was broken

2    down.

3          Q.   Okay.

4              MR. HANNAWALT:  Officer, I just admonish you

5    that -- it's fine.  But try to focus on the question.

6    Because I think -- and we'll get into all this.  But

7    counsel had just sort of said what alerted you to this.

8    And I think when you talked about the radio call you'd

9    answered the question.

10   BY MR. POINTER:  Q.  Okay.  So let's break that down

11   just a little bit.  So you were at the Bayview Station

12   when you first heard the call about a reported stabbing;

13   is that right?

14         A.   That is correct.

15         Q.   Okay.  And what information did you learn

16   about the stabbing, or what were you aware of at that

17   time?

18         A.   I remember hearing the call of someone

19   entering the hospital and the Victor Unit, which is the

20   sheriff's unit, they had put out that there was a

21   stabbing victim.  And that a unit was going down to the

22   hospital.  I don't remember quite which unit was going

23   down there.

24              And then I remember at that point I was still

25   at the station.  And it wasn't until Officer Margreiter

18

1    went back on scene; he called for additional units is

2    when I went out there.

3           Q.   Okay.  I take it that in terms of a -- a

4    person -- strike that.

5           I take it that in terms of receiving the

6    transmission about someone going to the hospital and

7    having had some type of stabbing wound or stabbing

8    injury, that's not something that was uncommon or

9    unheard of for you as a police officer, correct?

10          MR. HANNAWALT:  Objection.  Vague.

11   BY MR. POINTER:  Q.  Correct?  You still have to answer.

12   You kind of just --

13          A.   Oh, yes.  Absolutely.  Correct.

14          Q.   Okay.  So you get the information.  Were

15   you -- did you know at that time that -- in terms of the

16   circumstances of how this person wind up being injured

17   or wounded?  For example, did you know if it was five

18   people who attacked the person?  Or do you know if it

19   was a dispute over narcotic sales or drug sales?  Did

20   you know any of the circumstances to how this person

21   became injured?

22          A.   At that time, no.

23          Q.   Okay.  At some later point in time have you

24   learned information that -- around the circumstances of

25   how this person claims they were injured?

                                                          19

1        A.    Can you clarify, like, what later time you

2    mean.

3        Q.    Sure.   No problem.

4             I'll ask you to just focus your attention and

5    your memory to the time that you first heard the call

6    about a person coming into the hospital and being

7    injured up and until the time you ultimately went to the

8    area of 3rd Street where between Keith, Fitzgerald and

9    Gilman, which is where you wind up contacting Mario

10   Woods, correct?

11       A.    Correct.   I did hear a little bit about the

12   situation on scene when we did the perimeter.

13       Q.    Okay.

14       A.    Because you start asking questions like what

15   are we looking for?   And what's the situation?   And I

16   remember talking -- I don't remember which officer, but

17   I remember at some point I found out the person was

18   stabbed.   They were stable.   And that we were looking

19   for someone who regarded to stab this person.

20       Q.    And you had some type of description of the

21   person?

22       A.    Yes.

23       Q.    Okay.   Excuse me.   Now, I understand you're

24   saying that you learned more about the situation or the

25   circumstances when you actually left the station and

                                                          20

DEPOSITION OF OFFICER JESSIE ORTIZ

1    went out to perform the search for this person, right?

2          A.    That is correct.

3          Q.    Okay.  And the search that you performed was

4    somewhere in the area of Le Conte and 3rd Street?

5          A.    Yes.

6          Q.    Okay.  And I take it you didn't find the

7    stabbing suspect, correct?

8          A.    Correct.

9          Q.    Okay.  At some point in time you left that

10   area when the perimeter was broken down, correct?

11         A.    Correct.  I was leaving the area.

12         Q.    Okay.  I take it were you on your way back to

13   the station?

14         A.    Actually, I was going back to the car because

15   sometimes when you set up perimeter, the way that street

16   is, is kind of like a one-way circle around.  I remember

17   it was a few cop cars there.  So I parked -- I can't

18   remember exactly where I parked.  But we had walked away

19   from our patrol vehicle because you want to cover more

20   ground.

21         Q.    Sure.

22         A.    So I remember walking back to my patrol car.

23         Q.    Okay.  And then, ultimately, you got into your

24   patrol car, right?

25         A.    That's correct.

21

1    Q.   Okay.  Now, once again, similar to what I

2    asked before.  Just focusing your attention on the time

3    when you first heard the call about the reported

4    stabbing until you got back into your car somewhere in

5    the area of Le Conte when you were breaking down the

6    perimeter.

7         Had you learned anything about the

8    circumstances of the stabbing other than what you've

9    already discussed?  So, for example, what the dispute

10   was over, whether or not it was just random,

11   indiscriminate, whether it was the two -- the people

12   involved knew each other.  Did you learn any information

13   like that?

14   A.   No, I did not.

15   Q.   Okay.  Did you learn whether or not there were

16   any witnesses to this reported stabbing?

17   A.   I did learn there was -- there was a witness.

18   Q.   Okay.  And when you learned that there was a

19   witness, did you learn or were you told any more

20   information about what this witness was saying?

21   A.   Just what Officer Margreiter had broadcasted

22   over the air.

23   Q.   Okay.  And what was that?

24   A.   The suspect description and that he was still

25   possibly in the area.

22

1    where you're provided all the information.  And other

2    times, unfortunately, you are not.

