# Exhibit N

DEPOSITION OF ANTONIO SANTOS

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

GWENDOLYN WOODS, individually)
and as Successor in Interest )
to Decedent MARIO WOODS,      )
                              )
            Plaintiff,        )
                              )
        vs.                   ) CASE NO.:  3:15-05666-WHO
                              )
CITY AND COUNTY OF            )
SAN FRANCISCO; a municipal    )
corporation, et al,           )
                              )
            Defendants.       )
_____)    CERTIFIED COPY

DEPOSITION OF ANTONIO SANTOS

THURSDAY, JULY 19, 2018

REPORTED BY:  SHELLI G. ENG, CSR #11397

1

1                            I N D E X

2

3        EXAMINATION BY:                               PAGE

4        MR. POINTER                                7, 224

5        MR. CONNOLLY                                  217

6
                                  --o0o--
7

8        Appearance Page                               3-4

9        Exhibit Page                                    5

10       Location                                        6

11       Reporter's Certificates                       226

12       Witness Letter                                227

13       Deponent Signature Page                       228

14       Deponent's Correction Sheet                   229

15       Disposition of Transcript Review              230

16       Attorney's Notes                              231

17

18                                --o0o--

19

20

21

22

23

24

25

                                                              2

DEPOSITION OF ANTONIO SANTOS

```
 1                       APPEARANCES

 2


 3


 4      For the Plaintiff:

 5              LAW OFFICES OF JOHN L. BURRIS
                   AIRPORT CORPORATE CENTRE
 6            BY:  ADANTE POINTER, ATTORNEY AT LAW
                 PATRICK BUELNA, ATTORNEY AT LAW
 7               7677 Oakport Street, Suite 1120
                    Oakland, California 94621
 8                   Phone: (510) 839-5299
                      Fax: (510) 839-3882
 9             adante.pointer@johnburrislaw.com
               patrick.buelna@johnburrislaw.com
10


11


12      For the Defendants:

13              CITY AND COUNTY OF SAN FRANCISCO
                    OFFICE OF THE CITY ATTORNEY
14          BY:  SEAN FIELD CONNOLLY, DEPUTY CITY ATTORNEY
                 KELLY COLLINS, DEPUTY CITY ATTORNEY
15            JAMES F. HANNAWALT, DEPUTY CITY ATTORNEY
                    1390 Market Street, Sixth Floor
16                  San Francisco, California 94102
                     Phone: (415) 554-3800
17                    Fax: (415) 554-3837
                   sean.connolly@sfgov.org
18                 kelly.collins@sfgov.org
                   james.hannawalt@sfgov.org
19


20


21


22


23


24


25
                                                          3
```

```
1                          APPEARANCES

2                          (Continued)

3

4

5      Also Present:

6                     CHARLES AUGUST
                      WINSON SETO
7                     NICHOLAS CUEVAS
                      SCOTT PHILLIPS
8                     MEGAN BETTLES

9

10

11

12                      ---oOo---

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1                    INDEX OF EXHIBITS

2

3      Exhibit                                        Page

4      1    Defendant Antonio Santos' Response to
            Plaintiff's Interrogatories, Set 2; 7 pages . .  16
5
       2    Defendant Antonio Santos' Response to
6           Plaintiff's Interrogatories, Set 1; 5 pages . .  16

7      3    General Order 5.01; 11 pages . . . . . . . . . 82

8      4    Department Bulletin; 1 page . . . . . . . . . 87

9      5    Department Bulletin; 1 page . . . . . . . . 114

10     6    Document titled "Field Contacts with
            Persons with Mental Illness"; 4 pages . . . . . 130
11
       7    Document titled "Persons with Mental Illness -
12          Filed Contacts; 4 pages . . . . . . . . . . . 133

13

14

15

16

17                        ---oOo---

18

19

20

21

22

23

24

25

                                                          5

1          IN THE UNITED STATES DISTRICT COURT

2       IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3    GWENDOLYN WOODS,
     individually and as
4    Successor in Interest to
     Decedent MARIO WOODS,
5
              Plaintiff,
6
          vs.                    Case No. 3:15-05666-WHO
7
     CITY AND COUNTY OF
8    SAN FRANCISCO; a municipal
     corporation, et al,
9
              Defendants.
10   _____/

11

12          BE IT REMEMBERED THAT, pursuant to Notice,

13   and on Thursday, July 19, 2018, commencing at the hour of

14   10:31 a.m. thereof, at THE LAW OFFICES OF JOHN L. BURRIS,

15   Airport Corporate Center, 7677 Oakport Street, Suite

16   1120, Oakland, California 94621, before me, SHELLI G.

17   ENG, C.S.R. No. 11397, a Certified Shorthand Reporter in

18   the State of California, there personally appeared

19                    ANTONIO SANTOS,

20   called as a witness by the Plaintiff; who, having been

21   duly affirmed by me, was thereupon examined and testified

22   as is hereinafter set forth.

23                      ---oOo---

24

25

6

