# Exhibit O

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

GWENDOLYN WOODS, individually and as Successor in Interest to Decedent MARIO WOODS,

Plaintiff,

vs.

CITY AND COUNTY OF SAN FRANCISCO; a municipal corporation, et al,

Defendants.

CASE NO.: 3:15-05666-WHO

CERTIFIED COPY

VIDEO DEPOSITION OF RUBEN RIVERA

WEDNESDAY, JULY 25, 2018

REPORTED BY: ANGELICA R. GUTIERREZ, CSR NO. 13292

I N D E X

| EXAMINATION BY: | PAGE |
|---|---|
| MR. POINTER | 6, 70 |
| MR. CONNELLY | 52 |

--o0o--

| | |
|---|---|
| Appearance Page | 3 |
| Exhibit Page | 4 |
| Location | 5 |
| Reporter's Certificates | 83 |
| Deponent Signature Page | 84 |
| Deponent Signature Waiver | 85 |
| Witness Letter | 86 |
| Changes and/or Corrections | 87 |
| Attorney's Notes | 88 |

--o0o--

APPEARANCES

FOR THE PLAINTIFF:

LAW OFFICES OF JOHN L. BURRIS
Airport Corporate Centre
7677 Oakport Street, Suite 1120
Oakland, California 94621
(510) 839-5200

BY: ADANTE POINTER, ATTORNEY AT LAW

FOR THE DEFENDANTS:

OFFICE OF THE CITY ATTORNEY
1390 Market Street, 6th Floor
San Francisco, California 94102
415-554-3863

BY: SEAN CONNOLLY, DEPUTY CITY ATTORNEY

--o0o--

INDEX OF EXHIBITS

| PLAINTIFF'S | DESCRIPTION | PAGE |
| --- | --- | --- |
| 1 | Aerial view of Third and Fitzgerald, consisting of 1 page | 16 |
| 2 | Video, consisting of 1 USB | 31 |
| 3 | Picture, consisting of 1 page | 69 |

Pursuant to Notice of Taking Deposition and on Wednesday, July 25, 2018, commencing at the hour of 12:38 p.m., thereof, at the Office of the City Attorney, 1390 Market Street, San Francisco, California, before me, ANGELICA R. GUTIERREZ, CSR No. 13292, a Certified Shorthand Reporter and Deposition Officer of the State of California, there personally appeared:

RUBEN RIVERA,

called as a witness by the Plaintiff, who having been duly sworn by me, to tell the truth, the whole truth and noting but the truth, testified as hereinafter set forth:

---OOO---

RUBEN RIVERA,

having been first duly sworn, testified as follows:

THE WITNESS: (TO OATH) Yes.

EXAMINATION BY ADANTE POINTER

BY MR. POINTER:

Q. Mr. Rivera, can you please state and spell your full name for the record, please?

A. Ruben Rivera, R-U B-E-N R-I-V-E-R-A.

Q. Mr. Rivera, I introduced myself earlier off the record. I am Adante Pointer. I am one of the attorneys representing the mother of Mario Woods. I appreciate you for coming today and taking the time to participate in this process.

I am going to give you some guidelines or rules so that we just make sure that we are on the same page and that things go as smoothly as they can today. Okay?

A. Okay.

Q. I imagine you may have already heard some of the things I'm going to say to you in terms of how depositions take place already, but I'm just going to repeat them. Do you understand?

A. Yes.

Q. Okay. One of the things which you're doing very well is all of your responses need to be out loud,

by?

A. San Francisco Unified School District.

Q. Okay. And what do you do for the San Francisco Unified School District?

A. I am a 7355 truck driver.

Q. And you mentioned 7355 --

A. As the classification.

Q. At or about the time of, you know, December 2nd of 2015 when Mario Woods was shot and killed, were you a truck driver for the school district?

A. I was not. I was a transit operator.

Q. Okay. Were you driving muni vehicles?

A. Yes.

Q. Okay. So you were working for the City and County of San Francisco on that day?

A. Yes.

Q. And so my understanding is you actually witnessed or saw a portion of the incident concerning Mario Woods and the San Francisco police officers?

