# Exhibit P

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

GWENDOLYN WOODS, individually)
and as Successor in Interest )
to Decedent MARIO WOODS,      )
                              )
            Plaintiff,        )
                              )
        vs.                   ) CASE NO.:  3:15-05666-WHO
                              )
CITY AND COUNTY OF            )
SAN FRANCISCO; a municipal    )
corporation, et al,           )
                              )
            Defendants.       )
_____)    CERTIFIED COPY

VIDEO DEPOSITION OF CHARLES AUGUST

THURSDAY, JULY 26, 2018

REPORTED BY:  SHELLI G. ENG, CSR #11397

1

```
1

2                              I N D E X

3

4    EXAMINATION BY:                                    PAGE

5    MR. POINTER                            8, 102, 105

6    MR. CONNOLLY                              96, 104

7                            --o0o--

8

9    Appearance Page                                     3

10   Exhibit Page                                        5

11   Location                                            6

12   Reporter's Certificates                           107

13   Witness Letter                                    108

14   Deponent Signature Page                           109

15   Deponent's Correction Sheet                       110

16   Disposition of Transcript Review                  111

17   Attorney's Notes                                  112

18

19                            --o0o--

20

21

22

23

24

25
```

2

```
 1                        APPEARANCES

 2

 3

 4    For the Plaintiff:

 5              LAW OFFICES OF JOHN L. BURRIS
                   AIRPORT CORPORATE CENTRE
 6             BY:  ADANTE POINTER, ATTORNEY AT LAW
                  7677 Oakport Street, Suite 1120
 7                  Oakland, California 94621
                     Phone: (510) 839-5299
 8                    Fax: (510) 839-3882
                  adante.pointer@johnburrislaw.com
 9

10

11

12    For the Defendants:

13             CITY AND COUNTY OF SAN FRANCISCO
                  OFFICE OF THE CITY ATTORNEY
14        BY:  SEAN FIELD CONNOLLY, DEPUTY CITY ATTORNEY
               KELLY COLLINS, DEPUTY CITY ATTORNEY
15             1390 Market Street, Sixth Floor
                San Francisco, California 94102
16                 Phone: (415) 554-3800
                    Fax: (415) 554-3837
17                 sean.connolly@sfgov.org
                   kelly.collins@sfgov.org
18

19

20

21

22

23

24

25
                                                          3
```

```
 1                        APPEARANCES

 2                        (Continued)

 3

 4

 5   Also Present:

 6                        WINSON SETO
                          NICHOLAS CUEVAS
 7                        SCOTT PHILLIPS

 8

 9

10

11   Videographer:

12                        ANDREW GRAVES
                          (916) 451-7655
13

14

15                        ---oOo---

16

17

18

19

20

21

22

23

24

25
```

4

DEPOSITION OF CHARLES AUGUST

1                        INDEX OF EXHIBITS

2

3    Exhibit                                              Page

4    1     Video . . . . . . . . . . . . . . . . . . . . 89

5

6

7

8

9

10

11

12

13

14

15                        ---oOo---

16

17

18

19

20

21

22

23

24

25

5

```
 1              IN THE UNITED STATES DISTRICT COURT

 2        IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3   GWENDOLYN WOODS,
     individually and as
 4   Successor in Interest to
     Decedent MARIO WOODS,
 5
               Plaintiff,
 6
          vs.                        Case No. 3:15-05666-WHO
 7
     CITY AND COUNTY OF
 8   SAN FRANCISCO; a municipal
     corporation, et al,
 9
               Defendants.
10   _____/

11

12              BE IT REMEMBERED THAT, pursuant to Notice,

13   and on Thursday, July 26, 2018, commencing at the hour of

14   1:47 p.m. thereof, at THE LAW OFFICES OF JOHN L. BURRIS,

15   Airport Corporate Center, 7677 Oakport Street, Suite

16   1120, Oakland, California 94621, before me, SHELLI G.

17   ENG, C.S.R. No. 11397, a Certified Shorthand Reporter in

18   the State of California, there personally appeared

19                      CHARLES AUGUST,

20   called as a witness by the Plaintiff; who, having been

21   duly affirmed by me, was thereupon examined and testified

22   as is hereinafter set forth.

23                      ---oOo---

24

25
```

6

```
 1    reporter please swear in the witness.

 2                (Oath administered.)

 3                        EXAMINATION

 4    BY MR. POINTER:

 5         Q.   Officer, will you please state and spell your

 6    full name for the record.

 7         A.   Charles, C-h-a-r-l-e-s.  August, A-u-g-u-s-t.

 8         Q.   Do you sometimes also go by Derek?

 9         A.   Yes.

10         Q.   Officer August, are you currently employed as

11    an officer for the San Francisco Police Department?

12         A.   Yes.

13         Q.   How long have you been employed as a police

14    officer by San Francisco PD?

15         A.   Eleven years.

16         Q.   Is that the only police department you've

17    worked for?

18         A.   Yes.

19         Q.   Are you currently still on patrol?

20         A.   No.

21         Q.   And when was the last time you were on patrol?

22         A.   December 2nd, 2015.

23         Q.   That's the same date that Mario Woods was shot

24    and killed?

25         A.   Yes.
```

