# Exhibit Q

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

```
GWENDOLYN WOODS, individually)
and as Successor in Interest )
to Decedent MARIO WOODS,     )
                             )
            Plaintiff,       )
                             )
        vs.                  ) CASE NO.:  3:15-05666-WHO
                             )
CITY AND COUNTY OF           )
SAN FRANCISCO; a municipal   )
corporation, et al,          )
                             )
            Defendants.  )      CERTIFIED COPY
_____)
```

VIDEO DEPOSITION OF OFFICER WINSON SETO

TUESDAY, JULY 24, 2018

REPORTED BY:  ANGELICA R. GUTIERREZ, CSR NO. 13292

1

```
 1                    I N D E X

 2

 3   EXAMINATION BY:                          PAGE

 4   MS. NOLD                                   7

 5
                        --o0o--
 6

 7   Appearance Page                            3

 8   Exhibit Page                               4

 9   Location                                   5

10   Reporter's Certificates                  149

11   Deponent Signature Page                  150

12   Deponent Signature Waiver                151

13   Witness Letter                           152

14   Changes and/or Corrections               153

15   Attorney's Notes                         154

16

17                      --o0o--

18

19

20

21

22

23

24

25

                                               2
```

```
 1                          APPEARANCES

 2

 3        FOR THE PLAINTIFF:

 4             LAW OFFICES OF JOHN L. BURRIS
               Airport Corporate Centre
 5             7677 Oakport Street, Suite 1120
               Oakland, California  94621
 6             (510) 839-5200

 7             BY:  MELISSA NOLD, ATTORNEY AT LAW
                    PATRICK BUELNA, ATTORNEY AT LAW
 8

 9        FOR THE DEFENDANTS:

10             OFFICE OF THE CITY ATTORNEY
               1390 Market Street, 6th Floor
11             San Francisco, California 94102
               415-554-3863
12
               BY:  SEAN CONNOLLY, DEPUTY CITY ATTORNEY
13                  KELLY HOLMES, ATTORNEY AT LAW
                    Megan Bettles
14

15

16        ALSO PRESENT:  CUTLER ANDRUS, Videographer

17

18                          --o0o--

19

20

21

22

23

24

25
                                                           3
```

DEPOSITION OF OFFICER WINSON SETO

1

2                          INDEX OF EXHIBITS

3      PLAINTIFF'S          DESCRIPTION                      PAGE

4      1        SFPD Department Bulletin dated 6/15/13,
                consisting of 1 page                         117
5
       2        Department Bulletin, consisting
6               of 1 page                                    131

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              4

1              Pursuant to Notice of Taking Deposition and on

2       Tuesday, July 24, 2018, commencing at the hour of 10:20

3       a.m., thereof, at the Law Offices of John L. Burris, 7677

4       Oakport Street, Oakland, California, before me, ANGELICA

5       R. GUTIERREZ, CSR No. 13292, a Certified Shorthand

6       Reporter and Deposition Officer of the State of

7       California, there personally appeared:

8

9                      WINSON SETO,

10

11      called as a witness by the Plaintiff, who having been duly

12      sworn by me, to tell the truth, the whole truth and noting

13      but the truth, testified as hereinafter set forth:

14

15                     ---O0O---

16

17

18

19

20

21

22

23

24

25

                                                                5

1    Q.   However, we are entitled to your best

2    estimate, even if you're not exactly sure.  Say, for

3    example, you know something happened between 3:00 and

4    4 p.m., we're entitled to that guess, even if you don't

5    know the exact minute and seconds.  Okay?

6    A.   Okay.

7    Q.   And now you're allowed to take a break

8    whenever you need, just let us know and we'll go off

9    the record.  What you are not permitted to do is to

10   take a break in a middle of a question.  Say, for

11   example, I ask you a question, you can't say I need a

12   break.  We'd ask that you finish your response and then

13   we can take a break.  Just let us know.

14   A.   Okay.

15   Q.   And it's fine during your deposition to say

16   you don't know, you don't remember.  Those are fine

17   answers if they're applicable to the situation.

18        Do you have any questions before we get

19   started?

20   A.   No.

21   Q.   Okay.  Who's your current employer?

22   A.   San Francisco Police Department.

23   Q.   And how long have you been with the San

24   Francisco Police Department?

25   A.   Now just over ten years.

11

1    A.   Yes.

2    Q.   And what was that?

3    A.   3 Charley 14 David.

4    Q.   And does your call sign remain the same all

5    the time or does it just depend on what shift you're

6    working?

7    A.   It depends on what shift you're working, what

8    assignment you're working.  For me in particular, it's

9    not the same every day.

10   Q.   Okay.  And on the date of the incident, were

11   you a solo officer or did you have an additional

12   officer in the car with you?

13   A.   I had a partner.

14   Q.   And who was your partner?

15   A.   Officer Shaun Navarro.

16   Q.   And on that day, were you driving or was

17   Officer Navarro driving?

18   A.   I was driving.

19   Q.   Is it fair to assume you graduated from the

20   post certified police academy?

21   A.   Yes.

22   Q.   And what academy did you attend?

23   A.   The San Francisco Police Department Academy of

24   221.

25   Q.   And have you received any law enforcement

16

1          THE WITNESS:  I don't recall providing any

2     additional information.

3          MS. NOLD:  Q.  Okay.  Thank you.

4          Are you familiar with what is referred to as

5     the 21-foot rule?

6     A.   Yes.

7     Q.   And where did you learn about the 21-foot

8     rule?

9     A.   Various sources from the -- through the

10    department, certain trainings, and I think it was a

11    general rule of thumb that I think a lot of

12    organizations had the understanding of.

13    Q.   And can you explain to me what your

14    understanding of what the 21-foot rule is?

15    A.   My understanding, the 21-foot rule is in

16    regards to a police officer or a person with a firearm

17    that's holstered having to deal with the person who is

18    wielding a knife or an edge weapon.  The 21-foot rule

19    is the distance in which a person can close that

20    distance with the edge weapon and attack the person

21    with the holstered firearm.

22    Q.   And is it your understanding that the 21-foot

23    rule applies to situations where an officer's weapon is

24    not in a holster or does that only apply to an officer

25    when the weapon is holstered?

                                                          32

1          MR. CONNOLLY:  Objection; vague; incomplete

2     hypothetical; lacks foundation.

3          THE WITNESS:  So I believe this rule is a rule

4     of thumb and a lot of factors go into play.  If the

5     holster was -- if the firearm was un-holstered, that

6     would change things a little bit.  I think the distance

7     would be closer.  But other factors come into play,

8     such as the speed of the person wielding the edge

9     weapon or the proficiency of the police officer with

10     the firearm.  So it's hard to say, but that was just a

11     rule of thumb.

12          MS. NOLD:  Q.  Okay.  I want to talk

13     specifically now about the incident itself.  Were you

14     dispatched to this incident?

15          A.  Yes.

16          Q.  And prior to arriving on the scene, what do

17     you recall being the nature of the call that you were

18     dispatched to?

19          A.  It was to my understanding that it was an

20     incident regarding a suspect of a stabbing who was also

21     wielding a knife.

22          Q.  Okay.  And when you -- is it fair to say that

23     you then went to the scene where -- the scene which you

24     thought to be the accident as it was occurring?

