# Exhibit R

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

GWENDOLYN WOODS, individually)
and as Successor in Interest )
to Decedent MARIO WOODS,      )
                             )
            Plaintiff,        )
                             )
        vs.                   ) CASE NO.:  3:15-05666-WHO
                             )
CITY AND COUNTY OF            )
SAN FRANCISCO; a municipal    )
corporation, et al,           )
                             )
            Defendants.       )
_____)      CERTIFIED COPY

VIDEO DEPOSITION OF BRANDON THOMPSON

THURSDAY, JULY 26, 2018

REPORTED BY:  SHELLI G. ENG, CSR #11397

1

I N D E X

EXAMINATION BY:                                        PAGE

MR. POINTER                                           8,95

MS. COLLINS                                             92


                        --o0o--


     Appearance Page                                     3

     Exhibit Page                                        5

     Location                                            6

     Reporter's Certificates                            99

     Witness Letter                                    100

     Deponent Signature Page                           101

     Deponent's Correction Sheet                       102

     Disposition of Transcript Review                  103

     Attorney's Notes                                  104


                        --o0o--

2

DEPOSITION OF BRANDON THOMPSON

```
 1                        APPEARANCES

 2


 3


 4        For the Plaintiff:

 5                  LAW OFFICES OF JOHN L. BURRIS
                       AIRPORT CORPORATE CENTRE
 6             BY:  ADANTE POINTER, ATTORNEY AT LAW
                   7677 Oakport Street, Suite 1120
 7                    Oakland, California 94621
                       Phone: (510) 839-5200
 8                       Fax: (510) 839-3882
                   adante.pointer@johnburrislaw.com
 9


10


11


12        For the Defendants:

13                  CITY AND COUNTY OF SAN FRANCISCO
                       OFFICE OF THE CITY ATTORNEY
14             BY:  KELLY COLLINS, DEPUTY CITY ATTORNEY
               SEAN FIELD CONNOLLY, DEPUTY CITY ATTORNEY
15                  1390 Market Street, Sixth Floor
                     San Francisco, California 94102
16                      Phone: (415) 554-3800
                         Fax: (415) 554-3837
17                     kelly.collins@sfgov.org
                       sean.connolly@sfgov.org
18


19


20


21


22


23


24


25

                                                          3
```

```
 1                          APPEARANCES

 2                          (Continued)

 3


 4


 5      Also Present:

 6                          CHARLES AUGUST
                            WINSON SETO
 7                          NICHOLAS CUEVAS
                            SCOTT PHILLIPS
 8


 9


10


11      Videographer:

12                          ANDREW GRAVES
                            (916) 451-7655
13


14


15                          ---oOo---

16

17

18

19

20

21

22

23

24

25
```

4

1                            INDEX OF EXHIBITS

2

3        Exhibit                                              Page

4        1      Incident report; 2 pages . . . . . . . . . . .   15

5        2      Rivera video . . . . . . . . . . . . . . . .   46

6        3      CAD transmission . . . . . . . . . . . . . .   50

7        4      Muni bus video . . . . . . . . . . . . . . .   71

8

9

10

11

12

13                            ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25

                                                                 5

1           IN THE UNITED STATES DISTRICT COURT

2        IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3    GWENDOLYN WOODS,
     individually and as
4    Successor in Interest to
     Decedent MARIO WOODS,
5
              Plaintiff,
6
         vs.                      Case No. 3:15-05666-WHO
7
     CITY AND COUNTY OF
8    SAN FRANCISCO; a municipal
     corporation, et al,
9
              Defendants.
10   _____/

11

12           BE IT REMEMBERED THAT, pursuant to Notice,

13   and on Thursday, July 26, 2018, commencing at the hour of

14   10:33 a.m. thereof, at THE LAW OFFICES OF JOHN L. BURRIS,

15   Airport Corporate Center, 7677 Oakport Street, Suite

16   1120, Oakland, California 94621, before me, SHELLI G.

17   ENG, C.S.R. No. 11397, a Certified Shorthand Reporter in

18   the State of California, there personally appeared

19                      BRANDON THOMPSON,

20   called as a witness by the Plaintiff; who, having been

21   duly affirmed by me, was thereupon examined and testified

22   as is hereinafter set forth.

23                       ---oOo---

24

25

                                                              6

```
 1              Will the reporter please swear in the witness.
 2              (Oath administered.)
 3                          EXAMINATION
 4     BY MR. POINTER:
 5         Q.   Good morning, Officer.
 6         A.   Good morning.
 7         Q.   All right.  Would you please state and spell
 8     your full name for the record.
 9         A.   Brandon Thompson, B-r-a-n-d-o-n,
10     T-h-o-m-p-s-o-n.
11         Q.   You understand that you're here to give your
12     deposition in the matter concerning the death of
13     Mario Woods?
14         A.   Yes.
15         Q.   Okay.  I'm going to -- well, let me ask you
16     this.  How many times have you given a deposition
17     before?
18         A.   Once.
19         Q.   Okay.  How long ago was that?
20         A.   I don't remember.
21         Q.   Years ago?  Months ago?
22         A.   Years ago.
23         Q.   Okay.  I'm going to go over some guidelines
24     which you've probably heard before from your attorney
25     seated to your left in terms of things that will help
```

                                                              8

```
 1                    (Whereupon Plaintiff's Exhibit 1 was marked
 2                    for identification by the court reporter.)
 3      BY MR. POINTER:
 4          Q.   Before I start asking you questions about
 5      that, I understand the incident concerning the shooting
 6      death of Mario Woods happened December 2nd of 2015,
 7      correct?
 8          A.   Yes.
 9          Q.   Okay.  You were on patrol that day, correct?
10          A.   Yes.
11          Q.   Are you still a patrol officer today?
12          A.   Yes.
13          Q.   Okay.  So you still go out into the community
14      and patrol?
15          A.   Yes.  I'm in the specialized unit, so it's not
16      exactly -- it's a part of patrol, but, yeah, sure.  I'm
17      on patrol.
18          Q.   What's that specialized unit?
19          A.   It's a housing unit for Bayview station.
20          Q.   So what does that mean?
21          A.   So we work in public housing.  We do a lot of
22      different assignments than normal patrol.  It is not
23      really responding to calls for service as well as no
24      driving outside of our areas assigned to us for things
25      like -- for anything, patrol duties as far as traffic
```

15

1     tickets or things of that nature.

2          Q.   So is it fair to say you concentrate on the

3     public housing in the Bayview district?

4          A.   Very fair, yes.

5          Q.   Okay.  On the day concerning Mario Woods, were

6     you also assigned to a similar task in terms of

7     concentrating on the public housing area in the Bayview?

