# Exhibit S

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

GWENDOLYN WOODS, individually )
and as Successor in Interest )
to Decedent MARIO WOODS,      )
                              )
            Plaintiff,        )
                              )
        vs.                   ) CASE NO.:  3:15-05666-WHO
                              )
CITY AND COUNTY OF            )
SAN FRANCISCO; a municipal    )
corporation, et al,           )
                              )
            Defendants.   )    CERTIFIED COPY
_____)

VIDEO DEPOSITION OF LIEUTENANT DEAN HALL

TUESDAY, APRIL 17, 2018

REPORTED BY:  LISA LOUNDAGIN, CSR NO. 9213

1

DEPOSITION OF LIEUTENANT DEAN HALL

1                          I N D E X

2

3     EXAMINATION BY:                              PAGE

4     MR. POINTER                                   7

5                        --o0o--

6

7     Appearance Page                               3

8     Exhibit Page                                  4

9     Location                                      5

10    Reporter's Certificates                      64

11    Deponent Signature Page                      65

12    Deponent Signature Waiver                    66

13    Witness Letter                               67

14    Changes and/or Corrections                   68

15    Attorney's Notes                             69

16

17                        --o0o--

18

19

20

21

22

23

24

25

                                                          2

```
1                        APPEARANCES

2

3    FOR THE PLAINTIFF:

4         LAW OFFICES OF JOHN L. BURRIS
          Airport Corporate Centre
5         7677 Oakport Street, Suite 1120
          Oakland, California  94621
6         (510) 839-5200

7         BY:  ADANTE POINTER,  ATTORNEY AT LAW

8
     FOR THE DEFENDANTS:
9
          OFFICE OF THE CITY ATTORNEY
10        1390 Market Street, 6th Floor
          San Francisco, California 94102
11        415-554-3863

12        BY:  SEAN FIELD CONNOLLY, DEPUTY CITY ATTORNEY
               JAMES HANNAWALT, DEPUTY CITY ATTORNEY
13

14   ALSO PRESENT:  STEVEN CATHY, CLVS
                    Sacramento Legal video Center
15

16

17                       --o0o--

18

19

20

21

22

23

24

25

                                                         3
```

DEPOSITION OF LIEUTENANT DEAN HALL

```
 1                    E X H I B I T S

 2

 3    EXHIBIT NO.                                PAGE

 4

 5       1    San Francisco Police Department       26

 6             Incident Report for Incident No.

 7             151045735, Bates stamp 000021

 8

 9                       --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1              BE IT REMEMBERED that pursuant to Notice of

2      Taking Deposition, and on Tuesday, April 17, 2018,

3      commencing at the hour of 2:55 p.m., in the Law Offices of

4      JOHN L. BURRIS, 7677 Oakport Street, Suite 1120, Oakland,

5      California 94621, before me, LISA LOUNDAGIN, a Certified

6      Shorthand Reporter in and for the State of California,

7      personally appeared

8                          LIEUTENANT DEAN HALL,

9      produced as a witness in the above-entitled action, who

10     being by me first duly sworn, was thereupon examined as a

11     witness in said action.

12

13                          ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25

5

```
 1              MR. HANNAWALT:  James Hannawalt on behalf of

 2      defendants.

 3              THE VIDEOGRAPHER:  Okay.  Would the reporter

 4      please swear in the witness?

 5                      LIEUTENANT DEAN HALL

 6                      sworn as a witness by

 7                  the Certified Shorthand Reporter

 8                      testified as follows:

 9                  EXAMINATION BY MR. POINTER

10              MR. POINTER:  Q.  Great.  Sergeant Hall, my

11      name's Adanté Pointer, the attorney who will be taking

12      your deposition here today.

13              Would you please state and spell your full name

14      for the record?

15          A    Hugh Dean Hall, H-U-G-H D-E-A-N H-A-L-L.

16          Q    All right, great.  Sergeant, right?

17          A    I got promoted to lieutenant about five months

18      ago.

