# Exhibit T

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

GWENDOLYN WOODS, individually)
and as Successor in Interest )
to Decedent MARIO WOODS,      )
                              )
            Plaintiff,        )
                              )
        vs.                   )  CASE NO.:  3:15-05666-WHO
                              )
CITY AND COUNTY OF            )
SAN FRANCISCO; a municipal    )
corporation, et al,           )
                              )
            Defendants.  )      CERTIFIED COPY
_____)

VIDEO DEPOSITION OF OFFICER SCOTT PHILLIPS

TUESDAY, JULY 24, 2018

REPORTED BY:  ANGELICA R. GUTIERREZ, CSR NO. 13292

1

1                      I N D E X

2

3   EXAMINATION BY:                          PAGE

4   MR. BUELNA                                6

5                       --o0o--

6

7   Appearance Page                           3

8   Exhibit Page                              4

9   Location                                  5

10  Reporter's Certificates                  80

11  Deponent Signature Page                  81

12  Deponent Signature Waiver                82

13  Witness Letter                           83

14  Changes and/or Corrections               84

15  Attorney's Notes                         85

16

17                      --o0o--

18

19

20

21

22

23

24

25

                                              2

```
 1                          APPEARANCES

 2

 3   FOR THE PLAINTIFFS:

 4        LAW OFFICES OF JOHN L. BURRIS
          Airport Corporate Centre
 5        7677 Oakport Street, Suite 1120
          Oakland, California 94621
 6        (510) 839-5200

 7        BY:  MELISSA NOLD, ATTORNEY AT LAW
               PATRICK BUELNA, ATTORNEY AT LAW
 8

 9   FOR THE DEFENDANTS:

10        OFFICE OF CITY ATTORNEY, CITY OF SAN FRANCISCO
          1390 Market Street, 6th Floor
11        San Francisco, California 94102
          (415) 554-3863
12
          BY:  SEAN CONNOLLY, ATTORNEY AT LAW
13             KELLY COLLINS, ATTORNEY AT LAW

14

15   ALSO PRESENT - CUTLER ANDRUS, Videographer
                    MEGAN BETTLES, Legal Intern
16                  WINSON SETO
                    NICHOLAS CUEVAS
17                  CHARLES AUGUST

18

19                      --oOo--

20

21

22

23

24

25
```

3

1

2                       INDEX OF EXHIBITS

3    PLAINTIFF'S          DESCRIPTION                    PAGE
     1          Department Bulletin 15-106,
4               consisting of 1 page                      51

5    2          Department Bulletin 13-20,
                consisting of 1 page                       59
6

7

8
                         --o0o--
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          4

1           Pursuant to Notice of Taking Deposition and on

2    Tuesday, July 24, 2018, commencing at the hour of 3:06

3    p.m., thereof, at the Law Offices of John L. Burris, 7677

4    Oakport Street, Oakland, California, before me, ANGELICA

5    R. GUTIERREZ, CSR No. 13292, a Certified Shorthand

6    Reporter and Deposition Officer of the State of

7    California, there personally appeared:

8

9              OFFICER SCOTT PHILLIPS

10

11   called as a witness by the Plaintiff, who having been duly

12   sworn by me, to tell the truth, the whole truth and noting

13   but the truth, testified as hereinafter set forth:

14

15              ---oOo---

16        VIDEOGRAPHER:  My name is Cutler Andrus, I'll

17   be reporting in this proceeding on behalf of Sacramento

18   Legal Video Center, LLC, located at 3550-Watt Avenue,

19   Suite 140 in Sacramento, California.

20           Today's date is July 24th, 2018, and the time

21   on the video monitor is 3:06 p.m.  We are located at

22   7677 Oakport Street in Oakland, California in regards

23   to the matter of Gwendolyn Woods versus The City and

24   County of San Francisco, et al filed in the United

25   States District Court, the Northern District of

5

1     California.   The case number is 3:1505666.

2            This is volume 1 of the deposition of Scott

3     Phillips.   The noticing attorney is for the plaintiff.

4     The court reporter is Angelica Gutierrez, Barbara

5     Butler & Associates.   Any private conversation will be

6     recorded as this is a single track recording, so please

7     be aware of that with the microphone.

8            Will counsel please identify yourselves and

9     say whom you represent.

10           MR. BELNA:   Patrick Buelna for the Plaintiff

11    Gwendolyn Woods, with attorney Melissa Nold also for

12    plaintiff.

13           MS. COLLINS:   Kelly Collins for defendants

14    with Sean Connolly, who also represents the defendants.

15    And legal intern Megan Bettles.   Also present are

16    Defendants Seto, August and Cuevas.

17           VIDEOGRAPHER:   Will the court reporter please

18    swear in the witness.

19                 OFFICER SCOTT PHILLIPS,

20    having been first duly sworn, testified as follows:

21           THE WITNESS:   (TO OATH)   Yes.

22               EXAMINATION BY PATRICK BUELNA

23           MR. BUELNA:   Q.   Good afternoon, Mr. Phillips.

24       A.   Good afternoon.

25       Q.   If you could just state your full name for the

6

1    record.

2        A.    Scott Roy Phillips.

3        Q.    And if you could just spell it also for the

4    record.

5        A.    First name Scott, S-C-O-T-T, middle name Roy,

6    R-O-Y, last name Phillips, P-H-I-L-L-I-P-S.

7        Q.    Now, I realize that you just watched a bunch

8    of depositions but have you actually even actually been

9    deposed yourself before?

