# Exhibit U

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

GWENDOLYN WOODS, individually)
and as Successor in Interest )
to Decedent MARIO WOODS,      )
                              )
            Plaintiff,        )
                              )
        vs.                   ) CASE NO.:  3:15-05666-WHO
                              )
CITY AND COUNTY OF            )
SAN FRANCISCO; a municipal    )
corporation, et al,           )
                              )
            Defendants.   )     CERTIFIED COPY
_____)

VIDEO DEPOSITION OF OFFICER NICHOLAS CUEVAS

WEDNESDAY, JULY 25, 2018

REPORTED BY:  ANGELICA R. GUTIERREZ, CSR NO. 13292

1

1                          I N D E X

2

3       EXAMINATION BY:                          PAGE

4       MR. POINTER                                6

5                         --o0o--

6

7       Appearance Page                            3

        Exhibit Page                               4

8       Location                                   5

9       Reporter's Certificates                   82

10      Deponent Signature Page                   83

11      Deponent Signature Waiver                 84

12      Witness Letter                            85

13      Changes and/or Corrections                86

14      Attorney's Notes                          87

15

16

17                        --o0o--

18

19

20

21

22

23

24

25

                                                    2

```
 1                          APPEARANCES

 2

 3      FOR THE PLAINTIFFS:

 4           LAW OFFICES OF JOHN L. BURRIS
             Airport Corporate Centre
 5           7677 Oakport Street, Suite 1120
             Oakland, California 94621
 6           (510) 839-5200

 7           BY:  ADANTE POINTER, ATTORNEY AT LAW

 8

 9      FOR THE DEFENDANTS:

10           OFFICE OF CITY ATTORNEY, CITY OF SAN FRANCISCO
             1390 Market Street, 6th Floor
11           San Francisco, California 94102
             (415) 554-3863
12
             BY:  JAMES HANNAWALT, ATTORNEY AT LAW
13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1

2                              INDEX OF EXHIBITS

3       PLAINTIFF'S            DESCRIPTION                        PAGE

4         1          Department Bulletin,
                     consisting of 1 page                          28
5

6         2          Department Bullentin,
                     consisting of 1 page                          28
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                        4

1    Pursuant to Notice of Taking Deposition and on

2    Wednesday, July 25, 2018, commencing at the hour of 2:29

3    p.m., thereof, at the Office of the City Attorney, 1390

4    Market Street, San Francisco, California, before me,

5    ANGELICA R. GUTIERREZ, CSR No. 13292, a Certified

6    Shorthand Reporter and Deposition Officer of the State of

7    California, there personally appeared:

8

9    OFFICER NICHOLAS CUEVAS

10

11   called as a witness by the Plaintiff, who having been duly

12   sworn by me, to tell the truth, the whole truth and noting

13   but the truth, testified as hereinafter set forth:

14

15   ---oOo---

16

17

18

19

20

21

22

23

24

25

5

1                    OFFICER NICHOLAS CUEVAS,

2        having been first duly sworn, testified as follows:

3                    THE WITNESS:  (TO OATH)  Yes.

4                    EXAMINATION BY ADANTE POINTER

5                    MR. POINTER:  Q.  State and spell your full

6        name for the record.

7             A.  Officer Nicholas Cuevas, N-I-C-H-O-L-A-S,

8        C-U-E-V-A-S.

9             Q.  Are you currently employed by the San

10       Francisco Police Department?

11            A.  Yes, I am.

12            Q.  Okay.  You're here today to give your

13       deposition in the case, the shooting death of Mario

14       Woods.

15                 Do you understand that?

16            A.  Yes, I do.

17            Q.  All right.  And, in fact, you've sat through

18       the depositions of some of your fellow defendant

19       officers who were also involved in this incident,

20       correct?

21            A.  Yes, I have.

22            Q.  All right.  So you've heard me and the other

23       attorneys who have taken those depositions give the

24       guidelines and the rules, correct?

25            A.  I have.

                                                              6

1   A. In the, like --

2   Q. For San Francisco PD?

3   A. For San Francisco, you know, I'm not sure,

4 maybe somewhere around 10 to 15.  It just depends

5 because sometimes we substitute train, so I've had up

6 to two or three recruits in the car before, so roughly

7 about 10 to 15 that are recruits.

8   Q. And you started working for San Francisco PD

9 approximately May of 2010; is that correct?

10   A. That's correct.

11   Q. So you had been a San Francisco Police

12 Department officer for roughly five years up until the

13 day that Mario Woods was shot and killed?

14   A. Yes.

15   Q. Okay.  And you had been assigned to the

16 Bayview station approximately three years prior to

17 Mario Woods being shot and killed, correct?

18   A. Correct.

19   Q. Had you ever had Sergeant Kempinski be your

20 direct supervisor?

21   A. That's kind of a tough question.  I don't

22 think he -- he was not on the same -- so how it works

23 on our schedule is -- how it works, there's different

24 watch-off groups, so there's not just one in a swing

25 shift, the night shift or day shift.  Within each shift

24

DEPOSITION OF OFFICER NICHOLAS CUEVAS

1    there's different, they call them watch-off groups, so

2    it's not one constant team.  So I was a different

3    watch-off group, I believe, than Kapinski, so some of

4    our days may have overlapped.  And usually there's --

5    there could be two or two on an overlap day, there

6    could be four, four or five sergeants.  I had never

7    worked directly for -- I had minimal contact with him

8    he was in the Bayview station.

9         Q.   Okay.  And so do you remember what your call

10   sign was that day?

11             MR. HANNAWALT:  And are you talking about

12   December 2nd, 2017?

13        Q.   The day of the incident, do you remember what

14   your call sign was?

15        A.   I have an idea.  I'm not positive, but I

16   believe it was 3C12D, so three Charles 12 David, which

17   means that we were -- Charles is the Bayview District,

18   one two, meaning we worked two men.  We worked the two

19   car, which is the sector within the Bayview district.

20        Q.   Okay.  And that day you were armed with a .40

21   caliber?

22        A.   Yes.

23        Q.   Okay.  And you mentioned that you were in a

24   two man patrol unit.  You were actually the passenger,

25   correct?

                                                          25

1        A.    That's correct.

2        Q.    So you're training -- the officer being

