**JOHN L. BURRIS, ESQ. SBN 69888**
**ADANTE D. POINTER, ESQ. SBN 236229**
**DEWITT LACY, ESQ. SBN 258789**
**MELISSA C. NOLD, ESQ. SBN 301378**
**PATRICK M. BUELNA, ESQ. SBN 317043**
**LAW OFFICES OF JOHN L. BURRIS**
Airport Corporate Centre
7677 Oakport Street, Suite 1120
Oakland, California 94621
Telephone:  (510) 839-5200
Facsimile: (510) 839-3882
John.Burris@johnburrislaw.com
Adante.Pointer@johnburrislaw.com
Dewitt.Lacy@johnburrislaw.com
Melissa.Nold@johnburrislaw.com
Patrick.Buelna@johnburrislaw.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GWENDOLYN WOODS, an individual,<br><br>                    Plaintiff,<br><br>v.<br><br><br>CITY AND COUNTY OF SAN FRANCISCO, a municipal corporation; CHARLES AUGUST NICHOLAS CUEVAS WINSON SETO SCOTT PHILLIPS<br><br>                    Defendants. | CASE NO.: 3:15-cv-05666-WHO<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ALL OF HER CLAIMS** |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES………………………………………………………………3

INTRODUCTION…………………………………………………………………………6

   I.   STATEMENT OF FACTS……………………………………………...........6
       A.  Background……………………………………………………...........6
       B.  Mario Woods Defends Himself…………………………………...........7
       C.  Search for a Stabbing Suspect………………………………………8
       D.  First Contact with Mr. Woods………………………………………9

ARGUMENT………………………………………………………………………15

   I.   Summary Judgment Is Only Proper When There Is No Genuine Factual Dispute As to
       Material Facts………………………………………………………………...15

   II.   THE DEFENDANT OFFICERS UNREASONABLY SHOT MARIO WOODS WHEN HE
       STEPPED AWAY FROM DEFENDANT AUGUST…………………………………17

       A.  The Legal Standard for Excessive Force Claims…………………………………17

       B.  The Officers Used Excessive Force When They Shot Mario Woods Because He Was
           Not An Imminent Threat to the Officers or Anyone Else……………………………19

       C.  Defendants Failed To Provide Mario Woods Any Warning Prior to Opening Fire And
           Failed To Utilize De-Escalation Techniques …………………………………...22

   III.   THE DEFEDANT OFFICERS ARE NOT ENTITLED TO QUALIFIED IMMUNITY……24

   IV.   PLAINTIFF'S BANE ACT CLAIMS MUST PROCEED BECAUSE A REASONABLE
       JURY COULD CONCLUDE DEFENDANTS INTENDED TO VIOLATE MARIO
       WOODS' RIGHT TO BE FREE FROM UNREASONABLE SEIZURES……………......25

   V.   BASED ON THE TOTALITY OF THE CIRCUMSTANCES THE DEFENDANT
       OFFICERS VIOLATED THEIR DUTY OF CARE OWED TO MARIO WOODS ………..26

CONCLUSION……………………………………………………………………...29

# TABLE OF AUTHORITIES

## Cases

*Amylou R. v. County of Riverside*, 28 Cal.App.4th 1205 (1994) ................................................. 26

*Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242 (1986) ............................................................. 14

*Barber v. City of Santa Rosa*, 2010 WL 5069868 *6 (N.D.Cal. 2010).................................. 17

*Barnes v. Arden Mayfair, Inc.,* 759 F.2d 676 (9th Cir. 1985)................................................ 15

Billington v. Smith, 292 F.3d 1177, 1185 (9th Cir. 2002)...................................................... 17

Blanford v. Sacramento Cnty., 406 F.3d 1110, 1115 (9th Cir.2005)................................. 16, 18

*Brown v. City & Cnty. of San Francisco*, 2014 WL 1364931 (N.D. Cal. 2014)...................... 25

*Brown v. Ransweiler,* 171 Cal.App.4th 516 (2009) ................................................................. 23

Bryan v. MacPherson, *630 F.3d 805, 826 (9th Cir. 2010)* ..................................................... 16

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................................... 14

*Chien Van Bui v. City & Cnty. of San Francisco*, 2014 WL 3725843 (N.D. Cal. 2014).......... 25

*Deng v. Loeffler*, 2011 WL 2792340 *2 (D. Nev. 2011) .......................................................... 17

Deorle v. Rutherford, 272 F.3d 1272, 1282-83 (2001) ........................................................... 16

*Dorger v. City of Napa*, 2013 WL 5804544 (N.D. Cal. 2013) ................................................ 25

*Garcia v. United States*, 826 F.2d 806, 812 (9th Cir. 1987) ................................................... 17

*Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011) ................................. 15, 16, 18, 21

*Gonzalez v City of Anaheim*, 747 F.3d 789, 794 quoting *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir.1997) .......... 19

Graham v. Connor, 490 U.S. 386, 397 (1989).................................................................... 15, 16

*Grudt v. City of Los Angeles,* 2 Cal.3d 575 (1970)............................................................ 23, 24

*Harden v. San Francisco Bay Area Rapid Transit Dist.*, 215 Cal.App.3d 7, (1989).............. 27

*Hayes v. City of San Diego*, 736 F.3d 1223, 1234 (9th Cir. 2013) ......................................... 17

Hayes v. County of San Diego, 57 Cal.4 th 622 (2013) .......................................................... 23

*Hesterberg v. United States*, 2014 WL 5073716 (N.D. Cal. 2014) ....................................... 25

*Kayfetz v. California*, 156 Cal.App.3d 491 (1984) ..................................................................... 26

*Keenan v. Allan*, 91 F.3d 1275 (9th Cir. 1996).......................................................................... 14

*Kisela v. Hughes*, 138 S. Ct. 1148 (2018)................................................................................. 21

*Lockyer v. City and County of San Francisco*, 33 Cal.4th 1055, 1097 (2004) ......................... 27

*MacEachern v. City of Manhattan Beach*, 623 F.Supp.2d 1092, 1105 (C.D. Cal. 2009) ................... 17

*Martinez v. Cty. of Los Angeles*, 47 Cal. App. 4th 334, 349 (1996) ......................................... 26

*Mathews v. City of Oakland Police Dep't*, 2013 WL 6057689 (N.D. Cal. 2013) ........................ 25

*Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir.2011)............................................................. 16

*Morales v. Fry*, --- F.3d ----, 2017 WL 4582732, at *4 (9th Cir. 2017) ................................... 21

*Munoz v. Olin*, 24 Cal.3d 629 (1979) ....................................................................................... 23

*Nelson v. City of Davis*, 571 F.3d 924, 928-929 (9th Cir. 2009) ............................................. 14

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099 (9th Cir. 2000)........... 14

*O.S.C. Corp. v. Apple Computer, Inc.*, 792 F.2d 1464 (9th Cir. 1986)..................................... 15

*Pearson v. Callahan,* 555 U.S. 223, 231 (2009)....................................................................... 20

*Pham v. City of San Jose*, 2013 WL 5443027, *7 (N.D. Cal. 2013)......................................... 17

*Phillips v. City of Fairfield*, 406 F.Supp.2d 1101, 1118 (2005) .............................................. 26

