# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

GWENDOLYN WOODS, individually)
and as Successor in Interest )
to Decedent MARIO WOODS,      )
                              )
              Plaintiff,      )
                              )
         vs.                  ) CASE NO.:  3:15-05666-WHO
                              )
CITY AND COUNTY OF            )
SAN FRANCISCO; a municipal    )
corporation, et al,           )
                              )
              Defendants.     )
_____)

CERTIFIED COPY

PMK DEPOSITION OF SERGEANT STEVEN POMATTO

WEDNESDAY, AUGUST 15, 2018

REPORTED BY:  KELLY L. MCKISSACK, CSR #13430

1

1        A.    Correct, two years later.

2        Q.    So you've been a sergeant for approximately

3    six years?

4        A.    Yes.

5        Q.    Would it be fair to say then that you became a

6    sergeant around, if I do my math right, around 2012?

7        A.    December 2012.

8        Q.    Okay.  Great.

9              And are you familiar with the use of force

10    policy 5.01?

11        A.    Yes.

12        Q.    And I'm going to give you an exhibit here.

13    Mark this as Exhibit 1.

14              (Whereupon, Plaintiff's Exhibit 1 was marked

15              for identification.)

16    BY MR. BUELNA:  Q.  All right.  Do you recognize what

17    this is?

18        A.    I do.

19        Q.    And what is this?

20        A.    Department bulletin from the San Francisco

21    Police Department.

22        Q.    And if you could just read the title for me.

23        A.    The title of the Department Bulletin 15-106 is

24    "Avoiding the Lawful but Awful 'Use of Force'".

25        Q.    And this was issued when?

                                                                12

1          A.   The date on the bulletin is April 27, 2015.

2          Q.   And are you familiar with this bulletin?

3          A.   I am.

4          Q.   And do you know -- sorry.   Strike that.

5               And do you know how the officers, the

6     defendant officers, were trained in regards to this

7     bulletin?

8          A.   The bulletin was drafted by Written Directions

9     under the direction of the individuals that signed it on

10    the bottom.   And it was distributed throughout the

11    department via e-mail, as it's a department, an A

12    bulletin.   You could see the "A" on the top right-hand

13    corner.   So it was distributed via e-mail.

14              And then we're obligated to read the document

15    and then sign off in a computer database called HRMS

16    that we acknowledge that we did read the bulletin and

17    then sign for it.   That's the extent of the training.

18         Q.   And by "we," you mean all of the officers that

19    are employed by San Francisco Police Department?

20         A.   Yes, sir.

21         Q.   And does every single officer in the

22    San Francisco Police Department receive a bulletin like

23    this and then they have to do what you just described?

24         A.   Yes, sir.   Well, "A" department bulletins.

25         Q.   How many -- so there's different categories,

13

DEPOSITION OF PMK SERGEANT STEVEN POMATTO

1    correct?

2         A.   Right, A, B and C.   So the A bulletins are all

3    distributed in that manner.   The B bulletins are

4    distributed in a different manner.   And the C in an even

5    different manner.   They're just put on a bulletin board

6    on our intranet.   And then we're -- we are just

7    obligated to read them.   But the A priority bulletins

8    you have to initial and sign for them.

9         Q.   So if I understand you correctly, this is an A

10   priority bulletin.   And you had to have initialed and

11   signed that you had read this and understood it?

12        A.   Yes, electronically.   Yes.

13        Q.   And what about the -- so if there's a B one,

14   what's the process for the B one?

15        A.   The B one is it's put on a intranet,

16   San Francisco Police Department intranet.   And it's just

17   listed in chronological order.   So the next bulletin

18   could be 15-107.   It could be a B.   And it's just on the

19   board and you read it at your leisure.   That would be

20   something like a job announcement or wash your cars here

21   instead of there.   That kind of a bulletin.

22        Q.   And what about bulletin type C or category C?

23        A.   C is like congratulations.   This person

24   retired.   Or, you know, Jim works at this office now

25   instead of that office.   So it's just kind of a

14

1   BY MR. BUELNA:   Q.   And you mentioned a particular

2   agency.   Which agency was that?

3        A.   I believe that the agency that was under DOJ

4   reform involuntarily was Oakland.   And it was after, I

5   forget the acronym.   I think it was the Night Riders or

6   that incident I think spearheaded the reform for that

7   agency.   And then to avoid that, local law enforcement

8   just all embraced the concept because it's a good

9   concept.

