# EXHIBIT 5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GWENDOLYN WOODS, individually and as Successor in Interest to Decedent MARIO WOODS,

Plaintiff,

vs. Case No. 15-cv-05666 WHO

CITY AND COUNTY OF SAN FRANCISCO; a municipal corporation; CHARLES AUGUST, Police Officer for the City and County of San Francisco, NICHOLAS CUEVAS, Police Officer for the City and County of San Francisco; WINSON SETO, Police Officer for the City and County of San Francisco; ANTONIO SANTOS, Police Officer for the City and County of San Francisco; SCOTT PHILLIPS, Police Officer for the City and County of San Francisco; and DOES 1-50, individually and in their official capacities as Police Officers for the City and County of San Francisco, inclusive,

Defendants.

______________________________/

VIDEOTAPED DEPOSITION OF MARCEL SHEPARD-GARDNER

Volume II (Pages 95 - 227)

Wednesday, December 7, 2016

Reported by: Patricia Rosinski, CSR #4555

BONNIE WAGNER & ASSOCIATES
1819 Polk Street, Suite 446
San Francisco, California 94109
(415) 982-4849

APPEARANCES

FOR THE PLAINTIFF:

LAW OFFICES OF JOHN L. BURRIS
By: DeWITT M. LACY
Attorney at Law
Airport Corporate Center
7677 Oakport Street, Suite 1120
Oakland, California 94621
(510) 839-5200
dewitt.lacy@johnburrislaw.com

FOR THE DEFENDANTS:

CITY AND COUNTY OF SAN FRANCISCO
OFFICE OF THE CITY ATTORNEY
By: SEAN CONNOLLY
Deputy City Attorney
Fox Plaza
1390 Market Street, Seventh Floor
San Francisco, California 94102
(415) 554-3800
sean.connolly@sfgov.org

FOR THE DEPONENT MARCEL SHEPARD-GARDNER:

BAYVIEW HUNTERS POINT COMMUNITY LEGAL
By: HILARY HAMMELL
Attorney at Law
GENEVIEVE GUERTIN
Attorney at Law
4622 3rd Street
San Francisco, California 94124
(415) 854-6577
hilary@bhpcommunitylegal.org

And there also being present:
Officer Charles August
Officer Winson Seto
Larry Cossar, Videographer

INDEX OF EXAMINATIONS

| EXAMINATION BY | PAGE |
|---|---|
| MR. LACY | 102 |
| MR. CONNOLLY | 186 |

INDEX OF EXHIBITS

| PLAINTIFF'S EXHIBITS MARKED | | PAGE |
|---|---|---|
| EXHIBIT 6 | Transcript of Audio Recording of Marcel Shepard-Gardner December 2, 2015 (33 pages) | 178 |
| EXHIBIT 7 | Hand-drawn diagram (1 page) | 185 |

INDEX (continued)

| QUESTIONS INSTRUCTED NOT TO ANSWER | PAGE | LINE |
|---|---|---|
| Okay. How did you make it for four months without having a job? How did you make it? | 132 | 18 |
| Did you sell drugs? | 133 | 12 |
| Did you sell drugs on more than one occasion? | 133 | 16 |
| Did you sell marijuana? | 133 | 23 |
| Did you sell any meth? | 134 | 2 |
| Did you sell crack? | 134 | 6 |
| In December of 2015, were you selling drugs at that time? | 134 | 9 |
| Okay. When you got in the car with these girls, were you guys doing drugs? | 135 | 2 |
| Were you getting high? | 140 | 6 |
| Is it because you were high? | 173 | 1 |
| Did you have any drugs on you at that time? | 173 | 4 |
| Before we left off, we were talking about whether or not you had taken any drugs when you were sitting in the car on December 2nd of 2015. And by "drugs," I meant illicit drugs. Okay? Marijuana. Cocaine. Crack. Meth. Any pills. Amphetamines. | 176 | 13 |
| And the question was whether or not you had seen any of these girls do anything like that. | 177 | 2 |

---oOo---

BE IT REMEMBERED that, pursuant to Notice of Taking Deposition, and on Wednesday, December 7, 2016, commencing at the hour of 10:17 a.m., thereof, at the San Francisco City Attorney's Office, Fox Plaza, 1390 Market Street, 7th Floor, San Francisco, California, before me, PATRICIA ROSINSKI, CSR No. 4555, a Certified Shorthand Reporter in and for the State of California, there personally appeared

MARCEL SHEPARD-GARDNER,

produced as a witness in the above-entitled action, who being by me first duly sworn, was thereupon examined as a witness in said action.

Electronically signed by Patricia Rosinski (501-003-893-3227)
86b7407b-163f-463e-a8e7-48a3c888f773

Page 100

WEDNESDAY, DECEMBER 7, 2016 10:17 a.m.

SAN FRANCISCO, CALIFORNIA

---oOo---

PROCEEDINGS

THE VIDEOGRAPHER: Today is December 7th, 2016. The time on the monitor is 10:17 a.m.

This is Tape 1 and Volume II in the deposition of Marcel Shepard-Gardner, in the U.S. District Court, Northern District of California, in the matter of Gwendolyn Woods versus the City and County of San Francisco. Case No. 15-cv-05666 WHO.

We are at the offices of the San Francisco City Attorney at 1390 Market Street in San Francisco.

The deposition was noticed by the plaintiff Dwight [sic] Lacy.

My name is Larry Cossar. I'm contracted by Legal Videos in San Rafael, California. Today's court reporter is Patty Rosinski, working for Bonnie Wagner & Associates.

At this time, I'd like all persons present, except for the witness and the court reporter, to introduce themselves for the record. State your name, the firm you're working for, and whom you're representing in this matter, starting from my right, please.

Page 101

MR. LACY: DeWitt Lacy, from the Law Offices of John Burris for the Plaintiff, Gwendolyn Woods.

THE VIDEOGRAPHER: You guys can...

OFFICER SETO: All right. Officer Winson Seto, San Francisco Police Department.

OFFICER AUGUST: Officer Charles August, San Francisco Police Department.

MR. CONNOLLY: Sean Connolly, Deputy City Attorney, on behalf of defendants.

And small correction to your introduction. This is -- the deposition was noticed by defendants and was bifurcated after part one. So we're continuing with part two today.

THE VIDEOGRAPHER: Thank you.

MS. GUERTIN: I'm Genevieve Guertin with Bayview Hunters Point Community Legal on behalf of the witness.

MS. HAMMELL: Hilary Hammell with Bayview Hunters Point Community Legal representing the witness.

THE VIDEOGRAPHER: Thank you. Would the court reporter please swear in the witness.

MARCEL SHEPARD-GARDNER,
a witness having been duly
sworn, testified as follows:

///

Page 102

EXAMINATION BY MR. LACY

MR. LACY: Q. Good morning, Mr. Gardner -- Mr. Shepard-Gardner.

A. Good morning.

Q. Okay.

(Overlapping speakers.)

MR. LACY: Q. Can I call you "Mr. Gardner" for short? I mean, to --

A. Yeah.

Q. -- speed up things.

A. Yeah.

Q. Okay?

The last time you were here, your deposition was being taken -- that means the questions were being asked -- by the city attorney. Today I'm going to be asking you some questions, and I would imagine that the city attorney is going to have some follow-up questions afterwards. Okay?

A. Okay.

Q. I know that the city attorney gave you some admonitions -- that is to say, how these depositions work -- last time, you know. So kind of rules of the road. Do you recall those?

A. Yes.

Q. Most importantly, understand that you are still

Page 103

under oath. Okay? The oath that you took last time and that you took today is the same. It carries with it the same penalties of perjury. Okay?

A. (The deponent nodded.)

Q. And possibly incrimination. All right?

A. (The deponent nodded.)

Q. It is an oath and sworn testimony. Okay?

A. (The deponent nodded.)

Q. Is that a "yes"?

A. Yes.

Q. Okay. I don't mean to be difficult with you. As you know, although this is being video-recorded, most of the time we use the transcript for the record. Okay? And officially that's what we use. And that is to say, only what's written on this record is what is going to go before the judge at any time if need be. Okay?

A. (The deponent nodded.)

Q. So when I push you for a response other than a nod of the head, although it might be captured on video, it's not necessarily going to be captured well on the written record. Okay?

A. Got it.

Q. So I'm not being rude. You know, I'm not trying to be funny or anything like that. I just want to make sure we get a clear answer. All right?

Electronically signed by Patricia Rosinski (501-003-893-3227) 86b7407b-163f-463e-a8e7-48a3c888f773

10:20:44 A. Understood.
10:20:44 Q. I want to make sure you understand me, and I want to make sure I understand you. Is that fair?
10:20:49 A. Fair.
10:20:49 Q. Again, if you need to take a break at any time to talk with your counsel, to use the restroom, for whatever reason, just let me know. That's fine. Let's take a break. Okay?
10:20:59 A. Gotcha.
10:21:00 Q. Just I would ask that if there's a question pending, that you would first answer the question before you take that break. Is that fair enough?
10:21:08 A. That's fair.
10:21:09 Q. Okay. The last time we talked -- or last time in your deposition, these officers that are sitting behind me were present. Do you recall that?
10:21:21 A. Yes.
10:21:21 Q. That is --
10:21:21 A. There was also another officer too as well.
10:21:23 Q. That's right.
10:21:24 Last time there was another officer in addition to these two; is that right?
10:21:27 A. Correct.
10:21:28 Q. They sat at the table with us; is that right?
10:21:30 A. Yes.

10:21:31 Q. For the entire deposition; is that fair?
10:21:34 A. Yes.
10:21:37 Q. Does that accurately portray how you remember it?
10:21:38 A. Yes.
10:21:39 Q. How did that make you feel?
10:21:41 A. I still kind of want to know why they're here in the first place, you know. So I was -- would kind of like that to be clarified for me today.
10:21:51 Q. Does it worry you or concern you that they're here?
10:21:55 A. Well, I just want to know what the purpose of them being here is and their presence, you know. Not -- nobody else that's involved with this case is actually here right now other than attorneys, and they're part of this case. So I was kind of just, you know, curious to why that is.
10:22:13 Q. Okay. Well, they certainly have a right to be here because they're defendants. They've been accused of wrongfully killing Mario Woods. Okay?
10:22:20 A. Okay.
10:22:21 Q. Why they chose to be here, I don't know. I'm sure that maybe their counsel will you tell you at some point.
10:22:27 I guess my question, though, is: Does it

10:22:35 concern you? I guess does it -- are you worried about the impact of them being here?
10:22:41 MR. CONNOLLY: Objection. Irrelevance. As you say, they have a right to be here, so their presence here is irrelevant.
10:22:47 MR. LACY: Q. Okay. Go ahead. And I'll tell you this: He might have objections from time to time. None of those objections that he says are going to prevent you from answering my question. Okay? It's really for the record --
10:22:58 MS. HAMMELL: Yeah.
10:22:58 MR. LACY: -- for the court.
10:23:02 MS. HAMMELL: You can answer unless I instruct you not to answer.
10:23:02 MR. LACY: Q. And for the court to consider sometime later.
10:23:05 Unless your counsel -- either one of your counsel give you instruction not to answer, let him make his objection, and then go ahead and answer. All right?
10:23:12 So I'll ask again: What is -- I'll ask this: What is the concern you have about them being here?
10:23:20 I know you said you want to know why. But I guess, is there any other way you can voice the concern that you have about them being present?
10:23:35 A. Not really concern. It's just -- you know,

10:23:36 like I said, I just want to know what's the -- you know, their main motivation for being here, you know, witnessing my -- witnessing my testimony is more -- so -- more so my concern and everything. It's not really a concern. It's just more curiosity more than anything.
10:23:52 Q. Have you ever met them before?
10:23:54 A. Not -- I can't say that I have.
10:23:55 Q. Have they ever spoken to you before?
10:23:59 A. No.
10:24:01 Q. Do you know if they had anything to do specifically with you getting the job that you have now?
10:24:06 A. No.
10:24:10 Q. You know that they are -- this lawsuit is about the death of Mario Woods and the part that these two gentlemen behind me played in it. You understand that?
10:24:22 A. Yes.
10:24:22 Q. You understand what happened to Mario Woods?
10:24:24 A. Yes.
10:24:25 Q. What do you understand happened to him?
10:24:27 MR. CONNOLLY: Objection. It calls for speculation.
10:24:30 THE WITNESS: From what I seen on video, they -- Mario Woods was gunned down.
10:24:43 MR. LACY: Q. When you say "gunned down," you

Electronically signed by Patricia Rosinski (501-003-893-3227)
86b7407b-163f-463e-a8e7-48a3c888f773

Page 108

10:24:47 mean shot, right?
10:24:48 A. Yeah.
10:24:51 Q. It seems like it's bothering you to talk about that; is that fair to say?
10:24:57 A. I necessarily don't like talking about that whole -- just the whole incident altogether because it's just like a -- it's like a sore. It's -- it's like a sore issue -- like a -- it's kind of, like, something I've been trying to get over, like, for the last year, but it's kind of, like, I've been kind of forced to keep talking about it. And it kind of just -- it brings on a lot of anxiety to talk about it, really.
10:25:21 Q. Okay. Does the presence of these officers increase your anxiety any?
10:25:26 A. At first they did a little bit, just because of the unknowingness of -- you know, just because of the whole -- this whole situation and everything. But I -- after talking to my counsel and everything about it, just --
10:25:46 MS. HAMMELL: I'm going object. Sorry. Don't talk about things that you talked about with me. It's privileged.
10:25:52 THE WITNESS: Oh --
10:25:52 MS. HAMMELL: Attorney-client privilege.
10:25:52 THE WITNESS: -- well, not saying it like that,

Page 109

10:25:54 but just I kind of voiced my concern to her about --
10:25:57 MS. HAMMELL: Objection. Don't talk about things that you and I --
10:25:58 THE WITNESS: Okay.
10:26:00 MS. HAMMELL: -- discussed.
10:26:00 THE WITNESS: Okay. I won't. I guess I can't talk about that and so...
10:26:08 MR. LACY: Q. No, I don't want you to --
10:26:08 MS. HAMMELL: Is there a way you can phrase the question so he can answer?
10:26:12 MR. LACY: Sure.
10:26:12 Q. And maybe -- go ahead.
10:26:15 MS. HAMMELL: You can answer. Just don't talk about anything that we discussed together.
10:26:20 THE WITNESS: Okay.
10:26:21 MR. LACY: Q. And that's true. I don't want to hear about any of the conversation you had with your attorney. Okay?
10:26:27 A. (The deponent nodded.)
10:26:31 Q. You said last time you noticed that there were three officers.
10:26:38 Did the number of officers sitting around the table bother you or concern you then?
10:26:44 MR. CONNOLLY: Objection. Irrelevant.
10:26:47 THE WITNESS: I can just say it made me uneasy.

Page 110

10:26:51 MR. LACY: Q. Did it have anything to do with the fact that these officers work in this city?
10:27:05 MR. CONNOLLY: Objection. Irrelevant.
10:27:07 THE WITNESS: I wouldn't say it had anything to do with the city, no.
10:27:10 MR. LACY: Q. Did it have anything to do with the fact that you saw these officers gun down, as you said, Mario Woods on video?
10:27:18 MR. CONNOLLY: Objection. It calls for speculation. Argumentative.
10:27:21 THE WITNESS: It kind of does. It does bother [sic], you know, a little bit, but there's nothing I can really do about that.
10:27:34 MR. LACY: Q. Do you fear that your safety might be in jeopardy?
10:27:44 A. At the moment, no.
10:27:46 Q. Do you fear that at some other time after today your safety could be in jeopardy from these officers?
10:27:51 A. No.
10:27:53 MR. CONNOLLY: Objection. Irrelevant.
10:27:54 THE WITNESS: I don't think so. No.
10:27:55 MR. LACY: Q. Have you ever been threatened by any law enforcement officers?
10:28:02 A. At all?
10:28:04 Q. To participate in this --

Page 111

10:28:05 A. Oh, no.
10:28:07 Q. Have you ever been asked by any officers to give a statement about this incident?
10:28:28 A. I was -- at the beginning, I asked [sic] to give a statement, yes.
10:28:31 Q. Okay. Did you know that to be a San Francisco Police Department officer?
10:28:39 A. From my memory, I thought it was a sheriff.
10:28:43 Q. Okay. Did you know there to be any San Francisco Police Department officers who asked you to give a statement after your conversation with the sheriff?
10:28:56 A. Yes.
10:28:58 Q. Do you have the -- do you remember or recall the names of those officers?
10:29:02 A. No, not -- not -- no.
10:29:04 Q. What led you to believe they were San Francisco Police Department officers?
10:29:09 A. Because sheriffs wear beige and green uniforms. SFPD wear all blue.
10:29:18 Q. Did they explain to you why they wanted you to give a statement?
10:29:30 A. They said for most incidents of stabbings and shootings, they usually get a statement from the victims.

