# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

GWENDOLYN WOODS, individually)
and as Successor in Interest )
to Decedent MARIO WOODS,      )
                              )
            Plaintiff,        )
                              )
        vs.                   ) CASE NO.:  3:15-05666-WHO
                              )
CITY AND COUNTY OF            )
SAN FRANCISCO; a municipal    )
corporation, et al,           )
                              )
            Defendants.       )
_____)        CERTIFIED COPY


VIDEO DEPOSITION OF CHARLES AUGUST

THURSDAY, JULY 26, 2018


REPORTED BY:  SHELLI G. ENG, CSR #11397

1

```
 1    hypothetical.

 2              THE WITNESS:  Depends on the circumstances.

 3    BY MR. POINTER:

 4       Q.  And what does your training tell you in terms

 5    of communicating with a person based upon whatever the

 6    circumstances that were presented to you in your

 7    training?

 8              MR. CONNOLLY:  Objection.  Vague.  Lacks

 9    foundation.  Incomplete hypothetical.

10              THE WITNESS:  Give me a circumstance, and I

11    could probably tell you.

12    BY MR. POINTER:

13       Q.  Okay.  How many circumstances did they present

14    to you in your training?

15       A.  I don't remember an exact number.

16       Q.  A range or an approximation.

17       A.  I don't have that either.

18       Q.  Okay.  It sounds as if your training taught

19    you that there is more than one way you should

20    communicate to a person based upon the circumstances in

21    which you're encountering them.

22       A.  Yes.

23       Q.  So what are the different ways?

24       A.  Give me a circumstance, and I could tell you.

25       Q.  Okay.  Somebody is armed with a knife.
```

48

DEPOSITION OF CHARLES AUGUST

1        A.    Okay.

2        Q.    They make suicidal statements.

3        A.    Okay.

4        Q.    They don't make any verbal threats to anyone

5   there around them, and, in fact, there is no one in

6   their immediate vicinity.   What does your training tell

7   you as to how to communicate with that person?

8        A.    I'm going to talk to that person with a calm

9   voice.   I'm going to keep my distance and give them

10  personal space.   I'm going to watch my body language.

11  I'm going to listen to anything this person may say.

12       Q.    If they make suicidal statements, shoot me,

13  kill me, you haven't been taught to oblige them,

14  correct?

15       A.    Correct.

16       Q.    Your job as a peace officer is to preserve

17  human life if possible, correct?

18       A.    Yes.

19       Q.    In fact, the use of deadly force is supposed

20  to be your last resort, correct?

21       A.    Yes.

22            MR. CONNOLLY:  Objection.  Misstates the law.

23  Calls for a legal conclusion.

24  BY MR. POINTER:

25       Q.    Have you been taught any -- strike that.

                                                            49

1          Have you heard the word or the term "diffusing

2     techniques"?

3          A.   Yes.

4          Q.   Okay.  What does that term mean to you?

5          A.   Techniques used to deescalate a situation.

6          Q.   What techniques have you been taught to use

7     when dealing with a person who is experiencing a mental

8     health crisis but armed with a knife?

9          A.   Some of those same ones that I just mentioned;

10    low tone of voice, giving that person their own personal

11    space, watching my body language, being an active

12    listener.

13         Q.   Okay.  When you say watching your body

14    language, what does that mean?  What does your training

15    tell you?

16         A.   Not showing aggressiveness like, you know, me

17    seeming like I'm going to attack the person.

18         Q.   If I understand you correctly, you had

19    received -- they call critical incident training?

20         A.   Yes.

21         Q.   Okay.  And that was prior to the date you

22    interacted with Mr. Woods, right?

23         A.   Yes.

24         Q.   Where did you receive that training?

25         A.   At the San Francisco Police Academy.

                                                          50

1      Q.   Okay.  Can you describe that training?

2      A.   It was a long time ago.  I don't remember at

3  all.

4      Q.   Can you describe any of their principles that

5  you learned during the course of that training?

6      A.   Not that I could recall.

7      Q.   Any of the techniques that you learned during

8  the course of that training?

9      A.   The only one that comes to mind is slowing

10  down the scene.

11      Q.   Have you heard of the term "active listening

12  skills"?

13      A.   Yes.

14      Q.   What does that mean to you?

15      A.   Listening to the person.

16      Q.   And why were you -- strike that.

17           What were you taught is the purpose of

18  listening to the person?

19           MR. CONNOLLY:  I didn't hear it.  Can you

20  repeat the question?

21           MR. POINTER:  Sure.  I believe I said -- I'm

22  not sure if I'm going to repeat it the same.

23      Q.   In fact, I will withdraw the question and say,

24  what were you taught as to why it's important to listen

25  to the person, to use active listening skills?

                                                        51

 1      A.   Depending on what the person is saying, I may

 2 be able to diffuse the situation with just that -- I

 3 mean, that information that's given.

 4      Q.   What does your training and experience teach

 5 you as relates to you dealing with a person and they're

 6 telling you to shoot them?

 7           THE WITNESS:  I'm sorry?

 8           MR. CONNOLLY:  Incomplete hypothetical.

 9 BY MR. POINTER:

10      Q.   Sure.

11           I'm trying to find out what your training has

12 taught you as it relates to you dealing with a person,

13 and they ask you or tell you to shoot them.

14           MR. CONNOLLY:  Objection.  Incomplete

15 hypothetical.

16           THE WITNESS:  Depends on the circumstances.

17 BY MR. POINTER:

18      Q.   The person is armed with a knife.

19      A.   Okay.

20      Q.   They're in mental distress and they tell you

21 to shoot them.

22           MR. CONNOLLY:  Objection.  Vague.  Incomplete

23 hypothetical.

24           THE WITNESS:  Now, what is your question?

25           MR. POINTER:  He jumped the gun, so to speak.

                                                          52

1    It's okay.  I do it, too.

2          MR. CONNOLLY:  I don't know what --

3          MR. POINTER:  You're a smart guy.

4          MR. CONNOLLY:  -- is the person coming at you

5    with a knife or is that carved out?  Are you talking

6    about this situation or --

7          MR. POINTER:  No matter what I pose, it's

8    going to be an incomplete hypothetical.  You're very

9    smart, Counsel.

