# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

GWENDOLYN WOODS, individually)
and as Successor in Interest )
to Decedent MARIO WOODS,      )
                              )
              Plaintiff,      )
                              )
          vs.                 ) CASE NO.:  3:15-05666-WHO
                              )
CITY AND COUNTY OF            )
SAN FRANCISCO; a municipal    )
corporation, et al,           )
                              )
              Defendants.     )     CERTIFIED COPY
_____)

VIDEO DEPOSITION OF OFFICER SCOTT PHILLIPS

TUESDAY, JULY 24, 2018

REPORTED BY:  ANGELICA R. GUTIERREZ, CSR NO. 13292

1

1    Q.    27.  And if you recall, when did you start

2    working for the San Francisco Police Department?

3    A.    I began the Academy on January 5 of 2015.

4    Q.    And when did you complete the Academy?

5    A.    August, middle of August, same year.

6    Q.    And after you completed the Academy were you

7    on field training?

8    A.    I was, yes.

9    Q.    For approximately how long were you a field

10   training officer?

11   A.    I was a recruit for about 15 weeks.

12   Q.    So on the date of the incident, were you

13   still, December 2, 2015 were you still a field training

14   officer -- still in field training?

15   A.    I was, yes.

16   Q.    And did you have a field training officer?

17   A.    I did.

18   Q.    And who was your field training officer?

19   A.    Officer Cuevas.

20   Q.    Now, what was your role as a field training

21   recruit?

22   MS. COLLINS:  Objection, vague as to time.

23   THE WITNESS:  So as a role I have the same

24   role as any police officer, I'm just being -- I respond

25   to calls for service, handle incidences, write reports.

10

1      It's just a matter of being evaluated on a daily basis

2      by my field training officer.  There's three stages or

3      three different field training officers to evaluate you

4      throughout the course of the 16 weeks.

5          Q.   And which stage were you in on the date of

6      incident?

7          A.   I was in the final stage with Officer Cuevas.

8          Q.   Is it fair to say you had almost completed

9      your field training?

10         A.   Yes, I had about one week left.

11         Q.   And although you were still in training were

12     you permitted to use all uses of force?

13              MS. COLLINS:  Objection, vague as to time.

14              THE WITNESS:  Yes, for the duration of the FTO

15     program I was a sworn police officer and had all the

16     same duties and responsibilities.

17              MR. BUELNA:  Q.  And for approximately --

18     prior to the date of that incident, for approximately

19     how long was Officer Cuevas your field training

20     officer?

21         A.   Four or five weeks.

22         Q.   Is it fair to say for the four to five weeks

23     you guys worked together every day?

24         A.   For the most part, yes.

25         Q.   Was he your primary field training officer?

                                                              11

1        A.    Yes, for that phase.

2        Q.    You had others for different phases?

3        A.    I believe there was couple days where there

4    was a substitute because of Officer Cuevas had other --

5    didn't come -- didn't have work so they had to find

6    another to train me for that day.

7        Q.    Okay.  And you mentioned that you started your

8    field training in August 2015, correct?

9        A.    I did.

10       Q.    So by the day of the incident you had been,

11   you know, effectively on patrol for approximately three

12   to four months?

13       A.    Yes.

14       Q.    Okay.  Now, prior to the incident had you ever

15   responded to a call with a -- of an armed suspect?

16            MS. COLLINS:  Objection, vague as to time.

17   Definition of armed suspect.

18            THE WITNESS:  Yes, I responded to multiple

19   incidences of people with weapons.

20            MR. BUELNA:  Q.  And approximately, if you can

21   recall, how many of those calls involved a knife?

22       A.    Maybe -- can I clarify whether a knife was

23   actually seen or whether there was a call saying that

24   somebody was armed with a knife or --

25       Q.    Sure.  So how about I'll ask a more specific

                                                           12

1   question.

2          How many calls for service did you respond to

3   prior to the incident where when you arrived someone

4   was in possession of a knife, approximately?

5          MS. COLLINS:  Objection, vague as to

6   possession or found later.

7          THE WITNESS:  Probably six times, six to ten.

8          MR. BUELNA:  Q.  And how many of those calls

9   for service that you just mentioned were with Officer

10  Cuevas?

11      A.  I believe two, maybe.

12      Q.  And of the six times that you responded to a

13  call prior to the incident where the knife was

14  involved, in any of those instances was the person

15  actively holding the knife?

