# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

GWENDOLYN WOODS, individually)
and as Successor in Interest )
to Decedent MARIO WOODS,      )
                              )
            Plaintiff,        )
                              )
        vs.                   ) CASE NO.:  3:15-05666-WHO
                              )
CITY AND COUNTY OF            )
SAN FRANCISCO; a municipal    )
corporation, et al,           )
                              )
            Defendants.       )
_____)          CERTIFIED COPY

DEPOSITION OF ANTONIO SANTOS

THURSDAY, JULY 19, 2018

REPORTED BY:  SHELLI G. ENG, CSR #11397

1

DEPOSITION OF ANTONIO SANTOS

1      mind.

2           Q.   Right.  No.  I didn't mean that you have been

3      trained on everyone.  I'm just asking you what did your

4      training consist of in terms of recognizing the

5      behaviors or the symptoms of a person who is in a mental

6      health crisis.

7           A.   I still think that's pretty vague on -- I

8      mean, on how someone could be going through a mental

9      health crisis is so vast on what that is.  It is kind of

10     hard to answer.

11          Q.   When you say vast, do you mean to say there

12     are a number of different behaviors --

13          A.   Um-hmm.

14          Q.   -- or symptoms that a person could be showing

15     or exhibiting?

16          A.   I believe that's correct.

17          Q.   Okay.  So why don't you just name those that

18     are coming to your mind right now that you have been

19     trained on?

20          A.   Someone running around talking to themselves.

21          Q.   Making suicidal comments?

22          A.   There you go.  There is one right there.

23          Q.   Pacing back and forth?

24          A.   I mean, not necessarily.  People pace back and

25     forth for different reasons.

                                                          122

1    deal with them.

2         Q.   We are talking about the physical force

3    aspect.

4              Right now I'm just asking about communication.

5         A.   For the most -- I mean, we want to train to

6    deescalate the situation, but sometimes to bring a

7    situation down, you have to take control of it.  You

8    have to establish some more dominant -- you have to talk

9    to them in a more dominant manner.

10        Q.   So when you first -- strike that.

11             So it sounds like now, you've been told or at

12   least trained that you're going to try to deescalate the

13   situation by the use of your voice, right?

14        A.   So say that one more time.

15        Q.   Did you receive training that you should try

16   to deescalate the situation by the use of your voice?

17        A.   Yes.

18        Q.   Did you also receive training that you should

19   not threaten the person with arrest?

20             MR. CONNOLLY:  Objection -- hold on.

21   Objection.  That's vague as phrased and calls for an

22   incomplete hypothetical and argumentative.

23             THE WITNESS:  That's very specific.  You

24   can't -- it really depends on different situations

25   through my training and experience.  Some training,

                                                            126

1        Q.   Exactly.  Situations are fluid.  They're

2    dynamic.  They're changing.  You can't lock yourself

3    into one scenario, correct?

4        A.   Yes.

5        Q.   So as a police officer, you're trained to also

6    assess and then reassess the situation, correct?

7        A.   We are constantly assessing situations.

8        Q.   Okay.  In order to determine what is the

9    appropriate tactic to use for that situation, correct?

10       A.   That's correct.

11       Q.   Okay.  And for example, you're trained to

12   assess or reassess the situation because you may assess

13   it initially and think I need to use force.  This person

14   has a weapon.  They're about to hurt someone.

15            And then you reassess the situation and

16   realize they're not a threat to anyone, and then you

17   would not use the force or you would stop using the

18   force that you had started, correct?

19       A.   If you're saying observe someone where you

20   feel like you need to use force and they stop or they

21   comply or they're just -- not using force, and then we

22   stop and we don't use force, we reassess it and go about

23   it that way; is that correct?  That's your --

24       Q.   Yes.  That's the way you've been trained,

25   correct?

129

 1          A.   Yes.  We will constantly assess our actions

 2     and assess what is happening.

 3          Q.   Got it.

 4               So you will assess and reassess constantly, to

 5     use your word, in order to determine what is the best

 6     course or the best tactic, correct?

 7          A.   And see if we need to change tactics to

 8     something else, okay.

 9          Q.   Is that true?  That's the way you've been

10     trained?

11          A.   I believe that is true.

12          Q.   Okay.  Let's mark that.

13               (Whereupon Plaintiff's Exhibit 6 was marked

14               for identification by the court reporter.)

15     BY MR. POINTER:

16          Q.   Let me show you what has been marked as

17     Exhibit 6 to your deposition.  I will represent to you

18     this is learning domain 37, Chapter 4 on mental illness.

19     Go to page 4.

20               MR. CONNOLLY:  Which exhibit is this?

21               MR. POINTER:  This is Exhibit 6.

22               MR. CONNOLLY:  Is this something you produced

23     to us?

24               MR. POINTER:  This is a learning domain.

25               MR. CONNOLLY:  Is this something you produced

                                                            130

1     seeing the knife in his hand.

