# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

```
GWENDOLYN WOODS, individually)
and as Successor in Interest )
to Decedent MARIO WOODS,      )
                              )
            Plaintiff,        )
                              )
       vs.                    ) CASE NO.:  3:15-05666-WHO
                              )
CITY AND COUNTY OF            )
SAN FRANCISCO; a municipal    )
corporation, et al,           )
                              )
            Defendants.       )     CERTIFIED COPY
_____)
```

VIDEO DEPOSITION OF OFFICER WINSON SETO

TUESDAY, JULY 24, 2018

REPORTED BY:  ANGELICA R. GUTIERREZ, CSR NO. 13292

1

1    Mr. Woods, got close enough to him to be able to make
2    an observation of him, do you recall your perception of
3    his mental state?  Did he seem normal; did he seem to
4    be responding in a normal way in response to commands,
5    questions, and things like that?
6         MR. CONNOLLY:  Objection; vague; lacks
7    foundation; compound; calls for speculation as phrased.
8         THE WITNESS:  Did you mean initially when I
9    first saw him?
10        MS. NOLD:  Q.  Yes.  When you first got close
11   enough to be able to make observations?
12        MR. CONNOLLY:  Objection; vague the phrase
13   make observations, and lacks foundation and misstates
14   prior testimony.
15        THE WITNESS:  So if I understood you
16   correctly, as soon as I got to the vicinity to attempt
17   to contain Mr. Woods, I mean, I could see him, he
18   didn't appear initially impaired or anything to my --
19   in my knowledge.  But it's hard to tell just by looking
20   at someone right away like that.  It was impossible for
21   me to tell, so I wouldn't want to speculate at that
22   time either.
23        ==MS. NOLD:  Q.  Okay.  At some point later in==
24   ==the incident, did you ever come to the opinion that==
25   ==Mr. Woods might be impaired in some way?==

50

1     A.     That definitely crossed my mind.
2     Q.     And what did you observe that caused you to
3  believe that he might be impaired?
4     A.     Well, first of all, he was non-compliant and
5  he wasn't responding normally to the other uses of
6  forces that we were employing.  The pain compliance to
7  the ERIW, he didn't act as if a normal person normally
8  would, and so that raised questions in my mind thinking
9  that maybe he is not right at that time.
10    Q.     Okay.  And when you say not right, do you mean
11 to indicate that -- well, what do you mean to indicate
12 when you say he wasn't right?
13    A.     There could have been several reasons.  It
14 could have been drug-related, it could have been
15 alcohol, it could have been mental status -- altered
16 mental status, it could have been a medical condition.
17 I don't know at that time.  But just something that
18 just didn't seem normal.
19    Q.     And so when you observed Mr. Woods seeming
20 impaired, as you said -- strike that.
21           When you observed Mr. Woods that you perceived
22 him to be impaired, at that time you didn't have any
23 understanding as to the nature of his impairment,
24 whether it was mental or drug intoxication; is that
25 correct?

51

Barbara J.Butler & Associates - Certified Court Reporters
1659 Scott Blvd., Suite 15, Santa Clara, CA  95050 - (510) 83-BUTLER (2885) or (408) 248-BUTLER(2885)

1              MR. CONNOLLY:  Objection; misstates the
2      testimony of the witness.  Those are not his words.
3      Those were counsel's words.
4              MS. NOLD:  Okay.  That's your opinion.
5              MS. NOLD:  Q.  Go ahead.
6         A.   At the time I had an idea, an inkling as to
7      what may be going on, that he might be impaired, but I
8      didn't know he was impaired.  He could also have been
9      just very mad and adrenaline took over.  I don't know
10     at the time.
11        Q.   But it's fair to say that one of the
12     considerations that you made in your observations of
13     Mr. Woods, that he was suffering from some sort of
14     impairment with an unknown origin; is that correct?
15        A.   That was a possibility, yes.
16        Q.   Okay.  To your knowledge, was there anything
17     that you observed or personally participated in during
18     the incident, was there any attempts to contact the
19     department of emergency management to assist in this
20     incident?
21             MR. CONNOLLY:  Objection; lacks foundation.
22             THE WITNESS:  You mean dispatch, correct?
23             MS. NOLD:  Q.  Are you familiar with the
24     department of emergency management?
25        A.   I am.  And to my knowledge, that's dispatch.

52

1    closer towards the end of the block that -- people were
2    coming from the bus stops and a bus had just passed and
3    dropped off passengers.  I heard multiple people
4    yelling from the vicinity to my left, closer to the end
5    of the block.
6         Q.   Okay.  And during the entirety of the
7    incident, did your ever hear Mr. Woods make any sort of
8    verbal threats against any of the officers or anyone
9    else?
10        A.   I don't recall hearing a verbal threat.
11        Q.   And during the incident, did you see Mr. Woods
12   raise the knife in his hand in a manner you considered
13   threatening?
14             MR. CONNOLLY:  Objection; vague.
15             THE WITNESS:  Raise a knife as in like in a
16   motion as in -- can you describe it?
17             MS. NOLD:  Q.  Sure.  I'm just trying to found
18   out, as far as your observation, did you ever see
19   Mr. Woods with a knife in his hand manner that he
20   raised the knife in a manner that you considered
21   threatening?
22             MR. CONNOLLY:  Objection; vague, and vague as
23   to time.
24             THE WITNESS:  The reason why it's a little
25   confusing is because, someone wielding a knife does not

96

1  need to be in a certain position to be threatening, as
2  long as they're holding a knife. Even if it's behind
3  his back when he's face you could be very threatening
4  or even by his side could be threatening, because it
5  takes a split second to slash or thrust the knife at
6  someone to seriously hurt someone.
7          If you can clarify what do you mean by
8  raising? Do you mean like in a stabbing motion? What
9  did you mean by that?
10         MS. NOLD: Q. Sure. Did you ever see
11 Mr. Woods raise a knife or make any sort of stabbing
12 motions in the direction of any of the officers during
13 this incident?
14     A.  I did not see him make any stabbing motions.
15 No, I didn't.
16     Q.  And what position was Mr. Woods' arm that was
17 holding the knife? What position was it in during the
18 time you observed him?
19     A.  It was mostly by his side. And there were
20 times that it appeared that he was talking, his was
21 waiving the knife around kind of in a nonchalant manner
22 as someone who is speaking with their hands would do.
23     Q.  Okay.
24         MS. NOLD: Do you need a break, Sean?
25         MR. CONNOLLY: It depends how long you're

97

1  STATE OF CALIFORNIA    )
                          ) ss.
2  COUNTY OF CONTRA COSTA )

3

4        I, Angelica R. Gutierrez, a licensed Certified

5  Shorthand Reporter, duly qualified and certified as such

6  by the State of California;

7        That prior to being examined, the witness named in

8  the foregoing deposition was by me duly sworn to testify

9  to the truth, the whole truth, and nothing but the truth;

10       That the deposition was by me recorded

11  stenographically at the time and place first herein

12  mentioned, and the foregoing pages constitute a full,

13  true, complete and correct record of the testimony given

14  by the said witness;

15       That I am a disinterested person, not being in any

16  way interested in the outcome of said action, nor

17  connected with, nor related to any of the parties in said

18  action, or to their respective counsel, in any manner

19  whatsoever.

20

21              DATED: July 24, 2018

22

23       __/s/Angelica R. Gutierrez_____

24          ANGELICA R. GUTIERREZ, CSR No.  13292

25

149