# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

GWENDOLYN WOODS, individually )
and as Successor in Interest )
to Decedent MARIO WOODS,      )
                              )
            Plaintiff,        )
                              )
       vs.                    ) CASE NO.:  3:15-05666-WHO
                              )
CITY AND COUNTY OF            )
SAN FRANCISCO; a municipal    )
corporation, et al,           )
                              )
            Defendants.       )    CERTIFIED COPY
_____)

VIDEO DEPOSITION OF OFFICER NICHOLAS CUEVAS

WEDNESDAY, JULY 25, 2018

REPORTED BY:  ANGELICA R. GUTIERREZ, CSR NO. 13292

1

1       A.   Yes, I heard Officer Thompson say that.
2       Q.   An ERIW is extended range impact weapon,
3  correct?
4       A.   Yes.
5       Q.   And prior to Mario Woods being shot and
6  killed, did you hear any officers on the radio say
7  time and distance?
8       A.   I didn't hear at that time, I heard it
9  afterwards.
10      Q.   While you were there on scene you didn't hear
11  an officer say at least twice time and distance?
12      A.   I did not hear that.  And even if I did hear
13  it that's always in mind in situations like that,
14  that's always in our mind and in our training in
15  situations like this.
16      Q.   You said you have been trained on that.
17  What's your understanding and training as to why that's
18  important in a situation like this?
19      A.   It's common sense.  If someone is armed with a
20  weapon and you have distance on them it gives you time
21  to give that person -- it could be so much as a cooling
22  off period of time, it could be time to obstacles
23  between you, to give you distance, to give you enough
24  time to evacuate civilians and pedestrians.
25      Q.   Enough to deescalate the situation, correct?

38

1    A.    Yes.

2         MR. HANNAWALT:  Objection, incomplete

3    hypothetical.

4         Go ahead.

5         MR. POINTER:  Q.  Did you see any officers put

6    objects between themselves and Mario Woods?

7    A.    At the time Mario Woods was not contained and

8    it was absolutely impossible to put objects, there was

9    no objects around us to put the between the two of us,

10   put between Mario Woods and us.  We had a Muni bus, it

11   was 4:30 in the afternoon, kids were getting off

12   school, getting home, getting ready to eat dinner, do

13   their homework.  People are getting off work.  This is

14   a bedroom community, there is lots of people,

15   pedestrian traffic at the time, and there was nothing

16   to put in between us.

17   Q.    Did you on your communication that you were

18   having with your trainee, did you tell him, hey, let's

19   see if we can use the car to contain the stabbing

20   suspect?

21   A.    How this incident unfolded was we were going

22   southbound, very, very close to the incident, but we

23   didn't realize how close we were.  We began driving

24   Code 3 northbound Third Street from Laconte, and I

25   believe the location words put out was, I believe,

39

1 he was under the influence.
2 We all hear of people being under the
3 influence of PCP, right, every person if someone is
4 under the influence of PCP, what happens, they have no
5 pain compliance, they can display super human strength,
6 all sorts of stuff. In my training I have been told
7 that stimulants such as methamphetamines for pain,
8 there are other narcotics can display PCP like symptoms
9 when it comes to pain compliance and strength.
10 Q. Okay. And so what efforts, if any, did you
11 make to deescalate the situation?
12 MR. HANNAWALT: Objection, vague. Go ahead.
13 THE WITNESS: To this day I don't remember if
14 I gave any commands to Mario Woods. What I do remember
15 is Mario Woods, and I remember hearing Mario Woods
16 speak. I don't remember his exact words at the time.
17 I think during the time I did understand those words
18 but I don't remember, I couldn't tell you.
19 MR. POINTER: Q. I was going to say, did you
20 tell SFPD homicide investigators what those words were
21 at the time you gave the interview?
22 A. I didn't remember at that time.
23 Q. Okay. And so --
24 A. To this day I don't remember.
25 Q. As I was asking you, you mentioned that there