3         Q.   Understood.  And in terms of, you know, and

4    I'm just talking about your function as a police officer

5    in the course of the criminal justice system, use my

6    term, you're authorized to make detentions and arrests,

7    correct?

8         A.   That is correct.

9         Q.   All right.  But in terms of determining guilt,

10   a police officer doesn't determine guilt, correct?

11        A.   That's correct.

12        Q.   And I take it there's been times as a police

13   officer somebody reports a crime.  A suspect description

14   is given.  And you may come in contact with the person

15   who is the suspect.  But then after you investigate, you

16   find out that that person has not committed the reported

17   crime, correct?

18        A.   That is correct.

19        Q.   Now, my understanding is when you were

20   breaking down the perimeter somewhere around Le Conte,

21   you heard more information about the stabbing suspect

22   and that he had been located, correct?

23        A.   That is correct.

24        Q.   And I believe you received that information

25   over the radio; is that correct?

                                                          24

1     A.   That is correct.

2     Q.   All right.  Now, is it fair to say that up

3   until this point where you're -- where you heard the

4   stabbing suspect had been located, that you had been

5   receiving your information about this incident from the

6   radio?

7     A.   Yes.  Yes, to a degree.  I remember talking to

8   a few officers about the stabbing incident.  But, like I

9   said, they didn't know more about the case.

10    Q.   Understood.  So is it fair to say, then, the

11  information you had about the stabbing incident was from

12  police -- from fellow officers as well as from the

13  radio?

14    A.   This is correct.

15    Q.   Now, when you learned that your fellow

16  officers had located a person matching the description

17  of the stabbing suspect, what did you do?

18    A.   I remember going to my patrol car with

19  Officer Martinez.  I remember getting into my patrol

20  car, and it was -- it was a few blocks away.  Officer --

21  I remember on the radio Officer Hall gave us permission

22  to go lights and sirens.  And then we went to the

23  location.

24    Q.   Okay.  And you were driving?

25    A.   Yes, sir.

25

1        A.    That permission is the only thing right when

2     we got on scene -- before we got on scene.

3        Q.    I want to show you a Google map of the area of

4     3rd Street bordered by Fitzgerald, Keith and Gilman.

5     I'll have it marked Exhibit 1.

6              (Whereupon, Plaintiff's Exhibit 1 was marked

7              for identification.)

8              MR. HANNAWALT:  Is Keith on this map?

9              THE WITNESS:  It should be this right here.

10    Just the trees or the shadows are blocking it.

11    BY MR. POINTER:  Q.  I've asked you to take a look at

12    Exhibit 1.  Do you recognize that as being the block

13    where Mario Woods was shot and killed?

14       A.    Yes.

15       Q.    Okay.  I'm going to ask you, you mentioned

16    that when you came to the scene there were police cars

17    already there?

18       A.    Excuse me.  Yes.

19       Q.    Okay.  To the extent that you can remember,

20    can you mark for me on Exhibit 1 where those cars were

21    at?

22       A.    Sure.

23       Q.    I'll give you --

24              MR. HANNAWALT:  So that's a question, can you

25    first of all?

29

1        A.    Within the circled area.

2        Q.    Okay.  So you parked your police car in the

3    same area you circled on Exhibit 1 with black ink,

4    correct?

5        A.    That is correct.

6        Q.    All right.  And I take it once you parked,

7    yourself and Officer Martinez got out of the car?

8        A.    That is correct.

9        Q.    Okay.  Was there a particular reason -- or

10   strike that.

11             Why did you park your car at that particular

12   location?

13       A.    I remember we couldn't get through on

14   3rd Street.  I think there was one or two patrol cars

15   blocking the -- the -- the 3rd Street egress to go more

16   north.

17       Q.    Okay.  So would it be fair to say that there

18   were police cars blocking 3rd Street so you couldn't

19   drive further down 3rd Street on that side of the

20   street?

21       A.    Correct.  The cars couldn't get through.

22       Q.    Okay.  So essentially you went as far as you

23   could go on that side of 3rd Street?

24       A.    That is correct.

25       Q.    Okay.  And when you get out of your car what

31

1    did you do next?

2         A.   I remember telling Officer Martinez to grab

3    the ERIW, and I hit the trunk release, and locked up the

4    car.  And exit my vehicle I remember going towards

5    Mr. Woods and the group of officers.

6         Q.   Okay.  So by the time you got out of the car

7    you already saw officers essentially contacting

8    Mr. Woods?

9         A.   To a degree.  I could see from, like, a slight

10   distance.  From the corner of the eye you see a group of

11   people.

12        Q.   Okay.  Excuse me.  And when you get out of

13   your car, did you pull your weapon, your firearm?

14        A.   I did not.

15        Q.   At some point in time you did?

16        A.   No.

17        Q.   Okay.  Now, when you pulled up -- I'm going to

18   ask you some questions about the scene.  Okay.  As

19   opposed to what was going on with Mr. Woods.  So I ask

20   you to just kind of think about that for a moment.

21             When you brought your car to a stop and you

22   parked it, did you see any civilians between where you

23   parked your car and where you, as you said, looked out

24   in the distance and saw Mr. Woods and the officers?

25   Were there any civilians between yourself and -- and

                                                          32

DEPOSITION OF OFFICER JESSIE ORTIZ

1    where you saw the officers and Mr. Woods on 3rd Street?

2        A.    Yes.

3        Q.    Okay.  And without circling anything on the

4    map, just where were they that you -- as far as where

5    were those civilians that you saw?