```
1                         EXAMINATION
2     BY MR. POINTER:
3          Q.   Good morning.
4          A.   Good morning.
5          Q.   I introduced myself off the record.  My name
6     is Adante Pointer.  I am one of the attorneys.  I
7     represent the family or I should say the mother of
8     Mario Woods.
9               You're here today to give your deposition in
10    the case concerning the death of Mario Woods.  Do you
11    understand that?
12         A.   Yes.
13         Q.   Okay.  Good.
14              Could you please state and spell your full
15    name for the record.
16         A.   Antonio Santos.  A-n-t-o-n-i-o.  Last name is
17    Santos, S-a-n-t-o-s.
18         Q.   Do you have a middle name?
19         A.   Francisco.
20         Q.   Mister -- I should say Officer Santos, have
21    you ever given a deposition before?
22         A.   No.
23         Q.   I'm going to go over some guidelines or what
24    we call admonitions just to make sure we are on the same
25    page.
```

7

DEPOSITION OF ANTONIO SANTOS

1      to do that.  Do you understand that?

2          A.   Yes.

3          Q.   It is important that you do that today because

4      this may be the only time that I get to take -- or that

5      I get to take your deposition and/or talk to you before

6      trial.  Do you understand that?

7          A.   Yes.

8          Q.   Okay.  Now, you mentioned that you reviewed

9      three transcripts, three separate interviews that you've

10     given, and you also reviewed some policy; is that right?

11         A.   Yes.

12         Q.   What policy did you review?

13         A.   Firearms policy.

14         Q.   Did you review the deadly force policy?

15         A.   Yes.

16         Q.   Okay.  Did you also review any policies

17     pertaining to dealing with persons who are experiencing

18     mental health crises?

19         A.   I can't recall any policy that I have reviewed

20     recently on that one.

21         Q.   Okay.  Have you only worked as a member of law

22     enforcement or as a police officer for the San Francisco

23     Police Department?

24         A.   Yes.

25         Q.   Okay.  Has all of your training come through

12

1    the San Francisco Police Department?

2         A.   I have also sought other outside training, but

3    predominantly, yes, through San Francisco.

4         Q.   You went through your police academy through

5    the San Francisco Police Department?

6         A.   Yes.

7         Q.   And since you've been an officer, you received

8    additional training from the San Francisco Police

9    Department; is that correct?

10        A.   Correct.

11        Q.   You received use of force training from the

12   San Francisco Police Department; is that correct?

13        A.   That is correct.

14        Q.   And as I mentioned before, you received

15   training on how to deal with persons who are

16   experiencing mental health crisis as well, right?

17        A.   Yes.

18        Q.   You've also received training on how to deal

19   with persons who are having a mental health crisis who

20   are armed, correct?

21        A.   I cannot be 100 percent sure on that one.  I

22   can't think of a specific -- one specific training

23   course that deals specifically with someone who has a

24   mental crisis and armed.

25        Q.   Okay.  So you can't remember a specific

                                                              13

1    Q.   Same side of town; is that fair to say?

2    A.   Sure.

3    Q.   Okay.  So how did the call first come to your

4    attention?

5    A.   We heard of a call with a -- a call of a

6    stabbing where there was a -- I believe there was a

7    victim at the hospital.

8    Q.   And you also learned that the victim was not

9    being cooperative, right?

10   A.   I cannot recall that at all.

11   Q.   As you sit here today, have you learned that

12   the victim was termed being uncooperative?

13            MR. CONNOLLY:  Objection.  Vague.

14            THE WITNESS:  For him being uncooperative, I

15   cannot recall ever remembering that he was uncooperative

16   or that the victim at the hospital was uncooperative at

17   the time.

18   BY MR. POINTER:

19   Q.   Okay.  Now, you actually were going to -- you

20   actually headed downtown as opposed to going out and

21   looking for the stabbing suspect, right?

22   A.   That's correct.

23   Q.   And so you didn't have an intent to respond to

24   the call of this post stabbing, correct?

25   A.   Our plan was to go downtown.  We had a search

141

1    warrant also to prepare for, for the next morning, so we

2    were getting ready to finish our shift.

3         Q.   Okay.  And so at some point in time, you

4    decided to leave downtown and come back to the Bayview,

5    right?

6         A.   I believe we were starting to head back to our

7    station, which is in the Bayview district.

8         Q.   Okay.  And then you decided to actually go to

9    the scene were the stabbing suspect was located, right?

10        A.   We decided to go to the department building on

11   3rd Street and Le Conte Street because we heard that a

12   perimeter had formed.

13             Now, typically when perimeters are formed and

14   there's about to be a search.  It starts to lead to a

15   tactical operation, so we wanted to get a head start to

16   make sure that we would be there to assist.

17        Q.   Okay.  And so did you actually make it to

18   3rd and Le Conte?

19        A.   Yes.

20        Q.   And then what happened next?

21        A.   I heard that they searched the area and that

22   the suspect was not there.

23        Q.   What did you do next?

24        A.   Turned around and head back to the station.

25        Q.   Who was driving?

142

DEPOSITION OF ANTONIO SANTOS

1          A.   I was driving.

2          Q.   So something happened on your way back to the

3     station?

4          A.   Yes.

5          Q.   Okay.  What?

6          A.   We were turning onto 3rd Street and we heard

7     over the radio that they had located the suspect on -- I

8     believe it was 3rd and Fitzgerald, and that he had a

9     knife and was advancing towards an officer.

10          Q.   And what effect, if any, did that information

11     have upon you?

12          A.   Well, I responded code 3 to the scene.

13          Q.   Okay.  And code 3 means what?

14          A.   Lights and sirens.

15          Q.   So that became a priority to you?

16          A.   Yes.

17          Q.   Okay.  Because this person has a knife, right?

18          A.   It's a person, a suspect, who had already been

19     involved in a stabbing and is advancing on another

20     officer.

21          Q.   Okay.  As relates to the stabbing, you didn't

22     know if he actually stabbed anything, right?

23          A.   We were told over dispatch that he had stabbed

24     somebody.  He had already committed -- and that person

25     was at the hospital.  Stabbing victims do not go to the

143

DEPOSITION OF ANTONIO SANTOS

1    hospital who haven't been stabbed.

2         Q.   That's not what I'm asking.

3              I'm asking, did you know the circumstances of

4    the stabbing?

5         A.   No.

6         Q.   Did you know if it was in self-defense?

7         A.   Typically people who are defending themselves

8    don't go towards an officer with a knife.

9         Q.   That's not what I asked.

10             I asked you did you know the circumstances.

11   You said no, correct?

12        A.   Yes.

13        Q.   And that means you don't know whether it is

14   self-defense or if he did just stab somebody to want to

15   stab somebody, you didn't know, right?

16        A.   At the time, I did not the circumstances

17   around the stabbing.

18        Q.   Okay.  So you didn't know if he was innocent

19   of the stabbing or not, right?

20        A.   Typically, through my experience, people who

21   are innocent at stabbings don't go towards officers with

22   knives.

23             What I know is someone who has a knife -- we

24   were being told from another officer that he's advancing

25   toward another officer.

144

DEPOSITION OF ANTONIO SANTOS

1    Q.   So you believed what you heard come over

2   dispatch, that he was advancing on another officer,

3   right?

4    A.   That is what was put out over the radio.

5    Q.   And you believed it, right?  You took it as

6   true, correct?

7    A.   That's correct.

8    Q.   All right.  And that heightened your sense of

9   officer danger, correct?

10    A.   Heightened the urgency to get there.

11    Q.   Absolutely, because he was threatening one of

12   your fellow officers, right?

13    A.   That is correct.

14    Q.   So you need to get there, lights and sirens,

15   in order to deal with this person who you think stabbed

16   someone else and is also advancing on officers, right?

17    A.   Right.

18    Q.   And, in fact, over dispatch, the words that

19   were sent were he was charging at an officer, right?

20    A.   I cannot recall the exact verbiage of it, but

21   I know that advancing somewhere along the lines of he

22   was moving towards an officer.

23    Q.   He was being aggressive with his knife and

24   threatening an officer is what you had in mind, correct?

25         MR. CONNOLLY:  Objection.  Misstates the

145

```
 1      testimony.  Vague.

 2              Go ahead.

 3              THE WITNESS:  Can you say that phrase --

 4      BY MR. POINTER:

 5          Q.   Sure.

 6              Did you think this person was being aggressive

 7      in terms of advancing towards an officer with the knife?

 8              MR. CONNOLLY:  Objection.  Assumes facts not

 9      in evidence.  Misstates the testimony.

10              THE WITNESS:  I believe he had a knife and was

11      advancing towards an officer.

12      BY MR. POINTER:

13          Q.   Okay.  And you had concern for your fellow

14      officers, right?

15          A.   Of course, yes.

16          Q.   All right.  And so you actually drove down the

17      Muni tracks in order to get to the scene quickly, right?

18          A.   That's correct.  Our car tends to have a lot

19      of equipment.  It's an SUV.  It is a little bit slower,

20      plus I was a little unfamiliar with the Bayview, so I

21      let other units go since they're faster.  They could

22      take the street.  I was on the tracks.

23          Q.   Okay.  So you drove down the Muni tracks until

24      you got to 3rd and Fitzgerald, right?