A. Yes.

Q. I understand there are police officers present here in your deposition today, actually one, two, three officers. Is that an issue for you in terms of being able to give your deposition?

A. No.

Q. Okay. Great.

If it is an issue or becomes an issue, let us know and we'll see if we can try and address your concerns. Okay?

A. Yes.

Q. All right. Now, I'm just going to ask you some questions about the day. All right?

First of all, so you said you were working -- were you at work when this incident took place?

A. I was waiting for my relief bus, yes.

Q. When you say relief bus?

A. It's a relief point on Keith and Fitzgerald where we go and we wait for the other operator to show up with the bus and we take over.

Q. Okay. So, and when you say "we take over," meaning you were then going to take over driving that particular bus?

A. Correct.

Q. Was that the start of your shift or were you transitioning from one bus to another?

A. That was the start of my shift.

Q. Okay. Understood. And so my understanding -- and correct me if I'm wrong -- you're there, waiting for your relief bus, and this is when you noticed the

interaction between Mr. Woods and the San Francisco police officers?

A. Yes.

Q. All right. During the course of what took place, you actually recorded some of it on your cell phone; is that right?

A. That is correct.

Q. Okay. What kind of cell phone did you have in terms of the brand?

A. I believe it was a Galaxy, Samsung Galaxy S7 at the time.

Q. Okay. Do you have still have that phone, the physical phone itself?

A. No.

Q. Okay. Where is it?

A. Upgraded.

Q. Did you turn it back in?

A. Yes.

Q. Okay. And now you have a different phone?

A. Yes.

Q. Okay. When you took the videotape of the shooting, did you -- strike that.

The videotape that you took of the shooting, have you provided it or given it to anybody?

A. Yes.

Q. Who?

A. I provided it to a lady who works with Mr. Connolly.

Q. Okay. So you gave the video to a lady who works for Mr. Connolly?

A. Yes.

Q. When did you do that?

A. Months ago. I don't have an exact date. I'm horrible with dates.

Q. Understood. Was it -- well, this is currently July, right?

A. Right.

Q. Okay. Was it in the spring? Like, for example, April, May?

A. It was sometime last year, probably towards the last quarter, mid of the year. Not quite sure, though. I'm -- yeah. All I know is I've been where I'm at for six months so it's been more than six months.

Q. Okay. All right. And so this is July, so you have been working for the school district since the beginning of --

A. December.

Q. 2018.

A. December.

A. Approximately.

Q. Okay. That's a "yes"?

A. Yes.

Q. So, between the time that this incident happened concerning Mario Woods, which was December 2nd of 2015 to last summer of 2017, had you given the videotape to anyone else?

A. No.

Q. Okay. Did you by chance post it to social media or anything like that?

A. No.

Q. Okay. Had you showed it to any of your fellow employees or fellow coworkers when you were working for muni?

A. No. The ones that knew about it were there.

Q. Okay. What are the names of the other muni employees that were there with you when this took place?

A. A gentleman named Darrell, do not have a last name; and another one named Robert, do not have his last name.

Q. Okay. I believe I've spoken to a gentleman, Robert. Was he also a muni driver as well?

A. Yes, it was his coach that was actually there at the time.

Q. Okay. All right. I'll make the representation to you I've spoken to him.

The other person, Darrell, is he a muni driver or was he --

A. Yes.

Q. Okay. Do you know, was he there also for taking over a relief bus?

A. Yes.

Q. Okay. Now, my understanding of looking at Third and Fitzgerald right there, there's actually more than one muni stop at that corner; is that true?

A. There is a T-train stop, which is an island on Third Street at Keith and Fitzgerald, which is actually the street of our relief point. It's the 29 bus stop.

Q. And which bus were you waiting to take over?

A. The 29.

Q. Okay. I'm going to show you what I would like marked as Exhibit 1.

(Exhibit No. 1 was marked for identification.)