8

```
 1    interacting with Mario Woods, did you remember your

 2    training as relates to identifying suicidal statements?

 3              MR. CONNOLLY:  Objection to the word

 4    "remember" and what that means in this context.

 5              THE WITNESS:  Yes.  But in that instance, I

 6    didn't take that as a suicidal comment.

 7    BY MR. POINTER:

 8        Q.    Okay.  So now I'm asking you, on December 2nd

 9    of 2015, what was your understanding of your training as

10    relates to identifying suicidal statements?

11              THE WITNESS:  During the incident, I wasn't

12    thinking of my training of suicidal comments.

13    BY MR. POINTER:

14        Q.    Okay.  Now, when you first -- strike that.

15              Were you familiar with Mario Woods prior to

16    this day?

17        A.    No.

18        Q.    Okay.  Never heard the name?

19        A.    No.

20        Q.    When you saw him, he didn't look like someone

21    who was familiar to you, correct?

22        A.    No.

23        Q.    All right.  When you first saw Mario Woods, he

24    was standing at a bus stop, correct?

25        A.    Yes.
```

61

DEPOSITION OF CHARLES AUGUST

1      Q.   Okay.  In line with other people who were at
2  the bus stop, correct?
3      A.   Yes.
4      Q.   Was he doing anything that you considered
5  unusual?
6      A.   No.
7      Q.   Was he doing anything that you considered to
8  be threatening to the other people at the bus stop?
9      A.   No.
10      Q.   Was he doing anything that you considered to
11  be homicidal in nature?
12      A.   No.
13      Q.   And you were driving with your partner,
14  Officer Thompson, correct?
15      A.   Yes.
16      Q.   Okay.  Ultimately, you directed
17  Officer Thompson -- wait, were you driving?
18      A.   I was passenger.
19      Q.   Okay.  Sorry.
20           You pointed out Mr. Woods to Officer Thompson,
21  correct?
22      A.   Yes.
23      Q.   Okay.  Ultimately, the car was pulled and
24  stopped near the bus stop where Mr. Woods was standing
25  at, right?

62

DEPOSITION OF CHARLES AUGUST

1     A.   Yes.

2     Q.   Okay.  Yourself and your partner got out of

3   your patrol car, right?

4     A.   Yes.

5     Q.   Prior to getting out of the patrol car, did

6   Mr. Woods try to walk away from that area of the bus

7   stop?

8     A.   No.

9     Q.   Okay.  Prior to you and your partner getting

10  out of the patrol car, did Mr. Woods touch anyone that

11  was there at the bus stop?

12    A.   Not that I saw.

13    Q.   Okay.  You guys pull up to the bus stop.  You

14  got out of your car, correct?

15    A.   Yes.

16    Q.   What happened next?

17    A.   I got out of the car and he said, "I'm not

18  going with you."

19    Q.   Okay.  Had you said anything to him before he

20  said the statement that you say he said?

21    A.   No.

22    Q.   Okay.  When he made that statement,

23  approximately how much distance or space was between

24  yourself and Mr. Woods?

25    A.   About 10 feet.

63

1      Q.   Okay.  When he made the statement, did he have

2   anything in his hands?

3      A.   I believe he had a can of soda.

4      Q.   Okay.

5      A.   And it was shortly after that comment that he

6   presented the knife.

7      Q.   Okay.  When he, as you say, presented the

8   knife, did he make any statements at or about -- any

9   additional statements at or about that time?

10      A.   No.

11      Q.   So I'm just going to try to take you through

12   the sequence of events, and I'm going to make sure I

13   didn't skip anything because I'm trying to have it

14   jumbled the best I can.

15           So you pull up to the bus stop.  You and your

16   partner both get out of the car, correct?

17      A.   Yes.

18      Q.   Okay.  You get out of the car.  Mr. Woods has

19   a soda in his hand and he tells you or speaks in your

20   direction saying, "I'm not going with you," correct?

21      A.   Yes.

22      Q.   Okay.  What happened next?

23      A.   He presented the knife.  I drew my firearm.  I

24   pointed it at him.  And he said, "You're going to have

25   to squeeze that."

64

DEPOSITION OF CHARLES AUGUST

1      Q.   Okay.  And you didn't take that statement as a

2   suicidal statement?

3      A.   No.

4      Q.   Did you take it as a homicidal statement?

5      A.   No.

6      Q.   Did you -- when you pulled out the knife, can

7   you describe how he was holding it or presented it to

8   you, to use your word?

9      A.   The blade was pointed forward and he was

10   holding it down at his side.

11      Q.   Did he raise the blade towards you when he was

12   talking?