25          A.  Yes.

33

DEPOSITION OF OFFICER WINSON SETO

1      Q.   And when you first arrived at the incident, do
2  you recall where you parked your vehicle?
3      A.   I can estimate.
4      Q.   And that's perfectly fine.
5      A.   Yes.  Do you want me to tell you the location?
6      Q.   Yes.
7      A.   It was on the street somewhere on Third Street
8  between Fitzgerald and Gilman.
9      Q.   Okay.  And when you arrived on scene, were
10  there any other SFPD officers present that you saw?
11      A.   Yes.
12      Q.   And which officers were present?
13      A.   Did you mean in chronological order or all of
14  them or who I saw first?
15      Q.   When you first arrived, what officers were
16  there that you were able to see?
17      A.   I saw Officer August and Officer Thompson
18  first.
19      Q.   To your understanding at that point, there
20  were no other officers present that you could see?
21          MR. CONNOLLY:  Objection; misstates his
22  testimony; lacks foundation.
23          THE WITNESS:  Not at that moment.  But other
24  officers were right behind me.  So I know officers were
25  responding and coming into the scene just as my partner

34

DEPOSITION OF OFFICER WINSON SETO

1    and myself were.

2           MS. NOLD:  Q.  Okay.  And when you first

3    responded and parked your car, could see Mr. woods?

4        A.  Yes.

5        Q.  And where was Mr. Woods located?

6        A.  He was on the sidewalk -- the east sidewalk on

7    Third Street between Fitzgerald and Gilman.

8        Q.  And in proximity to Mr. Woods at that point,

9    where was Officer August?

10       A.  Officer August was somewhere between behind

11   Mr. Woods and they were both walking southbound.

12       Q.  Okay.  And at that time when you first

13   arrived, where was Officer Thompson?

14       A.  Somewhere behind Officer August.

15       Q.  And can you give me an approximate of how far

16   apart they were?

17       A.  It will be a rough estimate, maybe 10 feet

18   behind him.

19       Q.  Okay.  And how far apart -- your best

20   estimate, how far apart were Officer August and

21   Mr. Woods?

22           MR. CONNOLLY:  Objection; vague as to time.

23           THE WITNESS:  It's been a long time and they

24   were both moving at that time, best guess maybe 20 to

25   25 feet.

35

1    interrupt, but not so much a negotiator.  Crisis

2    intervention is a training that's provided to members

3    of the department, and they're not negotiators.  That's

4    why there was the confusion on that term.

5         Q.   Well, thank you for clarifying, because of

6    course we don't work there so we don't know all the ins

7    and outs and understand the distinctions.

8         A.   Sure.

9         Q.   Crisis intervention, is that a team?

10        A.   I think that's what it's called, but it's not

11   really a team.  It's just people who -- the members of

12   the department who have gone through the training, they

13   receive a pin.  That's a CIT pin that they can wear on

14   their uniform.

15        Q.   Okay.  And have you completed crisis

16   intervention training?

17        A.   I have.

18        Q.   Prior to this incident, had you completed

19   crisis intervention training?

20        A.   Yes.  But it was years before.

21        Q.   Do you know approximately when the year was?

22        A.   Roughly maybe 2010.

23        Q.   Okay.  To your knowledge on the date of this

24   incident, did SFPD have crisis intervention team

25   members available for response?

                                                      37

1      A.   When you say crisis intervention team, CIT

2    members?

3      Q.   Yes.

4           MR. CONNOLLY:  Objection.  Belated objection;

5    lacks foundation.

6           THE WITNESS:  Yes.

7           MS. NOLD:  Q.  Okay.  And to the degree that

8    you understand -- I understand you may not know all the

9    answers to this -- do you know how many crisis

10   intervention -- people who have received crisis

11   intervention training, team members, are available on

12   any given shift?

13          MR. CONNOLLY:  Objection; calls for

14   speculation; lacks foundation.

15          THE WITNESS:  I have no idea.

16          MS. NOLD:  Q.  Okay.  But at that time, you

17   yourself had received the crisis intervention training,

18   although you acknowledge that being several years

19   earlier, correct?

20          MR. CONNOLLY:  Objection; asked and answered.

21          THE WITNESS:  Yes, it was years before.

22          MS. NOLD:  Q.  So when you first arrived on

23   the scene and you got out of your patrol car, what's

24   the first thing you did?

25          A.   Once I stopped the car and parked it?

                                                          38

1    Q.   Yes.

2    A.   I got out of my vehicle, and as I was

3  observing the incident unfold, I also observed that the

4  subject was wielding a knife, and that's what I also

5  heard on the radio.  So my partner, he grabbed the

6  ERIW, and I drew my firearm, and we approached the

7  scene with the subject and other officers in order to

8  try to contain the situation.

9    Q.   At the time when you initially arrived and you

10  saw Mr. Woods with -- you said with a weapon in his

11  hand, correct?  Did you at that point make any attempt

12  to contact dispatch to get any additional assistance

13  from a supervisor?

14    A.   No.  I don't believe that was viable at this

15  time.  There was another officer who was already on the

16  radio giving play by play -- just giving play by play

17  through the radio to other officers and other

18  supervisors on the air.

19    Q.   And who was that officer that was providing

20  communications over the radio?

21    A.   Officer Thompson.

22    Q.   Okay.  So when you arrived, Officer Thompson

23  was already providing that information to dispatch and

24  it was your understanding to the supervisor staff; is

25  that's correct?

39

1    could be a lot of things, and in that situation by me

2    approaching the vicinity to assist him with my firearm

3    drawn, was in a way non-verbal communication to him

4    that I was there to assist.

5        Q.   Okay.  Was there -- when you first arrived and

6    there was Officer Thompson and Officer August and

7    yourself on the scene, was there any discussion among

8    you or any of the officers that you observed where

9    there was any discussion about a plan of how to handle

10   the situation?

11           MR. CONNOLLY:  Objection; lacks foundation.

12           THE WITNESS:  I'm assuming you're talking

13   about verbal communication or some type of formal

14   planning?

15           MS. NOLD:  Q.  Yes.

16       A.   Okay.  No, there wasn't any formal planning on

17   scene, because it was rapidly unfolding and it was

18   rapidly developing.  There is no time to discuss and

19   talk about the situation.

20       Q.   Okay.  And so was there anybody on scene from

21   the time that you first arrived who was providing you

22   directions as far as who --

23           MR. CONNOLLY:  Objection; vague by the word

24   "direction."

25           MS. NOLD:  Okay.  Let me finish the question.

                                                          42

1          MS. NOLD:   Q.   Providing you any sort of

2     direction as far as to where to go, what type of use of

3     force to bring out, anything like that?

4          A.   Well, I heard on the radio that the initial

5     officer, Officer Thompson was requesting an ERIW.   And

6     we had the ERIW so we responded and my partner Officer

7     Navarro grabbed that.

8          Q.   So let me know if I'm correct, when you

9     responded, you had heard over the radio that someone

10    was requesting the non-lethal rounds, and as a result,

11    your partner went to gather that information, but that

12    was done without direction or planning, but only

13    because of what he had heard over the radio -- what you

14    guys had heard over the radio?

15          MR. CONNOLLY:   Objection; misstates the

16    testimony and argumentative.

17          THE WITNESS:   So it was our understanding when

18    responding to this incident was that we were responding

19    to a subject wielding a knife, and with that said, one

20    of our trainings and non-verbal plans would be to

21    utilize an ERIW to attempt to bring this situation to a

22    peaceful conclusion.

23          MS. NOLD:   Q.   And did you have any

24    conversation with your partner Officer Navarro about

25    him retrieving the non-lethal weapon?

43

1    discussions as you were responding to the scene about

2    who was going to be doing what?  Did you have any what

3    I call planning conversations that are required amongst

4    the two of you?

5            MR. CONNOLLY:  Objection; asked and answered.

6            THE WITNESS:  I don't recall any verbal

7    communication as to who is going to do what.  Because

8    that's very fluid.  But it was understood what roles we

9    were going to play.

10           MS. NOLD:  Q.  And when you arrived on the

11   scene and you got out of the car and first saw

12   Mr. Woods, can you describe his physical appearance?

13       A.   Did you mean by what he was wearing or --

14       Q.   Yeah.  So --

15       A.   -- what he was doing?

16       Q.   So his physical appearance with regard to

17   height, weight, clothing, physical description?