8          A.   Yes, sir.

9          Q.   Okay.  And Sergeant Hall was your supervising

10    sergeant that day, correct?

11         A.   Yes.

12         Q.   Okay.  Is he still a sergeant that supervises

13    you from time to time?

14         A.   No.

15         Q.   Okay.  So given what you've explained your

16    current assignment, can you tell me how that differs

17    from what your assignment was on the day of the shooting

18    of Mario Woods?

19         A.   Same assignment.

20         Q.   So it hasn't changed, then?

21         A.   Has not.

22         Q.   Okay.

23         A.   Just different supervisor.

24         Q.   Fair enough.  Thank you.

25              So take a look at Exhibit 1.  I'm just trying

16

1     to find out -- strike that.

2              Take a look at Exhibit 1, and I'm going to ask

3     you some questions about it.  Look up when you're done.

4         A.   I'm good.

5         Q.   What is that document?

6         A.   It is a statement that I prepared regarding

7     this incident.

8         Q.   Okay.  And so you actually typed this document

9     out yourself?

10        A.   Yes.

11        Q.   Okay.  And this document, I take it, concerns

12    your observations that took place during the course of

13    your interacting with Mario Woods on the day he was shot

14    and killed, correct?

15        A.   Correct.

16        Q.   Okay.  And were you asked to prepare this

17    statement?

18        A.   I mean, kind of a trick question.  I mean,

19    nobody said, "Hey, you have to write a statement."

20             That's what you do after an incident.

21        Q.   So you prepared -- you're trained to prepare a

22    police report or incident report concerning an incident

23    similar to the one -- strike that.

24             You've been trained to prepare an incident

25    report when you're involved in a situation like the one

                                                              17

1    concerning Mario Woods, correct?

2         A.   Yes.

3         Q.   Okay.  And so you prepared -- where did you

4    prepare this statement at?

5         A.   At Bayview station.

6         Q.   Okay.  Did you have any assistance in

7    preparing this statement?

8         A.   No.

9         Q.   Did you talk to anyone before you prepared

10   this statement?  And by talk to, I mean did you consult

11   with anybody about what you're going to put into your

12   statement?

13        A.   No.

14        Q.   Okay.  Where did you prepare your statement in

15   the Bayview station?

16        A.   I don't remember.

17        Q.   Are there multiple places where you can

18   prepare a statement?

19        A.   Yes.

20        Q.   You typed your statement into a computer?

21        A.   Yes.

22        Q.   So I take it there are multiple places within

23   the Bayview station that you can type your statement

24   into a computer?

25        A.   Yes.

18

DEPOSITION OF BRANDON THOMPSON

1      Q.   Okay.  Now, on the date of the incident

2   concerning Mario Woods, you were actually making radio

3   transmissions about what was taking place, right?

4      A.   Yes.

5      Q.   Okay.  Have you ever been interviewed about

6   what you saw or what took place concerning Mario Woods

7   on the day he was shot and killed?

8      A.   Yes.

9      Q.   By whom?

10      A.   By --

11      Q.   Before you get started, I don't want to know

12   about any of the conversations you've had with your

13   attorney.  That's protected by attorney-client

14   privilege.  I'm sure she would object anyway, but before

15   you get started, I want to make sure we don't go down

16   that road, okay?  Thank you.

17           So you were going to explain to me the

18   different interviews you've given.

19      A.   I've only given one.

20      Q.   Okay.  Who was that to?

21      A.   It was -- what are they called now?  It's the

22   OCC, but they're not the OCC anymore.

23      Q.   Department of Police Accountability?

24      A.   I think that's it, yes.

25      Q.   Okay.  All right.  When did you give that

                                                          19

1        A.    Yes.

2        Q.    Did you have that training prior to your

3  contact with Mario Woods on December 2nd of 2015?

4        A.    Yes.

5        Q.    When you gave your interview to OCC/Department

6  of Police Accountability, were you represented by

7  counsel?

8              MS. COLLINS:  Objection.  Relevance.

9              THE WITNESS:  I think I was.

10  BY MR. POINTER:

11       Q.    So you had an attorney present with you?

12       A.    I think so.  I don't want to -- I'm not trying

13  to be vague.  I know I was listed as a witness, and you

14  don't always get it for a witness.  I can't really

15  remember.  I know I spoke before, but I don't remember

16  if anybody was ever there with me.  I'm sorry.

17       Q.    So I'm going to direct your attention to the

18  date of the incident.  I understand you've been -- oh,

19  you haven't been present.  A lot of testimony -- even in

20  your police report -- I understand a call came out about

21  somebody who had been stabbed, correct?

22       A.    Correct.

23       Q.    Okay.  Where were you at when you first

24  learned about the stabbing?

25       A.    On Potrero Hill.

                                                        27

1    Q.   Okay.  So you were already out of the station
2    essentially out doing your duties in the field?
3    A.   Yes.
4    Q.   Okay.  And after you heard -- strike that.
5         How did you hear about it?
6    A.   The radio dispatch.
7    Q.   So you heard the radio dispatch.  What did you
8    do next?
9    A.   We responded to the area of where they thought
10   that they had someone --
11   Q.   Okay.
12   A.   -- that possibly was involved in this
13   incident, and they were trying to make a perimeter.
14   Q.   Okay.  So were you partnered with somebody
15   that day?
16   A.   Yes.
17   Q.   Who was that?
18   A.   Charles August.
19   Q.   And had you been partnered with August prior
20   to that day before?
21   A.   Yes.
22   Q.   Was he -- I use my term -- a person who you
23   regularly partnered with?
24   A.   Yes.
25   Q.   Okay.  And so you guys were both in the same

28

1    patrol car?

2         A.    Yes.

3         Q.    Okay.   Who was the driver versus who was the

4    passenger?

5         A.    I was driving.

6         Q.    Okay.   And so do you -- I know some officers

7    kind of have a division of labor between partners.   Did

8    you and Officer August have any type of established

9    division of labor between you two?

10        A.    What do you mean by division of labor?

11        Q.    Yeah.   Like, for example, one person is

12   driving.   The other person will put out the calls or

13   make the transmissions.   Another person will have

14   responsibility for being the contact officer versus

15   being the cover officer.   Did you have any type of

16   division of labor like that between you two?

17             MS. COLLINS:   Objection.   On the date of the

18   incident or generally?

19   BY MR. POINTER:

20        Q.    We will start with generally, and then we will

21   find out if that was what you guys followed on the date

22   of the incident.

23        A.    Not really, no.

24        Q.    Okay.   So on this day, you get the call.

25        A.    Um-hmm.

                                                          29

1          Q.   You go down to establish perimeter, correct?

2          A.   That's where we were on our way to, yes.

3          Q.   Okay.  At that point in time, when you were on

4  your way, did you -- where were you heading in

5  particular?