19          Q    Well, congratulations, Lieutenant.

20          A    Thank you.

21          Q    At the time of the incident concerning Mario

22      Woods, you were a sergeant, correct?

23          A    Yes.

24          Q    Okay.  I'm going to -- well, let me ask you.

25      How many times have you had your deposition taken?
```

7

```
 1    counsel, what do you know?  Now it's green."
 2              You see what I mean?
 3         A    Yes.
 4         Q    Okay.  So with all that being said, try to do
 5    your best in terms of giving me your best memory.  And if
 6    during the course of the deposition, you remember
 7    something differently, or new information or more
 8    information comes in, or you just want to make a change,
 9    let us know, or let me know, and then we'll go back and
10    allow you to do just that to clarify your previous
11    response.  Okay?
12         A    Yes.
13         Q    Great.  So let's get started.  I'm sorry, let me
14    ask you one question before we dive in.
15              Is there any reason why your deposition can't go
16    forward today, either too tired, your mind's distracted,
17    long day, shift's over, anything?
18         A    I'm ready.
19         Q    All right, cool.  So when did you first start
20    working for San Francisco PD?
21         A    1998.
22         Q    Okay.  And you've been with them ever since,
23    right?
24         A    Yes.
25         Q    Or up till now is probably a better way to put
```

11

1    it.

2          A    Yes.

3          Q    Okay.  And I believe you mentioned -- maybe it

4    was off the record -- you're currently a lieutenant?

5          A    Yes.

6          Q    Okay.  What station are you assigned to?

7          A    I'm currently assigned to Tenderloin Station.

8          Q    Okay.  At the time of the incident where Mario

9    Woods was shot and killed, you were assigned to the

10   Bayview Station, right?

11         A    Yes.

12         Q    Okay.  And you were a sergeant at that time,

13   too, correct?

14         A    Yes.

15         Q    Okay.  Since then you've been promoted to

16   lieutenant, right?

17         A    Yes.

18         Q    Okay.  Congratulations.

19         A    Thank you.

20         Q    At the time of the incident concerning Mario

21   Woods -- is it your memory that this happened

22   December 12th of 2015?  I mean December 2nd, 2015?

23         A    December 2nd, that sounds right.

24         Q    Okay.  I'll just make the representation to you.

25         A    Okay.

                                                            12

DEPOSITION OF LIEUTENANT DEAN HALL

1      Q    All right.  I'm going to ask you some questions

2  about that day and what your memory was, maybe some

3  background stuff, and hopefully wrap it up.  Okay?

4      A    Okay.

5      Q    So do you remember what shift you were working

6  that day?

7      A    I believe I started at 11:00.  I believe that I

8  was working 11:00 to 9:00.

9      Q    Okay.

10      A    11:00 a.m. to 9:00 p.m.

11      Q    Is that a -- is there a particular name for that

12  shift?

13      A    Late day watch or 11:00 to 9:00.

14      Q    Okay.  And as you've already testified to, you

15  were a sergeant on that day.  And do you recall what your

16  assignment was?

17      A    At that time I was a housing supervisor.  So

18  when I say housing, I'm referring to subsidized housing.

19  And I had a team of about 14 officers and another

20  sergeant.  We worked uniform patrol but specifically in

21  the areas of housing developments.

22      Q    Okay.

23           THE VIDEOGRAPHER:  Mr. Pointer, can you move

24  your mike down just a little bit?  It's kind of --

25           MR. POINTER:  My beard cause it?

                                                              13

DEPOSITION OF LIEUTENANT DEAN HALL

```
 1          A    If my memory serves me, that was our standard

 2     shift.

 3          Q    Okay.  Let me see if I have your -- this is the

 4     question about -- let me see here.

 5               I'm going to show you something, and let's see

 6     if it refreshes your memory or -- yeah, refreshes your

 7     memory as it relates to which shift you were working.  I

 8     won't have it marked as an exhibit unless it actually has

 9     some substance to it.  You guys already have a copy of

10     this, Counsel.

11               This is Bates stamped 2845, and you can take a

12     look at it.

13          A    Just the first page?

14          Q    You can look at the entire --

15          A    Okay.

16          Q    -- four -- I think it's four pages.  See if it

17     refreshes your recollection.

18          A    (Reviewing document.)  Would you like it back?

19          Q    Sure.  Did looking at any of those pages or this

20     document refresh your recollection as to which shift you

21     were on?

22          A    It appears that day I started at 8:00 in the

23     morning.