10       A.    No, I have not.

11       Q.    So this is your first deposition?

12       A.    Yes.

13       Q.    Okay.  I know you heard the rules before but

14   I'm going to go over a couple of the rules again, even

15   though we do have a videographer here who's taking

16   your.  We also have a court reporter who's transcribing

17   everything that we say onto a written document.

18            What that means is, you know, typical

19   conversation you nay nod or shake your head or use body

20   gestures, but in order for the court reporter to catch

21   it I'm going to ask you today to verbally express

22   yourself, please say yes or no, no um-hmms or uh-uhs.

23            Do you understand.

24       A.    Yes.

25       Q.    Okay.  Also, this is sworn testimony so it has

7

1    Q.    27.  And if you recall, when did you start

2    working for the San Francisco Police Department?

3    A.    I began the Academy on January 5 of 2015.

4    Q.    And when did you complete the Academy?

5    A.    August, middle of August, same year.

6    Q.    And after you completed the Academy were you

7    on field training?

8    A.    I was, yes.

9    Q.    For approximately how long were you a field

10   training officer?

11   A.    I was a recruit for about 15 weeks.

12   Q.    So on the date of the incident, were you

13   still, December 2, 2015 were you still a field training

14   officer -- still in field training?

15   A.    I was, yes.

16   Q.    And did you have a field training officer?

17   A.    I did.

18   Q.    And who was your field training officer?

19   A.    Officer Cuevas.

20   Q.    Now, what was your role as a field training

21   recruit?

22        MS. COLLINS:  Objection, vague as to time.

23        THE WITNESS:  So as a role I have the same

24   role as any police officer, I'm just being -- I respond

25   to calls for service, handle incidences, write reports.

10

1    It's just a matter of being evaluated on a daily basis

2    by my field training officer.  There's three stages or

3    three different field training officers to evaluate you

4    throughout the course of the 16 weeks.

5        Q.   And which stage were you in on the date of

6    incident?

7        A.   I was in the final stage with Officer Cuevas.

8        Q.   Is it fair to say you had almost completed

9    your field training?

10       A.   Yes, I had about one week left.

11       Q.   And although you were still in training were

12   you permitted to use all uses of force?

13            MS. COLLINS:  Objection, vague as to time.

14            THE WITNESS:  Yes, for the duration of the FTO

15   program I was a sworn police officer and had all the

16   same duties and responsibilities.

17            MR. BUELNA:  Q.  And for approximately --

18   prior to the date of that incident, for approximately

19   how long was Officer Cuevas your field training

20   officer?

21       A.   Four or five weeks.

22       Q.   Is it fair to say for the four to five weeks

23   you guys worked together every day?

24       A.   For the most part, yes.

25       Q.   Was he your primary field training officer?

11

1    do you mean ten?

2         A.   Around that, approximately, yes.

3         Q.   Okay.  Now, in each one of those instances

4    or -- strike that.

5              In any of those instances did the suspect

6    ultimately die?

7         A.   No.

8         Q.   Okay.  In any of those instances was the

9    suspect shot by a San Francisco Police Officer?

10             MS. COLLINS:  Objection, vague as to time.

11   Calls for speculation, lack of foundation.

12             THE WITNESS:  No.

13             MR. BUELNA:  Q.  In all of those instances was

14   the person taken into custody without injury?

15        A.   I did.

16        Q.   Now, you did respond and I'm going to

17   represent to you the suspect was Mario Woods on the

18   date of the incident, you did respond to a call for

19   Mario Woods, is that correct?

20        A.   I did.

21        Q.   How did you -- why did -- what caused you to

22   respond; did you hear a dispatch, did you hear a call,

23   hear something on the radio ?

24        A.   Well, it started while we were in lineup at

25   Bayview Station.  There was a call for service earlier

                                                          14

1    in the day where somebody was stabbed and was in the

2    hospital, units had gone to the area of, I believe,

3    Third and Le Conte prior to us being on duty but were

4    unable to find a suspect.

5           And then as we were in lineup somebody came on

6    the air saying that they believe the suspect was in

7    that area of Third and Le Conte and so we broke from

8    lineup, drove to that area to try to search for the

9    suspect where we actually made contact with Mr. Woods

10   that's -- we responded to that scene because we heard

11   Officer Thompson saying that they located the suspect

12   in the area of Third and Fitzgerald and Gilman and that

13   he had a knife and was coming at his partner asking for

14   help.

15        Q.   And when you say "coming at his partner," are

16   you referring to -- identify who you are referring to

17   in that.

18        A.   I'm speaking about Officer August.

19        Q.   Okay.  You said a lot so I'm going to unpack

20   that a little bit?

21        A.   Yeah.

22        Q.   Now, you mentioned that you were at lineup

23   when you heard a call that the stabbing suspect may be

24   in the area of Third and Le Conte; is that correct?

25        A.   Yes.  A witness to the stabbing, I believe,

15

1          THE WITNESS:  Yes, we're supposed to adhere to

2     the policies as closely as possible.

3          MR. BUELNA:  Q.  And that's your training at

4     the San Francisco Police Department?

5          A.   Yes.  That's -- I mean, that's what we are

6     told, we're supposed to adhere to the policies.