3   trained, Officer Phillips was the driver, correct?

4        A.    Correct.

5        Q.    And when you heard the call about Mario Woods

6   come out you were actually there at the station,

7   correct?

8              MR. HANNAWALT:  Objection, vague as to which

9   call you are referring to.

10             Go ahead.

11             MR. POINTER:  Q.  The initial call was a

12   stabbing that had taken place.  You were at the Bayview

13   station, correct?

14        A.    Yes.

15        Q.    You were there during lineup, right?

16        A.    That's correct.

17        Q.    And you were watching an officer involved

18   shooting video, correct?

19        A.    Yeah, there is training -- there is a

20   lieutenant at the time was putting on, and it's what is

21   called line up training.  He was doing some discussion,

22   playing some type of a video camera that's from police

23   one, which showed a series of different types of

24   officer involved incidents, which I believe there were

25   some shootings on there, some violent assaults towards

                                                        26

1    officers.  It was what they call line up training.

2         Q.   The type of video that had you concerned for

3    your own safety as an officer, correct?

4              MR. HANNAWALT:  Objection, vague.

5              THE WITNESS:  I believe the video is -- yes,

6    the video would be, some of those incidents would be a

7    demonstration or an example that would concern an

8    officer if they were in that situation or if they were

9    presented with a similar situation.

10             MR. POINTER:  Q.  Officers being violently

11   assaulted?

12        A.   Yes.

13        Q.   Had you concerned, right?

14        A.   Yes.

15        Q.   And then you get a call about a stabbing

16   suspect, right?

17        A.   In lineup, yes, we did receive a call about a

18   stabbing suspect.

19        Q.   While you were watching or just finished

20   watching this officer involved video, right?

21        A.   Yes.

22        Q.   And you then respond to this situation

23   concerning a suspected stabbing suspect?

24        A.   Yes.

25        Q.   Okay.

27

1      Q.    And you left lineup, which is the Bayview

2    station, and then went to try to locate the stabbing

3    suspect?

4      A.    Yes.

5      Q.    And you left with your field -- with the

6    officer that you were field training, which was Officer

7    Phillips, correct?

8      A.    Yes.

9      Q.    Okay.  Did you ever make contact with this

10   stabbing victim?

11           MR. HANNAWALT:  Objection, vague.

12           MR. POINTER:  Q.  Did you ever talk to this

13   person?

14     A.    No.

15     Q.    Okay.  The information you had about the

16   stabbing came from information from dispatch, correct?

17     A.    Yes.

18     Q.    Did you ever make personal contact with any

19   witness who had witnessed the stabbing prior to you

20   actually coming in contact with Mario Woods?

21     A.    No.

22     Q.    Okay.  And I take it responding to a scene

23   where somebody is alleged to have a knife, that wasn't

24   your first time doing that, right?

25     A.    No.

31

1      Q.    Happens a lot, right?

2      A.    Yes.

3      Q.    Okay.  And so prior to arriving at the scene

4    you heard Officer Thompson say that the stabbing

5    suspect had charged at one of the officers who was

6    there at the scene, correct?

7            MR. HANNAWALT:  Objection, lacks foundation.

8    Misstates the record.

9            Go ahead.

10           THE WITNESS:  Yeah, he said charged him twice.

11           MR. POINTER:  Q.  And that all happened before

12   you got on the scene, right?

13     A.    That's correct.

14     Q.    And you took that information and added it to

15   what you had already been told, that this person had

16   stabbed someone who was at the hospital, right?

17     A.    Yes.

18     Q.    Okay.  Those allegations, if you will, you

19   hadn't seen that yourself but you are relying upon

20   information that had been told to you by dispatch?

21     A.    Yes.

22     Q.    Took it as being true, right?

23     A.    Yes.

24     Q.    Okay.  So you arrive at the scene thinking

25   that Mario Woods had stabbed somebody who was at the

                                                          32

1    hospital, so he committed that crime, correct?

2        A.   Yes.

3        Q.   Okay.  You also arrive on the scene thinking

4    that Mario Woods has charged at one of your fellow San

5    Francisco Police Officers, at least twice, prior to

6    your arrival, right?

7        A.   Yes.

8        Q.   Okay.  Very dangerous person, right?

9        A.   Yes.

10       Q.   Who is willing to stab civilians as well as

11   police officers, right?

12            MR. HANNAWALT:   Objection, lacks foundation.

13            MR. POINTER:  Q.  That's the information you

14   had, correct?

15       A.   Yes.

16       Q.   Okay.  Now, when you got to the scene, how

17   many officers were already there?

18       A.   I arrived simultaneously with at least one

19   other patrol car and I saw, the only officers I saw

20   immediately was Officer Thompson and Officer August.

21       Q.   When you arrived at the scene did you have any

22   verbal communication with Officer Thompson?

23       A.   The verbal communication I had, we were

24   driving, we initially were on -- we were searching for

25   the suspect at a different location, Third and Laconte,

33

1    in that area.

2          On our way there we initially were going the

3    go to the hospital to check on the victim to see -- at

4    that point in the investigation we weren't aware of

5    anyone having any contact with the victim, the victim

6    had no status.  So we were leaving the scene to go to

7    General Hospital.  We chose to drive northbound on

8    Third Street from Laconte to go towards General

9    Hospital.

10         And during our route to the hospital is when

11   Officer Thompson got on the radio and Officer Phillips

12   immediately began driving Code 3.  During his Code 3

13   driving I was talking to him, helping him clear

14   intersections, helping him break any type of tunnel

15   vision that was developing at the time, communicating

16   with him in that way, yes, so that I did communicate

17   with Officer Phillips prior to exiting our vehicle.

18        Q.   Okay, that's fine.

19             You had learned prior to arriving at the scene

20   that this person who went to the hospital saying that

21   they had been stabbed was not being compliant with the

22   police officers' investigation of the scene, right?

23        A.   I didn't hear that.

24        Q.   You had no information that this person was

25   not cooperating?

                                                        34