*Quiroz v. Seventh Ave. Center,* 140 Cal.App.4th 1256 (2006) ................................................. 23

*Reese v. County of Sacramento,* 888 F.3d 1030, 1043............................................................. 22

*Reynolds v. County of San Diego*, 84 F.3d 1162, 1168 (9th Cir. 1996) ............................... 17, 26

*Sankovich v. Life Ins. Co. of N. Am.* 638 F.2d 136 (9th Cir. 1981)........................................... 14

Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005) ....................................................... 15

*Young Han v City of Folsom*, 695 Fed.Appx. 197, 198 (9th Cir. 2017) ............................... 23, 24

## Federal Statutes and Rules

Federal Rule of Civil Procedure §56(c)........................................................................................ 14

Federal Rule of Civil Procedure § 56(e) ...................................................................................... 14

**State Statutes and Rules**

California Government Code section §§ 815.2..............................................................................23

California Government Code section § 820.6...............................................................................23

California Government Code section § 821.6........................................................................23, 26

Civil Code section §52.1 (the "Bane Act")................................................................................22

California Penal Code section §196...........................................................................................26

I.     INTRODUCTION

Resembling a modern-day firing squad, Defendant San Francisco Police Officers stood in a semi-circle around Plaintiff Gwendolyn Woods' son, Mario Woods, and shot a hail of bullets that shredded Mario's small, young body in front of a shocked crowd of people whose chilling cries echoed a protest of the officers' excessive force that resounds to this very day.

On December 2, 2015, Mario Woods stood in the back of a bus line as he suffered a mental health crisis. Mr. Woods had recently defended himself in a fight with another person. When two officers noticed Mr. Woods matched the description of the suspect from that reported fight, which may have involved a stabbing, the officers pulled over to confront him. After Mario Woods made a series of suicidal statements to the officers, he drew a knife that he never swung at anyone. Instead, Mr. Woods appeared to be scared and walked away from the officers. The officers called for back-up. When dozens of SFPD officers arrived, they cornered Mr. Woods and screamed frenzied orders.

Mr. Woods huddled himself against a wall, while SFPD Officers shot bean bag rounds into his body and pepper sprayed his face. Mr. Woods fell to his knee, disoriented and dazed, and hoping to escape the pain. He hobbled, head down, along the wall trying to avoid the pain. Defendant Officer August, without saying a word, walked over to Mr. Woods with his gun raised.

Mr. Woods looked up and took a step away from Defendant August in fear. Defendant August opened fire shooting Mr. Woods twice. Like a spark amongst a pile of gunpowder, four other Defendant Officers immediately started shooting. All four of the other Defendant Officers admittedly opened fire after already hearing others shooting.

Mr. Woods fell to the ground, shot more than twenty times, many of them striking his body from behind. Mr. Woods ultimately succumbed to the barrage of bullets that ravaged his body from head to toe. Tragically, Mario will never have an opportunity to tell his side of the story or defend against the Defendants' outrageous accusations. His voice fell silent, like the many other victims of police brutality that were shot and killed by San Francisco Police Officers in 2015.

I.        STATEMENT OF FACTS

**a.  Background**

The San Francisco Police Department had five officer involved shootings in 2015 prior to shooting and killing Mario Woods.[1] As early as March 2015, SFPD had come under immense pressure due to revelations that SFPD officers had committed crimes and exchanged racist text message while on duty placing the SFPD's treatment of minorities in the city into question.[2] To make matters worse, the SFPD had in place a Use of Force Policy that had not been updated or revised since 1995. **See Attached SFPD Use of Force Policy Attached As Exhibit 1.** At the time, Chief Suhr directed an "A" priority bulletin to be issued in April 2015 to emphasize to officers the principles of using time and distance in order to allow officers the opportunity to de-escalate and stabilize a situation without having to resort to deadly force. **See Suhr Bulletin on Avoiding Lawful But Awful Use of Force attached as Exhibit 2; SFPD Use of Force Supervisor Steve Pomatto's Deposition "Pomatto Depo" Attached as Exhibit 3 at pages 12-14, 28-29.** Unfortunately, the extent of the training on this critical bulletin was that officers read the one-page bulletin and electronically signed that they read it. **Pomatto Depo, 12-14.** No further training was required or conducted. **Pomatto Depo, 12-14.**

A few months after the bulletin was issued, Defendant officers failed to incorporate the important concepts of time and distance, de-escalation and the "stabilize mindset" when they shot and killed another young male, African-American, Mario Woods who stood approximately 5'9" and weighed 156 lbs. when officers filled him with at least twenty-two bullets. **Medical Examiner Report attached as Exhibit 4.**

---

[1] San Francisco District Attorney Decision Letters (https://sfdistrictattorney.org/decision-letters)
[2] These Actual Text Messages from San Francisco Cops Reveal the Scope of Police Racism
(https://mic.com/articles/112948/san-francisco-officer-s-text-messages-show-racist-police-departments-exists-everywhere#.SxjJMoYWy)

### A.  Mario Woods Defends Himself

Although the Defendant Officers were not present, did not know the circumstances of what took place between Mr. Woods and Mr. Gardner, they felt it was necessary to place a one-sided self-serving account into their brief. **Dckt #97, page 12.**  Nevertheless an accurate account of the circumstances as described by Marcel Gardner himself at his deposition reveals the following: Woods approached Mr. Gardner as he was sitting in the driver seat of a car with two women he claims he had just met and did not know. **Deposition of Marcel Gardner "Gardner Depo" Vol II at pages 136, 138-139 attached as Exhibit 5.** He saw Mr. Woods standing outside the car mumbling to himself, looking paranoid as if he wanted to fight. **Id. at pages 148-149.** The girls egged on Mr. Gardner to fight Woods. **Id. at 136.** Mr. Gardner got out the car and used the car door to hit Woods and push him back. **Id. at 161.** He then kicked Woods in the chest to create more space between the two. **Id. at 154.** Mr. Gardner saw Mario holding a knife but didn't feel any fear as he was larger than Mario and felt he could overpower and knock Woods down. **Id. at 155, 160, 190.** Mr. Gardner tried to punch Woods but missed. **Id. at 158.** At some point later in the altercation, he realized he had been stabbed but was not sure when. **Id. at 162.**

### B.  Search for a Stabbing Suspect

At approximately, 3:50 PM a broadcast went over police radio that: a stabbing victim had walked into the hospital, stabbed in the left bicep, at 6670 3rd Street in the Bayview, by a male unknown race, light complexion wearing a hoody. **Radio Dispatch 1 at 00:00-01:00 attached as Exhibit 6.** Notably, the deputy that called in the report advised that the "victim" was being "uncooperative", from which one can infer that Mr. Gardner may not have been an innocent victim but instead the aggressor or mutual combatant. **Id. at 01:00-01:15.**

Approximately thirty minutes later, dispatch updated officers that the suspect was still in the area. **Radio Dispatch 2 at 03:20-03:45 attached as Exhibit 7.** A description was provided that the suspect was a black male, short, tan pants, black ball cap, white insignia and a backpack. **Id at 03:45-6:05.** Shortly thereafter, Officers established a perimeter. **Id at 03:45-7:30.**