10        Q.   Now, you mentioned that there was -- you're

11   the use of force supervisor, correct?

12        A.   Yes.   It's a different title.   It's called

13   physical training and defensive tactics supervisor.

14        Q.   Are you the only physical training and

15   defensive -- can I call you use of force supervisor?

16        A.   Yes.   Yes.

17        Q.   Okay.   Are you the only use of force

18   supervisor in the San Francisco Police Department or are

19   there others?

20        A.   No.   I'm the only one.   I am the supervisor.

21   I have a group of six officers that work for me.

22        Q.   And what would their title be?

23        A.   Defensive tactics physical training or use of

24   force officers.   They're part of my training cadre,

25   instructors.

                                                          22

1       Q.   You're doing a good job.  And I'm just trying

2   to understand.  So would the use of force policy be --

3   it sort of principles to apply in these levels of force

4   be sort of ways to apply that principle?

5       A.   The use of force policy articulates the

6   standards behind the use of force, yes.  However -- and

7   then the use of force policy also dictates which force

8   option is appropriate for which level of resistance that

9   the person's occurring -- incurring.

10       Q.   Okay.  And with all that being said --

11       A.   Yes.

12       Q.   -- how, if at all, did this bulletin affect

13   the use of force policy or how you were training your

14   officers?  How is it supposed to affect an officer?

15       A.   So the Lawful but Awful bulletin itself didn't

16   really change policy.  What this bulletin -- I think

17   what the premise of this bulletin was, was just a

18   reminder of the philosophy and the reasonable standard

19   in the application of force.

20       It was just a reaffirmation for the department

21   to attempt to just use good judgment and to remind them

22   of the decision-making matrix, that I'm kind of

23   discussing.  That to use -- and it's clearly put out in

24   every use of force policy we've ever had to use the

25   human -- the lowest level of force to effect an arrest,

26

1    prevent escape, overcome resistance, defense of self,

2    defense of others, standard that we've kind of always

3    upheld.  So this was just basically kind of a

4    reaffirmation of that concept.

5         Q.   Well --

6         A.   If that makes sense.

7         Q.   No.  It does.  And I'm also just trying to

8    make sense of it.  So if you go to the second paragraph

9    where it says, "Department Bulletin 13-120 requires

10   officers to create time, distance, and establish a

11   rapport with people in crisis who are only a danger to

12   themselves."

13            What does that mean to create time, distance,

14   and establish a rapport with people in crisis?

15            MR. HANNAWALT:  Who are only a danger to

16   themselves.

17   BY MR. BUELNA:  Q.  Who are only in danger to

18   themselves.

19        A.   So if somebody obviously is only a danger to

20   themselves and not a danger to the public or to other,

21   an officer, then you put distance between you and the

22   subject, even perhaps items.  You create that time and

23   distance.  And you attempt the matrix that we talked

24   about before.  So as opposed to running up to someone in

25   crisis who might be armed, you stay back and effectively

27

1    try to communicate with them to get compliance before

2    you touch them.

3         Q.   And then the next sentence says, "Officers

4    should consider creating time, distance, and

5    establishing rapport as an alternative to using force in

6    every other circumstance; whenever it would be safe to

7    do so."

8              Is that the same idea?  Not even when people

9    are in crisis, but in every circumstance you should

10   consider using time, distance, and establishing a

11   rapport?

12        A.   Yes.

13        Q.   Whenever safe to do so?

14        A.   Whenever it is feasible.

15        Q.   Now, was that statement -- is that statement

16   in the general policy 5.01 use of force, or is it this

17   just kind of emphasizing that this should be going on?

18        A.   So yes.  It's in the policy, yes.

19        Q.   And this -- and so if I'm understanding how

20   you described the bulletin, it's really just trying to

21   bring to people's attention and emphasize that they

22   should be doing this?

23        A.   Yes.  And it's re-emphasizing something that's

24   been taught in law enforcement since I was taught that.

25   You know, it's a very simple concept.  As a law

28

1    enforcement officer you show up to an incident when

2    someone's in crisis.  And the first thing you do is get

3    out of the car.  You're in your uniform.  Somebody sees

4    you in your uniform from a distance, hopefully you get

5    compliance.  They just drop whatever they're doing.  Put

6    their hands up and say officer or something to that

7    officer.