Electronically signed by Patricia Rosinski (501-003-893-3227)
86b7407b-163f-463e-a8e7-48a3c888f773

Page 112

10:29:38 From what I remember, I thought I declined a
10:29:41 statement -- to give a statement about it and
10:29:45 everything.
10:29:45 Q. What do you mean?
10:29:46 A. Because I -- I necessarily didn't even want --
10:29:51 I didn't even want to talk about it. I just wanted to
10:29:53 just go home, just get stitched up and just go home.
10:29:56 And I just felt like I was kind of being just kind of,
10:30:00 like, held there against my will with just being forced
10:30:04 to, like, talk to officers or whatever about what
10:30:08 happened.
10:30:09 Q. What was it that made you feel like you were
10:30:12 being forced to talk to them?
10:30:14 A. Well, when you tell -- say that you don't want
10:30:17 to speak to somebody and then they kind of -- what's the
10:30:22 word? They're persistent about you talking and just
10:30:26 digging for details about stuff. That's what I mean.
10:30:29 Q. Okay. We'll get to the -- let's talk a little
10:30:40 separately about the two statements.
10:30:42 You said you remember first talking to what you
10:30:46 thought was a sheriff's deputy; is that right?
10:30:48 A. Correct.
10:30:49 Q. Was that at the hospital?
10:30:50 A. Yes.
10:30:52 Q. And that was -- you thought it was a sheriff's

Page 113

10:30:57 deputy because that person had on a brown uniform; is
10:31:01 that right?
10:31:01 A. Like the beige uniform with the green. The
10:31:04 kind that the sheriffs wear, yes.
10:31:06 Q. Did the person that was speaking with you
10:31:08 identify themselves as a sheriff's deputy?
10:31:11 A. I can't recall.
10:31:17 Q. Okay. Do you have a recollection of how long
10:31:23 you spoke to that person for?
10:31:25 A. For less than five minutes.
10:31:28 I was more agitated because it just felt like
10:31:36 the -- I don't know.
10:31:36 Q. Why were you agitated?
10:31:38 A. I just felt like the questions that I was being
10:31:42 asked weren't really, like, questions that had anything
10:31:45 to do with what was going on. More so to say it was
10:31:49 just kind of, like, trying to, like -- it was kind of,
10:31:55 like, they already had this idea of what could have
10:32:00 happened and whatever just because -- just off the area
10:32:04 I told them I was in.
10:32:08 Q. Okay. Do you remember who else was in the room
10:32:13 with you besides yourself and this person from the
10:32:16 sheriff's department?
10:32:17 A. Maybe the nurse that was attending to me at the
10:32:21 time, but I highly doubt that. I think that the officer

Page 114

10:32:25 may have asked her to step out.
10:32:27 But, you know, like I said, it was -- it's been
10:32:29 about a year. I can't remember everything detail for
10:32:32 detail.
10:32:33 Q. Sure.
10:32:35 Okay. All right. I want to talk a little bit
10:32:41 about your job. What do you do right now? Where do you
10:32:44 work?
10:32:44 A. I work for the San Francisco Public Utilities
10:32:48 Commission.
10:32:48 Q. What do you do there?
10:32:50 A. I am a public service aide for the ITS
10:32:54 department.
10:32:54 Q. What is the "ITS"?
10:32:57 A. Information technology services.
10:32:59 Q. Okay. You said a public service aide?
10:33:02 A. Yes.
10:33:02 Q. What does that mean?
10:33:04 A. It's a classification they call 9922. It's
10:33:12 a -- somewhat of a temporary -- a temporary position.
10:33:17 Q. When you say "somewhat," what do you mean?
10:33:19 A. It could -- because it can vary upon -- I guess
10:33:23 it's a couple of factors. From what I've been told, it
10:33:25 can either be varied off of the hours or it can go off
10:33:29 of a certain amount of hours or it can go off of years.

Page 115

10:33:35 Q. Okay. What are some of your responsibilities?
10:33:38 A. Handling calls, deploying equipment. Basic --
10:33:47 real basic stuff. Nothing real detailed or that you
10:33:54 would need like a very big skill set for.
10:33:57 Q. Okay. But how long have you been in this
10:34:02 particular position?
10:34:03 A. Since April.
10:34:05 Q. Of this year?
10:34:06 A. Yes.
10:34:11 Q. And the last time you spoke, you said you had
10:34:16 an understanding that this temporary assignment was
10:34:19 going to end soon; is that right?
10:34:21 A. Yes.
10:34:21 Q. By "soon," I mean in December.
10:34:23 A. Yes.
10:34:24 Q. Is that still what you understand?
10:34:25 A. Yes.
10:34:27 Q. So is that after -- at the end of this month,
10:34:29 your assignment ends?
10:34:30 A. Correct.
10:34:31 Q. Okay. Have you had any chance to talk with
10:34:34 anybody about that?
10:34:35 A. No one has talked to me about anything as far
10:34:41 as the -- since -- what -- what day was that? It was
10:34:46 sometime in -- since the day that my manager called me

Electronically signed by Patricia Rosinski (501-003-893-3227) 86b7407b-163f-463e-a8e7-48a3c888f773

Page 116

and told me that the date of my assignment was going to end, I haven't heard anything regarding any type of information regarding my job since.

Q. Okay. I want to talk a little bit about that.

You said there was a point in time where your manager called you and told you that your assignment was going to end; is that right?

A. Correct.

Q. When did that happen?

A. Like I had told Sean, it was literally the day after one of his associates that came and served me with the subpoena.

Q. One of Sean's associates?

A. Yes.

Q. Mr. -- and by "Sean," you mean Mr. Connolly?

A. Yes, Mr. Connolly's -- after Mr. Connolly kind of corrected me and told me that it -- it wasn't him that necessarily went out to serve with me for the paper. He said it was his colleagues and so...

Q. Got it.

So a day after somebody tried to serve you for -- to notice for this deposition, a subpoena for this deposition, your manager called and said, "Your assignment is going to be ending in December" --

(Overlapping speakers.)

Page 117

THE WITNESS: Yes.

MR. LACY: Q. -- is that correct?

Had you ever heard from your manager before about your assignment ending in December?

A. No. Originally what had happened was that the assignment was going to be timed out in October, but they had decided to say that I was going to be extended in another six months. So that'd mean that I would have been extended all the way out until April.

Q. When did they tell you that the assignment was going to be extended another six months?

A. Literally, I think it was around September or -- either early -- early or late September maybe. Yeah.

Q. And was that your manager who told you that?

A. That was actually Juliet Ellis, the assistant general manager of the PUC.

Q. Okay. Were you happy that the assignment got extended for another six months?

A. Yeah.

Q. You have a job for six more months?

A. Yes.

Q. You could take care of your family?

A. Yes.

Q. You have children, as I understand; is that right?

A. Two boys.

Q. How old?

A. Two and eight.

Q. They stay with you?

A. Currently not right now.

Q. Did they stay with you before you had this job?

A. No.

Q. You pay child support?

A. Yes.

Q. Since April?

A. Since April, yes.

Q. What about before then?

A. Before, no. My child support order was at -- with my first child was at zero. But after I took the job, I had a court appearance in April. They decided that -- to start charging me a child support amount for my child in Sacramento, and I've been paying that since -- since then.

Q. Okay. All right. Do both of your kids stay in Sacramento?

A. No, just one.

Q. The other one stays here with you?

A. The other one stays in Daly City with his mother.

Page 118

Page 119

Q. Okay.

A. But he goes to school out here in San Francisco.

Q. Okay. After your manager called you and said the assignment was going to end in December, you spoke last time a little bit and said that you felt that it might be because -- or it had -- it might have had something to do with your willingness to be here and participate in this deposition; is that right?

A. Yes.

Q. Why did you feel that?

A. It feels kind of coincidental that, you know, like I said, the day after this was done -- you know, that I was served, that all of a sudden the time that I was told that I was going to be getting extended to just all of a sudden just got shortened down without even -- without any cause.

Q. No explanation?

A. No, there was no explanation given to me as to why that decision was being made or anything like that. It was just -- just called and said, "Your time is -- your end date is going to be December 30th and to act according -- and to, you know, act accordingly."

Q. And what did -- what did that mean to you?

A. Umm. It just meant that, you know, my time was

Electronically signed by Patricia Rosinski (501-003-893-3227) 86b7407b-163f-463e-a8e7-48a3c888f773

Page 120

up and that I wasn't needed anymore or something. I don't know.

Q. Did you ask them why the sudden change?

A. I haven't even really been able to even ask my manager anything because, like, she has been, like, very distant from me since this happened. So she hasn't -- she hasn't even -- she hasn't spoken to me. So, like, the usual calls that I would have got from her --

(Reporter clarification.)

THE WITNESS: She hasn't spoken to me. She hasn't called. Like, her usual check-ins that she used to do with me or whatever, they all stopped. So as far as any contact or any conversation between me and my manager has went radio silent.

MR. LACY: Q. How often did she use to check in on you?

A. At least once every week.

Q. Okay. That would be through a phone call?

A. Phone call, email, sometimes she would stop by.

And, you know, for the most part, our relationship was pretty -- it was a pretty cool relationship. You know, I was able to go in there and talk to her, and it seemed like we had a pretty cool understanding and everything. No bad blood. No -- nothing of that nature.

Page 121

Q. Never had a bad review or anything like that?

A. Huh-um.

Q. Is that a "no"?

A. No.

Q. No complaints about you in the work that you do?

A. Not that I know of.

The only things that -- that I was told is just, like -- you know, just kind of learn the system a little bit better and stuff like that. And just -- that was pretty much the only thing that I was told. But I don't think those are like any disciplinary things or saying that, you know, I was doing bad or anything like that.

Q. Okay. You said that you felt like you were being asked to -- your assignment was ending because you weren't needed anymore. What did you mean by that?

A. Well, obviously, the PUC felt that they don't have no use for me no more. And, you know, who knows? Maybe -- I mean -- I don't know. Just -- I just sometime -- a lot of it I felt because I had voiced my opinion saying that I didn't want to participate in this and this probably has something to do with it. I don't know.

Like I said, it just seemed kind of

Page 122

coincidental that, you know, a lot of all this stuff just started happening around the time of, you know, the deposition and everything started happening.

Q. Okay. I want to talk about how you got this job. We spoke a little bit about it last time.

And I believe you said initially that Officer -- or now Chief -- Chaplin was kind of integral in helping you get this position; is that right?

A. Yes.

MR. CONNOLLY: I just object belatedly for misstating the testimony.

MR. LACY: Q. Okay. Did I say that right?

A. I believe so.

Could you repeat the question?

Q. Was -- did you say that Chief Chaplin -- I mean, of course at that time he probably wasn't chief, but did you say that before you got this job, that he played an important role in you getting this job?

A. I would say --

MR. CONNOLLY: Objection. It calls for speculation.

THE WITNESS: What initially happened was that I was approached by Tony and asked --

MR. LACY: Q. That's Tony Chaplin, right?

A. That's Tony Chaplin.

Page 123

Q. Okay.

A. -- that -- at the time, Chief Suhr may have a way to, you know, help me get a job and asked me if I was interested in working with the PUC. At the time, I did not know what agency the PUC was or anything like that. So at the time, I know I needed a job. So I just looked into it and followed up with what they were saying.

Q. Had you been working at that time?

A. No.

Q. About how long had you been out of work?

A. Since December. Because the job I had originally was working at, they had let me go. And I felt it was, like, due to the fact that I was stabbed and they kind of didn't want me to -- they felt they probably would have had some backlash from it, me being involved in some gang activity or something like that.

Q. What job was that?

A. I was working for BAVC as a -- what they classify me as a Treehouse mentor. And originally at the job, I started off as an internship for media -- it was an internship through my tentur [sic] during -- for the Tech SF program.

Q. Okay. Were you getting paid for that?

A. Yes.

Electronically signed by Patricia Rosinski (501-003-893-3227) 86b7407b-163f-463e-a8e7-48a3c888f773

Q. Okay.
A. But like -- like a monthly contract. It wasn't anything, like, substantial or anything like that. It was just enough just to try to maintain.
Q. Okay. When you say "try to maintain," does that mean to pay rent?
A. To cover bills and stuff. It didn't cover everything, but it just helped to, you know, get by and alleviate some -- you know, some pressure of bills and stuff like that.
Q. Pay your phone bill?
A. Yeah.
Q. Put some food in your pocket?
A. Yeah.
Q. Or put food on your plate.
(Overlapping speakers.)
THE WITNESS: Yeah, put some food on your plate, you know, pay storage bills and, you know, pay for, you know, my kids' diapers and clothes and stuff like that, getting around to go see them and stuff like that.
MR. LACY: When you say "storage bills," what do you mean?
A. Because of -- a lot of my stuff is still in storage, so I have still -- I have a storage bill that I

still pay.
Q. Is that because you didn't have a formal residence where you were staying?
A. Yeah.
Q. Okay.
A. I still really don't. Like a lot of my stuff -- the majority of my stuff still stays in storage so I still pay a storage bill just because I don't have a permanent residence right now to keep my stuff.
Q. But you've got family that lives here?
A. Yeah.
Q. You stay with them from time to time?
A. Sometimes, yeah.
Q. Okay. So you said Tony Chaplin approached you and said, "Hey, I think Chief Suhr can help you get a job at the PUC"; is that right?
A. Correct.
MR. CONNOLLY: Objection. It mischaracterizes the testimony. And hearsay.
MR. LACY: Q. Did he -- did he tell you this after you gave your statement to the sheriff's deputy?
A. Yes. This is all like all -- yeah, this is like way after the statements and stuff. So whenever, yeah, all that stuff was given.
Q. Did he tell you why he was coming to help you

out like that?
A. I never even -- I don't even -- I was never really given a reason. It was just like, you know, just -- I guess they, from what I was told, was giving a guy a break from all the stuff, you know, that, you know, I kind of was going through, just losing my job, going through the incident and, you know, kind of -- it was kind of, like, it wasn't -- no support was given to me at all. So I guess that -- that was their way of trying to give me some type of support.
Q. Did he tell you that you were the victim in this incident involving Mario Woods?
MR. CONNOLLY: Objection. Leading the witness. And it calls for facts not in evidence.
(Reporter clarification.)
MR. LACY: Q. You can answer, Mr. Gardner.
MS. HAMMELL: You can answer.
THE REPORTER: Did you have an objection? I couldn't hear you.
MS. HAMMELL: I just said, "You can answer."
THE WITNESS: I was told that statement a few times by quite a few officers, that I was a victim in this.
MR. LACY: Q. What was the first time you recall hearing that?

A. Maybe after that meeting with the -- what I told you was with multiple officers were in the room.
Q. What meeting was this?
A. That was the one at 850 Bryant.
Q. Okay. So there's a meeting with multiple officers in the room.
Do you have a recollection of when that happened?
A. This was like -- I don't know -- maybe February or something -- around there.
Q. Okay.
A. I believe it was around the Super -- it was either around the time of the Super Bowl.
Q. Okay. And you came to talk with these officers at 850?
A. Uh-hum.
Q. Is that a "yes"?
A. Yes.
Q. Why?
A. After a while -- after the incident happened, I was kind of, like, seeing a lot of things start happening, protesting, a lot of things. I felt that it was getting out of hand.
I was -- you know, people were telling me, you know, to look out, you know, watch -- you know, watch my

Electronically signed by Patricia Rosinski (501-003-893-3227)
86b7407b-163f-463e-a8e7-48a3c888f773

Page 128

10:49:03 back. You know, "People were talking in the streets about you," and, you know, things like that.

10:49:08 So after a month and a half, I was just kind of seeing stuff kind of go on and hearing things, I kind of just got -- you know, just kind of just hit up the police department. I was like, you know, "Yo. What's going on?" Like, you know, "What's going on with this case, and why is it getting out of hand like this?"

10:49:26 Q. So you called the police?

10:49:28 A. Yes.

10:49:28 Q. And you told them that you were worried about your safety?

10:49:32 A. Correct.

10:49:33 Q. Because people were telling you you need to -- people in the streets, as you say, were telling you you need to look out for yourself?

10:49:41 A. Correct.

10:49:43 Q. Do you know why people were telling you that? Did they give you a reason why?

10:49:52 A. It's a lot -- I mean, one thing I heard is that some people felt that I was responsible for Mario Woods getting killed. Because they said, from the narratives that they were hearing from the news, is that I went to the police and, you know, gave them a description which led to him ultimately, you know, killing Mario Woods.

Page 129

10:50:14 So some people felt that I was responsible for it and, you know, labeled me as a snitch. Things like that.

10:50:29 Q. You wanted some protection?

10:50:30 A. Yeah, I wanted to -- I actually wanted to be relocated. I asked for that seven or eight times, but I mean, hey, I'm still here.

10:50:41 Q. Okay. You said you asked for that several -- or several times. Was that several times during this meeting in February or --

10:50:47 A. I asked for it during the meeting in February. I asked for it before. I asked for it the day of the incident happening. I was asking for it altogether because I just -- one, I just wanted to just make sure, you know, I was out -- out the -- you know, out the clear of whatever this bullshit that was going on. I didn't know it was going to turn into something like this.

10:51:13 Q. Okay.

10:51:14 A. I seen it on TV, but you don't think it's going to be right in your backyard one day.

10:51:21 Q. Yeah. Tell me about it.