10          MR. CONNOLLY:  I'm going to leave it at

11    incomplete hypothetical.

12          MR. POINTER:  Okay.  Thank you.

13    Q.   So I'm just trying to figure out what your

14    training tells you, okay?

15          MR. CONNOLLY:  Any time he says "I'm just

16    trying to figure out," that means he's -- he's --

17          MR. POINTER:  That's the question I want the

18    answer to.  You're right.

19    Q.   Because once again, I wasn't there at the

20    training, so I don't know, but I'm asking you if you

21    know.  And if you do, just tell me.

22          What does your training tell you as it relates

23    to you're dealing with a person who's experiencing a

24    mental health crisis, they're armed with a knife, and

25    they tell you to shoot them and/or kill them?

53

1        MR. CONNOLLY:  Objection.  Vague.  Incomplete

2   hypothetical.

3        THE WITNESS:  It depends.  That person is not

4   a danger to me or to anyone else, then I am to just keep

5   talking to them.

6   BY MR. POINTER:

7        Q.   Okay.  And what are the things that would make

8   that person a danger?

9        A.   If he grabbed a hostage.

10       Q.   Okay.  Can you give me your best estimate as

11  to how many calls you've responded to in your career

12  where a person -- where you were told that a person was

13  armed with a knife?

14       A.   More than 15.

15       Q.   Now, up to the date from when you graduated

16  from the academy to December 2nd, 2015, can you give me

17  your best estimate as to how many calls you responded to

18  where a person was armed with a knife?

19       A.   More than 15.

20       Q.   Were you injured on any of those calls?

21       MR. CONNOLLY:  Objection.  Lacks foundation.

22       THE WITNESS:  No.

23  BY MR. POINTER:

24       Q.   Now, you mentioned that you received -- it's

25  called critical incident training?

54

1     A.   Yes.

2     Q.   Okay.  What were you taught as to when you're

3  supposed to use those skills?

4     A.   When I can recognize that the person I'm

5  dealing with is mentally ill.

6     Q.   Now, if a person is making suicidal

7  statements, you would consider that person to not be in

8  their right mind, right?

9         MR. CONNOLLY:  Objection.  Incomplete

10  hypothetical.

11         THE WITNESS:  Depends.

12  BY MR. POINTER:

13     Q.   I mean, is it common for you to encounter

14  people over the course of your work as a police officer

15  where they're telling you to shoot them?

16     A.   No.

17     Q.   Okay.  That's an unusual statement to make,

18  correct?

19     A.   Yes.

20     Q.   Person doesn't appear to be in their right

21  mind if they're telling you to shoot them, right?

22         MR. CONNOLLY:  Incomplete hypothetical.  Lacks

23  foundation.

24         THE WITNESS:  Depends.

25  BY MR. POINTER:

55

1      Q.   Okay.

2      A.   I mean, being mentally ill, there's a -- I

3   mean, I believe somebody could come into that conclusion

4   that that's the way they want to do things based on many

5   circumstances, not just because they're mentally ill.

6      Q.   Sure.

7           But they're not in their -- to use my term --

8   right mind if they're asking for a police officer to

9   shoot them in the street, right?

10          MR. CONNOLLY:  Objection.  Vague.  Incomplete

11   hypothetical.  Lacks foundation.

12          THE WITNESS:  I don't know that I wouldn't say

13   they're in their right mind.

14   BY MR. POINTER:

15      Q.   So you think they're sane?  Somebody is asking

16   you, as a police officer, to shoot them and kill them on

17   the street.

18          MR. CONNOLLY:  Objection.  Vague.  Incomplete

19   hypothetical.  Lacks foundation.  Calls for speculation.

20          THE WITNESS:  I don't know that I would use

21   that term "sane."

22   BY MR. POINTER:

23      Q.   What term would you use to describe a person

24   who is asking a police officer to kill them on the

25   sidewalk?

56

1          MR. CONNOLLY:  Objection.  Incomplete

2    hypothetical.

3          THE WITNESS:  It depends.

4    BY MR. POINTER:

5       Q.   On?

6       A.   On why they're asking me.

7       Q.   Are you going to ask them why -- strike that.

8          Have you been trained to ask a person as to

9    why they want you to kill them if they ask you to shoot

10   them?

11      A.   I've been trained -- I'm sorry.  I've been

12   trained to communicate with people, so, yeah, that may

13   come up.  If that person is asking me to do it, I may

14   ask them why they want me to do it.

15      Q.   Okay.  In the course of dealing with

16   Mario Woods, did you ask him why he told you to squeeze

17   the gun to shoot him?

18      A.   No.

19      Q.   Okay.  He did make suicidal statements,

20   correct?

21          MR. CONNOLLY:  Objection.  That calls for

22   speculation.  Lacks foundation.

23          THE WITNESS:  Yes.

24   BY MR. POINTER:

25      Q.   Okay.  So Mario Woods made statements which

                                                        57

1    you perceived as being suicidal in nature, right?

2              MR. CONNOLLY:  Objection.  Misstates the

3    testimony.

4              THE WITNESS:  At the time that he made the

5    comment, I didn't take that as it being a suicidal

6    comment.

7    BY MR. POINTER:

8         Q.   Okay.  But as you sit here today, you see it

9    as being a suicidal comment?

10        A.   No.

11        Q.   Okay.  So it's your position he didn't make

12   any suicidal comments during the course of you

13   interacting with him on the date of his death?

14             MR. CONNOLLY:  I'm going to object as vague.

15   I think the problem with that question is that it's

16   vague because it's starting to call for an expert

17   opinion on what is suicidal, what it means, the intent

18   behind the person who made the statement and the

19   circumstances.  So I'm trying to walk this line where

20   I'm objecting as to incomplete hypothetical, but if you

21   get deeper into that, there is a problem here if you're

22   going to keep going with that here.