16         MS. COLLINS:  Objection, misstates the

17  testimony, six to ten times, not six.

18         THE WITNESS:  Yes.

19         MR. BUELNA:  Q.  Approximately how many times

20  amongst those that you had mentioned was the suspect

21  holding the -- holding, actually holding the knife?

22         MS. COLLINS:  Objection, vague.

23         THE WITNESS:  At one point or another every

24  time, of those.

25         MR. BUELNA:  Q.  And of those do you mean six,

1    do you mean ten?

2        A.   Around that, approximately, yes.

3        Q.   Okay.  Now, in each one of those instances

4    or -- strike that.

5            In any of those instances did the suspect

6    ultimately die?

7        A.   No.

8        Q.   Okay.  In any of those instances was the

9    suspect shot by a San Francisco Police Officer?

10           MS. COLLINS:  Objection, vague as to time.

11   Calls for speculation, lack of foundation.

12           THE WITNESS:  No.

13           MR. BUELNA:  Q.  In all of those instances was

14   the person taken into custody without injury?

15       A.   I did.

16       Q.   Now, you did respond and I'm going to

17   represent to you the suspect was Mario Woods on the

18   date of the incident, you did respond to a call for

19   Mario Woods, is that correct?

20       A.   I did.

21       Q.   How did you -- why did -- what caused you to

22   respond; did you hear a dispatch, did you hear a call,

23   hear something on the radio ?

24       A.   Well, it started while we were in lineup at

25   Bayview Station.  There was a call for service earlier

                                                          14

1    in the day where somebody was stabbed and was in the

2    hospital, units had gone to the area of, I believe,

3    Third and Le Conte prior to us being on duty but were

4    unable to find a suspect.

5         And then as we were in lineup somebody came on

6    the air saying that they believe the suspect was in

7    that area of Third and Le Conte and so we broke from

8    lineup, drove to that area to try to search for the

9    suspect where we actually made contact with Mr. Woods

10   that's -- we responded to that scene because we heard

11   Officer Thompson saying that they located the suspect

12   in the area of Third and Fitzgerald and Gilman and that

13   he had a knife and was coming at his partner asking for

14   help.

15        Q.   And when you say "coming at his partner," are

16   you referring to -- identify who you are referring to

17   in that.

18        A.   I'm speaking about Officer August.

19        Q.   Okay.  You said a lot so I'm going to unpack

20   that a little bit?

21        A.   Yeah.

22        Q.   Now, you mentioned that you were at lineup

23   when you heard a call that the stabbing suspect may be

24   in the area of Third and Le Conte; is that correct?

25        A.   Yes.  A witness to the stabbing, I believe,

                                                            15

1    MR. BUELNA:  Q.  Was it fair to say that you

2    observed what appeared to be him talking?

3       A.  Yes, I could see his mouth moving which

4    appeared to be him talking.

5       Q.  Now, when you were on your way to Third and

6    Gilman, after having left Third and Le Conte, do you

7    recall Officer Cuevas instructing you at all?

8       A.  Instructing, no.  I mean, basically he was, as

9    a passenger we were driving code three with lights and

10   sirens, so he was basically watching out for other

11   traffic and other officers driving code three, because

12   that's really a lot of times the most dangerous

13   situation as other officers coming from different

14   directions.

15      Q.  Did you have any conversation about what you

16   might expect once you got on scene or any other

17   conversation as it relates to, you know, Mr. Woods

18   having a knife and the situation that you were going

19   to?

20      A.  I don't remember a specific conversation

21   regarding exactly what we're going to do when we get

22   there.  It was a matter of getting there safely at that

23   time and getting there as fast as possible to assist

24   them.

25      Q.  Do you have a general recollection of Mr.--

                                                        24

1      Officer Cuevas telling you what the plan was when you

2      got there or what you should be doing?

3              MS. COLLINS:  Objection, calls for

4      speculation.  Assumes facts not in evidence.

5              THE WITNESS:  No, I don't -- I don't recall a

6      specific conversation.  I think really we were waiting

7      to get there to see really what was in front of us.

8      You know, you can kind of go through scenarios in your

9      head of what the scene is going to look like but it

10     wasn't until we got there that we actually had any idea

11     what the scene looked like and how many people were

12     around and how contained he was, etcetera.