2          Q.   You mentioned that he was saying something, so

3     you actually heard his voice?

4          A.   I can't recall what he was saying.

5          Q.   Although you can't recall what he was saying,

6     but do you recall hearing a sound that you thought was

7     his voice?

8          A.   I'm sorry.  I cannot answer that, I cannot

9     remember that or recall that right now.

10          MR. CONNOLLY:  Listen closely.  Listen very

11     closely to the question.  I think it is slightly

12     different than what you're answering.

13     BY MR. POINTER:

14          Q.   I'm just asking even if you cannot remember

15     what was said, did you hear a sound that you thought,

16     oh, that's Mario Woods' voice?

17          A.   Yes.  He was speaking.  I know he was

18     speaking.

19          Q.   Okay.  But you just couldn't make out what he

20     was saying?

21          A.   I probably could make out then.  I just can't

22     recall what he was saying.

23          Q.   Okay.  That's important, you know, because if

24     you do while you're here today remember what he was

25     saying, please let me know.  That's an important piece

149

1    approached where Mario Woods was at, did you hear any

2    orders being given?

3         A.   I cannot recall what orders were being given.

4              MR. CONNOLLY:  And so he asked a different set

5    of questions.

6              Can you restate the question, please.

7              (Whereupon the record was read as follows:

8              "Question:  So when you got out of your car

9              and you approached where Mario Woods was at,

10             did you hear any orders being given?")

11             THE WITNESS:  I know there were orders being

12   given.  I cannot recall what those orders were.  I

13   cannot recall who was giving those orders.

14   BY MR. POINTER:

15        Q.   Did you hear -- but you heard orders, right?

16        A.   Yes.

17        Q.   Now, at some point in time while you were

18   there, you also gave orders, too, right?

19        A.   Yes.

20        Q.   Excuse me.  Before you started giving orders,

21   did you hear more than one officer giving orders to

22   Mario Woods?

23        A.   Did I hear more than one officer giving orders

24   to Mario Woods?

25        Q.   Yes.

                                                      159

1      A.    I cannot recall how many officers were giving

2   orders.  I'm sorry.  I don't know if it was just

3   Officer August or Officer Cuevas or whoever was there

4   giving orders.  I know that orders were being given.

5      Q.    But you can't say whether it was one or more

6   officers giving them?

7      A.    Yes.

8      Q.    Okay.  Now, so you ran over and you formed a

9   half circle around Mario Woods, correct?

10      A.    That is correct.

11      Q.    Can you describe his height?

12      A.    I believe he was a little bit shorter than me,

13   so maybe about -- I think I said five foot eight.  I

14   think that was the description too, about five foot

15   eight.

16      Q.    Sure.

17            And you described him in your homicide

18   interview as being approximately 120 pounds.

19      A.    130, yeah.  Skinny.  I'm not too good at

20   estimating weight.

21      Q.    That's something that you're trained to do

22   during the academy, right?

23      A.    Yeah.  But, I mean, he's also wearing a puffy

24   jacket.

25      Q.    Okay.  With the puffy jacket, you had him

                                                    160

```
 1      approximately 120, 130 pounds?
 2           A.   Yes.  Slimmer guy.
 3           Q.   Small guy?
 4           A.   Slim.
 5           Q.   Not big, right?
 6                MR. CONNOLLY:  Objection.  Argumentative.
 7                THE WITNESS:  I mean, big?  I will say he's a
 8      slender guy.
 9      BY MR. POINTER:
10           Q.   Okay.  When you described him to the homicide
11      investigator, you said he was not big.  Do you remember
12      saying that?
13           A.   If you have that transcript, I may have said
14      that, but, I mean --
15           Q.   If you don't remember, it's okay.  So you
16      don't remember saying that?
17           A.   I know he was a slender guy.
18           Q.   But you don't remember telling the homicide
19      investigator that he's not big?
20           A.   Sorry.  I can't recall my exact verbiage.
21           Q.   That's fine.
22                Do you remember telling the homicide
23      investigator that he looked confused?
24           A.   Once again, exact verbiage, I can't --
25           Q.   Did he look confused to you as you approached
```

161

```
1      the scene?
2           A.   He seemed kind of had a -- I want to say
3      frantic demeanor to him.  I can't remember if I used the
4      term confused or how I worded it then.
5           Q.   That's fine.
6                Did he look disoriented to you?
7                MR. CONNOLLY:  Objection.  Vague.
8                THE WITNESS:  I mean, could you please explain
9      how you would describe someone disoriented?
10     BY MR. POINTER:
11          Q.   Have you never used that word before?
12          A.   I just also want your verbiage.  I think we've
13     used the same words with different meanings earlier
14     today.
15          Q.   Sure.
16          A.   I think we've established that.
17          Q.   So when I say "disoriented," what does that
18     word mean to you?
19          A.   It can mean multiple things.  Are you saying
20     that he's walking around wondering, hey, is that a bird
21     in the sky?  There's nothing there.  Is the sky red?
22     There could be different -- there are different --
23          Q.   I'm not going to force you to use the word.
24     Just so we are clear, it is not my definition that
25     really matters.  I'm just trying to figure out from you.
```