48

1  were commands being given.  Specifically what efforts,
2  if any, did you make to deescalate the situation?
3       A.   My role in that, part of deescalation is
4  containing a person.  Deescalation doesn't just
5  immediately say, okay, we're going to go to the scene
6  now deescalation starts.  To get to the deescalation
7  the person has to be somewhat compliant.
8            So my initial role in this incident was to
9  contain Mario Woods in a circle.  The next responding
10 officer's role, since we had him contained, would be
11 pushing, getting the public, blocking out streets
12 pushing the public back, doing that sort of thing.
13           My role was lethal force cover.  I don't
14 remember if I gave him any commands or not, but
15 commands would be part of deescalation.  I specifically
16 heard other officers giving clear, concise commands at
17 the time which I understood.
18      Q.   Did you hear any officers trying to establish
19 a rapport with Mario Woods?
20           MR. HANNAWALT:  Objection, vague.
21           THE WITNESS:  I think in order to establish
22 rapport, just like I said earlier, there has to be --
23 to deescalate a situation you have to have some type of
24 compliance with that person and we needed him to drop
25 the knife to start a rapport with him.  He wasn't

49

1  responding to -- you know, he has a knife, he's walking
2  we have a semicircle around him and he's walking freely
3  with the knife in his hand, and he's not responding to
4  anything.
5         So I don't remember hearing an officer say
6  what is your name, are you okay.  I don't remember
7  hearing that.  I'm not saying that wasn't said.  I
8  don't remember hearing that, no.
9     Q.  So as you mentioned, he wasn't contained, he
10 was walking freely in a semicircle, while he's in that
11 semicircle did he approach any officer or try to stab
12 anybody?
13    A.  He did not try to stab anyone but he walked
14 directly at Officer August while in that semicircle.
15    Q.  Did you see him lunge or raise the knife at
16 Officer August?
17    A.  He did not lunge at Officer August beforehand.
18 I wasn't going to wait.  No one, I don't think anyone
19 there was going to wait for him.  No one is going to --
20 an officer is not going to wait for someone to lunge
21 before they react to someone.
22    Q.  Did you see him do anything with that knife
23 towards Officer August, other than walk toward him?
24    A.  He had that knife clenched tightly in his hand
25 and he was walking at Officer August.  Now, why he

50

1    A.    Probably about 10 feet.

2    Q.    Okay.  In front of you, right?  Strike that.
3 Let me put it another way.

4          You were behind Mario Woods when you fired
5 your gun, right?

6    A.    I'm not sure.  I wasn't directly behind him
7 because I would be firing directly at Officer August,
8 but kind of -- if you see it, you have a semicircle, I
9 was kind of maybe at the -- if Mario Woods was at the
10 12:00 I may have been at the 9:30, somewhere around
11 there.

12   Q.    Okay.  And so Mario Woods was not walking down
13 the sidewalk towards you, right?

14   A.    He was not walking towards me.

15   Q.    He wasn't faced towards you either, correct?

16   A.    No, but he could immediately it would only
17 take a split second for him to cover 10 feet with a
18 knife, two leaps.

19   Q.    And he didn't take those two leaps?

20   A.    He did not, and I wasn't going to allow him
21 to.

22   Q.    ==And he didn't move towards you in any way,==
23 ==right?==

24   A.    ==He did not.==

25   Q.    And he didn't verbally threaten you or

54

STATE OF CALIFORNIA     )
                        ) ss.
COUNTY OF CONTRA COSTA  )

I, Angelica R. Gutierrez, a licensed Certified Shorthand Reporter, duly qualified and certified as such by the State of California;

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That the deposition was by me recorded stenographically at the time and place first herein mentioned, and the foregoing pages constitute a full, true, complete and correct record of the testimony given by the said witness;

That I am a disinterested person, not being in any way interested in the outcome of said action, nor connected with, nor related to any of the parties in said action, or to their respective counsel, in any manner whatsoever.

DATED: July 25, 2018

_Angelica R. Gutierrez_____

ANGELICA R. GUTIERREZ, CSR No. 13292

82