6        A.    They were sporadically spread out.  I remember

7    people were still crossing the light even though there

8    was cop cars there.  There was people on the MUNI

9    platform.

10       Q.    When you say people were still crossing the

11   light even though there were cop cars, you mean they

12   were crossing at the intersection of 3rd Street and

13   Gilman?

14       A.    That is correct.

15       Q.    Okay.  So essentially crossing somewhere

16   around where the circle was at where the cop cars were

17   at?

18       A.    Close to us, sir.

19       Q.    Okay.  And you mentioned that there were

20   people on the MUNI platform?

21       A.    That is correct.

22       Q.    Okay.  And that's the elevated platform for

23   the, I think that's the T-Line?

24       A.    Yes, sir.

25       Q.    Okay.  Do you know how many people or can you

33

1   did you do next?

2        A.   I remember telling Officer Martinez to grab

3   the ERIW, and I hit the trunk release, and locked up the

4   car.  And exit my vehicle I remember going towards

5   Mr. Woods and the group of officers.

6        Q.   Okay.  So by the time you got out of the car

7   you already saw officers essentially contacting

8   Mr. Woods?

9        A.   To a degree.  I could see from, like, a slight

10   distance.  From the corner of the eye you see a group of

11   people.

12        Q.   Okay.  Excuse me.  And when you get out of

13   your car, did you pull your weapon, your firearm?

14        A.   I did not.

15        Q.   At some point in time you did?

16        A.   No.

17        Q.   Okay.  Now, when you pulled up -- I'm going to

18   ask you some questions about the scene.  Okay.  As

19   opposed to what was going on with Mr. Woods.  So I ask

20   you to just kind of think about that for a moment.

21            When you brought your car to a stop and you

22   parked it, did you see any civilians between where you

23   parked your car and where you, as you said, looked out

24   in the distance and saw Mr. Woods and the officers?

25   Were there any civilians between yourself and -- and

                                                              32

1    where you saw the officers and Mr. Woods on 3rd Street?

2        A.   Yes.

3        Q.   Okay.  And without circling anything on the

4    map, just where were they that you -- as far as where

5    were those civilians that you saw?

6        A.   They were sporadically spread out.  I remember

7    people were still crossing the light even though there

8    was cop cars there.  There was people on the MUNI

9    platform.

10       Q.   When you say people were still crossing the

11   light even though there were cop cars, you mean they

12   were crossing at the intersection of 3rd Street and

13   Gilman?

14       A.   That is correct.

15       Q.   Okay.  So essentially crossing somewhere

16   around where the circle was at where the cop cars were

17   at?

18       A.   Close to us, sir.

19       Q.   Okay.  And you mentioned that there were

20   people on the MUNI platform?

21       A.   That is correct.

22       Q.   Okay.  And that's the elevated platform for

23   the, I think that's the T-Line?

24       A.   Yes, sir.

25       Q.   Okay.  Do you know how many people or can you

33

DEPOSITION OF OFFICER JESSIE ORTIZ

1       Q.   Did you listen to that?

2       A.   Yes, sir.

3       Q.   So when you got to the scene you're -- as you

4   mentioned, you get out of the car.  And you go down

5   towards where you see the officers contacting Mr. Woods,

6   correct?

7       A.   That is correct.

8       Q.   Did you -- ultimately, you made it down to

9   where the officers were at?

10      A.   That is correct.

11      Q.   Okay.  Just asking you to focus your attention

12  on once you got out of your patrol car until you got

13  down to where the officers were at that were gathered

14  dealing with Mr. Woods.  Did you hear Mr. Woods say

15  anything?

16      A.   I did not.

17      Q.   Okay.  When you -- same point in time thinking

18  about from when you got out of your patrol car until you

19  got up to where the officers were at that were

20  contacting Mr. Woods.  Did you hear the officers say

21  anything?

22      A.   That, I did.

23      Q.   Okay.  And what did you hear?

24      A.   Drop the knife.

25      Q.   And did you yourself see Mr. Woods with a

36

1    knife?

2         A.   I did.

3         Q.   And when you saw him -- when you saw him with

4    the knife, what was he doing?  And I'm asking when you

5    first saw Mr. Woods with a knife, what was he doing?

6         A.   When I first saw him with a knife he had it in

7    his right hand and was standing.

8         Q.   So was he standing in one place?

9         A.   Yeah.  He was just standing kind of straight

10   up.

11        Q.   And when you say he had the knife in his right

12   hand, was it, for example, down to his side?  Was it

13   around his chest?  Was he waving it around?  What was he

14   doing with the knife?

15        A.   He had it, like, slightly in front of him, but

16   it was still close to his body.

17        Q.   And you were just, excuse me, making a gesture

18   with your own hands and arm.  Is that how he had it?

19        A.   Yes.  Say the black pen is a rough --

20        Q.   Yes.  I know it's not the actual thing.

21        A.   Correct.

22             MR. HANNAWALT:  It's awfully small, isn't it?

23             THE WITNESS:  Yes.  But he had --

24             MR. POINTER:  So was the knife.  Go ahead.

25             MR. HANNAWALT:  Actually, the knife was --

37

DEPOSITION OF OFFICER JESSIE ORTIZ

1    where -- all right.  There we go.  'Cause I don't know

2    how's he's going to hold it.  Yeah.

3        Q.   All right.  Officer, would you mind

4    demonstrating for us how Mr. Woods was holding the knife

5    when you first saw him.  Understanding that that's not a

6    knife.