25          A.   I believe I got to 3rd and Gilman.
```

                                                            146

```
 1        Q.   3rd and Gilman?
 2        A.   Or 3rd and Keith.  They're pretty much the
 3   same street right there.
 4        Q.   And brought the SUV to a stop, right?
 5        A.   Yes.
 6        Q.   Prior to you bringing the SUV to a stop, did
 7   you see the person who you later found out was
 8   Mario Woods?
 9        A.   I can't recall the exact moment when I saw
10   him, but I was -- I don't know if it was right when we
11   stopped the car or when we got out of the car and were
12   directed, but I saw him.
13        Q.   When you were approaching 3rd and Gilman,
14   slash, 3rd and Fitzgerald --
15        A.   Okay.
16        Q.   -- that area, did you see the officers out
17   there attempting to make contact with Mario Woods?
18        A.   I believe at that time when I parked, all the
19   officers were just arriving as well.  They drove too far
20   past, and we were all kind of moving towards him at the
21   same time.
22        Q.   Did you see any officer out there either on
23   the sidewalk or immediately off the sidewalk dealing
24   with Mario Woods when you first came to the scene?
25        A.   When I came to the scene, immediately I
```

147

1    remember seeing there were -- I saw Officer August was

2    there on the sidewalk.  And there was a few other people

3    that were moving away out of the area of Mr. Woods.

4         Q.   Did you see Officer Thompson when you first

5    came to the scene at or about the time you saw

6    Officer August?

7         A.   I can't recall if I saw Officer Thompson at

8    that exact moment.

9         Q.   Did you see any police officer closer to

10   Mario Woods and Officer August when you first saw

11   Officer August?

12        A.   I cannot recall.  Sorry.

13        Q.   Did you see Mario Woods charging at

14   Officer August when you arrived on the scene?

15        A.   When I saw him, he was not charging, no.  He

16   was at that time stopped on the sidewalk and

17   Officer August was giving him orders, I believe.

18        Q.   So Mario Woods was not advancing on any

19   officer when you first arrived at the scene, correct?

20        A.   That is correct.

21        Q.   So he was standing still, correct?

22        A.   He wasn't.  He was pacing.  I wouldn't say he

23   was advancing, but he was -- I would say jittery.  He

24   seemed frantic, agitated.  I remember -- I can't

25   remember what he was saying at the time, but I remember

                                                        148

1    seeing the knife in his hand.

2        Q.   You mentioned that he was saying something, so

3    you actually heard his voice?

4        A.   I can't recall what he was saying.

5        Q.   Although you can't recall what he was saying,

6    but do you recall hearing a sound that you thought was

7    his voice?

8        A.   I'm sorry.  I cannot answer that, I cannot

9    remember that or recall that right now.

10            MR. CONNOLLY:  Listen closely.  Listen very

11   closely to the question.  I think it is slightly

12   different than what you're answering.

13   BY MR. POINTER:

14       Q.   I'm just asking even if you cannot remember

15   what was said, did you hear a sound that you thought,

16   oh, that's Mario Woods' voice?

17       A.   Yes.  He was speaking.  I know he was

18   speaking.

19       Q.   Okay.  But you just couldn't make out what he

20   was saying?

21       A.   I probably could make out then.  I just can't

22   recall what he was saying.

23       Q.   Okay.  That's important, you know, because if

24   you do while you're here today remember what he was

25   saying, please let me know.  That's an important piece

149

1    of what we are trying to do here is find out the facts

2    of what took place, okay?

3         A.    Okay.

4         Q.    Thanks.

5               So you arrive on the scene.  Mario was pacing.

6    He looks agitated.  You saw the knife in his hand at

7    that time?

8         A.    Yes.

9         Q.    Okay.  And you saw Officer August giving him

10   some type of commands or orders; is that right?

11        A.    That's correct.

12        Q.    You don't recall seeing Officer Thompson or

13   where Officer Thompson was at?

14        A.    I can't recall where he was at.

15        Q.    Okay.  You then get out of your SUV, right?

16        A.    I believe I got out of my -- it was before

17   then, but I'm out of the SUV, sure.

18        Q.    Did you ever think to pull your SUV over to

19   the scene to where Mario Woods was at with

20   Officer August?

21        A.    My SUV was -- I mean, could you please

22   explain?  What do you mean, on the scene?  You mean

23   drive it onto Mario Woods or drive it right between

24   them?

25        Q.    Did you ever think about using your SUV as a

                                                           150

1    bunch of officers coming around, you want to lock it.

2    But to testify whether it was locked or not, I'm sorry.

3         Q.   You're trained on how to keep your cool in a

4    situation like this, right?

5         A.   Human nature, no matter what, adrenaline is

6    going to go up some.  Your focus is not going to be --

7              MR. CONNOLLY:  His --

8              MR. POINTER:  Hold on.  Let him finish,

9    please.

10             MR. CONNOLLY:  You want to know whether he

11   locked his car?

12             MR. POINTER:  Absolutely.

13             MR. CONNOLLY:  Do you remember whether you

14   locked your car or not?

15             THE WITNESS:  I cannot recall.

16             MR. CONNOLLY:  Okay.  Let's move on.  Next

17   question.

18   BY MR. POINTER:

19        Q.   So you're not sure if you did.

20        A.   I cannot recall if I did.

21        Q.   All right.  But you have these flash-bangs and

22   all these different weapons in there?

23        A.   I cannot recall if it was locked or not.

24        Q.   So you run over there.  What weapons did you

25   take with you over to the scene?

156

1    A.   Everything that was on my person that day.  I

2    had pepper spray.  I had baton.  I had -- what else did

3    I have on me?  My gun belt.  Firearm, pepper spray,

4    baton.  I believe that's what I had on me that day.

5        Q.   What other weapons did you have in your SUV?

6        A.   I have flash-bangs.  We have our rifles.  We

7    have our less lethal.

8        Q.   What is the less lethal?

9        A.   We have a 40 millimeter.

10       Q.   And you elected not to take that out of the

11   car?

12       A.   We did not take it out of the car.

13       Q.   Why was that?

14       A.   It was locked in the trunk.  And let me

15   elaborate on that a little more.