BY MR. POINTER:

Q. Mr. Rivera, I ask that you take a look at Exhibit 1. And does Exhibit 1 look to you to be an aerial or a top-down view of the area of Third and Fitzgerald?

blue ink.

MR. POINTER:

Q. And that's meant to indicate the area where the 29 bus stop is at, correct?

A. Yes.

Q. Okay. And prior to your attention being drawn to the person who you now know is Mario Woods and the police officers, how long had you been standing at 29 bus stop?

A. For a while.

Q. Okay.

A. I believe my arrival time around there was somewhere between 4:20.

Q. Okay .what time were you -- did you expect to take over the 29 bus, start driving?

A. I believe my start time was around 4:35, 4:37 at that time.

Q. Okay. So as I was asking before, you had been in the vicinity of the 29 bus stop, waiting for the bus to come, correct?

A. Yes.

Q. Okay. And at some point in time did you notice or was your attention drawn to the person who you later found out was Mario Woods?

A. I'm sorry. Please ask that one more time.

Q. Sure. Let me try to ask it a little simpler so you can answer.

How long had you been at the bus stop before you first noticed Mario Woods?

A. That is a very good question. I cannot give you an exact time as I was on my phone, going through social media pages. So I was not aware of the amount of time that I was standing there.

Q. Okay. At some point in time, did you -- did he catch your attention?

A. No.

Q. Okay. What happened that first caught your attention and had you looking at Mr. Woods and/or the police officers?

A. The police car that pulled up at the corner.

Q. Okay. Prior to the police car pulling up there, you hadn't noticed Mr. Woods; is that true?

A. Correct.

Q. Okay. So how long do you think you had been standing there, in the general vicinity of the 29 bus stop, prior to the police car pulling up?

A. Again, I do not have an exact timeline. I was not keeping track of that. I know that my bus was running late. It was running -- it always ran about five to ten minutes late.

Q. Okay.

A. So from my arrival time, to my bus being late, I can only guess.

Q. Okay. We don't want you to guess, but if you can give me an estimate or an approximation, I would be happy to take that.

A. Standing there before all that, probably about 25 -- 20, 25 minutes.

Q. Okay. And during that 20, 25 minutes, no one had done anything that caught your attention in terms of waving a knife or threatening people? You didn't see anybody do that, correct?

A. No.

Q. Okay. Now, you mentioned that you're essentially in your phone, going through social media pages, and then at some point in time you noticed that a police car had pulled up?

A. Yes.

Q. Okay. Looking at Exhibit 1, just with your finger and not with the pen, can you point to me where that police car pulled up?

A. (Indicating.)

Q. Okay. And that's what I -- you can tell me if you agree -- that's the corner of Third and Fitzgerald?

A. Keith and Fitzgerald.

fights, was there -- I'm trying to get a sense as to what had taken place between the time you were standing there and the police car pulled up.

A. There were various police cars going in the -- from this graph, south on Third Street, various amount of police cars, looks like they were going towards a call prior to this happening.

Q. Okay. So if I understand what you're saying correctly -- I mean, and correct me if I'm wrong -- you're standing there, waiting on your bus to come to the 29 bus stop, you're using your phone, looking at the social media pages, and you notice that there are police cars going down Third Street, and it looked like to you that they were responding to a call?

A. Yes.

Q. Okay. Other than that, there wasn't anything happening on the corner or in the vicinity of that 29 bus stop where you saw people, non-police officers having arguments or yelling and doing things like that, right?

A. That is correct.

Q. Okay. Essentially a normal day, waiting at the bus stop?

A. Yes.

Q. Okay. You see the police car pull up, right?

A. Yes.

Q. What happened next, if anything?

A. I heard, "Drop the knife," at which point I turned around.

Q. Okay. And when you turned around, did you see a person whom you thought the police were talking to?

A. Yes.

Q. Okay. And what was that person doing at that point in time?

A. At that point in time, that person was walking down the street, backpack on, soda in one hand and what appeared to be a knife in his other hand.