13      A.   No.

14      Q.   Did he swipe at you with the blade while he

15   was talking?

16          MR. CONNOLLY:  Wait.  I'm sorry, Mr. Pointer.

17   I didn't hear the end of that question.

18   BY MR. POINTER:

19      Q.   Did he swipe at you with the blade or the

20   knife while he was talking?

21      A.   No.

22      Q.   Did you hear what you perceived to be a

23   reaction from any of the civilians or non-police

24   officers that were in that area?

25          MR. CONNOLLY:  Objection.  Vague as to time.

65

1   BY MR. POINTER:

2        Q.   When he made the statement, did you hear any

3   reaction to anybody around that area?

4        A.   Not that I recall.

5        Q.   Okay.  At the time he made that statement and

6   he presented the knife, did you tell any of the people

7   who were in that area to leave, to get back?

8        A.   No.

9        Q.   When he made the statement and presented a

10  knife, did you hear your partner give any orders or

11  commands or make statements to the people in the area to

12  leave or to get back?

13       A.   No.

14       Q.   What happened next?

15       A.   He began to walk towards 3rd Street and then

16  go around the corner of the building.

17       Q.   Okay.  And did you and your partner then

18  follow him?

19       A.   Yes.

20       Q.   Okay.  Did you guys triangulate on Mr. Woods?

21  Triangulate.

22       A.   No.

23       Q.   Just describe for me how you guys followed

24  Mr. Woods from at or about that bus stop to 3rd Street.

25       A.   As he walked around the corner from the

66

1    building, I followed behind him at about a distance of

2    approximately 15 feet.  My partner was behind me.

3        Q.   Okay.  And as some point in time, to use my

4    term, he turned the corner and was on 3rd Street, right?

5        A.   Yes.

6        Q.   Okay.  And did you and your partner continue

7    to essentially follow him?

8        A.   Yes.

9        Q.   Okay.  What happened next?

10       A.   By the time we made it mid block, we were

11   walking towards Gilman, other officers arrived on the

12   scene.

13       Q.   And from what direction did they arrive from?

14       A.   I couldn't tell you directions.  Some were

15   coming northbound, 3rd Street from Gilman.

16       Q.   Those officers -- if I may, just discuss those

17   officers that were coming northbound from Gilman.  Were

18   they in a car?  Were they on foot?  Both?

19       A.   Vehicle.  Car.

20       Q.   Car, okay.

21           So you see the officers pulling up to the

22   scene coming down third from Gilman towards Fitzgerald?

23       A.   Yes.

24       Q.   Okay.  Do you see those officers get out of

25   their car?

67

1        A.   I don't recall.

2        Q.   Okay.  When Mr. Woods was walking towards

3   Gilman on 3rd Street, did you see any officers on foot

4   coming from Gilman towards your direction?

5        A.   Not that I recall.

6        Q.   Okay.  So you mentioned you see officers and a

7   patrol car coming down 3rd Street essentially from

8   Gilman towards Fitzgerald.  What happened next?

9        A.   When enough officers got on the scene, there

10   was a perimeter set around Mario.

11        Q.   Okay.  And that perimeter consisted of what?

12   Police officers?

13        A.   Yes.

14        Q.   And behind him was a series of buildings,

15   correct?

16        A.   Yes.

17        Q.   Okay.  And when you say the perimeter, is that

18   the semicircle?

19             MR. CONNOLLY:  Objection.  Vague.

20             THE WITNESS:  I would say perimeter.

21   BY MR. POINTER:

22        Q.   Okay.  How many officers were part of this

23   perimeter that you're talking about?

24        A.   I don't recall.

25        Q.   Do you have an approximation?  Best estimate?

68

1    words to the effect, "Come close and I will cut you," or

2    words to that effect?

3         A.   No.

4         Q.   Did you hear him make any -- strike that.

5              When he made the statement at the corner where

6    he said, "I'm not going with you, you're going to have

7    to squeeze," or words to that effect, did you take those

8    as a threat to you?

9         A.   No.

10        Q.   Prior to the half circle being formed, did you

11   hear Mr. Woods make any verbal threats to anybody about

12   what he was going to do with the knife?

13        A.   No.

14        Q.   Okay.  Now, you had mentioned that Mr. Woods

15   was traveling down 3rd Street going towards Gilman on

16   3rd, right?

17        A.   Yes.

18        Q.   At some point in time, he reversed course and

19   came back towards Fitzgerald still on 3rd, right?

20        A.   Yes.

21        Q.   Okay.  When he changed course from going from

22   Fitzgerald to Gilman, were there officers arriving from

23   Gilman to the scene?

24        A.   I'm sorry.  Say that one more time.

25        Q.   Sure.

70

1    I'm trying to figure out when Mr. Woods

2 changed course from going towards Gilman on 3rd and then

3 started going towards Fitzgerald on 3rd, were there

4 officers coming from Gilman at that time?