18       A.   He looked about roughly 5'8", 5'9", maybe 140.

19   He matched the description that was provided earlier,

20   which was a light-complected Black male, wearing a

21   black jacket, tan pants, and a baseball cap.  Now it's

22   been a while so I don't remember every detail of what

23   the description was.  But that's basic description that

24   I do remember.

25           And just to note that any CAD on the radio,

                                                              45

1    the description changed over the course of that period,

2    as additional information was being gathered.  So I'm

3    just giving you the latest that I remember.

4         Q.   And when you first observed Mr. Woods, was he

5    saying anything that you could hear?

6         A.   Did you mean initially as right when I got

7    to -- at some point I did hear him say something, but

8    did you mean right when I got there?

9         Q.   Sure.  So as you arrived, you got out of your

10   car and you went up closer to where the other Officer

11   August and Officer Thompson were located.  As you got

12   closer, did you hear anything that Mr. Woods was saying

13   that you -- that you could understand?

14        A.   Not immediately, but later I did.

15        Q.   Okay.  How much later did you hear Mr. Woods

16   approximately?

17        A.   Within seconds, less than a minute.

18        Q.   And what did you hear Mr. Woods saying?

19        A.   One part that I did hear, something to the

20   effect of, "You are going have to shoot me."

21        Q.   So you heard Mr. Woods something to the effect

22   of, you will have to shoot me.  Do you recall if he was

23   saying that in response to something somebody was

24   saying to him, do you know if that was in response to

25   comments from one of the other officers, or did you

                                                              46

DEPOSITION OF OFFICER WINSON SETO

1    just hear that as a comment from Mr. Woods that was

2    sort of stand alone, if that makes sense?

3              MR. CONNOLLY:  Objection; lacks foundation as

4    phrased, but go ahead.

5              THE WITNESS:  Well, to my understanding, I

6    didn't hear anything that -- before his statement that

7    would have triggered him to respond that way verbally.

8    I didn't hear anyone say anything, other than giving

9    him commands.

10             MS. NOLD:  Q.  Okay.  And from the time that

11   you first arrived, when did you first begin hearing

12   commands?

13        A.   Right away.

14        Q.   Okay.  And to the best of your understanding,

15   who was providing commands at that point, which

16   officer?

17        A.   Initially when I first arrived, it was Officer

18   August.  But as soon as I got up there, within seconds,

19   I issued commands as well, as well as my partner

20   Officer Navarro.

21        Q.   Okay.  So Officer August, yourself, and

22   Officer Navarro were all providing commands to

23   Mr. Woods?

24        A.   Yes.

25        Q.   Okay.  And when you first -- prior to you

47

DEPOSITION OF OFFICER WINSON SETO

1     giving commands, when you heard the commands coming

2     from Officer August, do you remember what the commands

3     were?

4          A.   To drop the weapon.

5          Q.   Do you recall hearing any other specific

6     commands?

7          A.   Getting on the ground.

8          Q.   Is there anything else that you recall

9     specifically that you considered a command?

10         A.   I believe that's all I can recall right now.

11         Q.   Okay.

12         A.   As far as commands go.

13         Q.   Okay.  And when you first arrived and you

14    heard Officer August providing commands initially, did

15    you hear anything else that was being said by Officer

16    August that was not a command, just other

17    conversations, questions, anything to that effect?

18         A.   By Officer August?

19         Q.   Yes.

20         A.   Not that I recall.

21         Q.   Okay.  And when you responded, do you recall

22    Officer Thompson making commands also?

23         A.   No.

24         Q.   Do you ever recall Officer Thompson making

25    commands?

48

1      A.    That definitely crossed my mind.

2      Q.    And what did you observe that caused you to

3   believe that he might be impaired?

4      A.    Well, first of all, he was non-compliant and

5   he wasn't responding normally to the other uses of

6   forces that we were employing.  The pain compliance to

7   the ERIW, he didn't act as if a normal person normally

8   would, and so that raised questions in my mind thinking

9   that maybe he is not right at that time.

10      Q.    Okay.  And when you say not right, do you mean

11   to indicate that -- well, what do you mean to indicate

12   when you say he wasn't right?

13      A.    There could have been several reasons.  It

14   could have been drug-related, it could have been

15   alcohol, it could have been mental status -- altered

16   mental status, it could have been a medical condition.

17   I don't know at that time.  But just something that

18   just didn't seem normal.

19      Q.    And so when you observed Mr. Woods seeming

20   impaired, as you said -- strike that.

21           When you observed Mr. Woods that you perceived

22   him to be impaired, at that time you didn't have any

23   understanding as to the nature of his impairment,

24   whether it was mental or drug intoxication; is that

25   correct?

51

1     was a part of the perimeter containment.  So without me

2     being there, it wasn't complete.  If that makes sense.

3              MS. NOLD:  Q.  Yeah, it does.

4              Do you know where -- and this may be outside

5     of the scope of what you knew at the time.  As you were

6     responding to the scene, did you have an understanding

7     of where the perimeter was supposed to be established

8     at, like the intersections?

9              MR. CONNOLLY:  Objection; lacks foundation;

10    vague as to time; calls for speculation.

11             THE WITNESS:  And if it's the same perimeter

12    we're talking about, as we were responding, officers

13    that were requesting the perimeter, specified which

14    locations they wanted units to be at.  And we responded

15    to one of those locations.

16             MS. NOLD:  Q.  Was it your understanding that

17    either Officers August or Thompson had requested a

18    perimeter to be established or do you know?

19        A.   At this perimeter, it was a different officer.

20        Q.   You said you heard Mario make statements about

21    having to shoot him or something to that effect,

22    correct?

23        A.   Yes.

24        Q.   And when you heard those statements, did you

25    consider those statements to be suicidal in nature?

                                                          55

DEPOSITION OF OFFICER WINSON SETO

1     A.   That was a concern that I did have, that that

2     might be what he was actually deciding to do.   That

3     might be his plan.   And that told me his mind set

4     possibly if that's really what he was thinking.

5     Q.   Okay.  And to your understanding, when you're

6     responding to a call for service and a person makes

7     comments that you perceive is suicidal, does any type

8     of policy or protocol kick in at that point?

9     A.   In regards to suicidal persons, yes.

10    Q.   And what policy do you understand to govern

11    suicidal persons?

12    A.   I don't remember the exact DGO or bulletin nor

13    the exact name of it, but we do definitely have

14    training and policies for that.

15    Q.   Okay.  And do those policies indicate a

16    particular course of action to your understanding?

17    A.   Well, there's an ultimate goal, if that's your

18    question.

19    Q.   What is that ultimate goal, to your

20    understanding?

21    A.   Is to get this person help and to bring him

22    into our custody or to the medical facility safely with

23    no injuries to anybody.

24         MS. NOLD:  Let's take a quick break.  Just

25    five minutes.

56

```
 1   effect, from the first time you contacted him,
 2   something like that.  You don't recall saying anything
 3   like that?
 4            MR. CONNOLLY:  Objection; vague; lacks
 5   foundation.
 6            THE WITNESS:  If I can look at it again, I
 7   could tell you.  But I don't recall at this moment
 8   whether or not I said it in that interview.  But given
 9   that statement that I heard, that was definitely one of
10   my concerns.  Not that it was the only concern, but
11   that was one of my concerns.  If that answers your
12   question.
13            MS. NOLD:  Q.  Okay.  So the concerns about
14   the statements that he made being potentially suicidal,
15   were among the concerns you had at that time?
16       A.   Yes.
17       Q.   Okay.  When you had exited your vehicle, you
18   and your partner, and approached where Mr. Woods was
19   located, what was Mr. Woods doing at the time?  Was he
20   stationary or was he moving?
21       A.   If I remember correctly, he was walking
22   southbound still.
23       Q.   Okay.  And at some point did Mr. Woods stop?
24       A.   Yes.
25       Q.   How long after the time that you arrived and
```

63

1    got out of your patrol car did Mr. Woods stop?