6          A.   To wherever the perimeter was set up.

7          Q.   Okay.  As you sit here today, do you know

8  where that was at?

9          A.   I just remember somewhere in what we call the

10  Bayview five car.

11          Q.   Okay.  And can you give me some streets or an

12  area?  Can you be more specific?

13          A.   Candlestick.

14          Q.   Okay.  And so did you make it to the Bayview

15  five car, to Candlestick?

16          A.   Yes.

17          Q.   Okay.  What happened when you got there?

18          A.   Bayview five car is a huge sector, so we were

19  in the Bayview five car during this incident, so I

20  remember I was driving southbound on 3rd Street.

21  Officer August -- since I'm driving, focusing on

22  driving, Officer August is kinda looking out and

23  clearing traffic and things like that for me.  He

24  directed me to someone who matched the description.  I

25  can't remember who was putting it out over there.  I

30

1     think it was Martreiter.  M-a-r-t-r-e-i-t-e-r, maybe.

2     It is another officer.  I don't know if that is the

3     correct spelling.

4             So I believe Martreiter was putting out

5     information regarding a description and Derek or sorry,

6     August mentioned I think that may be him at the corner

7     of -- I believe it was like 3rd and Fitz.

8          Q.   So if I understand what you're saying

9     correctly, you're driving, and your partner,

10    Officer August, points out a person who he thinks fits

11    the description of the stabbing suspect, correct?

12         A.   Correct.

13         Q.   Okay.  And that person, I take it whoever he

14    was pointing to, you looked and you saw the same person,

15    right?

16         A.   I don't remember.

17         Q.   Okay.  You mentioned that this person was

18    standing near the corner of 3rd and Fitzgerald?

19         A.   Yeah.

20         Q.   Okay.  Did you actually see that person before

21    you got out of your patrol car?

22         A.   Yes.

23         Q.   Okay.  So before you brought your patrol car

24    to a stop, you yourself saw that person that

25    Officer August was referring to, correct?

                                                            31

1      A.    Yes, correct.

2      Q.    Okay.  What was that person doing?

3      A.    He was waiting in line to get on the bus.

4      Q.    Okay.

5      A.    I assumed getting on the bus.

6      Q.    All right.  There were other people standing

7    in the same line?

8      A.    Yes.  Plenty of people.

9      Q.    Okay.  What was he doing as he was standing in

10    line?

11      A.    Standing in line.

12      Q.    Okay.  Did it appear that he was having a

13    conversation with anyone?

14      A.    No.

15      Q.    Did you see anything in his hands?

16      A.    No.

17      Q.    Did he have on a backpack?

18      A.    Yes.

19      Q.    Did you see a soda in his hands?

20      A.    I don't think I remember seeing anything in

21    his hands.

22      Q.    Okay.  Did he appear that he was causing a

23    disturbance at the bus stop?

24      A.    No.

25      Q.    Okay.  Essentially standing there like

                                                        32

1          My partner directed me to a single person.  I

2    don't care about the hundred -- it could it be a million

3    people out there.  This is San Francisco.  It's a huge

4    city.  I'm trying to find this one person.  It could be

5    a million people.  Like I said, I don't know if they're

6    scared.  I didn't talk to anyone else.  I'm looking for

7    the one person my partner directed me to talk to.

8          Q.   Okay.  So you have tunnel vision on this one

9    person?

10         A.   I didn't say I have tunnel vision.  I said I'm

11   looking at the one person my partner told me to talk to.

12   I know there's people out there.  If I was tunneled in,

13   I wouldn't have saw it.

14         Q.   Okay.  So you see those other people out

15   there, but you're focused on this one person, correct?

16         A.   I'm looking to speak with the person that my

17   partner pointed out to me, yes.

18         Q.   Okay.  And this is a person who you have

19   information that supposedly stabbed somebody, correct?

20         A.   You could twist it how you want.  My partner

21   is directing me to someone that I have no clue what they

22   have done to this point.  I haven't spoke with them.  I

23   talk to people every day.  They don't have anything to

24   do with incidents.

25              My partner said, "Hey, Brandon, that looks

                                                          34

DEPOSITION OF BRANDON THOMPSON

1    like it may be the guy."

2          I said, "Okay, partner.  Let's go over there

3    and try to talk to him."

4          So I made a U-turn, I pulled up my patrol car,

5    and I stopped to go make contact with this one person

6    that's right there.

7          Q.   Understood.

8               What was your understanding as to why you were

9    making contact with this person?

10         A.   Because my partner said that this person may

11   be involved with the stabbing.  I don't know if this

12   person did the stabbing.  I don't know if this person

13   was involved at all.  I'm doing my job as a police

14   officer I do every single day and try to catch people

15   that have just committed felonies or any kind of other

16   criminal activity.

17         Q.   Right.

18              And some of those people that you contact in

19   the course of performing those duties you just described

20   are, in fact, innocent?  They haven't committed the

21   crimes they've been alleged to have done, right?

22              MS. COLLINS:  Objection.  Calls for

23   speculation.  Legal conclusion.

24              THE WITNESS:  Yes.

25   BY MR. POINTER:

                                                          35

1     right now.  Let's go speak with him."

2          Q.   Okay.  So he fit the description of the

3     stabbing suspect?

4          A.   Yes.

5          Q.   Okay.  You and your partner decide to go over

6     and talk to this person, correct?

7          A.   Yes.

8          Q.   Okay.  You're focused on him as you go over

9     there to talk to him, right?

10         A.   As I exit the car, I'm driving up and I'm like

11    which one?

12          And my partner is like, the guy right there

13    with the hat and like the puff coat.

14          I'm like, okay.  Cool.  Let's go talk to him.

15         Q.   Okay.  So you ultimately stopped your car,

16    right?

17         A.   Yes.

18         Q.   Where did you stop it?

19         A.   Near 3rd and Fitzgerald, Fitzgerald.

20         Q.   At the bus stop where he's standing at or

21    somewhere else?

22         A.   Yeah.  Sure.

23         Q.   Okay.  You get out of the car, right?

24         A.   Um-hmm.

25         Q.   Okay.  When you get out the car, did the

38

1     person run away?

2          A.   No.

3          Q.   Did they pull out a knife and brandish it at

4     you?

5          A.   Yeah.

6          Q.   So when they did that when you pulled out of

7     the car -- when you got out of the car, what did you do

8     next?

9          A.   I probably broadcast it on the radio, we got a

10    guy with a knife.