24          Q    Okay.  And what time would that have you leaving

25     if you were to start at 8:00 in the morning?
```

                                                              15

1        A    6:00 p.m.

2        Q    Okay.  Now, if you can imagine, I don't know all

3    the business of SFPD and how all this stuff works.  I have

4    some understanding.  But so if I understand you correctly,

5    your shift was from 8:00 a.m. to 6:00 p.m. in the evening?

6        A    According to the lineup, yes.

7        Q    Okay.  And I also understand -- you can correct

8    me if I'm wrong -- that there's another shift for police

9    officers that starts sometime between 8:00 and 6:00 p.m.

10       A    Yes.

11       Q    Okay.  I don't know.  Layman's terms, I call it,

12   like, the swing shift, but is there a different term that

13   you're --

14       A    Generally speaking, I talked about it, the

15   eleven o'clock start time.

16       Q    Yes.

17       A    We kind of consider that a late day watch.  Then

18   there is a swing shift that starts at 3:00 p.m. or

19   4:00 p.m. generally speaking.

20       Q    Okay.  And so the three -- the shift that starts

21   at 3:00 or 4:00 p.m., is that considered night watch?

22       A    Swing watch.

23       Q    Swing watch, okay.  And when each shift starts,

24   is there a lineup?

25       A    Yes.

16

DEPOSITION OF LIEUTENANT DEAN HALL

1         A   I reviewed videos, I reviewed the CAD and my

2    police report or my statement and the police report.  I

3    think -- I think that's what I reviewed.

4         Q   Okay.  And how long ago did you review those

5    items?

6         A   I would say I've reviewed them periodically over

7    the last few days, maybe even the last few weeks.

8         Q   Sure.  I'm going to show you a document which I

9    want marked number 1 to your deposition.

10            (Plaintiff's Exhibit No. 1 marked for

11             identification.)

12        A   Thank you.

13        Q   Lieutenant, you mentioned that you reviewed your

14   report.  I just put in front of you a document that's

15   Bates stamped 32, which is Exhibit 1 to your deposition.

16            Is this the report or one of the reports that

17   you were referring to?

18        A   Yes, this is my written statement as a statement

19   to the larger report.

20        Q   Okay.  Right.  There were other supplemental or

21   other -- strike that.

22            There were other incident reports included in

23   the larger report, right?

24        A   Yes.  Generally speaking, yes.

25        Q   Essentially, reports from the other officers who

26

1    responded to the scene?

2         A    Yes.

3         Q    Okay.  And did you prepare any other written

4    reports other than this?

5         A    I believe that I completed the use of force

6    log --

7         Q    Okay.

8         A    -- which is a handwritten document.

9         Q    Okay.  And my understanding as it relates to the

10   shooting death of Mario Woods was that you were the first

11   sergeant to actually respond and get to the scene; is that

12   right?

13        A    Yes.

14        Q    Okay.  And then once you got there, essentially,

15   along the terms of what you've laid out here in your

16   report, you, use my term, kind of took command or

17   supervised the scene?

18        A    I would say that I was the crime scene manager

19   or the -- one of the lead crime scene managers after the

20   incident occurred.

21        Q    Okay.  And as a sergeant, that's -- that's -- a

22   part of your task you're trained on is you come to an

23   officer-involved shooting, that sergeant is -- then has

24   particular tasks to make sure the investigation's

25   integrity is maintained essentially?

                                                            27

1       A    Essentially, yes.

2       Q    Okay.  Now, given that you were assigned to

3   housing -- or strike that.

4            I understand from your earlier testimony, your

5   tasks, along with the officers that you were assigned

6   to -- to supervise, were really focused on patrolling the

7   housing developments, right?

8       A    Generally, yes.

9       Q    Okay.  Now, my understanding is in reading the

10  reports and stuff -- and you tell me if I'm wrong -- is

11  that Mr. Woods was initially contacted by police officers

12  at or about somewhere on Third in between Fitzgerald

13  and -- what's the other street?  Near Fitzgerald; is that

14  true?  Do you remember that?

15      A    Yes.

16      Q    Okay.  Now, were either -- were any of those

17  officers actually assigned to you that day?

18      A    Yes.

19      Q    Okay.  Which ones?

20      A    Officers August and Officers Thompson.

21      Q    Okay.

22      A    Before we go to the next one, can I take a quick

23  break?