7     Ultimately the goal is, you know, to stay safe.  And a

8     lot of the policies are just to keep us safe.

9          Q.   Are you trained that you may be disciplined if

10    you have found to have violated a San Francisco Police

11    Department policy?

12         A.   There can be, yes, administrative issues if

13    you violate any of the policies.

14         Q.   And you understood that as a referral on the

15    date of the incident?

16         MS. COLLINS:  Objection, vague, argumentative.

17         THE WITNESS:  Yes.

18         MR. BUELNA:  Q.  Now, getting back to the

19    incident.  You mentioned that you were directed to

20    assist in creating a perimeter; is that correct?

21         A.   Yes.  At Third and Le Conte we set a --

22    basically a perimeter in the area and just to search

23    for a person matching the suspect's description.

24         Q.   And I take it that you went to that -- to

25    create that perimeter, to go to that location with

                                                          18

1    Officer Cuevas?

2         A.    Yes.

3         Q.    Were you driving, were you in the passenger

4    seat?

5         A.    I was driving.

6         Q.    So is it fair to say then Officer Cuevas was

7    in the passenger seat?

8         A.    Yes.

9         Q.    And did you have any discussions while you

10   were on the way to Third and Le Conte, if you can

11   recall?

12        A.    I can't recall as with any specific.  I mean

13   generally we would have discussions about tactics on

14   the way to calls.  It was always good practice for us

15   to just talk about different scenarios of how things

16   could play out, where we are going, how we should, you

17   know, park and et cetera, so I can't recall a specific

18   conversation on that point, though.  It was common for

19   us to have conversations.

20        Q.    Okay.  Did those conversations include not

21   only strategy but also review of your performance or

22   tips?

23             MS. COLLINS:  Objection, vague as to time.

24             THE WITNESS:  All right.  Review and tips

25   would generally come afterwards, but usually it would

                                                          19

1    with you; is that correct?

2         MS. COLLINS:  Objection, incomplete

3    hypothetical.  Lacks foundation.  Vague.

4         THE WITNESS:  Yes, to certain calls it's

5    common for him to -- or for us to talk out and play out

6    how something might be handled.  But just kind of the

7    run of the mill basic calls, he would generally sit

8    back and watch me handle it myself and evaluate me,

9    critique me.

10        MR. BUELNA:  Q.  I understand.  Not too much

11   different than in the law?

12        A.   Yeah.  Yeah.

13        Q.   So is it fair to say that he would give you

14   some instruction if you were going to a call with an

15   armed suspect or something of that nature?

16        MS. COLLINS:  Objection, complete

17   hypothetical.  Vague.

18        THE WITNESS:  Yeah.  It wasn't uncommon for

19   him to -- to give me some advice, either before or

20   after, you know, how I should handle it or how I did

21   handle it.

22        MR. BUELNA:  Q.  Okay.  Now, you mentioned --

23   do you recall a conversation when you were on your way

24   to Third and Le Conte, but at some point you heard over

25   the radio Officer Thompson had located Mr. Woods; is

21

1    that correct?

2         A.   Correct, yes.  We had broken down the

3    perimeter at Third and Le Conte.  That was our car

4    sector, we were Charlie 12 David, which is where that

5    occurred.  So we were going to actually be going to the

6    hospital to interview the victim of the stabbing.  And

7    as we were pulling onto Third Street northbound from

8    Le Conte we heard Officer Thompson on the radio asking

9    for help.

10        Q.   Now, it may be difficult, is that -- do you

11   remember specifically what you heard over the

12   radio first?

13        A.   I just heard something to the effect of, like,

14   we have the suspect in the area of Third and Fitzgerald

15   or Gilman, he's coming at my partner, we need help.

16        Q.   Did he mention the knife?

17        A.   I believe he said he had the knife in the

18   hand, yes.

19        Q.   And that was prior to you arriving on scene?

20        A.   Yes.

21        Q.   So prior to you arriving on scene you knew or

22   you learned that they had located a suspect who is

23   coming at his partner and that he was armed with a

24   knife?

25             MS. COLLINS:  Objection, vague as to scene --

                                                          22

1    Officer Cuevas telling you what the plan was when you

2    got there or what you should be doing?

3                MS. COLLINS:  Objection, calls for

4    speculation.  Assumes facts not in evidence.

5                THE WITNESS:  No, I don't -- I don't recall a

6    specific conversation.  I think really we were waiting

7    to get there to see really what was in front of us.

8    You know, you can kind of go through scenarios in your

9    head of what the scene is going to look like but it

10   wasn't until we got there that we actually had any idea

11   what the scene looked like and how many people were

12   around and how contained he was, etcetera.

13                MR. BUELNA:  Q.  Now, at some point you

14   actually arrived on scene, correct?

15        A.    Correct.

16        Q.    And what's the first thing that you can recall

17   you see when you get on scene at Third and Gilman?

18        A.    So we stopped the car and stopped right behind

19   Officers Seto and Navarro.  I see them get out of the

20   car, out of their patrol car, and then I see Officer

21   August with his gun drawn and Officer Thompson behind

22   him, basically shadowing or following Mr. Woods

23   southbound on Third Street.

24        Q.    At that point did Mr -- sorry.  Strike that.

25                At that point that you arrived on scene did

                                                              25

1    officer Cuevas and you have any conversation?