```
 1        A.   If it was on the radio transmission at the

 2   time, after the incident, I'm sure I heard it.  I can't

 3   recall at this time.

 4        Q.   And as you reviewed the CAD for your

 5   deposition, you don't recall hearing it there either?

 6        A.   No, I don't recall.  I'm not saying I didn't

 7   hear it, I just don't recall.

 8        Q.   Okay.  Is there a code for that, when a person

 9   who's a witness and/or a victim is not complying?

10        A.   Just in plain English, you know,

11   uncooperative, but I'm not familiar with any type of

12   radio code for it.

13        Q.   Okay.  So when you arrive on the scene you see

14   that there's officers as well as just civilians there

15   in the vicinity of Third and Fitzgerald, right?

16        A.   Yes.

17        Q.   Okay.  What was Mario Woods doing, if

18   anything, when you first arrived on scene?

19        A.   He was -- Officer August was challenging him,

20   giving him a command.  At the time I could hear Officer

21   Thompson still on the radio communicating with

22   dispatch, giving them a play by play of the incident.

23        Q.   Okay.

24        A.   Mario Woods had a knife in his hand and he was

25   not dropping it and he was moving about freely on the
```

36

1    sidewalk, beyond the east sidewalk of Third Street

2    uncontained.

3        Q.   Okay.  And you mentioned that heard Officer

4    August giving Mario Woods command, correct?

5        A.   Yes.

6        Q.   And then you also said you heard Officer

7    Thompson putting out transmissions over the radio; is

8    that right?

9        A.   That's correct.

10       Q.   Okay.  9:15, did you hear the transmissions

11   that Officer Thompson was putting over the radio, were

12   you hearing those because you were in the vicinity to

13   hear him or were you hearing it through the radio ?

14       A.   I'd say both.  Close enough to hear him.  I

15   heard him on the radio, obviously, before I was in the

16   vicinity.  That's when he called out, you know, that's

17   when the urgency, I heard urgency in his voice when he

18   said they were charged, and that's when we were in

19   route, and I believe I could still hear him on the

20   radio when we were on the scene.  So I'd probably be

21   able to hear the radio and him at the same time, at

22   some point in this incident.

23       Q.   Sure.  Prior to you arriving on scene, did you

24   hear an officer put out a transmission on the radio to

25   bring an ERIW?

37

1      A.   Yes, I heard Officer Thompson say that.

2      Q.   An ERIW is extended range impact weapon,

3   correct?

4      A.   Yes.

5      Q.   And prior to Mario Woods being shot and

6   killed, did you hear any officers on the radio  say

7   time and distance?

8      A.   I didn't hear at that time, I heard it

9   afterwards.

10      Q.   While you were there on scene you didn't hear

11   an officer say at least twice time and distance?

12      A.   I did not hear that.  And even if I did hear

13   it that's always in mind in situations like that,

14   that's always in our mind and in our training in

15   situations like this.

16      Q.   You said you have been trained on that.

17   What's your understanding and training as to why that's

18   important in a situation like this?

19      A.   It's common sense.  If someone is armed with a

20   weapon and you have distance on them it gives you time

21   to give that person -- it could be so much as a cooling

22   off period of time, it could be time to obstacles

23   between you, to give you distance, to give you enough

24   time to evacuate civilians and pedestrians.

25      Q.   Enough to deescalate the situation, correct?

38

1     A.   Yes.

2          MR. HANNAWALT:  Objection, incomplete

3     hypothetical.

4          Go ahead.

5          MR. POINTER:  Q.  Did you see any officers put

6     objects between themselves and Mario Woods?

7          A.   At the time Mario Woods was not contained and

8     it was absolutely impossible to put objects, there was

9     no objects around us to put the between the two of us,

10    put between Mario Woods and us.  We had a Muni bus, it

11    was 4:30 in the afternoon, kids were getting off

12    school, getting home, getting ready to eat dinner, do

13    their homework.  People are getting off work.  This is

14    a bedroom community, there is lots of people,

15    pedestrian traffic at the time, and there was nothing

16    to put in between us.

17    Q.   Did you on your communication that you were

18    having with your trainee, did you tell him, hey, let's

19    see if we can use the car to contain the stabbing

20    suspect?

21    A.   How this incident unfolded was we were going

22    southbound, very, very close to the incident, but we

23    didn't realize how close we were.  We began driving

24    Code 3 northbound Third Street from Laconte, and I

25    believe the location words put out was, I believe,

                                                          39