At approximately 4:32 PM the officers decided to break down the perimeter. **Id at 16:15-16:30**. As Officers Thompson and Defendant August were driving along 3rd Street, Defendant Officer Charles August noticed a person that matched the description. **Deposition of Brandon Thompson "Thompson Depo" attached as Exhibit 8 at pages 30-31.**

### C.  First Contact with Mr. Woods

Defendant August pointed out a person, Mario Woods, that he believed matched the description. **Id.; Deposition of Charles August "August Depo" attached as Exhibit 9 at pages, 61-62.** At the time, Mario Woods was simply standing in the back of a bus line on 3rd Street and Fitzgerald, not causing any disturbance. **August Depo, 61-62; Thompson Depo, 31-32.** Defendant August said, "Hey Brandon, that looks like it may be the guy" so, Officer Thompson made a U-turn to talk to Mr. Woods. **Thompson Depo, 34-35.** Officer Thompson did not know Woods was guilty or not because sometimes people are innocent that are originally suspects. **Thompson Depo, 35-37.**

Defendant August pointed out the guy with the hat and puffy coat on 3rd and Fitzgerald Avenue. **Id.** Officer Thompson parked his car along Fitzgerald just past the corner of Keith St. (referred to as 3rd St.) and Fitzgerald Ave. **See Photo of Patrol Car Parked attached as Exhibit 10.** Officer Thompson and Defendant August exited the patrol car, and Defendant August claims Mr. Woods said, "I'm not going with you," while holding a soda in his hand. **August Depo, 63-64.**

Defendant August contends Mr. Woods was standing approximately ten feet away when Mr. Woods presented a knife prompting Defendant August to draw his firearm**. August Depo, 64;**

**Thompson Depo, 39-40.** Both officers recalled Mario Woods saying something to the effect of, "You're going to have to squeeze that," indicating that he wanted Defendant August to shoot and kill him. **August Depo, 64; Thompson Depo, 41; 43.** Officer August did not consider the statement homicidal. **August Depo, 65.** During this time, Mr. Woods held the knife at his side, but did not swipe or threaten anyone with it. **August Depo, 65.** In fact, the Defendants never saw Mr. Woods swipe, stab, run at, sprint, or threaten the officers with the knife throughout the entirety of the incident nor did they hear Mr. Woods verbally threaten them**. August Depo at 65, 69-70*; Deposition of Scott Phillips "Phillips Depo" attached as Exhibit 11 at pages 30-31; Deposition of Antonio Santos "Santos Depo" attached as Exhibit 12 at pages 190-191; Deposition of Winson Seto "Seto Depo" attached as Exhibit 13 at page, 97; Deposition of Nicholas Cuevas "Cuevas Depo" attached as Exhibit 14 at page 50.**

Then Mr. Woods walked away from Defendant August along Fitzgerald Avenue and around the corner onto 3rd Street (which is actually Keith St but routinely referred to throughout the incident, in testimony and reports as 3rd Street). **Thompson Depo at 41, 58; See Muni Bus Video "Bus Video" front facing camera attached as Exhibit 15 at 16:33:46-16:33:52.**

Defendant August and Officer Thompson did not order any of the people in the area to leave or to get back, nor were bystanders ever ordered to clear out. **August Depo, 66.** Defendant August followed Mr. Woods at a distance of approximately 15 feet from behind Mr. Woods as he walked southbound on Keith St. **August Depo, 66-67.** Meanwhile, Officer Thompson followed them and radioed at approximately 4:33 PM to other officers: Mr. Woods had a knife, the officers had him at gunpoint, Mr. Woods was coming at his partner, Officer Thompson did not have any ERIW (less than lethal firearm), and called for additional units. **See Radio Dispatch at 18:00-18:16.** Sgt. Hall ordered

that everyone stay off the air and respond Code 3 (with lights and sirens). **Radio Dispatch 2 at 18:17-18:40.**

As Mr. Woods walked southbound on Keith St., Officer Thompson spotted fellow SFPD officers passing him and redirected them to the scene. **Radio Dispatch 2 at 18:17-18:40; Bus Video at 16:33:53-16:34:20.** Officer Thompson also re-stated that Mr. Woods had a knife, that he was charging at his partner and refused to drop the knife despite the fact that the Muni Bus video showed that Mr. Woods did not charge Defendant August or anyone else a single time. *Id.* Officer Thompson updated officers that they were walking towards Gilman. *Id.* Suddenly, Defendant August closed the distance aggressively between himself and Mr. Woods, such that his partner, Officer Thompson, commanded him to "back up, back up!" *Id.*

Mr. Woods continued to walk southbound on Keith St. towards the corner of 3rd Street and Gilman, and nearly made it to the front of a large industrial building and cement wall with no one nearby. **See Rivera Video attached as Exhibit 28 at 00:15-00:40; See Photos of Industrial Building on Keith/3rd Street Attached as Exhibit 16**. However, as more SFPD Officers arrived, including Defendants, they ushered Mr. Woods back northbound towards the Keith St. and Fitzgerald Ave bus stop on the corner where Mr. Woods initially came from where a bus was unloading passengers. **See Rivera Video at 00:15-00:40; Bus Video at 16:34:20-16:34:40.**

Officer Thompson moved from behind his partner out into the street and continued to narrate the incident on the radio. **See Rivera Video at 00:24-00:30.** However, Officer Thompson never broadcasted that Mr. Woods made suicidal statements that he desired the officers to shoot him. **See Radio Dispatch 2 at 18:00-19:40.** Besides Defendants Seto and August, the other Defendants did not hear or learn that Mr. Woods was suicidal since it was not communicated. **Phillips Depo, 62;**

Several patrol cars and officers had arrived from the southside of the block. **See Rivera Video at 00:10-00:30**. Phillips noted that pedestrian bystanders were 30-40 feet away when he arrived. **Phillips Depo, 34.** Pedestrian bystanders remained at that distance throughout the incident with over a dozen officers present and layered between the bystanders and Mr. Woods when the Defendants opened fire. **Cell Phone Video 00:00-00:25; Rivera Video 01:00-01:14.**

Sgt. Hall instructed someone to deploy an Extended Range Impact Weapon (ERIW). **Radio Dispatch 2 at 18:45-18:50.** Officer Thompson frantically replied that ERIW was deployed twice, Mr. Woods was going down but refused to drop the knife. **Radio Dispatch 2 at 18:51-19:11.** Another sergeant via radio reminded the officers to utilize "time and distance". *Id.* Officers are trained to utilize time and distance to provide officers an opportunity to strategize, create a plan and employ de-escalation techniques to stabilize the situation. **Pomatto Depo, 26-27, 32-34; Suhr's Avoiding the Lawful But Awful Use of Force Bulletin; Police Practices Expert Scott Defoe Rule 26 Report attached as Exhibit 17 pages 9-10; See Learning Domain 37: Persons With Mental Illnesses – Field Contact attached as Exhibit 18.**