8             If not, you give them a command.  Drop the

9    knife or X, Y, Z.  Or put your hands up, turn around,

10   face away.  Verbal compliance.  So if you get that

11   verbal compliance, then you go to that step.  Then the

12   next would be I have to actually walk up to you, put my

13   hands on you.  That's physical.

14             So the bulletin that you're -- or the

15   paragraph that you're referencing is exactly what we've

16   been taught in law enforcement from the inception.  Is

17   you start verbal.  And then, if feasible, escalate to

18   until you get that compliance that you need.

19        Q.   Before I move on I just want to focus up a

20   little bit on what you had mentioned before about the

21   levels and give you an example.  For example, if you

22   asked a person to stop or they should be stopping or

23   you've made your presence known, uniform presence, and

24   then begin walking in one direction, is one of the ways

25   of, you know, using force to put yourself -- block

29

DEPOSITION OF PMK SERGEANT STEVEN POMATTO

1    where we had left off.  It's "Critics of the referenced

2    'stabilize mindset' claim this strategy is not only too

3    lofty but is too risky for officers.  I disagree and

4    argue that conducting a thoughtful assessment of the

5    situation is not asking an officer to accept more risk."

6           What does the, quote, unquote, stabilize

7    mindset mean?

8           A.   I believe that the stabilize mindset is

9    creating time and distance.  Is to if you get a

10   semi-compliant subject who is verbally, excuse me,

11   verbally complying, you're in turn stabilizing the

12   situation.  So stabilizing the situation, if you're

13   getting compliance -- compliance may not be verbal

14   either.  It may just be physical.

15           So if you're, hypothetically, if I say, stop,

16   don't move, and you're taking a step to your left, but

17   then you're taking a step to your right, and then you're

18   taking a step to your left, I'm actually visually

19   getting compliance verbally.  So I wouldn't have to

20   escalate to cutting you off because you're not really --

21   so that's the definition of the stabilized mindset that

22   you're looking for.

23           But as soon as you start taking three or four

24   steps, then you're losing that compliance.  Then you

25   have to reevaluate very quickly and then make the

33

1     determination whether you need to divert or if you need

2     to -- hey, no.  No.  Don't go too far.  Stay here.  That

3     kind of a stabilization.  So that compliance is what is

4     most important in this kind of a situation here.

5               Time, distance, that kind of thing.  And then

6     that little minute compliance, if all that is aligning,

7     then the stabilization mindset -- I'm not in risk.  If I

8     take 10 minutes, 20 minutes, 30 minutes, 40 minutes,

9     then I'm not losing that stabilized mindset.  There it

10    is.  It's a defined terrain objective in a known

11    location.  So you're not -- everything's stable.

12              As soon as one factor changes in that

13    stabilized mindset, then the reevaluation process kicks

14    right in.  And that's when you have to move to cut off

15    somebody if they're progressing towards some other

16    factor, which would be -- and it falls back onto the --

17    so you're constantly doing that effect an arrest,

18    prevent escape, overcome resistance, defense of self,

19    defense of other reevaluation while you're attempting to

20    deescalate the situation.  So if one factor changes,

21    then you have to reevaluate that really quickly.  And

22    then you might have to change the stabilization mindset.

23         Q.   Could I ask you to say that -- so it's almost

24    like an acronym of EPOD, effect arrest.  What's the next

25    one?

                                                           34

1    Q.    Were these principles that you just said

2    something that were taught prior to you becoming the use

3    of force supervisor?

4    A.    This was something that was taught to me when

5    I was becoming a police officer in 2000.  So this is a

6    philosophy that's been in law enforcement for long

7    before I've even been a policeman.  It's a philosophy

8    that's pretty much existed -- I can't get the exact

9    date.  But I can tell you it's been around for at least

10   20 years that I've been a police officer.

11   Q.    Is it fair to say that the San Francisco

12   Police Department officers are trained this way?

13   A.    Yes.  This -- this acronym philosophy is a

14   POST, Police Officer Standardized Training, standard

15   by -- and it's set by California POST.

16   Q.    Now --

17   A.    To answer your question, yes.  It's a

18   philosophy that's been around for a long time.

19   Q.    Now, I'm going to move on to the bottom

20   paragraph.  We're about the middle way through.

21   "Assessing your options is the first step to ensuring

22   that you are moving in the most tactically sound way you

23   can in a given set of circumstances.  When an officer is

24   able to decrease his/her exposure to a threat by

25   creating time and distance, the officer will need less

36

1   force to overcome the decreased level of risk and

2   thereby increase his/her level of safety."