10:51:24 You said these officers in this meeting in February told you -- that was the first time you recall hearing them say to you that you were the victim --

10:51:42 A. Correct.

Page 130

10:51:42 Q. -- and that you needed to be taken care of; is that right?

10:51:46 MR. CONNOLLY: Objection. That misstates the testimony.

10:51:50 THE WITNESS: Yes.

10:51:51 MR. LACY: Q. Okay. Did they tell you that they were going to help take care of you?

10:52:00 MR. CONNOLLY: Objection. Leading. Hearsay.

10:52:03 THE WITNESS: They said something in a matter of that they wanted to help me.

10:52:10 MR. LACY: Q. Okay. Well, what did that mean to you?

10:52:13 A. Well, that -- you know, I was cautious about that at first because I didn't know what the motives of it was and everything. So, you know, I don't know what everybody's motives is in this whole thing. So I just kind of, like -- I just proceeded with things very cautiously.

10:52:35 I just -- just tried to take advantage of the situation of, you know, trying to start over and get a job somewhere where, you know, I could potentially turn it into a career and, you know, live my life, you know. But it seemed like that didn't happen.

10:52:51 Q. Okay. So you asked them at that time if they could relocate you; is that right?

Page 131

10:52:57 A. Yes.

10:52:57 Q. In February I'm talking about.

10:52:59 A. Yes.

10:52:59 Q. Did they tell you no?

10:53:01 A. They got me hooked up with the Victims of Crime people. I got approved for some funding, but I also -- to be relocated, but I also -- but I was also told that I couldn't get funding at the same time because of the fact that Mario Woods was deceased. So it was no -- to this -- from what I was told, there was no threat no more to me, and that I would -- that I was eligible [sic] for that type of compensation.

10:53:34 Q. Okay. So it's your understanding that the police that you spoke with in February connected you with the Victims Services Unit in the district's attorney's office; is that right?

10:53:43 A. Correct.

10:53:44 Q. But the Victim Services Unit could not give you funding because Mario Woods himself was not a direct threat to you because he was now deceased; is that right?

10:53:54 A. From my understanding, from what I was told, it was -- yeah, they told me that I wasn't qualified to receive any type of funding for Victims of -- Victims of Crime because Mario Woods was deceased and, like,

Electronically signed by Patricia Rosinski (501-003-893-3227) 86b7407b-163f-463e-a8e7-48a3c888f773

Page 132

10:54:08 there's no way to get restitution out of him or anything like that.
10:54:11 Q. Okay. Were you scared of Mario Woods?
10:54:15 A. No.
10:54:16 Q. Okay. Did you ask for any other assistance at this meeting in February?
10:54:29 A. No, I just -- not -- not really, no. Just, you know, I just said, you know -- I was just -- it'd be nice to try to get some assistance with a job and, you know, housing and stuff and try to get out of here, but -- you know, that was pretty much the only thing I was saying.
10:54:44 I was just saying it as a statement. I didn't ask, you know -- particularly say that, you know, "Hey, I need you guys to give me housing and a job so I can get back on my feet" because that's not going to happen if you ask for stuff like that.
10:55:01 Q. Okay. How did you make it for four months without having a job? How did you make it?
10:55:09 MR. CONNOLLY: Objection. Irrelevant.
10:55:12 MS. HAMMELL: I'd object also on the basis of privacy.
10:55:16 You don't have to answer that if you don't want to. And you don't have to -- and you can assert the Fifth Amendment if you don't want to say --

Page 133

10:55:22 (Reporter clarification.)
10:55:25 MS. HAMMELL: I'm instructing my client that he can refuse to answer on the basis of privacy or on the basis of the Fifth Amendment, if anything that you say you feel might get you in trouble.
10:55:36 It's up to you whether you want to answer that question and how much, but that is my advice.
10:55:42 THE WITNESS: I would just say I would...
10:55:48 MR. LACY: Q. Remember, you're under oath, okay? You have the right to be able to take the Fifth.
10:55:54 A. I plead -- I plead the Fifth on that one.
10:55:59 Q. Did you sell drugs?
10:56:02 MS. HAMMELL: Objection. I instruct you to plead the Fifth.
10:56:04 THE WITNESS: Plead the Fifth.
10:56:05 MR. LACY: Q. Did you sell drugs on more than one occasion?
10:56:10 MS. HAMMELL: Same objection.
10:56:10 (Overlapping speakers.)
10:56:10 THE WITNESS: Plead the Fifth.
10:56:11 MS. HAMMELL: Same instruction.
10:56:12 THE WITNESS: I plead the Fifth.
10:56:16 MR. LACY: Q. Did you sell marijuana?
10:56:18 MS. HAMMELL: Same instruction.
10:56:19 (Overlapping speakers.)

Page 134

10:56:19 THE WITNESS: Plead the Fifth.
10:56:21 MR. LACY: Q. Did you sell any meth?
10:56:24 A. Plead the Fifth.
10:56:24 (Overlapping speakers.)
10:56:24 MS. HAMMELL: Same.
10:56:25 MR. LACY: Q. Did you sell crack?
10:56:26 MS. HAMMELL: Same.
10:56:26 THE WITNESS: Plead the Fifth.
10:56:28 MR. LACY: Q. In December of 2015, were you selling drugs at that time?
10:56:58 MS. HAMMELL: Same objection and instruction.
10:57:04 You can answer or you plead -- you can answer or you can plead the Fifth. I instruct you to plead the Fifth if your response would be incriminating.
10:57:08 THE REPORTER: You're going to have to speak up, please.
10:57:17 MR. LACY: Do you want to take a break?
10:57:17 MS. HAMMELL: Can we take a break? This line of questioning is --
10:57:20 (Overlapping speakers.)
10:57:20 MR. CONNOLLY: That's fine, but I'm going to also object vague as to time on that last question.
10:57:24 MR. LACY: Okay. I'll make it very specific.
10:57:26 Q. December 2nd: Were you selling drugs on that day?

Page 135

10:57:29 A. No.
10:57:30 Q. Okay. When you got in the car with these girls, were you guys doing drugs?
10:57:35 MS. HAMMELL: I instruct you to plead the Fifth.
10:57:37 THE WITNESS: Plead the Fifth.
10:57:40 MS. GUERTIN: Let's take a break.
10:57:42 MR. LACY: You want to take a break?
10:57:42 (Overlapping speakers.)
10:57:44 MR. LACY: Okay.
10:57:44 THE VIDEOGRAPHER: The time is 10:57 a.m. We're going off the record.
10:57:55 (Whereupon, a recess was held from 10:57 a.m. to 11:13 a.m.)
11:13:31 THE VIDEOGRAPHER: The time is 11:13 a.m. We're back on the record.
11:13:41 MR. LACY: Q. Mr. Gardner, I'll remind you you're still under oath. Okay?
11:13:55 A. All right.
11:13:56 Q. All the same rules that we gave in the beginning and, frankly, the last time you started your deposition still apply, okay?
11:14:03 A. Uh-hum.
11:14:05 Q. Is that a "yes"?
11:14:06 A. Yes.

Electronically signed by Patricia Rosinski (501-003-893-3227) 86b7407b-163f-463e-a8e7-48a3c888f773

Page 136

Q. Okay. When we left off, we were talking about the day of the incident.
A. Uh-hum.
Q. And specifically we were talking about the moments before you encountered Mr. Woods. Do you recall that?
A. Yeah.
Q. These two ladies who you said you were with, you didn't know them?
A. No.
Q. Whose house were you at?
A. I wasn't at nobody's house.
Q. You weren't in front of your house?
A. I was in front of the house I was staying, my aunt's house, yes.
Q. Okay.
(Reporter clarification.)
THE WITNESS: Of my aunt's.
MR. LACY: Q. Okay. So you were at your aunt's house?
A. Correct.
Q. And you see these ladies outside?
A. Uh-hum.
Q. Is that a "yes"?
A. Yes.

Page 137

Q. You never met them before?
A. No.
Q. You didn't know them -- did they call you?
A. No, they just kind of just held a conversation with me outside, was kind of flirting with me a little bit. And, you know, I was kind of getting into a conversation with them.
They were kind of on their way going somewhere, and they said they're going to come back, so that's -- I was just kind of outside. Just chilling. And they came back, and we were just kind of outside just chilling.
Q. Did they tell you where they were going?
A. No.
THE VIDEOGRAPHER: Excuse me. I'm sorry.
MR. LACY: Go ahead.
THE VIDEOGRAPHER: Can you raise your microphone up a little bit? Thank you. Sorry to interrupt.
THE WITNESS: Is that better?
THE VIDEOGRAPHER: Yeah, thank you.
THE WITNESS: All right.
MR. LACY: Do we need to take a break --
THE VIDEOGRAPHER: No.
MR. LACY: -- to get everything together?
THE VIDEOGRAPHER: If we can, I see you sliding

Page 138

back down. Why don't we just put it on your sweater, Mr. Gardner. There you go.
Does that work better?
THE WITNESS: Yeah.
THE VIDEOGRAPHER: Okay. Thank you.
MR. LACY: Q. Did they tell you they were going to get drugs?
A. No. They -- no. They -- like I said, they didn't tell me anything specific. They just told me they would be back and if I was going to still be right there where I was at. I was, like, "yeah." So that's where I was.
Q. When they came back, you got in the car with them?
A. They got in the car with me.
Q. So you were sitting in a car --
A. Yeah.
Q. -- when you saw them initially?
A. Yeah.
Q. And you said it was a friend's car; is that right?
A. Correct.
Q. And you were sitting in the driver's seat --
A. Yeah.
Q. -- is that right?

Page 139

A. Yes.
Q. So when they got in the car, these two girls --
A. Uh-hum.
Q. -- where did they sit?
A. Passenger and passenger rear.
Q. Okay. And how long did you sit in the car before you saw Mario Woods? Do you recall?
A. I can't really recall that. It's just like -- I just know that he was like kind of, like -- I had left for, like, a hot second to go get a burger from Burger King that day. And I came back and Mario was kind of just standing right there.
Q. Okay.
A. So...
Q. So he was standing there when the girls returned?
A. No, the girls were with me when I went to -- they were with me when I went to Burger King.
Q. Okay. So the girls got in the car with you; is that right?
A. Uh-hum.
Q. Is that a "yes"?
A. Yes.
Q. You sat there for a little bit and chatted; is that right?

Electronically signed by Patricia Rosinski (501-003-893-3227)
86b7407b-163f-463e-a8e7-48a3c888f773

Page 140

11:17:46 A. Yes.
11:17:46 Q. Flirted with each other?
11:17:47 A. Yeah.
11:17:48 Q. Had fun?
11:17:49 A. Yeah.
11:17:49 Q. Were you getting high?
11:17:51 MS. HAMMELL: Objection.
11:17:52 I'm going to instruct you not to answer on the basis of privacy and the Fifth Amendment.
11:17:57 THE WITNESS: I'll respect -- honor what my lawyer says.
11:17:59 MR. LACY: Q. Okay. You don't recall how long you sat there?
11:18:03 A. Not necessarily, no. We sat there -- I mean, I can't like -- no.
11:18:07 Q. Okay.
11:18:08 A. I can't put a time frame on it exactly.
11:18:11 Q. You left to Burger King to go get something to eat?
11:18:15 A. Uh-hum.
11:18:15 Q. You come back from Burger King; is that right?
11:18:18 A. Yes.
11:18:19 Q. Which Burger Kind do you recall going to?
11:18:21 A. On the Bayshore.
11:18:23 Q. Okay. I have to ask. You could have went to

Page 141

11:18:27 the Burger King somewhere else.
11:18:27 A. I know. I understand.
11:18:28 Q. So you go to the Burger King on the Bayshore. You come back. Do you go anywhere else besides Burger King?
11:18:33 A. No, just go to Burger King, come back. And Mario was just kind of standing right there in one of the people's drive kind of like -- I don't know what you call those, like, ports, little driveway ports, and stuff. So he was kind of standing in one of those, kind of just -- just standing right there.
11:18:55 Q. Okay. You said you didn't know him --
11:18:58 A. No.
11:18:59 Q. -- is that right?
11:19:00 A. Yeah, I just -- I don't know the guy.
11:19:02 Q. Did you recognize him, though? Had you seen him in the neighborhood before?
11:19:06 A. I seen him standing right there in that particular spot, you know. He was like -- kind of, like, just sitting by -- you kind of, like, see -- you just turn around like any person needs to see. Just kind of just standing right there in the little spot or whatever. So I just seen him standing right there a couple of times, walk past him and no problems or anything like that.

Page 142

11:19:26 So, yeah, like I said, this particular day, I don't know what was his problem. He seemed a little bit kind of out there or whatever.
11:19:35 Q. Okay. So, then, is it fair to say that you had seen him around the neighborhood before?
11:19:39 A. Correct -- not around the neighborhood, just in that particular spot.
11:19:44 Q. Okay. In that particular spot in that driveway that you were talking about; is that right?
11:19:49 A. Yeah.
11:19:52 Q. Did you ever speak to anybody about who he was before that day?
11:19:57 A. No.
11:19:58 Q. Did you know if he was selling any drugs?
11:20:01 A. No.
11:20:02 Q. Okay. When you come back from Burger King on December 2nd, 2015 --
11:20:10 A. Uh-hum.
11:20:11 Q. -- you park back in front of your auntie's house; is that right?
11:20:17 A. Yeah, kind of, like, on the sidewalk. But, yeah, kind of, like, right there in front of the house, yeah.
11:20:22 Q. And you start hanging out again with these girls; is that right?

Page 143

11:20:25 A. Uh-hum.
11:20:25 Q. Is that a "yes"?
11:20:26 A. Yes.
11:20:27 Q. You eat your burgers?
11:20:29 A. I mean, I'm the only one eating the burgers. So I was just -- kind of just sitting right there eating my burger, minding my business, and listening to music and stuff. Chillin'.
11:20:38 Q. Okay. You noticed Mario Woods across the street; is that right?
11:20:40 A. Not really across the street. Let's say if the car was sitting right here, he's standing right there.
11:20:47 Q. Okay. I'm going to do this -- and I know this is not to scale. This is just to orient me, okay?
11:20:53 A. Uh-hum.
11:20:55 THE VIDEOGRAPHER: Excuse me. Can you scoot that way, Counsel? Yeah.
11:20:57 THE WITNESS: Oh, okay.
11:20:58 MR. LACY: Q. I'm going to give you this. I'm going to give you this pen that Patty let me use a little bit earlier today. I'm going to ask you, if you can, just, you know, draw, you know, a sketch mark of the street, the house, and the driveway where you were, where Mario Woods was. Okay?
11:21:17 A. (The deponent complies.)

Electronically signed by Patricia Rosinski (501-003-893-3227)
86b7407b-163f-463e-a8e7-48a3c888f773

Page 144

11:21:27 Q. So what you're doing -- hold on.
11:21:30 Okay. These are houses?
11:21:31 A. Driveways.
11:21:32 Q. These are driveways?
11:21:33 A. These are the driveway things.
11:21:35 Q. Okay.
11:21:36 A. So I would say Mario was standing --
11:21:36 Q. Okay.
11:21:42 A. -- somewhere right here.
11:21:42 Q. Okay.
11:21:43 A. The car is parked somewhere --
11:21:45 Q. Draw a square where the car is. And if you can, put a directional -- put an arrow in it facing the direction -- so the car is facing that.
11:21:55 A. That is on the sidewalk, though. So let's say this is -- this part right here is the sidewalk. And the car is parked right there. And this is the rest of Third Street. Down here is La Conte. Up here is the little roundabout that kind of goes around the whole building block.
11:22:09 Q. Okay. So you're looking at Mario; is that right?
11:22:12 A. Uh-hum.
11:22:12 Q. Is that a "yes"?
11:22:13 A. Yes.

Page 145

11:22:13 Q. You're still in the driver's seat; is that right?
11:22:16 A. Correct.
11:22:18 Q. So at some point, you say these girls notice Mario as well; is that right?
11:22:26 A. They noticed that he was doing some weird shit. They were just, like, saying, "This dude is, like, doing weird shit right now," or whatever.
11:22:34 And, honestly, I just -- kind of just told them whatever. Just kind of leave him alone because he's probably tweaking off something, you know. Like, you know, he didn't -- he never was a threat or anything before. So to not be, you know, paranoid about it.
11:22:49 Q. What do you mean by "tweaking"?
11:22:51 A. He just looked like somebody that was tweaking off something.
11:22:55 Q. I mean, look. I might understand what that means, okay? I'll be frank with you --
11:22:58 (Overlapping speakers.)
11:23:01 THE WITNESS: Not everybody else does.
11:23:01 MR. LACY: Q. Not everybody else does. So how --
11:23:03 A. So --
11:23:03 Q. -- would you explain that to somebody who doesn't?