23             THE WITNESS:  What is your question?

24             MR. POINTER:  Can I have it read back?

25             (Whereupon the record was read as follows:

                                                              58

1    "Question:  Okay.  So it's your position he

2    didn't make any suicidal comments during the

3    course of you interacting with him on the date

4    of his death?")

5    THE WITNESS:  I didn't take his comment as

6    suicidal.

7    BY MR. POINTER:

8    Q.   Okay.  Have you received any training on how

9    to identify suicidal statements?

10   A.   Possibly.  None that I can remember.

11   Q.   And that's the state of your memory as you sit

12   here today, correct?

13   A.   Yes.

14   Q.   Was that also the state of your memory and

15   understanding on the date of this incident, that you

16   couldn't remember any training that you might have

17   received in order to identify the suicidal statements?

18   MR. CONNOLLY:  That misstates the testimony.

19   THE WITNESS:  What was your question again?

20   BY MR. POINTER:

21   Q.   You just testified that you couldn't recall

22   receiving any training on identifying suicidal

23   statements as you sit here today during your deposition,

24   correct?

25   MR. CONNOLLY: Wait, wait.  Objection.  But

59

 1    that misstates exactly what he said.

 2            MR. POINTER:  Well, I just asked him,

 3    "correct?"

 4            MR. CONNOLLY:  Could have been training, he

 5    said.  He just doesn't remember it, which is slightly

 6    different.

 7    BY MR. POINTER:

 8        Q.  Okay.  So as you sit here today, you don't

 9    remember any of the training that you may have received

10    as relates to identifying suicidal statements, correct?

11        A.  I can't recall any at this time.

12        Q.  Okay.  And I'm asking, did you have the same

13    understanding of not being able to recall your training

14    when you were dealing with Mario Woods on December 2nd

15    of 2015?

16            MR. CONNOLLY:  Lacks foundation.

17            THE WITNESS:  No.

18    BY MR. POINTER:

19        Q.  Okay.  So on December 2nd of 2015, you could

20    remember that training, correct?

21            MR. CONNOLLY:  Objection.  Misstates

22    testimony.

23            THE WITNESS:  Repeat that.

24    BY MR. POINTER:

25        Q.  On December 2nd of 2015, when you were

                                                          60

DEPOSITION OF CHARLES AUGUST

1   interacting with Mario Woods, did you remember your

2   training as relates to identifying suicidal statements?

3           MR. CONNOLLY:   Objection to the word

4   "remember" and what that means in this context.

5           THE WITNESS:   Yes.   But in that instance, I

6   didn't take that as a suicidal comment.

7   BY MR. POINTER:

8       Q.   Okay.   So now I'm asking you, on December 2nd

9   of 2015, what was your understanding of your training as

10  relates to identifying suicidal statements?

11          THE WITNESS:   During the incident, I wasn't

12  thinking of my training of suicidal comments.

13  BY MR. POINTER:

14      Q.   Okay.   Now, when you first -- strike that.

15          Were you familiar with Mario Woods prior to

16  this day?

17      A.   No.

18      Q.   Okay.   Never heard the name?

19      A.   No.

20      Q.   When you saw him, he didn't look like someone

21  who was familiar to you, correct?

22      A.   No.

23      Q.   All right.   When you first saw Mario Woods, he

24  was standing at a bus stop, correct?

25      A.   Yes.

61

1    Q.   Okay.  In line with other people who were at

2  the bus stop, correct?

3    A.   Yes.

4    Q.   Was he doing anything that you considered

5  unusual?

6    A.   No.

7    Q.   Was he doing anything that you considered to

8  be threatening to the other people at the bus stop?

9    A.   No.

10    Q.   Was he doing anything that you considered to

11  be homicidal in nature?

12    A.   No.

13    Q.   And you were driving with your partner,

14  Officer Thompson, correct?

15    A.   Yes.

16    Q.   Okay.  Ultimately, you directed

17  Officer Thompson -- wait, were you driving?

18    A.   I was passenger.

19    Q.   Okay.  Sorry.

20       You pointed out Mr. Woods to Officer Thompson,

21  correct?

22    A.   Yes.

23    Q.   Okay.  Ultimately, the car was pulled and

24  stopped near the bus stop where Mr. Woods was standing

25  at, right?

62

1     A.   Yes.

2     Q.   Okay.  Yourself and your partner got out of

3  your patrol car, right?

4     A.   Yes.

5     Q.   Prior to getting out of the patrol car, did

6  Mr. Woods try to walk away from that area of the bus

7  stop?

8     A.   No.

9     Q.   Okay.  Prior to you and your partner getting

10 out of the patrol car, did Mr. Woods touch anyone that

11 was there at the bus stop?

12    A.   Not that I saw.

13    Q.   Okay.  You guys pull up to the bus stop.  You

14 got out of your car, correct?

15    A.   Yes.

16    Q.   What happened next?

17    A.   I got out of the car and he said, "I'm not

18 going with you."

19    Q.   Okay.  Had you said anything to him before he

20 said the statement that you say he said?

21    A.   No.

22    Q.   Okay.  When he made that statement,

23 approximately how much distance or space was between

24 yourself and Mr. Woods?

25    A.   About 10 feet.

63

 1      Q.   Okay.  When he made the statement, did he have

 2   anything in his hands?

 3      A.   I believe he had a can of soda.

 4      Q.   Okay.

 5      A.   And it was shortly after that comment that he

 6   presented the knife.

 7      Q.   Okay.  When he, as you say, presented the

 8   knife, did he make any statements at or about -- any

 9   additional statements at or about that time?

10      A.   No.

11      Q.   So I'm just going to try to take you through

12   the sequence of events, and I'm going to make sure I

13   didn't skip anything because I'm trying to have it

14   jumbled the best I can.

15           So you pull up to the bus stop.  You and your

16   partner both get out of the car, correct?

17      A.   Yes.

18      Q.   Okay.  You get out of the car.  Mr. Woods has

19   a soda in his hand and he tells you or speaks in your

20   direction saying, "I'm not going with you," correct?