13             MR. BUELNA:  Q.  Now, at some point you

14     actually arrived on scene, correct?

15         A.    Correct.

16         Q.    And what's the first thing that you can recall

17     you see when you get on scene at Third and Gilman?

18         A.    So we stopped the car and stopped right behind

19     Officers Seto and Navarro.  I see them get out of the

20     car, out of their patrol car, and then I see Officer

21     August with his gun drawn and Officer Thompson behind

22     him, basically shadowing or following Mr. Woods

23     southbound on Third Street.

24         Q.    At that point did Mr -- sorry.  Strike that.

25             At that point that you arrived on scene did

                                                         25

1    Q.   Okay.  Is it fair, correct me if I'm wrong, is

2    it fair to say that after that initial order that you

3    didn't make any verbal orders?

4    A.   That is correct, I did not make any other

5    verbal orders after that initial.

6    Q.   Now, at the time that you arrived in the

7    perimeter and came to a stop, what was Mr. Woods doing?

8         MS. COLLINS:  Objection, vague as to time.

9         THE WITNESS:  You're saying almost at the

10   moment that I stopped to form the perimeter?

11        MR. BUELNA:  Q.  Correct.

12   A.   He was basically facing me with a knife in his

13   right hand.

14   Q.   Was he swiping the knife at you in a stabbing

15   motion?

16   A.   I didn't see him make any stabbing motions

17   with the knife.

18   Q.   During the entirety of the incident?

19   A.   For the entirety of the incident I did not see

20   him make any motions I would consider a stabbing

21   motion.

22   Q.   Did you see him sprint at any officer?

23   A.   Sprint?

24   Q.   Correct.

25   A.   No, I do not see him sprint.

30

1      Q.    Did you see him run at any officer?

2      A.    I did not see him run at any officer.

3      Q.    And you didn't hear him threaten any officer?

4      A.    I could not verbally make out what he was

5      saying.

6      Q.    So to your knowledge he didn't threaten any

7      officer based of what you heard?

8            MS. COLLINS:  Objection, lacks foundation.

9      Calls for speculation.

10           THE WITNESS:  Well, verbally I could not hear

11     him but the mere presence of him holding the knife as a

12     stabbing suspect and refusing to comply with orders,

13     even after taking multiple rounds from the ERIW, two

14     different types of ERIW and OC spray, that in itself

15     showed a great deal of threat to me.

16           MR. BUELNA:  Q.  Verbal threats?

17     A.    But verbal threats, I could not make out

18     anything that he was saying.

19     Q.    You mentioned that you stopped making verbal

20     orders but other officers were making verbal orders,

21     correct?

22     A.    Yes.

23     Q.    Do you recall some of the verbal orders that

24     you overheard?

25     A.    Yeah.  I mean, they were similar to what I

31

1    said, basically, drop the knife, get on the ground, you

2    know, or I'll shoot.  I also heard Officer Navarro

3    making orders to drop the knife when he was deploying

4    the ERIW.  We're taught to say red light, red light

5    less lethal, drop the weapon or I'll shoot, just as a

6    verbal recognition for other officers so they don't

7    hear the loud noise go off and think it's gunfire.

8         Q.   Oh, did you hear Navarro say red light, red

9    light, that sequel?

10        A.   I did.

11        Q.   How many times?

12        A.   I can't recall.  I know he deployed the ERIW

13   multiple times, and I just remember hearing it multiple

14   times.  I can't -- three or four, maybe, times I heard

15   him say.

16        Q.   What was Mr. Woods response to being hit with

17   ERIW?

18             MS. COLLINS:  Objection, compound.  That

19   multiple times.

20             THE WITNESS:  There were a couple instances

21   where he was hit where he almost made no reaction.  And

22   there was only one that I saw that really seemed to

23   have any -- put him in any sort of pain for a brief

24   moment, and that's the round hit him somewhere near the

25   groin.  I don't know if it hit him in the groin, but I

32

1  know it hit him somewhere near there and he basically

2  bent down for a brief second and then stood right back

3  up.

4          MR. BUELNA:  Q.  Now, eventually he began to

5  walk northbound?

6      A.    That is correct.

7      Q.    So there was a time when you first got there

8  and he was walking southbound, correct?

9      A.    Yes, as arriving in our vehicle he was walking

10 southbound.