162

```
 1      I said did he look disoriented.  You were unclear, so
 2      I'm like do you use the term?  You said yes, but we may
 3      have different definitions.  So I'm trying to find out
 4      what your definition is of that word.
 5           A.   Okay.  I --
 6                MR. CONNOLLY:  Why don't you just ask him what
 7      he looked like?
 8                THE WITNESS:  Yeah.  It's --
 9                MR. POINTER:  I will.
10                THE WITNESS:  Yeah.  I'm sorry.  The word --
11      the actual word --
12      BY MR. POINTER:
13           Q.   You're having trouble with the word?
14           A.   Yeah.  It's --
15           Q.   Oh, okay.  We won't --
16           A.   That's why -- that's why -- that's why I don't
17      want to sit here and use that word and thinking
18      you're --
19           Q.   That's why I asked you to --
20           A.   Yeah, yeah.
21           Q.   -- as opposed to me defining what you --
22                THE COURT REPORTER:  I'm sorry.  We're going
23      to need to slow down a bit.  The record is getting
24      muddled again.  You're talking over each other.
25                MR. CONNOLLY:  Can we plan a lunch break at
```

1    some point?

2              MR. POINTER:  Yes.

3              MR. CONNOLLY:  Now?

4              MR. POINTER:  In a moment.  Let's just finish

5    this point.

6         Q.   So you mentioned that he looked frantic to

7    you.  What was he doing that made you believe that he

8    was frantic?

9         A.   I'm trying to -- it was along with his kind of

10   his pacing.  He kind of had some jerky movements going

11   along with him.  I don't want to say jerky, but twitchy.

12   The way I remember -- sorry.  I'm trying to refresh my

13   memory on his actual movements.  It was kind of his

14   jerkier -- at the time, it seemed like quicker

15   movements, and just his demeanor in general.

16        Q.   So you mentioned that he had the knife in his

17   hand, correct?

18        A.   Yes.

19        Q.   Was he pointing a knife at anyone?

20        A.   I don't believe he was pointing the knife at

21   anyone.

22        Q.   Was he slashing the air with it?

23        A.   Not that I could recall.

24        Q.   Okay.  And so when you joined the half circle,

25   you also began issuing commands to him as well, correct?

                                                        164

1      A.   That is correct.

2      Q.   Told him to drop the knife, right?

3      A.   Yes.

4      Q.   Did you ever tell him "don't move" or words to

5   that effect?

6      A.   Not that I could recall.

7      Q.   Did you ever tell him to freeze or words to

8   that effect?

9      A.   I believe I told him to get on the ground.

10      Q.   Did you ever tell him to turn around put his

11   hands behind his back or behind his head?

12      A.   I believe I told him to drop the knife and get

13   on the ground.

14           MR. POINTER:  Why don't we take that break?

15           We can go off the record.

16           (Whereupon recess was taken from 2:14 to

17           2:58.)

18   BY MR. POINTER:

19      Q.   All right.  Officer, we are going to go back

20   on the record and start with the -- or continue with

21   your deposition after lunch.

22           Do you understand the same rules and

23   guidelines apply?

24      A.   I do.

25      Q.   Great.

1      Q.   Okay.  But you don't remember exactly what

2  point?

3      A.   No.

4      Q.   All right.  I gotcha.

5           And Officer Barnes went with you to help you

6  form this half circle or semicircle around Mario Woods,

7  right?

8      A.   To create a perimeter around him.

9      Q.   All right.  And after you left to get out of

10  the car and came to a stop, were there other officers

11  over there besides yourself and Officer Barnes who were

12  helping form this half circle perimeter?

13      A.   Can you say that one more time?

14      Q.   I was trying to figure out whether other

15  officers were over in the same location when you ran

16  from your car, you stopped, and started to form --

17      A.   Officers were coming from different angles.

18  Some officers drove a little past the scene.  They went

19  up to the corner of 3rd and Fitzgerald when being that

20  everything was moving, it was down closer toward 3rd and

21  Gilman, so officers were coming from different

22  directions.

23      Q.   Prior to you getting out of the car until the

24  point you stopped and kind of started forming this

25  semicircle, did you have any communications with anybody

                                                          167

DEPOSITION OF ANTONIO SANTOS

1       in terms of developing a plan?

2              A.   We are always kind of creating a plan, when

3       you're showing up on scene, even as an officer, you're

4       constantly planning in your own mind what is going on,

5       what are your options available to you.  Then when you

6       actually arrive on the scene, you need to observe what

7       is going on, assess the situation, develop a plan, act

8       on that plan.