7        A.   Correct.  It was just a really strong clench

8    of the -- the knife he had.  And it was just -- I

9    remember it was just -- it was -- come from here to

10   there.  And it was just a strong -- you can see from the

11   veins it was a strong clench.

12       Q.   Okay.  Thank you.  Was that fine, Counsel?

13            MR. HANNAWALT:  That's fine.

14   BY MR. POINTER:  Q.  So you saw Mr. Woods standing in

15   the manner that you just described.  Did you -- and

16   your -- this is while you're on your way over to where

17   Mr. Woods is at, correct?

18       A.   That is correct.

19       Q.   Okay.  And at that time you saw officers with

20   their guns drawn, correct?

21       A.   That is correct.

22       Q.   Okay.  Do you recall what officers were

23   essentially over there contacting Mr. Woods when you

24   were on your way over there?

25       A.   The only two officers I knew for sure at the

42

1      time was Officer Thompson and Officer August.

2          Q.    And you had heard them make, at least

3      Officer Thompson make some radio transmissions which

4      prompted you to go to that location, right?

5          A.    That is correct.

6          Q.    Okay.  Now, when you get over there to where

7      Mr. Woods is at and the officers are at, had they formed

8      this, use my term, a semicircle kind of around him?

9          A.    Yes.

10         Q.    Okay.  And Mr. Woods is on the sidewalk,

11     right?

12         A.    Yes.

13         Q.    Okay.  And he's essentially standing with his

14     back against, there are some buildings on that street?

15         A.    Yes.

16         Q.    Okay.  And the officers at that time are about

17     the curb and/or right off the curb in the street, right?

18         A.    Yes.

19         Q.    Okay.  And I understand right now you can't

20     identify or recall who all the officers that were there

21     that were dealing with him when you first made it to the

22     scene.  You've at least established that it was

23     Officer Thompson and Officer August, correct?

24         A.    That is correct.

25         Q.    Do you know if there were more officers, but

                                                                43

DEPOSITION OF OFFICER JESSIE ORTIZ

1      Q.   No problem.  Prior to you making it over to

2   the semicircle where you saw the officers gathered, had

3   you seen Mr. Woods struck with a less lethal object,

4   like the foam batons or anything like that?

5      A.   Yes.

6      Q.   Okay.  And I'm just trying to get from you --

7   it's kind of not the way we talk in general

8   conversation.  But it's a deposition so I'm going to

9   kind of take it step by step.

10          So, Officer, can you describe what you saw in

11   terms of what was going on with Mr. Woods as you're

12   making your way over to where the semicircle of officers

13   were at?

14      A.   I'm making my way over and I see officers

15   giving him -- I hear officers giving him command, verbal

16   command to drop the knife.  Right before I approach the

17   semicircle I remember Mario getting -- I don't know how

18   you would say proper term dact or hit with some kind of

19   non -- less than lethal object.  I don't know if it was

20   the -- at the time the beanbag or the rubber dowel or

21   the 40-millimeter rubber bullet.

22      Q.   Sure.  Okay.  But you saw him -- you saw him

23   hit.  It looked like it hit him?

24      A.   Yes.

25      Q.   Okay.  Can you describe what his reaction was,

45

1     physical reaction was to that?

2          A.   He kind of -- he kind of, like, kind of

3     crunched down a little bit.  And then he kind of popped

4     right back up.

5          Q.   When you say crunched down --

6          A.   Oh, sorry.

7          Q.   No problem.  When you say Mario crunched down,

8     do you mean, like, leaned forward?

9          A.   Slightly, yes.  It's kind of like use your

10    body as a little, you know, like, slightly fetal-ish

11    kind of, you know, you kind of just crunch a little bit.

12         Q.   It looked like he was responding to the impact

13    of whatever hit him?

14         A.   Correct.

15         Q.   Okay.  And then what happened next?

16         A.   At that point I came into the semicircle.

17         Q.   Okay.  So you joined the other officers.  And

18    now you're actually looking at or facing Mario as well,

19    correct?

20         A.   Correct.

21         Q.   Okay.  I take it officers are still yelling

22    commands at Mario?

23         A.   That is correct.

24         Q.   Similar commands to drop the knife?

25         A.   Yes, sir.

                                                            46

1   semicircle.  Mario had just -- on your way over to the

2   semicircle you saw him kind of respond to him being hit

3   with the less lethal gun.  And then you said he kind of

4   crouched over.  And then he pops back up?

5        A.   Correct.

6        Q.   Okay.  And about that time you join the

7   semicircle?

8        A.   Yes, sir.

9        Q.   Okay.  What happens next?

10       A.   He still had the knife in his hand.  So I

11   still hear officers giving verbal commands.  I decided

12   that maybe use another force option of the point OC

13   spray.  So I yelled out, I'm going to spray, to officers

14   around me to inform that I'm deploying OC.  And drop the

15   knife.  So I -- I sprayed Mario Woods.  I did a figure

16   eight spray with my left hand.  And I probably sprayed

17   in -- holding him between two to four seconds.

18       Q.   Okay.  Excuse me.  I'm going to ask you a

19   couple questions about that.  So you joined the

20   semicircle.  You decided that you were going to use

21   another force option, correct?

22       A.   Correct.

23       Q.   And you elected to use your OC spray or what

24   we call pepper spray, correct?

25       A.   Correct.

48

1        Q.   Okay.  That was located -- where was the

2   pepper spray located?  Was it on your duty belt?