16            By the time we got out to observe what was

17   happening, we saw Mr. Woods there.  We wanted to, one,

18   make sure he was not a threat to another officer.  And

19   then from there, we were going to observe to have an

20   officer go and grab the less lethal, if necessary.  But

21   at that time, someone else was already deploying a

22   40 millimeter.

23       Q.   So you decided to not take the 40 millimeter

24   out of your car because the trunk was locked.  You saw

25   another officer with one, and you were concerned for the

157

1    other officer's safety who was dealing with Mario Woods?

2         A.    That is incorrect.  We did not take it.  One,

3    you want to get out and assess what is happening.  Then

4    it was also we wanted to -- in order to get out there,

5    it's going to take a few seconds to go grab that.  You

6    want to assess first before you go back to grab it, make

7    sure the officer is safe.

8              Officer Barnes, who was my partner, would have

9    been the next one to go and grab that.  And then also at

10   that point, another officer was already deploying

11   40 millimeter rounds on him.

12        Q.    Okay.  So when you got out of the car, you saw

13   Mario Woods was already being shot with the

14   40 millimeter round?

15        A.    No.  We got out of the car to assess what was

16   happening.  When I got out, it was pretty fluid, pretty

17   dynamic.  We were starting to establish our semicircle

18   around him.  And he was -- and at that -- moments later,

19   he was being -- people were deploying 40 millimeters

20   onto him.

21        Q.    Okay.  So the deployment of the 40 millimeter

22   was after you had left the car and ran over to where

23   Mario Woods was at, correct?

24        A.    The car was about five feet away from us.

25        Q.    So when you got out of your car and you

                                                        158

DEPOSITION OF ANTONIO SANTOS

1    approached where Mario Woods was at, did you hear any

2    orders being given?

3              A.   I cannot recall what orders were being given.

4              MR. CONNOLLY:   And so he asked a different set

5    of questions.

6              Can you restate the question, please.

7              (Whereupon the record was read as follows:

8              "Question:   So when you got out of your car

9              and you approached where Mario Woods was at,

10             did you hear any orders being given?")

11             THE WITNESS:   I know there were orders being

12   given.   I cannot recall what those orders were.   I

13   cannot recall who was giving those orders.

14   BY MR. POINTER:

15             Q.   Did you hear -- but you heard orders, right?

16             A.   Yes.

17             Q.   Now, at some point in time while you were

18   there, you also gave orders, too, right?

19             A.   Yes.

20             Q.   Excuse me.   Before you started giving orders,

21   did you hear more than one officer giving orders to

22   Mario Woods?

23             A.   Did I hear more than one officer giving orders

24   to Mario Woods?

25             Q.   Yes.

159

1          A.    I cannot recall how many officers were giving

2    orders.  I'm sorry.  I don't know if it was just

3    Officer August or Officer Cuevas or whoever was there

4    giving orders.  I know that orders were being given.

5          Q.    But you can't say whether it was one or more

6    officers giving them?

7          A.    Yes.

8          Q.    Okay.  Now, so you ran over and you formed a

9    half circle around Mario Woods, correct?

10         A.    That is correct.

11         Q.    Can you describe his height?

12         A.    I believe he was a little bit shorter than me,

13   so maybe about -- I think I said five foot eight.  I

14   think that was the description too, about five foot

15   eight.

16         Q.    Sure.

17               And you described him in your homicide

18   interview as being approximately 120 pounds.

19         A.    130, yeah.  Skinny.  I'm not too good at

20   estimating weight.

21         Q.    That's something that you're trained to do

22   during the academy, right?

23         A.    Yeah.  But, I mean, he's also wearing a puffy

24   jacket.

25         Q.    Okay.  With the puffy jacket, you had him

                                                          160

DEPOSITION OF ANTONIO SANTOS

1      approximately 120, 130 pounds?

2          A.   Yes.  Slimmer guy.

3          Q.   Small guy?

4          A.   Slim.

5          Q.   Not big, right?

6               MR. CONNOLLY:  Objection.  Argumentative.

7               THE WITNESS:  I mean, big?  I will say he's a

8      slender guy.

9      BY MR. POINTER:

10         Q.   Okay.  When you described him to the homicide

11     investigator, you said he was not big.  Do you remember

12     saying that?

13         A.   If you have that transcript, I may have said

14     that, but, I mean --

15         Q.   If you don't remember, it's okay.  So you

16     don't remember saying that?

17         A.   I know he was a slender guy.

18         Q.   But you don't remember telling the homicide

19     investigator that he's not big?

20         A.   Sorry.  I can't recall my exact verbiage.

21         Q.   That's fine.

22              Do you remember telling the homicide

23     investigator that he looked confused?

24         A.   Once again, exact verbiage, I can't --

25         Q.   Did he look confused to you as you approached

                                                        161

1    the scene?

2        A.    He seemed kind of had a -- I want to say

3    frantic demeanor to him.   I can't remember if I used the

4    term confused or how I worded it then.

5        Q.    That's fine.

6        Did he look disoriented to you?

7        MR. CONNOLLY:   Objection.  Vague.

8        THE WITNESS:   I mean, could you please explain

9    how you would describe someone disoriented?

10   BY MR. POINTER:

11       Q.    Have you never used that word before?

12       A.    I just also want your verbiage.  I think we've

13   used the same words with different meanings earlier

14   today.

15       Q.    Sure.

16       A.    I think we've established that.

17       Q.    So when I say "disoriented," what does that

18   word mean to you?

19       A.    It can mean multiple things.  Are you saying

20   that he's walking around wondering, hey, is that a bird

21   in the sky?  There's nothing there.  Is the sky red?

22   There could be different -- there are different --

23       Q.    I'm not going to force you to use the word.

24   Just so we are clear, it is not my definition that

25   really matters.  I'm just trying to figure out from you.

                                                        162