Q. Okay. And this person that you just talked about that appeared to have a knife in one hand and a soda in the other, can you give me an approximation as to how tall they were?

A. I'm horrible at this. I'm going to let you know that right now.

Q. Please.

A. But I'm going to say a little taller than me. I'm 5'6" so I'm going to go with 5'7", 5'8".

Q. And that's fair enough. So the person who you saw was just a little bit taller than you; is that correct?

A. Correct.

Q. And you said you were 5-foot-5?

A. 5'6".

Q. 5'6", I'm sorry.

MR. CONNOLLY: Let the record reflect I'm 6'4".

BY MR. POINTER:

Q. All right. So, and can you describe how they were built? Were they muscular, were they, you know, thin, skinny?

A. I could not tell. There was a big coat that they were wearing.

Q. Okay. Fair enough.

And so, when your attention was drawn to this person who the police were talking to, were there other people at the bus stop as well?

A. Yes.

Q. Prior to the police officers talking to this person, who we know is Mario Woods, had you noticed him prior to them saying something to him?

A. No.

Q. Okay. And so you heard the officers call to him, "Put down the knife," right?

A. Yes.

Q. Okay.

A. Drop the knife.

Q. Drop the knife. And did you hear him say anything in return?
A. Yes.
Q. And what was that?
A. He said, "Fuck you. Come get it."
Q. And so when you saw the police pull up, down on the scene and you heard them yelling, or telling Mario Woods to drop the knife, was it one officer, two officers, or more than that?
A. It was one officer, the driver, who hopped out of the vehicle, who spoke to Mario Woods. His partner, moments after, stepped out of the vehicle as well.
Q. Okay. Do you see either one of the two officers that you're referring here to here at your deposition today?
A. Honestly could not tell you.
Q. Okay. All right.
Well, based upon what you saw that day, can you describe what the officer looked like who was driving?
A. Black male.
Q. Okay. Tall, short?
A. Taller.
Q. Tall. Okay. And what about the partner?
A. Seemed to be probably Caucasian, light skinned

knife?

A. No.

Q. Did you see him spit at anyone?

A. No.

Q. Did you ever hear him verbally threaten anyone, saying words to the effect of, "I'm going to cut you," or, "I want to slice you," or anything like that?

A. To that question?

Q. Yes.

A. No.

Q. Okay. Did you ever see Mr. Woods run towards anyone?

A. No.

Q. Now, I understand that during the course of this incident Mr. Woods was shot several times with, like, a bean bag rounds. Did you see that take place?

A. Yes.

Q. And at some point in time after being shot several times with those bean bag rounds, you saw Mr. Woods go to the ground, or at least to his knee, correct?

A. Yes.

Q. Okay. And then he stood up afterwards, right?

A. Yes.

Q. Okay. And then he started walking, correct?
A. Yes.
Q. Okay. Focusing on that point in time after he went to his knee or the ground and he started walking, can you describe the manner in which he was walking? For example, was he limping, did it look like his leg hurt or was he walking briskly, fastly, jogging?
A. Just walking away.
Q. Okay. So is it fair to say that he wasn't running towards anyone at that point in time?
A. Yes.
Q. Okay. Is it also fair to say -- let me just ask you. Did it appear to you that he was limping at that point in time?
A. No.
Q. Okay. Did it look like, as he was walking, he was having any difficulty walking?
A. Explain difficulty.
Q. Yeah. Sure.
Did you notice him walking any differently than you had previously seen him walking during the course of this incident?
A. From the pepper spray or mace that was sprayed at him, it just looked like he was walking away a little more just dazed from the pepper spray?

 A. No. No.

Q. Okay. Fair to say you don't know police procedure?

A. Correct.

Q. Or police training?

MR. CONNOLLY: Objection, vague.

A. Correct.

BY MR. POINTER:

Q. I mean, you don't -- you're not a police officer and you've never been trained in police tactics, right?

A. Correct.

Q. Okay. You never read up on police tactics, have you?

A. I don't -- no.

Q. Okay. Now, I'm going to show you what I'll represent to you is the video that you've taken, but I'm going to show it to you. Let me know if this is your video. Okay?