5    A.   Is this prior to the perimeter or after the

6 perimeter?

7    Q.   Prior to the perimeter.  I'm sorry.  Let me

8 back up, actually, because I think that's an important

9 point.  I don't want to confuse you or me.

10    You mentioned that at some point in time, this

11 half circle was formed, right?

12    A.   Um-hmm.

13    Q.   "Yes"?

14    A.   Yes.

15    Q.   Okay.  Had Mario Woods changed course from

16 going towards Gilman back towards Fitzgerald prior to

17 the half circle being formed?

18    A.   Yes.  He had changed direction.

19    Q.   Okay.  Now, when he had changed direction, was

20 that at or about the time there were officers coming

21 from Gilman?

22    A.   Yes.  That was like right before the first

23 patrol car had pulled up.

24    Q.   Okay.  So is it fair to say that he stopped

25 walking in the direction of Gilman prior to that first

71

1    patrol car pulling up?

2         A.   Yes.

3         Q.   Okay.  There was a period of time where

4    Mario Woods, as you said, has the half circle in front

5    of him, right?  What is your best estimate how much time

6    he was in front of this half circle, if you will?

7         A.   I couldn't tell you.

8         Q.   Okay.  The less lethal was deployed or shot

9    while Mr. Woods was in front of this half circle,

10   correct?

11        A.   Yes.

12        Q.   Okay.  Was there any warning -- did you hear

13   any warnings made that the less lethal was going to be

14   used on him before it was fired?

15        A.   Yes.

16        Q.   Can you describe what that warning was?

17        A.   "Red light.  Less lethal.  Less lethal.  Stop

18   or I will shoot."

19        Q.   Who issued those orders?

20        A.   Jennifer Traw.

21        Q.   Jennifer is a woman or a female?

22        A.   Yes.

23        Q.   And I believe you said she issued those orders

24   prior to firing the less lethal weapon?

25        A.   Yes.

                                                          72

1      Q.    Okay.  Did you hear Mario Woods give what you

2  interpreted to be a verbal response to that?

3      A.    No.

4      Q.    When she -- strike that.

5            When she gave that order, was Mario Woods

6  facing her?

7      A.    No.

8      Q.    Did you see what appeared to be -- strike

9  that.

10           Did you see what you perceived to be any

11 response by him to those orders or commands?

12     A.    I'm sorry.  Say that again.

13     Q.    I'm trying to figure out when you heard

14 Officer Traw give those orders and commands, did you see

15 Mario respond to those orders and commands?

16     A.    No.

17     Q.    And at some point in time, he was shot with

18 the less lethal, right?

19     A.    Yes.

20     Q.    Okay.  Did you see the less lethal hit him?

21     A.    Yes.

22     Q.    Okay.  Did you also see Officer Ortiz spray

23 the pepper spray on Mario Woods?

24     A.    I saw Officer Ortiz spray pepper spray towards

25 his direction, yes.

                                                        73

1      Q.    Okay.  How close did Officer Ortiz get to

2   Mario Woods when he sprayed the pepper spray?

3      A.    Not close.

4      Q.    More than an arm's length away?

5      A.    Yeah.

6      Q.    After Officer Ortiz sprayed the pepper spray,

7   did Mr. Woods look disoriented?

8      A.    No.

9      Q.    After Officer Ortiz sprayed the pepper spray,

10  did Mr. Woods say anything?

11     A.    No.

12     Q.    After Mr. Ortiz or Officer Ortiz sprayed the

13  pepper spray, did Mr. Woods walk towards Officer Ortiz?

14     A.    No.

15           MR. POINTER:  All right.  Let's take a break

16  right here.

17           THE VIDEOGRAPHER:  Time is 3:05 p.m.  We are

18  now off the record.

19           (Whereupon recess was taken from 3:05 to

20           3:23.)

21           THE VIDEOGRAPHER:  The time is 3:23 p.m.  We

22  are now back on the record.

23  BY MR. POINTER:

24     Q.    Officer, same rules apply as previously, okay?

25     A.    Okay.

                                                        74

1        Q.    When we were discussing before we took our

2    break that Mario Woods was on 3rd Street, officers had

3    formed -- I believe we called it a half circle?

4        A.    Perimeter.

5        Q.    Perimeter, which was in the shape of a half

6    circle?

7        A.    Yes.

8        Q.    And Mr. Woods -- sorry.

9             Officer Traw had given Mr. Woods some orders,

10   right?

11       A.    Yes.

12       Q.    As well as a warning that she was going to use

13   less lethal, correct?

14       A.    Yes.

15       Q.    Mr. Woods didn't appear to respond to those

16   orders or commands, correct?