2         A.   As soon as officer Navarro and I got to the

3    general vicinity of where Mr. Woods and Officer August

4    was, we took positions to triangulate him in a

5    semi-containment, and he stopped when we took our

6    positions.

7         Q.   Okay.  And at that point, who was -- which

8    officers were present in the triangulated positions?

9              MR. CONNOLLY:  Objection; lacks foundation as

10   phrased.

11             THE WITNESS:  Immediately right at the

12   beginning when we first got to those positions, I only

13   remember Officer August, Officer Navarro, and myself.

14   However, additional officers were immediately arriving

15   right after us, and I know officers were coming from my

16   right.

17        Q.   Okay.  And in the triangulated position,

18   what -- which position of the triangle were you in?

19   Who was to your left and who was to your right?

20        A.   From my perspective?

21        Q.   Yes, from your perspective.

22        A.   Officer August was to my left and Officer

23   Navarro was to my right.

24        Q.   And at that time Mr. Woods -- well, is it fair

25   to say Mr. Woods was standing still at that point or

                                                      64

 1        very quickly.

 2             A.    Right.

 3             Q.    During that time -- I understand that he

 4        wasn't fully contained, but at the time that you

 5        triangulated around -- essentially around where

 6        Mr. Woods was at, were any other officers providing him

 7        any commands or directions at that point?

 8             A.    Yes, we were.  I myself immediately identified

 9        myself, I said, "Police," and I told him to drop the

10        weapon and get on the ground.

11             Q.    Okay.  And in response to your command, what

12        was Mr. Woods' response to the instructions?

13             A.    He didn't respond to them.

14             Q.    And do you recall Mr. Woods saying anything in

15        response to your commands?  Was he saying, no, or

16        saying anything audible that you were able to

17        understand?

18             MR. CONNOLLY:  Objection; vague as to time

19        vague as to response.

20             THE WITNESS:  It's hard to determine whether

21        or not he's talking to me or responding to what I was

22        saying, because other officers at some point, they were

23        giving commands as well, and he -- it was hard to hear

24        him.  So I don't know if he was responding to me or not

25        verbally.  But he was definitely not complying to my

                                                              67

```
1        already have his non-lethal force out at that point in
2        time, that you recall?
3               MR. CONNOLLY:  Objection; vague as to time;
4        calls for speculation; lacks foundation.
5               THE WITNESS:  You're saying when we took our
6        positions?
7               MS. NOLD:  Q.  Yes.
8        A.   Yes.  He already had his ERIW.  He grabbed it
9        when he was exiting the car.
10       Q.   So when you and Officer Navarro and Officer
11       August initially somewhat triangulated around
12       Mr. Woods, were yourself and Officer August, did you
13       both have your firearms drawn?
14       A.   Yes.
15       Q.   And at that same period of time, was Officer
16       Navarro -- at that point, did he have his ERIWs on?
17       A.   Yes.
18       Q.   The ERIW, is that something that shoots out a
19       non-lethal projectile?
20       A.   Yes.  And to be more specific, he was
21       deploying the 40-millimeter.
22       Q.   And is that like a slug or is that like a bean
23       bag?  What's the material?
24       A.   The official term is a foam baton, but it's
25       kind of like a rubber bullet.
```

72

1      Q.    Okay.   And how long -- from the time that you

2    took your position to triangulate somewhat around

3    Mr. Woods, how long for that period of time did the

4    first non-lethal round get deployed?

5            MR. CONNOLLY:   Objection; vague as to time;

6    lacks foundation.

7            THE WITNESS:   It would me a very rough

8    estimate, maybe within five to ten seconds.   And that's

9    a really rough estimate.   As soon as we got there, he

10   gave the admonishment and then he deployed the ERIW.

11           MS. NOLD:   Q.   And when you said he gave the

12   admonishment, do you mean Officer Navarro gave the

13   admonishment?

14      A.    Yes.

15      Q.    And what is the admonishment, if you can just

16   let me know what that is?

17      A.    "Red light, less lethal, drop the weapon or

18   I'll shoot."

19      Q.    And just so I'm clear, is that something

20   Officer Navarro said verbally?

21      A.    Yes.   Something to that effect.

22      Q.    Okay.   Is that something you understand to be

23   part of the requirement for deployment of a non-lethal?

24      A.    Yes, that's per department policy.

25      Q.    Okay.   Immediately prior to the less lethal

73

1    rounds being deployed, what was Mr. Woods doing?

2            MR. CONNOLLY:  Objection; asked and answered;

3    vague as to time.

4            THE WITNESS:  So he was standing there still

5    appearing to be talking or saying something and he was

6    kind of waving the knife around.

7            MS. NOLD:  Q.  So the non-lethal rounds --

8    initially a non-lethal round was deployed.  Did you

9    observe the non-lethal round striking Mr. Woods based

10   on your understanding?

11       A.   Yes.

12       Q.   Okay.  And what was Mr. Woods' response to the

13   non-lethal round contacting him that you observed?

14       A.   He looked for the most part fairly unfazed by

15   the rounds and it looked like it had little to no

16   effect.

17       Q.   Did you -- in response to being struck with

18   the non-lethal rounds, do you recall seeing Mr. Woods

19   double over or squat down or do anything to adjust him

20   from being standing upright?

21       A.   There was one of the rounds, I believe it was

22   the last round that Officer Navarro deployed, it struck

23   him somewhere near the groin.  I don't know if it hit

24   the groin or not, but it was near that area, and it

25   made Mr. Woods bend over a little bit, and then he

74

1    stood back up.

2        Q.   Okay.  And during the period of time from the

3    first non-lethal round was fired to the last non-lethal

4    round was fired that you were observing, do you recall

5    what type of commands were being provided to Mr. Woods

6    at that time?

7        A.   The ones that I could recall were to drop the

8    knife and to get on the ground.

9        Q.   Okay.  And were those commands being provided

10   by you or by other officers?

11       A.   Both.

12       Q.   Okay.  Did you ever utilize any non-lethal

13   force options, a baton, pepper spray, ERIW rounds, any

14   other non-lethal options?

15       A.   Are you asking about me personally or other

16   officers?

17       Q.   You personally.

18       A.   No, I didn't.  Because I was lethal cover and

19   that was my sole role.

20       Q.   And that was your sole role.  And correct me

21   if I'm wrong, and that was in relationship to your

22   partner being on the non-lethal rounds?

23       A.   Yes.

24       Q.   And after Mr. Woods had been struck by the

25   non-lethal rounds, what happened next after the last

75

1   non-lethal round?

2       A.   If I recall correctly, as far as timeframe

3   chronologically speaking, that's when I heard him make

4   the statement shortly after, and then shortly after

5   that, he started walking northbound.

6       Q.   And you mean the statement, are you referring

7   to the statement where he said something to the effect

8   of, officers are going to have to shoot him?

9       A.   Yes.  That's the only one I heard from him.

10      Q.   Okay.  Was there any other recognizable

11  statements that you heard from Mr. Woods during the

12  entire incident?

13          MR. CONNOLLY:  Objection; asked and answered.

14          THE WITNESS:  Other than that statement that

15  we previously spoke about, no.

16          MS. NOLD:  Q.  But, correct, that you heard

17  him -- that you heard something to be him talking but

18  you couldn't understand the contents of what he was

19  saying, correct?

20      A.   Yes.

21      Q.   Okay.  Did you ever observe Mr. Woods make any

22  sort of threats against any of the officers or anything

23  you perceive to be a threat against any of the officers

24  verbally?