11         Q.   Okay.  Then what happened next?

12         A.   The person is like in the line.  Derek -- I

13    don't know -- I'm going to keep calling him Derek.  When

14    I mention Derek, I'm referring to Officer August.

15              So Derek gets out of the car.  The guy kind

16    of -- Mr. Woods kind of walks towards Derek as Derek is

17    exiting his car, and he takes out this large knife in I

18    believe it was his pants pocket.  After that, I see

19    Derek take out his firearm.  I see Mr. Woods begin to

20    walk towards 3rd Street.

21         Q.   When you say "walk towards 3rd Street," was

22    that towards Officer August or in a different direction?

23         A.   No.  That was in a different direction.

24         Q.   Okay.  You mentioned that as you brought the

25    car to a stop and you and your partner are getting out

39

1       the car, Mr. Woods pulled out a knife, correct?

2           A.   Yes.

3           Q.   Did you hear him say anything between the time

4       you were getting out the patrol car and he started

5       walking back away from Officer August?

6           A.   Started walking towards Officer August when we

7       first exited the patrol car, was my understanding when I

8       first exited.

9           Q.   Okay.  How close did he get to Officer August?

10          A.   I don't know.  A few feet, I guess.

11          Q.   Did he make any swinging motion with the

12      knife?

13          A.   I don't think so.

14          Q.   Okay.

15          A.   But I don't remember.

16          Q.   Okay.  So during that point in time, did you

17      hear Mr. Woods say anything?

18          A.   Yes.

19          Q.   What did he say?

20          A.   Can I look at my statement?

21          Q.   Absolutely.

22          A.   The words I wrote that day were -- was

23      something to the effect of, "Excuse me, you not taking

24      me today."

25          Q.   Okay.  Do you recall him saying anything else

                                                            40

```
 1        other than that statement?

 2             A.   At that point or later on?

 3             Q.   At that point, I'm sorry.

 4             A.   I don't remember, no.

 5             Q.   So after he makes that statement -- strike

 6        that.

 7                  After Mr. Woods made that statement, did you

 8        say anything else in response to that?

 9             A.   I didn't say anything to Mr. Woods.

10             Q.   Okay.  Did you hear your partner say anything

11        in response to that statement?

12             A.   I know Derek was talking to him.  I don't know

13        what they were saying.

14             Q.   And at some point in time, you said that

15        Mr. Woods walked on 3rd back towards Gilman?

16             A.   He walked towards 3rd Street, so we are still

17        on Fitzgerald.

18             Q.   So he walked towards the corner?

19             A.   Yes.

20             Q.   Okay.  And what happened next, if anything?

21             A.   I know that Derek was trying to talk to him,

22        and Mr. Woods mentioned -- again, I don't remember the

23        exact quote.  Let me -- he was saying that "you better

24        squeeze that motherfucker and kill me."

25             Q.   Okay.  So he was making a suicidal statement?
```

                                                              41

1          MS. COLLINS:  Objection.  Calls for

2     speculation.

3               THE WITNESS:  I wouldn't say it was a suicidal

4     statement.

5     BY MR. POINTER:

6          Q.   Okay.  So Mr. Woods made a statement that you

7     heard telling your partner to shoot him, right?

8          A.   Yes.

9          Q.   Okay.  Then what happened next -- strike that.

10               Did your partner say anything in response to

11     that?

12          A.   Again, I know that Officer August and

13     Mr. Woods were exchanging words because I could hear

14     Mr. Woods replying and talking coherently to August, but

15     I don't remember what Derek was saying, though -- or

16     August.  I'm sorry.

17          Q.   When you say that Mr. Woods was responding

18     coherently, what do you mean by that?

19          A.   That he spoke clearly.  He clearly understood

20     what was being told to him.  He didn't slur his speech.

21     He didn't appear to be -- to talk any different than

22     anyone else that I would speak to on a daily basis.

23          Q.   Okay.  So you could understand what he was

24     saying, correct?

25          A.   Correct.

42

DEPOSITION OF BRANDON THOMPSON

```
1         Q.   It was clear?  It wasn't slurred?

2         A.   Yes.

3         Q.   Okay.  And he told your partner to shoot him,

4    right?

5         A.   Yes.  Well --

6         Q.   I mean, words to that effect.

7         A.   I mean, I don't want to you to try to say

8    something I didn't say just now.  So I would say that he

9    said "you're not taking me today" and "you better

10   squeeze that motherfucker and kill me" or something like

11   that, or "shoot me."

12             But yeah, so he did that and he had the knife

13   in his hand still.

14        Q.   Okay.  And so you heard these statements that

15   he made?

16        A.   Um-hmm.

17        Q.   Did you do anything in response to that?

18        A.   I kept walking toward him.  I continued to

19   broadcast our location via my PIC radio.

20        Q.   Okay.  Did you request a supervisor to come to

21   the scene?

22        A.   I requested additional units as well as units

23   with less lethal rounds, almost everything that I could

24   think of that we would need in a situation with a person

25   with a --
```

                                                          43

1      Q.    Did you specifically ask for a supervisor --

2      A.    I don't know.

3      Q.    You're not sure?

4      A.    No.

5      Q.    Okay.  You listened to the dispatch recordings

6   of this, correct?

7      A.    Yes.

8      Q.    Did you hear that on there?

9      A.    Well, yes and no.

10           So my location, Sergeant Hall is already on

11   location, so I'm not going to look at her and say, "Hey,

12   come here," and she's sitting right next to me or she's

13   in the same building as me.

14      Q.    So Sergeant Hall was on the scene when you put

15   out your location?

16      A.    Sergeant -- so the whole scene, this whole

17   incident is a scene.  So Sergeant Hall is on location on

18   this incident.

19           So when I'm saying to you that, hey, I have

20   this person and I need these people, the people in the

21   incident are coming to exactly where I am now; that

22   being Sergeant Hall, Officer Martreiter and the dozens

23   of other officers who are on patrol and working this

24   exact incident that day.

25      Q.    When you put out the location of where you

                                                      44

DEPOSITION OF BRANDON THOMPSON

1       were at, do you know where Sergeant Hall was at

2       specifically?

3              A.   I know that he was on the scene with these

4       other people.

5              Q.   So somewhere between 3rd Street and Fitzgerald

6       and Gilman?

7              A.   No.

8              Q.   Can you establish what perimeter?  I wasn't

9       there and I don't know what you know, so that's why I'm

10      asking.

11             A.   What I am trying to explain to you is that

12      he's already -- everybody that is on this incident,

13      that's who I am asking for to -- hey, I know you guys

14      are a block away, two blocks away, three blocks away,

15      wherever you're at.  But now we don't need that anymore.

16      I need you guys right here.

17                  So when I'm asking for people to come and I'm

18      telling them that I have this person who I believe to be

19      the subject in this incident, I'm saying, "Hey, leave

20      there and now come here."