24      Q    Absolutely.

25      A    Is that all right?  Take a quick --

                                                          28

1           THE VIDEOGRAPHER:  We are going off the record

2    at 3:23 p.m.

3               (Recess taken.)

4           THE VIDEOGRAPHER:  We are back on the record at

5    3:28 p.m.

6           MR. POINTER:  Q.  All right.  Lieutenant, all

7    the same rules and guidelines apply as before.  You

8    understand?

9       A   I understand.

10      Q   Okay, great.  So you mentioned that you had

11   reviewed some videos in preparing -- in preparation for

12   your deposition?

13      A   Yes.

14      Q   Okay.  I take it those were videos of the

15   incident and the shooting?

16      A   Yes.

17      Q   Okay.  Were you actually on scene when shots

18   were fired?  And by on scene, I mean, like, out of your

19   police car.  Put it that way.

20          THE REPORTER:  I'm sorry?

21          MR. POINTER:  Out of his police car.

22          THE WITNESS:  The answer is kind of.  Because as

23   I arrived and exited my car, I heard the gunshots.

24          MR. POINTER:  Q.  Okay.  Did you actually see

25   any police officers firing their gun when you heard the

                                                          29

DEPOSITION OF LIEUTENANT DEAN HALL

1    gunshots?

2         A    No.

3         Q    Were you -- did you see Mario Woods and what he

4    was doing when you heard the gunshots?

5         A    No.

6         Q    Okay.   It's fair to say that when you finally

7    saw officers -- the officers who fired their guns, it was

8    after the shots had already stopped?

9         A    Generally, yes.

10        Q    Fun part about lawyers.   You say, "Generally,"

11   I'm wondering, what -- what do you mean by that?   Can you

12   explain what you mean by "generally, yes"?

13        A    Yes, I can.   The area of Third and Le Conte,

14   which is about four or five blocks away, where Mario Woods

15   stabbed Mr. Garlan -- Mr. Farlan -- I forgot his name --

16   Gardner -- that occurred at about Third and Le Conte-ish.

17   It's about four or five blocks away, but it's at a slight

18   downhill.

19             So as I started to move from Le Conte towards

20   Third and Fitzgerald and Keith, I saw officers, but I

21   didn't see -- it was from a distance.

22        Q    Okay.   So you can make out officers, but you

23   couldn't -- you weren't close enough where you can

24   actually see who the actual officers were that you were

25   looking at, right?

                                                            30

1        A    Correct.

2        Q    Okay, I understand.  So you mentioned that you

3   initially started from Third and Le Conte and made your

4   way up Third Street?

5        A    Yeah.   It would be downhill, but yes.

6        Q    Okay.  And did you yourself meet with the person

7   that Mario Woods is accused of stabbing?

8        A    I did not.

9        Q    Okay.  So your -- the information you were

10  working with was coming through the radio?

11       A    Partially, yes.  Partially from the officers,

12  yes.

13       Q    Okay.  I was going to ask:  Did you meet any --

14  did you communicate directly with any persons who held

15  themselves out to be a witness prior to you getting up to

16  the scene where Mario Woods was shot and killed?

17       A    I did not.

18       Q    Okay.  So let's take you back in time to I was

19  asking you questions of when you arrived on scene to

20  Fitzgerald and Third.  Okay?

21       A    Yes.

22       Q    So I think we've established and you testified

23  you didn't see what Mario Woods was doing when the

24  shots -- when you heard the gunshots, right?

25       A    Correct.

                                                          31

1     Q    And you were getting out of your car when you

2   heard the shots; is that fair?

3     A    Correct.

4     Q    Okay.  And when you heard the shots, you weren't

5   actually looking at the officers when you were hearing the

6   shots go off, right?

7     A    I'll clarify.  As I previously stated, from

8   Le Conte, it's a couple blocks and a downhill slope, and

9   then where the incident occurred, Fitzgerald is generally

10   flat at Third.  Based on where I parked close to the

11   intersection being in the flat area, my line of sight

12   couldn't see all the details of who was where at the time.

13          I know the officers were on foot.  I know Mario

14   Woods was on foot as opposed to in a vehicle.  But as I

15   came down the hill, I just saw officers starting to

16   gather.

17     Q    Okay.  Speaking of which, you mentioned that you

18   stopped your patrol car, right?

19     A    Yes.

20     Q    Where did you stop it at in terms of was it

21   towards the intersection of Fitzgerald, or was it

22   somewhere else?