2        A.   No, there wasn't time, as I saw it, to have

3    any conversation and we exited our patrol vehicle as

4    quickly as possible to try to contain Mr. Woods.

5        Q.   Did you draw your weapon as soon as you exited

6    the car?

7            MS. COLLINS:  Objection, vague as to time.

8            THE WITNESS:  I drew my department issued

9    handgun out in route to the scene or in route to the

10   general area of Mr. Woods.

11           MR. BUELNA:  Q.  Okay.  So it's fair to say

12   that by the time that you arrived on scene your weapon

13   was already out?

14           MS. COLLINS:  Objection, vague as to arriving

15   on scene.

16           THE WITNESS:  My handgun was drawn, or at

17   least unholstered when I'd arrived, basically as we

18   formed the semicircle to contain Mr. Woods, somewhere

19   between the patrol vehicle and there I had unholstered

20   my handgun.

21           MR. BUELNA:  Q.  We know Third and Gilman you

22   get out of the car, and I'm just trying be, frankly,

23   clear, was there a firearm in your hand or was it in

24   its holster?

25       A.   After exiting the vehicle I'd unholstered it

26

1   and held it down as to not point it at any other

2   officers or bystanders until I got to an area where I

3   had a clear backdrop and was not going to point it at

4   any unintended targets.

5       Q.   And did Officer Cuevas, if you can recall, as

6   you approach or come closer to Mario Woods, is he on

7   your right or your left?

8       A.   As I recall Officer Cuevas was to my left as

9   we approached.

10      Q.   And from now on when I refer to the scene I am

11  going to refer to the scene as being Third and Gilman,

12  okay?

13      A.   Okay.

14      Q.   You mentioned you saw Mr. Woods moving

15  southbound and Officer Thompson and Officer August

16  essentially shadowing him; is that correct?

17      A.   Yes.

18      Q.   Now, as you're coming closer, did Mr. Woods

19  change direction or stop?

20      A.   Eventually, yes, as we basically approached

21  him and then -- and then we all -- Officers Seto and

22  Navarro had just arrived and we then basically filled

23  in the gaps to essentially block off any routes of

24  escape.

25      Q.   Now --

                                                      27

1      A.   And from there stopped, at least in the

2  general, small area.

3      Q.   Now, were you head on -- strike that.

4      When you arrive and you're in the make shift

5  perimeter, were you facing Mario Woods head on or were

6  you to his right or to his left?

7      MS. COLLINS:  Objection, vague.  Confusing.

8      If you understand you can answer.

9      THE WITNESS:  Yeah, I was basically facing him

10  head on almost.  I was perpendicular to the wall that

11  he was -- for backup.

12      MR. BUELNA:  Q.  That's what I needed, an

13  anchor.  So perpendicular to the wall?

14      A.   Yes.  If Officer August is 12 o'clock I'm

15  9 o'clock.

16      Q.   Okay.  Now, is officer -- when you are in --

17  I'm going to call it perimeter, is that okay?

18      A.   Yes.

19      Q.   When you are in your perimeter is Officer Seto

20  and -- to your right or is he to your left?

21      A.   I believe he was to my left.

22      Q.   And what about Officer August, was he to your

23  left or to your right?

24      A.   He was also to my left.

25      Q.   Do you recall which officers were to your

                                                              28

1    right, if any?

2         A.   I know Officer Santos was to my right, but I

3    know that later, I didn't know that at the time.  I

4    wasn't familiar with Officer Santos at the time.

5    Officer Navarro he was to my right deploying the 40

6    millimeter ERIW.  And there was an officer that I

7    wasn't familiar with to my right.

8         Q.   Now, from the time you exited the car to the

9    time you arrived to your perimeter, did you have any

10   conversations with any officers?

11        A.   No.  It was about 30 feet full sprint.

12        Q.   Okay.  And when you came to a stop, did you

13   have any -- in your perimeter did you have any

14   conversations with any officers?

15        A.   I did not have any conversations with any

16   other officers.

17        Q.   Did you -- what did you -- strike that.

18             Did you begin to make any verbal commands?

19        A.   Shortly after arriving within the perimeter I

20   gave one verbal command to drop the knife or I'll

21   shoot, which he -- which he did not respond to or

22   comply to.  I heard other officers giving verbal

23   commands that were similar, so I decided that I didn't

24   need to say any more, that I would just sit there -- I

25   would just be -- act as a cover officer.

1      Q.   Did you see him run at any officer?

2      A.   I did not see him run at any officer.

3      Q.   And you didn't hear him threaten any officer?

4      A.   I could not verbally make out what he was

5    saying.

6      Q.   So to your knowledge he didn't threaten any

7    officer based of what you heard?

8           MS. COLLINS:  Objection, lacks foundation.

9    Calls for speculation.

10          THE WITNESS:  Well, verbally I could not hear

11   him but the mere presence of him holding the knife as a

12   stabbing suspect and refusing to comply with orders,

13   even after taking multiple rounds from the ERIW, two

14   different types of ERIW and OC spray, that in itself

15   showed a great deal of threat to me.

16          MR. BUELNA:  Q.  Verbal threats?

17     A.   But verbal threats, I could not make out

18   anything that he was saying.

19     Q.   You mentioned that you stopped making verbal

20   orders but other officers were making verbal orders,

21   correct?

22     A.   Yes.

23     Q.   Do you recall some of the verbal orders that

24   you overheard?