```
1   there was a couple blocks ahead of us.  And I saw a
2   patrol car stop, I heard someone get on the radio and
3   say, hey, you went too far.  And I think that was the
4   patrol car in front of us.  So we came to a screeching
5   stop, literally right on top of the scene as it came.
6        So as soon as we stopped it was -- it was --
7   it was very important for us to get out of the car
8   immediately.
9        Q.   So did you have a conversation with your
10   trainee that if possible to use the car as a way to
11   contain this stabbing suspect?
12        A.   No, I didn't.  We were out of the car
13   before -- the minute it stopped.
14        Q.   And.
15        A.   I'm sorry.
16        Q.   Go ahead.
17        A.   I didn't mean to interrupt, but from where we
18   stopped I don't believe it would have been possible for
19   us to position our patrol car in that manner because
20   there's light poles, trees the turning radius of the
21   vehicle, etc.
22        Q.   Was there any conversation prior to you
23   arriving to the scene about the use of the patrol car
24   as a way to contain Mario Woods?
25        A.   No.
```

40

1     of this incident did Mario Woods make any verbal

2     threats to you?

3          A.   He didn't -- verbal?

4          Q.   Yeah.

5          A.   He didn't.

6          Q.   Did Mario Woods swing the knife at you?

7          A.   No, he did not.

8          Q.   Now, in your -- from your perspective in

9     watching Mario Woods, his demeanor and the way he was

10    behaving, you thought he was on drugs, right?

11         A.   I did.  I do.

12         Q.   Okay.  Now, as it relates -- we already know

13    that he was shot a number of times with less lethal

14    munitions, right?

15         A.   Yes.

16         Q.   At some point in time Mario Woods went to the

17    ground, prior to being shot by lethal bullets, right?

18              MR. HANNAWALT:  Objection, vague.

19              MR. POINTER:  Q.  Did you see him?

20         A.   I understand what you are saying.  Yes.

21         Q.   Okay.  After he -- strike that.

22         A.   But he didn't necessarily do that -- he took a

23    knee, is that what you are asking?  He took a knee

24    while less lethal rounds were being delivered, he took

25    a knee and then bounced back up.

                                                          45

1      that was based on him being -- that was a determination

2      that I made that he was possibly under the influence of

3      narcotics at the time?

4          Q.   So you were watching Mario Woods and you

5      believed that he was intoxicated, right?

6          A.   Under the influence, yes.

7          Q.   Is under the influence and intoxicated the

8      same thing or do you have a distinction?

9          A.   I think that intoxicated is alcohol and under

10     the influence of either a prescription or some type of

11     narcotic.  That's just --

12         Q.   Fair enough.  I'm not fighting you on that,

13     that's cool.  So you are watching Mario Woods you

14     formed an opinion that he was kind of under the

15     influence of some type of narcotic, right?

16         A.   Yes.

17         Q.   Okay.  As it relates when you saw him take a

18     knee, did you think that was in terms of he had been

19     shot with munitions and OC spray or do you think that

20     he was having a cramp or a muscle spasm?

21         A.   I'm not sure.  I don't know if it was

22     because -- it could have been both, could have played a

23     factor in it.  But I knew he was not showing any pain

24     compliance to the less lethal, and I believe the reason

25     why he wasn't showing any pain compliance was because

                                                          47

DEPOSITION OF OFFICER NICHOLAS CUEVAS

1    he was under the influence.

2           We all hear of people being under the

3    influence of PCP, right, every person if someone is

4    under the influence of PCP, what happens, they have no

5    pain compliance, they can display super human strength,

6    all sorts of stuff.  In my training I have been told

7    that stimulants such as methamphetamines for pain,

8    there are other narcotics can display PCP like symptoms

9    when it comes to pain compliance and strength.

10       Q.   Okay.  And so what efforts, if any, did you

11   make to deescalate the situation?

12           MR. HANNAWALT:  Objection, vague.  Go ahead.

13           THE WITNESS:  To this day I don't remember if

14   I gave any commands to Mario Woods.  What I do remember

15   is Mario Woods, and I remember hearing Mario Woods

16   speak.  I don't remember his exact words at the time.

17   I think during the time I did understand those words

18   but I don't remember, I couldn't tell you.

19           MR. POINTER:  Q.  I was going to say, did you

20   tell SFPD homicide investigators what those words were

21   at the time you gave the interview?

22       A.   I didn't remember at that time.

23       Q.   Okay.  And so --

24       A.   To this day I don't remember.

25       Q.   As I was asking you, you mentioned that there

                                                              48

DEPOSITION OF OFFICER NICHOLAS CUEVAS

1    were commands being given.   Specifically what efforts,

2    if any, did you make to deescalate the situation?

3         A.   My role in that, part of deescalation is

4    containing a person.   Deescalation doesn't just

5    immediately say, okay, we're going to go to the scene

6    now deescalation starts.   To get to the deescalation

7    the person has to be somewhat compliant.

8              So my initial role in this incident was to

9    contain Mario Woods in a circle.   The next responding

10   officer's role, since we had him contained, would be

11   pushing, getting the public, blocking out streets

12   pushing the public back, doing that sort of thing.

13             My role was lethal force cover.   I don't