Despite the fact that Mr. Woods is essentially still for a minute and huddled against the wall, the Defendant Officers failed to communicate with one another, create a tactical plan or employ de-escalation techniques on the way to the scene or at the scene. **Rivera Video at 00:29-01:09; Santos Depo 167-170; Phillips Homicide Statement Attached as Exhibit 19 at 13:00-13:20; Phillips Depo 24-25; Expert Defoe Rule 26 Report, page 6-7.** In fact, the officers had no conversations about containment. **Phillips Homicide 13:00-13:20; Phillips Depo 39.** Although there were a dozen officers on scene, none established themselves as a leader, a point of contact to communicate with Woods or ordered bystanders to clear the area. **Phillips Depo 33-34.** Instead, a mixture of officers screamed hysterically over one another to drop the knife and to get down. **Rivera Video at 00:29-**

**01:09.** Although it was clear that Mr. Woods was pleading through his gesticulations and moving his mouth, officers could not hear him nor did they take the time to be quiet to hear him and gain verbal compliance. **Phillips Depo 23-24; Cell Phone Video 1 attached as Exhibit 20, 00:00-00:16.**

Arriving officers continued to gather at the south end of the semi-circle with their guns directed toward Mr. Woods and the pedestrians standing on the north corner of Keith St. **Rivera Video at 01:00-01:08; Cell Phone Video 1 at 00:15-00:25.** This uncoordinated formation essentially cut-off Mr. Woods' path southbound, and funneled Mr. Woods back north towards bystanders who were still 30-40 feet away. *Id.*

Defendants recognized that Mr. Woods was acting "not natural", "not normal", and appeared mentally impaired by intoxication or mental disorder. **Phillips Homicide Statement 11:30-12:20.** Defendant Seto also heard Mr. Woods make another suicidal statement to officers. **Seto Homicide 6:30-6:45; 13:30-14:00**. One officer sprayed Mr. Woods with pepper spray. **Ortiz Homicide Statement attached as Exhibit 21 at 13:00-13:10.** Another Officer fired more less-lethal rounds. **See Rivera Video 00:30-1:10.** Witness Ruben Rivera testified that Mr. Woods appeared to disoriented and dazed as a result of the less-lethal rounds and pepper spray. **Deposition of Ruben Rivera "Rivera Depo" attached as Exhibit 29 at pages 29-30.**

Mr. Woods was likely in terrific pain and scared huddled against the cement wall while raising his hands and pleading with officers. **See Cell Phone Video 2 attached as Exhibit 22 at 00:00-00:18.** In fear for his life, confused and in mental crisis, Mr. Woods limped in the only direction open to him – northbound. *Id.* Although Defendant August testified Mr. Woods and himself were exchanging words in low voice, it is nearly impossible for this to have occurred given the amount of yelling and noise. *Id.***; August Depo, 76-77.**

As Mario Woods hobbled along the wall of the building towards the corner of Keith St. and Fitzgerald, Defendant August silently closed the distance between himself and Mr. Woods in violation of both his training and the Sergeant's orders over the radio regarding time and distance. **See Rivera Video at 01:07-01:10.** Mr. Woods did not change direction, make a sudden movement but had his head down. ***Id.*; Cell Phone Video 3 attached as Exhibit 23 at 00:05-00:07.** Defendant August testified that Mr. Woods told Defendant August he was going to have to shoot him but the video evidence suggests that Mr. Woods did not even notice him. **August Depo, 79-80.** Miraculously, only Defendant August heard this statement as well, despite other officers standing close by.

Defendant August had decided in his mind that if Mr. Woods reached a certain spot he would shoot him, but did not communicate this intention to Mr. Woods. **August Depo, 83-84.** Instead, Defendant August closed the distance between the two, placing Mr. Woods inside of the kill zone thereby ensuring Mr. Woods would be shot. **See Rivera Video at 01:07-01:10.**

Defendant August explained that he fired because Mr. Woods closed the distance between the two while moving at a rapid rate. **August Depo, 83-84**. This version of the facts is clearly contradicted by video evidence: Mr. Woods was walking with his head down, limping, and appeared to not notice Defendant August until after Defendant August took three or four steps to close the distance between the two of them. **Cell Phone Video 3 at 00:05-00:07; Rivera Video at 01:07-10**.

When Mario Woods finally raised his head, witness Ruben Rivera's video shows Mr. Woods stepped his right leg away from Defendant August when he opened fire: **Rivera Video at 01:07-01:10** Mr. Woods can be seen taking several steps directly straight in the direction of Keith St. and Fitzgerald while Defendant August moved laterally towards the wall and Mr. Woods; at 01:11, just before Defendant August opened fire, Mr. Woods is showed taking a step towards the wall with his

right foot away from Defendant August, then with his next step his left foot crossed over his right, taking another step towards the wall, away from the Defendant again – then Defendant August shoots his first shot; at 01:12, Mr. Woods is keeled over having been struck by the bullet and no longer a threat when the four other Defendant Officers gratuitously and unconstitutionally unleashed a hail storm of bullets. **See Rivera Video 01:07-01:12; Still Photos of Rivera Video at 1:07-12 attached as Exhibit 24.** When Defendant August opened fire, there were no civilians nearby. In fact, the civilians were still 30-40 feet away in any direction with several officers between themselves and Mr. Woods. **See Still Photos attached as Exhibit 24; See Chronology of Events with Photo Still Images attached as Exhibit 30.**

Defendant August testified he shot first, which can be seen from his pistol's recoil and heard in Ruben Rivera's video of the incident. **August Depo 88-89; Rivera Video 1:10-1:14**. In fact, the four Defendant Officers made statements to homicide investigators that they fired after Defendant August shot, even though Officer Ortiz who, also had his pistol out, decided *not* to shoot while faced with the same circumstances. **Cuevas Homicide Statement attached as Exhibit 25 at 18:00-18:30; Phillips Depo, 49-50; Seto Homicide Statement attached as Exhibit 26 at 8:25-9:00; Santos Homicide Statement attached as Exhibit 27 at 1:12:10-1:12:50; Ortiz Homicide 7:00-7:30.**

In fact, Defendant Seto heard a "pop" when he was bringing up his sights and then fired. **Seto 8:25-9:00.** Although at deposition, some of the Defendants changed their story; for example, Defendant Santos denied at deposition that he fired because he heard Officer August fire**. Santos Depo, 204.** However, in his statement to Homicide Investigators, Defendant Santos explained that when Mr. Woods began moving northbound that he had "the line drawn in the sand" and had "it set:" if Woods advanced "where he would shoot him." **Santos Homicide 1:12:10-1:12:50.** Defendant Santos focus was mainly on Woods, not August. *Id.* As Woods walked northbound, that's when

Santos "heard the first gunshot" and that's when it "clicked" that Woods was in August's "danger zone" so Santos opened fire. *Id.* Therefore, Officer Santos did not see Defendant August was in an immediate threat of danger from Mr. Woods, but concluded from Defendant August's gunshot that Defendant August was in danger. This is the very definition of unconstitutional, sympathetic fire.

## II.        ARGUMENT

A. Summary Judgment Is Only Proper When There Is No Genuine Factual Dispute As to Material Facts

Summary judgment is proper when the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. §56(c).  Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to return a verdict for the nonmoving party. *Id.* at pp. 248-249.