3          What does this mean by decreasing exposure of

4   threat by using time and distance?

5      A.   So if you're -- if I get out of the car and

6   I'm in my uniform and you're making contact with me, eye

7   contact, that's one step in compliance.  Then I tell

8   you, don't -- you know, stay where you are.  Put your

9   hands up.  So you stand right in one location like we

10  had discussed earlier and you put your hands up.

11         Let's just say, for example, you have some

12  kind of a weapon on you.  It doesn't even have to be in

13  your hands.  It could be in your waistband.  Now, I

14  might retreat behind a vehicle, an engine block.  And I

15  might continue -- I might put this table between us if

16  we are in here.  She was fighting us in the corner.  I

17  would stand over there in that corner and the table

18  would be between us.

19         Now, I might be effective in getting

20  compliance from her without actually coming around and

21  exposing myself person to person.  I can have -- I can

22  stand here and talk to you and the table is between us.

23  That is increasing my safety and yours by providing that

24  barrier.  It's going to be hard for you to get over the

25  table without me formulating a plan to counter that kind

                                                          37

1    of an action.  If there's no table, you can converge on

2    my quickly.  So that's that concept.

3          If I'm getting that little bit of compliance,

4    then I can put the tree between us.  I can put some kind

5    of a little bit more space, little bit more distance.

6    Like, oh, this is a really big guy.  And I can talk to

7    you and keep that.

8          So, like, if we're 20 feet apart, I can stay

9    20 feet away from you.  Even if you walk two steps

10   towards me, I can take two steps back.  If you take two

11   steps to the right, I can take two more steps to the

12   right.  I don't have to actually engage you until

13   sufficient help gets there.  Then sufficient help,

14   another car, another person, another car, another

15   person.  Then those are visual factors that will

16   decrease your, like, oh, wow.  There's a lot more help

17   here.  So I might get compliance.

18      Q.   Is it fair to say the best case scenario is

19   where you get verbal compliance?

20          MR. HANNAWALT:  Objection.  Vague.  Incomplete

21   hypothetical.

22          THE WITNESS:  Yes.

23          MR. HANNAWALT:  Argumentative.  Go ahead.

24          THE WITNESS:  Yes, obviously.  I mean, if I

25   converge onto a scene that's semi-critical or critical

38

1    and I say stop.  Police.  Drop whatever.  You throw it

2    away.  And I say, get down on your left knee.  Get down

3    on your right knee, and you do.  Put your hands behind

4    your back.  Interlace your fingers, and you do, that's

5    the perfect scenario.  I just walk up and put handcuffs

6    on you and it's done.

7    BY MR. BUELNA:  Q.  Given what you've described as using

8    time and distance, is it fair to say that the ideas to

9    use time and distance to allow yourself the time and the

10   distance to use a technique, such as verbal compliance,

11   give you more time to do that?

12             MR. HANNAWALT:  Objection.  Incomplete

13   hypothetical.  Argumentative.  Go ahead.

14             THE WITNESS:  Again, yes.  Verbal compliance

15   and time and distance deescalation is all the perfect

16   scenario.  However, when you -- there are quickly

17   unfolding incidents where you're constantly reevaluating

18   the situation.

19             And some -- so basically to summarize the

20   whole answer, it's -- it all falls back onto when it's

21   feasible.  If no one is in danger of serious injury or

22   death, if no one is trying to run away, if he's not

23   trying to, or she or he or the suspect is not trying to

24   evade or not trying to be apprehended or not trying to

25   actively resist or is threatening somebody else's life.

39

1    So it's kind of a -- it's kind of a fine line.  It's the

2    matrix.

3            You fall back under that same concept that I

4    had talked about before with the effect an arrest,

5    prevent escape, overcome resistance, defense of self,

6    defense of others.  So if I can actively get there and

7    none of those are falling in, you're not trying to

8    escape, you're not trying to hurt someone else, you're

9    not trying to hurt me, then I can fall back onto that

10   distance and compliance.

11           However, if you take four steps to the right

12   and now you're significantly closer to someone else who

13   could be injured by your actions, then the whole matrix

14   escalates itself.