Page 146

11:23:05 A. -- I would say he seemed to be having side effects of some type of drug.
11:23:10 Q. Okay. How did you become aware of what that looks like?
11:23:13 A. Of being years in the neighborhood that I grew up in, you see a lot of people partake in drugs and stuff. So you kind of learn to observe what kind of -- what -- you know, people that are on drugs and kind of try to avoid them to some extent.
11:23:30 Q. Okay. At some point, you say Mr. Woods, Mario, comes up to your car; is that right?
11:23:43 A. Correct.
11:23:44 Q. He comes up to your door; is that right?
11:23:46 A. Correct.
11:23:48 Q. And tries to open the door, you said; is that right?
11:23:51 A. Yes.
11:23:53 Q. Why didn't you just lock the door?
11:23:54 A. The door was locked.
11:23:57 Q. So he wasn't going to be able to get in?
11:23:59 A. Correct.
11:24:02 Q. Why did you get out?
11:24:05 A. Mario Woods was trying to bust a window out.
11:24:11 Q. He tried to bust a window?
11:24:13 A. Yeah. He was trying to get in -- at first it

Page 147

11:24:16 seemed like the only thing he was trying to do was entice me to try and get out of the car and fight him.
11:24:21 And I -- you know, I just looked at him and kind of chuckled at him because I was like, "No, I'm not about to fight you, man. Like, you're on something." I'm not -- you know, I'm not going to fight somebody that's on -- like clearly not in their right mind and everything like that because, one, they could hurt me and hurt -- hurt themselves in the process.
11:24:37 So I just kind of just tried to avoid it. Even though the girls were kind of, like, trying to entice me to do it, I just kind of just, you know -- just kind of was passive about it.
11:24:44 Q. So the girls were telling you to get out and beat this guy up?
11:24:48 A. They -- you know, they -- just like any young girls, they want to -- you know, they see -- they want -- if they see a potential fight getting ready to happen, they want to antagonize them and try to boost a guy's ego up.
THE REPORTER: Can you slow down, please. "They want to try to antagonize" --
THE WITNESS: Yeah.
THE REPORTER: Slow down if you can.
11:25:06 THE WITNESS: Boost -- boost -- you know, boost

Electronically signed by Patricia Rosinski (501-003-893-3227) 86b7407b-163f-463e-a8e7-48a3c888f773

Page 148

11:25:07 a guy's ego to try to get them to fight and everything.
11:25:11 MR. LACY: Q. Okay. So they're egging you on. Is that fair to say?
11:25:14 A. Yeah.
11:25:15 Q. Did you and Mario Woods have words while you're sitting in the car?
11:25:19 A. No, I didn't have words with him. He was kind of -- like I said before, he kind of was mumbling words. Couldn't really make out what he was saying because he was outside the car, and you could only hear so much through the sunroof window that was kind of cracked so I can hear what he was saying.
11:25:37 Q. Okay.
11:25:37 A. Okay.
11:25:37 Q. So the driver's side window where you were sitting was closed; is that right?
11:25:41 A. Yes.
11:25:42 Q. The sunroof, though, was cracked a little bit?
11:25:44 A. Yeah. It wasn't cracked enough for anybody to get in or anything like that, but it was cracked enough to where I can at least hear what's going on on the outside and stuff like that.
11:25:54 Q. Okay. And it's your understanding that he was saying something to you that led you to believe he wanted to fight?

Page 149

11:26:01 A. I mean, his body language more so told me that more than anything that -- like, if I couldn't understand what he was saying, his body language more so told me that.
11:26:10 Q. If you could demonstrate for me -- for us what that body language is since this is being video-recorded. And you might need to take off your mic and just stand up and show me the posture that you're talking about.
11:26:23 MR. CONNOLLY: Objection. Vague as to time.
11:26:26 THE WITNESS: Like...
11:26:28 MR. LACY: Q. Can you show us?
11:26:31 A. Show you like how he was walking around and stuff?
11:26:35 Q. Well, you said he was posturing in a certain way that led you to believe that he wanted to fight; is that right?
11:26:41 A. Well, I mean, when you're kind of standing right there and you got your hands kind of, like, balled up like, you know -- like you about to -- like you in a stance like you kind of tensing up like you getting ready to fight somebody, yeah, you kind of, like -- that's how I took it.
11:26:54 Q. Can you stand up and show me what you mean?
11:26:57 A. Like what I'm saying, like when you kind of

Page 150

11:26:58 stand up and you like -- this is kind of like -- you're just kind of sitting there relaxed.
11:27:01 But he was kind of, like -- kind of, like, had this, like, stance like he was ready to fight somebody. Like -- you know, like -- like he was getting -- like he was like -- he was like -- kind of like "Bring it on" kind of thing.
11:27:12 Q. Okay.
11:27:12 A. So, you know, like, I'm looking at him in the car. I'm just like, "Dude, I'm not trying to fight you," whatever. So I'm just kind of, like, giving him a nod.
THE REPORTER: Slow down.
THE WITNESS: I'm just giving him the nod, the -- I mean, I'm not trying to -- like wave him off, 11:27:27 like it's no beef, no problems with me or whatever. So he just seemed like he was kind of zoned in or whatever he was doing, and that was it.
11:27:36 So when I realized what he was trying to do when he was trying to, like, came up to the car and just trying to knock the window out or whatever, after he realized he couldn't open the door or whatever, to my understanding, he was doing that because he thought I was trying to call somebody on him or whatever. So it was...

Page 151

11:27:58 MR. LACY: Q. What do you mean by "call somebody on him"?
11:28:01 A. Because I guess he took me playing on my phone, playing a game, he took that as me trying to call somebody to signal to get him to -- like to try to, you know, play him out or something like that.
11:28:12 Q. And when you say you took that to mean that, I'm wondering why you would think something like that.
11:28:20 You know, I have my own understanding. I used to live in Potrero Hill, okay? I have my own understanding as to why you might think that.
11:28:28 But can you explain to us why you would think that his understanding was you were trying to call somebody?
11:28:35 A. Well --
11:28:36 MR. CONNOLLY: Let me just put an objection on the record, that it calls for speculation and hearsay and lacks foundation.
11:28:41 THE WITNESS: I -- you know, I can't necessarily say -- speak for him and what he was probably going through. But, you know, if it was me, I would say like maybe it's just like -- because that's just how things happen. You might see somebody get on their phone and try to call somebody and just -- it's just -- it's just something that happens more often than

Electronically signed by Patricia Rosinski (501-003-893-3227)

86b7407b-163f-463e-a8e7-48a3c888f773

Page 152

usual nowadays, that you see that happen.

MR. LACY: Q. In the neighborhood in Bayview, that type of thing happens; is that right?

A. I would say it happens not just in the Bayview. It happens probably in a lot of areas that -- you know, that are similar to Bayview.

Q. Where I come from, they say, "I'm calling the goon squad."

A. Yes.

Q. Is that right?

A. Something like that, yeah.

Q. The goons are the people that are going to come hurt you, right?

A. You can say that, yeah.

Q. Okay. So you figured he might think you're trying to call somebody to come get him?

A. Correct.

Q. And you thought he was going to try to break out the window; is that right?

A. Correct.

Q. Why didn't you just drive away?

A. I'm -- in my head, I'm standing in front of my house; somebody's messing with me. My -- my -- I want to stand my ground and not, you know, run away because the thing is is that, you know, this is where I stay at.

Page 153

So if I'm going to run away from where I'm staying at literally, that's like not -- really not -- not something that I necessarily want to just be -- what's the word I want to say? It's not something that I necessarily want to just bow down -- out, you know, gracefully, and just say -- you know, just take -- take a loss like that, just say, you know, I'm going to let this guy punch me in -- in front of my house and stuff like that.

So it came as being -- after I seen he wasn't going to stop doing what he was doing, I just got out the car to kind of, like, confront him to kind of say, "Hey, dude. You -- we have a problem. Like, you know, what's the -- what's the issue" and everything.

And immediately kind of, like, right after that happened, I got out the car. He kind of shown me he had like a knife.

And at that point, I was already out the car. So it was either, you know, run -- it was either run away, or you going to sit here and fight this guy.

Q. I'm going to -- you said a lot of things. I'm going to talk about that. Okay?

First I want to get to this point about getting out of the car and not being punked.

At the time you were getting out of the car,

Page 154

did you feel threatened by Mario Woods?

A. I felt that he could potentially do something to hurt me. I didn't feel threatened by him. There's a difference.

Q. You felt that you could handle the situation --

A. Yes.

Q. -- is that right?

And you got out to handle the situation; is that right?

A. Correct.

Q. And when you got out, you kicked him in the chest; is that right?

A. When I got out of the car -- the reason why I kicked him in the chest is because he had already shown me he had a knife. So in order to keep distance between us, that's -- that was my first initial reaction because he -- the initial reaction was to swing at me with a knife, and I kicked him back to try to make sure that he --

THE REPORTER: Wait a minute. You have to slow down, please.

MR. LACY: Q. She's got to type down everything. It's all right. It's not personal, okay?

So I'll ask you this: Your testimony here today is that when you got out of the car, Mario Woods

Page 155

shown a knife at you; is that right?

A. Yes.

Q. Okay.

A. He had already kind of, like -- he had the knife kind of, like, in his -- kind of, like, in his sweater kind of, like, hanging out like that to some extent, like...

And, I mean, like I said, after that happened, I was kind of, like, "Okay. How am I going to handle this situation now when I don't have a weapon on me?" And, you know, "How am I going to end up with" -- you know, "How am I going to, you know, keep myself safe in this situation? How am I going to fend this person off?"

You know, Mario Woods wasn't like a big guy or anything like that. So, you know, a person like me and my stature, you would think that it would be easy for you to take out somebody like that, you know, at least fighting-wise. Not to kill him or anything like that, but, you know, you think that you might have the upper hand on him, you know. He wasn't somebody who you can take lightly like that. I underestimated him --

Q. Okay.

A. -- a little bit.

So, you know, I -- after I ended up getting

Electronically signed by Patricia Rosinski (501-003-893-3227)
86b7407b-163f-463e-a8e7-48a3c888f773

Page 156

11:33:15 stabbed, it was -- I was really outnumbered. I mean...
11:33:18 Q. All right. Well, let's talk about it.
11:33:23 After all this happened, you spoke to law
11:33:26 enforcement; is that right?
11:33:27 A. At the hospital.
11:33:28 Q. At the hospital; is that right?
11:33:30 A. Yes.
11:33:31 Q. Did you know at that time Mario Woods had been
11:33:33 shot by police?
11:33:34 A. No.
11:33:37 Q. Were you speaking truthfully to the officers at
11:33:40 the hospital?
11:33:40 A. Yeah.
11:33:41 Q. You didn't make up anything, did you?
11:33:43 A. No.
11:33:43 Q. You had no reason to make up things, did you?
11:33:46 A. No.
11:33:46 Q. Is that a "no"?
11:33:47 A. No. I said "no," I had no reason to make up
11:33:51 anything.
11:33:52 Q. Your testimony here today is that you got out
11:34:05 of the car. He, being Mario Woods, pulled out a knife;
11:34:10 is that right?
11:34:10 MR. CONNOLLY: Objection. Asked and answered.
11:34:12 MR. LACY: Q. Is that right?

Page 157

11:34:13 A. Yes, Mario Woods pulled a knife out.
11:34:17 Q. Do you recall telling the sheriff something
11:34:20 different?
11:34:22 A. What I told the sheriff, do you have it in
11:34:26 front of you?
11:34:27 Q. I'm asking, do you recall.
11:34:28 A. I don't recall saying anything different unless
11:34:32 you're saying I did.
11:34:44 Q. Do you recall telling the sheriff (as read):
11:34:55 "And then, you know, he tried to tussle my
11:34:59 hand. He tried to tussle for it. Got some space in
11:35:02 between us and then -- you know, at first he tried -- he
11:35:07 figured, like, from when I kicked him and punched him,
11:35:10 he got overpowered by me. That's when he took out his
11:35:14 knife and everything. And that's why I was all 'Okay.
11:35:19 I'm going to try to figure out what to do right now.'"
11:35:23 Do you remember saying something like that?
11:35:25 A. If I did, I don't remember saying it. Exactly
11:35:30 like that, no.
11:35:32 Q. You didn't have any reason to misrepresent
11:35:34 things to the sheriff, did you?
11:35:37 A. No.
11:35:37 Q. You were telling the sheriff the truth. Right?
11:35:40 A. Well, yeah, I'm telling the sheriff the truth.
11:35:44 I told the sheriff the truth.

Page 158

11:35:45 Q. Were you overpowering Mario?
11:35:48 A. Like I said, I'm bigger than Mario. So it
11:35:52 could -- that was more so if -- more so an opinion more
11:35:57 than anything, not so much what was actually going on.
11:36:00 So, you know, that's -- that's what I can try and
11:36:05 clarify up.
11:36:07 Q. Okay. So when you got out of the car, you got
11:36:13 out of the car and pushed him with the door first; is
11:36:17 that right?
11:36:17 A. Yeah.
11:36:19 Q. Then you kicked him in the chest; is that
11:36:22 right?
11:36:22 A. I kicked him in the chest area, yes.
11:36:25 Q. And then you punched him; is that right?
11:36:27 A. I tried to attempt to land a punch, but I don't
11:36:31 know if it landed or not. But, yeah.
11:36:32 Q. Maybe it didn't land flush. Is that fair to
11:36:35 say?
11:36:35 A. Yes.
11:36:36 Q. If it landed flush, you might have knocked him
11:36:40 out. Is that fair to say?
11:36:40 MR. CONNOLLY: Objection. It calls for
11:36:40 speculation.
11:36:41 THE WITNESS: It could have, but you never
11:36:43 know.

Page 159

11:36:43 MR. LACY: Q. Okay. Anyways, you felt that
11:36:46 you were -- kind of had the upper hand at that point; is
11:36:49 that right?
11:36:49 A. I wanted to believe that. But, obviously, I
11:36:53 didn't after I got stabbed, so...
11:36:55 Q. Then he pulled out the knife; is that right?
11:36:57 A. No. He already -- the knife was already -- I
11:37:01 would say this is what -- this is how this -- I can see
11:37:05 why you're kind of, like, trying to get to understand
11:37:10 when the knife was pulled out initially.
11:37:11 Like I said, when I first stepped out the car,
11:37:14 Mario Woods had already kind of, like, had the knife in
11:37:17 his -- kind of, like, in his sleeve already kind of,
11:37:19 like, being shown.
11:37:20 And, you know, like I said, I was already out
11:37:23 the car. But it wasn't like he was trying to, like, let
11:37:28 it be known that he had the knife on him and everything.
11:37:31 It was kind of, like, he was trying to keep it concealed
11:37:34 and to kind of use it as a surprise attack on me. But I
11:37:37 already kind of peeked it [sic] when I -- when we had
11:37:39 already got out the car.
11:37:41 Q. So before you even got out of the car, you saw
11:37:45 a knife. That's your testimony today?
11:37:47 A. Yes.
11:37:48 Q. Okay. So why did you get out of the car?

Electronically signed by Patricia Rosinski (501-003-893-3227)
86b7407b-163f-463e-a8e7-48a3c888f773

Page 160

A. Like I said, man, I'm not scared of no knife. And I'm -- just didn't -- like, I didn't feel that I was going to let some little guy just come up there and just punk me in front of my house and just think that he's going to scare me off or whatever.

Q. But he had a knife?

A. And? People have guns down me. I'm sitting there running away from people and others just because of it [sic].

Q. Okay. So you got out to confront him even though he had a knife?

A. Correct, I did. Probably wasn't the smartest decision, but I did it.

Q. And you started kicking him; is that right?

MS. HAMMELL: Objection. Asked and answered.

You can answer.

THE WITNESS: I kicked him one time, landed one kick to him when I -- when the fight probably initially started.

MR. LACY: Q. Okay. Then you get stabbed; is that right?

A. Eventually, that's what -- yeah, I got stabbed. I can't remember exactly how many -- the fight, you know, blow for blow.

But, you know, like I said, I remember getting

Page 161

out the car, hitting him with the car door, trying to, you know, get -- like kind of give me some distance and space or whatever because of how close he was to the door.

And when I seen him kind of have pull out the knife again and try to kind of make his way towards me, I kind of kicked him back to kind of gain some distance and, you know...

Q. You said, "pull out the knife again." What did you mean?

A. Maybe -- what do you mean what do I mean?

Q. What do you mean by "pull out the knife again"? Where was it? Where did you see him pull out the knife from?

A. His -- like, from his sleeve thing. Like, I don't know how you -- like, I don't know how a person would hold a knife. I'm just saying, you know --

Q. I don't know.

A. -- I can't, you know, remember exactly how the hell he was holding the knife and everything.

I seen it, then I didn't see it -- because I'm trying to focus on what he's doing -- and then the next thing I see it again, and I'm trying to dodge it and everything. And that's what happened.

Q. Okay.

Page 162

A. I can't really relive exactly the moment exactly, you know. All I know is, like -- Mr. Lacy, is that the dude stabbed me. You know, I ran off. He kind of was still chasing me after that. And, you know, it wasn't like it was a situation -- it wasn't like it was a situation like he just continued to keep chasing me around. It was kind of, like, he just -- after he lost focus of me or whatever, I just kind of got on and just went to the hospital.

Q. So you ran off after you got stabbed; is that right?

A. Correct.

After I realized that I was stabbed and my arm went limp and I wasn't in a position to fight or defend myself anymore, I kind of just kind of ran off to try to see if I could find something originally to kind of defend myself. But I couldn't find anything really that was -- that I could either pick up or use at the time, so...