21      A.   Yes.

22      Q.   Okay.  What happened next?

23      A.   He presented the knife.  I drew my firearm.  I

24   pointed it at him.  And he said, "You're going to have

25   to squeeze that."

                                                            64

DEPOSITION OF CHARLES AUGUST

1      Q.   Okay.  And you didn't take that statement as a

2   suicidal statement?

3      A.   No.

4      Q.   Did you take it as a homicidal statement?

5      A.   No.

6      Q.   Did you -- when you pulled out the knife, can

7   you describe how he was holding it or presented it to

8   you, to use your word?

9      A.   The blade was pointed forward and he was

10   holding it down at his side.

11      Q.   Did he raise the blade towards you when he was

12   talking?

13      A.   No.

14      Q.   Did he swipe at you with the blade while he

15   was talking?

16         MR. CONNOLLY:  Wait.  I'm sorry, Mr. Pointer.

17   I didn't hear the end of that question.

18   BY MR. POINTER:

19      Q.   Did he swipe at you with the blade or the

20   knife while he was talking?

21      A.   No.

22      Q.   Did you hear what you perceived to be a

23   reaction from any of the civilians or non-police

24   officers that were in that area?

25         MR. CONNOLLY:  Objection.  Vague as to time.

65

DEPOSITION OF CHARLES AUGUST

1    BY MR. POINTER:

2         Q.    When he made the statement, did you hear any

3    reaction to anybody around that area?

4         A.    Not that I recall.

5         Q.    Okay.   At the time he made that statement and

6    he presented the knife, did you tell any of the people

7    who were in that area to leave, to get back?

8         A.    No.

9         Q.    When he made the statement and presented a

10   knife, did you hear your partner give any orders or

11   commands or make statements to the people in the area to

12   leave or to get back?

13        A.    No.

14        Q.    What happened next?

15        A.    He began to walk towards 3rd Street and then

16   go around the corner of the building.

17        Q.    Okay.   And did you and your partner then

18   follow him?

19        A.    Yes.

20        Q.    Okay.   Did you guys triangulate on Mr. Woods?

21   Triangulate.

22        A.    No.

23        Q.    Just describe for me how you guys followed

24   Mr. Woods from at or about that bus stop to 3rd Street.

25        A.    As he walked around the corner from the

66

1    building, I followed behind him at about a distance of

2    approximately 15 feet.   My partner was behind me.

3         Q.   Okay.  And as some point in time, to use my

4    term, he turned the corner and was on 3rd Street, right?

5         A.   Yes.

6         Q.   Okay.  And did you and your partner continue

7    to essentially follow him?

8         A.   Yes.

9         Q.   Okay.  What happened next?

10        A.   By the time we made it mid block, we were

11   walking towards Gilman, other officers arrived on the

12   scene.

13        Q.   And from what direction did they arrive from?

14        A.   I couldn't tell you directions.  Some were

15   coming northbound, 3rd Street from Gilman.

16        Q.   Those officers -- if I may, just discuss those

17   officers that were coming northbound from Gilman.  Were

18   they in a car?  Were they on foot?  Both?

19        A.   Vehicle.  Car.

20        Q.   Car, okay.

21             So you see the officers pulling up to the

22   scene coming down third from Gilman towards Fitzgerald?

23        A.   Yes.

24        Q.   Okay.  Do you see those officers get out of

25   their car?

67

1    A.   I don't recall.

2    Q.   Okay.  When Mr. Woods was walking towards

3  Gilman on 3rd Street, did you see any officers on foot

4  coming from Gilman towards your direction?

5    A.   Not that I recall.

6    Q.   Okay.  So you mentioned you see officers and a

7  patrol car coming down 3rd Street essentially from

8  Gilman towards Fitzgerald.  What happened next?

9    A.   When enough officers got on the scene, there

10  was a perimeter set around Mario.

11    Q.   Okay.  And that perimeter consisted of what?

12  Police officers?

13    A.   Yes.

14    Q.   And behind him was a series of buildings,

15  correct?

16    A.   Yes.

17    Q.   Okay.  And when you say the perimeter, is that

18  the semicircle?

19         MR. CONNOLLY:  Objection.  Vague.

20         THE WITNESS:  I would say perimeter.

21  BY MR. POINTER:

22    Q.   Okay.  How many officers were part of this

23  perimeter that you're talking about?

24    A.   I don't recall.

25    Q.   Do you have an approximation?  Best estimate?

68

1          A.    Approximately seven.

2          Q.    And is there a shape that you would -- that

3     you can use to describe the perimeter?  For example, was

4     it a rectangle?  Was it a triangle?  Semicircle?  A

5     line?

6          A.    About a half circle.

7          Q.    So it's fair to say there was approximately

8     seven officers in this half circle around Mario Woods?

9          A.    Yes.

10         Q.    Okay.  At some point in time, an officer -- I

11    use the word "shot."  Some people say "deploy."  You can

12    use either word.  I don't care -- but deployed one of

13    these less lethal weapons at Mr. Woods, correct?

14         A.    Yes.

15         Q.    Okay.  Was that prior to the half circle being

16    formed?

17         A.    No.

18         Q.    Prior to the half circle being formed, did you

19    see Mr. Woods charge at anybody?

20         A.    No.

21         Q.    Prior to the half circle being formed, did you

22    see Mr. Woods swipe at anybody with the knife?

23         A.    No.

24         Q.    Prior to the half circle being formed, did you

25    hear Mr. Woods issue any verbal threats to anyone saying

                                                              69

1    words to the effect, "Come close and I will cut you," or

2    words to that effect?

3         A.   No.

4         Q.   Did you hear him make any -- strike that.

5              When he made the statement at the corner where

6    he said, "I'm not going with you, you're going to have

7    to squeeze," or words to that effect, did you take those

8    as a threat to you?

9         A.   No.

10        Q.   Prior to the half circle being formed, did you

11   hear Mr. Woods make any verbal threats to anybody about

12   what he was going to do with the knife?

13        A.   No.

14        Q.   Okay.  Now, you had mentioned that Mr. Woods

15   was traveling down 3rd Street going towards Gilman on

16   3rd, right?