11     Q.    And then at some point he came to essentially

12 a stop?

13     A.    Correct.  As we formed a perimeter around him

14 he stopped.

15     Q.    Now, from the time that he initially came to a

16 stop after moving southbound, approximately how long

17 past until he began moving northbound.  So essentially

18 I'm asking -- how long was he standing still while you

19 were at the perimeter?

20     A.    I would say anywhere from 30 to 45 seconds.

21     Q.    Now, during that 30 to 45 seconds that he was

22 standing still, did you hear any officers designate

23 themselves as the person to be communicating with

24 Mr. Woods?

25          MS. COLLINS:  Objection, vague.  Calls for

33

1    speculation.  Lacks foundation.

2           THE WITNESS:  I did not hear anybody verbally

3    say that they were going to assume the role of the sole

4    contact officer.

5           MR. BUELNA:  Q.  Is it fair to say during that

6    30 to 45 seconds you heard several commands from

7    several different officers?

8       A.   I heard -- yes.  I gave a command myself and

9    heard multiple commands given by different officers,

10   all to the effect of drop the knife and surrender the

11   knife and get on the ground.

12      Q.   And during that 30 to 45 seconds did you ever

13   become aware that there were civilians in the area?

14      A.   Yes.  When we pulled up in the vehicle -- I

15   mean, it was about 4:30 in the afternoon, on Third

16   Street it's rush hour traffic, so there was multiple

17   people, multiple cars around.  There was multiple

18   people on the Muni platform on Third Street.  There was

19   a parked Muni bus with bystanders on the sidewalk and

20   all within a range of 30 to 40 feet.

21          After -- even after we arrived, and even

22   during the incident I could hear bystanders and people

23   behind us and to my left yelling, you know, just drop

24   the knife, just give up, just, you know, stop, drop the

25   knife.

34

1    officers, the public.  And that time just wasn't

2    available to us.

3        Q.  Did any other officer give you any verbal

4    instructions for that 30 to 45 seconds that Mr. Woods

5    was essentially still?

6            MS. COLLINS:  Objection, vague.  Overbroad.

7            THE WITNESS:  No, I don't recall any officers

8    speaking directly to me or giving any orders to me

9    directly.

10           MR. BUELNA:  Q.  You also mentioned that

11   Officer Thompson was on the air essentially updating

12   the situation, correct?

13       A.  Yes.

14       Q.  Was he continually doing that throughout the

15   incident or were there times he would stop and then

16   continue?

17       A.  I mean, he would update it periodically,

18   update periodically.  There was other people that were

19   on the air, too, but I didn't recognize their voices,

20   but he was the one that I heard, at least initially,

21   and over the course of the incident on the air giving

22   updates of what was happening, including, you know,

23   deployment of the ERIW, deployment of the OC spray, et

24   cetera

25       Q.  Did you ever hear any supervisors or what you

1    I could hear civilians yelling.

2         Q.   And so when you determined that you were going

3    to discharge a firearm it was not in fear that

4    Mr. Woods was going -- was attacking a civilian but

5    rather your -- another officer, correct?

6              MS. COLLINS:  Objection, misstates the

7    testimony.  Assumption, facts not in evidence.

8              THE WITNESS:  Well, I mean the primary reason,

9    the reason I did in that exact instant was in

10   protection for Officer August.  I mean, if he had

11   broken a perimeter and is now wondering throughout --

12   amongst a bunch of civilians and bystanders, we have

13   almost essentially no way of stopping him.  So that was

14   a secondary fear, and that was always in my head why we

15   needed to contain this man and why we needed to prevent

16   his ability to flee, because if he does flee, you know,

17   we have essentially an armed person, again, that has

18   shown very little respect for human life or other

19   people or the public safety.  That if he did break our

20   perimeter that he could very potentially injure more

21   people kill other people.  Yes, my immediate response

22   was to Officer August, but that was always a secondary

23   thought that was in my head, it was also the public

24   safety.

25         Q.   That's not why you fired, you fired because

48

1    Officer August --

2              MS. COLLINS:  Objection, argumentative.

3              THE WITNESS:  I fired in that exact moment for

4    the protection of Officer August.

5              MR. BUELNA:  Q.  And you mentioned that

6    Mr. Woods was advancing on Officer August, correct?

7         A.    Yes, he was advancing.

8         Q.    And by advancing, did you perceive him to be

9    advancing towards Officer August in particular or just

10   appeared to be going northbound in the general

11   direction?