9              So initially, you need to go -- we all have

10      our plan, our standards that we go through.  And from

11      there arrive, observe, orient, make a decision, and act

12      on that.

13             Q.   Okay.  So on your way in the car to the scene,

14      did you have communications with anyone about what the

15      plan was going to be?

16             A.   I believe Officer Thompson was calling things

17      out over the radio of what was happening or what they

18      needed.  I believe he was making a plan for less lethal,

19      calling for someone with less lethal to the scene.

20             Q.   Okay.

21             A.   So I believe that that is all incorporating

22      with planning.

23             Q.   Okay.  So the plan was to use less lethal, is

24      your understanding?

25             A.   That is a part of the plan.

168

DEPOSITION OF ANTONIO SANTOS

1          Q.   Okay.

2          A.   It is not the plan.  And, of course, someone

3    with an edge weapon, someone who could easily stab you

4    in whatever state of mind, you do want to have less

5    lethal on the scene, so that is one primarily, less

6    lethal, get to the scene.  And the plan is also to

7    create containment to make sure he is no longer a risk

8    to the public.  There are other people, bus stops in the

9    area, so our plan is contain it, contain the scenario.

10         Q.   Did you have any conversation with your fellow

11   officers who responded to the scene as to what the plan

12   was going to be?

13         A.   At the accident scene, when you're code 3,

14   you're trying to find direction.  A lot of stuff is

15   happening where you are paying attention to traffic,

16   other officers going code 3.  So whether -- I can't

17   recall we were saying that, okay, here is our primary

18   plan that we are going to do, I can't recall if we did

19   do that.  I know ultimately we did have a plan to -- a

20   standard plan, we need to contain this situation.

21         Q.   What I hear you saying is that you don't have

22   any recollection of communicating with any of your

23   fellow officers as to what the plan was going to be?

24         A.   I believe that is pretty standard on what our

25   plan is going to be.  We need to contain the situation,

169

1    and also that we have Officer Thompson saying -- having

2    the plans on the radio of we need less lethal.  We need

3    more officers.  That is part of establishing a plan.

4         Q.   Okay.  So other than what you heard

5    Officer Thompson say on the radio, did you hear any

6    other communication from officers as it relates to what

7    the plan was going to be in terms of dealing with

8    Mario Woods?

9         A.   I believe that that kind of answers it, that

10   development of a plan is pretty quick, couple of blocks,

11   going code 3.

12        Q.   I'm not asking how quick it was.  I'm just

13   saying were there any other details?  Was that the

14   extent of the plan?  If that was, that's okay.  I don't

15   know.

16             MR. CONNOLLY:  I'm going to object if you're

17   going to keep going down this line about the word

18   "plan" --

19             MR. POINTER:  I will withdraw.  I will

20   withdraw the question.

21             MR. CONNOLLY:  Okay.

22   BY MR. POINTER:

23        Q.   From your perspective, Officer, you were

24   there, I wasn't.  I'm trying to find out what was the

25   plan and what communication there was between the

                                                      170

1    was in.

2                   THE WITNESS:   As to if Officer Barnes and I

3    sat there and created a plan for it, because

4    Officer Barnes and I were the only people in our

5    vehicle.   Our plan, what we had was, one, how we were

6    going to arrive to the scene, how we were going to get

7    to the scene, and that was by our decision to go code 3

8    down the Muni tracks.

9                   Other plan was we are talking about vehicles

10   that were passing, plan on when we were going to cross

11   over 3rd Street, and then we arrived.

12                  Whether we communicated that we had to set

13   containment or not, we both knew we had to have the

14   situation contained.

15   BY MR. POINTER:

16       Q.   So you're saying you both knew that.   I'm

17   asking you, was there any verbal conversation between --

18   let's just start with yourself and Officer Barnes -- as

19   to what you guys were going to do once you got to the

20   scene?

21       A.   I think I stated I couldn't recall if there

22   was any conversation saying that we needed to contain

23   it, but we -- it is pretty standard of what we do.

24       Q.   So the answer is no, you don't remember,

25   right?

                                                            172

1     A.   I cannot recall if there was an exact

2     conversation.

3          Q.   Any conversation in general?

4          A.   We were talking about vehicle traffic, about

5     which route we were going to get there.

6          Q.   And once you got to the accident scene, did

7     you have any communication with Officer Barnes as it

8     relates to what the plan was going to be?

9          A.   I think at that time, we were concerned about

10    the threat that was in front of us, a man with a knife,

11    that we need to contain, and also the general public

12    that was around.

13         Q.   I understand those are your concerns.  I'm

14    asking you did you have any communication with

15    Officer Barnes once you got to the scene as relates to

16    what the plan was going to be.

17         A.   I cannot recall if there was any conversation

18    what the plan was going to be.