3        A.   Yes, sir.

4        Q.   Okay.  So you reached down, grabbed your

5   pepper spray.  And you tell your fellow officers what

6   you're about to do, correct?

7        A.   Correct.

8        Q.   Is that the way you've been trained?

9        A.   Yes, sir.

10        Q.   You've been trained to notify or advise your

11   fellow officers what you're going to do in terms of

12   dealing with the suspect before you do it, right?

13             MR. HANNAWALT:  Objection.  Vague.  Incomplete

14   hypothetical.

15   BY MR. POINTER:  Q.  All right.  Let me back it up.  I'm

16   not an officer.  That's why I'm asking.  How -- how are

17   you trained or how were you trained in terms of dealing

18   with a situation where you're going to elect to use your

19   OC spray and there's other officers nearby?

20        A.   You just let them know that you're going to

21   use it.  You're going to use the OC spray.

22        Q.   Is there a particular reason or what's the

23   purpose behind letting your fellow officers know what

24   you're going to do?

25        A.   One, to know that you are applying another

                                                          49

1   force -- another force.  And, two, to let them know that

2   there's going to be pepper spray in the air.

3        Q.   And you let them know that you're going to use

4   another type of force or that you're going to use force,

5   it's also for officer safety reasons?

6        A.   Yes.

7        Q.   Okay.  Pepper spray is in the air --

8        A.   It gets everywhere.  So they -- it's giving

9   them a warning as well that it's going to be in the air

10  and the subject is going to have it on -- the subject's

11  going to have it on him.

12       Q.   Okay.

13            MR. HANNAWALT:  Just admonish the witness

14  again.  Wait until he finishes the question.

15            THE WITNESS:  Sorry.

16  BY MR. POINTER:  Q.  And pepper spray is an, to use my

17  term, irritant.  It irritates the person who it's

18  sprayed on, right?

19       A.   Yes.

20       Q.   I mean, and when I say that, let me be a

21  little bit more descriptive.  Or let me just ask you.

22  What is your understanding as to what the pepper spray

23  will do to a person?  Or what do you expect it to do to

24  a person?

25       A.   My experience is when -- usually when you

                                                           50

DEPOSITION OF OFFICER JESSIE ORTIZ

1    spray someone, they -- their eyes shuts up.  They have

2    difficult breathing and they comply with the police.

3        Q.   Okay.  So in terms of the physical reaction,

4    you've been trained and it's your expectation pepper

5    spray will cause a person to have difficulty seeing,

6    correct?

7        A.   Yes.

8        Q.   As well as difficulty breathing, right?

9        A.   Possibility of difficulty breathing, correct.

10       Q.   And then you mentioned that you use -- you use

11   a technique called circle eight?

12       A.   Figure eight.

13       Q.   I'm sorry.  Figure.  I'm thinking about

14   driving cars.

15       A.   No worries.

16       Q.   So use the figure eight technique.  What's --

17   what's the -- what was your intent behind the figure

18   eight?  Let me withdraw that question.

19            Why did you use the figure eight technique?

20       A.   That's how we were trained in the academy.

21       Q.   Okay.

22       A.   So we get -- we get sprayed, and then they

23   tell us you want to do a figure eight because you cover

24   an area instead of trying to aim, in case the subject

25   moves.  You give it a sweep.

                                                         51

DEPOSITION OF OFFICER JESSIE ORTIZ

1    Q.   Okay.  So it's not like you decided to use the

2    pepper spray, started moving towards Mario, and then

3    told everybody?

4    A.   Yes.  I was in the circle.  I pull -- I

5    explained, I said that I was going to do it, and then I

6    stepped slightly closer to Mario.

7    Q.   Okay.  Point being, you didn't start going --

8    you didn't start advancing or moving towards Mario prior

9    to you warning the other officers what you were going to

10   do, right?

11   A.   Correct.

12   Q.   So you gave your fellow officers advance

13   warning before you went to apply the force?

14   A.   Correct.

15   Q.   Okay.  Now, when you -- excuse me.  When you

16   walked towards Mario and went to apply the pepper spray,

17   you mentioned that you got within a few yards of him?

18   A.   Yes, sir.

19   Q.   Can you be any more descriptive, two yards,

20   three yards, ten yards, arms' length?  You can use

21   something if you -- a relative length if you'd like to

22   describe it.

23   A.   I would say within, like, one or -- maybe

24   about two yards.  So, like, 6 to 10 feet maybe.

25   Q.   Okay.  That's fine.  So you got -- when you

53

1  statements to the effect of, I'm not going, squeeze it,

2  things like that?

3      A.   I did not.

4      Q.   Now, prior to you pulling your OC spray off

5  your duty belt had you unholstered your firearm?

6      A.   I have not.  I did not.

7      Q.   So is it fair to say that the first weapon, I

8  know officers say deployed.  I'm just going to say is it

9  fair to say that the first weapon that you -- that you

10 used was your OC spray?

11     A.   Yes.

12     Q.   Okay.  Now, once you used the OC spray did you

13 step back into the semicircle of officers?

14     A.   Yes.  I slightly stepped back.

15     Q.   Okay.  And after you used the OC spray and you

16 mentioned you slightly stepped back, did Mario come

17 towards you?

18     A.   No.  He went away from me.

19     Q.   So you use the pepper spray.  Mario then

20 starts moving away from you in wherever you were at when

21 you sprayed the spray, correct?

22     A.   Correct.

23     Q.   And when you say he moved away, was that

24 moving on 3rd Street but towards Fitzgerald and away

25 from Gilman?