```
 1       some point?
 2                   MR. POINTER:  Yes.
 3                   MR. CONNOLLY:  Now?
 4                   MR. POINTER:  In a moment.  Let's just finish
 5       this point.
 6            Q.  So you mentioned that he looked frantic to
 7       you.  What was he doing that made you believe that he
 8       was frantic?
 9            A.  I'm trying to -- it was along with his kind of
10       his pacing.  He kind of had some jerky movements going
11       along with him.  I don't want to say jerky, but twitchy.
12       The way I remember -- sorry.  I'm trying to refresh my
13       memory on his actual movements.  It was kind of his
14       jerkier -- at the time, it seemed like quicker
15       movements, and just his demeanor in general.
16            Q.  So you mentioned that he had the knife in his
17       hand, correct?
18            A.  Yes.
19            Q.  Was he pointing a knife at anyone?
20            A.  I don't believe he was pointing the knife at
21       anyone.
22            Q.  Was he slashing the air with it?
23            A.  Not that I could recall.
24            Q.  Okay.  And so when you joined the half circle,
25       you also began issuing commands to him as well, correct?
```

1       A.    That is correct.

2       Q.    Told him to drop the knife, right?

3       A.    Yes.

4       Q.    Did you ever tell him "don't move" or words to

5    that effect?

6       A.    Not that I could recall.

7       Q.    Did you ever tell him to freeze or words to

8    that effect?

9       A.    I believe I told him to get on the ground.

10       Q.    Did you ever tell him to turn around put his

11    hands behind his back or behind his head?

12       A.    I believe I told him to drop the knife and get

13    on the ground.

14            MR. POINTER:  Why don't we take that break?

15            We can go off the record.

16            (Whereupon recess was taken from 2:14 to

17            2:58.)

18    BY MR. POINTER:

19       Q.   All right.  Officer, we are going to go back

20    on the record and start with the -- or continue with

21    your deposition after lunch.

22            Do you understand the same rules and

23    guidelines apply?

24       A.   I do.

25       Q.   Great.

165

1          So before we took our lunch break, I was

2     asking you questions about essentially what took place

3     while you were there on the scene contacting

4     Mario Woods.  Do you remember that?

5          A.   Yes.

6          Q.   Okay.  So you drive to the scene with

7     Officer Barnes as your passenger, right?

8          A.   Yes.

9          Q.   You park your car.  You park your SUV and you

10    leave the SUV, and essentially go over to where

11    Mario Woods is at, right?

12         A.   Parked our SUV, got out of the vehicle, went

13    over to Mr. Woods.

14         Q.   When did you -- strike that.

15              Did you unholster your gun prior to you

16    actually getting over to where Mario Woods was at?

17         A.   I can't recall the exact moment it went out,

18    I'm sorry.

19         Q.   Do you know if came out prior to you actually

20    getting or reaching the point where Mario Woods was

21    standing?

22         A.   I never quite got to the point where he was

23    standing.  I was always a few feet away, so between the

24    time where I got out of my vehicle and to where I was

25    standing, it came out at a point.

166

1          Q.    Okay.  But you don't remember exactly what

2     point?

3          A.    No.

4          Q.    All right.  I gotcha.

5                And Officer Barnes went with you to help you

6     form this half circle or semicircle around Mario Woods,

7     right?

8          A.    To create a perimeter around him.

9          Q.    All right.  And after you left to get out of

10    the car and came to a stop, were there other officers

11    over there besides yourself and Officer Barnes who were

12    helping form this half circle perimeter?

13         A.    Can you say that one more time?

14         Q.    I was trying to figure out whether other

15    officers were over in the same location when you ran

16    from your car, you stopped, and started to form --

17         A.    Officers were coming from different angles.

18    Some officers drove a little past the scene.  They went

19    up to the corner of 3rd and Fitzgerald when being that

20    everything was moving, it was down closer toward 3rd and

21    Gilman, so officers were coming from different

22    directions.

23         Q.    Prior to you getting out of the car until the

24    point you stopped and kind of started forming this

25    semicircle, did you have any communications with anybody

                                                        167

1    in terms of developing a plan?

2         A.   We are always kind of creating a plan, when

3    you're showing up on scene, even as an officer, you're

4    constantly planning in your own mind what is going on,

5    what are your options available to you.  Then when you

6    actually arrive on the scene, you need to observe what

7    is going on, assess the situation, develop a plan, act

8    on that plan.

9              So initially, you need to go -- we all have

10   our plan, our standards that we go through.  And from

11   there arrive, observe, orient, make a decision, and act

12   on that.

13        Q.   Okay.  So on your way in the car to the scene,

14   did you have communications with anyone about what the

15   plan was going to be?

16        A.   I believe Officer Thompson was calling things

17   out over the radio of what was happening or what they

18   needed.  I believe he was making a plan for less lethal,

19   calling for someone with less lethal to the scene.

20        Q.   Okay.

21        A.   So I believe that that is all incorporating

22   with planning.

23        Q.   Okay.  So the plan was to use less lethal, is

24   your understanding?

25        A.   That is a part of the plan.

                                                       168

1      Q.   Okay.

2      A.   It is not the plan.  And, of course, someone

3    with an edge weapon, someone who could easily stab you

4    in whatever state of mind, you do want to have less

5    lethal on the scene, so that is one primarily, less

6    lethal, get to the scene.  And the plan is also to

7    create containment to make sure he is no longer a risk

8    to the public.  There are other people, bus stops in the

9    area, so our plan is contain it, contain the scenario.

10     Q.   Did you have any conversation with your fellow

11   officers who responded to the scene as to what the plan

12   was going to be?

13     A.   At the accident scene, when you're code 3,

14   you're trying to find direction.  A lot of stuff is

15   happening where you are paying attention to traffic,

16   other officers going code 3.  So whether -- I can't

17   recall we were saying that, okay, here is our primary

18   plan that we are going to do, I can't recall if we did

19   do that.  I know ultimately we did have a plan to -- a

20   standard plan, we need to contain this situation.

21     Q.   What I hear you saying is that you don't have

22   any recollection of communicating with any of your

23   fellow officers as to what the plan was going to be?

24     A.   I believe that is pretty standard on what our

25   plan is going to be.  We need to contain the situation,

                                                      169

1     containment going.  Other officers were talking, saying

2     that they were going to use -- I believe Officer Ortiz

3     discussed how he was going to use his OC.  We had

4     Officer Traw talk about how she was going to deploy

5     ERIW.  There was Officer Navarro who was deploying the

6     ERIW.  So plans were happening.  People were talking.

7          Q.   And so that's what I am trying to figure out.

8     People were talking.  I'm asking you, what was your

9     participation, if any, in developing a plan in terms of

10    communication with other officers once you were on the

11    scene?

12         A.   Once I was on the scene?

13         Q.   Yes.

14         A.   I was focused on giving orders and making sure

15    that Mr. Woods knew that there were clear orders as what

16    we wanted.

17         Q.   I understand that's what you were focused on.

18    I'm trying to ask you what communications did you

19    personally have with your fellow officers as relates to

20    the plan once you were on the scene?

21         A.   I believe that that was said.

22              One, en route what our plan was, how we were

23    going to get there, and once we were on scene.  I was

24    not there giving orders, no, but what I was doing was --

25    let me correct that.  I wasn't giving orders to other

                                                            174

1    officers.   I was giving orders to Mr. Woods.

2         Q.   So you had no discussions with the fellow

3    officers once you got on the scene as to what the plan

4    was going to be, right?

5         A.   I believe everybody knew the plan was we need

6    to contain him.

7         Q.   So you don't recall having any conversations

8    with fellow officers saying you're going to be either

9    cover or the contact officer, right?

10        A.   Conversations as to whether they were having

11   cover or contact --

12        Q.   As to who it was going to be.

13             MR. CONNOLLY:   Let me just object as to vague

14   as to time.

15   BY MR. POINTER:

16        Q.   Once you got out of the car, from that moment

17   until Mario was shot and killed, did you have any

18   conversations with any officer as it relates to who was

19   going to be the cover versus the contact officer?

20        A.   No.  That scene was moving and changing so

21   rapidly that you don't have time to really sit there and

22   sit back and scream a plan.  I mean, this was happening

23   mere -- it was under a minute that everything unfolded.

24        Q.   Okay.  So the answer is no?

25        A.   I think I just kind of explained my answer.  I

                                                          175

1        Q.   You have a football team.  There's people with

2   different roles to play.  There is a head coach, right?

3   So my question is, who was in charge at the scene?  You

4   said you have a tactical -- you're part of the SWAT

5   team, you guys have leadership it was a part of the

6   principles.  Who was your leader there at the scene?

7        A.   We had different people.

8             MR. CONNOLLY:  Objection.  Vague.

9             THE WITNESS:  In that scene, we had different

10  people that were in different roles of leadership.  We

11  had Officer Derek August who was in that initial contact

12  with Mario.  You have Officer Thompson who was

13  coordinating people coming through.

14             I believe between that partnership, sure.  I

15  believe that they were -- whether they were in charge, I

16  don't know if I would quite use that term, but they were

17  the first there.

18  BY MR. POINTER:

19        Q.   What term would you use?

20             MR. CONNOLLY:  Objection.  Argumentative.

21  Vague.  What term would you use to use a term that he

22  can't define?  So, I mean, how is he going to answer

23  that question?

24             MR. POINTER:  Stop.

25             THE WITNESS:  I would say that they were the

                                                        179

1   primary officers on that situation.

2   BY MR. POINTER:

3       Q.   So you're following their lead?

4       A.   I think that they were there.  They

5   established initial everything, initial contact with

6   Mr. Woods.  I think that as things were unfolding, they

7   were the primaries there at that moment.  And if

8   Mr. Woods would have allotted us extra time to develop

9   it, I think other people could have -- would have been

10  taking leadership positions.

11      Q.   Okay.  So did you designate amongst yourselves

12  as to who was going to be the lead officer making

13  contact with Mr. Woods?

14      A.   Once again, when everyone is arriving, coming

15  code 3 to a scenario, officers are not afforded the

16  luxury to scream, "Hey, look, everyone.  I am the

17  leader.  You, over here, you are taking this corner."

18           This scene was unfolding quickly, so you

19  cannot yell at while people are trying to get

20  information out.  Officers trying to get information out

21  over dispatch.  People trying to deal with Mr. Woods.

22  People are trying to create a perimeter, plug holes and

23  eliminate avenues of escape.  And people are trying to

24  deploy less lethal tactics.

25           You don't sit there and scream, "I am the

180

1    leader.  Everybody, look at me.  I am supreme leader."

2          Q.   Clearly, because that didn't happen.

3               So I'm asking you, what, if anything -- if

4    there was no communication, just say "we didn't have a

5    verbal communication about this was going to be a

6    contact officer" or "this was going to be the lead

7    officer."  It is perfectly fine.  Just tell me if you

8    had any communication about that.

9               MR. CONNOLLY:  Objection.

10   BY MR. POINTER:

11         Q.   No, no.  Not whether there is time.  I didn't

12   ask that part.

13              I just asked was there any communication

14   amongst the officers as relates who was going to be the

15   lead officer?

16              MR. CONNOLLY:  Objection.  Vague.

17   Argumentative.  Asked and answered.

18              THE WITNESS:  I believe I told you.  On a

19   situation like this is unfolding rapidly while

20   Officer Thompson is trying to give out -- broadcast over

21   dispatch what is happening.  Officer August is trying to

22   talk to Mr. Woods.  You have other officers trying to

23   contain the situation.  Roles are not verbally screamed

24   on who is doing what.

25   BY MR. POINTER:

                                                        181