A. Okay.

MR. POINTER: And I'm going have this marked as Exhibit 2 to this deposition.

(Exhibit No. 2 was marked for identification.)

MR. POINTER: And you don't need to record the

audio or anything.

And let me just state this on the record.

So this is Exhibit 2, video, and it's a video that's one minute and 29 seconds long.

MR. CONNOLLY: Before you go.

MR. POINTER: Sure.

MR. CONNOLLY: Are you going to give the reporter a thumb drive? How are you going to make it an exhibit?

MR. POINTER: Absolutely. I'm going to give her --

MR. CONNOLLY: Are we looking at that particular thumb drive?

MR. POINTER: That's it right here.

(Playing video.)

BY MR. POINTER:

Q. Is that the video you took?

A. Yes.

Q. Okay. I don't know why there's no audio on here.

A. You have the volume button all the way down on the screen.

Q. I thought I'd turned it up.

I'm going to show it to you again, just so we can hear the audio, and then I'm going to ask you

questions, okay?

A. (Witness nods head.)

Q. Okay. Thank you.

(Playing video.)

BY MR. POINTER:

Q. So I just played for you Exhibit 2 with volume this time; right? Yes?

A. Yes.

Q. Okay. You want a moment? I know it can be emotional.

Do you want a second before we proceed?

A. I'm good.

Q. Are you sure?

A. (Witness nods head.)

Q. Okay. So this video, you took this with your cell phone, right?

A. Yes.

Q. Okay. And it appears that you can hear a lot of different voices, talking, during the course of the video, correct?

A. Yes.

Q. Some of those -- one of those voices is yours, correct?

A. Yes.

Q. Okay. You heard yourself -- I believe I heard

A. Yes.

Q. Okay. And now where you were standing at on the corner, were there other people near you?

A. Yes.

Q. Okay. Approximately how many people?

A. More than five.

Q. Okay. And so of those people who were standing next to you, was anybody in front of you?

A. No.

Q. Okay. So is it fair to say that you have -- right before Mario Woods was shot -- there was Mario Woods, the officer who had his back to you, a second officer, and then yourself and the other people who were standing there on the corner?

MR. CONNOLLY: Objection, vague as to exact placement of those people you are referring to.

BY MR. POINTER:

Q. Okay.

A. Yeah, I got lost there.

Q. No, that's fine. I don't think I actually explained that to you earlier.

From time to time I may ask questions and Mr. Connolly may object to a question for whatever reason. You're still to answer the question, okay?

So I'm going to go back and try to simplify

it, if I can.

What I'm trying to figure out is just who were the people, whether it's regular civilians and bystanders or police officers, from where you were standing to where Mario Woods was at. Does that make sense?

A. Okay. Now I understand that question --

Q. Okay.

A. -- a lot more.

Q. Okay. Great.

So what I would like to do is, I'm going to show you your video. And you can look at that and just tell us what the answer is based upon your understanding. Okay? Is that fair?

A. That's fair.

Q. Okay. I'm going to rewind the video.

(Playing video.)

BY MR. POINTER:

Q. What I've asked you to focus in on is whether or not -- or who and how many officers were between yourself and Mario Woods at or about the time he was shot. Okay? Does that make sense?

A. From what I see in the video? Or from what I recall?

Q. Well, if the video is different than from what

you recall, let me know that.

A. Because there are passengers getting off of this bus that's right here (indicating), and from where the bus is at to where the officer directly in front of me is, are positioned differently.

Q. Absolutely.

So I want you to just focus in on the people who were on essentially the sidewalk here on -- what street did you call this right here? Keith?

A. This is Keith, and that's Fitzgerald.

Q. Okay. And Mr. Woods was on Keith, correct?

A. Yes.

Q. Okay. And you're standing essentially where Fitzgerald and Keith intersect there, correct?

A. Right.

Q. And you're looking down Keith, correct?

A. Correct.

Q. Okay. So my question is, I'm trying to find out how many officers were between you and Mario Woods on the sidewalk of Keith Street, right before the time -- right before he was shot. Do you understand?