17       A.    Correct.

18       Q.    Less lethal was used against him, correct?

19       A.    Correct.

20       Q.    Officer Ortiz sprayed some pepper spray in

21   Mr. Woods' direction, correct?

22       A.    Correct.

23       Q.    Additional rounds of less lethal were fired at

24   Mr. Woods, correct?

25       A.    Correct.

                                                              75

1    Q.   At some point in time, Mr. Woods went towards

2    the ground; is that right?

3    A.   Correct.

4    Q.   Down on his knee?

5    A.   No.  He squatted down.

6    Q.   Okay.  He squatted down, and then he

7    essentially stood back up, right?

8    A.   Correct.

9    Q.   During the point in time where he went down

10   towards the ground or squatted down and then stood back

11   up, did you hear Mario Woods say anything?

12   A.   No.

13   Q.   Okay.  Now, given that officer -- yourself,

14   Officer Thompson, Officer Traw, perhaps other officers

15   had been giving commands to Mr. Woods to either drop the

16   knife, stop, things of that nature, and he wasn't

17   responding, did you give any consideration to using

18   other communication tactics?

19        MR. CONNOLLY:  Objection.  Vague.

20        THE WITNESS:  Yes.

21   BY MR. POINTER:

22   Q.   What did you consider?

23   A.   There were enough people giving him commands

24   to drop the knife, get down on the ground and such,

25   because I had built a rapport with him from the

76

1    beginning, we had conversation, I lowered my voice, and

2    because he would periodically look at me and say things,

3    I would tell him, you know, just put the knife down, you

4    know, let's not do it this way, things of that sort.

5         Q.   So it was your opinion that you built a

6    rapport with Mr. Woods?

7         A.   Yes.

8         Q.   And you essentially -- if I heard you

9    correctly, you're saying you told him words to the

10   effect of let's not do it this way?

11        A.   Yes.

12        Q.   What point in time during the incident did you

13   make those statements?

14        A.   While he was in perimeter.

15        Q.   Okay.  That was also at the same time when

16   there were other officers giving him orders, right?

17        A.   Yes.

18        Q.   It's fair to say those officers were yelling

19   the orders, right?

20        A.   Yes.

21        Q.   And you say you lowered your voice?

22        A.   Yes.

23        Q.   Now, at some point, Mr. Woods starts moving

24   from where he was at, and then kind of in front of this

25   half circle back towards Fitzgerald, correct?

                                                        77

1      A.    Yes.

2      Q.    Can you describe the manner in which he was

3    moving on 3rd Street towards Fitzgerald?  For example,

4    was he running?  Was he jogging?

5      A.    He was walking.

6      Q.    Okay.  Did it appear to you that he was

7    walking with a limp?

8      A.    No.

9      Q.    You didn't see him with a limp?

10     A.    No.

11     Q.    Now, from the position that you were in in

12    terms of this half circle, Mario Woods was in front of

13    the half circle, correct?

14     A.    Yes.

15     Q.    All right.  And when Mr. Woods started walking

16    towards Fitzgerald on 3rd Street, did you move from your

17    position?

18     A.    Yes.

19     Q.    Okay.  Can you describe how you moved from

20    your position?

21     A.    Yes.  I sidestepped to my left to put a

22    barrier between Mario and the people that I could hear

23    behind me.

24     Q.    Okay.  Did you notice whether there were any

25    other officers behind you in that direction?

78

DEPOSITION OF CHARLES AUGUST

1      Q.   As Mario was walking essentially from where he

2   was at in front of the half circle and started moving

3   back towards Fitzgerald, did you hear him say anything?

4      A.   Yes.

5      Q.   What did he say?

6      A.   He told me that I was going to have to shoot

7   him.

8      Q.   Okay.  Did you interpret that to be a suicidal

9   statement?

10      A.   No.

11      Q.   And when he said that you're going to have to

12   shoot him, was he doing anything with the knife?

13      A.   He was still walking with it at his side.

14      Q.   Okay.  With the pointed edge of the knife

15   pointed down towards the ground?

16      A.   With the pointed edge faced towards me.

17      Q.   Now, obviously, at some point, you fired your

18   gun, right?

19      A.   Yes.

20      Q.   Did you make a decision as it relates to, for

21   example, if he gets to a particular location on that

22   street, that you were going to fire your gun?

23      A.   No.

24      Q.   Had you made a decision that if he gets within

25   a certain amount of feet or distance to you, that you

80

DEPOSITION OF CHARLES AUGUST

1       Q.   I'm just asking, did you make a decision that

2   if Mario Woods got within a certain amount of feet of

3   you, inches of you, yards of you, that you were going to

4   fire your gun prior to you actually using your gun?  Did

5   you have that line that if this guys gets within two

6   feet of me, five feet of me, ten feet of me, I'm going

7   to shoot him?  Had you made such a decision in your mind

8   prior to you actually firing your gun?

9            MR. CONNOLLY:  Same objection.

10  BY MR. POINTER:

11       Q.   And you can answer.

12       A.   I was prepared to use my weapon if he got too

13  close and I felt danger.