25      A.   Not that I recall verbally.

76

1     A.    The space that he was standing in.

2     Q.    Which was somewhat surrendered by officers at

3     that point, correct?

4     A.    Yes.

5     Q.    Okay.  And prior to leaving that space, he

6     made the statements, right, as he began to -- you said

7     he began to walk, correct?

8     A.    Yes.

9     Q.    Okay.  Who was he walking towards?  Was he

10    walking in the direction any of the officers in

11    particular?

12    A.    From my perspective, he appeared to be walking

13    in the direction of Officer August.

14    Q.    At that point, what did Officer August do in

15    response to Mr. Woods coming in his direction?

16    A.    I observed him back pedal.

17    Q.    Okay.  And what did Mr. Woods do at that point

18    while Officer August was backpedaling?

19    A.    He continued to walk towards Officer August.

20    Q.    Can you describe for me whether Mr. Woods, was

21    he walking fast; was he walking slow in your

22    observation?

23    A.    I guess that depends on what my definition of

24    fast and slow is.  He appeared to be walking at a

25    regular walking pace.

78

1    Q.   And did you observe Mr. Woods walking -- after

2    he had been struck with the non-lethal rounds, did you

3    observe anything that appeared to be Mr. Woods limping

4    or anything to that effect or have any sort of

5    deficiency in his ability to walk?

6              MR. CONNOLLY:  Objection; vague.

7              THE WITNESS:  It didn't seem like it to me.

8              MS. NOLD:  Q.  Okay.  And so did Mr. Woods

9    continue -- did he continue to walk in the same general

10   direction of travel?

11   A.   Yes.

12   Q.   And then what happened next?

13   A.   So from my perspective, there are a lot of

14   things going on kind of all at the same time.  It

15   happened very quickly.  As he began to move

16   northbound -- I had a tree to my left that I had to get

17   around in order to follow Mr. Woods.  I went around the

18   tree.  As soon as I went around the tree, it

19   appeared to me that Mr. Woods had closed the distance

20   between himself and Officer August.  Officer August was

21   still backpedaling at that time, and it appeared to me

22   that Officer August was backpedaling slower than

23   Mr. Woods' forward movement speed.  So the distance was

24   closing.

25              And at that time, he still had the knife in

79

1    his hand.  I remember giving commands telling him to

2    stop.  He didn't comply.  And as he continued getting

3    closer, he increased the threat level and became an

4    imminent threat to Officer August, and I decided to

5    discharge my firearm at Mr. Woods to stop his forward

6    advancement.

7         Q.   And at the time that you discharged your

8    firearm, to your knowledge, had anyone else at that

9    point already discharged their firearm or were you the

10   first to shoot?

11        A.   It's hard to say because it happened all at

12   the same time.  But if was to tell you -- to break it

13   all down, I believe I heard another round go off right

14   before mine did.  If that's what you're asking.

15        Q.   Yes.  Yes.  To your knowledge, do you recall

16   hearing anything that you thought based on your

17   training and experience was a gunshot prior to you

18   opening fire?

19        A.   I do remember hearing a sound, maybe a pop

20   right before my round went off.  So if your question

21   was whether or not I was the first one to shoot, I may

22   not have been, because I heard something that sounded

23   like a possible gunshot that went off right before

24   mine.  If that -- I don't know if that answers your

25   question.

80

1          MR. CONNOLLY:  Objection; vague.

2          THE WITNESS:  And just to clarify, and by

3     that -- by my description of it, was kind of a sudden

4     forward -- like a sudden forward motion.  A jerking

5     motion.  And it looked like he was -- it was a quick

6     forward motion, but it could have been the beginning of

7     a lunge, it could have been something else.  But that's

8     what my perception was at the time.

9          MS. NOLD:  Q.  Was the lunging motion -- to

10    the best of your recollection, what you perceived at

11    the time as a lunging motion, did that happen before or

12    after you heard the popping noise that you suspect

13    might have been gunfire?

14         MR. CONNOLLY:  Objection; asked and answered.

15         THE WITNESS:  That's actually very difficult

16    to say.  Again, it happened almost all at the same

17    time, so I wouldn't be able -- I can't tell you exactly

18    if it happened before or after.

19         MS. NOLD:  Q.  Okay.  In the, let's say,

20    approximately 30 seconds prior to the time that you

21    opened fire, did you provide Mr. Woods any sort of

22    warning that you intended to use lethal force against

23    him if he did not comply, anything to that effect?

24         A.  Yes.  Right when we got on the scene and took

25    our positions, my first commands were specifically,

                                                              83

1       "police, drop the weapon, get on the ground or I'll

2       shoot."

3           Q.   Okay.  And that's when you said when you

4       first -- is when you first made contact?  Was that

5       prior to the triangulation or after that?

6           A.   Our first contact was a triangulation.

7           Q.   Okay.

8           A.   It wasn't like I stopped there and talked to

9       him and stood there and then waited for a little bit

10      before triangulation.  It was basically the

11      triangulation was the position we initially took.

12          Q.   Okay.  And then after that, Mr. Woods began

13      to -- continue to travel down the sidewalk; is that

14      correct?  After you made that statement to Mr. Woods

15      about stopping or shoot, then he continued down the

16      road after that -- down the sidewalk after that?

17          A.   No.  And if I understood you correctly, that

18      was all part of my commands -- my commands to identify

19      myself, to give him commands and what might happen if

20      he doesn't comply, is what I first told him.  And he

21      had already stopped.  He had stopped.  As soon as we

22      took those positions and gave the commands, he stopped

23      where he was.

24          Q.   Okay.  And then after that point -- after he

25      had stopped, after he had stopped and you had provided

84

1    direction?

2        A.   Yes.   That's the second time he started

3    walking.

4        Q.   And from the second time when he began walking

5    again in the general direction of Officer August, did

6    you provide him any commands at that point up until the

7    time that you opened fire?

8        A.   Yes.   The entire time I was giving him

9    commands.

10        Q.   What commands were you providing him after the

11    triangulation was broken and he continued to walk in

12    the opposite direction?

13        A.   What do you mean by triangulation broken, as

14    soon as he started walking?

15        Q.   Yeah.   As soon as he started walking in the

16    general direction of Officer August, what commands were

17    you providing him at that point?

18        A.   As soon as he started walking, I said, "Stop."

19    That was the command, I told him to stop, and he

20    didn't.

21        Q.   Okay.   And did you provide him any other

22    commands other than stop up until the time that you

23    opened fire?

24        A.   I may have told him to get on the ground

25    again, but my primary concern was to have him stop, to

                                                          86

1          THE WITNESS:  That's incorrect.  The movement

2     that I was describing was during the time -- roughly

3     around the time of me discharging my firearm.  That was

4     in relations to that, and I was describing my

5     observations, what I was hearing, what I was thinking,

6     what I was doing.  So that was all encompassing one.

7     That wasn't a part of my determination to discharge my

8     firearm.  Is that what you're asking?

9          MS. NOLD:  Q.  Yeah.  Well, why don't you just

10     tell me what observations and considerations

11     contributed to your decision to open fire?

12          A.  Okay.  So it started off being that he's a

13     suspect of a violent felony, that he had already

14     stabbed someone.  He's a suspect of that.  Coupled with

15     the fact that he does have a knife on him still, he's

16     refusing to drop it, he's made a statement that to me I

17     perceived to be a possible suicidal statement, and that

18     his behavior was -- it didn't quite seem normal, and

19     that he was quite unpredictable at that time.

20          So given all that, the totality of the

21     circumstances made him already a pretty huge threat.

22     By him advancing towards Officer August, increased that

23     threat level exponentially and it became an imminent

24     threat.