21             Q.   Okay.  So you put out a call for additional

22      units to come to the scene, correct?

23             A.   Yes.

24             Q.   And you also asked for less lethal to be

25      brought to the scene, correct?

                                                              45

1    A. Yes.

2    Q. Okay.  You were putting out transmissions

3  while you were there on the scene essentially describing

4  what was taking place as well, correct?

5    A. Yes.

6    Q. Okay.  Let's take a quick second here.  We

7  don't have to go off the record.  I'm just going to set

8  up.

9      Okay.  Officer, I'm going to show you what has

10  been turned over to us.  It's a video and I will make

11  the representation it was taken by Ruben Rivera of the

12  incident from his cell phone.  And I'm going to ask

13  you -- first, I'm going to show it to you, then I'm

14  going to ask you a couple of questions, okay?

15    A. Okay.

16    Q. All right.

17      MS. COLLINS:  Are we marking this as an

18  exhibit?

19      MR. POINTER:  I will, yes.  Marked as

20  Exhibit 2 to this deposition, Rivera video.  This is

21  Exhibit 2.

22      (Whereupon Plaintiff's Exhibit 2 was marked

23      for identification by the court reporter.)

24  BY MR. POINTER:

25    Q. Can you see it?

46

DEPOSITION OF BRANDON THOMPSON

```
 1    transmissions, okay?

 2         A.   Okay.

 3         Q.   Thank you.

 4              (Video played.)

 5    BY MR. POINTER:

 6         Q.   I stopped it at 18:14.

 7         A.   Okay.

 8         Q.   Can you describe -- first of all, describe

 9    where you were at on the scene when you were putting out

10    these transmissions.

11         A.   I believe we were just exiting our vehicle.

12    We were still on Fitzgerald.

13         Q.   Okay.  And describe to me what was taking

14    place as you were putting out these transmissions?

15         A.   That transmission is pretty accurate of what

16    was going on.  I had a guy and he had a knife and he was

17    coming toward my partner.

18         Q.   Is that what you were referring to earlier

19    when you said you and your partner were getting out of

20    your car and he stepped towards Officer August and he

21    had a knife in his hand?

22         A.   Yes.

23         Q.   Okay.  I'm going to push play going from

24    18:14, okay?

25         A.   Okay.
```

1      Q.   All right.  So I stopped it at 18:13.

2      A.   Yes.

3      Q.   "We got the guy.  He's got a knife.  He's

4    coming at my partner."

5           What were you referring to?

6      A.   That was when we just exited the vehicle.

7    They were still towards the bus stop area.

8      Q.   Okay.  So Mr. Woods and Officer August have

9    this exchange, if you will.  What would you term that?

10     A.   I wouldn't say it's an exchange.  We had just

11   exited the vehicle.

12     Q.   Okay.

13     A.   There was no words even uttered by either

14   myself or Officer August at that point, no.

15     Q.   At some point in time -- I'm just trying to

16   get the time frame, if you will.

17     A.   Yes.

18     Q.   You're getting out the car.  Mr. Woods, as you

19   testified, comes towards your partner.  He has a knife

20   in hand.  He says a statement about "I'm not going back"

21   or something like that?

22     A.   Yes.

23     Q.   Okay.  Then at some point in time, you

24   described that Mr. Woods essentially walks on 3rd or

25   towards the corner of 3rd and then back down 3rd Street

57

1       Q.   Okay.   Yourself and your partner then proceed

2   to essentially pursue him; is that correct?

3            MS. COLLINS:  Objection.  Vague as to the term

4   "pursue."

5            THE WITNESS:  No.

6   BY MR. POINTER:

7       Q.   Okay.  So then you tell me.  Whatever words

8   you want to use.  You follow him, pursue him, call, I

9   don't know.  But what did you do once he started going

10  towards the corner of 3rd Street?

11      A.   We walked with him towards 3rd Street.

12      Q.   Okay.  And then when he got to the corner of

13  3rd and Keith right there, he's going down 3rd towards

14  Gilman, did you walk with him as well?

15      A.   Yes.

16      Q.   And Mr. Woods walks -- continues to walk down

17  3rd towards Gilman, and you mentioned that he had

18  stopped or at some point in time, did he stop moving

19  towards Gilman?

20      A.   Yes.

21      Q.   What happened at that point in time?

22      A.   It appeared that Mr. Woods was going to come

23  towards Officer August now.

24      Q.   Okay.  Did he make any steps towards

25  Officer August at that point in time?

                                                          59

1        Q.   Okay.

2        A.   On 3rd.

3        Q.   Now, at the corner of 3rd and Gilman, did you

4    see anybody over there?  Were there people in that area?

5        A.   Yes.

6        Q.   Okay.  Can you give me an estimate as to how

7    many people were over in the area of 3rd and Gilman?

8        A.   I don't recall.

9        Q.   Okay.  I take it you were concerned for those

10   people?

11       A.   Concerned for everyone, yes.

12       Q.   Okay.  And so Mr. Woods continues walking in

13   that direction, correct?

14       A.   Yes.

15       Q.   Okay.  Other officers arrive on the scene,

16   right?

17       A.   Yes.

18       Q.   Some of those officers are actually coming

19   from that very direction, from 3rd and Gilman towards

20   where Mr. Woods and yourself and Officer August are at,

21   correct?

22       A.   I think so, yes.

23       Q.   Okay.  Mr. Woods never makes it to the corner

24   of 3rd and Gilman, correct?

25       A.   Correct.

                                                          61

1          Q.   At some point in time, Mr. Woods is
2     essentially facing towards the street, 3rd Street
3     itself, and the officers start assembling in front of
4     him in a semicircle, correct?
5          A.   You're skipping a lot.   Yes.
6          Q.   Please fill in the blanks.
7          A.   So before the officers and Mr. Woods are
8     facing the street and everything, the officers that are
9     coming from 3rd Street and Gilman, you mentioned a
10    minute ago, had now deployed the less lethal ammunition
11    on Mr. Woods.   And I remember the first ones -- I
12    remember seeing at least were Officer Navarro and
13    Officer Seto.
14         Q.   Okay.   So the less lethal that you mentioned
15    that they deployed on Mr. Woods, shot him with, what was
16    Mr. Woods doing at that point in time?   Was he walking?
17    Standing still?   What was he doing?
18         A.   I would say when they deployed the less lethal
19    rounds, Mr. Woods was still advancing towards 3rd and
20    Gilman.
21         Q.   Okay.   So he was still walking towards 3rd and
22    Gilman when he was first shot with the less lethal?
23         A.   When the first less lethal was deployed, yes.
24         Q.   Okay.   Deployed means fired or shot, right?
25         A.   I would say deployed means when you deploy it,

                                                            62

DEPOSITION OF BRANDON THOMPSON

1          Q.   All right.   Based upon a person being hit, you

2     expect them to follow your orders, right?