23     A    It was -- I believe it was in the crosswalk

24   Third and Gilman, and it would be the crosswalk on the

25   north side near the T line onramp.

32

DEPOSITION OF LIEUTENANT DEAN HALL

1       Q    Okay.  When you say the T line onramp, do you

2   mean the -- use my term, the island or the median that

3   people can wait on while they're waiting for the bus?

4       A    Yes, the T line is the Muni light rail that

5   travels along Third.

6       Q    Okay.

7       A    So my vehicle was generally kind of in the

8   intersection or crosswalk of Third and Gilman.

9       Q    Okay.  Is it fair to say in terms of -- in

10  relation to Gilman to Fitzgerald, that there's a block

11  between Fitzgerald and Gilman?

12      A    Yes.

13      Q    Okay.  All right.  Now, how did you know that

14  the officers had confronted or were contacting Mario?

15  What brought you down to Third and Gilman or Third and

16  Fitzgerald?

17      A    Radio transmission.

18      Q    Okay.  So you listened to the radio?

19      A    Yes.

20      Q    On your way -- well, strike that.

21      Where were you at when you first learned that

22  they actually had made contact with the person you now

23  know is Mario Woods, but at that time a person who fit the

24  description of the stabbing suspect?

25      A    I'm sorry, can you say that again?

33

1        Q    Yeah, sure.   When did you learn that the

2   officers were making contact with Mario Woods?

3        A    I believe that I was on foot in the area of

4   6600 Third, which is about Le Conte.

5        Q    Okay.  Which is where there had been a perimeter

6   set up once upon a time, right?

7        A    Kind of.  We never completed the perimeter based

8   on the area.

9        Q    I understand.  Put it another way.  That's the

10   place where the officers had gathered to conduct a search

11   for the stabbing suspect, right?

12        A    Correct.

13        Q    Okay.  The perimeter was not completed.  It

14   was -- its integrity was not maintained and thought that

15   he may have slipped out of the perimeter, right?

16        A    I might not characterize it as the integrity,

17   but based on the timeframe of the initial crime, we're

18   there to look for crime scene evidence and potentially a

19   perimeter.

20        Q    Okay.

21        A    Potentially suspects, potentially witnesses.

22        Q    Okay.  Now, once you heard that the officers

23   were making contact with somebody who fit the description,

24   did you put out any transmissions between hearing that and

25   making it down to where you pulled your -- parked your car

                                                              34

DEPOSITION OF LIEUTENANT DEAN HALL

1    at Gilman and Third Street?

2         A    If my memory serves me from the incident and

3    reviewing the tapes, I believe that I authorized a Code 3

4    response.   At the time I was 3C, 3 Charlie, 170, which was

5    my call sign.   And I believe that I stated on the air

6    something to the effect of, "Advise the officers to

7    respond in an emergency fashion in their vehicles."   And I

8    believe that I made a statement regarding the extended

9    range impact weapon.

10        Q    Okay.

11        A    The beanbag shotgun.

12        Q    Okay.   When you say you made a statement about

13   the beanbag shotgun, what was that statement?

14        A    I don't know if I advised the officers to have

15   it or if I made mention of it specifically in a certain

16   way, but I believe those were my two radio transmissions

17   generally before the incident occurred.

18        Q    Okay.   Why was it that you instructed or advised

19   the officers to have the beanbag weapon available?

20        A    Because it was appropriate.   Because that's my

21   responsibility and duty as a supervisor and a sergeant.

22   And generally, the officers know that, but one of my

23   responsibilities is to remind and to document in CAD form

24   the actions that we're taking.

25        Q    Okay.   And why did you think the beanbag gun was

35

1    appropriate?

2              (Knock at the door.)

3              MR. BURRIS:  I just want to say hello to you

4    guys.

5              MR. POINTER:  Let's go off the record.

6              THE VIDEOGRAPHER:  Okay.  We are going off the

7    record at 3:38 p.m.

8              (Off the record.)

9              THE VIDEOGRAPHER:  We are going back on the

10   record at 3:38 p.m.

11             MR. POINTER:  Q.  Okay, Officer.  Lieutenant,

12   all the same rules and guidelines still apply.  You

13   understand that?

14        A    I understand.

15        Q    Great.  I believe I was asking you, and I'll

16   just ask it again, why did you think the beanbag shotgun

17   was appropriate for this particular incident concerning

18   Mario Woods?