25     A.   Yeah.  I mean, they were similar to what I

                                                          31

DEPOSITION OF OFFICER SCOTT PHILLIPS

1   said, basically, drop the knife, get on the ground, you

2   know, or I'll shoot.  I also heard Officer Navarro

3   making orders to drop the knife when he was deploying

4   the ERIW.  We're taught to say red light, red light

5   less lethal, drop the weapon or I'll shoot, just as a

6   verbal recognition for other officers so they don't

7   hear the loud noise go off and think it's gunfire.

8       Q.   Oh, did you hear Navarro say red light, red

9   light, that sequel?

10       A.   I did.

11       Q.   How many times?

12       A.   I can't recall.  I know he deployed the ERIW

13   multiple times, and I just remember hearing it multiple

14   times.  I can't -- three or four, maybe, times I heard

15   him say.

16       Q.   What was Mr. Woods response to being hit with

17   ERIW?

18       MS. COLLINS:  Objection, compound.  That

19   multiple times.

20       THE WITNESS:  There were a couple instances

21   where he was hit where he almost made no reaction.  And

22   there was only one that I saw that really seemed to

23   have any -- put him in any sort of pain for a brief

24   moment, and that's the round hit him somewhere near the

25   groin.  I don't know if it hit him in the groin, but I

32

1    know it hit him somewhere near there and he basically

2    bent down for a brief second and then stood right back

3    up.

4              MR. BUELNA:  Q.  Now, eventually he began to

5    walk northbound?

6         A.   That is correct.

7         Q.   So there was a time when you first got there

8    and he was walking southbound, correct?

9         A.   Yes, as arriving in our vehicle he was walking

10   southbound.

11        Q.   And then at some point he came to essentially

12   a stop?

13        A.   Correct.  As we formed a perimeter around him

14   he stopped.

15        Q.   Now, from the time that he initially came to a

16   stop after moving southbound, approximately how long

17   past until he began moving northbound.  So essentially

18   I'm asking -- how long was he standing still while you

19   were at the perimeter?

20        A.   I would say anywhere from 30 to 45 seconds.

21        Q.   Now, during that 30 to 45 seconds that he was

22   standing still, did you hear any officers designate

23   themselves as the person to be communicating with

24   Mr. Woods?

25             MS. COLLINS:  Objection, vague.  Calls for

                                                          33

1    speculation.  Lacks foundation.

2            THE WITNESS:  I did not hear anybody verbally

3    say that they were going to assume the role of the sole

4    contact officer.

5            MR. BUELNA:  Q.  Is it fair to say during that

6    30 to 45 seconds you heard several commands from

7    several different officers?

8        A.  I heard -- yes.  I gave a command myself and

9    heard multiple commands given by different officers,

10   all to the effect of drop the knife and surrender the

11   knife and get on the ground.

12       Q.  And during that 30 to 45 seconds did you ever

13   become aware that there were civilians in the area?

14       A.  Yes.  When we pulled up in the vehicle -- I

15   mean, it was about 4:30 in the afternoon, on Third

16   Street it's rush hour traffic, so there was multiple

17   people, multiple cars around.  There was multiple

18   people on the Muni platform on Third Street.  There was

19   a parked Muni bus with bystanders on the sidewalk and

20   all within a range of 30 to 40 feet.

21           After -- even after we arrived, and even

22   during the incident I could hear bystanders and people

23   behind us and to my left yelling, you know, just drop

24   the knife, just give up, just, you know, stop, drop the

25   knife.

34

1    Q.   Is it fair to say during the incident you

2    heard a lot of screaming?

3    A.   I mean, there was a lot of -- a lot of noise

4    from outside individuals or bystanders, there was

5    traffic and other officers giving commands.

6    Q.   Would you depict the scene as chaotic?

7         MS. COLLINS:  Objection, vague.

8         THE WITNESS:  I don't know that I'd depict it

9    as chaotic.  It was -- I feel like it was -- everybody

10   assumed a role and it happened organically.  I think

11   arriving initially we kind of knew what needed to be

12   done.  We obviously can't have somebody wielding  a

13   knife who a suspect of a stabbing walking around with

14   bystanders so we knew the first thing we had to do was

15   to contain him to -- in order to eventually, you know,

16   get him under arrest or investigate the crime and take

17   him into custody.  We knew that had to be done.

18        I think other officers that arrived later did

19   a good job of pushing bystanders back and creating

20   space, or as much space as they could, blocking

21   traffic, you know.  I think it almost appears chaotic

22   but it was organized chaos to where, you know,

23   everybody assumed their role and knew what needed to be

24   done.  Yeah, I think -- so I think there was

25   organization, to which, isn't clearly depicted.

35

1          THE WITNESS:  I mean, the radio is a tool that

2     we use to try to formulate plans, respond, give

3     updates, everything.  But sometimes it is a matter of

4     just don't do that.

5          MR. BUELNA:  Q.  Now, you mentioned you -- or

6     you mentioned that he was standing still essentially

7     for 30 to 45 seconds, correct?

8          A.   Yeah, approximately 30 to 45 seconds.

9          Q.   Not exact.  It's a general idea.  And then he

10    began to move northbound, correct?

11         A.   Correct.

12         Q.   And at that point did you hear other officers

13    giving commands when he began to move northbound?