14   remember if I gave him any commands or not, but

15   commands would be part of deescalation.   I specifically

16   heard other officers giving clear, concise commands at

17   the time which I understood.

18        Q.   Did you hear any officers trying to establish

19   a rapport with Mario Woods?

20             MR. HANNAWALT:   Objection, vague.

21             THE WITNESS:   I think in order to establish

22   rapport, just like I said earlier, there has to be --

23   to deescalate a situation you have to have some type of

24   compliance with that person and we needed him to drop

25   the knife to start a rapport with him.   He wasn't

49

1    responding to -- you know, he has a knife, he's walking

2    we have a semicircle around him and he's walking freely

3    with the knife in his hand, and he's not responding to

4    anything.

5            So I don't remember hearing an officer say

6    what is your name, are you okay.  I don't remember

7    hearing that.  I'm not saying that wasn't said.  I

8    don't remember hearing that, no.

9       Q.   So as you mentioned, he wasn't contained, he

10   was walking freely in a semicircle, while he's in that

11   semicircle did he approach any officer or try to stab

12   anybody?

13      A.   He did not try to stab anyone but he walked

14   directly at Officer August while in that semicircle.

15      Q.   Did you see him lunge or raise the knife at

16   Officer August?

17      A.   He did not lunge at Officer August beforehand.

18   I wasn't going to wait.  No one, I don't think anyone

19   there was going to wait for him.  No one is going to --

20   an officer is not going to wait for someone to lunge

21   before they react to someone.

22      Q.   Did you see him do anything with that knife

23   towards Officer August, other than walk toward him?

24      A.   He had that knife clenched tightly in his hand

25   and he was walking at Officer August.  Now, why he

                                                        50

1    wouldn't drop that, why he walked directly at another

2    officer, I can only assume that he was going to use

3    that knife as a weapon.

4        Q.   You saw him moving towards -- is it your

5    testimony that he moved in the direction of Third and

6    Fitzgerald only after Officer August moved in that

7    direction?

8        A.   I'm sorry?

9        Q.   I'm trying to just figure out in the course of

10   what happened here, you are saying that he walked

11   towards Officer August, moving towards Officer August.

12   I'm trying to figure out, is it your position that

13   Officer August was in the location he was in and Mario

14   Woods then started walking towards him or that Mario

15   Woods was walking in that direction and Officer August

16   came into his path?

17       A.   So Mario Woods was walking in the direction of

18   Officer August.  Officer August stepped, yeah, I guess

19   he had to sidestep to his left, he had to sidestep to

20   block him, otherwise Mario Woods would broken our

21   perimeter.  He was forced to sidestep.  He had other --

22   other than letting him walk past him and not doing

23   anything he did walk in his path.

24       Q.   So is it fair to say that side of the

25   perimeter was not contained, right?

51

1    stepping in a gap, he was walking towards officers who

2    were near a gap.  He was walking towards officers, yes.

3         Q.   There was a gap in the containment that Mario

4    Woods started walking towards prior to Officer August

5    moving to fill that gap, correct?

6         A.   Correct.

7         Q.   Okay.  Why did you fire your gun?

8         A.   I fired my gun because Mario Woods was way too

9    close.  The entire time of this incident he was too

10   close to any of us.  We had no the choice but to be

11   that close to him because of the proximity, the Third

12   Street was on a sidewalk it's in a residential area.

13   There's a Muni T line platform there that pedestrians

14   walk on and there is a Muni bus with people coming out

15   of the Muni bus.  I saw people out there.  I saw people

16   gathering.

17            I fired my weapon in defense for Officer

18   August, in defense my own life, in defense of the lives

19   of -- and the safety of the public behind him, because

20   it was only us between Mario Woods and the public.

21        Q.   You mentioned you fired your gun in defense of

22   yourself?

23        A.   Yes.

24        Q.   So how far away was Mario Woods when you fired

25   your gun?

53

1        A.    Probably about 10 feet.

2        Q.    Okay.  In front of you, right?  Strike that.

3    Let me put it another way.

4              You were behind Mario Woods when you fired

5    your gun, right?

6        A.    I'm not sure.  I wasn't directly behind him

7    because I would be firing directly at Officer August,

8    but kind of -- if you see it, you have a semicircle, I

9    was kind of maybe at the -- if Mario Woods was at the

10   12:00 I may have been at the 9:30, somewhere around

11   there.

12       Q.    Okay.  And so Mario Woods was not walking down

13   the sidewalk towards you, right?

14       A.    He was not walking towards me.

15       Q.    He wasn't faced towards you either, correct?

16       A.    No, but he could immediately it would only

17   take a split second for him to cover 10 feet with a

18   knife, two leaps.

19       Q.    And he didn't take those two leaps?

20       A.    He did not, and I wasn't going to allow him

21   to.

22       Q.    And he didn't move towards you in any way,

23   right?

24       A.    He did not.

25       Q.    And he didn't verbally threaten you or

                                                          54

1   announce his intention to stab you, did he?

2        A.   He, I believe that he would have stabbed

3   anyone of us given the chance.  Mario Woods when I --

4   we already established that in the radio transmission