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Celotex,* 477 U.S. at 323 (citing Fed.R.Civ.P., Rule 56(e)). In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

"[A]t this stage of the litigation, the judge does not weigh disputed evidence with respect to a disputed material fact. Nor does the judge make credibility determinations with respect to statements

made in affidavits, answers to interrogatories, admissions, or depositions. These determinations are within the province of the factfinder at trial." *Nelson v. City of Davis*, 571 F.3d 924, 928-929 (9th Cir. 2009). Moreover, the court is required to draw all inferences in a light most favorable to the non-moving party. *Id.* The court should not grant summary judgment where there are undisputed facts which reasonably lend themselves to different inferences. *Sankovich v. Life Ins. Co. of N. Am.,* 638 F.2d 136, 140 (9th Cir. 1981). The court must evaluate the evidence and reasonable inferences to determine whether there is sufficient probative evidence to permit "a finding in favor of the opposing party based on more than mere speculation, conjecture, or fantasy." *O.S.C. Corp. v. Apple Computer, Inc.,* 792 F.2d 1464, 1466-1467 (9th Cir. 1986), quoting *Barnes v. Arden Mayfair, Inc.,* 759 F.2d 676, 681 (9th Cir. 1985).

III.     THE DEFENDANT OFFICERS UNREASONABLY SHOT MARIO WOODS WHEN HE STEPPED AWAY FROM DEFENDANT AUGUST

**A. The Legal Standard for Excessive Force Claims**

The Ninth Circuit has stated that summary judgment in excessive force cases should be granted sparingly, as the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom. *Smith v. City of Hemet,* 394 F.3d 689, 701 (9th Cir. 2005).

In evaluating a Fourth Amendment claim of excessive force, courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor,* 490 U.S. 386, 397 (1989).  This inquiry "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Id.* at 396 (quoting *Tennessee v. Garner,* 471 U.S. 1, 8 (1985)). The Ninth Circuit applies a three-step process to determine reasonableness in use-of-force cases.  *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011).  First, the court must "assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'"  *Id.*  (quoting *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 532 (9th Cir. 2010)). Even when an officer may have been justified in using some force, "the amount [of force] actually used may be excessive." *Id.* (quoting *Santos v. Gates*, 287 F.3d at 853).

Second, the court must evaluate the government's interest in the use of force under the totality of the circumstances. *Glenn, supra*, 673 F.3d at 871 (citing *Graham*, 490 U.S. at 396). In G*raham*, the Supreme Court noted that courts should consider such factors as (1) whether the suspect posed an immediate threat to the safety of the officer or others; (2) the severity of the crime at issue; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. In addition to the *Graham* factors, the Ninth Circuit considers the availability of less intrusive alternatives to the force employed, whether proper warnings were given, and whether it should have been apparent to officers that the person they used force against was emotionally disturbed, as additional factors in its analysis. *See, e.g. Deorle v. Rutherford,* 272 F.3d 1272, 1282-83 (2001). The Ninth Circuit "examines the totality of the circumstances and considers 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham.*'" *Bryan v. MacPherson,* 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v. Foxworth,* 31 F.3d 873, 876 (9th Cir. 1994)).

Finally, the court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Glenn*, 673 F.3d at 871 (quoting *Miller v. Clark Cnty*., 340 F.3d 959, 964 (9th Cir. 2003)). In applying this test, the court must keep in mind the perspective of a reasonable officer on the scene and recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. The Supreme Court has cautioned against use of the "20/20 vision of hindsight" in evaluating the circumstances facing the officer at the time of the shooting. *Id*. at 396. However, the Ninth Circuit has also cautioned that "the prohibition against evaluating officers' actions 'with 20/20 vision of hindsight' cuts both ways" and that in evaluating those circumstances facing an officer, they cannot rely on evidence that the officers were not then aware. *Glenn*, 673 F.3d at 873, fn. 8.

### a.   The Officers Used Excessive Force When They Shot Mario Woods Because He Was Not An Imminent Threat to the Officers or Anyone Else

The intrusion of Mr. Woods' constitutional rights was the most severe possible – the Defendant Officers shot Mr. Woods twenty-two times leaving him mangled and lifeless. The remaining steps are

disputed and will be determinative of whether the government's use of deadly force at the time the Defendant officers opened fire was reasonable.

The immediacy of the threat posed by the suspect is the most important factor in considering the reasonableness of the force. *Mattos v. Agarano,* 661 F.3d 433, 441 (9th Cir.2011) (en banc). Deadly force is not automatically reasonable because a suspect is in possession of a potentially deadly weapon. *Glenn, supra* at 871. Otherwise, the fact that a person was armed would always end the inquiry. *Blanford v. Sacramento Cnty.,* 406 F.3d 1110, 1115 (9th Cir.2005).

Ultimately, the analysis can be consolidated into one question: with all the reasonable inferences of disputed and undisputed facts construed in the favor of Plaintiff, would a reasonable jury still **necessarily** find that a reasonable officer, in each of the Defendant's place, would have perceived an immediate threat of death or serious physical injury at the time each Defendant Officer shot Mario Woods?

The answer is no, because a jury could reasonably conclude from simply watching videos of the incident that Mr. Woods did not pose an imminent threat. The video proves that although Mr. Woods had a knife, he never got closer than approximately ten feet to anyone and indisputably had it closely held against his side throughout the incident and at the time Defendants shot him. A jury can also reasonably conclude Mr. Woods stepped away, not towards, Defendant August when Defendant August opened fire. See Rivera Video at 1:10-1:12. In fact, all of the Defendant officers testified that they did **not** see Mr. Woods lunge at Defendant August.

Defendants rely on inapposite cases involving suspects armed with a knife where the court found the use of force reasonable. However, in each of these cases the suspect is either verbally threatening the officers, actively swinging the knife at officers, or trying to disarm an officer: **(1)** *Hayes v. City of San Diego*, 736 F.3d 1223, 1234 (9th Cir. 2013) (acknowledging "threatening an officer with a weapon does justify the use of deadly force."); **(2)** *Barber v. City of Santa Rosa*, 2010 WL 5069868 *6 (N.D.Cal. 2010) (holding shooting of mentally ill man armed with a butcher knife who verbally threatened Officers by yelling "slashing" multiple times and continued to advance towards the officers with the knife raised above his was reasonable); **(3)** *Billington v. Smith,* 292 F.3d 1177, 1185 (9th Cir. 2002) (suspect grappling for officer's gun posed immediate threat; **(4)** *Reynolds v. County*

*of San Diego*, 84 F.3d 1162, 1168 (9th Cir. 1996) (holding deadly force to be reasonable when suspect, behaving erratically, suddenly swung a switchblade at the officer who was standing right beside him); **(5)** *Pham v. City of San Jose*, 2013 WL 5443027, *7 (N.D. Cal. 2013) (granting summary judgment to officers who shot man from 6 to 8 feet away who had slit someone's throat, charged at them with a knife and ignored orders to drop knife); **(6)** *Garcia v. United States*, 826 F.2d 806, 812 (9th Cir. 1987) (holding deadly force to be reasonable when suspect attacked agent with a rock and stick); **(7)** *MacEachern v. City of Manhattan Beach*, 623 F.Supp.2d 1092, 1105 (C.D. Cal. 2009) (granting summary judgment to officer who fatally shot suspect who, having already jabbed the knife at an officer, continued to walk toward the officer with the knife); and **(8)** *Deng v. Loeffler*, 2011 WL 2792340 *2 (D. Nev. 2011) (suspect ran toward officer holding two knives above his head from 50 to 75 feet away; officer back peddled while issuing commands to drop the knives, the officer justifiably shot suspect once suspect was within 5 feet of officer and still holding both knives above his head); **(9)** *Blanford*, 406 F.3d at 1113 (suspect was wielding a sword in a public street, raised the sword at officers growling and roaring, then attempted to get into houses, possibly to take hostages).