15           So it kind of dictates -- mostly dictates --

16   that matrix is mostly dictated by, in my experience in

17   law enforcement, is the suspect's actions.  So if the

18   suspect's actions are not compliant, then you go in a

19   different direction.  If that makes --

20   BY MR. BUELNA:  Q.  Is it fair to say that if you're

21   closing time and distance, and by that getting closer,

22   which shortens time essentially to react, then you're

23   increasing exposure?

24           MR. HANNAWALT:  Objection.  Incomplete

25   hypothetical.  What are we doing here?  I mean, this is

40

1   a PMK depo on two categories.  Now you're asking him

2   just general use of force.

3            MR. BUELNA:  This is in here.  This is in

4   the -- in the bulletin.  This is creating time and

5   distance in literally reading basically from it.  And so

6   I think I'm entitled to ask about things that are inside

7   the bulletin.

8            MR. HANNAWALT:  You asked him -- you read from

9   the bulletin.  You asked him what it meant.  He

10  explained it.  And now you're asking him hypothetical

11  questions.

12           MR. BUELNA:  No.

13           MR. HANNAWALT:  Yes, you are.

14           MR. BUELNA:  Okay.  So you can make your

15  objections.  Okay.

16           MR. HANNAWALT:  Don't interrupt my objections.

17           MR. BUELNA:  Not speaking objections.

18           MR. HANNAWALT:  You don't interrupt my

19  objection.

20           MR. BUELNA:  But you're making speaking

21  objections.  So you can make your objection that can be

22  preserved later for the court.  But you're interrupting

23  the depo by just arguing.

24           MR. HANNAWALT:  Well, at some point we're just

25  going to leave because you're no longer -- we're not

41

1  here for the 30(b)(6) deposition.

2           MR. BUELNA:  This is a 30(b)(6) deposition.

3           MR. HANNAWALT:  No.  You're off topic.  And

4  you're asking --

5           MR. BUELNA:  We'll take it one by one.  We'll

6  take it one by one, question by question.

7           MR. HANNAWALT:  Okay.  So could you reread the

8  last question and objection.

9           (Whereupon, the question was read by the

10          court reporter.)

11          MR. HANNAWALT:  And the objection is it's

12  beyond the scope of the designation.  It's an incomplete

13  hypothetical.  And it's argumentative.  Go ahead.

14          THE WITNESS:  It would be -- I mean, it would

15  be a case-by-case basis, and it would be situational.  I

16  can give an instance where closing time and distance

17  could probably increase exposure.  However, you could

18  also argue that closing time and distance could also

19  increase the likelihood of compliance.

20          An example I could give is, if you're 10 feet

21  away and I'm close to 6 feet away, then you could -- a

22  suspect could actually interpret that as, okay, he's

23  serious.  I need to comply now.  And it depends upon

24  your demeanor.  There's a whole bunch of other factors,

25  obviously.  But it also could increase my exposure to,

42

1    They did not get that.  Resort to the baton.  They did

2    not get compliance there.  It's not saying that the

3    situation couldn't be stabilized with additional use of

4    those tactics, which would be uniform presence, verbal

5    control and baton.

6           However, the suspect's actions would dictate

7    the stabilization of that scene.  If the subject was to

8    maintain a certain position and not effectively

9    violate -- or basically it goes back to the mindset that

10   I was talking about with the effecting an arrest,

11   preventing escape, overcoming resistance, defense of

12   self or defense of others.  They didn't violate that --

13   not violate, but kind of go into that -- any of those

14   issues to say that an officer couldn't continuously use

15   the baton to try to gain that compliance, you might get

16   a minimal bit of stabilization at that tool.

17          However, if you did -- if the suspect's

18   actions dictated a further level of resistance going

19   from that intermediate level to a deadly or threatening,

20   then you could escalate in either direction.

21       Q.  So I want you to assume that officers have

22   contacted a stabbing subject.  He's produced a knife.

23   He's refused orders to drop the knife.  Who has been

24   ordered onto the ground and has refused to get on the

25   ground.  Has been ordered to drop the knife and warned

                                                      50

1    that he would be shot with less lethal or warned that

2    he'd be shot if he didn't drop the knife.  He continues

3    not to drop the knife.  He's hit with an extended-range

4    baton four times.  He's not dropped the knife.  The

5    officers are standing between the suspect and members of

6    the public who are on the sidewalk behind the officers

7    some distance, perhaps 20 to 50 feet.

8              The officers have guns drawn and pointed at

9    the suspect at a distance ranging between 10 and

10   15 feet.  And the suspect then begins to walk toward

11   the -- in a northerly direction or toward the group of

12   officers, is that situation stable?