Q. Okay. And you said he chased you?

A. Kind of chased me into one of those little driveway ports or whatever.

And I kind of, like, tried to throw, like, some garbage cans in his way to try to keep him -- try and trip him up and keep him from, you know, kind of getting

Page 163

too close to me because that's the last thing I wanted him to do, was kind of stab me in my back.

Q. What did he do after you threw the trash cans?

A. I -- all I know is that he was -- he kind of disappeared for a minute. So I was kind of relieved about that because he could have just kept -- kept coming after me and could have -- I wouldn't be right here talking to you.

Q. But he didn't?

A. Correct.

Q. He left?

A. He didn't leave. He just lost his focus or whatever he was doing on me, and he went to the car and started messing with the girls.

Q. Okay. You saw him go over back to the car?

A. The girls drove off. And one of the girls got off in the driver's seat, because the keys was still in the car, drove off in the car. I saw them, like, on that back street part that I was mentioning, and I got in the car, drove off, and went to the hospital.

Q. Okay.

THE VIDEOGRAPHER: Excuse me. The pen is kind of ruining my audio. Would you mind --

THE WITNESS: Oh, sorry.

THE VIDEOGRAPHER: -- putting that down?

Electronically signed by Patricia Rosinski (501-003-893-3227) 86b7407b-163f-463e-a8e7-48a3c888f773

Page 164

11:42:14 That's okay.
11:42:14 MR. LACY: All right. Why don't we take a little bit of a break. I might be done. Take a little break.
11:42:37 THE VIDEOGRAPHER: The time is 11:42 a.m. We're going off the record.
11:42:39 (Whereupon, a recess was held from 11:42 a.m. to 11:48 a.m.)
11:47:45 THE VIDEOGRAPHER: The time is 11:48 a.m. We're back on the record.
11:48:37 MR. LACY: Q. Okay. Mr. Gardner, you're still under oath, okay?
11:48:50 A. Uh-hum.
11:48:51 Q. Is that a "yes"?
11:48:52 A. Yes.
11:48:52 Q. You know that?
11:48:54 And all the admonitions I gave you still apply. Okay?
11:48:57 A. Okay.
11:48:58 Q. I have a few other questions I want to ask you about this incident involving Mr. Woods. All right?
11:49:03 A. Go ahead.
11:49:04 Q. And more specifically I'm going to talk to you about the conversation you had with a sheriff's deputy. You recall that, right?

Page 165

11:49:23 A. I don't recall the conversation in detail, but I recall having a conversation, correct.
11:49:27 Q. Fair enough.
11:49:28 Do you recall them asking you (as read):
11:49:38 "Okay. So backing up. You get out of the car. You use the door. You push him. You basically take him on, like, 'Hey, what's your problem? What's going on with you?' Does he lunge at you? Does he come at you first just hand to hand?"
11:49:56 A. Kind of just -- kind of just --
11:49:58 Q. Hold on. Let me ask the question, and then you can answer. Okay?
11:50:01 A. Uh-hum.
11:50:03 Q. Then he says -- or then you say, "Yeah, he's, like, he was coming at me, like trying to come at me hand to hand. I guess when he figured he couldn't overpower me and stuff and kind of, like, and then"...
11:50:20 The next question was, "Did he land any blows?"
11:50:23 The answer was (as read):
11:50:24 "No. The only thing he couldn't -- he couldn't really land anything on me because I kicked back. He couldn't -- like, I seen that he kind of was like -- it kind of, like, dazed him a little bit or whatever. And that's when I seen he kind of pull out a knife. And I was just all"...

Page 166

11:50:46 Do you remember that?
11:50:48 A. That statement sounds so stagnated.
11:50:52 Q. Do you remember saying that?
11:50:54 A. I don't remember saying that -- saying that statement exactly like that, no.
11:50:59 Q. Would you have been lying to the police?
11:51:01 A. Well, I didn't lie to the police that day.
11:51:05 Q. You didn't lie to them that day, did you?
11:51:07 A. No.
11:51:07 Q. Do you recall telling the law enforcement officers that you saw Mario Woods pull a knife out of his hip pocket after you kicked him and punched him?
11:51:21 A. Like I just told you, Mr. Lacy, before we went to break, I told -- I explained to you -- I kind of even showed you exactly the mannerisms that Mr. Woods used that day, my actions regarding the kick, and how all that stuff got started and everything.
11:51:35 Q. I hear you.
11:51:35 (Overlapping speakers.)
11:51:39 THE WITNESS: All that stuff -- all that same stuff still applies. Everything that I just said earlier today, that's -- that what happened from what I remember. And regardless of what that transcript says right there, that's from what I remember what happened that day.

Page 167

11:51:52 MR. LACY: Q. So would --
11:51:52 A. Whatever happened that day, my memory could -- like, I could have been in a state of shock right there. I could have been not in a correct state of mind of me explaining something like that.
11:52:05 Q. So your memory now is better than it was when you were --
11:52:08 A. I wouldn't say it's better. I would just say that me going through something at a time -- in-the-heat-of-the-moment kind of situation, kind of dealing with something right after it happened versus talking about it now, that's probably why I'm able to speak about it so calmly right now.
11:52:24 Q. Okay. Do you remember yourself being erratic when this conversation was happening?
11:52:29 A. Yes.
11:52:29 Q. You do?
11:52:30 A. Yes.
11:52:30 Q. Okay. Do you remember -- the question was, though: Do you remember telling the officers that you saw Mario Woods pull a knife out of his hip after you had kicked him in the chest and punched him in the face?
11:52:46 A. I don't remember saying that exactly to the officer, no.
11:52:48 Q. Do you deny that that's what you said?

Electronically signed by Patricia Rosinski (501-003-893-3227)

86b7407b-163f-463e-a8e7-48a3c888f773

Page 168

11:52:51 A. I don't remember -- recalling -- saying that to the officer, is what I'm saying.
11:52:56 Q. Well, I just so happen to have an audio recording. Okay? I'm going to play a little bit of this.
11:53:32 MR. LACY: You don't have to worry about recording this word for word, okay?
11:53:36 Q. I just want to know whether or not you recognize your voice on this. Okay? Is that right?
11:53:38 A. Okay.
11:53:45 Q. Okay. I'll play a little bit, and I'll stop it and kind of break it up a little bit. All right?
11:53:49 MR. CONNOLLY: Wait. So, Counsel, can you just identify for the record what it is you're having the witness listen to, and we'll figure out how to at least characterize it as some kind of exhibit.
11:53:59 MR. LACY: Sure.
11:54:00 Q. I'm going to play for you, Mr. Gardner, a recording of an interview of you at San Francisco General Hospital that was provided by the defendants. Okay?
11:54:17 A. Okay.
11:54:18 MR. LACY: Counsel?
11:54:20 MR. CONNOLLY: Does it have a date -- or can you identify it by date or time, that type of thing?

Page 169

11:54:25 MR. LACY: Sure.
11:54:26 San Francisco General Hospital. I mean, if you let it play --
11:54:29 MR. CONNOLLY: Just for the record.
11:54:30 MR. LACY: If you let it play, it says the record --
11:54:32 (Overlapping speakers.)
11:54:32 MR. CONNOLLY: Okay. Then you can authenticate it. That's fine.
11:54:34 MR. LACY: Yeah.
11:54:34 MR. CONNOLLY: That's fine.
11:54:35 MR. LACY: Let me go, man.
11:54:37 AUDIO RECORDING:
11:54:37 SERGEANT HUTCHING: Q. All right. I'm Sergeant Hutching, San Francisco Police Department, 4904. I'm at San Francisco General Hospital with Marcel Shepard; is that right?
11:54:47 A. Yeah.
11:54:48 Q. Okay. And today is 12/2/2015.
11:54:54 MR. LACY: Q. Okay. You heard that?
11:54:55 A. Uh-huh.
11:54:56 Q. Is that a "yes"?
11:54:57 A. I heard the -- I hear the officer. I didn't -- I heard -- barely heard my voice on there.
11:55:05 Q. Did it sound erratic?

Page 170

11:55:07 A. It didn't -- it didn't even sound like me, really, but I -- I have to listen to it more to see if -- you know, how -- what -- what was going on that day.
11:55:15 Q. But you barely heard your voice?
11:55:17 A. I barely heard it, yes.
11:55:19 Q. Okay. We'll play a little bit more.
11:55:20 You heard that it said that it was December 2nd of 2015?
11:55:23 A. Correct.
11:55:23 Q. And that it was at San Francisco General Hospital?
11:55:25 A. Correct.
11:55:26 Q. And he identified himself as a sheriff deputy; is that right?
11:55:31 A. I guess. Yeah, whatever. Yeah, he identified himself as a deputy something. I don't know.
11:55:37 MR. CONNOLLY: Yeah, let me -- I'm going to object. I think that mischaracterizes the evidence that last part on who -- identifying the speaker.
11:55:44 MR. LACY: Q. All right. Let's go a little bit forward. Okay? We'll see if you recognize your voice. Okay?
11:55:50 AUDIO RECORDING:
11:55:52 SERGEANT HUTCHING: It is approximately

Page 171

11:55:55 1854 hours, and we're in San Francisco General's sheriff's interview room. And I'm going to get a statement from Marcel.
11:56:08 INSPECTOR BONNER: I'm Inspector Carl Bonner, Star No. 1099, also present.
11:56:14 SERGEANT HUTCHING: Q. Okay. So, Marcel, I'm talking to you. I understand you've been treated at General Hospital for an injury to your left shoulder area. I can see some blood coming through the -- some of the gauze bandaging and the shirt.
11:56:29 Tell me what happened. How did you get that?
11:56:34 A. Um, pretty much I got stabbed in front of my house. Got in a confrontation.
11:56:39 MR. LACY: Q. Did you hear that exchange right there?
11:56:41 A. Yes.
11:56:41 Q. Did you hear your voice?
11:56:43 A. Yes, I did.
11:56:43 Q. Did you hear yourself say pretty much you got stabbed --
11:56:48 A. In front of my house that day.
11:56:50 Q. -- in front of your house, got in a confrontation; is that right?
11:56:54 A. Correct.
11:56:54 Q. Do you know what you meant by "confrontation"?

Electronically signed by Patricia Rosinski (501-003-893-3227) 86b7407b-163f-463e-a8e7-48a3c888f773

A. Fight. I mean, what's the point of kind of overanalyzing the word? Are you just trying to make sure that that's what I --
Q. I'm just trying to understand.
A. Okay.
Q. That's all. I'm trying to understand.
A. Just asking for my own clarification too, so I can kind of know.
Q. Got it.
All right. So you said you got into a fight in front of your house and you got stabbed. You heard that. Right?
A. Correct.
Q. Did you sound erratic to yourself right there?
A. No. At that point, I was more irritated because I was being held -- I felt I was being detained against my own will because I was told that I couldn't leave until Inspector Bonner came there to speak to me.
Q. Okay. So you had to come talk to -- you had to talk to this guy before you left; is that right?
A. Correct.
Q. And you didn't want to talk to him; is --
A. No.
Q. -- that right?
A. No.

Q. Is it because you were high?
MS. HAMMELL: Objection. Instruct not to answer. Privacy and Fifth Amendment.
MR. LACY: Q. Did you have any drugs on you at that time?
MS. HAMMELL: Same objection. Same instruction.
THE WITNESS: The only drugs I had took that day -- at that moment was the same drugs that they -- the doctors had administrated [sic] to me at the time. So, yes, I was probably high and agitated. I just wanted to go home.
MR. LACY: Q. Okay. So your testimony is that you hadn't taken any other drugs on that day?
A. Like I said, I didn't have not took any drugs that day. The only thing that was going -- the only thing I had took was the drugs that the doctors had administered to me at the hospital that day.
Q. Did you see the girls that you were with taking drugs?
MS. HAMMELL: Objection. Don't answer.
THE WITNESS: No.
MS. HAMMELL: Privacy. Fifth Amendment. Don't answer.
MR. LACY: Well, it's not a privacy issue. I

mean, it's the girls. It's not him.
MS. HAMMELL: I mean, it's --
THE WITNESS: The next question.
MS. HAMMELL: Yeah.
THE WITNESS: I'm just --
MR. LACY: Q. Did you hear the question?
A. I heard the question.
Q. What was your answer?
A. I told you no.
Q. No, you didn't see them take any drugs?
A. No.
Q. Did you have an understanding that they had taken drugs?
A. No.
Why -- where is -- where is this thing with drugs coming from?
Q. I'm just asking.
A. I'm just asking where is -- where is the questions resorting from [sic]?
Q. Well, I've got questions I've got to ask.
A. Okay.
MS. HAMMELL: Okay. Let's take a break.
THE WITNESS: No. I'm just asking --
MS. HAMMELL: I think we should take a break. Let's take a break before he asks the next question.

THE WITNESS: Okay. Take a break.
MR. CONNOLLY: Before we -- we can take a break, but before we do that, can we -- can you please mark that exhibit before we take a break and --
MR. LACY: Why do I need to do that before I take a break?
MR. CONNOLLY: Well, we need to mark it as an exhibit.
MR. LACY: Okay.
MR. CONNOLLY: Okay.
MR. LACY: Duly noted, Counsel.
MR. CONNOLLY: Thank you.
THE VIDEOGRAPHER: Okay. This marks the end of Video Number 1.
The time is 11:59 a.m. We're going off the record.
(Whereupon, a recess was held from 11:59 a.m. to 12:15 p.m.)
THE VIDEOGRAPHER: This is the beginning of Video Number 2 in Mr. Gardner's deposition.
The time is 12:15 p.m. We're back on the record.
MS. HAMMELL: Before we get back into it, DeWitt, Noonan [sic] asked me to modify some testimony. I want you to ask again the questions that you had asked

Electronically signed by Patricia Rosinski (501-003-893-3227)
86b7407b-163f-463e-a8e7-48a3c888f773

12:16:00 about drugs. There's confusion about the meaning of the
12:16:03 of the word "drugs."
12:16:04 MR. LACY: Q. Okay. Before we left -- I'll
12:16:13 remind you, of course, you're still under oath. Okay?
12:16:16 A. (The deponent nodded.)
12:16:16 Q. Is that a "yes"?
12:16:17 A. Yes.
12:16:18 Q. Okay. And I understand this is frustrating.
12:16:20 Okay? It's a frustrating process for all of us. Okay?
12:16:23 And I don't mean to be antagonizing. I'm just trying to
12:16:26 find answers. Okay?
12:16:28 A. Okay.
12:16:28 Q. Before we left off, we were talking about
12:16:35 whether or not you had taken any drugs when you were
12:16:41 sitting in the car on December 2nd of 2015. And by
12:16:48 "drugs," I meant illicit drugs. Okay?
12:16:51 A. "Illicit" meaning?
12:16:52 Q. Illegal.
12:16:54 MS. HAMMELL: Can you clarify that even more?
12:16:56 MR. LACY: Q. Marijuana. Cocaine. Crack.
12:17:00 Meth. Any pills. Amphetamines.
12:17:05 MS. HAMMELL: Okay. I'm going to instruct you
12:17:06 not to answer on the basis of the Fifth Amendment and
12:17:10 privacy.
12:17:10 THE WITNESS: And I will follow my counsel's

12:17:12 advice on that.
12:17:13 MR. LACY: Q. And the question was whether or
12:17:15 not you had seen any of these girls do anything like
12:17:20 that.
12:17:21 Same instruction?
12:17:21 MS. HAMMELL: Same instruction.
12:17:23 THE WITNESS: Okay.
12:17:23 MR. LACY: Q. All right. Earlier you
12:17:27 indicated that you didn't recall a particular part of a
12:17:33 statement that I actually read out --
12:17:35 A. Correct.
12:17:36 Q. -- as a transcript to the interview that you
12:17:38 gave to law enforcement or the inspectors at the general
12:17:44 hospital on December 2nd. Do you remember that?
12:17:46 A. Correct.
12:17:47 Q. Okay. I'm going to play for you an excerpt of
12:17:51 it -- of your statement. Okay? Your recorded
12:17:53 statement. Okay?
12:17:54 A. Okay.
12:17:55 Q. I just want us to listen here.
12:17:59 As a matter of fact, what I'll do is -- okay.
12:18:07 I'm going to do this: I'll give you this.
12:18:11 MS. HAMMELL: Thank you.
12:18:12 MR. LACY: I'll mark this as -- we left off on
12:18:17 5.