17        A.   Yes.

18        Q.   At some point in time, he reversed course and

19   came back towards Fitzgerald still on 3rd, right?

20        A.   Yes.

21        Q.   Okay.  When he changed course from going from

22   Fitzgerald to Gilman, were there officers arriving from

23   Gilman to the scene?

24        A.   I'm sorry.  Say that one more time.

25        Q.   Sure.

                                                              70

1          I'm trying to figure out when Mr. Woods

2     changed course from going towards Gilman on 3rd and then

3     started going towards Fitzgerald on 3rd, were there

4     officers coming from Gilman at that time?

5          A.   Is this prior to the perimeter or after the

6     perimeter?

7          Q.   Prior to the perimeter.  I'm sorry.  Let me

8     back up, actually, because I think that's an important

9     point.  I don't want to confuse you or me.

10          You mentioned that at some point in time, this

11     half circle was formed, right?

12          A.   Um-hmm.

13          Q.   "Yes"?

14          A.   Yes.

15          Q.   Okay.  Had Mario Woods changed course from

16     going towards Gilman back towards Fitzgerald prior to

17     the half circle being formed?

18          A.   Yes.  He had changed direction.

19          Q.   Okay.  Now, when he had changed direction, was

20     that at or about the time there were officers coming

21     from Gilman?

22          A.   Yes.  That was like right before the first

23     patrol car had pulled up.

24          Q.   Okay.  So is it fair to say that he stopped

25     walking in the direction of Gilman prior to that first

71

1    patrol car pulling up?

2        A.    Yes.

3        Q.    Okay.  There was a period of time where

4    Mario Woods, as you said, has the half circle in front

5    of him, right?  What is your best estimate how much time

6    he was in front of this half circle, if you will?

7        A.    I couldn't tell you.

8        Q.    Okay.  The less lethal was deployed or shot

9    while Mr. Woods was in front of this half circle,

10   correct?

11       A.    Yes.

12       Q.    Okay.  Was there any warning -- did you hear

13   any warnings made that the less lethal was going to be

14   used on him before it was fired?

15       A.    Yes.

16       Q.    Can you describe what that warning was?

17       A.    "Red light.  Less lethal.  Less lethal.  Stop

18   or I will shoot."

19       Q.    Who issued those orders?

20       A.    Jennifer Traw.

21       Q.    Jennifer is a woman or a female?

22       A.    Yes.

23       Q.    And I believe you said she issued those orders

24   prior to firing the less lethal weapon?

25       A.    Yes.

72

1       Q.   Okay.  Did you hear Mario Woods give what you

2   interpreted to be a verbal response to that?

3       A.   No.

4       Q.   When she -- strike that.

5            When she gave that order, was Mario Woods

6   facing her?

7       A.   No.

8       Q.   Did you see what appeared to be -- strike

9   that.

10            Did you see what you perceived to be any

11   response by him to those orders or commands?

12       A.   I'm sorry.  Say that again.

13       Q.   I'm trying to figure out when you heard

14   Officer Traw give those orders and commands, did you see

15   Mario respond to those orders and commands?

16       A.   No.

17       Q.   And at some point in time, he was shot with

18   the less lethal, right?

19       A.   Yes.

20       Q.   Okay.  Did you see the less lethal hit him?

21       A.   Yes.

22       Q.   Okay.  Did you also see Officer Ortiz spray

23   the pepper spray on Mario Woods?

24       A.   I saw Officer Ortiz spray pepper spray towards

25   his direction, yes.

73

1      Q.    Okay.  How close did Officer Ortiz get to

2   Mario Woods when he sprayed the pepper spray?

3      A.    Not close.

4      Q.    More than an arm's length away?

5      A.    Yeah.

6      Q.    After Officer Ortiz sprayed the pepper spray,

7   did Mr. Woods look disoriented?

8      A.    No.

9      Q.    After Officer Ortiz sprayed the pepper spray,

10  did Mr. Woods say anything?

11     A.    No.

12     Q.    After Mr. Ortiz or Officer Ortiz sprayed the

13  pepper spray, did Mr. Woods walk towards Officer Ortiz?

14     A.    No.

15           MR. POINTER:  All right.  Let's take a break

16  right here.

17           THE VIDEOGRAPHER:  Time is 3:05 p.m.  We are

18  now off the record.

19           (Whereupon recess was taken from 3:05 to

20           3:23.)

21           THE VIDEOGRAPHER:  The time is 3:23 p.m.  We

22  are now back on the record.

23  BY MR. POINTER:

24     Q.    Officer, same rules apply as previously, okay?

25     A.    Okay.

                                                          74

1      Q.   When we were discussing before we took our

2  break that Mario Woods was on 3rd Street, officers had

3  formed -- I believe we called it a half circle?

4      A.   Perimeter.

5      Q.   Perimeter, which was in the shape of a half

6  circle?

7      A.   Yes.

8      Q.   And Mr. Woods -- sorry.

9           Officer Traw had given Mr. Woods some orders,

10  right?

11      A.   Yes.

12      Q.   As well as a warning that she was going to use

13  less lethal, correct?

14      A.   Yes.

15      Q.   Mr. Woods didn't appear to respond to those

16  orders or commands, correct?

17      A.   Correct.

18      Q.   Less lethal was used against him, correct?

19      A.   Correct.

20      Q.   Officer Ortiz sprayed some pepper spray in

21  Mr. Woods' direction, correct?

22      A.   Correct.

23      Q.   Additional rounds of less lethal were fired at

24  Mr. Woods, correct?

25      A.   Correct.

75

1    Q.   At some point in time, Mr. Woods went towards

2    the ground; is that right?

3    A.   Correct.

4    Q.   Down on his knee?

5    A.   No.  He squatted down.

6    Q.   Okay.  He squatted down, and then he

7    essentially stood back up, right?

8    A.   Correct.

9    Q.   During the point in time where he went down

10   towards the ground or squatted down and then stood back

11   up, did you hear Mario Woods say anything?