12        A.    Officer August was backing up and he was

13   advancing, basically closing the distance to Officer

14   August and himself.

15        Q.    But it appeared that -- and I'm just asking

16   for your interpretation of the events -- but it

17   appeared to you that he was specifically going after

18   Officer August or that he was attempting to flee?

19             MS. COLLINS:  Objection, calls for

20   speculation.

21             THE WITNESS:  I'm not sure.  I can't really

22   guess, you know.  All I know is he was walking head on

23   to Officer August.

24             MR. BUELNA:  Q.  Did you hear any other

25   officers open fire prior to you discharging your

49

1    firearm?

2            MS. COLLINS:   Objection, argumentative.   Open

3    fire.

4            THE WITNESS:   I heard other gunshots around

5    the same time they discharged mine.

6            MR. BUELNA:   Q.   By around the same time, do

7    you mean prior or after or the same time?

8        A.   About the time I made a mental note in my head

9    that I was going to discharge my firearm I heard a

10   round or two rounds go off or a couple rounds go off.

11       Q.   Did it motivate you at all to open fire?

12           MS. COLLINS:   Objection, argumentative.

13           THE WITNESS:   No, I made it very clear by my

14   head that I am going to discharge my firearm.   It was

15   no way sympathetic fire.

16           MR. BUELNA:   Q.   And what's sympathetic fire

17   mean to you?

18       A.   As it means to me and as I understand it, it's

19   basically that the stressful situation, if you hear

20   other gunfire you may -- it may elicit a response to

21   fire as well, unknowingly.

22       Q.   Now, if you had already heard a couple of

23   shots why did you feel the need to fire?

24           MS. COLLINS:   Objection, argumentative.   Asked

25   and answered.

1          MR. BUELNA:   Q.   Did he appear to comply with

2   any of those commands?

3        A.   He did not comply to any of the commands that

4   were given.

5        Q.   Did any officers attempt to calmly speak with

6   Mr. Woods as opposed to scream at him?

7             MS. COLLINS:   Objection, vague as to time.

8   May call for speculation.   Misstates the testimony.

9             THE WITNESS:   I do not know if any other

10  officers spoke to him prior to my arrival.

11            MR. BUELNA:   Q.   I'm just asking 30 to 45

12  seconds?

13       A.   In that 30 to 45 seconds I personally did not

14  hear anybody speak calmly.   With all the ambient noise

15  I wouldn't be able to hear a person speaking calmly.

16       Q.   Did you hear any officer try to establish

17  himself as the one to establish a rapport with

18  Mr. Woods in that 30 to 45 seconds?

19            MS. COLLINS:   Objection, vague.   Vague as to

20  establish a rapport.   Assumes facts not in evidence.

21            THE WITNESS:   No, I think the first mindset

22  was to contain and give orders.   I don't feel that

23  there was time, at least in that 30 to 45 seconds, to

24  establish rapport.

25

                                                          56

DEPOSITION OF OFFICER SCOTT PHILLIPS

1         MR. BUELNA:  Q.  But you just mentioned that

2    he wasn't complying with orders.  So as an alternative,

3    wouldn't you agree that trying to establish rapport,

4    speaking calmly, asking his name would be alternative

5    de-escalation techniques that you can apply in that

6    moment?

7         MS. COLLINS:  Objection, incomplete

8    hypothetical.  Calls for speculation.  Assumes facts

9    not in evidence.

10        Go ahead.

11        THE WITNESS:  Sorry, can you read that one

12   more time.

13        MR. BUELNA:  Read it back.

14        (Whereupon, the record was read back

15        by the court reporter.)

16        MS. COLLINS:  Same objection.

17        THE WITNESS:  I was just trying to act as a

18   cover officer.  I can only speak for myself what I did.

19        MR. BUELNA:  Q.  Are you prohibited from using

20   any de-escalation techniques as a cover officer?

21        MS. COLLINS:  Objection, incomplete

22   hypothetical.  Lacks foundation.  Calls for

23   speculation.

24        THE WITNESS:  I mean, the duty of a cover

25   officer is to watch, watch and look at surroundings, to

57

1    watch the suspect and to basically cover anybody else

2    who is trying to make contact.