19         Q.   Do you recall having any conversation with any

20    other of the officers who were there at the scene as

21    relates to what the plan was going to be once you guys

22    got to the scene?

23         A.   Once we got to the scene, we were trying to

24    give orders, trying to talk to Mr. Woods, here.  Give

25    him orders on what we need to do.  We were getting

                                                        173

1    containment going.  Other officers were talking, saying

2    that they were going to use -- I believe Officer Ortiz

3    discussed how he was going to use his OC.  We had

4    Officer Traw talk about how she was going to deploy

5    ERIW.  There was Officer Navarro who was deploying the

6    ERIW.  So plans were happening.  People were talking.

7         Q.   And so that's what I am trying to figure out.

8    People were talking.  I'm asking you, what was your

9    participation, if any, in developing a plan in terms of

10   communication with other officers once you were on the

11   scene?

12        A.   Once I was on the scene?

13        Q.   Yes.

14        A.   I was focused on giving orders and making sure

15   that Mr. Woods knew that there were clear orders as what

16   we wanted.

17        Q.   I understand that's what you were focused on.

18   I'm trying to ask you what communications did you

19   personally have with your fellow officers as relates to

20   the plan once you were on the scene?

21        A.   I believe that that was said.

22             One, en route what our plan was, how we were

23   going to get there, and once we were on scene.  I was

24   not there giving orders, no, but what I was doing was --

25   let me correct that.  I wasn't giving orders to other

174

1    officers.  I was giving orders to Mr. Woods.

2        Q.   So you had no discussions with the fellow

3    officers once you got on the scene as to what the plan

4    was going to be, right?

5        A.   I believe everybody knew the plan was we need

6    to contain him.

7        Q.   So you don't recall having any conversations

8    with fellow officers saying you're going to be either

9    cover or the contact officer, right?

10       A.   Conversations as to whether they were having

11   cover or contact --

12       Q.   As to who it was going to be.

13            MR. CONNOLLY:  Let me just object as to vague

14   as to time.

15   BY MR. POINTER:

16       Q.   Once you got out of the car, from that moment

17   until Mario was shot and killed, did you have any

18   conversations with any officer as it relates to who was

19   going to be the cover versus the contact officer?

20       A.   No.  That scene was moving and changing so

21   rapidly that you don't have time to really sit there and

22   sit back and scream a plan.  I mean, this was happening

23   mere -- it was under a minute that everything unfolded.

24       Q.   Okay.  So the answer is no?

25       A.   I think I just kind of explained my answer.  I

                                                      175

1    primary officers on that situation.

2    BY MR. POINTER:

3         Q.   So you're following their lead?

4         A.   I think that they were there.  They

5    established initial everything, initial contact with

6    Mr. Woods.  I think that as things were unfolding, they

7    were the primaries there at that moment.  And if

8    Mr. Woods would have allotted us extra time to develop

9    it, I think other people could have -- would have been

10   taking leadership positions.

11        Q.   Okay.  So did you designate amongst yourselves

12   as to who was going to be the lead officer making

13   contact with Mr. Woods?

14        A.   Once again, when everyone is arriving, coming

15   code 3 to a scenario, officers are not afforded the

16   luxury to scream, "Hey, look, everyone.  I am the

17   leader.  You, over here, you are taking this corner."

18             This scene was unfolding quickly, so you

19   cannot yell at while people are trying to get

20   information out.  Officers trying to get information out

21   over dispatch.  People trying to deal with Mr. Woods.

22   People are trying to create a perimeter, plug holes and

23   eliminate avenues of escape.  And people are trying to

24   deploy less lethal tactics.

25             You don't sit there and scream, "I am the

180

1   leader.  Everybody, look at me.  I am supreme leader."

2        Q.   Clearly, because that didn't happen.

3             So I'm asking you, what, if anything -- if

4   there was no communication, just say "we didn't have a

5   verbal communication about this was going to be a

6   contact officer" or "this was going to be the lead

7   officer."  It is perfectly fine.  Just tell me if you

8   had any communication about that.

9             MR. CONNOLLY:  Objection.

10  BY MR. POINTER:

11       Q.   No, no.  Not whether there is time.  I didn't

12  ask that part.

13            I just asked was there any communication

14  amongst the officers as relates who was going to be the

15  lead officer?

16            MR. CONNOLLY:  Objection.  Vague.

17  Argumentative.  Asked and answered.

18            THE WITNESS:  I believe I told you.  On a

19  situation like this is unfolding rapidly while

20  Officer Thompson is trying to give out -- broadcast over

21  dispatch what is happening.  Officer August is trying to

22  talk to Mr. Woods.  You have other officers trying to

23  contain the situation.  Roles are not verbally screamed

24  on who is doing what.

25  BY MR. POINTER:

                                                      181

DEPOSITION OF ANTONIO SANTOS

1      Q.   So if I hear you correctly, you had no one

2   officer designated to be the lead officer?