                                                        55

1        A.    Actually, it'd be Keith Street.

2        Q.    Okay.  Keith Street.

3              Keith Street just so we're clear here, Keith

4    Street is this street?

5        A.    Yes, sir.

6        Q.    Okay.  So Keith Street is actually the street

7    that runs along the block that Mario was standing on?

8        A.    Yes.

9        Q.    Okay.  Now, did you -- did you notice at the

10   time you applied the pepper spray whether or not there

11   was a MUNI bus, some people say articulated, most people

12   just say pulled up to the bus stop?

13       A.    Yes.  I remember there was a bus already

14   there.

15       Q.    Okay.  So the bus -- from your memory the bus

16   was already there when -- well, strike that.

17             Let me ask it another way.  When you parked

18   your car was the MUNI bus already there?

19       A.    Yes.

20       Q.    Okay.  So what -- can you describe what

21   happened next after you sprayed the pepper spray.  You

22   stepped back at least a little bit towards the

23   semicircle.  And Mario moves, I won't say opposite

24   direction, but he moves down the block away from you

25   towards Keith Street?

                                                          56

DEPOSITION OF OFFICER JESSIE ORTIZ

1       A.   I saw Officer August.

2       Q.   Okay.  And you're sitting there in the

3    semicircle when you sprayed the OC spray.  Had you seen

4    Officer August already in that same location where you

5    just described him being between essentially your

6    location and -- and Fitzgerald?

7       A.   I saw him at some point.  I think it was right

8    after the spray.

9       Q.   Okay.  So is it fair to say you don't know

10   whether or not he was a part of the semicircle or had

11   already been standing in that location?

12      A.   Well, I assumed he was part of the semicircle

13   considering that we were backing him up.

14      Q.   Okay.  When you arrived on scene --

15      A.   Bless you.

16      Q.   Bless you.  When you arrived on scene, got out

17   your car, what was your understanding as it relates to

18   who was the lead officer in dealing with Mario Woods?

19           MR. HANNAWALT:  Objection.  Lacks foundation.

20   Go ahead.

21           THE WITNESS:  I don't know.  Officer Thompson,

22   Officer August.  But I didn't know whether officers or a

23   sergeant may have got on scene first.  So yeah.  I don't

24   know besides Officer August and Thompson.

25

58

1    BY MR. POINTER:   Q.   It's fair to say no one had told

2    you or identified themselves as being the lead officer

3    in the situation, right?

4         A.   That is correct.

5         Q.   Okay.   Did you -- you mentioned a sergeant.   I

6    was actually about to ask that next.   Do you recall if

7    there were any sergeants on the scene when you first got

8    there?

9         A.   I didn't see no sergeants on the scene.

10        Q.   Okay.   Now, you mentioned in your -- the

11   interview you gave to the homicide investigators that

12   Mario -- let's see here.   Mario had fire in his eye?

13        A.   Yes, sir.

14        Q.   What did you mean by that?

15        A.   They were like bulging out, anger.   It's a

16   term I use for like if -- if someone's possibly on

17   narcotics or they -- when you go through confrontation

18   you see when someone gets angry, you see their eyes get

19   like really just -- they -- they bulge out.   They have

20   fire.   I guess it's -- it's -- it's just very intense.

21        Q.   So when you looked at him it looked like his

22   eyes were bulging?

23        A.   Yeah.   They were like almost like bulging out.

24        Q.   You mentioned that like similar to a person

25   who's intoxicated?

                                                        59

1      A.    Intoxicated, angry, that's my experience.

2  Usually when someone's in a verbal argument, a fight,

3  they -- they're just -- they're angry.  Their emotions

4  are going.  And so their eyes come out a little bit

5  more.

6      Q.    It didn't look like he was in his right mind

7  state?

8           MR. HANNAWALT:  Objection.  Vague.  Lacks

9  foundation.  Go ahead.

10          THE WITNESS:  Possibly.

11 BY MR. POINTER:  Q.  I mean, I guess another way to put

12 it, do you know what his right mind state is?

13     A.    That, I do not.

14     Q.    Right.  So you're just dealing with what's in

15 front of you right there, right?

16     A.    Yes.

17     Q.    Okay.  And when you saw him he looked like he

18 was angry and upset?

19     A.    Angry, confronted, agitated, did not want to

20 comply.  He just had to drop the knife.

21     Q.    Okay.  And so one of the things I'm trying to

22 understand from your perspective as you're making these

23 observations of Mario is, what -- what -- what -- what

24 did those observations mean to you?  So it sounds like

25 when you're looking at him you're thinking okay.  He's

60

DEPOSITION OF OFFICER JESSIE ORTIZ

1    agitated.  He's angry or he's upset?

2              MR. HANNAWALT:  Objection.  Misstates

3    testimony.  He never said he was upset.  He said

4    aggravated.  Or he said angry, confrontational,

5    noncompliant.

6    BY MR. POINTER:  Q.  Well, let's -- let's -- let's -- as

7    opposed to either one of us as the attorneys testifying

8    for you, why don't -- I'll just ask it this way.  When

9    you were observing Mario, did you form an opinion that

10   he may have been intoxicated?

11        A.   Intoxicated in which ways?

12        Q.   I mean, like, that he was under the influence

13   of something.

14        A.   Yes.

15        Q.   Did you form the opinion when you were looking

16   at Mario that after -- and this is -- let me withdraw

17   the question.