```
 1          THE WITNESS:  Multiple officers, especially
 2   myself, on the scene, were giving orders to Mr. Woods.
 3   BY MR. POINTER:
 4          Q.   Have you been trained that the best practice
 5   is to have a single officer make contact with a person,
 6   correct?
 7          A.   There is a training, a theory, of dealing with
 8   people.  Actually, no, not even necessarily.  With a
 9   suspect, you could have different officers talk to him.
10   It is really situational driven.
11          Q.   Have you received any training that's taught
12   you that you should have one officer be a single point
13   of contact with the suspect?
14          A.   Training with a suspect.  I mean, you could
15   have multiple officers giving orders.  It is not a hard
16   written rule.
17          Q.   So you have not received that training?
18          A.   I did not say I have not received that
19   training.  There are different trainings for different
20   circumstances.
21          Q.   Okay.  Have you received any training that
22   says that you should designate a single officer to
23   communicate with someone who is in a mental health
24   crisis?
25          A.   In the situation, I do not believe that he was
```

183

1    in a mental health crisis.  I believe this man was

2    intoxicated and had just stabbed somebody and was now

3    not complying with orders.

4         Q.   So I didn't ask you what you believed.  I

5    asked you about your training.

6              MR. CONNOLLY:  You did ask him.

7              MR. POINTER:  I asked him about his training.

8              MR. CONNOLLY:  No.

9              MR. POINTER:  I said have you been trained

10   that you are to have a single officer point of contact

11   with someone who is in the midst of a mental health

12   crisis.

13             MR. CONNOLLY:  Asked and answered.  Calls for

14   an incomplete hypothetical and is an incomplete

15   hypothetical.

16             THE WITNESS:  I'm sorry.  Can you say that

17   question one more time.

18             MR. POINTER:  Can I have it read back?

19             (Whereupon the record was read as follows:

20             "Question:  I said have you been trained that

21             you are to have a single officer point of

22             contact with someone who is in the midst of a

23             mental health crisis.")

24             THE WITNESS:  In training and in learning

25   domain 37, it does state -- I will actually read it

                                                          184

1    scenario may be in the field, correct?

2          A.   We have training on different techniques for

3    different scenarios.

4          Q.   Okay.  And so those techniques, some of those

5    techniques are about deescalating a situation, correct?

6          A.   Correct.

7          Q.   Okay.  What, if any, tactics or techniques

8    would you use during the course of dealing with

9    Mario Woods to deescalate the situation?

10         A.   One, letting him know -- being that he was

11   still an active threat at the time, he still had a

12   weapon and attempted to kill someone by stabbing them

13   earlier, the technique we needed to do is give him

14   orders to get onto the ground.

15         Q.   Okay.  So that is one technique.  Thank you.

16         A.   Give him orders to put the weapon down.

17         Q.   Anything else?

18         A.   Other officers, the technique I did, gave him

19   orders, tell him to get on the ground.  Sometimes we are

20   also told sometimes you need to use a louder voice to

21   make sure that they can hear you, to make sure that they

22   can snap into focus.  Hey, look at me.

23         Q.   So the two techniques I heard, one is that you

24   personally used.  You told him to get on the ground, and

25   you said you used a louder voice?

188

1    Q.   Did you ask him whether or not he was taking

2    medications?

3    A.   No.

4    Q.   Did you ask him?

5    A.   I did not ask him if he was taking medications

6    because he was very unresponsive to us.  I'm already

7    giving him orders to drop the knife.  I'm not going to

8    be, hey, are you on any medications right now?

9         He's still a threat.  Our ultimate concern is

10   to stop him from being a threat.

11   Q.   When he was on the scene, what did he do that

12   was threatening other than posses the weapon that you

13   personally saw?

14   A.   One, not complying with us, not complying with

15   the less lethal that he was being hit with, not

16   complying with the OC spray that he was being sprayed

17   with.  That's what I am observing.

18        So at that time, I'm not thinking what

19   medication are you using.  I'm thinking about the safety

20   of my fellow officers, of myself, of the public.

21   Q.   So you saw an officer essentially leave the

22   semicircle and go and spray OC spray on Mr. Woods,

23   right?  Did you see that happen?

24   A.   I saw an officer step forward in the

25   semicircle and spray OC spray.

190

1          MR. CONNOLLY:  Objection.  Vague.

2          THE WITNESS:  I can't recall what other

3     officers were saying.

4     BY MR. POINTER:

5          Q.  So you have no memory as to what the officers

6     were saying at the scene?

7          A.  I cannot recall what any of the other officers

8     were saying.  I was focused on Mr. Woods at the time.

9          Q.  Understood.

10          So you don't know what people were saying; is

11     that fair?

12          A.  I can't recall what anyone was saying.  I'm

13     sorry.  I cannot give testimony as to what they said.

14          Q.  I understand.

15          So you testified today you can't recall

16     anything that Mr. Woods said, and now you're saying you

17     can't recall anything that the other officers said,

18     correct?

19          A.  I know in general other officers were giving

20     orders.  I cannot remember who was giving orders, what

21     specific orders were being said.

22          Q.  So you know something was being said, but as

23     you sit here today, you don't know what was being said?

24          A.  I cannot recall what was being said.

25          Q.  Okay.  Now, when you came over there and

193

1    formed a semicircle, what was Mr. Woods doing?

2        A.   He was on the sidewalk.  He had the knife in

3    his hand.  He was moving -- I can't remember if he was

4    walking up -- which way he was going or if he was just

5    stopped.  I just remember him being on the sidewalk,

6    knife in his hand, saying something.  I can't recall

7    what he was saying.

8        Q.   Did you ever see him point the knife at any of

9    those officers?

10       A.   I do not remember.  I cannot recall him

11   pointing the knife at any officers.

12       Q.   You looked at the videos, right?

13       A.   Yes.  I've seen the videos.

14       Q.   Now, what happened next?

15       A.   After several orders were given to him to drop

16   the knife, after ordering him that if he did not drop

17   the knife, I would shoot him, he was hit multiple times

18   with less lethal.

19            There was a time when he dropped to a knee but

20   still had the knife in his hand.  I was hoping at that

21   time he was going to just surrender, but he did not

22   surrender.  He stood back up.

23            I don't know how many more times he was hit

24   with a 40 millimeter, but it was several more times, I

25   believe.  He was also hit with the 870 ERIW, the

                                                           194

1    Super-Sock, that seemed to have no effect on him

2    whatsoever.

3              He then -- someone attempted to --

4    Officer Ortiz attempted to use pepper spray on him.  It

5    had no effect on him.

6        Q.   So up to that point, did you ever hear

7    Mr. Woods threaten anybody through all of that use of

8    force?

9              MR. CONNOLLY:  Objection.  Vague.  Can you

10   repeat that question, I'm not sure I --

11             MR. POINTER:  Yeah.

12        Q.   I asked, during the use of force you just

13   described, which is the less lethal use of force, did

14   you hear Mr. Woods make any verbal threats?

15        A.   I cannot recall anything that Mr. Woods said.

16        Q.   During that use of force as you just

17   described, did you see Mr. Woods point the knife at any

18   of the officers?

19        A.   Mr. Woods did not point the knife at officers.

20        Q.   During that use of force you just described,

21   was Mr. Woods still essentially in the same position

22   that you described, which is either maybe pacing or

23   moving kind of side to side?

24        A.   During that time, from what I could recall, he

25   was around the same area.  He maybe moved a couple of

                                                          195

DEPOSITION OF ANTONIO SANTOS

1    feet here and there.

2         Q.   And he never walked toward you guys in a

3    semicircle, did he?

4         A.   Towards myself or -- I mean, after the use of

5    force, he started walking.

6         Q.   That was after use of force.  I'm asking

7    during the period of time we have been talking about,

8    which is you're saying first less lethal, a projectile

9    was fired at him.  There was additional 40 millimeters,

10   Super-Sock fired at him, and there was the OC spray.

11   During that period of time, did Mr. Woods walk towards

12   the officers?

13        A.   I mean, any direction he's going to go, he's

14   walking towards officers, so towards officers were

15   deploying the 40 millimeter at him or --

16        Q.   Your semicircle.

17        A.   I mean, I'm trying to say any direction you go

18   into, you're going to be walking towards an officer.  He

19   was surrounded.

20        Q.   Okay.  So your testimony is Mr. Woods walked

21   towards officers when he was being shot with a less

22   lethal and OC spray?

23        A.   I'm sorry.  I'm just trying to understand the

24   line of questioning.

25        Q.   It's simple.  I just want to know did he walk

                                                        196