A. Between myself?

Q. Yes. Understand?

A. Uh-hum.

Q. So as I mentioned, I'm going to play the video

forward from a minute and seven seconds.

(Playing video.)

BY MR. POINTER:

Q. All right. So I paused it at a minute and 22, which is after the shooting takes place.

A. Okay. So now looking at what I see, the second officer is running into the picture before or as the shooting occurs.

Q. So is it fair to say there's two officers between yourself and Mario Woods at or about the time he was shot?

MR. CONNOLLY: Objection, misstates testimony, lacks foundation.

THE WITNESS: I'm going to say no.

BY MR. POINTER:

Q. No? Okay.

I'm going to play for you a portion of the video from one minute and nine seconds to one minute and 15 seconds.

Okay. Now, I think we can agree at one minute and nine seconds Mario Woods has not been shot, correct?

A. Correct.

Q. So he's standing --

A. And there's only one officer between me and

Mario Woods.

Q. Right. And now I'm going to hit play.

(Playing audio.)

BY MR. POINTER:

Q. And I just paused it at one minute and 13 seconds.

A. Correct.

Q. Did you see the second officer --

A. -- running into the frame as the shooting is happening, but not prior to the incident.

Q. Okay.

(Playing video.)

BY MR. POINTER:

Q. And when you say "the incident," what do you mean?

A. Prior to the shooting.

Q. Okay.

A. Right there, there's nobody there.

Q. All right. So this is a still frame I'm showing you at a minute and 33 seconds, right?

A. Correct.

Q. Mr. Woods is walking essentially down --

A. Already walking down, yes.

Q. Okay. Go back. So a minute and 33, Mr. Woods is walking?

that effect, right?

A. Yes.

Q. Did you hear him say anything else during the course of this incident?

A. Through the course of the incident, I did not hear clear verbiage but he was yelling at them when they approached the corner towards Gilman and Third.

Q. But you don't know what he was saying, correct?

A. Correct.

Q. And did you hear the officers give any commands to Mr. Woods?

A. Yes.

Q. Okay.

A. I recall hearing them tell him to drop the knife.

Q. Okay. Did you hear any officers say, "Drop the knife or I'm going to kill you"?

A. No.

Q. Any officers say, "Drop the knife or I'm going to shoot you"?

A. No.

Q. Did it appear to you that Mr. Woods was, to use my term, in an altered mental state; i.e., he was either intoxicated or was having a mental health

problem or was disturbed?

MR. CONNOLLY: Objection, vague, lacks foundation, calls for speculation.

THE WITNESS: He did not -- I don't know what that looks like. I do know that he did act confrontational at one point.

BY MR. POINTER:

Q. At which point was that?

A. At the point when he reached the corner of Gilman and Third when he took off his backpack and dropped his drink.

Q. And that was prior to him being shot with bean bags, correct?

A. Yes. Yes.

Q. When you say he appeared confrontational, did you see him go towards any officers?

A. No.

Q. Did you see him -- go ahead.

A. He had hand gestures at --

Q. What were those? Can you describe those hand gestures?

A. Hand gestures, he was putting them up in the air, waving them at the officers and it seemed as if he was angry, and that's what I recall seeing.

Q. So that's the only time you saw him being

EXAMINATION BY SEAN CONNOLLY

BY MR. CONNOLLY:

Q. Mr. Rivera, I have a couple followup questions on a couple areas Mr. Pointer covered with you.

The videotape, it's now been marked as Exhibit 2, you took that video on the day of the incident, correct?

A. Correct.

Q. You met with police investigators on the day of the incident, correct?

A. Correct.

Q. You could have given that video to them at that time, correct?

A. Correct.

Q. You didn't, correct?

A. Correct.

Q. Why not?

A. I was scared. I drive the 29 line. I'm in the public eye. I'm in that area. I didn't know if there would be any backlash or repercussions to me for providing that video at that time.