14       Q.   Okay.  So then the question is, what had you

15  in your mind determined was too close?

16            MR. CONNOLLY:  Objection.  Vague.

17            MR. POINTER:  Sure.

18            THE WITNESS:  The distance when I fired.

19  BY MR. POINTER:

20       Q.   Okay.  What distance is that?

21       A.   I have no idea.

22       Q.   Okay.

23       A.   It was within 10 feet.

24       Q.   Okay.  So had you made a decision that if he

25  got within 10 feet of you, you were going to shoot your

83

1   gun?

2       A.   In my head at that time, the distance didn't

3   matter.   It was the fact that he was closing the

4   distance and he was closing the distance at a fast pace,

5   which is why I decided to discharge my firearm.

6       Q.   When you say fast pace, was it a faster pace

7   than he had been walking?

8       A.   It was a faster pace than he was walking.   He

9   started to pick up the pace.

10      Q.   When he picked up the pace, he was closing the

11  distance, that's when you decided to fire your gun?

12      A.   Yes.

13      Q.   Had you told anyone that you had planned to

14  move from your location in the half circle to block his

15  path?

16      A.   No.

17      Q.   Did you tell him before you fired your gun,

18  I'm going to shoot you?

19      A.   No.

20      Q.   Did you see him raising the knife immediately

21  prior to you firing your shots?

22      A.   No, but he still had the knife clenched in his

23  right hand and walking in my direction.

24      Q.   Okay.  So he had the knife, but he had the

25  knife the entire time you were out there dealing with

84

1    he would have -- I'm sorry.

2    BY MR. POINTER:

3         Q.    I'm just trying to figure out the trajectory.

4         A.    No, no.  I hear you.  Go ahead.

5         Q.    When you started -- when you left from in

6    front of the half circle and you started moving down

7    3rd Street towards Fitzgerald, if you would not have

8    left from your position where you were at as part of the

9    half circle, you two would not have intersected?

10        A.    No, but he would have met the civilians

11   standing behind me.

12        Q.    So essentially, you moved from your

13   position -- you moved from your position in the half

14   circle and cut off his path to which you thought would

15   bring him in contact with civilians, correct?

16        A.    Yes.

17        Q.    Okay.  And you say that as he was making that

18   walk from where he was in front of the half circle

19   towards Fitzgerald, he started moving at a faster pace,

20   right?

21        A.    Yes.

22        Q.    And so you ultimately fired your gun, right?

23        A.    Yes.

24        Q.    And you double tapped, right?

25        A.    Yes.

86

1      Q.   What does that mean?

2      A.   I fired twice.

3      Q.   Successive shots, right?

4      A.   I believe so.

5      Q.   When you double tap, is there any pause

6  between the shots?

7      A.   Yes.

8      Q.   How long was that pause?

9      A.   Depends on the circumstances.

10     Q.   Okay.  Well, these circumstances, when you

11  double tapped and shot your gun at Mario Woods, how much

12  of a pause was there between your two shots that you

13  fired?

14     A.   At that time, when I shot, I believe that --

15  I'm sorry.  At that time, when I shot twice, and he

16  dropped, I no longer shot.

17     Q.   Okay.  But I'm asking you, you mentioned that

18  there was a pause between your two shots, correct?

19     A.   You asked me if when we -- if we double tap,

20  is there a pause.

21     Q.   Let me back up.  I'm sorry.  I confused you

22  and maybe even myself.

23          You fired twice?

24     A.   Yes.

25     Q.   Okay.

87

1       A.   I believe so.

2       Q.   Was there a pause between your two shots?

3       A.   No.

4       Q.   And you said you used the technique called

5    double tapping, correct?

6       A.   Yes.

7       Q.   Explain to me what that is mechanically in

8    terms of what you do with your finger or your hands?

9       A.   I pull the trigger twice.

10      Q.   Successively, meaning back to back, correct?

11      A.   Yes.

12      Q.   At the time you pulled the trigger,

13   Mario Woods was facing you?

14      A.   Yes.

15      Q.   And you said you stopped firing because he

16   started going down?

17      A.   Yes.

18      Q.   Correct?

19           Had you heard any gun shots prior to you

20   pulling your trigger?

21      A.   No.

22      Q.   Is it fair to say you were the first person to

23   fire?

24           MR. CONNOLLY:  Objection.  Lacks foundation.

25   Calls for speculation.

88

1    directly in front of you.  I'm offset from you, right?

2         A.   Right.

3         Q.   I'm to your left, right?

4         A.   Yes.

5         Q.   But I'm in front of you, correct?

6              If I was directly in front of you, I have to

7    move to my left so that, essentially, our heads would be

8    in line, right?

9         A.   Yes.

10        Q.   Okay.  So when I asked you was Mario Woods

11   directly in front of you at the time you shot, that's

12   what I am trying to figure out.  Were you offset or was

13   he directly in front of you?

14        A.   At the time that I shot, he was directly in

15   front of me.