25          Q.  Okay.  And in that description you didn't say

90

1    already, all that we suspected him of doing already.

2    It was in my mind that if he got any closer, if we

3    didn't do anything, that he probably would hurt or

4    worse Officer August.

5            MS. NOLD:  Q.  And at that time Officer August

6    had his weapon unholstered, correct?

7        A.   Yes.

8        Q.   And his weapon was pointed at Mr. Woods at

9    that point?

10       A.   Yes.

11       Q.   And when you opened fire, can you estimate how

12   far apart Officer August and Mr. Woods were?

13       A.   This would be a rough estimate.

14           MR. CONNOLLY:  Objection; vague.  From each

15   other or from Officer Seto?

16           MS. NOLD:  Q.  From one another?

17       A.   So Officer August and Mr. Woods?

18       Q.   Yeah.

19       A.   It's going be a rough estimate, but it was

20   within 10 feet.

21       Q.   Okay.  And at the time when you opened fire on

22   Mr. Woods, did you see any civilians within the area of

23   where Mr. Woods was located?

24           MR. CONNOLLY:  Objection; vague.

25           THE WITNESS:  Are you talking about right

94

1     before I discharged my firearm?

2          MS. NOLD:  Q.  Yes.

3          A.   I didn't see it, because what I was looking at

4     was Mr. Woods and the wall behind him.  So what I was

5     visually looking at, there were nobody standing there.

6     But I know people were all around us, because I could

7     hear people yelling from all around us.  And, I mean,

8     yelling as in civil advances, not officers.

9          Q.   Okay.  So it was your understanding there were

10    people, but you don't have any personal knowledge of

11    how far away those people are; is that correct?

12              MR. CONNOLLY:  Objection; vague as to time.

13              THE WITNESS:  I have a general idea based on

14    people yelling from what direction and roughly how far,

15    I have an idea.

16              MS. NOLD:  Q.  Okay.  And what was you idea

17    how far away the people -- we're talking about

18    civilians, correct?

19          A.   Yes, civilians.

20          Q.   Approximately how far in your estimation were

21    those civilians based on your auditory observations?

22          A.   Again, this is going to be a rough estimation.

23    I heard voices, people yelling from behind me where the

24    community platform was, which was roughly maybe 20,

25    25 feet behind me.  There were people to my left,

                                                              95

1      closer towards the end of the block that -- people were

2      coming from the bus stops and a bus had just passed and

3      dropped off passengers.  I heard multiple people

4      yelling from the vicinity to my left, closer to the end

5      of the block.

6           Q.   Okay.  And during the entirety of the

7      incident, did your ever hear Mr. Woods make any sort of

8      verbal threats against any of the officers or anyone

9      else?

10          A.   I don't recall hearing a verbal threat.

11          Q.   And during the incident, did you see Mr. Woods

12     raise the knife in his hand in a manner you considered

13     threatening?

14               MR. CONNOLLY:  Objection; vague.

15               THE WITNESS:  Raise a knife as in like in a

16     motion as in -- can you describe it?

17               MS. NOLD:  Q.  Sure.  I'm just trying to found

18     out, as far as your observation, did you ever see

19     Mr. Woods with a knife in his hand manner that he

20     raised the knife in a manner that you considered

21     threatening?

22               MR. CONNOLLY:  Objection; vague, and vague as

23     to time.

24               THE WITNESS:  The reason why it's a little

25     confusing is because, someone wielding a knife does not

96

1     going to go.

2            MS. NOLD:  Probably closer to two.

3            MR. CONNOLLY:  I want to take a break at some

4     point, but if you're almost finished, then I want to

5     just finish.  But I might have follow-up, but I don't

6     know.

7            MS. NOLD:  Let's take a five and then see how

8     much longer we go, and if it's going to be much longer

9     then a half an hour or something, then we'll --

10           VIDEOGRAPHER:  We're going off the record.

11    The time is 12:36.

12           (Recess taken from 12:36 PM to 1:37

13           PM.)

14           VIDEOGRAPHER:  We are back on the record.  The

15    time is 1:37.

16           MS. NOLD:  Q.  Okay.  Back on the record.  You

17    are still under oath and all the same rules still

18    apply.  Okay.

19           What I didn't mention earlier but I'll just

20    put on the record is that also present during the

21    deposition since the beginning has been defendants

22    August, Cuevas, and Phillips.  I don't know which one

23    is which, but all three are present as well.

24           When you received the call for service for

25    this particular incident, do you recall where you were

                                                         98

1      at that point in time, like physical location?

2           A.   I was in lineup at the station.

3           Q.   And do you recall if at that time during

4      lineup you guys were receiving any sort of training or

5      information regarding officer involved shootings?

6           A.   I do remember some things being talked about

7      and reviewed during lineup.

8           Q.   And do you recall that information, was it a

9      bulletin; was it just verbal information; was there a

10     video?  Do you remember how that information was being

11     relayed to you?

12          A.   Yeah.  It was a verbal discussion and some

13     videos being played.

14          Q.   Okay.  In the videos that were being played,

15     do you recall what the content was, what type of videos

16     they were?

17          A.   They were mostly -- they are all law

18     enforcement videos of some officer involved shootings,

19     some officer incidents from body-cam point of views,

20     maybe dash-cam point of views, things like that.  I

21     don't remember exactly.

22          Q.   Okay.  And do you remember in those videos, do

23     you remember what -- I guess, was there a particular

24     teaching point, for example, that was being relayed?

25     Do you recall with the intent of showing the videos was

99

1     there's something that could prevent him from walking

2     backwards, at some point he's not going to be able to

3     back up any further because there were people directly

4     behind him just further down the block.

5          MS. NOLD:  Q.  And when you say further down

6     the block, about how many feet behind Officer August

7     was the crowd of people or the civilians?

8          A.  A rough estimate, 40 feet.  Again, it's a very

9     rough estimate.  It's just based on my recollection.

10         Q.  Okay.  And I understand, I mean, it's hard to

11    judge distance from -- you know, in general it's hard

12    to judge distance.

13              And do you recall during the incident

14    hearing -- and this would have been coming from not one

15    of the officers on the scene, but from somebody off

16    scene that was -- that was making comments saying,

17    "Time and distance" during the incident, do you recall

18    that coming over the radio?

19         A.  During the incident, I don't remember hearing

20    anything on the radio.

21         Q.  And I don't mean to try to confuse what you

22    may have been aware of afterwards from hearing things

23    you heard afterwards.  At the time that the incident

24    was going on, you don't recall hearing that

25    radio broadcast, right?

105

1     enforcement term de-escalation?

2         A.   Yes.

3              MR. CONNOLLY:  I didn't hear the question.

4     Can you read it back?

5              (Whereupon, the record was read back

6              by the court reporter.)

7              THE WITNESS:  Yes, I am familiar with it.

8              MS. NOLD:  Q.  And can you describe to me your

9     understanding of with de-escalation means as it applies

10    to law enforcement?

11        A.   The term de-escalation it's quite a broad

12    term.  It can be -- but the general definition of in,

13    to my understanding is, to bring whatever threat level

14    or situation that we're presented with, bring it to a

15    lower level of threat or danger, so as to effectively

16    perform our duties with the least amount of risk to

17    personnel safety.  And that includes members of the

18    department, the public, and the suspect.

19        Q.   And did you use any de-escalation efforts

20    yourself in this incident?

21        A.   Yes.

22        Q.   Okay.

23        A.   So our -- in my efforts to give him commands

24    to drop the weapon and get on the ground, is a form of

25    attempting de-escalation.  If he would have complied

                                                    107

DEPOSITION OF OFFICER WINSON SETO

1    with our commands, the situation would have

2    de-escalated in that situation.

3         Q.   Okay.  So it's your understanding that

4    providing commands is a form of de-escalation?