3          A.   Yes.

4          Q.   At some point in time during this incident,

5     you saw a fellow Officer Ortiz use pepper spray against

6     Mr. Woods, right?

7          A.   Yes.

8          Q.   Can you describe how that took place?

9          A.   I remember he kind of reached his arm out and

10    in this motion and kind of sprayed in the direction of

11    Mr. Woods.

12         Q.   Okay.   Did it appear to have an effect on

13    Mr. Woods?

14         A.   No.

15         Q.   He didn't appear to be disoriented?

16         A.   I'm not sure.   I don't recall, to tell you the

17    truth.

18         Q.   After the pepper spray, there were more less

19    lethal rounds deployed against Mr. Woods, right?

20         A.   Yes.

21         Q.   Okay.   At some point in time, he went down to

22    his knee?

23         A.   Did he fully go down to his knee?   I don't

24    recall.

25         Q.   Did he go from a standing position towards the

66

1    ground at some point in time?

2        A.   Yes, kind of like a hunched over kind of

3    position, yes.

4        Q.   Okay.  And that was after he had been -- that

5    was after the less lethal ammunitions had been deployed

6    at the incident, right?

7        A.   Yes.

8        Q.   Okay.  During the time where the less lethal

9    rounds were being deployed against him until the time

10   that the last round -- the last less lethal round was

11   deployed against him, did you hear Mr. Woods say

12   anything?

13       A.   I could not hear him saying anything, no.

14       Q.   You heard officers giving him orders, though,

15   correct?

16       A.   Yes.

17       Q.   Drop the knife, words to that effect?

18       A.   Officers and the public screaming at him --

19       Q.   To drop the knife, correct?

20       A.   -- yes, yelling at him --

21       Q.   To drop the knife, correct?

22       A.   -- among things, yes.

23       Q.   And you believed that Mr. Woods might either

24   stab Officer August or someone in the crowd, correct?

25       A.   Yes.

67

1   driving that day?

2          A.   Probably 042.

3          Q.   That's what it says.  I didn't realize it was

4   in your statement.

5          A.   Oh, is it?

6          Q.   Yeah.

7          A.   Same car I drive every day.

8          Q.   Okay.  All right.  I'm going to show you video

9   from Bates stamp No. 354, which is the Muni bus camera,

10  and --

11              MS. COLLINS:  That's Exhibit 4?

12              MR. POINTER:  We are going to make this

13  Exhibit 4, yes.

14              (Whereupon Plaintiff's Exhibit 4 was marked

15              for identification by the court reporter.)

16  BY MR. POINTER:

17          Q.   And I'm going to show you the forward-facing

18  camera view from the Muni bus which is essentially out

19  the driver's window, if you will.

20          A.   Okay.

21          Q.   And so we don't have to go over it a hundred

22  times, there is a police car that goes into the camera

23  view and out, and towards 3rd and Fitzgerald.  I'm just

24  trying to figure out if that's your car, and then I will

25  play the video some more, and then I will ask you some

                                                          71

1    going to ask you, do you see your car?  In fact, I'm

2    going to slow it down to one-quarter time.

3              (Video played.)

4    BY MR. POINTER:

5         Q.   And I'm going to pause the video.  Up in the

6    corner here, it says 16:33 and 29.  And there is -- when

7    I pause the video, there is a patrol car that looks like

8    it is clearing the intersection, correct?

9         A.   Yes, sir.

10        Q.   Do you know if that's your patrol car?

11        A.   Yes.

12        Q.   So you guys are essentially on the block where

13   this incident takes place?

14        A.   Yes.

15        Q.   Okay.  Keeping the same camera angle, however

16   you can see it, if you need to adjust the laptop, feel

17   free to do so.

18             I'm going to press play where we just stopped

19   it, which is 16:33 and 29, going forward at a quarter

20   speed, okay?

21             (Video played.)

22   BY MR. POINTER:

23        Q.   I'm going to pause the video at 16:33 and 56.

24   Do you see yourself and Officer August there at about

25   the corner of 3rd and Fitzgerald?

                                                          73

1      A.    Yes.

2      Q.    Okay.  Have the -- and we'll play it again.  I

3  don't want to go so far back.  But had the -- when you

4  say that Mr. Woods was -- had advanced towards

5  Officer August and made the statement about you're going

6  to have to come -- what was the statement again?

7           "You're not taking me today" or words to that

8  effect, had that already occurred before this Muni bus

9  came to a stop here?

10     A.    Yes.

11     Q.    So I'm going to show you another snippet from

12  this exhibit, and I'm going to start it from 16:33:55,

13  and I'm going to ask you to take a look at the video,

14  and I will ask you some questions.

15           (Video played.)

16  BY MR. POINTER:

17     Q.    I'm going to pause it at 16:34:10.

18           During the course of that clip, it appears

19  that Mario Woods was walking towards Gilman Street,

20  correct, on 3rd?

21     A.    I think that's -- this is 3rd Street, right?

22     Q.    Yes.

23     A.    Then he's walking towards Gilman.

24     Q.    Okay.  And it looked as if -- and you saw

25  Officer August in that clip, too, correct?

                                                          74

1    fair, though.

2          Q.   When it comes to a stop.

3          A.   In the middle of the street before the bus

4    stop.

5          Q.   Wherever it comes to a stop.

6          A.   Okay.

7          Q.   Okay.  Thank you.

8               (Video played.)

9    BY MR. POINTER:

10         Q.   I stopped it at 16:33:56.

11         A.   Um-hmm.

12         Q.   Is it fair to say the bus had come to a stop?

13         A.   I don't know.

14         Q.   All right.  I will rewind it back.

15         A.   No.  Play it forward so I can see if it's not

16   moving anymore.

17              (Video played.)

18              THE WITNESS:  Okay.  Stop it there.  Now, it's

19   stopped.

20   BY MR. POINTER:

21         Q.   16:34.

22              What I want you to concentrate on, and I will

23   rewind it back or we can try different angles, but did

24   you see anybody else on that corner other than yourself,

25   Officer August and Mario Woods?

                                                           76

1     A.    That's not an accurate representation of it.

2     Q.    Okay.  In the camera view that you just looked

3  at, did you see anybody else other than you three?

4     A.    I'm going to tell you that camera view isn't

5  an accurate representation of everybody that is right

6  there.  If you can give me a better camera view, then

7  let's do it.

8     Q.    Okay.  But in this camera view that we are --

9     A.    It is not an accurate representation.

10    Q.    That's not what I'm asking.

11          I'm just trying to figure out -- I will show

12 you as many views as I can, okay?  We can go through the

13 entire tapes.  I'm not trying to hide anything from you,

14 I'm just asking you, does this camera angle here, did

15 you see anything?