19        A    I think it's a force option.  And as the word

20   dictates, it's an option.  One of our force tactics, which

21   can be used in mental health situations, in situations

22   when someone is armed with a weapon.  So I thought it was

23   appropriate based on the call for service and the

24   information that we had at the time.

25        Q    Okay.  And I take it you've undergone training

                                                          36

DEPOSITION OF LIEUTENANT DEAN HALL

1              Like I said, I know Officer Navarro fired one

2     and Officer Traw.  Is that your understanding?

3          A    That is my understanding.

4          Q    Okay.  What were the weapons they were using so

5     that we just use the same word or --

6          A    Officer Traw had the station level ERIW.  And

7     it's my understanding that Officer Navarro had a

8     40 millimeter extended range impact weapon.  I am

9     personally not trained or familiar with the 40 millimeter,

10    and I'm not certified to deploy with it --

11         Q    Okay.

12         A    -- and I've never fired one.

13         Q    So is it fair to say that when you were

14    telling -- or when you put out the dispatch about having

15    the less lethal weapon, which one were you referring to,

16    or were you referring to both?  I don't know.

17         A    Referring to extended range impact weapons.

18         Q    Okay.  So is that -- does that include the

19    station level, as well as the 40 millimeter one?

20         A    Generally speaking, yes.

21         Q    Okay.  So that I'm clear -- and I want to just

22    make sure.  I don't want to say a word here and then a

23    different word somewhere else.

24              When you -- your intent, when you said have the

25    ERIW or grab one to have there, was you were referring to

                                                          42

1    either weapon?

2         A    Yes.

3         Q    Okay.  All right.  Now, do you remember making

4    any other transmissions prior to you arriving on scene and

5    Mr. Wood being shot?

6         A    I do not recall making other statements --

7         Q    Okay.

8         A    -- on the radio.

9         Q    Do you remember if there were any other

10   sergeants that -- strike that.  Let me ask it another way.

11        So I understand that you had your officers that

12   you were responsible for that were focused on the housing

13   developments.  Were there other, use my term, patrol

14   sergeants out there who were supervising officers, as

15   well, at this time?  And I mean in the Bayview and those

16   that are -- were out doing the search.

17        A    I get it.  Can you start over for me, though?  I

18   forgot the beginning.

19        Q    I'm sorry.  I'll see if I can say it simply.

20   Let me get out of attorney mode so I can just ask you.

21        Were there any other sergeants out there that

22   were supervising officers who were looking for Mr. Woods?

23        A    Prior to the incident, I don't recall that.

24        Q    Okay.

25        A    Strike that.

43

1    you portions of the CAD.  This has been Bates stamped 373.

2    And first I'm just going to play a portion to see if --

3    I'll ask some follow-up questions.  So you just listen.

4    Okay?

5         A    Okay.

6         Q    Thank you, Lieutenant.

7              MR. POINTER:  And for you, you don't need to

8    transcribe what's said on the CAD.

9              THE REPORTER:  Okay.

10             MR. POINTER:  Okay.  You, you keep the tape on.

11             THE VIDEOGRAPHER:  Understood.

12             (Audio recording playing.)

13             MR. POINTER:  Q.  I'm just going to stop it at

14    14:15.  I heard somebody refer to Charlie 170.  Is that

15    you?

16        A    That was my call sign.

17        Q    Okay.  So in listening to that, and I don't know

18    if you could tell it, was that you talking, or was that

19    somebody talking, and then they mentioned your call sign?

20        A    Dispatch and I had a conversation.  My voice is

21    pretty distinct.  That was me --

22        Q    Okay.

23        A    -- in the Charlie 170 transmission.

24        Q    Okay.  All right.  Thank you.

25             MR. CONNOLLY:  Adanté, can you let me know what

46

1    timestamp roughly you're at --

2              MR. POINTER:  Sure, no problem.

3              MR. CONNOLLY:  -- just to track it a little bit?

4              MR. POINTER:  Absolutely.  I'm going to start --

5    once again, this is from the CAD, audio CAD, which is

6    Bates stamped 373.  And I'm going to start from 18 minutes

7    going forward.  That's 18 minutes per the time of the

8    player, not the --

9              MR. CONNOLLY:  Got it.

10             MR. POINTER:  Not the dane or whatever it's

11   called.