14         A.   At that time I don't recall any specific

15    verbal commands.  That point was, I don't know, kind of

16    a little bit, a little bit hazy in terms of, you know,

17    I just don't recall the verbal commands specifically.

18         Q.   Now, at some point you opened fire; is that

19    correct?

20         A.   I discharged my firearm, yes.

21         Q.   Was that the first time that you discharged

22    your firearm on duty, on patrol?

23         MS. COLLINS:  Objection, relevance.

24         THE WITNESS:  On duty we -- I mean, we

25    discharge our firearms when we go to requalify at the

                                                           41

1    range.  We get detail from patrol to go there.  But

2    actually to anything other than a target, that's my

3    first time discharging a firearm.

4            MR. BUELNA:  Q.  The first time that you ever

5    discharged your firearm at a human being, correct?

6            MS. COLLINS:  Objection, argumentative.

7            THE WITNESS:  That is the first time I

8    discharged my firearm to protect anybody from a human

9    being.

10           MR. BUELNA:  Q.  I mean, you shot a human

11   being, though, right?

12           MS. COLLINS:  Objection, argumentative.

13           THE WITNESS:  I don't know if hit him or not

14   but I shot at Mr. Woods.

15           MR. BUELNA:  Q.  Okay.  And you're taught --

16   strike that.

17           You're trained that discharging your firearm

18   is the most serious use of force, correct?

19           MS. COLLINS:  Objection, incomplete

20   hypothetical.  Vague.  Lack of foundation.  Calls for

21   speculation.

22           THE WITNESS:  Discharging  a firearm is the

23   highest use of force on the use of force continuum in

24   the department, yes.

25           MR. BUELNA:  Q.  In what situations are you

                                                          42

1    trained that you are allowed or permitted to discharge

2    your firearm?

3            MS. COLLINS:  Objection, vague as to allowed,

4    permitted.  Lack of foundation.  Incomplete

5    hypothetical.

6            THE WITNESS:  To protect ourselves, to protect

7    others.  I mean to -- I mean, it's a matter of anything

8    that's reasonable, it's -- it's -- when you are -- when

9    you encounter a certain level of threat, either to

10   yourself, to another person, you know, the law says

11   that we're allowed to use our firearms to protect,

12   protect ourselves and protect, you know, others.

13           MR. BUELNA:  Q.  Now, you said threat, but do

14   you understand threat to mean an immediate threat of

15   serious bodily harm and/or death?

16       A.  Yes.  Imminent threat, yes.

17       Q.  Not any threat?

18       A.  No, no, it's not any threat, but it's an

19   immediate threat that's high enough to illicit the use

20   of lethal force.

21       Q.  And essentially -- strike that.

22           Now, in order to protect human life; is that

23   correct?

24           MS. COLLINS:  Objection, incomplete

25   hypothetical.  Calls for a legal conclusion.  Vague.

                                                        43

1           THE WITNESS:  To protect ourselves and the

2      public, safety of the public.

3           MR. BUELNA:  Q.  Human lives, correct?

4           MS. COLLINS:  Objection, argumentative.  Asked

5      and answered.

6           THE WITNESS:  Yes, it can be, can also be -- I

7      mean for the most part, yes.

8           MR. BUELNA:  Q.  Other situations where you

9      discharge your firearm and it's not to protect human

10     life?

11          MS. COLLINS:  Objection, argumentative.

12          THE WITNESS:  I can think of either, there

13     might some other scenarios, but I mean --

14          MR. BUELNA:  Q.  I would like to hear them.

15          MS. COLLINS:  Objection, argumentative.

16          THE WITNESS:  Blowing up a puppy shelter, I

17     don't know.  You know, it's just a matter of, yes, to

18     people.

19          MR. BUELNA:  Q.  Okay.  Now, prior to you

20     opening your firearm, what was Mr. Woods doing just

21     prior?

22          MS. COLLINS:  Objection, vague as to opening

23     your firearm.

24          MR. BUELNA:  Okay.  Sorry.  Strike that.

25          Prior to discharging your firearm what was

                                                          44

1    Mr. Woods doing?

2                 MS. COLLINS:  Objection, vague as to time.

3                 THE WITNESS:  Mr. Woods was advancing on

4    Officer August northbound on Third Street prior to

5    discharging my firearm.

6         Q.   Approximately how far away was Mr. Woods from

7    Mr. August?

8                 MS. COLLINS:  Objection, vague.  At the moment

9    he discharged the firearm or. . .

10                THE WITNESS:  At the moment I discharged my

11   firearm what was the distance --

12                MR. BUELNA:  Q.  At the moment you decided --

13        A.   -- or at the moment I decided in my head that

14   I was going to discharge my firearm?

15        Q.   At the moment you decided.

16        A.   It's hard to say because, you know, Officer

17   August was moving backwards and Mr. Woods was

18   essentially closing the distance, the gap, but I would

19   say at that moment in my head that I decided to

20   discharge my firearm was about 4 to 5 feet.

21        Q.   Now, rewinding a little bit.

22             When Mr. Woods began to move northbound, did

23   he appear to be limping?