5   that Officer Thompson said that he had charged the

6   officers twice.  In my mind I believed he tried to stab

7   officers two times.

8             When I got on scene I saw Mario Woods matching

9   the description of a stabbing suspect.  Part of Mario

10  Woods description, he was wearing a backpack.  I saw a

11  backpack on the ground at the scene.  When somebody

12  sheds a backpack and presents a knife I can only assume

13  they are going to use that as a weapon.  If you shed a

14  backpack you want to be more mobile, right?

15       Q.   Who was the closest person --

16       A.   Officer August.

17            MR. HANNAWALT:  Before you begin the next

18  question, have you finished your answer?

19            THE WITNESS:  I don't know.

20            MR. HANNAWALT:  The question was why --

21            MR. POINTER:  Wait, hold on, man.  You can't

22  coach the witness.  If he says he didn't have anything

23  else to say now you are going to --

24            MR. HANNAWALT:  Mr. Pointer, you interrupted

25  the witness.

55

1    my deposition how I see fit.  You have a chance, the

2    opportunity to ask him questions.  Let that happen on

3    your time, please.  Please.

4             MR. HANNAWALT:  So can you read the last

5    question that he asked officer August, was what?

6             (Whereupon, the record was read back

7             by the court reporter.)

8             MR. POINTER:  Q.  Did you see --

9             MR. HANNAWALT:  Move on.  If you haven't

10   completed your previous response because you were

11   interrupted we can supplement later.

12            Go ahead, Mr. Pointer.

13            MR. POINTER:  Thank you, Counsel.

14            MR. POINTER:  Q.  Did you see Officer Ortiz

15   pepper spray Mario Woods?

16       A.   Yes.

17       Q.   Did he get closer to Mario Woods than Officer

18   August was before Mario Woods was shot and killed?

19       A.   No.

20       Q.   Okay.  And so Officer August got the closest

21   to Mario Woods out of all the officers there that you

22   personally saw, correct?

23       A.   Yes.

24       Q.   Okay.  Is it fair to say that Officer Ortiz

25   was the second closest to Mario Woods in terms of the

                                                        60

1    officers who were there on the scene who you personally

2    saw?

3         A.   I don't think that's fair to say because at

4    any given point when we were in a semicircle he's

5    walking around closing the distance on any one of us so

6    it's not fair to say that.

7         Q.   Officer Ortiz was a part of that semicircle?

8         A.   I don't know if he was a part or if he stepped

9    in afterwards, I don't know.

10        Q.   Let me back up.  Did you see Officer Ortiz

11   pepper spraying Mario Woods?

12        A.   Yes, I did.

13        Q.   Okay.  When did that happen during the course

14   of the events?

15        A.   That was after the ERIW rounds were deployed.

16        Q.   While the semicircle had been formed around --

17   or formed dealing with Mario Woods, right?

18        A.   Yes.

19        Q.   So Officer Ortiz was a part of the semicircle

20   and you saw him -- Officer Ortiz was a part of the

21   semicircle and you say him use pepper pray on Mario

22   woods, right?

23             MR. HANNAWALT:  Objection, lacks foundation.

24   Misstates testimony.  Go ahead.

25             THE WITNESS:  I don't know if Officer Ortiz

61

DEPOSITION OF OFFICER NICHOLAS CUEVAS

1        MR. POINTER:  Q.  And based upon that

2   intoxication and noncompliance, did you make any other

3   efforts to communicate to Mario Woods what you wanted

4   him to do, other than firing your gun?

5        MR. HANNAWALT:  Objection.  Can you read back

6   the question.

7        MR. POINTER:  I mean, I withdraw the question.

8        MR. POINTER:  Q.  During this incident you had

9   the 21-foot rule is mind?

10       A.  Yes.

11       Q.  The 21-foot rule is -- applies to a person

12   with a knife, right?

13       A.  Yes.

14       Q.  In terms of they can cover the span of 21 foot

15   with a knife and injure an officer or anybody, right?

16       A.  Correct.

17       Q.  All right.  You've also been trained that that

18   applies to an officer who doesn't have their gun

19   already in hand and deployed, right?

20       A.  It's just -- it's a general rule.  It depends

21   on the officer, their capabilities, stress, the stress

22   level of the event, the capability of the suspect with

23   the knife, how fast he is.  There's lot of other

24   factors in there.

25           But I did, yes, to answer your question I did

66

1    have that in mind during the time.

2        Q.   Right.  The question was, the 21-foot rule as

3    you've been trained, and as you understand it, applies

4    to when an officer is essentially -- has not already

5    taken their gun out of their holster?

6        A.   That's part of it.  But like as I said, there

7    are other factors.

8        Q.   I understand.  But the way the 21-foot rule,

9    the way it was trained to you, is that a suspect cover

10   the distance of 21 feet prior to an officer

11   unholstering their gun and firing it, correct?

12       A.   Correct.

13       Q.   All right.  So if you already have your gun

14   out you actually have defeated the 21-foot rule?

15           MR. HANNAWALT:  Objection, incomplete

16   hypothetical.

17           Go ahead.

18           THE WITNESS:  This isn't a sterile

19   environment.  That's a trained environment, the 21-foot

20   rule.  You could say the distance of this room is

21   probably about 21-foot, and in a training situation you

22   could stand there, know what's going -- what's going to

23   happen, someone can run at an officer or a civilian or

24   whoever holster a firearm and that person could, in

25   theory that person could mortally assault that officer,

67

1    civilian, whoever it is, from the other side of the