Here, Mr. Woods did not verbally threaten the officers, or slash, jab or lunge at the officers. Instead, the knife stayed at Mr. Woods' side throughout the incident. Moreover, after several less-lethal rounds and a dose of pepper spray, Mr. Woods began to limp, dazed and disoriented, slowly northbound, with his head down. Defendant August, in violation of his training closed the distance between them quickly and silently. When Mr. Woods noticed Defendant August closing the gap, he stepped away from Defendant August and then the officers fired.

The instant situation is strikingly similar to *Glenn v. Washington Cnty.*, 673 F.3d 864 (9th Cir. 2011). In *Glenn*, the Ninth Circuit denied the Defendant officers' motion for summary judgment on an excessive force claim, to which officers were called to aid an intoxicated and suicidal individual. *Id.* at 880. In *Glenn*, like in Woods, Lukus held a knife and did not drop it despite several orders from officers. *Glenn,* supra at 873. Like Mr. Woods, Lukus did not threaten or attack any officers. *Id.*

The Ninth Circuit held that rather than immediately drawing their weapons and shouting commands and expletives at Lukus, which predictably escalated the situation instead of bringing it closer to a peaceful resolution, officers should have attempted the tactics of "persuasion" or

"questioning." *Id.* Similarly here, there is video evidence that Mr. Woods was pleading and trying to converse with officers. Furthermore, several officers noted that Woods seemed to be in an altered state and had made suicidal statements. Instead of talking with Woods, like in *Glenn*, the officers shot Mr. Woods with beanbag shotguns several times, then shot him to death shortly thereafter. *Id.*

In *Glenn,* the officers attempted to justify shooting eleven shots and thereby killing Lukus by arguing he posed a danger to his parents by continuing to hold the knife when he started moving towards his grandmother's house. *Id.* at 879.The Ninth Circuit held that contrary to officers' claims, bystanders were either behind officers, or inside the residence.  *Id.* at 873-74.  Similarly, here, the closest bystanders were over thirty feet away with several officers between them and Mr. Woods.

The *Glenn* Court the held that taking the facts in a light most favorable to the Plaintiffs under the totality of the circumstances, a genuine dispute of material fact remained as to whether Defendants' use of deadly force was objectively reasonable.  *Id.* at 880. Given the respective positions of the parties, as reflected in the record, this court should reach an identical conclusion.

### b.   Defendants Failed To Provide Mario Woods Any Warning Prior to Opening Fire And Failed To Utilize De-Escalation Techniques

The Ninth Circuit has recognized that an officer must give a warning before using deadly force "whenever practicable." *Gonzalez v City of Anaheim*, 747 F.3d 789, 794 quoting *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir.1997) (citing *Garner*, 471 U.S. at 11–12, 105 S.Ct. 1694).

 In *Gonzalez*, the 9th Circuit reversed summary judgment because an officer failed to provide a warning prior to opening fire in circumstances much more severe and uncertain than here. *Gonzalez v City of Anaheim*, 747 F.3d 789. Two Anaheim police officers approached Gonzalez during a traffic stop from either side of his minivan. *Id* at 792. An officer warned Gonzalez he would shoot him if he did not stop reaching down into the car. *Id.* Gonzalez stopped then reached again putting something in his mouth and attempting to drive away while reaching down. *Id.* One officer hit Gonzalez in the head while the other officer opened the minivan door. *Id.* Gonzalez hit the gas causing one officer to fall and the other officer to be trapped inside of the moving car. The officer yelled at Gonzalez to stop but he kept going. *Id.* When the officer tried to turn off the ignition Gonzalez swatted his hand. At that point, the officer drew his weapon and shot Gonzalez in the head.  *Id.* The Ninth Circuit held a

reasonable jury could conclude that if the car was slow-moving, then alternatives could have been used and the officer's failure to provide a warning prior to firing weighed against reasonableness. *Id.* at 797. Ultimately, the Ninth Circuit concluded that a reasonable jury *could* find in favor of the plaintiffs on this record, and reversed summary judgment. *Id.*

Here, Defendant August was the first to shoot Woods which prompted the other Defendant officers to open fire. Defendant August decided prior to opening fire that if Mr. Woods got within a certain distance he would open fire. The video showed that Mr. Woods was moving slow and it was Defendant August that was the closing distance between the two. Furthermore, a close viewing of Ruben Rivera's video shows that Defendant August was taking a step towards Mr. Woods and ***Mario Woods had taken a step away from Defendant August when Defendant August opened fire.***

In light of the foregoing, a reasonable juror could conclude that once Mr. Woods noticed Defendant August had gotten closer he was trying to avoid a confrontation by stepping away. His efforts were rewarded with two bullets and then twenty more. A reasonably jury could conclude that there were lesser alternative means available including talking to Mr. Woods, ordering him to stop or back up, and providing a warning prior to opening fire. In fact, even when Defense Counsel Hannawalt presented a similar, although biased, portrayal of this case with a person advancing on an officer to SFPD Use of Force Supervisor Steve Pomatto, much to the chagrin of Hannawalt, Pomatto explained the officer could reasonably retreat, maintain a safe distance and continue attempts to de-escalate and gain verbal compliance. **Pomatto Depo, 53.** This is because Officers are trained to create time and distance, to establish rapport with troubled persons, persuade them to drop their weapon and ultimately bring the incident to a peaceful resolution. However, here, Defendant August and his fellow Officers erased both time and distance and failed to utilize any of the other tactics they were taught to prevent this exact situation from occurring.

Bystander video shows that after the very first shot, Mr. Woods immediately fell over and ceased to be a threat. Inexcusably, the Defendants fired another 21 bullets into Mr. Woods as he was falling to and/or was laying on the ground. In fact, Defendant Phillips, Seto, Santos and Cuevas admitted they fired *after* they heard Defendant August open fire; for his own part, Defendant Santos admitted that he fired *because* he heard August shoot. A reasonable jury could therefore believe the

*only reason* Defendants Philips, Santos, Seto and Cuevas opened fire was because August opened fire and not because they independently felt Mr. Woods was an imminent threat. Indeed, Officer Ortiz, who also had his gun drawn and was standing in the semi-circle, did not fire his weapon. Based on this, a reasonable jury could conclude it was unreasonable for the other four Defendants to open fire as well.