13             MR. BUELNA:  Objection.  Talk about long, long

14   hypothetical.  Lots of facts.  Mischaracterization of

15   facts.  Argumentative.  And the same objections --

16             MR. HANNAWALT:  What's your objection?

17             MR. BUELNA:  I'm making all the objections.  I

18   let you make a five-, ten-minute objection.  So give me

19   the same amount.

20             Improper.  Outside the scope of what was

21   testified to before, what's testified to now.  And

22   essentially trying to have him read the lawsuit and then

23   make an opinion.  But other than that, vague.

24   Ambiguous.  Compound.  Incomprehensible.  Argumentative.

25

DEPOSITION OF PMK SERGEANT STEVEN POMATTO

1    BY MR. HANNAWALT:   Q.   Do you understand the question?

2         A.   I do.

3         Q.   Okay.

4         A.   So even if the situation was minimally

5    stabilized and there was an officer in the path of the

6    suspect and the public, or even just himself, if the

7    suspect was to advance towards the public or the officer

8    or he couldn't retreat even further or in defense of the

9    public, if he had to escalate, then the situation would

10   not be stabilized if the suspect was to advance pretty

11   much in any direction that an officer was between he and

12   the public.

13        Q.   So by advancing in the direction of officers

14   the stabbing suspect is destabilizing the situation?

15             MR. BUELNA:   Objection.   Mischaracterizes the

16   witness' testimony.   Incomplete hypothetical.   Assumes

17   facts not in evidence.   Vague and ambiguous.   Compound.

18             THE WITNESS:   I would say -- can I answer it

19   now?

20             MR. BUELNA:   Yeah.

21             THE WITNESS:   I would say yes.   If the suspect

22   was to advance towards an officer who was defending the

23   public, who was preventing escape, or in defense of

24   himself, it would be the suspect's actions of advance

25   that would escalate that from minimally stabilized to

52

1     not a stable situation.

2              Now, if the suspect was to advance in a

3     direction where the officer could retreat with the

4     suspect, perhaps keep that distance without jeopardizing

5     the safety of the public or allowing an escape route,

6     then you could probably maintain that stabilization.

7     However, it would be all situational.

8     BY MR. HANNAWALT:  Q.  And in that situation can you

9     explain how officers are trained with regard to Penal

10    Code 835 concerning their duty to arrest suspected

11    felons?

12         A.   An officer is trained to effect that arrest,

13    prevent that escape, overcome that resistance, to defend

14    themselves and defend the public.  And they do not have

15    a duty to retreat.  They actually have an obligation to

16    stand their ground and defend the public.

17             MR. HANNAWALT:  Okay.  That's all the

18    questions I have.

19             MR. BUELNA:  That's it.  Okay.

20             THE COURT REPORTER:  Would you like a

21    transcript?

22             MR. HANNAWALT:  Can we get an expedited

23    transcript for Monday, August 20.

24             (Discussion off the record.)

25

53

DEPOSITION OF PMK SERGEANT STEVEN POMATTO

1    STATE OF CALIFORNIA              )

2                                     )  Ss.

3    COUNTY OF ALAMEDA                )

4

5            I hereby certify that the witness, Sgt. Steven
     Pomatto, in the foregoing deposition appeared before me,
6    Kelly McKissack, a Certified Shorthand Reporter and a
     disinterested person.

7
             Said witness was then and there at the time
8    and place previously stated by me placed under oath to
     tell the truth, the whole truth and nothing but the
9    truth in the testimony given on the date of the within
     deposition; that the deposition is a true record of the
10   witness' testimony as reported by me.

11           The testimony of the witness and all questions
     and remarks requested by Counsel was reported under my
12   direction and control, caused to be transcribed into
     typewritten form by means of Computer-Aided
13   Transcription.

14           I am a Certified Shorthand Reporter licensed
     by the State of California, and I further certify that I
15   am not interested in the outcome of the said action, nor
     connected with, nor related to any of the parties in
16   said action, nor to their respective counsel.  I am not
     of counsel or attorney for either or any of the parties
17   to the case named in the within caption.

18           IN WITNESS WHEREOF, I have hereunto affixed my
     signature this 20th day of August, 2018.

19

20

21    _/s/Kelly McKissack_____

22   Kelly McKissack
     Certified Shorthand Reporter
23   California License No. 13430

24                        --oOo--

25

56