12:18:17 THE REPORTER: Yes.
12:18:18 MR. LACY: So that will be 6 in order.
12:18:18 (Whereupon, Plaintiff's Exhibit 6 was marked
12:18:27 for identification and is attached hereto.)
12:18:27 MS. HAMMELL: Have you ever reviewed this
12:18:29 before?
12:18:30 THE WITNESS: Nope. I've never seen this.
12:18:31 MR. LACY: Q. Okay. That's fine. I want you
12:18:34 to go ahead and turn to Page 13. We're going to listen
12:18:44 and see if this transcript is accurate here. Okay?
12:18:49 A. 13?
12:18:50 Q. Yeah.
12:18:52 Is everybody there?
12:18:53 MS. HAMMELL: Yes.
12:18:54 MR. LACY: Okay. So I'm going to press play
12:18:57 here. And I might have to take it back a second.
12:18:57 AUDIO RECORDING:
12:18:57 SERGEANT HUTCHING: Q. You get out of the car.
12:18:57 You use the door. You push him...
12:18:57 SERGEANT HUTCHING: Q. ...right now. You say
12:19:06 that you're wearing more or less flip-flops. Were you
12:19:07 wearing flip-flops today?
12:19:07 A. No.
12:19:07 Q. Okay. What were you wearing? Boots?
12:19:11 A. I was wearing, like, shoes -- regular

12:19:15 shoes.
12:19:16 Q. Basketball shoes?
12:19:16 A. Tennis shoes, classic kind of casual shoes.
12:19:16 Whatever. Okay.
12:19:17 MR. LACY: Q. So Line 23. Are you there?
12:19:19 A. Uh-hum.
12:19:20 Q. Do you see Line 23?
12:19:20 A. Uh-hum.
12:19:22 Q. Is that a "yes"?
12:19:23 A. Yes.
12:19:23 Q. All right. I want you to listen along and tell
12:19:26 me if this was recorded accurately.
12:19:26 AUDIO RECORDING:
12:19:30 SERGEANT HUTCHING: Q. So backing up. You get
12:19:30 out of the car. You use the door. You push him. You
12:19:32 basically take him on, like, "Hey, what's your problem?
12:19:34 What's going on with you?"
12:19:36 MR. LACY: Q. And we turn the page.
12:19:40 AUDIO RECORDING: Q. Does he lunge at you?
12:19:42 Does he come at you first just hand to hand?
12:19:44 A. Yeah.
12:19:44 MR. LACY: Q. Did you hear that?
12:19:46 A. Yeah, I heard the question.
12:19:47 Q. Was that -- did it accurately reflect what the
12:19:49 question was asked to you?

Electronically signed by Patricia Rosinski (501-003-893-3227)
86b7407b-163f-463e-a8e7-48a3c888f773

Page 180

MR. CONNOLLY: I'm sorry, Counsel. I have lost you. And so -- I'm sorry. You're going to have to reask that.

MS. HAMMELL: I agree. That was a vague question. I don't understand it.

MR. LACY: Q. So Page 13, from Line 23 onto Page 14, Line 2.

A. So you're asking -- what's the question?

Q. I'm asking: The question you just heard --

A. Uh-hum.

Q. -- did that accurately reflect what's on this page?

A. The answer or the question?

Q. The question. I can rewind it. So I'll do this again. Okay?

A. So you want me to say --

Q. Hold on one second.

AUDIO RECORDING:

SERGEANT HUTCHING: Q. Okay. I'm looking at you right now. You say that you're wearing more or less flip-flops. Were you wearing flip-flops today?

A. No.

Q. Okay. What were you wearing? Boots?

A. I was wearing, like, regular shoes.

Q. Basketball shoes?

Page 181

A. Tennis shoes, classic kind of casual shoes. Whatever.

MR. LACY: Q. Okay. So I'm going to say that we start reading -- what I'm about to start playing for you now is going to start at Line 23 of Page 13.

A. Uh-hum.

Q. Okay? Is that a "yes"?

A. Yes.

Q. You understand that?

A. Okay.

Q. The line, as it reads on Page 13 -- or Line 23 of Page 13 starts with a question. Am I right?

A. Uh-hum, yes.

Q. It says "Q"?

A. Yes.

Q. And it says, "Okay. So backing up. You get out of the car. You use the door. You push him. You basically take him on, like, 'Hey, what's your problem? What's going on with you?' Does he lunge at you? Does he come at you first hand to hand?"

Did I read all that correctly?

A. I mean, that's what's on the paper.

Q. That's what I'm asking. Is that what's on the paper?

A. Yeah.

Page 182

Q. I'm not misrepresenting anything?

A. Yeah.

Q. I'm going to play for you an audio recording, and what I want to know is whether or not you understand this audio recording to say what this transcript says on this particular part. Okay? That's all I'm asking, is about this particular part. All right? We can deal with the rest later.

But on this particular part I'm asking whether or not you heard exactly what's on this page. Okay? Or if you heard something different, tell me. Okay? Do you understand?

MS. HAMMELL: Whether he's hearing it right now, or whether he heard it back at the time?

MR. LACY: Right now. I'm going to play it.

MS. HAMMELL: Got it. Got it.

MR. LACY: Right now.

MS. HAMMELL: Okay.

MR. LACY: Q. What you're hearing right now, what I'm about to play, is it the same as what you're reading?

A. Yes.

Q. That's what I'm asking.

A. Yes.

Q. Okay. So let me play this thing. All right?

Page 183

AUDIO RECORDING:

SERGEANT HUTCHING: Q. Okay. So backing up. You get out of the car. You use the door. You push him. You basically take him on, like, "Hey, what's your problem? What's going on with you?" Does he lunge at you? Does he come at you first just hand to hand?

A. Yeah, he's, like, coming at me -- like trying to come at me hand to hand. I guess when he figured he couldn't overpower me and stuff and, like, that's --

Q. Did he land any blows on you?

A. No. The only thing -- he couldn't -- he couldn't really land anything on me because, like, I kicked him back. He couldn't -- like, I seen that he kind of was, like -- kind of, like, dazed him a little bit or whatever. And that's when I seen him kind of pull out a knife. And I was just all...

Q. Did you kick him in the...

MR. LACY: Q. Did you hear all that?

A. Yeah.

Q. Did what you heard match what you read on the transcript?

A. Yeah.

Q. Do you recall now telling the officer -- or telling the law enforcement inspectors that after you

Electronically signed by Patricia Rosinski (501-003-893-3227) 86b7407b-163f-463e-a8e7-48a3c888f773

Page 184

12:23:23 kicked him, that's when you saw him pull out the knife?
12:23:26 A. I don't recall that.
12:23:28 Q. You don't?
12:23:28 A. No.
12:23:29 Q. Okay. I'm going to go a little bit further.
12:23:31 All right? Listen.
12:23:33 AUDIO RECORDING:
12:23:33 SERGEANT HUTCHING: Q. Now, this is an audio
12:23:35 recording. I see you motioning with your right hand to
12:23:38 your right hip. You're indicating that he's pulling the
12:23:41 knife out of his right hip.
12:23:44 A. Yeah. So if you stand up, [unintelligible]
12:23:45 it was like this.
12:23:45 Q. Okay. Was it in his pants pocket?
12:23:45 A. Yeah.
12:23:45 Q. Was it in a sheath?
12:23:52 A. It wasn't in no sheath. It was just a
12:23:52 blade that was just taken out and everything. That's as
12:23:52 much as I could see, you know. I was just trying to
12:23:58 focus on where he was moving the blade and everything.
12:24:00 MR. LACY: Q. Okay. Did you hear that?
12:24:02 A. Yeah.
12:24:02 Q. Did you hear you say that you recalled
12:24:10 Mario Woods taking a knife out of his pocket?
12:24:13 A. No.

Page 185

12:24:14 Q. That's not what you recall because that's not
12:24:17 what you heard?
12:24:18 A. I mean, I heard that saying, yes. I recall --
12:24:21 you know, like hear it, see it, yeah.
12:24:22 Q. That's what you said, right?
12:24:23 A. That's what I said at the time, yeah.
12:24:25 Q. Your memory was better then, right?
12:24:29 A. I wouldn't say -- why do you say my memory is
12:24:35 better than -- why -- just -- like I said, at the
12:24:35 time -- like I told you before, earlier, I was --
12:24:41 Q. Stressed out?
12:24:42 A. Yeah.
12:24:43 Q. Okay. Very well.
12:24:47 I want to go ahead and mark this as 7. Okay?
12:24:47 (Whereupon, Plaintiff's Exhibit 7 was marked
12:24:56 for identification and is attached hereto.)
12:24:56 MR. LACY: Q. And I'm going to have you mark
12:25:02 on here with a M inside the box that you noted was the
12:25:13 car. Okay? Would you?
12:25:14 So inside the box you drew as the car, would
12:25:18 you make an M for you so I can identify it later.
12:25:23 And I know this isn't a hundred percent
12:25:25 accurate. Okay?
12:25:25 A. (The deponent complies.)
12:25:26 Q. Thank you.

Page 186

12:25:27 All right. And would you mark a W over the
12:25:31 figure you drew as Mario Woods being in the position he
12:25:35 was when you seen him initially.
12:25:40 A. Can I ask a question, why you couldn't do it?
12:25:42 Q. Because you have to indicate it. This is not
12:25:45 my recollection. It is yours. Okay? It's just formal
12:25:49 like that. All right?
12:25:49 A. I was just asking.
12:25:51 Q. All right.
12:25:52 Okay. I don't have any further questions at
12:25:56 this time.
12:25:56 MR. CONNOLLY: I have some follow-up.
12:26:03 Let's -- have you marked, Counsel, this as an
12:26:06 exhibit?
12:26:06 MR. LACY: Yes.
12:26:08 MR. CONNOLLY: What's the number or the letter?
12:26:09 MR. LACY: 6.
12:26:10 THE WITNESS: 6.
12:26:11 MR. CONNOLLY: 6?
12:26:11 MS. HAMMELL: That's correct.
12:26:11 MR. CONNOLLY: 6?
12:26:11 MR. LACY: Yes.
12:26:13 EXAMINATION BY MR. CONNOLLY
12:26:13 MR. CONNOLLY: Q. Mr. Gardner, can you go back
12:26:15 to Page 14 that you were just reading.

Page 187

12:26:18 A. Uh-hum.
12:26:19 Q. And there seems to be one part of this dialogue
12:26:24 on this page that counsel did not ask you about that
12:26:27 starts at Page -- at Line 11. It starts with -- at the
12:26:34 end of that line and says, quote, "And that's when I
12:26:38 seen he kind of pull out a knife. And I was just all,"
12:26:42 and then before you finish your sentence, the next
12:26:45 question begins, and the question is: "You kicked him
12:26:48 in the chest." Do you see that?
12:26:51 A. Yeah.
12:26:51 Q. Okay. When I read it, it appears to say -- you
12:26:55 appear to be saying that you saw the knife before you
12:26:59 kicked him in the chest. That's how this reads.
12:27:04 MR. LACY: Is that a question, Counsel?
12:27:05 MR. CONNOLLY: I'm asking him.
12:27:07 Q. Do you see that transcript, and the language I
12:27:10 just pointed out?
12:27:13 MS. HAMMELL: Asked and answered.
12:27:14 THE WITNESS: Yeah, because I had said that
12:27:16 earlier, that I seen the knife before -- when I got out
12:27:20 the car. Before I got out the car.
12:27:21 MR. CONNOLLY: Q. Right. Okay.
12:27:23 So just -- I want to be clear on what you're
12:27:27 telling Mr. Lacy here.
12:27:29 You saw the knife before you kicked him?

Electronically signed by Patricia Rosinski (501-003-893-3227)
86b7407b-163f-463e-a8e7-48a3c888f773

Page 188

12:27:34 A. Correct.
12:27:35 Q. Okay. Now, at the beginning of Mr. Lacy's questions about this part of the transaction, you said initially when Mr. Woods approached the car window and you saw him, that based on his size, you didn't view him as a threat. Do you remember saying -- giving testimony like that?
12:28:14 A. Yes.
12:28:15 Q. Okay. And let me -- I'm going to ask follow-up questions on this point.
12:28:22 Why is it at that point, when you were in your car and you looked up and saw Mr. Woods in this fighting stance with his fist balled, the one you demonstrated on the camera when Mr. Lacy asked you, why isn't it that you didn't view him as a threat at that point?
12:28:41 A. Well, I didn't even view him -- like I said, I never really viewed him as a threat. I just kind of looked at it as a situation where -- this might be a situation that I could -- potentially might have to defend myself.
12:28:51 So it wasn't really like a threat. It was just like -- kind of, like, seeing something and kind of, like, trying to figure out the best possible way of how to deal with it.
12:29:02 Q. Right.

Page 189

12:29:03 And that was, in part -- you testified to this, and you correct me if I'm wrong -- that this guy, Mario Woods, comes up to you in front of your own house -- or your aunt's home --
12:29:14 A. Uh-hum.
12:29:15 Q. -- and essentially starts challenging you. Correct?
12:29:18 A. Yes.
12:29:18 Q. And you felt as though, "This is where I live. I don't know this guy. I'm not going to be chased away by him"; is that correct?
12:29:27 A. Correct.
12:29:29 Q. And I think you said that based on what you knew at that point in time, you could overpower him if this thing escalated?
12:29:39 A. Yeah.
12:29:40 Q. And then you said something that interests me -- and I want to ask you some questions about -- you said that, quote, "I guess I underestimated him." Do you remember saying that?
12:29:51 A. Correct.
12:29:51 Q. What did you mean by that?
12:29:53 A. Just, like, the guy wasn't as easy to go down as I thought he was going to be easy to go down.
12:30:02 Q. And that was before you saw the knife, correct?

Page 190

12:30:08 A. That -- I mean, like even me after seeing the knife, I didn't really think he was going to pose of a threat as much as that -- possibly can [sic]. You know, I thought, you know, okay, maybe I can knock him out before he can get a -- you know, land a shot on -- with me on the -- with the knife and everything.
12:30:26 Q. When you first saw the knife, did it concern you?
12:30:30 A. Yeah, it concerned me. I mean, like what -- it's just like seeing, like, any type of weapon or whatever that has a potential to kill you. So, yeah.
12:30:37 Q. Right, it does. And that's my point. Is that why it concerned you when you first saw it?
12:30:42 A. Yeah.
12:30:42 Q. You thought it could be used to kill you?
12:30:45 A. Yes.
12:30:45 Q. You thought if this thing escalated physically, it didn't matter how big or small he was, if he had a knife, he could kill you?
12:30:56 A. Yes. He could potentially, yeah.
12:31:08 Q. You also told Mr. Lacy that -- he asked you, "Well, why did you get out of the car?" And you said, "Maybe that was not the smartest decision." Okay? What did you mean by that?
12:31:20 A. Well, I mean, looking at it in hindsight, no.

Page 191

12:31:24 I mean, like, you know, I got stabbed partially due to a ego trip a little bit, you know, kind of trying to make sure that, you know, I kind of stand my ground in front of, you know -- in front of where I stay at. Just like most men would probably try to do, you know, that -- you know, probably if in this type of situation, you know, you just -- you don't necessarily want to be punked out by somebody in front of your own house. So that way you got to be looking -- like, every time you come outside, you got to be looking around the corner to see, is this guy outside. Okay. Right. Kind of walk outside, kind of be sneaking around. So it's kind of, like, me just kind of asserting -- you know, standing my ground and, you know, being my own man.
12:32:04 I didn't think that, you know, that would go down the way it did and everything.
12:32:09 Q. You didn't think he was going to actually stab you initially, did you?
12:32:12 A. I didn't even think that any -- I didn't even think me and this guy was going to even have a confrontation, like, to tell you the truth.
12:32:18 I mean, like, honestly, I didn't think that he -- like he had it in him to just, you know, come do what he did and everything. It was just -- to me it was just like a total fluke incident.

Electronically signed by Patricia Rosinski (501-003-893-3227)
86b7407b-163f-463e-a8e7-48a3c888f773

It wasn't like something that -- you know, like, me and him had it out or anything before or anything like -- you know, this is, like, premeditated or something like that, if I see you again, this is going to happen and shit like that.

But, no, this was just like -- kind of, like, going to a party and you kind of, like, seeing -- like, you know, get into it with somebody randomly.

Q. Right. I understand that. I understand what you're saying.

You couldn't have predicted what he was going to do with that knife when you got out of that car, could you have?

A. No.

Q. Okay. And you did get stabbed, correct?

A. Yes.

Q. The moment you got stabbed -- I don't think anyone has asked you this -- but do you recall that moment? Was it a -- was it a fraction of a second or was it, you know, a slow unfolding of events? Do you recall the motion that stabbed you?

A. I don't recall the motion that stabbed me. I just remember just -- it just -- it just happened. It was like one of the things that just kind of happened so quick that by the time you realize it happened, it was

just like -- it's already done. So my arm, it was just limp, and that's how I knew I was stabbed at that point, so...

Q. It happened quickly?

A. Yeah.

Q. Before you knew it, you were stabbed --

A. Yeah.

Q. -- just like that?

Now, listening to Mr. Lacy ask you these questions about this confrontation you had with Mr. Woods, you'd think that you started this confrontation. My question to you is: Who started this confrontation?

A. I think the male ego did --

Q. Whose?

A. -- more than anything.

It wasn't mine, really. Like -- obviously, like, I wasn't the one that looked like I had a problem. I can't be having a problem. I'm eating a cheeseburger and stuff, you know what I mean? So I can't have a problem with somebody like that, you know, and be trying to eat a cheeseburger and stuff. So, like, honestly, I don't think I was the aggressor in the -- in the situation, but...