12   A.   No.

13   Q.   Okay.  Now, given that officer -- yourself,

14   Officer Thompson, Officer Traw, perhaps other officers

15   had been giving commands to Mr. Woods to either drop the

16   knife, stop, things of that nature, and he wasn't

17   responding, did you give any consideration to using

18   other communication tactics?

19        MR. CONNOLLY:  Objection.  Vague.

20        THE WITNESS:  Yes.

21   BY MR. POINTER:

22   Q.   What did you consider?

23   A.   There were enough people giving him commands

24   to drop the knife, get down on the ground and such,

25   because I had built a rapport with him from the

76

1   beginning, we had conversation, I lowered my voice, and

2   because he would periodically look at me and say things,

3   I would tell him, you know, just put the knife down, you

4   know, let's not do it this way, things of that sort.

5        Q.   So it was your opinion that you built a

6   rapport with Mr. Woods?

7        A.   Yes.

8        Q.   And you essentially -- if I heard you

9   correctly, you're saying you told him words to the

10  effect of let's not do it this way?

11       A.   Yes.

12       Q.   What point in time during the incident did you

13  make those statements?

14       A.   While he was in perimeter.

15       Q.   Okay.  That was also at the same time when

16  there were other officers giving him orders, right?

17       A.   Yes.

18       Q.   It's fair to say those officers were yelling

19  the orders, right?

20       A.   Yes.

21       Q.   And you say you lowered your voice?

22       A.   Yes.

23       Q.   Now, at some point, Mr. Woods starts moving

24  from where he was at, and then kind of in front of this

25  half circle back towards Fitzgerald, correct?

                                                      77

1      A.    Yes.

2      Q.    Can you describe the manner in which he was

3 moving on 3rd Street towards Fitzgerald?  For example,

4 was he running?  Was he jogging?

5      A.    He was walking.

6      Q.    Okay.  Did it appear to you that he was

7 walking with a limp?

8      A.    No.

9      Q.    You didn't see him with a limp?

10     A.    No.

11     Q.    Now, from the position that you were in in

12 terms of this half circle, Mario Woods was in front of

13 the half circle, correct?

14     A.    Yes.

15     Q.    All right.  And when Mr. Woods started walking

16 towards Fitzgerald on 3rd Street, did you move from your

17 position?

18     A.    Yes.

19     Q.    Okay.  Can you describe how you moved from

20 your position?

21     A.    Yes.  I sidestepped to my left to put a

22 barrier between Mario and the people that I could hear

23 behind me.

24     Q.    Okay.  Did you notice whether there were any

25 other officers behind you in that direction?

                                                        78

DEPOSITION OF CHARLES AUGUST

1    A.    No.

2    Q.    Did you notice as to whether there were any

3    officers near the bus behind you?

4    A.    No.

5    Q.    I take it you didn't hear any officers call

6    out to you to let you know they were behind you?

7    A.    No.

8    Q.    So it's fair to say you started sidestepping

9    to the left once you saw Mario leave from where he was

10   standing in front of the half circle?

11   A.    Yes.

12   Q.    Okay.  While he was walking towards -- in the

13   direction of Fitzgerald and you were sidestepping, did

14   you say anything to him?

15   A.    I don't recall.

16   Q.    You mentioned just a few moments ago that you

17   had told Mario Woods to the effect "let's not do this"

18   and lowered your voice, correct?

19   A.    Yes.

20   Q.    Did you mention that or say that to homicide

21   investigators in the aftermath of this incident?

22   A.    I believe so.

23   Q.    I take it you mentioned it in all the other

24   interviews as well?

25   A.    Yes.

79

1     Q.   As Mario was walking essentially from where he

2   was at in front of the half circle and started moving

3   back towards Fitzgerald, did you hear him say anything?

4     A.   Yes.

5     Q.   What did he say?

6     A.   He told me that I was going to have to shoot

7   him.

8     Q.   Okay.   Did you interpret that to be a suicidal

9   statement?

10    A.   No.

11    Q.   And when he said that you're going to have to

12   shoot him, was he doing anything with the knife?

13    A.   He was still walking with it at his side.

14    Q.   Okay.   With the pointed edge of the knife

15   pointed down towards the ground?

16    A.   With the pointed edge faced towards me.

17    Q.   Now, obviously, at some point, you fired your

18   gun, right?

19    A.   Yes.

20    Q.   Did you make a decision as it relates to, for

21   example, if he gets to a particular location on that

22   street, that you were going to fire your gun?

23    A.   No.

24    Q.   Had you made a decision that if he gets within

25   a certain amount of feet or distance to you, that you

80

1    were going to fire your gun?  This is all prior to you

2    actually firing your gun.

3          MR. CONNOLLY:  Let me object to the extent it

4    lacks foundation.  Can you give me one second?  I want

5    to think about that question.

6          All right.  I'm going to withdraw it for now,

7    see what the next questions are.

8    BY MR. POINTER:

9          Q.   Do you still have the question in mind,

10   Officer?

11         A.   No.  Can you repeat that one more time?

12              MR. POINTER:  Can I have it repeated, please?

13              (Whereupon the record was read as follows:

14              "Question:  Had you made a decision that if he

15              gets within a certain amount of feet or

16              distance to you, that you were going to fire

17              your gun?  This is all prior to you actually

18              firing your gun.")

19              THE WITNESS:  Are you asking if I made a

20   decision -- I'm sorry.  Say that one more time.

21              (Whereupon the record was read as follows:

22              "Question:  Had you made a decision that if he

23              gets within a certain amount of feet or

24              distance to you, that you were going to fire

25              your gun?  This is all prior to you actually

                                                              81

1           firing your gun.")

2           MR. CONNOLLY:  Okay.  So let me object.  The

3    problem I'm having with the question -- and I think

4    there has to be some understanding, Mr. Pointer.  You've

5    asked a series of questions, and if you're asking that

6    question in the context of all the preceding questions

7    and answers that have come before it, I'm fine.

8           But if you're asking that as an isolated

9    question separate from those things, I think it's vague

10   because it doesn't incorporate the series of things he's

11   already testified to.  That's the problem I'm having.