3              MR. BUELNA:  Q.  If there's a cover officer

4    there's a lead officer, I presume; is that correct?

5         A.   Nobody was necessarily designated verbally as

6    a lead, it was just a matter of allowing others to give

7    commands.

8         Q.   So was there someone that was organically a

9    lead in this situation?

10             MS. COLLINS:  Objection, argumentative.

11             THE WITNESS:  I mean, I would say no single

12   person in that amount of time verbally established

13   themselves as a lead, as the lead officer.  I think

14   everybody kind of just fell into different roles.  We

15   didn't necessarily be told what to do.  People,

16   multiple people gave orders 'cause I think it was

17   unclear, you know, maybe this guy isn't understanding,

18   maybe he just, you know, maybe he needs to be told

19   again.  So, you know, as the ERIW was deployed, you

20   know, people continued to give orders and every

21   opportunity, really, to surrender peacefully.

22             MR. BUELNA:  Let's take brief break, I'm

23   almost done.

24             VIDEOGRAPHER:  Off the record.  The time is

25   4:20.

                                                        58

1    understand this and apply the principles during patrol,

2    from the Academy.

3            MR. BUELNA:  Q.  Now, while you were on scene

4    on Third and Gilman with Mr. Woods, did you observe him

5    do anything unusual as far as his behavior?

6            MS. COLLINS:  Objection, vague as to time.

7    Vague as to unusual.

8            THE WITNESS:  The only thing that appeared

9    unusual to me was the level of pain tolerance and

10   that's what struck me as a red flag really in the whole

11   situation.  You know, after being shot multiple times

12   with a EIRW, the OC spray having being sprayed in the

13   Academy and knowing how painful that is, you know,

14   having no response to it, even back spray if that's all

15   that got on him, raised a lot of red flags and really

16   heightened my perceived level of threat.

17           And that being said, I guess that's what I

18   would have considered what you'd call unusual, just his

19   level of pain tolerance.

20       Q.  Did you make any -- come to any conclusions

21   based off of that observation that he was under the

22   influence of some substance?

23       A.  I believed based off that that he was most

24   likely or possibly under the influence of some sort of

25   drug or alcohol.  He also may have just been, you know,

                                                    61

1    a person with a lot of adrenaline or somebody that had

2    a really high pain tolerance so.

3        Q.    So it wasn't apparent to you that he was

4    suffering some sort of mental altered state?

5            MS. COLLINS:  Objection, calls for

6    speculation.  Vague as to altered mental state.

7            THE WITNESS:  I did not draw necessarily that

8    conclusion in that brief 30 to 45 second time period,

9    that this is a person that is clearly under an altered

10   mental state or that is high on drugs or that has

11   mental illness or anything like that.

12           It appeared to me that this is a suspect armed

13   with a knife that is not complaint to orders, that is

14   not peacefully surrendering and that ultimately did not

15   want to be taken into custody.

16           MR. BUELNA:  Q.  You didn't learn on scene

17   from any of the other officers that he had expressed

18   suicidal ideation?

19       A.    No, I was not aware of that on scene.  I did

20   not hear him say that or I did not hear other officers

21   on scene reiterate that.

22       Q.    Is that something that you would expect to

23   hear from another officer?

24           MS. COLLINS:  Objection, calls for

25   speculation.  Lacks foundation.  Incomplete

62

```
 1    STATE OF CALIFORNIA    )
                             ) ss.
 2    COUNTY OF CONTRA COSTA )

 3

 4           I, Angelica R. Gutierrez, a licensed Certified

 5    Shorthand Reporter, duly qualified and certified as such

 6    by the State of California;

 7           That prior to being examined, the witness named in

 8    the foregoing deposition was by me duly sworn to testify

 9    to the truth, the whole truth, and nothing but the truth;

10           That the deposition was by me recorded

11    stenographically at the time and place first herein

12    mentioned, and the foregoing pages constitute a full,

13    true, complete and correct record of the testimony given

14    by the said witness;

15           That I am a disinterested person, not being in any

16    way interested in the outcome of said action, nor

17    connected with, nor related to any of the parties in said

18    action, or to their respective counsel, in any manner

19    whatsoever.

20

21                       DATED: July 24, 2018

22

23           __/s/Angelica R.Gutierrez_____

24              ANGELICA R. GUTIERREZ, CSR No.  13292

25
```

80