3           MR. CONNOLLY:  Objection.  Lacks foundation.

4   Asked and answered.

5           THE WITNESS:  Say that one more time.

6   BY MR. POINTER:

7      Q.   There wasn't a single officer or one officer

8   who was designated to be the lead officer?

9      A.   At that --

10          MR. CONNOLLY:  Objection.  Lacks foundation.

11   Asked and answered.  Vague.

12          THE WITNESS:  At that time, no officer

13   screamed, "I am the leader of this run."

14   BY MR. POINTER:

15      Q.   But although no officer screamed, "I am the

16   leader of this run," did you yourself believe that there

17   was a particular officer who was the lead officer?

18          MR. CONNOLLY:  Objection.  Vague as to the

19   phrase "lead officer."  Lacks foundation.

20          THE WITNESS:  I believe that Officer Thompson

21   and Officer August were the lead officers on this run.

22   BY MR. POINTER:

23      Q.   Was there any one officer designated to

24   communicate with Mr. Woods?

25          MR. CONNOLLY:  Objection.  Vague as to time.

182

1          THE WITNESS:  Multiple officers, especially

2    myself, on the scene, were giving orders to Mr. Woods.

3    BY MR. POINTER:

4          Q.   Have you been trained that the best practice

5    is to have a single officer make contact with a person,

6    correct?

7          A.   There is a training, a theory, of dealing with

8    people.  Actually, no, not even necessarily.  With a

9    suspect, you could have different officers talk to him.

10   It is really situational driven.

11         Q.   Have you received any training that's taught

12   you that you should have one officer be a single point

13   of contact with the suspect?

14         A.   Training with a suspect.  I mean, you could

15   have multiple officers giving orders.  It is not a hard

16   written rule.

17         Q.   So you have not received that training?

18         A.   I did not say I have not received that

19   training.  There are different trainings for different

20   circumstances.

21         Q.   Okay.  Have you received any training that

22   says that you should designate a single officer to

23   communicate with someone who is in a mental health

24   crisis?

25         A.   In the situation, I do not believe that he was

                                                        183

1   Q.   Did you ask him whether or not he was taking

2   medications?

3   A.   No.

4   Q.   Did you ask him?

5   A.   I did not ask him if he was taking medications

6   because he was very unresponsive to us.  I'm already

7   giving him orders to drop the knife.  I'm not going to

8   be, hey, are you on any medications right now?

9   He's still a threat.  Our ultimate concern is

10   to stop him from being a threat.

11   Q.   When he was on the scene, what did he do that

12   was threatening other than posses the weapon that you

13   personally saw?

14   A.   One, not complying with us, not complying with

15   the less lethal that he was being hit with, not

16   complying with the OC spray that he was being sprayed

17   with.  That's what I am observing.

18   So at that time, I'm not thinking what

19   medication are you using.  I'm thinking about the safety

20   of my fellow officers, of myself, of the public.

21   Q.   So you saw an officer essentially leave the

22   semicircle and go and spray OC spray on Mr. Woods,

23   right?  Did you see that happen?

24   A.   I saw an officer step forward in the

25   semicircle and spray OC spray.

190

1     Q.   Did Mr. Woods stab out at that officer with a
2     knife?
3     A.   You mean the officer with the OC spray?
4     Q.   Yes.
5     A.   Okay.  No, he didn't.  Mr. Woods did not stab
6     him.  The person with the OC spray was maybe a foot in
7     front of us, if at most.
8     Q.   The question I asked you was, did you see
9     Mr. Woods make a slashing motion at the officer who
10    sprayed him with OC spray?
11    A.   He did not slash at the person who sprayed him
12    with OC spray.
13    Q.   Did you see Mr. Woods make any verbal
14    threat -- strike that.
15         Did you hear Mr. Woods make any verbal threats
16    to anyone on that scene while you were there?
17    A.   I cannot recall what Mr. Woods said.
18    Q.   So then you can't say he did, right?
19    A.   I cannot recall if he did.
20    Q.   Okay.  You can't recall if he did; you just
21    don't know?
22    A.   I cannot recall what he said on the scene.
23    Q.   You have no memory of it, right?
24    A.   I cannot recall it.
25    Q.   So you have no memory?

191

1    formed a semicircle, what was Mr. Woods doing?

2        A.   He was on the sidewalk.  He had the knife in

3    his hand.  He was moving -- I can't remember if he was

4    walking up -- which way he was going or if he was just

5    stopped.  I just remember him being on the sidewalk,

6    knife in his hand, saying something.  I can't recall

7    what he was saying.

8        Q.   Did you ever see him point the knife at any of

9    those officers?

10       A.   I do not remember.  I cannot recall him

11   pointing the knife at any officers.