18              After he was hit with the -- with the less

19   lethal projectile, did he appear to have been in any

20   type of pain to you?

21        A.   Not that I could tell.

22        Q.   And so, taking us back to the story.  So he's

23   moving down the street towards the intersection of

24   Fitzgerald and Keith and 3rd.  What happened next?

25        A.   So after the pepper spray?

61

1          MR. HANNAWALT:  Objection.  Vague as to time.

2     Go ahead.

3          THE WITNESS:  When I saw him, slightly more

4     away than arms' length.

5     BY MR. POINTER:  Q.  Did you ever see Officer August

6     take a step towards Mario Woods?

7          A.   No.  I saw Mario Woods walk towards him

8     because I was -- I could see Officer August, but I see

9     more of Woods walking towards him.

10         Q.   And can you describe the way in which you saw

11    Mario Woods walking towards Officer August?

12         A.   Still very aggressive.  Like I said, you could

13    see the knife still in his hand.  People are still

14    telling him -- officers are still telling him to drop

15    the knife.  And then just very -- just, yeah.  You could

16    still see he's very agitated.

17         Q.   And as Mario Woods was, to use your words, was

18    walking towards Officer August, were you also kind of

19    parallelling or tracking him down the street?

20         A.   Yes.

21         Q.   Okay.  And in terms of your placement in this

22    semicircle, were you on the right side, the left side or

23    towards the middle?

24         MR. HANNAWALT:  Objection.  Vague.  In terms

25    of orientation, are you oriented from Mr. Woods'

                                                            63

1    perspective or from the officer's perspective?

2         MR. POINTER:  From the officer's perspective.

3         MR. HANNAWALT:  Thank you.

4         THE WITNESS:  Okay.  So the circle's round.

5    I'm on -- from my point of view I'm on the right side of

6    the circle.

7    BY MR. POINTER:  Q.  Okay.  So that would mean

8    Officer August would be to your left?

9         A.   That is correct.

10        Q.   Okay.  And so after Mario was pepper-sprayed

11   and he's moving towards Officer August in the direction

12   of Fitzgerald and Keith intersection, you're walking,

13   too, down in the same direction, correct?

14        A.   Correct.

15        Q.   And I take it you're watching Mario, right?

16        A.   Yes.

17        Q.   Okay.  And from your interview I believe you

18   said that Mario made like an NFL receiver and burst

19   towards Officer August?

20        A.   Not burst.  He was just fidgety like the NFL

21   receivers are.  You know when the NFL receiver comes off

22   the line they're very fidgety.  And that's how -- what I

23   told homicide on that.

24        Q.   Okay.  So when you say fidgety, you mean

25   like -- because in the NFL when they're doing that, it's

                                                              64

1    like they're trying to get around the defender?

2        A.   Yeah.

3            MR. HANNAWALT:   Objection.   Lacks foundation.

4    Calls for speculation.   Sometimes they're blocking.

5    BY MR. POINTER:   Q.   Did you think Mario was trying to

6    block Officer August?

7        A.   No.   No.   It's from -- from -- there was no

8    one around him when he did that.   He was just very, very

9    movement.   You know, he -- after I -- right as I

10   pepper-sprayed him or slightly before he was just -- he

11   wasn't standing still.   He was just very like side to

12   side kind of movement with his arms and shoulders and

13   with a knife right there.

14       Q.   Okay.   And when he was side to side moving

15   with his shoulders with the knife, did he appear to you

16   to strike out at anybody with the knife, lunge at

17   anybody with the knife, stab towards anybody with the

18   knife?

19       A.   No.   At that time, no.   But it was -- it was

20   scary because when someone's moving like that fast with

21   a knife, you don't know if you can get stabbed or not.

22       Q.   When you say he was moving fast, do you mean

23   like he was running?   Do you mean like he was power

24   walking or walking fast?   What --

25       A.   No, his movement.   We talked about like the

                                                            65

1    NFL movement.  That receiver, they do this quick move.

2    They're not even running yet.  He had that same movement

3    up on his upper body.  He wasn't running.  But he had

4    quick movements.  And that's dangerous when someone has

5    a knife because you don't know if they can stab you,

6    someone else or your partner.

7         Q.   Okay.  So his upper body was moving quickly?

8         A.   Yes.

9         Q.   Okay.  But he in terms of walking, running,

10   literally moving down the street, can you describe, was

11   that slow?  Was that fast?

12        A.   I guess to me it seemed fast, but it probably

13   was a normal step.  But at the moment that I saw it, it

14   seemed fast.

15        Q.   So to you it seemed like he was moving fast?

16        A.   Yes.

17        Q.   Now, in terms of using force, you've been

18   trained that you are to assess and then reassess,

19   correct?

20        A.   Correct.

21        Q.   And you're also to allow a person to comply

22   with your orders?

23        A.   Correct.

24        Q.   You've also been taught that the officer is

25   responsible for each use of force, correct?

66

1    BY MR. POINTER:   Q.   And I just paused it at 16:33:57.

2    The bus has now come towards the corner there at

3    Fitzgerald and Keith, correct?

4         A.   Correct.

5         Q.   Did you see any civilians other than Mario

6    Woods on the sidewalk of Keith Street where Mario was

7    at?

8         A.   I did not.

9         Q.   Okay.   I'm going to ask you looking at the

10   frontward-facing camera angle on the MUNI bus starting

11   from 16:33 and 42.   And I'm going to slow it down to

12   one-quarter speed.   If you look at the elevated T-rail

13   platform and tell me how many people you see on that

14   platform.   Okay?