```
 1      towards officers who were in the semicircle when he was

 2      being fired upon or when the OC spray was sprayed on him

 3      or at him.

 4           A.   No.  He was not walking towards officers.

 5           Q.   So you mentioned that he went down to his knee

 6      and then he stood back up, right?

 7           A.   Yes.

 8           Q.   And after he stood back up, what happened

 9      next?

10           A.   40 millimeter rounds were deployed again,

11      striking him.  OC spray was used.  No effect.  And then

12      he was hit with the ERIW.

13           Q.   And then what happened next?

14           A.   He started walking northbound on 3rd or Keith,

15      I don't know which part that sidewalk is.

16           Q.   So I'm going to take this portion at a time

17      where you said he went down to his knee.

18           A.   Okay.

19           Q.   He stood back up.

20           A.   Okay.

21           Q.   Until he started walking northbound towards

22      Fitzgerald or Gilman on the sidewalk.

23           A.   Yes.  Northbound towards Fitzgerald, I believe

24      it is.

25           Q.   Fitzgerald.
```

197

1        A.   All right.

2        Q.   What orders, if any, did you give during that

3    period of time?

4        A.   I gave him the orders to get on the ground.  I

5    gave him orders to drop his knife.

6        Q.   And while Mr. Woods -- strike that.

7             Now, at some point in time, you said Mr. Woods

8    actually starts walking towards 3rd and Fitzgerald,

9    right?

10        A.   Yes.

11        Q.   Okay.  And ultimately, he was shot, right?

12        A.   Yes.

13        Q.   Okay.  So we are going to take the period of

14    time from when he starts walking until the first shot

15    rings out, okay?

16        A.   Okay.

17        Q.   During that period of time, what orders, if

18    any, did you give?

19        A.   I think I stated it.  I told him to drop the

20    knife, to get on the ground.

21        Q.   During that period of time, when he starts

22    walking until the first shot rings out, did Mr. Woods,

23    to use my term, lunge at anyone?

24             MR. CONNOLLY:  Objection.  Vague.

25             THE WITNESS:  So let me understand your

                                                          198

1    question.  You said at any time while he was walking

2    northbound on 3rd or Keith, whatever it is, at any time,

3    did he lunge at anybody?

4    BY MR. POINTER:

5         Q.   I'm asking about the particular period of time

6    which is after he got up to his feet, as you said, he

7    starts moving northbound until he was shot.  Did he

8    lunge?

9              MR. CONNOLLY:  Objection.  Vague.

10             THE WITNESS:  I did not see him lunge at

11   anyone.

12   BY MR. POINTER:

13        Q.   Did you see Mr. Woods -- during the same

14   period of time, did you see Mr. Woods make any movements

15   with the knife that you perceived as him trying to stab

16   someone with a knife?

17        A.   At that time, I believe Mr. Woods advancing on

18   an officer with a knife would be him attempting to stab

19   them.  I would not anticipate him to walk forward with a

20   knife extended out in front of him in an attempt to stab

21   somebody.

22        Q.   So he had the knife extended out in front of

23   him?

24        A.   No.  I said I would not expect him, if he were

25   to stab someone, to walk up towards them with a knife

                                                         199

1    extended out in front of you.  You would have it down by

2    your side.

3         Q.   So you're hoping that the person comes to your

4    side and you can stab them there?  I don't understand.

5    I'm trying to understand why would that be your

6    expectation, that you're going to have a knife at your

7    side when you're trying to stab somebody else?

8         A.   Because you wouldn't walk into someone with

9    your hand fully extended outwards and slowly have the

10   knife enter him while you're walking.  In order to

11   swing, you need to have your hand back to get momentum.

12        Q.   All right.  And so you're watching him walk

13   down the street at this point in time, right?

14        A.   I'm watching him walk away from me, yes.

15        Q.   This is after he had already been shot with

16   the less lethal, right?

17        A.   Yes.

18        Q.   He has not made any verbal threats that you

19   can recall, right?

20        A.   I cannot recall anything that he was saying.

21        Q.   You haven't seen him move the knife, strike

22   out with the knife in any way towards any officer,

23   correct?

24        A.   That is correct.

25        Q.   And you mentioned that as he was moving

                                                        200

DEPOSITION OF ANTONIO SANTOS

1    towards 3rd and Fitzgerald on the sidewalk, that he

2    walked towards an officer, right?

3         A.   Yes.

4         Q.   Okay.  What officer was that?

5         A.   Officer Derek August or Charles August.

6         Q.   Officer August was actually a part of the

7    semicircle, right?

8         A.   Yes.

9         Q.   So did the entire semicircle walk towards 3rd

10   and Gilman or 3rd and Fitzgerald?

11        A.   No.  The semicircle, I don't believe it moved

12   down towards 3rd and Gilman.

13        Q.   Officer August left the semicircle?

14        A.   Officer August was backpedaling in the

15   semicircle.

16        Q.   So he was still a part of the semicircle?

17        A.   Yes.

18        Q.   Okay.  Was there any additional space between

19   Officer August and the other officers who were part of

20   the semicircle?  Essentially, when Mr. Woods got up off

21   his knee and started moving, as you're saying northbound

22   on 3rd towards Gilman --

23        A.   Fitzgerald.

24        Q.   -- Fitzgerald, how close was Officer August to

25   you?

Barbara J.Butler & Associates - Certified Court Reporters
1659 Scott Blvd., Suite 15, Santa Clara, CA  95050 - (510) 83-BUTLER (2885) or (408) 248-BUTLER(2885)

1      A.   I'm sorry.  I'm just really making sure I

2  understand this question.  There was a little confusion

3  with this one.

4           So was Officer August moving away from me

5  while Mr. Woods was moving towards him or towards

6  Fitzgerald?

7      Q.   Yes.

8      A.   Officer August was moving away from me.

9      Q.   Did Officer August communicate to you --

10  strike that.

11          Did you ever hear Officer August tell anyone

12  that he was planning on walking towards 3rd and

13  Fitzgerald?

14     A.   I can't recall anything that Officer August

15  had said.

16     Q.   Did you recall him giving any time of hand

17  signal or any type of communication that he was planning

18  to move towards 3rd and Fitzgerald?

19     A.   Once again, I can't recall anything he said.

20  I was focused on Mr. Woods at that point.

21     Q.   And Officer August had his gun out at the

22  point in time when Mr. Woods started moving towards 3rd

23  and Fitzgerald before he was ultimately shot; is that

24  right?

25     A.   That is correct.

                                                      203

DEPOSITION OF ANTONIO SANTOS

```
 1              MR. CONNOLLY:  I have to take a break.

 2              MR. POINTER:  No problem.

 3              (Whereupon recess was taken from 3:43 to

 4         3:55.)

 5              MR. POINTER:  All right.  Let's go back on the

 6     record, here.

 7         Q.   Officer, so at some point in time, you fired

 8     your gun, right?

 9         A.   Yes.

10         Q.   And I believe you shot -- well, strike that.

11              How many times did you fire your gun?

12         A.   I believe I fired it five times.

13         Q.   And you shot your gun because August shot his

14     gun, right?

15         A.   No.

16         Q.   That's what you told the investigators,

17     though?

18         A.   That's not what I told investigators.

19         Q.   You thought August was in danger?

20         A.   Yes.

21         Q.   You ever heard of the term "sympathetic fire"?

22         A.   Yes, I have.

23         Q.   So you don't believe that what you did was the

24     case of sympathetic fire?

25         A.   What I did was not a case of sympathetic fire.
```

204

1        Q.   And you understand that based upon your

2    training, that you're responsible for each and every

3    shot you fire, correct?

4        A.   Yes.

5        Q.   And you told investigators that when you shot

6    your gun -- strike that.   Withdraw.

7             You told investigators that when you fired

8    your gun, you could not see the knife, correct?

9        A.   At the moment, the way he was turned, I did

10   not see the knife.

11       Q.   At the moment you fired your gun, you did not

12   see the knife, correct?

13       A.   At the moment I fired, I did not see the

14   knife.   He was turned.   It was on the opposite side of

15   his body from me.

16       Q.   So you didn't see it raised or moving because

17   you didn't see it at all?

18       A.   I did not see him raise or move the knife.

19       Q.   In fact, after the shooting, you went over to

20   where Mr. Woods was lying on the ground, right?

21       A.   That is correct.

22       Q.   And you saw the knife -- you recovered the

23   knife inches away from his waist, correct?

24       A.   I stepped on the knife and I moved it away.

25       Q.   And it was inches away from his waist,

                                                            205