Q. Where were you born?

A. I was born in Los Angeles.

Q. Where were you raised?

A. San Francisco.

A. Yes.

Q. And what did I tell you?

A. Yes.

Q. I told you I would have to turn it over to the other side?

A. You would have to turn it over to the other side, yes.

Q. Okay. And did you give me that video at some point or did you give that video to my investigator at some point around that time?

A. I did give the video to your investigator.

Q. Okay. Is it fair to say that I told you that I would have to turn it over because I had legal timelines by which I would turn it over but I would wait as long as I could to allow you to switch jobs, because you were thinking of switching jobs at the time?

A. Yes.

Q. Okay. All right. So now let me go back and cover some things that Mr. Pointer asked you about.

This is the Exhibit 1 here. Exhibit 1, which is a diagram of the area.

You -- at some point you said you heard a person, whom you now know as Mario Woods, say to the police officers -- the police officer, "Fuck you. Come

and get it." Do you recall that?

A. Yes.

Q. Where was Woods standing approximately when he said that?

A. Right here where it's marked on the paper (indicating).

Q. Okay. So you're pointing to the corner of Keith and Fitzgerald where it says "MW1"?

A. Yes.

Q. Okay. So where it's marked MW1 on Exhibit 1 is approximately the area of where Woods was when he uttered that remark, "Fuck you. Come and get it"?

A. Yes.

Q. And what was that remark in response to?

MR. POINTER: Objection, calls for speculation.

BY MR. CONNOLLY:

Q. Did you hear what that remark was in response to?

MR. POINTER: Objection, calls for speculation. Assumes facts not in evidence. You can respond.

BY MR. CONNOLLY:

Q. Did you hear the remarks that were made that that response was made to?

MR. POINTER: Objection, same objections.

BY MR. CONNELLY:

Q. Okay. Go ahead.

A. Yes.

Q. What were the comments that Mr. Woods' said that in response to?

A. "Drop the knife."

Q. And that was being uttered by a police officer?

A. Yes.

Q. Do you know which police officer?

A. The first officer on the scene, coming out of the vehicle, at the far piece of this drawing.

Q. Was it the African American officer?

A. The African American officer.

Q. So see if I understand this. The African American officer who was first on the scene, who got out of the car that's depicted on Exhibit 1 at the corner of Keith and Fitzgerald, is the one who said to Woods, "Drop the knife," or words to that effect, correct?

A. Correct.

Q. And in response to that Woods said, "Fuck you. Come and get it."

MR. POINTER: Objection, assumes facts not in

evidence. Calls for speculation. Misstates the record too.

BY MR. CONNELLY:

Q. Is that correct?

A. Correct.

Q. Did Woods say anything else at that point?

A. No.

Q. Did the officer say anything else in response to that comment?

A. No.

Q. Okay. And at that point what happened?

A. Mario Woods walked away from the officer, towards Gilman and Third, at which point other officers were arriving from that direction, stopped in front of Mario Woods. Mario Woods took off his backpack, dropped his drink, waved his hands in the air in a manner that I cannot write on paper, so --

Q. Let me stop you there. You're pointing to what's now the southern part of the diagram --

A. Correct.

Q. -- along Keith?

A. Yeah.

Q. Why don't you put a circle generally in the area where Woods was waving his hands, and put MW2 or something that says MW2 onto that area?

A. No.

Q. And do you recall after that point bystanders telling him to drop the knife?

A. Yes.

Q. Do you recall police officers after that point -- that point being where Mario is at MW2 on the diagram -- telling him to drop the knife?

A. Yes.

Q. And in fact the video you just saw, even you yourself yell to him words to the effect, "Drop the knife"?

A. Yes.

Q. And do you recall telling the inspector that after he was shot with rubber bullets, he was -- the entire time they're telling him to drop the knife, at which point he does not drop the knife. When he -- when the male gets up, he is shot again several times with these rubber bullets. Do you remember saying that to the inspector?

A. Yes.

Q. Does that refresh your recollection as to whether or not Woods still had the knife in his hand after the point he was at MW2 on the diagram?