16        Q.   Okay.  Mario Woods is going down the street.

17   He didn't change his direction, right?

18        A.   No.

19        Q.   Okay.  You moved, sidestepped to your left,

20   correct?

21        A.   Yes.

22        Q.   And then essentially blocked his path, right?

23        A.   Yes.

24        Q.   Okay.  It's your testimony that as you

25   sidestepped, you actually placed yourself directly in

                                                          93

```
 1    front of him so that you were not offset from him,

 2    correct?

 3        A.   Yes.

 4        Q.   Now, as you sidestepped to the left, you were

 5    actually closing the distance between yourself and

 6    Mr. Woods, right?

 7             MR. CONNOLLY:  Objection.  Vague.

 8             THE WITNESS:  I'm sorry.  Repeat that again.

 9             MR. POINTER:  Can I have that read back,

10    please.

11             (Whereupon the record was read as follows:

12             "Question:  Now, as you sidestepped to the

13             left, you were actually closing the distance

14             between yourself and Mr. Woods, right?")

15             THE WITNESS:  I sidestepped to the left, but

16    he was closing the distance.

17    BY MR. POINTER:

18        Q.   Okay.  So your movements to the left did not

19    bring you closer to Mario Woods?

20        A.   No.

21             MR. CONNOLLY:  Objection.  Vague and

22    argumentative.

23             THE WITNESS:  No.

24             MR. POINTER:  Let's take a quick break.  I

25    think we are about to be done, unless you have some
```

                                                          94

1    Q.   And I'm sorry, the number you said that you

2  weighed today, did you say 220.

3    A.   225.

4    Q.   225.  So you might have been 230 or so, 235?

5    A.   Yeah, about.

6    Q.   Okay.  And then finally, did you ever tell

7  Mario Woods that if he got within a certain amount of

8  feet or distance from you that you would shoot him?

9    A.   No.

10        MR. POINTER:  Okay.  No further questions.

11                     EXAMINATION

12 BY MR. CONNOLLY:

13    Q.   I have a couple of follow-up questions in a

14 particular area that counsel asked you about.

15        The exhibit he showed you, Officer August, and

16 I'm referring to the videotape, I think it was

17 Plaintiff's No. 3 that counsel characterizes it as.

18 Counsel -- in that context, counsel asked you about

19 sidestepping to block the path of Mario Woods.  Do you

20 remember that?

21    A.   Yes.

22    Q.   And you said that you had sidestepped into

23 essentially Mario Woods' line of advance along the

24 buildings; is that fair?

25    A.   Yes.

96

DEPOSITION OF CHARLES AUGUST

1      Q.   At the time you sidestepped into Mario Woods

2   line of advance along the building, were you

3   backpedaling or walking backwards at the same time?

4      A.   Yes.

5      Q.   Okay.   And at the time you shot Mario Woods,

6   were you walking backwards?

7      A.   Yes.

8      Q.   You were backpedaling?

9      A.   Yes.

10      Q.   And when you walked or when you sidestepped

11   into Mario Woods' line of advance, did he stop?

12      A.   No.

13      Q.   Did he slow down?

14      A.   No.

15      Q.   Did he drop the knife?

16      A.   No.

17      Q.   Did he still have the knife in his hand?

18      A.   Yes.

19      Q.   In your opinion or estimation, did he appear

20   to see you at that point in time?

21      A.   Yes.

22      Q.   Did you shoot your gun at Mario Woods?

23      A.   Yes.

24      Q.   Why did you shoot Mario Woods?

25           MR. POINTER:   Objection.   Calls for a

97

1  narrative.

2        THE WITNESS:  Based on the knowledge that I

3  had that he was a suspected stabbing -- he was a

4  stabbing suspect, he failed to surrender and drop the

5  knife, the fact that he was walking towards me with a

6  knife still in hand, the fact that he told me that he

7  wasn't going to go with me, that I was going to have to

8  shoot him, I determined that he probably didn't want to

9  go to jail, and the fact that there were civilians

10  behind me, and he was coming dangerously close.

11  BY MR. CONNOLLY:

12      Q.   Okay.  I maybe asked it too broadly.  I want

13  to focus on that last thing you just said.

14        In your opinion, did Mario Woods get

15  dangerously close to you?

16      A.   Yes.

17      Q.   What do you mean by that?

18      A.   He was close enough to stab me or slash at me

19  if he wanted to.

20      Q.   And so counsel asked you whether your decision

21  to shoot him was a matter of his distance from you.  Do

22  you recall those questions?

23      A.   Yes.

24      Q.   Was it more than just a matter of distance

25  that Mario Woods was from you that dictated whether or

98

1    not you were going to shoot him?

2         A.   Yes.

3         Q.   What were the other factors?

4              MR. POINTER:  Objection.  Calls for a

5    narrative.

6              MR. CONNOLLY:  Let me rephrase it.

7         Q.   Besides distance, was the fact that he had the

8    knife in his hand still a factor?