5         A.   Yes.

6         Q.   Okay.  And can you describe the

7    de-escalation -- if you observed any de-escalation

8    efforts from other officers?

9         A.   You mean the commands, correct?  I did hear

10   other officers give commands.  And I will just clarify

11   what I was talking about regarding de-escalation.  I

12   know other forms and tactics of de-escalation involves

13   subjects who are not a danger to others, maybe who are

14   just feeling suicidal, who are not actively endangering

15   officers or the public, and we can maybe talk to them

16   and try to talk them down and have them comply

17   peacefully.  And this is, again, another situation of

18   de-escalation, another tactic.

19         But in this case, of course, going back to

20   this specific case, it wasn't feasible to even employ

21   that tactic, because of the threat level that he

22   presented, the fact that he was a danger and wielding a

23   knife and already not complying.

24        Q.   Okay.  And outside of the officers providing

25   Mr. Woods commands, did you observe any other

108

1    in your mouth.  I want to make sure those words come

2    directly from you, because ultimately it's not --

3    nobody is judged upon your attorney's words.  It's

4    yours.  So I want to make sure that we don't put words

5    in your mouth.

6        A.    Sure.  Because use of force can also be a

7    deterrent for suspect's potential actions as well.  So

8    if -- that's my understanding of it as well.  And I

9    think sometimes if a suspect is using deadly force and

10   you can use -- and we can meet it with -- we can use

11   something else other than deadly force and take him

12   into custody peacefully, I think that's a form of

13   de-escalation as well.

14       Q.    Okay.  And that's probably why we are here.

15   We have different views of what things are.  Okay.

16           If you could just describe what -- to the

17   degree that's possible, beyond verbal commands, what

18   did you personally do to attempt to de-escalate the

19   situation outside of the verbal commands?

20       A.    Verbal commands, that was it.  But it was

21   given the circumstances that we were presented.  There

22   was no other option we could have used.  We had other

23   officers also giving commands, other officers using

24   different levels of force options.  Even though

25   presented with a deadly force scenario, we used -- we

                                                          112

1      exhausted every other means possible before we

2      ultimately used deadly force.

3           Q.   Okay.  And just so that I make sure that I

4      understood your testimony earlier, you don't recall

5      anybody speaking or asking Mr. Woods if he was okay,

6      what was wrong with him, or asking him any questions;

7      is that correct?

8           A.   I do, yes, I remember saying that.  And in

9      those situations, you don't stop and ask a question

10     where they're a threat and a danger to people around

11     them who are not contained.

12          Q.   Okay.  And that's based on your training from

13     the San Francisco police department?

14          A.   It that situation it was not feasible, yes.

15     Yes.

16          Q.   I'm just trying to get a better understanding

17     of why it wasn't feasible to ask Mr. Woods questions.

18     People were giving him commands.  There's multiple

19     people giving him commands.  I'm trying to understand

20     why it wasn't feasible to try to ascertain an

21     acknowledgment that he was in some sort of potentially

22     altered state, why it was impossible to ask him if he

23     was okay, what's wrong, try to determine -- try to make

24     some sort of human connection with this individual.

25     And you're saying this wasn't feasible, so I'm trying

113

1          MS. NOLD:  Okay.  I think we're done, Sawn.

2          MR. CONNOLLY:  I have a couple follow-up

3     questions, officer Seto.

4                      EXAMINATION

5          MR. CONNOLLY:  Q.  Counsel asked you -- in

6     referencing -- I think it was Exhibit 1 of your

7     deposition, department bulletin 13-20.  Do you recall

8     being asking questions about that bulletin?

9          A.  Yes, I do.

10         Q.  Does the bulletin require you to jeopardize

11    your own safety and the safety of any other person in

12    attempting to interpret or apply a bulletin?

13         A.  No, it does not.  And it states here in the

14    bulletin, under no circumstance.

15         Q.  Can you read that sentence of the bulletin

16    you're referring to?

17         A.  Yes.  It's in bold and underlined.  It says,

18    "Under no circumstance shall officers jeopardize their

19    own safety or that of any other person in attempting to

20    interpret or apply this directive."

21         Q.  Okay.  When you responded to this scene, what

22    exactly were you responding to?  What call were you

23    responding to?

24         A.  It was the call of a stabbing with a stabbing

25    suspect.

                                                         133

DEPOSITION OF OFFICER WINSON SETO

1          Q.    And was there a sort of numeric identifier

2     used to code that language?

3          A.    Yes.   It would be a 219 call.

4          Q.    Okay.   So the call you were responding to that

5     you heard, was a 219 call?

6          A.    Yes.

7          Q.    And you said a 219 represents a stabbing of

8     some type?

9          A.    Yes.

10         Q.    Was any part of the call a call directed to

11    respond to a mental health crisis?

12         A.    No.

13         Q.    Did any part of the radio call broadcast a

14    call for a 5150 service?

15         A.    No.

16         Q.    Did any part of the call reference a person

17    under the influence of drugs or alcohol?

18         A.    No.

19         Q.    When you arrived at the scene, did anyone

20    report to you that the call involved a person who was

21    mentally unstable?

22         A.    No.

23         Q.    Did anyone inform you that the incident

24    involved a person with a mental health crisis?

25         A.    No.

134

1        Q.    Did anyone inform you that the call involved

2    someone who was high on methamphetamine?

3        A.    No.

4        Q.    At any point in time when you arrived at the

5    scene, did Mr. Woods inform you or any other officer in

6    your presence that he was high on methamphetamine?

7        A.    No.

8        Q.    At any point in time after you arrived on

9    scene, did Mr. Woods inform you or any other officer in

10   your presence that he was high on any drug?

11       A.    No.

12       Q.    At any point in time that you arrived at the

13   scene, did Mr. Woods inform you or any other officer in

14   your presence that he was suffering from a mental

15   health crisis of any kind?

16       A.    No.

17       Q.    When you arrived on the scene, was Mr. Woods

18   armed with a weapon?

19       A.    Yes.

20       Q.    What was he armed with?

21       A.    A knife.

22       Q.    Could you see the knife?

23       A.    Yes.

24       Q.    Can you describe the knife?

25       A.    It was a fixed blade knife that appeared to

                                                            135

1   have been maybe a kitchen knife, roughly eight to 10

2   inches in length.  And that's the best estimate.

3       Q.  At the time you arrived on scene and saw

4   Mr. Woods, did he match the description of the stabbing

5   suspect you had heard over the radio?

6       A.  Yes.

7       Q.  Did you have any information at the time you

8   arrived on the scene and saw Mr. Woods that there was a

9   victim to the stabbing?

10      A.  Yes.

11      Q.  And what was your information?

12      A.  That the victim was at the hospital for the

13  stabbing.  That was the extent that I heard.

14      Q.  Was that information broadcast that the victim

15  of the stabbing was at the hospital?

16      A.  At some point it was broadcast.

17      Q.  After you arrived at the scene and saw

18  Mr. Woods, were there any attempts by you or other

19  officers to gain -- to attempt to have Mr. Woods submit

20  to arrest?

21      A.  Yes.

22      Q.  What actions did you or other police officers

23  in your presence take in order to attempt to get

24  Mr. Woods to submit to arrest?

25      A.  There was kind of a list of things that we did

136

```
 1        over that course.  Did you want me to list --
 2             Q.   Tell me chronologically what you did or
 3        observed that were actions by San Francisco police
 4        officers to attempt to get Mr. Woods to submit to
 5        arrest?
 6             A.   From the time that I got on the scene, I
 7        myself, along with our officers on scene we issued
 8        verbal commands for Mr. Woods to drop the weapon, to
 9        get on the ground.  He did not comply.  Multiple ERIW
10        rounds were deployed.
11             Q.   Before you go on to ERIW, what are verbal
12        commands designed to do when directed at a suspect of a
13        crime?
14             A.   To have them give up and surrender to arrest.
15             Q.   In response to any of the verbal commands, did
16        Mr. Woods submit to arrest?
17             A.   No.
18             Q.   In response to any of the verbal commands made
19        by you or any other officer in your presence, did
20        Mr. Woods surrender the weapon?
21             A.   No.
22             Q.   Were there any other actions taken by San
23        Francisco police officers, either yourself or others in
24        your presence, to gain -- to make Mr. Woods submit to
25        arrest?
```

1          A.   Yes.

2          Q.   What was the next one that you observed?

3          A.   The next one that I observed, to my

4     recollection, is the 40-millimeter ERIW.