16          MS. COLLINS:  Objection.  The video speaks for

17 itself.

18          THE WITNESS:  So you asked me do I see anybody

19 at the corner.  I got this much of the corner, and you

20 want me to tell you that I don't see anybody there.  But

21 I'm telling you that there were people at the corner.

22 BY MR. POINTER:

23    Q.    Sure.

24          So what we will do is we will rewind the

25 video --

77

1    were any officers standing near the bus when

2    Mario Woods -- in the interaction with Mario Woods.  I

3    believe you said you weren't sure; is that true?

4         A.   Yeah.

5         Q.   I can't remember.

6         A.   I believe you said do I recall if there were

7    any officers standing next to the bus stop during this,

8    and I don't know.

9              MR. POINTER:  Let's take a quick break.  We

10   might be done.

11             THE VIDEOGRAPHER:  Time is 12:30 p.m.  We are

12   now off the record.

13             (Whereupon recess was taken from 12:30 to

14             12:32.)

15             THE VIDEOGRAPHER:  The time is 12:32 p.m.  We

16   are now back on the record.

17             MS. COLLINS:  Mr. Pointer, I believe you have

18   no further questions, right.

19             MR. POINTER:  Yeah.  No further questions.

20             MS. COLLINS:  Thanks.

21                            EXAMINATION

22   BY MS. COLLINS:

23        Q.   Officer Thompson, you were just shown a series

24   of little snips of a Muni bus video.  Were the frames

25   you were shown only of the initial contact you had with

92

1    Mr. Woods?

2         A.   Yes, sir.  Just a small portion of it.

3         Q.   And do you feel that those frames fairly and

4    accurately depicted the entire area you considered the

5    corner of 3rd and Gilman at the time you were

6    contacting --

7         A.   3rd and Fitzgerald?

8         Q.   Yeah, I'm sorry.  3rd and Fitzgerald.

9         A.   No.  It did not depict it.

10        Q.   Okay.  And from Exhibit 4, that Muni bus

11   video, were you just shown any frames at the time of the

12   shooting?

13        A.   No.

14        Q.   Okay.  Have you seen other videos that

15   depicted the time that shots were fired at Mr. Woods?

16        A.   I have.  Not today.

17        Q.   Okay.  And were you able to see nonpolice

18   officers in the area of the shooting in some of the

19   other videos you've seen?

20             MR. POINTER:  Objection.  Vague and ambiguous.

21   Compound.

22             THE WITNESS:  Yes, plenty of people that

23   weren't officers in other videos.

24   BY MS. COLLINS:

25        Q.   Now, when you first arrived at the corner and

93

1     got out of your patrol car and you and Officer August

2     contacted Mr. Woods, can you describe his demeanor upon

3     initial contact?

4               MR. POINTER:  Objection.  Vague and ambiguous.

5     Calls for speculation.

6               THE WITNESS:  From what I observed from

7     Mr. Woods was when he pulled out the knife, he made the

8     statements of we are not going to be able to take him.

9     He dropped his backpack, kind of took up a threatening

10    posture like he was ready to fight Officer August or at

11    least had bad intention with the knife at that point.

12    BY MS. COLLINS:

13        Q.   Can you describe his tone that you heard when

14    he was saying "I'm not going with you" or something to

15    that effect?

16        A.   Yeah.  I would say it's kind of like a

17    threatening, serious kind of manner as he spoke.

18        Q.   At any point when you and Officer August were

19    contacting Mr. Woods, did you see Mr. Woods put the

20    knife down?

21        A.   No.  He never did.

22        Q.   At any point, did you see Mr. Woods --

23    actually, let me withdraw that.

24               Were you able to see the knife at the time

25    shots were fired?

                                                              94

DEPOSITION OF BRANDON THOMPSON

1      A.   I don't remember.

2      Q.   When Officer August and Mr. Woods had the

3   initial contact right after you got out of the patrol

4   car, did you hear Officer August give Mr. Woods any

5   commands?

6      A.   I remember Officer August telling Mr. Woods to

7   drop the knife, and then I didn't hear much after that.

8           MS. COLLINS:  Nothing further.  Thank you.

9                   FURTHER EXAMINATION

10  BY MR. POINTER:

11     Q.   Officer August, when yourself -- I'm sorry,

12  Officer August.  Officer Thompson.  Officer Thompson.

13  My apologies.

14          Officer Thompson, when yourself,

15  Officer August and Mario Woods began walking down 3rd

16  streets towards Gilman --

17     A.   Um-hmm.

18     Q.   -- and away from 3rd and Fitzgerald --

19     A.   Yes.

20     Q.   -- did you ask anybody to secure the corner,

21  the corner of 3rd and Fitzgerald?

22     A.   What do you mean by that?

23     Q.   Did you ask any of your fellow officers who

24  you testified were coming to the scene --

25     A.   My bad.

                                                        95

1        Q.    It's not to be harassing or annoying.  Some

2   people say I don't know, and you tell them something,

3   they're like, well, that sounds about right or it's an

4   estimate or it's an approximation.

5        A.    I have not taken anything as harassment or

6   annoying.  I literally have no clue how many people came

7   off that bus.

8        Q.    You mentioned -- you were asked questions by

9   your counsel.  You said you've looked at other videos.

10  You said yes, I've looked at those videos, I saw there

11  were plenty of people around, so I was trying to figure

12  out what was the basis and what did you see in terms of

13  plenty of people?

14       A.    I don't know how many people came off that

15  bus, but there were plenty of people.

16             Like I said earlier, there were people at the

17  corner because Mr. Woods -- I think we are all in

18  agreement that he was in the line to get on the bus with

19  other people.  So you have the people that are there.

20  You have the people that came off the T line tracks.

21  Now, you have the people that also have now exited this

22  bus that is besides the stop as well who were all

23  sitting there at the corner having their own little -- I

24  gave them orders to disperse.  They all stayed, like I

25  said earlier.  They decided to film and they wanted to

                                                           97

1    watch what was going on.

2              So now, we have nowhere to walk to at that

3    corner because these people don't want to leave because

4    they want to make sure they get their own footage which,

5    okay, they did.  But I have no clue how many people were

6    there.

7         Q.   Okay.  And you mentioned that he was standing

8    in the line at the corner, right?

9         A.   Um-hmm.

10        Q.   And you mentioned, that --

11        A.   Not really the corner.  At the bus stop, yes.

12   Just right off the corner --

13        Q.   You mentioned you were focused on him and you

14   don't know how many people were in that line, right?

15        A.    I just remember other people being there,

16   yeah.