12             (Audio recording playing.)

13             MR. POINTER:  Q.  All right.  I just stopped it

14   at 18:49.  You hear someone right before I stopped that

15   says, "Charlie 170, listen up.  Someone needs to deploy

16   the ERIW."

17        A    Yes.

18        Q    Was that you, or was that somebody else?

19        A    That was me speaking.

20        Q    Okay.  And so it's fair to say you were putting

21   out a transmission telling the officers who were on scene

22   dealing with Mr. Woods that they need to deploy the ERIW,

23   correct?

24        A    Yes.

25        Q    Okay.  Okay.  I'm going to press play, and we're

                                                            47

1    just going to go just forward from 18:50 where I stopped

2    it at.

3         A    Before we move ahead?

4         Q    Sure.  Go ahead.

5         A    At the beginning of that recording, I was also

6    on the radio saying, "Respond Code 3.  Stay off the air."

7         Q    Okay.

8         A    That was my voice saying that, as well.

9         Q    Oh, okay.  You mean in the portion of the tape I

10   just played?

11        A    Yes, but at the beginning.

12        Q    Understood.  Thank you.  And that's probably a

13   good point.  You know, I'm -- I don't know -- I'm learning

14   your voice.  But if you hear your voice, and there's a

15   portion of something in there, and I don't ask you, or if

16   you just tell me, "Hey, you know, I heard myself say, 'Da,

17   da-da, da-da,'" I'd appreciate it.  Okay?

18        A    I understand.

19        Q    Thank you.  So I'm going to play it forward from

20   18:50.

21             (Audio recording playing.)

22             MR. POINTER:  Q.  I'm going to stop it at 19:13.

23   Anytime between 18:50 and 19:13, did you hear your voice?

24        A    I did not hear myself in that last block that

25   you played.

48

Report Type: Initial

**San Francisco Police Department**
**INCIDENT REPORT**

151045735

Incident Report *Statement*

**INCIDENT NO.**

| 1 | 5 | 1 | 0 | 4 | 5 | 7 | 3 | 5 |
|---|---|---|---|---|---|---|---|---|

| Name (Last,First,Middle)<br>Hall, Hugh D 567 | DOB/Age | Residence Phone(Day/Night) | Business Phone (Day/Night)<br>415/671-2300 | |
|---|---|---|---|---|
| Residence | Zip Code | Business Address / City if not San Francisco<br>201 Williams Street, SF | | Zip Code<br>94124-2558 |
| Date of Statement<br>12/03/15 | Time Started<br>00:00 | Time Completed<br>00:45 | Location Where Statement Taken<br>At Scene ☐     Other:   POTR | |

On the above date and time, I was assigned to uniformed patrol as the Bayview Housing Team Leader. I was involved in the initial investigation of a stabbing victim who had walked into SFGH and advised that he had been attacked in the area of 3rd St / LeConte Ave by an unknown black male. I coordinated a search of that area with numerous Bayview Units, but we were unable to locate the suspect at that time.

A short time later, I overheard Officer Thompson #153 broadcast that the knife wielding suspect had been located near 3rd St / Fitzgerald Ave (about 4 blocks from the initial incident). Thompson went on to describe the suspect's non compliance and officers' subsequent use of force.

I arrived on scene (2911 Keith St @ Fitzgerald Ave) and observed the suspect laying motionless. I directed officers to render aid, and solicit witness statements from citizens. I personally asked several people if they witnessed the incident, but no one came forward.

As involved officers were giving public safety statements, I was able to identify the officers who had used reportable force. As part of my use of force investigation, I noted the officers using force and the type of force used. I later entered my findings into the Bayview station force log.

I coordinated and managed the crime scene until its completion.

Δ π EXHIBIT   1
Deponent   Hall
Date 4/17/18 Rptr.  LL
WWW.DEPOBOOK.COM

000021

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1           CERTIFICATE OF REPORTER

2

3           I, LISA LOUNDAGIN, hereby certify that the

4    witness in the foregoing deposition was by me duly sworn

5    to tell the truth, the whole truth, and nothing but the

6    truth in the within-entitled cause;

7

8           That said deposition was taken in shorthand by

9    me, a Certified Shorthand Reporter of the State of

10   California, and was thereafter transcribed into

11   typewriting, and that the foregoing transcript constitutes

12   a full, true, and correct record of said deposition and of

13   the proceedings which took place;

14

15          That I am a disinterested person to the said

16   action.

17

18          IN WITNESS WHEREOF, I have hereunto set my hand

19   this 17th day of April, 2018.

20

21

22                         ____/s/Lisa Loundagin_____

23                         LISA LOUNDAGIN

24                         CSR No. 9213

25

64