24        A.   I'm not familiar with his normal gait, but he

25   appeared after the final or the last round, EIRW round

                                                          45

```
 1    that hit him near the groin he appeared to have a
 2    slight limp from that, but it didn't affect his ability
 3    to walk but he did have a slight limp.
 4         Q.   And you mentioned that when you decided to
 5    open fire, and by that I mean discharge your firearm,
 6    Officer August was approximately 4 to 5 feet away from
 7    Mr. Woods, correct?
 8         A.   Yes, I would say that's approximately, yes.
 9         Q.   Okay.  And why did you discharge your firearm?
10    Why did you decide to?
11         A.   Because he was an imminent threat to Officer
12    August.  He had a knife, he had already stabbed
13    somebody and already shown that he had no respect for
14    human life himself.  He was not, like not complying to
15    us and any commands, any less than lethal forces,
16    including two different types of extended range impact
17    weapons and OC spray, he clearly was determined -- I
18    could see determination in his face that he was not
19    going to give up.  So as he approached and advanced on
20    Officer August I made that from the totality of
21    everything thought the threat level was high enough and
22    imminent enough to discharge my firearm.
23         Q.   Now, did you know that he had stabbed someone?
24         A.   He matched the description of a stabbing
25    suspect very closely and currently had a knife in his
```

46

1    hand, which gave me reasonable suspicion to believe

2    that he was the suspect of a stabbing.

3        Q.   But you didn't know that he actually, in fact,

4    had stabbed someone prior, correct?

5            MS. COLLINS:  Objection, argumentative.  Asked

6    and answered?

7            THE WITNESS:  I knew that there was a person

8    in the hospital that was stabbed by a suspect who

9    matched the description of Mr. Woods.  A witness gave

10   another description, even further description and a

11   clear description and the exact same description

12   matched Mr. Woods.

13           MR. BUELNA:  Q.  Did you see him stab someone?

14       A.   I did not see him stab anybody.

15       Q.   Did you see him stab anybody while you were on

16   Third and Gilman?

17       A.   He did not stab anybody while I was on Gilman

18   that I saw.

19       Q.   And when you determined to discharge your

20   firearm, could you see any civilians in your sight?

21       A.   No.  The way I was facing the backdrop was

22   essentially a wall.

23       Q.   Were you generally aware that there were

24   civilians around?

25       A.   Yes, as I pulled up I could see civilians and

47

DEPOSITION OF OFFICER SCOTT PHILLIPS

1    I could hear civilians yelling.

2         Q.   And so when you determined that you were going

3    to discharge a firearm it was not in fear that

4    Mr. Woods was going -- was attacking a civilian but

5    rather your -- another officer, correct?

6         MS. COLLINS:   Objection, misstates the

7    testimony.   Assumption, facts not in evidence.

8         THE WITNESS:   Well, I mean the primary reason,

9    the reason I did in that exact instant was in

10   protection for Officer August.   I mean, if he had

11   broken a perimeter and is now wondering throughout --

12   amongst a bunch of civilians and bystanders, we have

13   almost essentially no way of stopping him.   So that was

14   a secondary fear, and that was always in my head why we

15   needed to contain this man and why we needed to prevent

16   his ability to flee, because if he does flee, you know,

17   we have essentially an armed person, again, that has

18   shown very little respect for human life or other

19   people or the public safety.   That if he did break our

20   perimeter that he could very potentially injure more

21   people kill other people.   Yes, my immediate response

22   was to Officer August, but that was always a secondary

23   thought that was in my head, it was also the public

24   safety.

25        Q.   That's not why you fired, you fired because

48

1   Officer August --

2          MS. COLLINS:  Objection, argumentative.

3          THE WITNESS:  I fired in that exact moment for

4   the protection of Officer August.

5          MR. BUELNA:  Q.  And you mentioned that

6   Mr. Woods was advancing on Officer August, correct?

7      A.   Yes, he was advancing.

8      Q.   And by advancing, did you perceive him to be

9   advancing towards Officer August in particular or just

10   appeared to be going northbound in the general

11   direction?

12      A.   Officer August was backing up and he was

13   advancing, basically closing the distance to Officer

14   August and himself.

15      Q.   But it appeared that -- and I'm just asking

16   for your interpretation of the events -- but it

17   appeared to you that he was specifically going after

18   Officer August or that he was attempting to flee?

19          MS. COLLINS:  Objection, calls for

20   speculation.

21          THE WITNESS:  I'm not sure.  I can't really

22   guess, you know.  All I know is he was walking head on

23   to Officer August.

24          MR. BUELNA:  Q.  Did you hear any other

25   officers open fire prior to you discharging your

                                                      49

1    firearm?

2              MS. COLLINS:  Objection, argumentative.  Open

3    fire.

4              THE WITNESS:  I heard other gunshots around

5    the same time they discharged mine.

6              MR. BUELNA:  Q.  By around the same time, do

7    you mean prior or after or the same time?

8         A.   About the time I made a mental note in my head

9    that I was going to discharge my firearm I heard a

10   round or two rounds go off or a couple rounds go off.

11        Q.   Did it motivate you at all to open fire?

12             MS. COLLINS:  Objection, argumentative.

13             THE WITNESS:  No, I made it very clear by my

14   head that I am going to discharge my firearm.  It was

15   no way sympathetic fire.

16             MR. BUELNA:  Q.  And what's sympathetic fire

17   mean to you?

18        A.   As it means to me and as I understand it, it's

19   basically that the stressful situation, if you hear

20   other gunfire you may -- it may elicit a response to

21   fire as well, unknowingly.

22        Q.   Now, if you had already heard a couple of

23   shots why did you feel the need to fire?