2    room.

3            Just because you have your gun out of your

4    holster doesn't mean that there aren't other factors,

5    you know, just there's -- getting your gun out of your

6    holster is, yeah, it's going to delay you, but a

7    handgun is probably one of the worst self-defense

8    weapons that there is.  It's very hard to hit something

9    with a handgun.

10           MR. POINTER:  Q.  Do you know how many times

11   Mario Woods was hit?

12           MR. HANNAWALT:  I think --

13           MR. POINTER:  I'm asking the question.

14           MR. HANNAWALT:  No, you interrupted the

15   witness again with your argumentative question.  Why

16   don't you finish your answer.

17           MR. POINTER:  I mean, I apologize --

18           MR. HANNAWALT:  Same thing happened.

19           MR. POINTER:  Hold on.  I was trying to extend

20   you a courtesy.  You've gone too far, man, come on.

21           MR. HANNAWALT:  Finish your answer.

22           THE WITNESS:  In this rule you are saying --

23   this rule that you can effectively be out of that

24   holster and hit someone.

25           MR. POINTER:  Q.  The question I'm asking you

                                                          68

1    is the way that you were trained on the 21-foot rule

2    was that it was applicable about the 21 foot was the

3    officer's reaction time taking the gun out of the

4    holster, correct?

5        A.   That is part of the rule.  That's not the

6    entire.  As I was saying, if you have your holster out

7    21-foot doesn't mean you are going to stop the threat.

8    I have seen hundreds of people shot with handgun fire

9    and rifle fire that have continued to kill people.

10       Q.   Hundreds of people?

11       A.   I mean, maybe not hundreds, but I've seen

12   dozens of people, I've seen more people live by being

13   shot than have died.

14       Q.   Okay.  And those were shots that you fired?

15       A.   No, shots -- victims.

16       Q.   Shot by the police?

17       A.   No, victims who were shot by other people,

18   other citizens.  I've seen more people shot and live

19   than more people were shot and died.

20       Q.   You sat there and watched it?

21       A.   I have seen shootings, yes.

22       Q.   How many?

23       A.   I have seen at least one shooting.

24       Q.   So you've seen one shooting and that --

25       A.   I have heard gunshots.  I've responded to

69

DEPOSITION OF OFFICER NICHOLAS CUEVAS

1   scenes.  I've been in the area, people were shot.  I've

2   seen lots of people.

3        Q.   Were those incidents where there is a knife

4   versus gun?

5        A.   I mean, I have seen -- okay, so we're getting

6   off track here.  I need to answer the question that you

7   initially asked, and the question you initially asked

8   was the 21-foot rule, and part of the training was if

9   the gun is holstered, just because the gun -- so based

10  on what you are saying, if an officer is holstered that

11  he could stop a threat from 21-foot and that's not

12  right.  That's a flaw in that -- in that theory,

13  because --

14       Q.   So the theory is flawed?

15       A.   I believe so, yes.

16            MR. HANNAWALT:  Okay.

17            MR. POINTER:  I'm not the one training you on

18  it.  I mean, I didn't make it up.

19            MR. HANNAWALT:  Objection, move to strike.

20  You know your colloquy is irrelevant.

21            Have you finished your answer about the

22  21-foot rule?

23            THE WITNESS:  No.

24            MR. HANNAWALT:  Okay.  Please finish your

25  answer.

70

1          Wait for him to finish before you ask the next

2     question.  Okay.  Thank you.

3          THE WITNESS:  So you're saying if an officer's

4     holster -- part of the 21-foot rule is an officer --

5          I'm saying that regardless if it's holstered

6     or not, you have to bank on that threat being stopped.

7     Someone running at you with a knife, if they are

8     30 feet away and you are firing at them running at you

9     and you hit them, does not mean they are going to stop.

10         MR. POINTER:  Q.  So once again, the 21-foot

11    rule as it was trained to you applies to when an

12    officer's reaction time and their gun is holstered

13    versus when it's unholstered and they are pointing it

14    at the person?

15         A.   Yes.

16         MR. HANNAWALT:  Objection.  Asked and

17    answered.

18         MR. POINTER:  Q.  During this incident

19    concerning Mario Woods you had your gun unholstered,

20    correct?

21         A.   Yes, I did.

22         Q.   And it was pointed at him, right?

23         A.   Yes.

24         Q.   So you are not sitting here with your gun

25    holstered worried about him covering 21 feet, correct?

71

1      A.   I'm worried about him covering 10 feet.

2      Q.   Right.  With your gun already trained on him?

3      A.   Yes.

4      Q.   Okay.

5      A.   Just because my gun is trained on him doesn't

6   mean it's going to immediately stop the threat.

7      Q.   I'm sorry, go ahead.

8      A.   Just because there are multiple guns on him

9   doesn't mean it's going to stop the threat.  And at

10   that time, I don't know how many guns were drawn.  I

11   know there is less lethal and there is lethal cover.  I

12   couldn't tell you how many.

13      Q.   There was no communication amongst your fellow

14   officers.

15      A.   There was communication.

16      Q.   I didn't even get a chance to finish my

17   question?

18      A.   I'm sorry.

19          MR. HANNAWALT:  You are acting like

20   Mr. Pointer now.

21          MR. POINTER:  But let's go.

22          MR. POINTER:  Q.  So you didn't know whether

23   there were multiple officers with guns trained on Mario

24   Woods at the time of this incident?

25          MR. HANNAWALT:  Objection misstates the

                                                        72