IV.    THE DEFENDANT OFFICERS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Pearson v. Callahan,* 555 U.S. 223, 231 (2009). To determine whether a government official is entitled to qualified immunity, this court must conduct a two-part analysis. Government officials are denied qualified immunity only if: (1) the facts that a plaintiff has alleged or proved show a violation of a constitutional right; and (2) the right at issue was clearly established at the time of the defendant's alleged misconduct. *See id.* at 232. The court has discretion in deciding which of the two qualified immunity prongs should be addressed first. *See id.* at 242. The court continues to focus on the policy intentions driving the doctrine of qualified immunity which "balance[s] two important, competing interests: the need to hold public officials accountable for irresponsible actions, and the need to shield them from liability when they make reasonable mistakes." *Morales v. Fry*, --- F.3d ----, 2017 WL 4582732, at *4 (9th Cir. 2017). Thus, the body of law seeks to shield only officers when the undisputed record shows that defendant officers made 'reasonable mistakes', as opposed to 'irresponsible actions' such as those described in the present action. *Id.*

Here, there is a clear violation – At the time Defendant August opened fire, Mr. Woods was not actively threatening anyone with the knife or trying to provoke a confrontation. Mr. Woods merely possessed a knife and was moving away. Officers are trained that deadly force is only permissible if they perceive an imminent threat of serious bodily harm and/or death. However, Mr. Woods stepping away from Defendant August, as Defendant August stepped quickly toward him, gun pointed and predetermined to opening fire once Mr. Woods reached a certain point is a **clear violation** of Woods' Fourth Amendment right to be free from unreasonable force. *Glenn v. County of*

*Washington*, a closely analogous case, clearly put officers on notice that this conduct violates the constitution.

Defendants erroneously contend that *Kisela v. Hughes*, 138 S. Ct. 1148 (2018) controls this case, as it is both legally and factually distinguishable. In *Kisela*, the suspect (Hughes) was armed with a knife and within mere feet of her neighbor. In addition, there were no barriers between the suspect and her neighbor; however, there was a chain link fence separating Officers from the two which effectively prevented them from intervening. By contrast, the closest bystander to Mario Woods was over thirty feet away and there were dozens of officers on scene and a significant number of them stood between the public and Mr. Woods. Furthermore, Hughes was uninjured and appeared to be within striking distance. Here, Woods was clearly injured, slow-moving, not within striking distance and stepping into the wall to back away from Officer August when the Defendant Officers opened fire.

Furthermore, the *Kisela* Court pointed out that Kisela shot Hughes in 2010 and *Glenn* was decided in 2011. Therefore, Officer Kisela could not have been on notice that it was a clearly established violation since *Glenn* was decided after the Kisela's shooting. Here, Defendants shot and killed Mario Woods in 2015, four years after *Glenn*, and therefore the violation was clearly established.

V.     PLAINTIFF'S BANE ACT CLAIMS MUST PROCEED BECAUSE A REASONABLE JURY COULD CONCLUDE DEFENDANTS INTENDED TO VIOLATE MARIO WOODS' RIGHT TO BE FREE FROM UNREASONABLE SEIZURES

Civil Code section 52.1 (the "Bane Act") prohibits a person from using threats, intimidation, or coercion to interfere with another person's constitutional rights. In a claim under the Bane Act, the plaintiff must prove "interference with a legal right accompanied by a form of coercion." First, the Bane Act does not require the "threat, intimidation or coercion" element of the claim to be transactionally independent from the constitutional violation alleged, it can be one in the same. *Reese v. County of Sacramento,* 888 F.3d 1030, 1043 citing *Cornell v. City and County of San Francisco*, 225 Cal.Rptr.3d at 382–83. Second, the Bane Act requires a "a specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Id.*

Here a reasonable jury could conclude Defendants intended to violate Mario Woods' right to be free from unreasonable seizures as Defendant August was aggressive with Mr. Woods from the beginning of the incident. In fact, his own partner had to order him to "back up" when he was confronting Woods. Then, when Woods limped northbound along the wall, Defendant August did not backpedal with him, order him to stop, or warn him – instead he left the semicircle and his fellow officers, closed the distance between himself and Mr. Woods and shot him without warning just as Mr. Woods stepped away from him. A reasonable jury could conclude from this conduct that Defendant August had a specific intent to violate Woods' constitutional rights. Furthermore, a reasonable jury could also conclude that the other Defendant officers' shots were gratuitous and only intended to kill Mr. Woods and deprive him of his constitutional rights, not to stop an immediate threat.

VI.    BASED ON THE TOTALITY OF THE CIRCUMSTANCES THE DEFENDANT OFFICERS VIOLATED THEIR DUTY OF CARE OWED TO MARIO WOODS

Plaintiff asserts direct liability against the Defendant Officers and against Defendant City under a theory of respondeat superior for wrongful death. Under California law, public employees "are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions, subject to the same defenses available to private persons." Hayes v. County of San Diego, 57 Cal.4 th 622 (2013); see also Cal. Gov. Code § 820. In addition, "public entities are generally liable for injuries caused by the negligence of their employees acting within the scope of their employment." Id.; see also Cal. Gov. Code § 815.2. "The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages" suffered by the heirs. Quiroz v. Seventh Ave. Center, 140 Cal.App.4th 1256, 1264 (2006).

The California Supreme Court has long held that "an officer's lack of due care can give rise to negligence liability for the intentional shooting death of a suspect." Munoz v. Olin, 24 Cal.3d 629, 634 (1979) (citing Grudt v. City of Los Angeles, 2 Cal.3d 575, 587 (1970)).

In this context, to prove the tort, a plaintiff must show that the officer violated his "duty to use reasonable force under the totality of the circumstances." See Brown v. Ransweiler, 171 Cal.App.4th 516, 526, fn.10 (2009). Importantly, the California Supreme Court recently reaffirmed long-standing

precedent that when an officer's pre-shooting conduct did not cause the plaintiff any injury independent of the injury resulting from the shooting, negligence "liability can arise if the tactical conduct and decisions leading up to the use of deadly force *show*, as part of the totality of circumstances, that the use of deadly force was unreasonable." *Hayes,* 57 Cal.4th at 632. "In short, California recognizes that peace officers have a duty to act reasonably when using deadly force, and reasonableness is determined in light of the totality of the circumstances, including consideration of tactical and preshooting actions." *Young Han v City of Folsom*, 695 Fed.Appx. 197, 198 (9th Cir. 2017).

Here, the Defendant Officers committed outright failures in their approach to Mario Woods. Although Mr. Woods stood still, huddled against a wall, in front of over a dozen officers for nearly a minute, there was no communication amongst the officers en route or on scene, no efforts to clear bystanders from the street. Defendant Phillips admitted the semi-circle of officers itself was not coordinated amongst the officers and its purpose was not for containment. Instead, it happened incidentally.

Officers Thompson, Defendant Seto and Defendant August all heard Mario Woods make suicidal statements, but did not communicate this fact to any of their fellow officers. Officer Thompson who stayed on his radio arguably narrating the incident failed to communicate this important fact to arriving officers. Instead, he escalated the situation when he misrepresented to responding officers that Mr. Woods was "charging" his partner – the video evidence clearly showed that this did not occur.

Officers are trained to recognize and treat someone in a mental crisis, differently. See DeFoe Report, 9-13. Officers are trained to employ de-escalation techniques, including not yelling frenzied orders but identifying a sole point of contact to talk the person down. See *Young Han*, 695 Fed.Appx. 198 (finding material fact question based on police practice expert's evidence that officers' failed to use reasonable care under the totality of the circumstances under generally accepted police practices for dealing with someone they believed was a person of diminished capacity). At different points throughout the incident, Mr. Woods appeared to be pleading with

officers but none of the officers could establish a conversation because they were all yelling over one another in violation of their training.