Q. And that's my question. I mean, you were in

your car seated when Mario Woods came to your window. Correct?

A. Correct.

Q. You were in your car -- seated in your car when he started banging on the windows as though he was going to break it. Correct?

MS. HAMMELL: Objection. Mischaracterizes prior testimony, evidence.

But you can answer.

THE WITNESS: What --

MR. CONNOLLY: Q. You were in your car when he came up to your window? That's my first question.

A. Yes.

Q. And you were in your car when he started banging on the window?

A. Yeah.

Q. Had you done anything up to that point to provoke him?

A. No.

Q. And did you call him out verbally?

A. No.

Q. Did you flip him off, you know, with your finger behind the window?

A. No.

Q. Did you mouth anything or gesture to him in any

way that would provoke him?

A. No.

Q. And you were still in your car when you first saw the knife. Correct?

A. Correct.

Q. And you felt as though you were vulnerable being in the car. Correct?

A. Yeah.

Q. If he got through the window somehow and wanted to stab you, there's nowhere you could have gone. Correct?

A. No.

Q. Is that correct?

A. Correct.

Q. Mr. Lacy asked you about some of your observations about how Mr. Woods was behaving before and during the physical confrontation that I want to ask you follow-up questions about.

I know you were asked some questions when I examined you which you didn't answer, but you answered the same question when Mr. Lacy asked you. But I'm going to ask you a couple more because they're important to me to try to understand -- get a visual picture of what was happening.

And as Mr. Lacy and I have both tried to

Electronically signed by Patricia Rosinski (501-003-893-3227)

86b7407b-163f-463e-a8e7-48a3c888f773

Page 196

12:37:13 explain, we're not here just to, you know, belabor points. We're trying -- we weren't present. So we don't have a visual picture, the same visual picture you have. And we're just trying, through words, to fill that picture in.

12:37:26 And my question has to do with this -- various used -- words used: tweaking, doing, quote/unquote, weird shit.

12:37:41 I asked you at the first deposition a little bit about his speech and how you arrived at that conclusion he was acting weird and tweaking, and you said his speech was slurred. And that's about as far as we got.

12:37:57 When you -- and you've said you've seen people on drugs and you've lived and experienced seeing people on drugs and the symptoms they exhibit when they are on drugs.

12:38:13 A. Uh-hum.

12:38:14 Q. As best you can, can you describe what it was -- other than using a phrase "acting weird" or "tweaking" -- what it was Mr. Woods was doing?

12:38:23 And, for instance, I would say to you, you know, were his eyes following you? Was there anything about his eyes that were unusual?

12:38:33 A. What do you mean his eyes being unusual?

Page 197

12:38:36 Q. When you looked at him, did you think he was tweaking because his eyes were watery or bloodshot? Or some people will have a fixed stare and gaze at you, and some people can't look at you eye to eye.

12:38:50 Did you notice anything about his eyes in that regard?

12:38:54 A. I would say that it was more of a fixed stare.

12:38:57 Q. Okay. And was it a faraway stare? People have oftentimes used that phrase. In other words, if he was, like, looking right through you, like he didn't see you although he was looking at you, or was he engaged with you visually? Do you know what I'm saying?

12:39:12 A. Well, that's just a perception. I mean, like I can just sit here and say, like, what he could have been doing, but at the end of the day, like, I don't know exactly what he was doing. It could look like that, but, like, you know, I don't know exactly what he was doing.

12:39:23 Like I said, like, his behavior was just not like a person that was sober. He didn't strike me as a person that was sober. He just striked me as a person that was on drugs, and that was it.

12:39:34 Q. Okay. And, again, was that because he just -- he wouldn't verbally engage with you? In other words, you tried to verbally engage him, like, "Dude, what's up? Why are you doing this," and he just wouldn't respond, or there was some kind of communication that led you to believe that he's high on something. So on that question it's more verbal. I'm talking about the verbal part of it.

Page 198

12:39:57 A. I think I asked you this question before, but I'm not going to ask. I'm just going to say that from my understanding that day when I seen Mr. Woods and how his actions were, like I say, it just seemed like it was -- just, like, he was off.

12:40:13 Q. Okay.

12:40:15 A. Like erratic, not -- like agitated. He just -- compared to what people told me about him, that wasn't the person who I seen that day.

12:40:27 Q. Okay.

12:40:28 A. So...

12:40:29 Q. Okay. I asked you during the first part of this deposition whether you had seen Mr. Woods anywhere on any previous occasion, and you said no.

12:40:47 When Mr. Lacy asked you, you said you had actually seen him in that spot before, that spot near your aunt's house.

12:40:55 I want to ask you one more time, just make sure we're all clear and on the same page.

12:41:03 My understanding is that you did not know Mario Woods prior to this incident?

Page 199

12:41:09 A. Correct.

12:41:10 Q. And you had not had any sort of verbal interactions with him prior to this incident?

12:41:16 A. Correct.

12:41:17 Q. But you had, in fact, seen him in the neighborhood. And by "neighborhood," I mean in that area that you've earlier described. Is that fair?

12:41:24 A. Correct.

12:41:25 Q. Okay. And how many times had you seen him in that area prior to this incident?

12:41:30 A. Probably like once or twice.

12:41:32 Q. Okay.

12:41:33 A. It wasn't like -- like a lot to just say, like, yeah, I kind of -- "I know this guy, yeah. He's the guy that stands in the corner all the day." Like, you know, if I seen him, I seen him. But, you know, like -- like I say, it was once or twice.

12:41:52 Q. Okay. Mr. Lacy also -- he asked you some questions and asked you to look at this exhibit, which is -- I think we've described it as 6, the transcript of the interview. And there were a couple of things I noticed about it, other parts of the transcript.

12:42:24 But you'll recall that when I asked you questions during my part of the deposition, I asked you

Electronically signed by Patricia Rosinski (501-003-893-3227) 86b7407b-163f-463e-a8e7-48a3c888f773

whether you had described to the police officers asking you about the incident -- when you were describing who stabbed you, whether the person who stabbed you was wearing green shoes. You said no.

A. Correct.

Q. I see here in this transcript at Page 10 when you were asked that question by the police, you described the person who stabbed you as wearing green shoes, some dark forest green shoes, Page 10, Line 11 [sic]. Do you see that?

A. So?

Q. Does that refresh your recollection as to what you told the police officers in terms of describing Mario Woods' shoes?

A. It looks like it.

Q. Okay.

A. I mean, it's in the transcript.

Q. Well, does it refresh your recollection as to what you told them?

MS. HAMMELL: Would you clarify that question?

MR. CONNOLLY: Q. Does reviewing this exhibit refresh your recollection as to what you told the police officers during this interview that Mr. Lacy asked you about?

MS. HAMMELL: Can you put in layperson's terms

what "refresh your recollection" means?

MR. CONNOLLY: That is a layperson term that lawyers use a lot. You can show --

MS. HAMMELL: Can I rephrase it for him?

MR. CONNOLLY: -- any witness any exhibit, anything. You can say something to them to help refresh their recollection.

He has previously testified in his deposition that he did not recall or --

THE WITNESS: Well --

(Overlapping speakers.)

MR. CONNOLLY: -- alternatively, did not.

THE WITNESS: I still don't recall saying this, though. But like I said, like, you guys have this stuff written down, like, and you're asking me to recall something that -- that was said over a year ago now. I don't remember saying that.

MR. CONNOLLY: Q. And that's fair. It's understandable that over time people's memories become worse.

But you would agree that this interview was given shortly after the incident?

A. This interview was given at the time -- from what I heard at the beginning of this transcript, it was given after -- around, like, what? Seven or eight.

Q. But from your memory, you interviewed shortly after the incident, correct?

A. No, this is, like, a couple hours after the incident.

Q. Okay. From your recollection, you were interviewed a couple of hours after the incident?

A. Yeah.

Q. And your memory of the events would have been fresher than they are today?

A. And your point is?

MS. HAMMELL: Well, you can answer the question. Do you agree with what he asked?

THE WITNESS: I -- I would say this is -- I would say that day I -- I can't remember exactly what was said and what my kind of -- what -- you know, what I was probably thinking that day. Because obviously he wasn't wearing no green shoes that day.

MR. CONNOLLY: Q. Well, you don't know that.

A. I seen the video, so I mean, yeah.

Q. Do you know what color of shoes he was wearing that day?

A. Black.

Q. Are you certain about that?

A. From what I seen in the video, it looked like they were a black pair of shoes to me.

Q. I know, but I'm not asking you what some video appeared to depict. I'm asking from --

A. It didn't appear.

Q. -- your recollection.

A. It is -- like, that's what I seen from the video, right? I -- like I said -- from what I said, that this was an estimate. He told me to give him an estimation.

If you look at what Inspector Bonner said, he said it was a estimation -- I gave him an estimation of what I could recall from that.

Q. But when you did that, you did that a couple hours after the incident?

A. I did it from what I could recall.

Q. And you did that a couple hours after the incident?

MS. HAMMELL: Asked and answered many times.

MR. CONNOLLY: Q. -- is that correct?

MS. HAMMELL: But you can answer it.

THE WITNESS: I'd say yes.

MR. CONNOLLY: Q. Okay. How many -- how many times have you viewed a videotape of the shooting of Mario Woods?

A. More times than I would probably like to remember -- see.

Electronically signed by Patricia Rosinski (501-003-893-3227)

86b7407b-163f-463e-a8e7-48a3c888f773

Page 204

12:46:41 Q. Okay. Can you just give me a number, an estimate, if possible? More than ten?

12:46:45 A. I don't know. Probably so. I wasn't counting how many times I seen the video of somebody getting killed, so...

12:46:58 Q. Did you see any video before you gave a statement to these police officers on this date, December 2nd?

12:47:06 A. Did I see any video?

12:47:07 Q. Did you see the video of the shooting of Mario Woods before giving the statement on December 2nd?

12:47:13 A. Nope.

12:47:13 Q. Okay.

12:47:16 A. Apparently, he was already shot and killed after this time. So that would explain why there were so many officers at the hospital that day to help me up at the hospital.

12:47:31 Q. Okay. Did you read any newspaper articles about this case?

12:47:38 A. Uh-hum.

12:47:39 Q. Is that a "yes"?

12:47:40 A. Quite a bit, yeah.

12:47:41 Q. When you say "quite a bit," like how much? How many times? What?

12:47:45 A. Let's put it like this, man: I just -- this --

Page 205

12:47:48 this whole situation, I've been following it to see what -- how -- what is going to happen and how I'm going to have to be used in this.

12:47:56 Q. Okay. So you've been following it in the press?

12:47:59 A. Yes, I have.

12:48:01 Q. Now, we discussed earlier and then went over, you yourself gave several interviews to media outlets too, correct, about this incident?

12:48:11 MS. HAMMELL: That was asked and answered.

12:48:12 You can answer.

12:48:13 THE WITNESS: Yeah.

12:48:15 MR. CONNOLLY: Q. Okay. You said you met the mayor after this incident?

12:48:32 MS. HAMMELL: Asked and answered.

12:48:33 THE WITNESS: Yes, I did.

12:48:34 MR. CONNOLLY: Q. Do you recall the date?

12:48:36 THE WITNESS: No.

12:48:36 MR. CONNOLLY: Q. Do you recall whether it was a matter of days, weeks, or months after the incident that you met the mayor?

12:48:42 A. Maybe -- not days. Maybe like a month.

12:48:50 Q. And on how many separate occasions did you meet the mayor after this incident?

12:48:58 A. I only seen him that one time.

Page 206

12:49:00 Q. And had you ever met him or any mayor before this incident?

12:49:04 A. Yeah, I've met mayors before this incident happened. I met Mayor -- well, I seen him and met him before the incident even happened. He came to one of my Tech SF meetings.

12:49:14 Q. Who? Which mayor?

12:49:16 A. Lee.

12:49:17 Q. Oh, this Mayor. Mayor Lee?

12:49:20 A. Yes.

12:49:20 Q. Did you -- I mean, did he know you by name? Do you have a relationship with him?

12:49:22 A. He's not going to remember me by name.

12:49:24 Q. Well, I know, but I'm asking. I don't know.

12:49:27 A. I'm not that special.

12:49:32 Q. When you met with him after the -- just to be clear, you met with him one time after this incident?

12:49:38 A. Yes.

12:49:38 Q. Okay. And where did that meeting take place?

12:49:40 A. In his office.

12:49:42 Q. And how long did the meeting last?

12:49:46 A. I don't know. 20 minutes.

12:49:48 Q. And I think you said several people were present during that meeting?

12:49:57 A. There were several people. I know the mayor

Page 207

12:50:00 was, a few of the staff was around. I just remember one, Diane -- I think her name is Deanna. Her last name starts with a O.

12:50:16 Q. Okay.

12:50:16 A. She was, like, one of the people who put in a point to get me connected with certain agencies: child support, employment. Housing's supposed to be in on there too, but I guess apparently I have to go through the other outlets that everybody else goes through. I don't get no special privileges or -- it looks like for that.

12:50:40 Q. And so what did the mayor tell you that day? What did you guys talk about?

12:50:46 A. He gave me some fake-ass condolence. He's sorry that that -- that I-had-to-go-through-something-like-that speech. And -- and "We're going to do anything we can to try to help you get through this and everything." So, yeah.

12:51:04 Q. Did he say anything other than those types of comments?

12:51:08 A. Not that I can recall, no.

12:51:10 Q. Okay. Did you get any certificate, award, anything like that, from the mayor's office?

12:51:20 A. For?

12:51:20 Q. For anything.

Electronically signed by Patricia Rosinski (501-003-893-3227) 86b7407b-163f-463e-a8e7-48a3c888f773

Page 208

A. No.
Q. And there's one other area I want to ask you about that Mr. Lacy brought up.
A. Uh-hum.
Q. Are you suggesting there is some kind of connection between being subpoenaed in this case and you being notified that your job had come to an end?
A. Well, I just kind of look at it like this, man: I figure the only reason why I was offered a job is so -- I mean, there was tabs to be placed on me because there was no other way of really asserting any kind of tabs on me. So what better way to keep tabs on me is to have me working for the City of San Francisco so you can just look up my name in the system and find me and just, hey, ever so conveniently find me and give me a disposition [sic] when you -- when you ever -- when you need me to come into play for this situation.
MS. HAMMELL: You mean deposition?
THE WITNESS: Deposition, yeah. Sorry. I'm not -- don't know all the legal jargon. But, yeah.
MR. CONNOLLY: Q. But that's what you think, correct?
A. I mean, yeah, that's what I think. I ain't saying that's what's going on.
Q. Well, I know.

Page 209

But I want to know, is there any -- has anyone -- is there any evidence of that? Is that just something you've put together?
A. Well --
MS. HAMMELL: Objection. Compound.
But you can answer.
THE WITNESS: Compound? What --
MS. HAMMELL: Don't worry about it. Just -- you can answer however you want truthfully.
THE WITNESS: Well, like I said, it's just -- I just find it like, you know, I get some help to get a city job and expedited into working. Due to the fact of the nature of this whole situation, that's the only reason why I even got a look at getting a job for the city. Other than that, I would have still been, you know, a regular Joe on the street.
But for some reason, this gave me some type of clout to get a job with the city and expedited me into working.
Then, you know, a couple months down the line -- you know, six, seven months down the line, all of a sudden you guys want me to speak. I say no. Then I get deposed.
Next thing I know my job calls me -- my manager calls me and says that I won't be working no longer for

Page 210

the PUC and doesn't even really give me a definitive answer.
So I'm expecting it to be something on my end, but I haven't been told anything that it was from my end. So what else am I supposed to think?
MR. CONNOLLY: Q. Could it have been a coincidence?
A. I mean, that would have been one hell of a coincidence, don't you think?
Q. I don't know. It was a temporary job. "Temporary," doesn't that mean temporary means temporary and not permanent?
A. Well, if you're -- if it was temporary, why would you tell somebody you're going to give them an X amount of time, and then all of a sudden this happens and then (indicating) you cut -- you cut -- you cut it down all of a sudden?
Q. Okay. But this is your opinion?
A. And then my -- and my manager also barely makes sure she says to me that you guys represent us as counsel. So everything that I have -- basically I have to comply to all this stuff and, you know...
Q. So your manager told you you have to comply with this process?
A. Yeah.