12          I'm trying to let you guys go and have this

13   narrative, but do you understand that?  Am I making

14   myself clear?

15          MR. POINTER:  I don't, but we will see what he

16   says and see if he can clarify it.

17          MR. CONNOLLY:  I mean -- okay.  So I want you

18   to know, I don't want to object.  I want to let you guys

19   go and have a narrative.

20          MR. POINTER:  Then let me go.

21          MR. CONNOLLY:  There seems to be a totality of

22   circumstances you are talking about, but you're asking

23   him one at a time.  So I'm going to let it go as long as

24   it's understood you're asking about this broader thing.

25   BY MR. POINTER:

                                                           82

DEPOSITION OF CHARLES AUGUST

1    Q.   I'm just asking, did you make a decision that
2    if Mario Woods got within a certain amount of feet of
3    you, inches of you, yards of you, that you were going to
4    fire your gun prior to you actually using your gun?  Did
5    you have that line that if this guys gets within two
6    feet of me, five feet of me, ten feet of me, I'm going
7    to shoot him?  Had you made such a decision in your mind
8    prior to you actually firing your gun?

9         MR. CONNOLLY:  Same objection.

10   BY MR. POINTER:

11        Q.   And you can answer.

12        A.   I was prepared to use my weapon if he got too
13   close and I felt danger.

14        Q.   Okay.  So then the question is, what had you
15   in your mind determined was too close?

16             MR. CONNOLLY:  Objection.  Vague.

17             MR. POINTER:  Sure.

18             THE WITNESS:  The distance when I fired.

19   BY MR. POINTER:

20        Q.   Okay.  What distance is that?

21        A.   I have no idea.

22        Q.   Okay.

23        A.   It was within 10 feet.

24        Q.   Okay.  So had you made a decision that if he
25   got within 10 feet of you, you were going to shoot your

83

1    gun?

2         A.   In my head at that time, the distance didn't

3    matter.   It was the fact that he was closing the

4    distance and he was closing the distance at a fast pace,

5    which is why I decided to discharge my firearm.

6         Q.   When you say fast pace, was it a faster pace

7    than he had been walking?

8         A.   It was a faster pace than he was walking.  He

9    started to pick up the pace.

10        Q.   When he picked up the pace, he was closing the

11   distance, that's when you decided to fire your gun?

12        A.   Yes.

13        Q.   Had you told anyone that you had planned to

14   move from your location in the half circle to block his

15   path?

16        A.   No.

17        Q.   Did you tell him before you fired your gun,

18   I'm going to shoot you?

19        A.   No.

20        Q.   Did you see him raising the knife immediately

21   prior to you firing your shots?

22        A.   No, but he still had the knife clenched in his

23   right hand and walking in my direction.

24        Q.   Okay.  So he had the knife, but he had the

25   knife the entire time you were out there dealing with

84

1          A.    I believe so.

2          Q.    Was there a pause between your two shots?

3          A.    No.

4          Q.    And you said you used the technique called

5     double tapping, correct?

6          A.    Yes.

7          Q.    Explain to me what that is mechanically in

8     terms of what you do with your finger or your hands?

9          A.    I pull the trigger twice.

10         Q.    Successively, meaning back to back, correct?

11         A.    Yes.

12         Q.    At the time you pulled the trigger,

13    Mario Woods was facing you?

14         A.    Yes.

15         Q.    And you said you stopped firing because he

16    started going down?

17         A.    Yes.

18         Q.    Correct?

19               Had you heard any gun shots prior to you

20    pulling your trigger?

21         A.    No.

22         Q.    Is it fair to say you were the first person to

23    fire?

24               MR. CONNOLLY:   Objection.   Lacks foundation.

25    Calls for speculation.

                                                          88

1          THE WITNESS:   Yes.

2    BY MR. POINTER:

3          Q.   From your perspective, right?

4          A.   Yes.

5          Q.   Let's go off the record for a quick sec.  I'm

6    going to set up the computer, ask a few questions.  We

7    will be out of here.

8               THE VIDEOGRAPHER:  The time is 3:40 p.m.  We

9    are now off the record.

10              (Whereupon recess was taken from 3:40 to

11              3:43.)

12              THE VIDEOGRAPHER:  One moment.  The time is

13   3:43 p.m.  We are now back on the record.

14   BY MR. POINTER:

15         Q.   Okay.  Officer, same rules and guidelines

16   apply before we took a break, okay?

17         A.   Okay.

18         Q.   I'm going to show you what I'm going to have

19   marked as Exhibit 1 to your deposition.  It is a video.

20   I think we actually produced it as Video 3.

21              (Whereupon Plaintiff's Exhibit 1 was marked

22              for identification by the court reporter.)

23              MR. POINTER:  It is a 15-second video.

24              MR. CONNOLLY:  Counsel, how did you

25   characterize this video?  I didn't hear you.

                                                          89

1           MR. POINTER:  Video 3.

2           MR. CONNOLLY:  Three from what?

3           MR. POINTER:  What we sent to you guys.

4           MR. CONNOLLY:  What you guys sent to us, okay.

5   So is it -- do you know if it's marked some way or do

6   you --

7           MR. POINTER:  We have this Video 3.

8           MR. CONNOLLY:  Video 3?

9           MR. POINTER:  Yeah.  When we take a little

10  break, I will identify so we make sure we have the same

11  thing.

12      Q.  So I want to show you, Officer -- what I am

13  going to ask you is a series of questions about the

14  relevant locations and directions of Mario Woods and

15  yourself, okay?

16      A.  Okay.

17      Q.  So first I'm going to ask you some questions

18  about Mario Woods' path of travel, okay?

19      A.  Okay.

20      Q.  If you need to change this in any way that

21  makes it easier for you to see, just let me know.

22      A.  Okay.

23      Q.  All right.  So I'm going to hit play.  Can you

24  see from here?  That's the first thing.

25      A.  Yes.

                                                        90

 1              MR. CONNOLLY:  Are you sure?

 2              THE WITNESS:  Yes.

 3    BY MR. POINTER:

 4         Q.   Are you sure?

 5         A.   Yes.

 6              (Video played.)