12       Q.   You looked at the videos, right?

13       A.   Yes.  I've seen the videos.

14       Q.   Now, what happened next?

15       A.   After several orders were given to him to drop

16   the knife, after ordering him that if he did not drop

17   the knife, I would shoot him, he was hit multiple times

18   with less lethal.

19            There was a time when he dropped to a knee but

20   still had the knife in his hand.  I was hoping at that

21   time he was going to just surrender, but he did not

22   surrender.  He stood back up.

23            I don't know how many more times he was hit

24   with a 40 millimeter, but it was several more times, I

25   believe.  He was also hit with the 870 ERIW, the

                                                          194

1    Super-Sock, that seemed to have no effect on him

2    whatsoever.

3              He then -- someone attempted to --

4    Officer Ortiz attempted to use pepper spray on him.  It

5    had no effect on him.

6         Q.   So up to that point, did you ever hear

7    Mr. Woods threaten anybody through all of that use of

8    force?

9              MR. CONNOLLY:  Objection.  Vague.  Can you

10   repeat that question, I'm not sure I --

11             MR. POINTER:  Yeah.

12        Q.   I asked, during the use of force you just

13   described, which is the less lethal use of force, did

14   you hear Mr. Woods make any verbal threats?

15        A.   I cannot recall anything that Mr. Woods said.

16        Q.   During that use of force as you just

17   described, did you see Mr. Woods point the knife at any

18   of the officers?

19        A.   Mr. Woods did not point the knife at officers.

20        Q.   During that use of force you just described,

21   was Mr. Woods still essentially in the same position

22   that you described, which is either maybe pacing or

23   moving kind of side to side?

24        A.   During that time, from what I could recall, he

25   was around the same area.  He maybe moved a couple of

                                                      195

1          MR. CONNOLLY:  I have to take a break.

2          MR. POINTER:  No problem.

3          (Whereupon recess was taken from 3:43 to

4          3:55.)

5          MR. POINTER:  All right.  Let's go back on the

6     record, here.

7          Q.  Officer, so at some point in time, you fired

8     your gun, right?

9          A.  Yes.

10         Q.  And I believe you shot -- well, strike that.

11             How many times did you fire your gun?

12         A.  I believe I fired it five times.

13         Q.  And you shot your gun because August shot his

14     gun, right?

15         A.  No.

16         Q.  That's what you told the investigators,

17     though?

18         A.  That's not what I told investigators.

19         Q.  You thought August was in danger?

20         A.  Yes.

21         Q.  You ever heard of the term "sympathetic fire"?

22         A.  Yes, I have.

23         Q.  So you don't believe that what you did was the

24     case of sympathetic fire?

25         A.  What I did was not a case of sympathetic fire.

                                                            204

1    Q.   And you understand that based upon your

2    training, that you're responsible for each and every

3    shot you fire, correct?

4         A.   Yes.

5         Q.   And you told investigators that when you shot

6    your gun -- strike that.  Withdraw.

7              You told investigators that when you fired

8    your gun, you could not see the knife, correct?

9         A.   At the moment, the way he was turned, I did

10   not see the knife.

11        Q.   At the moment you fired your gun, you did not

12   see the knife, correct?

13        A.   At the moment I fired, I did not see the

14   knife.  He was turned.  It was on the opposite side of

15   his body from me.

16        Q.   So you didn't see it raised or moving because

17   you didn't see it at all?

18        A.   I did not see him raise or move the knife.

19        Q.   In fact, after the shooting, you went over to

20   where Mr. Woods was lying on the ground, right?

21        A.   That is correct.

22        Q.   And you saw the knife -- you recovered the

23   knife inches away from his waist, correct?

24        A.   I stepped on the knife and I moved it away.

25        Q.   And it was inches away from his waist,

205

1      correct?

2           A.   It was about waist level, correct.

3           Q.   Now, you told SFPD homicide investigators that

4      you gave Woods commands three to five times, correct?

5           A.   I can't recall how many times.  I gave him

6      commands.  I'm not going to say the exact amount of

7      commands I gave.  I'm sorry.  I can't recall.

8           Q.   When you gave the homicide investigation, that

9      was just hours essentially after the incident, correct?

10          A.   The next morning, correct.

11          Q.   Was your memory better then than it is now?

12          A.   It was probably fresher in my memory then.

13          Q.   You also told homicides -- strike that.

14               You also told SFPD homicide investigators that

15      you believed Mario Woods was high or intoxicated on some

16      type of narcotic at the time of this incident; correct?

17          A.   That is correct.

18          Q.   He had an altered mind state; is that correct?

19          A.   I believe he was intoxicated.

20          Q.   That he had an altered mind state?

21               MR. CONNOLLY:  Objection.  Vague.

22               THE WITNESS:  Some levels of intoxication.

23      BY MR. POINTER:

24          Q.   So that's a yes?

25          A.   I believe that he was intoxicated at the time

206

1    of this event.