15        A.   Okay.

16             (Video playing.)

17   BY MR. POINTER:   Q.   All right.   I stopped it at 16:33

18   and 54.   How many people did you count on the T-rail

19   platform?

20        A.   Three or possibility of three.

21        Q.   Now, I understand when you gave your statement

22   to the homicide investigators you told them that you

23   thought that Mario Woods was going to stab

24   Officer August; is that true?

25        A.   Yes.

87

DEPOSITION OF OFFICER JESSIE ORTIZ

1       Q.    Can you tell me what made you believe that?

2    What made you believe that?

3       A.    He was walking right towards Officer August.

4       Q.    Okay.  Did you see him stab at Officer August?

5       A.    From my angle I did not.

6       Q.    Did you see him lunge at Officer August?

7       A.    I cannot tell from my angle if I could see

8    that.

9       Q.    When you say you couldn't tell, are you saying

10   that you didn't see or you saw something but you're not

11   sure what it was?

12      A.    It's when he started walking away he turned

13   like slightly away.  So I couldn't -- I wouldn't be able

14   to tell what his frontal hand motion would be.  And so I

15   can't -- I can't -- I can't honestly answer that.

16      Q.    In terms of when you say you can't honestly

17   answer it, are you saying you couldn't see what he was

18   doing?  So you don't know what he was doing?

19      A.    Correct.  I just know he was -- I know that

20   you could still see the hand clenched.  The knife wasn't

21   on the floor because I could see that from the

22   progression the knife still in his hand and that he was

23   walking towards Officer August.

24      Q.    Okay.  But you didn't see him do anything with

25   the knife that led you to believe that, other than him

                                                          88

1     carrying it, that he was going to stab Officer August?

2          MR. HANNAWALT:  Objection.  Misstates

3     testimony.  He said he was walking towards him as well.

4     BY MR. POINTER:  Q.  So let's just start over.

5          A.   Okay.

6          Q.   I don't want to mischaracterize anybody's

7     testimony.

8          A.   I got you.

9          Q.   That's why we have the video and a person

10    typing a transcript.

11               What was he doing that led you to believe he

12    was going to stab Officer August other than, as you

13    mentioned, he was carrying the knife and it was clenched

14    in his hand and he was walking towards Officer August?

15          A.   What led me to believe it, if he got in range

16    with it I feared that he was going to stab

17    Officer August or he was going to stab Officer August

18    because of the way he was acting, the way he was

19    fidgeting, the way the knife was moving in motion with

20    him.  The way -- because he didn't drop the knife, I

21    believed that he was still a threat to Officer August

22    and to us.

23          Q.   Okay.  And I thank you.  So he was a threat.

24    I'm asking a little bit different question.  What led

25    you to believe he was going to specifically stab

                                                      89

1    Officer August?

2            MR. HANNAWALT:  Objection.  Asked and

3    answered.  Go ahead.  You can say the same thing again.

4            MR. POINTER:  This coaching that's ridiculous.

5            MR. HANNAWALT:  Well, you're --

6            MR. POINTER:  No.  It's ridiculous, man.  I

7    mean, if we played this for the court, the judge would

8    be mad at you.  You can't say -- you can have asked and

9    answered.  You can't say asked and answered and say the

10   same thing again.

11           MR. HANNAWALT:  Asked and answered.  Same

12   question.  Gets the same answer.

13           MR. POINTER:  And it's the same coaching.

14           THE WITNESS:  Again, he didn't comply.  He

15   wasn't dropping the knife.  And he -- he was still

16   agitated.  And he was walking towards Officer August

17   with the knife.  And I believe the fact that he was the

18   suspect who stabbed a guy, he's still volatile.

19   BY MR. POINTER:  Q.  Now, in terms -- so you said a

20   couple of things that I'm going to ask you about.  You

21   yourself never unholstered or took your gun out of its

22   holster, right?

23           A.  That is correct.

24           Q.  You yourself actually approached close -- the

25   closest to Mario Woods and didn't use your gun, right?

                                                        90

DEPOSITION OF OFFICER JESSIE ORTIZ

1   STATE OF CALIFORNIA            )

2                                 ) ss.

3   COUNTY OF ALAMEDA             )

4

5         I hereby certify that the witness, OFFICER
    JESSIE ORTIZ, in the foregoing deposition appeared
6   before me, Kelly McKissack, a Certified Shorthand
    Reporter and a disinterested person.

7
         Said witness was then and there at the time
8   and place previously stated by me placed under oath to
    tell the truth, the whole truth and nothing but the
9   truth in the testimony given on the date of the within
    deposition; that the deposition is a true record of the
10  witness' testimony as reported by me.

11        The testimony of the witness and all questions
    and remarks requested by Counsel was reported under my
12  direction and control, caused to be transcribed into
    typewritten form by means of Computer-Aided
13  Transcription.

14        I am a Certified Shorthand Reporter licensed
    by the State of California, and I further certify that I
15  am not interested in the outcome of the said action, nor
    connected with, nor related to any of the parties in
16  said action, nor to their respective counsel.  I am not
    of counsel or attorney for either or any of the parties
17  to the case named in the within caption.

18        IN WITNESS WHEREOF, I have hereunto affixed my
    signature this 2nd day of May, 2018.

19

20

21  __/s/Kelly McKissack_____

22  Kelly McKissack
    Certified Shorthand Reporter
23  California License No. 13430

24               --o0o--

25

                          100