```
 1        correct?
 2             A.   It was about waist level, correct.
 3             Q.   Now, you told SFPD homicide investigators that
 4        you gave Woods commands three to five times, correct?
 5             A.   I can't recall how many times.  I gave him
 6        commands.  I'm not going to say the exact amount of
 7        commands I gave.  I'm sorry.  I can't recall.
 8             Q.   When you gave the homicide investigation, that
 9        was just hours essentially after the incident, correct?
10             A.   The next morning, correct.
11             Q.   Was your memory better then than it is now?
12             A.   It was probably fresher in my memory then.
13             Q.   You also told homicides -- strike that.
14                  You also told SFPD homicide investigators that
15        you believed Mario Woods was high or intoxicated on some
16        type of narcotic at the time of this incident; correct?
17             A.   That is correct.
18             Q.   He had an altered mind state; is that correct?
19             A.   I believe he was intoxicated.
20             Q.   That he had an altered mind state?
21                  MR. CONNOLLY:  Objection.  Vague.
22                  THE WITNESS:  Some levels of intoxication.
23        BY MR. POINTER:
24             Q.   So that's a yes?
25             A.   I believe that he was intoxicated at the time
```

206

DEPOSITION OF ANTONIO SANTOS

1    of this event.

2         Q.   Now, you didn't tell San Francisco Police

3    Department investigators during your homicide interview

4    that you felt there were any other officers who were

5    endangered by Mario Woods at the time you fired your

6    shots, right?

7         A.   I believe that Officer August was the main

8    officer at the risk of danger at that exact moment.  I

9    mean, there are other officers in the area.

10         This is a man who I believe was intoxicated,

11    who I believe had already stabbed somebody, who still

12    had that weapon, who was not complying, where less

13    lethal was not working on that person, where pepper

14    spray was not working on that person, and that

15    40 millimeter I've seen that hit multiple people and

16    they always -- it is very effective, and that it was

17    ineffective on him.

18         Q.   Yes.  And you didn't tell San Francisco Police

19    Department homicide investigators that you felt any

20    other officers were in danger at the time you fired your

21    gun, right?

22         A.   At the moment where I discharged my firearm, I

23    did it in defense of Officer August.

24         Q.   You didn't mention to San Francisco Police

25    Department homicide investigators that you fired your

207

1    radio communications mention that the suspect had mental

2    health issues?

3         A.   I do not believe any of them had anything

4    about mental health issues.

5         Q.   Going to the scene itself.  While you were on

6    the scene observing Mario Woods through the time he was

7    shot, did he ever surrender physically to arrest?

8         A.   No.

9         Q.   Did he ever surrender the knife that he had in

10   his possession?

11        A.   No.

12        Q.   His person?

13        A.   He always had the knife on him.

14        Q.   Where was the knife the entire time you saw

15   him?

16             MR. POINTER:  Objection.  Vague and ambiguous

17   as to time.  After the shooting, before the shooting?

18   BY MR. CONNOLLY:

19        Q.   Where was the knife the entire time you saw

20   him before he was shot?

21        A.   It was in his hand.  Right hand.

22        Q.   Do you recall -- counsel asked you a very

23   specific question about whether you could see the knife

24   in his hand at the time you fired your weapon.  Do you

25   recall that?

                                                      218

1          A.    Yes.

2          Q.    Could you see the knife in his hand at the

3    very time you fired your weapon?

4               MR. POINTER:   Objection.   Asked and answered.

5               THE WITNESS:   At the very time, I could not

6    see the knife.   But just prior to when he was shot, and

7    prior -- before he started walking and advancing towards

8    Officer August, I saw the knife in his hand.   I never

9    saw him drop the knife.

10   BY MR. CONNOLLY:

11         Q.    And at the time you fired your weapon, why

12   isn't it you couldn't see the knife?

13         A.    Because the knife was --

14               MR. POINTER:   Objection.   Calls for

15   speculation.

16               THE WITNESS:   The knife was on the other side

17   of him.   It was in his hand on the opposite side of him,

18   the side away from me.

19   BY MR. CONNOLLY:

20         Q.    Counsel asked you about the moment you fired

21   your weapon in the context of defending Officer August.

22   Do you recall those questions?

23         A.    Yes.

24         Q.    Were there bystanders on the scene behind

25   Officer August?

DEPOSITION OF ANTONIO SANTOS

```
 1                MR. POINTER:  Objection.  Vague and ambiguous
 2     as to behind.
 3                THE WITNESS:  There was a bus stop directly
 4     behind Officer August.  There were officers all around
 5     us.
 6     BY MR. CONNOLLY:
 7          Q.   Did you see bystanders behind Officer August
 8     from your vantage while you were on the scene before
 9     Mario Woods was shot?
10          A.   When I arrived on scene, I saw that there were
11     bystanders immediately on the scene that moved -- there
12     were bystanders on the scene that moved away while our
13     circle was formed.
14          Q.   At the time you arrived on the scene, while
15     you were there, before Mario Woods was shot, did you see
16     bystanders in the vicinity where Mario Woods was
17     standing?
18          A.   Yes.
19          Q.   How close were the bystanders to where
20     Mario Woods was standing approximately while you were on
21     the scene?
22                MR. POINTER:  Objection.  Vague and ambiguous
23     which bystanders you're referring to.
24                THE WITNESS:  When I arrived on the scene,
25     there were bystanders approximately 10, 15 feet away.
```

220

```
 1      BY MR. CONNOLLY:
 2           Q.   Did you see those bystanders before you fired
 3      your weapon?
 4                MR. POINTER:  Objection.  Vague and ambiguous
 5      as to time.
 6                THE WITNESS:  Before I fired my weapon, I
 7      saw -- re-do that, please.
 8      BY MR. CONNOLLY:
 9           Q.   Let me withdraw the question.
10                Were you cognizant that there were bystanders
11      present at the time you fired your weapon?
12           A.   Yes.
13           Q.   Did you see Mario Woods advance toward
14      Officer August in moments before you fired your weapon?
15           A.   Yes.
16           Q.   How close to Officer August did Mario Woods
17      get before you fired your weapon?
18           A.   I believe he was about 6 to 8 feet away from
19      Officer August.
20           Q.   Counsel asked you about the position of the
21      knife in that period of time.  Do you recall that?
22           A.   Yes.
23           Q.   And in the moments before you fired your gun,
24      approximately where -- what was the position of the
25      knife?
```

221

1          MR. POINTER:  Objection.  Asked and answered.

2          THE WITNESS:  I believe the knife was down by

3      his right side.

4      BY MR. CONNOLLY:

5          Q.   Did it concern you that Mario Woods was

6      advancing toward Officer August from a distance of 6 to

7      8 feet with the knife at his side?

8          MR. POINTER:  Objection.  Assumes facts not in

9      evidence.

10     BY MR. CONNOLLY:

11         Q.   Go ahead and answer the question.

12         A.   Yes.  It --

13         MR. POINTER:  It misstates -- go ahead.

14         THE WITNESS:  Yes.  It concerned me that he

15     was advancing on Officer August with the knife.

16     BY MR. CONNOLLY:

17         Q.   Why?

18         A.   Because within that range, he easily could

19     strike Officer August.  This is a man that had -- that

20     appeared to be intoxicated; that had already stabbed

21     someone; that was not surrendering.  He was not

22     reacting.  He had minimal reaction to the less lethal

23     that we used.  He did not react to the OC spray that was

24     used, not following commands, and was now advancing

25     towards an officer.  And also with the positioning of

                                                                222

1    the knife in his hand, he easily could have stabbed

2    Officer August.

3         Q.   What do you mean by that?  In other words,

4    what do you mean by that last part?

5         A.   The way that he was positioned, the way he was

6    holding it.

7         Q.   "He," being?

8         A.   Mario Woods.  He moved the knife back

9    towards -- like a retention.  That's how you would stab

10   somebody.  You wouldn't walk up to them slashing the

11   knife in front of them.  It would be down by his side

12   ready to stab or swing.

13        Q.   Was, in your opinion, Officer August

14   vulnerable to being stabbed from the position that

15   Mario Woods was in at the time you fired your gun?

16             MR. POINTER:  Objection.  Vague and ambiguous.

17   Compound.

18             THE WITNESS:  Yes.

19   BY MR. CONNOLLY:

20        Q.   All right.  Last question.  This may have been

21   covered, but in case it wasn't, at the time you fired

22   your weapon at Mario Woods, did you believe Mario Woods

23   posed an imminent threat to Officer August, threat of

24   death or bodily injury?

25        A.   Yes.

223

1    STATE OF CALIFORNIA )

2    COUNTY OF ALAMEDA   )

3            I, Shelli G. Eng, Certified Shorthand Reporter,

4    No. 11397, State of California, do hereby certify:

5            That prior to being examined, the witness named

6    in the foregoing deposition, to wit, ANTONIO SANTOS, was

7    by me duly affirmed to testify the truth, the whole truth

8    and nothing but the truth; that said deposition was taken

9    down by me in shorthand at the time and place therein

10   named and thereafter reduced to typewriting under my

11   direction and supervision; that the witness was given an

12   opportunity to read and correct said deposition and to

13   subscribe the same.  Should the signature of the witness

14   not be affixed to the deposition, the witness did not

15   avail himself of the opportunity to sign or the signature

16   has been waived.

17           I further certify that I am not of counsel for

18   either or any of the parties to the said deposition, nor

19   in any way interested in the event of this action and

20   that I am not related to any of the parties thereto.

21           WITNESS MY HAND this 27th day of July, 2018.

22

23           ___/s/Shelli G. Eng_____
             SHELLI G. ENG, CSR NO. 11397
24           CERTIFIED SHORTHAND REPORTER

25

226