A. Does not refresh a clear visual --

Q. Do you recall Woods being pepper sprayed with

or kicked or slashed at the officers.

Do you recall that?

A. I recall the question, yes.

Q. In that period of time, do you recall seeing the knife in Mr. Woods' hands?

A. No.

Q. Do you recall which direction Mr. Woods advanced on the street?

A. According to this diagram, I would call that north.

Q. And who was Mr. Woods advancing towards at the time he was shot?

MR. POINTER: Objection. Objection, calls for speculation. Vague and ambiguous.

THE WITNESS: He was advancing towards the officer that was standing between where I was at and where Woods was at.

BY MR. CONNELLY:

Q. Can you describe that officer?

A. Black male. Can't tell height. Probably close to 6 feet.

Q. Do you have a visual recollection of Woods actually closing the distance as he approached that officer?

MR. POINTER: Objection, assumes facts not in

evidence, misstates the witness's testimony, vague and ambiguous.

THE WITNESS: Yes.

BY MR. CONNELLY:

Q. So in your mind, he was advancing toward the officer?

A. Yes.

Q. And he was also advancing toward your position?

A. Yes.

Q. Now, counsel spent some time going over the video with you between 1:07 and 1:20, asking you essentially how many officers were in the video frame.

Do you recall that series of questions?

A. Yes.

Q. At the time Mario Woods was shot, how many officers were between you and Mario Woods in a direct line?

MR. POINTER: Objection, vague and ambiguous.

THE WITNESS: One.

BY MR. CONNELLY:

Q. And the second officer that counsel referred to, is it fair to say that he was off screen, running into the picture just as the shots started?

A. Yes.

Q. Have you ever been stabbed with a knife?

A. No.

Q. Approximately how many feet behind the African American officer were you, if you can estimate at the time of the shooting?

A. As far as feet go, I don't know how much about approximately ten yards is, but ten yards, approximately.

Q. From Woods to you or from the officer?

A. From the officer.

Q. Okay. In your -- did you observe Woods ever comply with anything officers were ordering him to do?

MR. POINTER: Objection, calls for speculation.

A. No.

BY MR. CONNELLY:

Q. Did it appear as though he was complying?

A. No.

Q. So on that video do you recall yourself telling Woods to drop the knife?

A. Yes.

Q. Do you recall yourself saying, "It isn't worth it"?

A. Yes.

Q. What did you mean by that?

A. I mean, a silly knife ain't worth your life. A knife ain't worth your life, if they're asking you to drop it, drop it. As far as what I meant, that's what I meant.

Officers are pointing guns at you, you have a knife, let it go. It's not worth your life. It's not worth you agitating somebody who can essentially take your life over not dropping a simple knife. Just let due process be, and that's it.

Q. So it was clear to you what the officers were asking?

A. Yes.

Q. All right. Thank you.

Actually, one last thing. Exhibit marked as next in order.

COURT REPORTER: 3.

(Exhibit No. 3 was marked for identification.)

BY MR. CONNELLY:

Q. Does this knife appear to be that or similar to the knife you saw Mr. Woods had at the time of the incident?

A. I seen the metal part of the knife, yeah.

Q. Okay. All right. Thank you.

MR. POINTER: I have a couple of followup

# Exhibit O

***Placeholder for Media File***

STATE OF CALIFORNIA )
) ss.
COUNTY OF CONTRA COSTA )

I, Angelica R. Gutierrez, a licensed Certified Shorthand Reporter, duly qualified and certified as such by the State of California;

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That the deposition was by me recorded stenographically at the time and place first herein mentioned, and the foregoing pages constitute a full, true, complete and correct record of the testimony given by the said witness;

That I am a disinterested person, not being in any way interested in the outcome of said action, nor connected with, nor related to any of the parties in said action, or to their respective counsel, in any manner whatsoever.

DATED: July 25, 2018

__/s/Angelica R. Gutierrez_________________

ANGELICA R. GUTIERREZ, CSR No. 13292