9         A.   Yes.

10        Q.   Is the fact that he was closing that distance,

11   whatever that distance was, still a factor?

12        A.   Yes.

13        Q.   Counsel asked you about the position of the

14   knife at the time you shot him earlier in the

15   deposition.  Do you recall that?

16        A.   Yes.

17        Q.   Could you have been stabbed with that knife

18   from the position it was in at the time you shot as

19   Mario Woods advanced toward you?

20        A.   Yes.

21        Q.   Did you see the knife in his hand at the time

22   you fired?

23        A.   Yes.

24        Q.   Do you have any training experience or

25   knowledge otherwise about how a knife can kill or

99

```
 1   out.

 2        Q.   Do you know where the femoral artery is?  Have

 3   you heard of the femoral artery?

 4        A.   Yes.

 5        Q.   Have you heard of the brachial artery?

 6        A.   Yes.

 7        Q.   All right.  Counsel asked you whether you

 8   yourself warned Mario Woods at any point whether you

 9   would shoot him or use less lethal force against him as

10   a warning.  Do you recall that?

11        A.   Yes.

12        Q.   And I believe you testified that you did not

13   have a recollection of yourself saying that, correct?

14        A.   Correct.

15        Q.   Did you hear any other officer at the scene

16   issue a warning that they would shoot or they would use

17   lethal force before the shooting occurred?

18        A.   Yes.

19        Q.   Do you know who that was?

20        A.   I do not.

21        Q.   Do you have a distinct recollection of hearing

22   that warning?

23        A.   Yes.

24        Q.   Okay.  And for the record, can you tell me

25   what race you identify as?
```

101

1          A.    African-American.

2               MR. CONNOLLY:   All right.   I have nothing

3     further subject to Mr. Pointer's -- if he has questions.

4                       FURTHER EXAMINATION

5     BY MR. POINTER:

6          Q.    Officer, you just testified you heard a

7     warning.   You said you had a distinct memory of hearing

8     officers warn Mr. Woods that he would be shot and killed

9     or shot if he didn't comply; is that right?

10         A.    Yes.

11         Q.    When did that happen during the course of this

12    incident?

13         A.    Prior to the shots being fired.

14         Q.    How much time had passed before the shots

15    being fired?   Are we talking about seconds?   Are we

16    talking about minutes?

17         A.    Seconds.

18         Q.    Okay.   So is it fair to say while Mr. Woods

19    was walking down 3rd towards Fitzgerald?

20         A.    I would say probably prior to that.

21         Q.    While he was in the semicircle?

22         A.    Yes.

23         Q.    Okay.   Was it prior to the last round of less

24    lethal being fired at him?

25         A.    No.

1    Q.   So it was after the last round of less lethal,

2    but before gun shots actually went off?

3    A.   Yes, I would say.

4    Q.   Was it prior to him actually started moving or

5    walking towards Fitzgerald?

6    A.   Yes.

7    Q.   So at some time where -- sometime between the

8    time the last less lethal shot was fired and Mr. Woods

9    started walking is when you say that you have a distinct

10   memory of Mr. Woods being warned by another officer that

11   he would be shot; is that correct?

12   A.   Yes.

13   Q.   Okay.  And you don't know who that officer was

14   though, correct?

15   A.   No.

16   Q.   Okay.  On the date of this incident, you were

17   wearing a bulletproof vest?

18   A.   Yes.

19   Q.   What weapons did you have on you besides your

20   firearm?

21   A.   I had a collapsable baton.

22   Q.   When you say "collapsable baton," what does

23   that mean?

24   A.   It extends and retracts.

25   Q.   Okay.  What does it extend to?

103

1    STATE OF CALIFORNIA )

2    COUNTY OF ALAMEDA   )

3            I, Shelli G. Eng, Certified Shorthand Reporter,

4    No. 11397, State of California, do hereby certify:

5            That prior to being examined, the witness named

6    in the foregoing deposition, to wit, CHARLES AUGUST, was

7    by me duly affirmed to testify the truth, the whole truth

8    and nothing but the truth; that said deposition was taken

9    down by me in shorthand at the time and place therein

10   named and thereafter reduced to typewriting under my

11   direction and supervision; that the witness was given an

12   opportunity to read and correct said deposition and to

13   subscribe the same.  Should the signature of the witness

14   not be affixed to the deposition, the witness did not

15   avail himself of the opportunity to sign or the signature

16   has been waived.

17           I further certify that I am not of counsel for

18   either or any of the parties to the said deposition, nor

19   in any way interested in the event of this action and

20   that I am not related to any of the parties thereto.

21           WITNESS MY HAND this 3rd day of August, 2018.

22

23                        --/s/Shelli G. Eng----------
                          SHELLI G. ENG, CSR NO. 11397
24                        CERTIFIED SHORTHAND REPORTER

25

                                                           107