5          Q.   What is a 40-millimeter ERIW?

6          A.    It's officially called a foam baton round,

7     which is a rubber projectile.

8          Q.    Is this particular -- what does ERIW stand

9     for?

10          A.   Extended range impact weapon.

11          Q.   Is this particular weapon a, quote, unquote,

12     less than lethal form of force?

13          A.   Yes.

14          Q.   How many times did you see this particular

15     less than lethal weapon used?

16          A.   How many other times.

17          Q.   I'm sorry, at the scene of the arrest?

18          A.   I believe roughly four rounds of those were

19     deployed.

20          Q.   And do you know who used the 40-millimeter

21     ERIW?

22          A.   Yes.

23          Q.   Who was that?

24          A.   My partner, Officer Navarro.

25          Q.   Did Officer Navarro deploy the ERIW uses of

138

1    force before any gunshots were fired?

2         A.    Yes.

3         Q.    Were they all done before gunshots were fired?

4         A.    Yes.

5         Q.    Were there any other forms of less than lethal

6    force employed by any San Francisco police officer in

7    your presence before gunshots were fired?

8         A.    Yes.   Another officer deployed the other ERIW

9    option, which is the 870 shotgun, which shots bean bag

10   rounds.

11        Q.    And is that a less than lethal form of force?

12        A.    Yes.

13        Q.    And was Mr. Woods hit with the bean bag?

14        A.    Yes.

15        Q.    In response -- how many times was he hit with

16   a bean bag?

17        A.    I only recall seeing one.   There could be

18   more.   I'm not sure.

19        Q.    In response to being hit by the bean bag, did

20   Mr. Woods submit to arrest?

21        A.    No.

22        Q.    In response to being hit with the bean bag,

23   did Mr. Woods surrender the weapon?

24        A.    No.

25        Q.    Going back to the 40-millimeter, did you see

139

DEPOSITION OF OFFICER WINSON SETO

1      Mr. Woods hit with the 40-millimeter rubber bullet from

2      the ERIW?

3           A.   Yes.

4           Q.   In response to being hit by the 40-millimeter

5      ERIW, did Mr. Woods submit to arrest?

6           A.   No.

7           Q.   In response to being hit with the

8      40-millimeter rubber bullets, did Mr. Woods surrender

9      his weapon?

10          A.   No.

11          Q.   Did you see any other forms of less than

12     lethal force used or employed against Mr. Woods before

13     gunshots were fired?

14          A.   Yes.

15          Q.   And what was that?

16          A.   I remember seeing someone to my right, another

17     officer, attempt to use the OC spray.

18          Q.   And what is OC spray?

19          A.   It's basically a pepper spray.

20          Q.   And what is it designed to do?

21          A.   To gain compliance from the subject by

22     disorienting them with compliance from the chemicals in

23     the eyes or the face.

24          Q.   Did you see Mr. Woods hit with the pepper

25     spray -- or the OC spray?

140

DEPOSITION OF OFFICER WINSON SETO

1        A.   I'm not sure whether or not he was actually

2   hit by it, as in if the chemical actually hit him, but

3   it was shot in his direction, but it was ineffective.

4        Q.   Okay.  And in response to the OC spray, did

5   Mr. Woods submit to arrest?

6        A.   No.

7        Q.   In response to the pepper spray, did Mr. Woods

8   surrenderer the weapon?

9        A.   No.

10        Q.   Do you have an estimate of how much time you

11   were on scene from the time you arrived to the time the

12   last shot was fired?

13        A.   It was -- I know it was under a minute.  It

14   was very quick.

15        Q.   Okay.

16        A.   Do you me to give you an estimate as far as

17   how many seconds?

18        Q.   No.  I just -- I have a of couple questions

19   about the duration of time.  The first one is that, if

20   you have an estimate of how long it was from the time

21   you arrived to until the time the last shot was fired,

22   and I think you said it was under a minute; is that

23   correct?

24        A.   I believe so.

25        Q.   Okay.  Do you have an estimate -- you heard

141

1    shots fired while you were there, correct?  Let me

2    backup.

3              You heard gunshots fired while you were

4    present on the scene, correct?

5         A.   Yes.  At some point.

6         Q.   How many -- if you can estimate -- give me

7    your best estimate, if you can, how many -- how long

8    was it between the first shot and the last shot?

9         A.   To the best of my recollection, it felt like

10   it happened almost all at once.  It would been --

11        Q.   Just a matter of seconds or a matter --

12        A.   Yeah, a matter of seconds.  Maybe two to three

13   seconds.

14        Q.   So just so we're clear, your best estimate

15   between the first shot fired on scene that you heard

16   and the last shot fired on scene that you heard, is

17   between two and three seconds?

18        A.   Is my best estimate, yes.

19        Q.   Did you fire your gun at Mario Woods on

20   December 2nd, 2015?

21        A.   Yes, I did.

22        Q.   Why?

23        A.   Because he was advancing on Officer August and

24   created an imminent threat situation.

25        Q.   And what was the imminent threat?

142

DEPOSITION OF OFFICER WINSON SETO

1        A.    That he was going to stab Officer August or

2     hurt him.

3        Q.    And how close to Officer August in your

4     estimation was Woods at the time you fired the gun?

5        A.    My best estimate would be somewhere between

6     five and 10 feet.

7        Q.    And at the time you fired your gun, was Woods

8     advancing in the direction of Officer August?

9        A.    Yes.

10       Q.    In your training and experience, was Mario

11    Woods close enough to Officer August with a knife that

12    he could have stabbed and injured or mortally wounded

13    or killed Officer August?

14       A.    Yes, I believe so.  He could have closed the

15    distance very quick.  The distance was not great.

16       Q.    Officer Seto, for the record, what is your

17    race?

18       A.    I am Chinese.

19       Q.    And where did you grow up?

20       A.    In the City of San Francisco in the Bayview

21    district.

22       Q.    All right.  I have nothing further.

23                    FURTHER EXAMINATION

24              MS. NOLD:  Q.  Do you have any reason to

25    believe that your race is relevant to this incident?

                                                      143

```
 1    STATE OF CALIFORNIA      )
                               ) ss.
 2    COUNTY OF CONTRA COSTA )

 3

 4         I, Angelica R. Gutierrez, a licensed Certified

 5    Shorthand Reporter, duly qualified and certified as such

 6    by the State of California;

 7         That prior to being examined, the witness named in

 8    the foregoing deposition was by me duly sworn to testify

 9    to the truth, the whole truth, and nothing but the truth;

10         That the deposition was by me recorded

11    stenographically at the time and place first herein

12    mentioned, and the foregoing pages constitute a full,

13    true, complete and correct record of the testimony given

14    by the said witness;

15         That I am a disinterested person, not being in any

16    way interested in the outcome of said action, nor

17    connected with, nor related to any of the parties in said

18    action, or to their respective counsel, in any manner

19    whatsoever.

20

21                        DATED:  July 24, 2018

22

23         __/s/Angelica R. Gutierrez_____

24            ANGELICA R. GUTIERREZ, CSR No.  13292

25
```

                                                       149