17             MR. POINTER:  Okay.  No other questions.

18             MS. COLLINS:  Okay.  Thanks.

19             THE VIDEOGRAPHER:  Time is 12:39 p.m.  We are

20   now off the record.

21             (Proceedings concluded at 12:39 p.m.)

22                      ---oOo---

23

24

25

                                                            98

San Francisco Police Department

Report Type: Initial                    **INCIDENT REPORT**                    **151045735**

**Incident Report** *Statement*

## INCIDENT NO.

| 1 | 5 | 1 | 0 | 4 | 5 | 7 | 3 | 5 |

**000008**

| Name (Last,First,Middle) Thompson, Brandon L 153 | DOB/Age | Residence Phone(Day/Night) | Business Phone (Day/Night) 415/671-2300 | |
|---|---|---|---|---|
| Residence | Zip Code | Business Address / City if not San Francisco 201 Williams Street, SF | | Zip Code 94124-2558 |

| Date of Statement 12/02/15 | Time Started 22:00 | Time Completed 23:50 | Location Where Statement Taken At Scene ☐   Other:   POTR |
|---|---|---|---|

On 12/2/15 at around 1621 hours, Off. August #1119 and I, responded as back up to the area of Keith St and LeConte Av to assist in searching for the suspect of a stabbing. Off. August and I were driving a marked police vehicle and in full police BDU uniform. I was driving police vehicle black and white 042 and Off. August was in the front passenger seat.

As we travelled S/B on 3rd St approaching Fitzgerald Av, Off. August alerted me that a black male wearing a black hat with white writing, a black jacket (that was possibly a North Face jacket) and beige pants was standing at the South East corner of 3rd St and Fitzgerald at the bus stop. This description matched the description that had been recently broadcasted by Off. Margreiter #2356.

I made a U-turn at 3rd St and Hollister Av. I then travelled N/B on 3rd to Fitzgerald. I stopped my police vehicle on Fitzgerald near the S/E corner. Off. August and I exited our vehicle to make contact with the subject. The subject was standing towards the end of a line of people who were waiting to board the bus. Off. August was closest to the sidewalk as we exited our vehicle. As Off. August and I exited the vehicle the black male began to back pedal. The black male then grabbed a knife out of his jeans pocket and said something to the effect of "you not taking me today." The subject was lifting his pants and had an aggressive and challenging demeanor.

Off. August and I both drew our department issued firearms and told the male to drop the knife. I heard the male say, "You better squeeze that motherfucker and kill me." The subject then began to walk towards 3rd St and turned left onto S/B 3rd St and walked on 3rd towards Gilman Av. I broadcasted via pic radio that I had a subject who was possibly involved in the stabbing and he had a knife that he was refusing to drop. Off. August and I followed the subject as he walked S/B on 3rd. I heard Off. August telling the subject to drop the knife. The subject again refused to drop his knife. I asked for units to respond with ERIW to assist and I continued to broadcast developments and our direction.

I yelled for the subject to drop his knife and Off. August yelled numerous times for the subject to drop the knife. As the subject continued to walk S/B on 3rd St I saw numerous officers approach Off. August, the subject and myself. I noticed Off. Navarro #1435 walking towards us with his 40mm ERIW drawn. Officers on scene continued to yell at the subject to drop his knife. I saw Off. Navarro engage the subject with his ERIW one time. The ERIW round appeared to strike the subject and had no effect. I saw Off. Navarro deploy his ERIW three more times after the initial and the subject still did not drop his knife. The fourth ERIW round that was fired by Off. Navarro appeared to strike the subject in his midsection. The subject appeared to be stunned and crouched to one knee but still refused to drop his knife. The subject quickly regained his balance and stood back up.

As Officers began to fan out around the subject I walked into the street to broadcast information to dispatch. I saw Off. Ortiz #1131 approach the subject with his OC in his outstretched hand and it appeared that he was going to deploy his OC on the subject. I then noticed a large crowd of people behind Off. August standing at the corner S/E corner of 3rd and Fitzgerald near our police vehicle. Numerous people in the crowd were recording video or taking pictures on their phones.

It should be noted that this is a break area and shift change location for Muni Drivers and multiple Muni bus routes have stops at or near this location. The Muni T line is also near this intersection. There are schools in the area. Adults

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER


DEPOSITION EXHIBIT
Thompson

CCSF_WOODS 000019

San Francisco Police Department
**INCIDENT REPORT**

Report Type: **Initial**                                                      151045735

as well as children were in the crowd. I feared that if the subject approached Off. August he may stab Off. August or
seriously injure him. I also feared that if the subject walked past Off. August he would stab or seriously injure an adult
or child who was standing in the crowd. The subject appeared to be angry and have an aggressive fight or flight
demeanor. I believed that the subject's aggression may be taken out on bystanders and he may stab someone again.

I walked towards the crowd to advise them to back up when I saw the subject with the knife still in his hand, begin to
walk towards the crowd. I saw Off. August attempt to cut off the subjects path towards the bystanders. I yelled "back
up" as loud as I could at the crowd when I heard multiple gunshots. I immediately advised dispatch that shots were
fired. I saw that the subject was down and multiple officers approached the subject to render aid. I walked towards the
crowd to locate any witnesses who were willing to cooperate. As I approached the crowd no one would assist me and
said they didn't see anything and began to walk away. I was unable to locate any witnesses who were willing to speak
with me.

I assisted officers establish a crime scene.

Shortly after the incident I returned to Bayview Police Station.

000009

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER                    CCSF_WOODS 000020

DEPOSITION OF BRANDON THOMPSON

1    STATE OF CALIFORNIA )

2    COUNTY OF ALAMEDA   )

3              I, Shelli G. Eng, Certified Shorthand Reporter,

4    No. 11397, State of California, do hereby certify:

5              That prior to being examined, the witness named

6    in the foregoing deposition, to wit, BRANDON THOMPSON,

7    was by me duly affirmed to testify the truth, the whole

8    truth and nothing but the truth; that said deposition was

9    taken down by me in shorthand at the time and place

10   therein named and thereafter reduced to typewriting under

11   my direction and supervision; that the witness was given

12   an opportunity to read and correct said deposition and to

13   subscribe the same.  Should the signature of the witness

14   not be affixed to the deposition, the witness did not

15   avail himself of the opportunity to sign or the signature

16   has been waived.

17             I further certify that I am not of counsel for

18   either or any of the parties to the said deposition, nor

19   in any way interested in the event of this action and

20   that I am not related to any of the parties thereto.

21             WITNESS MY HAND this 3rd day of August, 2018.

22

23             __/s/Shelli G. Eng/_____
               SHELLI G. ENG, CSR NO. 11397
24             CERTIFIED SHORTHAND REPORTER

25

99