24             MS. COLLINS:  Objection, argumentative.  Asked

25   and answered.

                                                        50

1     understand this and apply the principles during patrol,

2     from the Academy.

3                     MR. BUELNA:  Q.  Now, while you were on scene

4     on Third and Gilman with Mr. Woods, did you observe him

5     do anything unusual as far as his behavior?

6                     MS. COLLINS:  Objection, vague as to time.

7     Vague as to unusual.

8                     THE WITNESS:  The only thing that appeared

9     unusual to me was the level of pain tolerance and

10    that's what struck me as a red flag really in the whole

11    situation.  You know, after being shot multiple times

12    with a EIRW, the OC spray having being sprayed in the

13    Academy and knowing how painful that is, you know,

14    having no response to it, even back spray if that's all

15    that got on him, raised a lot of red flags and really

16    heightened my perceived level of threat.

17                    And that being said, I guess that's what I

18    would have considered what you'd call unusual, just his

19    level of pain tolerance.

20        Q.   Did you make any -- come to any conclusions

21    based off of that observation that he was under the

22    influence of some substance?

23        A.   I believed based off that that he was most

24    likely or possibly under the influence of some sort of

25    drug or alcohol.  He also may have just been, you know,

                                                            61

1    verbalized by Mr. Woods to the time that he began

2    walking northbound advancing so. . .

3        Q.    What materials did you review to prepare for

4    this deposition, if any?

5        A.    I reviewed department bulletins, including

6    these two that you gave to me.  I reviewed the CAD from

7    the incident, the incident report, and also the

8    transcript from my homicide interview, and department

9    general orders 5.01 and 5.02.

10       Q.    Do you recall what your call sign was that

11   day?

12       A.    Yes, it was a 3 Charlie 12 David.

13       Q.    And you completed certified posts for the

14   police academy?

15       A.    Yes.  And I graduated that in August of 2015.

16       Q.    Do you require any glasses or corrective

17   lenses?

18       A.    I do wear contact lenses.

19       Q.    Is that for seeing better?

20       A.    I do need to wear them to drive and stuff like

21   that.  If I was reading it's okay but, yeah, I just

22   wear them -- corrected to the point where I don't need

23   any other assistive advices to help me see.

24       Q.    Were you wearing them on the day of the

25   incident?

71

1    Department of Police Accountability, which was OCC, and

2    one to internal affairs.

3        Q.   And did you review either of those transcripts

4    and/or audio prior to this deposition?

5        A.   No, I was never given the audio or transcript

6    from those.

7        Q.   Okay.  Have you gone through implicit bias

8    training?

9           MS. COLLINS:  Objection, vague as to the term,

10    implicit bias training.

11           THE WITNESS:  We went through a course in the

12    Academy, it was entitled Racial Profiling, which I

13    believe covers, well, it did cover the topics of

14    implicit bias.  I think they have since changed the

15    title of that.

16           MR. BUELNA:  Q.  And when did you go through

17    that, I'm sorry?

18        A.   That was towards the end of the academy, so I

19    mean, maybe it was, you know, early summer, June or

20    July, I think.

21        Q.   Since the Academy have you received other

22    training on the same topics?

23        A.   Not since the Academy I have not received

24    additional training on implicit bias.

25        Q.   Take a moment to review real quick.

73

1    Calls for legal conclusion.  Calls for speculation.

2    Relevance.

3            THE WITNESS:  No.  Every person that I met and

4    dealt with at the police department of that incident

5    has been extremely professional.

6            MR. BUELNA:  No further questions.

7            MS. COLLINS:  Q.  Just one follow up question

8    for you, Officer Phillips.  You mentioned that at the

9    time you made the decision to discharge your firearm

10   you saw Mr. Woods advancing towards Officer August; is

11   that correct.

12       A.  That's correct.

13       Q.  Were you able to see the knife in Mr. Woods

14   hands at that time?

15       A.  Yes, in my recollection I saw the knife

16   through the entirety of the incident.  I mean, it was

17   continuous.  I mean, it would go to his side, maybe up

18   to his hip, but through the entire incident I saw the

19   knife.

20       Q.  You just gestured with your right hand, so was

21   it in his right hand?

22       A.  It was in his right hand.

23       Q.  Okay.  Officer Phillips, did you see Mr. Woods

24   advance toward Officer August while armed with the

25   knife at the time you discharged your firearm?

                                                          78

```
1    STATE OF CALIFORNIA    )
                            ) ss.
2    COUNTY OF CONTRA COSTA )

3

4         I, Angelica R. Gutierrez, a licensed Certified

5    Shorthand Reporter, duly qualified and certified as such

6    by the State of California;

7         That prior to being examined, the witness named in

8    the foregoing deposition was by me duly sworn to testify

9    to the truth, the whole truth, and nothing but the truth;

10        That the deposition was by me recorded

11   stenographically at the time and place first herein

12   mentioned, and the foregoing pages constitute a full,

13   true, complete and correct record of the testimony given

14   by the said witness;

15        That I am a disinterested person, not being in any

16   way interested in the outcome of said action, nor

17   connected with, nor related to any of the parties in said

18   action, or to their respective counsel, in any manner

19   whatsoever.

20

21                       DATED: July 24, 2018

22

23        __/s/Angelica R.Gutierrez_____

24        ANGELICA R. GUTIERREZ, CSR No.  13292

25
```

80