```
 1        testimony.
 2                 MR. POINTER:  Q.  I'm asking a question.
 3                 MR. HANNAWALT:  All right.  And I'm making an
 4        objection.
 5                 THE WITNESS:  What I said is I didn't know how
 6        many guns were trained on Mario Woods at this time.
 7                 MR. POINTER:  Q.  Did you have a sense one,
 8        two, three, 20?
 9            A.    I knew there was at least August.  I knew
10        there was at least three, me, Officer August and
11        Officer Phillips.
12            Q.    Now, you told SFPD investigators that you
13        believed Officer August fired first, correct?
14            A.    Yes.
15            Q.    And you fired after you heard a shot fired,
16        right?
17            A.    Yes.
18            Q.    So why did you still fire your weapon if you
19        had already heard another gunshot go off?
20            A.    I was in the process of firing my weapon, I
21        heard a shot go off.  I had already made the decision
22        to fire my weapon at that time.
23            Q.    So you made the decision to fire your weapon
24        prior to you hearing the first shot go off?
25            A.    Yes.
```

73

1      Q.    Did you give any warning before firing your

2   weapon?

3      A.    I don't remember.

4      Q.    As you sit here today you don't have a memory

5   of that?

6      A.    I don't remember.  I do remember when Mario

7   Woods was being told to drop the knife.  I remember him

8   looking directly at me and shaking his head that he was

9   not going to drop it.  And I don't remember whether or

10  not I gave him an order prior to shooting.  It's in my

11  training to do that, but I heard other officers at the

12  time and it's also in my training not to interrupt.  So

13  to make -- I wouldn't speak over another officer, speak

14  the same time to make sure it's clear and concise.

15     Q.    So did you tell SFPD homicide that you gave

16  him a warning prior to shooting?

17     A.    I don't believe I told them that.  I'm not

18  sure.

19     Q.    You are not sure or you don't remember?

20     A.    I'm not sure to this day if I gave him a

21  warning, gave Mario Woods a warning or not.

22     Q.    Have you reviewed any documents, videos that

23  or anything that says that you did?

24     A.    I mean, I don't think so.  If you have my SFPD

25  homicide interview and it says something like that I

74

1     Q.   You have been trained that you are responsible

2   for each shot that you fire, correct?

3     A.   Yes.

4     Q.   And that each shot you fired has to be

5   justified, right?

6     A.   Yes.

7     Q.   You also have been taught to assess a

8   situation and reassess them in terms of the use of

9   force you elect to use, correct?

10     A.   Yes.

11     Q.   When was the last time you saw Mario Woods

12   holding the knife?

13     A.   Right before I pulled the trigger.

14     Q.   And what was he doing with it?

15     A.   He had it in his hand.  He had a grip on it

16   and he was walking towards Officer August.

17     Q.   And where was his hand at?

18     A.   At his side.

19     Q.   And how was his arm, was it straight, was it

20   bent?

21     A.   It was going with his natural sway.

22     Q.   What does that mean, can you describe it?

23     A.   It was swinging with his natural gait.

24     Q.   And when you say swinging, was it coming up

25   above his legs?

76

1       A.    No.

2       Q.    Never heard of the term subjective fear?

3       A.    No.

4       Q.    Never heard of the idea of objective

5    reasonable --

6             MR. HANNAWALT:  Objection, legal conclusion.

7             THE WITNESS:  I have --

8             MR. POINTER:  Q.  You have been trained on

9    when you can use deadly force, correct?

10            A.    Yes.

11      Q.    You have been trained that you cannot just say

12   I'm scared and just start shooting because you're

13   scared, right that justifies the use of deadly force.

14   There has to be an objective basis for the use of your

15   deadly force, correct?

16            MR. HANNAWALT:  Objection to the extent it's

17   an incomplete hypothetical, correct?

18            THE WITNESS:  I'm not sure how to answer that.

19   I mean, yeah you shouldn't have, there shouldn't be

20   someone saying I'm scared, there has to be a reason why

21   you are scared, right?  Yes, there should be a reason

22   why you're scared if you are using deadly force there

23   should be an objective reason why, not just 'cause your

24   I'm saying I'm scared.

25            MR. POINTER:  Q.  An over reaction to a threat

                                                           80

```
 1    STATE OF CALIFORNIA    )
                             ) ss.
 2    COUNTY OF CONTRA COSTA )

 3

 4         I, Angelica R. Gutierrez, a licensed Certified

 5    Shorthand Reporter, duly qualified and certified as such

 6    by the State of California;

 7         That prior to being examined, the witness named in

 8    the foregoing deposition was by me duly sworn to testify

 9    to the truth, the whole truth, and nothing but the truth;

10         That the deposition was by me recorded

11    stenographically at the time and place first herein

12    mentioned, and the foregoing pages constitute a full,

13    true, complete and correct record of the testimony given

14    by the said witness;

15         That I am a disinterested person, not being in any

16    way interested in the outcome of said action, nor

17    connected with, nor related to any of the parties in said

18    action, or to their respective counsel, in any manner

19    whatsoever.

20

21              DATED:  July 25, 2018

22

23    _Angelica R. Gutierrez_____

24         ANGELICA R. GUTIERREZ, CSR No.  13292

25

                                                          82
```