Then, due to the shape of their semi-circle and the gap they created, Mr. Woods limped toward the gap and up the street toward the corner. Defendant August, in violation of his training, quickly closed the distance and opened fire on Mr. Woods as Mr. Woods took a step away from Defendant August's charge.

*Hayes* and *Grudt*, instruct that for purposes of "reasonable care" pursuant to state tort law, whether Defendant August committed negligent and/or tortious acts by improperly closing the distance between he and Mr. Woods, failed to attempt to establish rapport, try alternate methods or give any warning before shooting Mr. Woods as he stepped away is a determination for the trier of fact. Likewise, whether his fellow Defendant Officers committed negligence and/or tortious act by way of failing to establish a single officer to be the contact officer, coordinate a plan, wait for a sergeant to arrive, permit time for Woods to comply, forming adequate containment and then using deadly force because they heard August's gun shot and then continued to fire after it was obvious Woods was hit and falling to the ground is a determination for a jury to decide.

Several other courts that have interpreted *Hayes* have denied summary judgment when even a single question of fact exists. See *Dorger v. City of Napa*, No. 12-CV-00440-WHO, 2013 WL 5804544, at *9-10 (N.D. Cal. 2013) (denying summary judgment to the shooting officers when there was a genuine issue of material fact as to whether the decedent's hands were cuffed when he was shot); *Hesterberg v. United States*, No. 13-CV-01265-JSC, 2014 WL 5073716, at *19 (N.D. Cal. 2014) (finding "even if Cavallaro's pre-tasing conduct was reasonable—Cavallaro breached her duty of care to Hesterberg when she tased him, which…,was unreasonable under the totality of the circumstances."); *Brown v. City & Cnty. of San Francisco*, No. C 11-02162 LB, 2014 WL 1364931, at *17 (N.D. Cal. 2014) (denying summary judgment to supervising officer because "the disputed facts that allow the excessive force claims to go forward also allow the tort claims to go forward."); *Chien Van Bui v. City & Cnty. of San Francisco*, No. C 11-04189 LB, 2014 WL 3725843, at *15-16 (N.D. Cal. 2014) (same); *Mathews v. City of Oakland Police Dep't*, No. 12-CV-03235-JCS, 2013 WL 6057689, at *18 (N.D. Cal. 2013) (same).

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Despite Defendants representations, the *Hayes* Court makes it clear that it is erroneous to disallow a jury to determine whether an officers' shooting was negligent based on state tort analysis even though the shooting itself, when viewed in isolation, may be found reasonable for purposes of Fourth Amendment analysis. See *Hayes, supra*, 57 Cal.4th at 629-30.

Defendant Officer August failed to use best practices in approaching Mario Woods by failing to attempt to engage him in dialogue prior to rushing up to confront him, when the nearest bystander is over thirty-feet away, and not utilizing the passage of time when there was no emergency or reason not to, and placing himself in a tactically precarious position such that he created a threatening and compromising situation he then decided to shoot his way out of. See e.g., *Dorger v. City of Napa*, No. 12-CV-00440-WHO, 2013 WL 5804544, at *9-10 (N.D. Cal. 2013) (denying summary judgment to the primary planning officer that did not use actual force because "whether Hunter's preshooting conduct (*e.g.,* her plan to detain [decedent], including the presence of armed officers) played a role in negligently provoking a dangerous situation that resulted in the use of reasonable or unreasonable use of lethal force, is relevant under the totality of the circumstances test.")

Defendants erroneously cited to immunities under Penal Code Section 196, Government Code Section 821.6 and 820.6. Those immunities do not apply here. Penal Code section 196 immunity for justifiable homicide only applies if, indeed, the homicide is justifiable. "The test for determining whether a homicide was justifiable under Penal Code section 196 is whether the circumstances 'reasonably create[d] a fear of death or serious bodily harm to the officer or to another.'" *Martinez v. Cty. of Los Angeles*, 47 Cal. App. 4th 334, 349 (1996) (internal citation omitted)). Similarly, "[i]n actions involving claims under state law, an officer's use of deadly force is privileged as a matter of law if he reasonably fears for his safety or that of others in the area." *Reynolds v. Cty. of San Diego*, 858 F. Supp. 1064, 1074 (S.D. Cal. 1994), aff'd in part, remanded in part, 84 F.3d 1162 (9th Cir. 1996). For the same reasons that there are fact questions as to Plaintiff's Fourth Amendment claim, a reasonable jury could conclude that at the time officers opened fire Mr. Woods was not a threat, had not created a reasonable fear of death or serious bodily harm to Officer August or anyone else and that the Officers over-reacted. Therefore, the immunity cannot apply.

Government Code section 821.6 applies to conduct during the course of an investigation, not during an arrest. Defendants claim that California Government Code section 821.6 bars liability from Plaintiff's state law causes of action. However, the provision's principal function is to provide relief from malicious prosecution. See *Kayfetz v. California*, 156 Cal.App.3d 491 (1984). But the statute also "extends to actions taken in preparation for formal proceedings," including actions "incidental to the investigation of crimes." *Amylou R. v. County of Riverside*, 28 Cal.App.4th 1205 (1994). Even so, section 821.6, as it applies to police conduct, is limited to actions taken in the course or as a consequence of an investigation. See, e.g., *Phillips v. City of Fairfield*, 406 F.Supp.2d 1101, 1118 (2005). Here, the alleged tortious conduct occurred during an arrest, not an investigation.

Government Code section 820.6 provides that "[i]f a public employee acts in good faith, without malice, and under the apparent authority of an enactment that is unconstitutional, invalid or inapplicable, he is not liable for any injury caused thereby except to the extent that he would have been liable had the enactment been constitutional, valid, and applicable." Under this code section, a police officer is not civilly liable for enforcing an unconstitutional statute or regulation, if the enforcement is in good faith and without malice. *Lockyer v. City and County of San Francisco*, 33 Cal.4th 1055, 1097 (2004). An officer acts with malice if the officer violates the rights of a person either knowingly (i.e., intentionally) or with reckless disregard of those rights. *Harden v. San Francisco Bay Area Rapid Transit Dist.*, 215 Cal.App.3d 7, (1989).

This immunity does not apply either. Here, the Defendant Officers opened fire in clear reckless disregard of Mario Wood's Constitutional rights. Defendants opened fire on Mr. Woods when he was not an immediate threat to officers or anyone else. Therefore, the immunities in this section do not apply. Defendant August did not make a mistake when he silently and deliberately walked up to Mario Woods, who noticed him and took a step back, which was quickly followed by August opening fire. The rest of the Defendants opened fire too. However, they shot solely because they heard Defendant August's gun fire and not because they feared for themselves or anyone else all of which is a clear violation of Mr. Woods' constitutional rights.

## CONCLUSION

Based on the foregoing, this Court must deny Defendants' motion for summary judgment.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Dated: September 5, 2018                    **LAW OFFICES OF JOHN L. BURRIS**


                                            By: _/s/John L. Burris_

                                                 JOHN L. BURRIS
                                                 ADANTE D. POINTER
                                                 DEWITT M. LACY
                                                 MELISSA C. NOLD
                                                 PATRICK BUELNA
                                                 Attorneys for Plaintiff