Page 211

Q. Are you here because your manager told you to be here, or are you here because there's a court-ordered --
A. Well, I'm here --
Q. -- subpoena?
A. -- because you obviously --
Q. Hold on. Hold on.
A. -- subpoenaed me. So I have to.
Q. Okay. So you're just obeying a court order by being here, correct?
A. That's all. Other than that, I'm pretty sure I would be in a lot of legal boo-hoo right now if I didn't follow it, right?
Q. Well, I'm confused. You said -- you also told Mr. Lacy, you know, you asked for help after this incident. You asked for housing. You asked for assistance.
A. Why would -- why else wouldn't I want to ask for help if I want to get away from this whole situation that was caused by city workers?
Like, at the end of the day, this was an incident that wasn't caused by my -- my incident with Mario was just a street fight. He didn't get killed. He wasn't hurt or anything.
But after the incident happened with the cops,

Electronically signed by Patricia Rosinski (501-003-893-3227)
86b7407b-163f-463e-a8e7-48a3c888f773

Page 212

12:56:09 he's hurt and he's killed. All of a sudden my life is
12:56:12 being fucked up and all the shit with me just being a
12:56:15 victim. Well, I'm just told I'm being a victim, but I
12:56:18 mean, I feel like I'm being treated like a criminal to
12:56:26 some extent.
12:56:27 THE REPORTER: Wait. Slow down.
12:56:27 MR. CONNOLLY: Q. Okay. So you were stabbed,
12:56:30 correct?
12:56:30 MS. HAMMELL: Objection. Asked and answered
12:56:32 many times.
12:56:32 MR. CONNOLLY: Q. Correct?
12:56:34 A. Correct.
12:56:35 Q. Did you feel by being stabbed you became a
12:56:39 victim of a stabbing?
12:56:41 A. I wouldn't classify myself as a victim at all.
12:56:45 Q. Okay. So you were stabbed with a knife and you
12:56:48 were unarmed at the time you were stabbed, and you don't
12:56:51 feel as though you were a victim by that act?
12:56:55 A. No.
12:56:56 Q. But you did go to the Victim's Indemnity Fund
12:57:00 or the Victim Services Unit of the district attorney and
12:57:03 request assistance as a victim, did you not?
12:57:06 A. That's what I was told to do.
12:57:10 Q. Could you have elected not to do it?
12:57:13 A. I don't know. They didn't tell me I couldn't

Page 213

12:57:16 not do it. So as far as I know, I just went ahead and
12:57:20 did what was advised of me to do.
12:57:22 Q. Okay. But you had -- I mean, you had the power
12:57:24 of choice at the time, did you not?
12:57:25 A. I don't know. Did I? I wasn't told anything
12:57:27 about that. I was just told to just go and apply for
12:57:30 that.
12:57:30 Q. And you could have chosen not to apply too,
12:57:33 correct?
12:57:35 A. I -- I guess if that's...
12:57:37 Q. I mean, you could have pursued employment with
12:57:42 the PUC or you could have chosen not to, correct?
12:57:48 A. So what are you implying?
12:57:48 MS. HAMMELL: He's just asking.
12:57:51 MR. CONNOLLY: Q. I'm implying that it was
12:57:52 your decision, was it not? Was it your decision to
12:57:54 pursue that job at the PUC?
12:57:56 A. I checked it out to see what kind of
12:57:59 opportunity was presented to me because I didn't want to
12:58:00 turn down any opportunities.
12:58:01 Q. Right. It was an opportunity, right?
12:58:03 A. That's how I looked at it. But it didn't turn
12:58:06 out that it was an opportunity to just turn around. It
12:58:08 was just something temporary.
12:58:10 Q. Well, I thought Mr. Lacy asked you whether or

Page 214

12:58:13 not -- that opportunity helped you sustain your family
12:58:16 and yourself, did it not?
12:58:18 A. How is it helping me sustain if I'm not about
12:58:23 to be getting any income after this month?
12:58:24 Q. Well, has it up to this point been helping
12:58:26 sustain your life?
12:58:27 A. Not necessarily, no.
12:58:28 Q. So you didn't need the job?
12:58:30 A. What I'm saying is that the job didn't
12:58:33 necessarily fulfill my needs, is that -- I'm still
12:58:36 homeless as of right now. I'm still struggling to pay
child support --
THE REPORTER: Can you please slow your speech
down? "I'm still struggling to"?
THE WITNESS: (No response.)
THE REPORTER: I'm trying to make a record of
what you're saying, and if you talk too fast --
THE WITNESS: Okay. So I have to slow down?
THE REPORTER: Well, excuse me. No --
MS. HAMMELL: Please watch your tone with the
12:59:09 witness.
12:59:09 MR. CONNOLLY: No. Hold on. You don't talk to
12:59:10 the court reporter that way. You don't treat the court
12:59:11 reporter that way. We don't do that here. Okay?
12:59:14 MS. HAMMELL: Can we go off the record for a

Page 215

12:59:17 second?
12:59:20 MR. CONNELLY: Yeah, we'll go off the record.
12:59:20 THE VIDEOGRAPHER: The time is 12:59 p.m.
12:59:20 (Whereupon, a recess was held from 12:59 p.m.
13:07:32 to 1:07 p.m.)
13:07:32 THE VIDEOGRAPHER: The time is 1:07 p.m.
13:07:38 MS. HAMMELL: Before it gets back started, I
13:07:38 wanted to just object for the record to the tone that's
13:07:44 been taken by some personnel here that -- towards this
13:07:46 witness who's a third-party witness doing his best. I'm
13:07:49 hoping we can all keep that in mind as we go down the
13:07:53 final stretch.
13:07:54 I also want to remind everyone we have a
13:07:55 stipulation to keep this to no more than three hours. I
13:07:57 recall we started at 10:16. All of us have to leave
13:08:01 today by 1:16, so we will be leaving at that time.
13:08:04 MR. CONNOLLY: Q. Mr. Gardner, on the day of
13:08:40 the incident, before you had a confrontation with
13:08:43 Mario Woods, did Mario Woods ask to buy drugs from you?
13:08:46 A. Fuck, no.
13:08:49 Q. What was that?
13:08:50 MS. HAMMELL: Watch your language. Just answer
13:08:57 yes or no.
13:08:57 THE WITNESS: I said my answer.
13:08:58 MR. CONNOLLY: Q. At the time -- on the date

Electronically signed by Patricia Rosinski (501-003-893-3227) 86b7407b-163f-463e-a8e7-48a3c888f773

Page 216

13:09:41 of the incident, at the time of the incident, were you
13:09:43 employed by any company, organization, business?
13:09:49 A. I probably already stated this for the record
13:09:59 already, but BAVC was my employer at the time of the
13:10:02 incident that I was working for.
13:10:04 Q. And where are they -- where are their business
13:10:08 offices located?
13:10:08 A. Google it.
13:10:10 MS. HAMMELL: You can answer. You should
13:10:11 answer.
13:10:11 THE WITNESS: Google it.
13:10:12 MR. CONNOLLY: Q. You don't know?
13:10:15 A. It's on Mariposa Street. That's all I know. I
13:10:18 don't know the exact address. So, as I said, "Google
13:10:20 it."
13:10:20 MS. HAMMELL: You don't know the answer?
13:10:22 THE WITNESS: I don't know the answer right
13:10:23 now, no.
13:10:24 MR. CONNOLLY: Q. And how long had you worked
13:10:33 there as of the date of the incident?
13:10:39 A. Eight months.
13:10:39 Q. And how much were you making at the date of the
13:10:42 incident?
13:10:42 A. 1400 a month.
13:10:44 MS. HAMMELL: There are six minutes left.

Page 217

13:10:46 MR. CONNOLLY: Well, I mean, we've never
13:10:50 clarified whether that was three hours of testimony
13:10:52 versus three hours of time and --
13:10:52 (Overlapping speakers.)
13:10:52 MS. HAMMELL: The understanding was that it
13:10:52 wouldn't last another session.
13:10:55 MR. CONNOLLY: Let me finish for the record.
13:10:57 I'm making a record, please.
13:11:00 You've spent a lot of time consulting with your
13:11:04 client outside of this room. So I think since we're
13:11:07 near the end, we should just finish up even if it goes
13:11:11 beyond 15 minutes.
13:11:11 MS. HAMMELL: Well --
13:11:11 MR. CONNOLLY: If you don't want to, that's
13:11:12 fine. We'll come back.
13:11:13 MS. HAMMELL: I think -- yeah, I think we
13:11:15 should discuss that because we all have a hard need to
13:11:18 get out of here.
13:11:19 My understanding it was three hours at the
13:11:21 session due to my client's medical condition, that it's
13:11:24 stressful to be in a deposition, whether it's at the
13:11:26 table or conferring.
13:11:27 MR. CONNOLLY: Okay. So why don't we bifurcate
13:11:27 the deposition, and we can --
13:11:27 (Overlapping speakers.)

Page 218

13:11:27 MS. HAMMELL: We'll go --
13:11:30 MR. CONNOLLY: -- come back at a later time.
13:11:31 THE WITNESS: That's all good because I'm just
13:11:33 going to go back to my [unintelligible] because I can't
13:11:33 be doing --
13:11:36 (Overlapping speakers.)
13:11:36 MS. HAMMELL: Would you rather stay now for 15
13:11:36 minutes or --
13:11:36 (Overlapping speakers.)
13:11:36 THE WITNESS: I can't keep doing -- I can't
13:11:37 keep coming back and doing this because I'm just going
13:11:38 to --
13:11:38 MS. HAMMELL: Are you fine to stay now for 15
13:11:40 more minutes or to come back? You have to come back if
13:11:45 Sean makes you come back.
13:11:45 THE WITNESS: For what? Just because he wants
13:11:47 to be an asshole right now?
13:11:49 MS. HAMMELL: No. Sorry. Let's not talk about
13:11:49 this on the record.
13:11:52 Let's go off the record.
13:11:54 MR. LACY: How much more do you have, Counsel?
13:11:56 MR. CONNOLLY: Not much.
13:11:56 MR. LACY: Well, what does that mean?
13:11:56 MR. CONNOLLY: I don't know. It depends on
13:11:59 what the answer is. If I've got to go Google an

Page 219

13:12:00 address, it may take a little longer. Let me go Google
13:12:02 it now while I waste everybody's time.
13:12:02 MS. HAMMELL: It seems like you're getting
13:12:03 pretty frustrated --
13:12:03 MR. CONNOLLY: I'm not.
13:12:03 MS. HAMMELL: -- and your tone has become kind
13:12:05 of abusive and hostile.
13:12:05 (Overlapping speakers.)
13:12:05 MR. CONNOLLY: I get paid to be here. I'll be
13:12:05 here all day if I have to.
13:12:07 MS. HAMMELL: If that's going to become
13:12:08 harassment --
13:12:08 MR. CONNOLLY: Okay.
13:12:08 MS. HAMMELL: -- I'm going to object if you ask
13:12:11 questions like that to my client.
13:12:12 MR. CONNOLLY: Where he worked? The address of
13:12:15 where he worked?
13:12:15 MR. LACY: He answered.
13:12:16 MS. HAMMELL: Right, he answered that he didn't
13:12:18 know.
13:12:19 Mr. CONNOLLY: Are we going --
13:12:19 (Overlapping speakers.)
13:12:19 MS. HAMMELL: You're getting frustrated with
13:12:19 the answer.
13:12:20 MR. CONNOLLY: -- back on the record or not?

Electronically signed by Patricia Rosinski (501-003-893-3227) 86b7407b-163f-463e-a8e7-48a3c888f773

Page 220

Are we going back on the record or not?

THE VIDEOGRAPHER: I don't think we were off the record.

MR. LACY: We're on the record.

THE VIDEOGRAPHER: We're on the record.

(Overlapping speakers.)

13:12:26 MR. LACY: Are we resuming?

13:12:28 MS. HAMMELL: Yeah, let's resume. Let's just finish it.

13:12:32 MS. GUERTIN: I just want to say I do actually have to be someplace at 1:30, so...

13:12:36 MR. LACY: How much longer do you have, Counsel?

13:12:38 MR. CONNOLLY: I don't know.

13:12:39 MR. LACY: Counsel is telling you she --

13:12:41 (Overlapping speakers.)

13:12:41 MR. CONNOLLY: I don't know. I don't know. I don't know. I'm spending more time addressing all these remarks. I can't follow --

13:12:44 MS. HAMMELL: That's not accurate.

13:12:48 MS. GUERTIN: I, unfortunately, do have to be someplace at 1:30, and it will take me 15 minutes to get there.

13:12:53 So, you know, my understanding -- my ability to be here was based on the representation that this would

Page 221

take no more than three hours today.

13:13:01 You know, realistically, if -- is there an estimate of time that you have for the rest of your questioning?

13:13:08 If you think it's going to be five minutes, then that's okay. But if you, you know, do genuinely think that it's going to take longer than that, then I need to leave, so...

13:13:18 MR. LACY: Counsel?

13:13:19 MR. CONNOLLY: I don't know. It's not going to be long, but I suspect it will be 15 minutes. It could be less. It could be a little more. I just don't know.

13:13:27 MS. HAMMELL: Can we set a prior cap?

13:13:30 MR. CONNOLLY: It in part necessarily depends on what the answer to the questions are.

13:13:34 MS. HAMMELL: Can we set a hard cap on -- at 1:30?

13:13:38 MR. CONNOLLY: That's fine. But if we're not done, we'll just have to reconvene at another time.

13:13:41 MR. LACY: I don't have any further questions, so I'm not asking any other questions.

13:13:46 MS. GUERTIN: I do have to go. So why don't we -- let's briefly confer outside, and then you can decide what --

13:13:50 MS. HAMMELL: Okay.

Page 222

13:13:50 MS. GUERTIN: -- you want to do.

13:13:50 THE WITNESS: Do you guys want me to go outside with you?

13:13:53 MS. HAMMELL: Yes.

13:13:53 THE VIDEOGRAPHER: Okay. The time is 1:14 p.m. We're going off the record.

13:18:31 (Whereupon, a recess was held from 1:14 p.m. to 1:18 p.m.)

13:18:33 THE VIDEOGRAPHER: The time is 1:18 p.m. We're back on the record.

13:18:45 MS. HAMMELL: Even though we had the stipulation to do three hours, we've agreed to go past three hours today, assuming you don't have more than half an hour left.

13:18:52 If it gets to that point that my client's anxiety is so triggered that he cannot tolerate staying here, we'll decide whether we have to end it or -- and get recalled or whether we'll keep pushing. I just wanted to let you guys know.

13:19:09 MR. CONNOLLY: I have nothing further. Anything else?

13:19:15 MR. LACY: All right.

13:19:15 THE VIDEOGRAPHER: This marks the end of Video Number 2 and the conclusion of today's deposition of Mr. Gardner. The time is 1:19 p.m., and now we're off

Page 223

13:19:25 the record.

(Whereupon, at the hour of 1:19 p.m., the deposition was concluded.)

Electronically signed by Patricia Rosinski (501-003-893-3227) 86b7407b-163f-463e-a8e7-48a3c888f773

DECLARATION OF WITNESS

I, MARCEL SHEPARD-GARDNER, hereby declare that I have read the foregoing testimony recorded on pages 102 to 218, inclusive, and the same is a true and correct transcription of my testimony, except as I have indicated on the errata sheet attached hereto.

__________________________

WITNESS

1. ( ) The Deponent failed to appear to read, correct, or sign his or her deposition.

2. ( ) The Deponent refused to read, review, or sign his or her deposition for the following reason:

3. ( ) The Deponent approved his or her deposition by letter (with) or (without) corrections attached hereto and made a part of this deposition herein.

REPORTER'S CERTIFICATE

STATE OF CALIFORNIA )
)
COUNTY OF MARIN )

I, PATRICIA ROSINSKI, Certified Shorthand Reporter No. 4555 for the State of California, certify:

That MARCEL SHEPARD-GARDNER, the witness in the foregoing deposition, was by me first duly sworn to testify to the truth in said cause;

That said deposition was reported at the time and place therein stated by me and was thereafter transcribed by me on computer, after which the witness was afforded the opportunity to read, correct, and sign the deposition;

That if unsigned, the witness shall not have availed him- or herself of the opportunity to sign, or signature has been waived.

I further certify that I am not interested in the outcome of said action, nor connected with nor related to any of the parties in said action, nor to their respective counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of December 2016.

Patricia Rosinski

Patricia Rosinski, CSR #4555

December 16, 2016

Marcel Shepard-Gardner
c/o Hilary Hammell
Bayview Hunters Point Community Legal
4622 3rd Street
San Francisco, California 94124

Re: Woods v. City and County of San Francisco

Dear Mr. Shepard-Gardner:

Notice is hereby given that the original transcript of your deposition, taken December 7, 2016, is now available for your reading, correcting and signing. This review is not mandatory.

Pursuant to CCP 2025.520, for 35 days following the date of this notice you may change the form or substance of an answer to any question. You may make changes to the original transcript at our office or a certified copy provided by counsel or by purchasing a certified copy if permitted by the code.

Forward any changes and/or signature to our office. Upon receipt, we will include such in the original transcript as well as notify all counsel.

Please telephone this office for an appointment if you desire to review the original transcript.

Sincerely,

Bonnie L. Wagner & Associates

cc: Counsel of record

DEPONENT'S CHANGES OR CORRECTIONS

Note: If you are adding to your testimony, please print the exact words you want to add. If you are deleting from your testimony, print the exact words you want to delete. Specify with "Add" or "Delete," and sign this form.

DEPOSITION OF: MARCEL SHEPARD-GARDNER
NAME OF CASE: Woods vs. City and County of San Francisco
DATE OF DEPOSITION: December 7, 2016

I, MARCEL SHEPARD-GARDNER, have the following corrections to make to my deposition:

| PAGE | LINE | CHANGE-ADD-DELETE |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Electronically signed by Patricia Rosinski (501-003-893-3227)
86b7407b-163f-463e-a8e7-48a3c888f773