 7    BY MR. POINTER:

 8         Q.   All right.  Let's hit that back.  Play it one

 9    more time and ask you a question, okay?

10              (Video played.)

11    BY MR. POINTER:

12         Q.   I just paused it at 9 seconds.  Did it appear

13    that Mario Woods was walking with a limp?  I will play

14    it again.

15              (Video played.)

16    BY MR. POINTER:

17         Q.   Did it look like his left leg was injured, not

18    normal gait?  I will play it for you again.  And what I

19    mean by gait, I mean legs walking without any type of

20    hitch.

21              (Video played.)

22              MR. CONNOLLY:  Is there a question pending?

23    The question that's pending, objection.  Lacks

24    foundation.  Calls for speculation.

25    BY MR. POINTER:

                                                            91

DEPOSITION OF CHARLES AUGUST

```
1        Q.   Did it appear to you that Mr. Woods' left leg,
2    he was limping with that left leg?
3        A.   No.
4        Q.   I'm going to ask you a question about the
5    direction he was going, okay?
6             (Video played.)
7    BY MR. POINTER:
8        Q.   Is it fair to say as Mario Woods was moving
9    towards Fitzgerald, he was walking essentially up
10   against the wall of the buildings that were behind him,
11   correct?
12       A.   Yes.
13       Q.   And did you ever see him change direction from
14   the time he started moving to the time he was shot?  And
15   I don't mind playing it again.
16       A.   No.
17       Q.   Okay.  Did you ever see him change direction
18   and move towards you?
19       A.   Yes.  He was walking in my direction because I
20   stepped in front of him.
21       Q.   Okay.  Now, I understand you're saying you
22   stepped in front of him.  So, for example, we are here
23   today, and I'm across the table from you, correct?
24       A.   Yes.
25       Q.   Okay.  So I'm in front of you, but I'm not
```

                                                              92

1    directly in front of you.  I'm offset from you, right?

2        A.   Right.

3        Q.   I'm to your left, right?

4        A.   Yes.

5        Q.   But I'm in front of you, correct?

6             If I was directly in front of you, I have to

7    move to my left so that, essentially, our heads would be

8    in line, right?

9        A.   Yes.

10       Q.   Okay.  So when I asked you was Mario Woods

11   directly in front of you at the time you shot, that's

12   what I am trying to figure out.  Were you offset or was

13   he directly in front of you?

14       A.   At the time that I shot, he was directly in

15   front of me.

16       Q.   Okay.  Mario Woods is going down the street.

17   He didn't change his direction, right?

18       A.   No.

19       Q.   Okay.  You moved, sidestepped to your left,

20   correct?

21       A.   Yes.

22       Q.   And then essentially blocked his path, right?

23       A.   Yes.

24       Q.   Okay.  It's your testimony that as you

25   sidestepped, you actually placed yourself directly in

93

1    front of him so that you were not offset from him,

2    correct?

3         A.   Yes.

4         Q.   Now, as you sidestepped to the left, you were

5    actually closing the distance between yourself and

6    Mr. Woods, right?

7              MR. CONNOLLY:  Objection.  Vague.

8              THE WITNESS:  I'm sorry.  Repeat that again.

9              MR. POINTER:  Can I have that read back,

10   please.

11             (Whereupon the record was read as follows:

12             "Question:  Now, as you sidestepped to the

13             left, you were actually closing the distance

14             between yourself and Mr. Woods, right?")

15             THE WITNESS:  I sidestepped to the left, but

16   he was closing the distance.

17   BY MR. POINTER:

18        Q.   Okay.  So your movements to the left did not

19   bring you closer to Mario Woods?

20        A.   No.

21             MR. CONNOLLY:  Objection.  Vague and

22   argumentative.

23             THE WITNESS:  No.

24             MR. POINTER:  Let's take a quick break.  I

25   think we are about to be done, unless you have some

                                                          94

1    questions.

2            MR. CONNOLLY:  I think I have a couple of

3    questions.

4            THE VIDEOGRAPHER:  The time is 3:50 p.m.  We

5    are now off the record.

6            (Whereupon recess was taken from 3:50 to

7            3:58.)

8            THE VIDEOGRAPHER:  The time is 3:58 p.m.  We

9    are now back on the record.

10   BY MR. POINTER:

11       Q.   Officer, the same rules and guidelines apply

12   as before the break.  Do you understand that?

13       A.   Yes.

14       Q.   How tall are you?

15       A.   Six-one.

16       Q.   Okay.  How much did you weigh on the date of

17   December 2nd, 2015?

18       A.   I have no idea.

19       Q.   How much do you weigh today?

20       A.   Like 225.

21       Q.   Okay.  Did you weigh less then?

22       A.   No.  Probably more.

23       Q.   Okay.  Do you have a sense as to how much

24   more?

25       A.   Maybe 10 pounds more.

                                                        95

```
 1   STATE OF CALIFORNIA )

 2   COUNTY OF ALAMEDA   )

 3            I, Shelli G. Eng, Certified Shorthand Reporter,

 4   No. 11397, State of California, do hereby certify:

 5            That prior to being examined, the witness named

 6   in the foregoing deposition, to wit, CHARLES AUGUST, was

 7   by me duly affirmed to testify the truth, the whole truth

 8   and nothing but the truth; that said deposition was taken

 9   down by me in shorthand at the time and place therein

10   named and thereafter reduced to typewriting under my

11   direction and supervision; that the witness was given an

12   opportunity to read and correct said deposition and to

13   subscribe the same.  Should the signature of the witness

14   not be affixed to the deposition, the witness did not

15   avail himself of the opportunity to sign or the signature

16   has been waived.

17            I further certify that I am not of counsel for

18   either or any of the parties to the said deposition, nor

19   in any way interested in the event of this action and

20   that I am not related to any of the parties thereto.

21            WITNESS MY HAND this 3rd day of August, 2018.

22

23                       --/s/Shelli G. Eng----------
                         SHELLI G. ENG, CSR NO. 11397
24                       CERTIFIED SHORTHAND REPORTER

25
```

107