2         Q.   Now, you didn't tell San Francisco Police

3    Department investigators during your homicide interview

4    that you felt there were any other officers who were

5    endangered by Mario Woods at the time you fired your

6    shots, right?

7         A.   I believe that Officer August was the main

8    officer at the risk of danger at that exact moment.  I

9    mean, there are other officers in the area.

10             This is a man who I believe was intoxicated,

11   who I believe had already stabbed somebody, who still

12   had that weapon, who was not complying, where less

13   lethal was not working on that person, where pepper

14   spray was not working on that person, and that

15   40 millimeter I've seen that hit multiple people and

16   they always -- it is very effective, and that it was

17   ineffective on him.

18        Q.   Yes.  And you didn't tell San Francisco Police

19   Department homicide investigators that you felt any

20   other officers were in danger at the time you fired your

21   gun, right?

22        A.   At the moment where I discharged my firearm, I

23   did it in defense of Officer August.

24        Q.   You didn't mention to San Francisco Police

25   Department homicide investigators that you fired your

                                                          207

1      gun because civilians are in danger?  You didn't tell

2      them that, correct?

3            A.   At the time that it happened, I did not see

4      the people directly behind Officer August in that

5      moment.  My focus was on Mr. Woods and Officer August.

6            Q.   Okay.  Gotcha.

7            Do you have a specific memory of each and

8      every verbal order that you gave?

9            A.   Not every specific order.

10           Q.   Do you have a memory as to the specific time

11     you gave each one of those orders?

12           A.   Could you please clarify that?  How many times

13     I said it?  Exactly what time it was?  I mean, I'm

14     sorry.  Do you mind?

15           Q.   That's okay.

16           Do you agree that deadly force is the highest

17     level of force an officer can use?

18           A.   I believe that deadly force is the most

19     serious option that an officer would have to use.

20           Q.   Do you agree that special rules apply as it

21     relates to the use of deadly force, correct?

22                MR. CONNOLLY:  Can you repeat that?

23                THE WITNESS:  Yeah.

24     BY MR. POINTER:

25           Q.   You agree that there are special rules that

208

DEPOSITION OF ANTONIO SANTOS

1    STATE OF CALIFORNIA )

2    COUNTY OF ALAMEDA   )

3            I, Shelli G. Eng, Certified Shorthand Reporter,

4    No. 11397, State of California, do hereby certify:

5            That prior to being examined, the witness named

6    in the foregoing deposition, to wit, ANTONIO SANTOS, was

7    by me duly affirmed to testify the truth, the whole truth

8    and nothing but the truth; that said deposition was taken

9    down by me in shorthand at the time and place therein

10   named and thereafter reduced to typewriting under my

11   direction and supervision; that the witness was given an

12   opportunity to read and correct said deposition and to

13   subscribe the same.  Should the signature of the witness

14   not be affixed to the deposition, the witness did not

15   avail himself of the opportunity to sign or the signature

16   has been waived.

17           I further certify that I am not of counsel for

18   either or any of the parties to the said deposition, nor

19   in any way interested in the event of this action and

20   that I am not related to any of the parties thereto.

21           WITNESS MY HAND this 27th day of July, 2018.

22

23           ___/s/Shelli G. Eng_____
             SHELLI G. ENG, CSR NO. 11397
24           CERTIFIED SHORTHAND REPORTER

25

                                                         226

1      BARBARA J. BUTLER & ASSOCIATES
            CERTIFIED COURT REPORTERS
2     1659 Scott Blvd., Ste 15, P.O. Box 3508
             Santa Clara, California 95055
3             Phone: (510) 83-BUTLER

4                July 27, 2018

5     ANTONIO SANTOS                    Ref. #18071945A
      c/o CITY AND COUNTY OF SAN FRANCISCO
6     OFFICE OF THE CITY ATTORNEY
      JAMES F. HANNAWALT, DEPUTY CITY ATTORNEY
7     1390 Market Street, Sixth Floor
      San Francisco, California 94102
8
                   Re:  WOODS vs. CCSF
9         Deposition/Sworn Statement taken on: 7/19/18

10    The original transcript of your deposition taken in the
      above-entitled action has been prepared and is available
11    at this office for your reading, signing and correcting,
      if necessary.  If you are represented by counsel who has
12    a copy of your deposition, you may review that copy and
      submit to this office the Deponent's Correction Sheet
13    located at the back of your deposition transcript,
      indicating any changes you wish to make.
14
      Unless otherwise directed, your original transcript will
15    be sealed 35 days from the date this notice is sent.

16    You may call to set up an appointment at this office
      Monday through Friday between the business hours of
17    9:00 a.m. and 5:00 p.m.

18                  Sincerely,

19

20                  Shelli G. Eng, CSR

21    If you do not wish to read your deposition transcript,
      please sign below and return within 35 days from the date
22    this letter was mailed.

23
      _____        _____
24    Signature                           Date

25

                                                        227