# EXHIBIT 17

## On-Scene Consulting

September 1, 2018

Mr. Adante Pointer, Attorney at Law
Law Offices of John L. Burris
Airport Corporate Centre
7677 Oakport Street, Suite 1120
Oakland, California 94621

### Federal Rules of Civil Procedure 26 (a) (2) (B) Report

**GWENDOLYN WOODS, individually and as Successor in Interest to Decedent MARIO WOODS, PLAINTIFF,**
**vs.**
**CITY AND COUNTY OF SAN FRANCISCO; a municipal corporation, et al, DEFENDANTS.**
**Case No. 3:15-05666-WHO**

Dear Mr. Pointer,

Thank you for retaining me to analyze and render opinions regarding the December 2, 2015 shooting death of Mr. Mario Woods at 6670 3rd Street, San Francisco by San Francisco Police Department Police Officers Charles August (#1115), Antonio Santos (#2474), Winston Seto (#2370), Scott Phillips (#1707) and Nicholas Cuevas (#2295).  Pursuant to the requirements of Rule 26, I have studied reports, San Francisco Police Department documents, videos, Transcriptions of Digitally Recorded Interviews and Depositions, and other material (as listed under Materials Reviewed) provided to me thus far regarding this case.  Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report to refine or express additional opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

On-Scene Consulting

**Materials Reviewed:**

1. Report on the Officer-Involved Shooting Death of Mario Woods, by George Gascon, District Attorney, Independent Investigations Bureau, dated May 24, 2018.
2. Report by Jason C. Fries, CEO, 3-D Forensics Inc.
3. Deposition Transcript of Person Most Knowledgeable (PMK) San Francisco Police Department Lieutenant Wilfred Williams taken on August 15, 2018.
4. Deposition Transcript and Exhibit of Person Most Knowledgeable (PMK) Steven Pomatto taken on August 15, 2018.
5. San Francisco Police Department Bulletin, A 15-106, "Avoiding the Lawful but Awful Use of Force," dated April 27, 2015.
6. Deposition Transcript of Charles August taken on July 26, 2018.
7. San Francisco Police Department Bulletin, A 13-120, "Response to Mental Health Calls with Armed Suspects," dated June 17, 2013.
8. Deposition Transcript and Transcript and Exhibits of Officer Nicholas Cuevas taken on July 25, 2018.
9. Deposition Transcript and Exhibits of Officer Scott Phillips taken on July 24, 2018.
10. Video from cellular telephone, (1:29).
11. Officer-Involved Shooting Report, No. 151045735, (CCSF Woods 000001-317).
12. Event History Detail: Call 153362542, San Francisco Police Department, (CCSF Woods 000042-59).
13. Audio Recorded Interview of Officer Jesse Ortiz, (26:19), (CCSF Woods 000318).
14. Audio Recorded Interview of Officer Antonio Santos, (36:55), (CCSF Woods 000319).
15. Audio Recorded Interview of Witness Ruben Rivera, (0:39), (CCSF Woods 000321).
16. Audio Recorded Interview of Shawn Navarro, (34:13), (CCSF 000323).
17. Dispatch Recording of Initial Stabbing Incident, (3:00), (CCSF Woods 000327).
18. Dispatch Recording, (0:37), (CCSF Woods 000328).
19. Dispatch Recording, (22:51), (CCSF Woods 000329).
20. Dispatch Recording, (9:50), (CCSF Woods 000330).
21. Dispatch Recording, (31:02), (CCSF Woods 000331).
22. Dispatch Recording, (1:43), (CCSF Woods 000332).
23. Dispatch Recording, (4:48), (CCSF Woods 000333).
24. Dispatch Recording, (1:39), (CCSF Woods 000334).
25. Dispatch Recording, (11:32), (CCSF Woods 000335).
26. Dispatch Recording, (0:13), (CCSF Woods 000336).
27. Dispatch Recording, (3:58), (CCSF Woods 000337).
28. Dispatch Recording, (4:58), (CCSF Woods 000338).
29. Dispatch Recording, (14:39), (CCSF Woods 000339).
30. Dispatch Recording, (3:29), (CCSF Woods 000340).
31. Dispatch Recording, (3:58), (CCSF Woods 000341).
32. Dispatch Recording, (0:42), (CCSF Woods 000342).
33. Dispatch Recording, (0:45), (CCSF Woods 000343).
34. Dispatch Recording, (1:14), (CCSF Woods 000344).
35. Dispatch Recording, (0:37), (CCSF Woods 000345).
36. Dispatch Recording, (2:53), (CCSF Woods 000346).
37. Dispatch Recording, (0:54), (CCSF Woods 000347).
38. Dispatch Recording, (0:37), (CCSF Woods 000328).
39. Dispatch Recording, (22:51), (CCSF Woods 000329).

On-Scene Consulting

40. Maps, (CCSF Woods 00360 & 362).
41. Photographs, (CCSF Woods 000422-000771).
42. Instagram Documents, (CCSF Woods 000772-1030).
43. San Francisco Police Department Policies and Procedures, (CCSF Woods 001032-2285).
44. San Francisco Police Department General Order, 5.01, Use of Force, Revised October 4, 1995, (CCSF Woods 1042-1052).
45. San Francisco Police Department General Orders, (CCSF Woods 002286-2492).
46. Personnel Complaints Against Defendant Officers, (CCSF Woods 002499-2618).
47. San Francisco Police Department General Order, 060, 5.2.1, "The Crisis Intervention Team (CIT) Response to Person in Crisis Calls for Service" and Miscellaneous Documents, dated December 21, 2016, (CCSF Woods 002619-2641).
48. San Francisco Crisis Intervention Team Training, Overview Goals and Values, (CCSF 002642-2844).
49. San Francisco Police Department Bay View Police Station Worksheet Line-Up, (CCSF Woods 002485-2849).
50. Collaborative Reform Initiative, "An Assessment of the San Francisco Police Department, October 2016, (432 Pages).
51. Second Amended Complaint for Damages Wrongful Death and Violation of Civil Rights and Damages, Case No. 3:15-05666-JCS.
52. Deposition Transcript and Exhibits of Ruben Rivera taken on July 25, 2018.
53. Deposition Transcript and Exhibits of Antonio Santos taken on July 19, 2018.
54. Deposition Transcript of Officer Winston Seto taken on July 24, 2018.
55. Deposition Transcript and Exhibits of Brandon Thompson taken on July 26, 2018.
56. Woods Video No. 5, (1:29).
57. Woods Video No. 1, (1:06).
58. Woods Video No. 2, (2:00).
59. Woods Video No. 3, (0:15).

**California POST Basic Learning Domains as Follows:**
1. #1: "Leadership, Professionalism and Ethics."
2. #2: "Criminal Justice System."
3. #3: "Policing in the Community."
4. #20: "Use of Force."
5. #21: "Patrol Techniques."
6. #23: "Crimes in Progress."
7. #33: "Arrest and Control."
8. #35: "Firearms/Chemical Agents."
9. #37: "People with Disabilities."

**Summary**

The following statement summaries represent documents/statements that were used in part during my review but are in no way meant to be exhaustive. The documents listed in the Materials Reviewed Section of this report represent the full library of documents reviewed thus far and used as a basis for my opinions.

On-Scene Consulting

**The below listed information is a verbatim synopsis of portions of the Report on the Officer-Involved Shooting Death of Mario Woods, by George Gascon, District Attorney, Independent Investigations Bureau, May 24, 2018:**

**Synopsis:**

"On the afternoon of December 2, 2015, SFPD officers were searching for a man who had reportedly stabbed another person with a knife. Police dispatchers broadcast a description of the suspect. Dispatch also informed officers the stabbing victim sought emergency medical care. Shortly afterwards, an officer broadcast a witness report that the suspect may still be in the area of the stabbing.

Officer August reported that he and his partner were driving down 3rd Street when he saw a man standing on the corner who matched the description of the stabbing suspect. He told officer Thompson to do a U-turn, and they "rolled up slow" to the suspect. Officer August who sat in the front passenger seat, claimed that his window was down, and that when they pulled up to the corner, Woods looked over and announced, "I'm not goin with you." According to Officer August, when he got out of the car, Woods pulled out a "long kitchen knife" with his right hand, holding it at his side. Officer Thompson reported that Woods said something to the effect of "you not taking me today," while "lifting his pants and having an aggressive and challenging demeanor. In response, Officer August said he drew his gun and told Woods to drop the knife.

According to both officers, Woods responded something to the effect that the officers were going to have to "squeeze" the triggers of their guns.

Woods then began walking away from them on Keith Street headed towards 3rd Street. Officer August reported that he repeatedly told Woods to drop the knife, and Woods was "yellin back" at him: "You're gonna have to fuckin' shoot me. You're gonna have to fuckin' shoot me." While Officer August was engaged with Woods, Officer Thompson said he was broadcasting over SFPD radio they were contacting a possible assailant who had a knife and was refusing to drop it.

**_Less Lethal Force Deployed:_**

Other officers soon arrived, and ultimately surrounded Woods in a semi-circle on Keith Street with Woods backed up against a building. These officers include the ones who, with Officer August, ultimately used lethal force-Officers Jennifer Traw (Star No. 566), Shaun Navarro (Star No. 1435), and Jesse Ortiz (Star No. 1131). At least nine other officers were present for at least part of the incident but is unclear how many of them were a part of the semi-circle surrounding Woods. These other officers did not use any weapons during the incident.

In addition to pepper spray, officers used two other types of less than lethal force against Woods. SFPD is equipped with two kinds of ERIW-Extended Range Impact Weapon-both which were deployed in this case. As the name suggests, an ERIW is a munitions delivery system designed to deliver force similar to impact weapons such as a baton, but from an extended distance. The "Super-Sock" ERIW is a Remington 870 12-gauge shotgun that fires "super sock" bean bags. The Tactical 40-millimeter ERIW is launched from a rifle, and it fires foam baton munitions.

## On-Scene Consulting

*The 40-millimeter foam baton rounds are heavier than a bean bag and therefore deliver a more forceful impact.*

*The evidence does not establish with certainty the sequence of less-than-lethal force deployed. Officers could not recall precisely when each kind of ERIW was fired, and when the pepper spray was used. What is established, however, is, that officers fired four rounds of foam baton and two rounds of bean bags, and deployed pepper spray once before officers used lethal force.*

### Dispatch Recordings:

*Dispatch recordings provide a contemporaneous account of the less-than-lethal deployment. A supervisor, Sergeant Hugh Hall, ordered the deployment of ERIW. Officer Thompson radioed that an ERIW had been deployed. Sergeant Hall then said, "Time and distance, time and distance."*

### Officers Statements, (Less than Lethal Force):

**Officer Shawn Navarro-***Officer Shawn Navarro delivered one 40-millimeter round to Woods' thigh. Officer Navarro fired another round that struck the lower half of Wood's body. Officer Navarro said he ultimately fired two more rounds aiming at Woods below the waist.*

**Officer Jesse Ortiz-** *Officer Jesse Ortiz said he sprayed Woods in the face with Pepper Spray for two to four seconds.*

**Officer Jennifer Traw-** *Officer Jennifer Traw said she fired the "Super Sock" ERIW two times at Woods, aiming below Woods' waist.*

### Officers Statements, (Lethal Force):

**Officer Charles August:** *Officer Charles August fired his gun five times.*

**Officer Nicholas Cuevas:** *Officer Nicholas Cuevas fired his gun four times.*

**Officer Scott Phillips:** *Officer Scott Phillips fired his gun seven times.*

**Officer Antonio Santos:** *Officer Antonio Santos fired his gun five times.*

**Officer Winston Seto:** *Officer Winston Seto fired his gun five times.*

### Autopsy:

*Dr. Michael D. Hunter, Chief Medical Examiner, examiner Woods' body and determined the cause of death was multiple gunshot wounds. Dr. Hunter found 20 gunshot wounds to various parts of the body-including the abdomen, back, thighs, arms, right index finger, head. Left thumb, and left calf and buttock—and a "probable" gunshot wound to the right cheek. Dr. Hunter also found five impact injuries consistent with less than lethal rounds- "targetoid contusions" to the left chest, left forearm, left hip and left thigh, and an abrasion on the right calf that may be a "tangential injury" from a less than lethal round.*

## On-Scene Consulting

**Opinions:**

Note: None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues.  Rather, my opinions involve the consistency of the officers' actions with standard police practices.

1.  It is my opinion that a reasonable that a reasonable law enforcement officer acting consistent with standard police practices would have formulated an effective and safe tactical plan.  It is my opinion that the Defendants failed to formulate a tactical plan.  I base my opinion on California Commission on Peace Officers Standards and Training, Student Materials, Learning Domain, No. 21-Chapter 1: Basic Concepts of Law Enforcement Patrol,1-22:

**Inadequate Communication:**
- Not establishing roles, (cover, contact, etc.).
- Failure to work with other officers as a team.
- Failure to notify dispatch of actions.

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 21-Basic Concepts of Law Enforcement Patrol, Officer Safety While on Patrol.

The element of officer safety refers to the practical application of tactically sound procedures to perform law enforcement activities in a safe and effective manner to include the utilization of available resources.

In addition, it is my opinion that the Defendants failed to formulate a tactical plan that should have outlined Less than Lethal Force options such as: Oleoresin Capsicum spray, 40mm, baton or the deployment of the 870 Remington 12-Gauge Shotgun with a Drag Stabilized 12-Gauge Bean Bag Round.  The Drag Stabilized 12-Gauge Round is a translucent 12 Gauge shell loaded with a 40-Gram tear shaped bag made from a cotton and ballistic material blend and filled with #9 shot.  The design utilizes four stabilizing tails and smokeless powder as the propellant.  The round has a velocity of 270 feet per second (FPS) with a maximum effective range of 75 feet.

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 21-Chapter 2: Patrol Methodologies and Tactics, 2-45:

**Plan of Action:**
- Officers should discuss safety factors as well as possible plans for taking actions in situations involving fleeing subjects.
- Plans may include coordination of who will transmit radio traffic.
- Appropriate use of escalation of force.

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 21-Chapter 1: Basic Concepts of Law Enforcement Patrol, 1-21:

On-Scene Consulting

**Inappropriate Attitude:**
- Careless or complacent.
- Overconfident.
- Too aggressive.

**Poor or No Planning:**
- Rushing into the situation without any plan of action.
- Failure to establish plan of action prior to engaging the suspect.
- Not considering alternative actions.

As set forth in <u>POST Learning Domain 22</u>, "Officers are trained to work together and function as a team.  In order to ensure officer safety and to ensure an appropriate outcome, the primary officers and cover officers must effectively communicate with one another.  Appropriate communication involves advising the primary officer of any critical occurrences or safety issues."

<u>In addition, I base my opinion on the following facts and testimony in this matter</u>:
- According to Officer Scott Phillips, he and his partner did not plan on the way to the call and he did not have any conversations with any other officers after arriving at scene, (<u>Deposition Transcript of Officer Scott Phillips, Page 29</u>).
- According to Officer Antonio Santos, he does not recall if there was a conversation with Officer Barnes as to what the plan would be, (<u>Deposition Transcript of Antonio Santos, Page 173</u>).
- According to Officer Antonio Santos, he did not have any communication with other officers regarding a plan, (<u>Deposition Transcript of Antonio Santos, Page 177</u>).
- According to Officer Winston Seto, there wasn't any formal planning on scene, it was rapidly unfolding and rapidly developing, (<u>Deposition Transcript of Winston Seto, Page 42</u>).
- According to Officer Scott Phillips, he never heard an officer advise that they were the sole contact officer, (<u>Deposition Transcript of Officer Scott Phillips, Page 34</u>).

In addition, it is my opinion that Officer Nicholas Cuevas failed to properly train Officer Scott Phillips who was in field training at the time of this incident.  Field Training Officers such as Officer Cuevas are given the responsibility to properly train officers who are assigned to them during their field training.  It is my opinion that Officer Cuevas should have formulated a plan with Officer Phillips while en route to this incident and should have provided proper oversight and direction upon arrival at the incident.  Based on my review of the facts in this matter, at no time did Officer Cuevas formulate a tactical plan with Officer Phillips nor did he provide any oversight and guidance during the incident.  In addition, I base my opinion based on my experience being a field training officer during my tenure with the Los Angeles Police Department.

## On-Scene Consulting

I base my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

2.  It is my opinion that a reasonable law enforcement officer acting consistent with standard police practices would have looked for available cover upon arrival at scene and not walked in an "open air environment" and create a semi-circle that did not afford them any cover or concealment if they reasonably that Mr. Mario Woods posed a credible threat.   It is my opinion that the Defendants exercised poor tactics when they walked in an "open air environment" that did not afford them any cover or concealment and created a semi-circle if they reasonably believed that Mr. Mario Woods posed a credible threat.   In addition, I base my opinion on my review of the facts in this matter as well as <u>California Police Officer Standards and Training (POST), Learning Domain No. 21-Basic Concepts of Law Enforcement Patrol, Officer Safety While on Patrol.</u>
The element of officer safety refers to the practical application of tactically sound procedures to perform law enforcement activities in a safe and effective manner to include the utilization of available resources.

In addition, I base my opinion on <u>California Police Officer Standards and Training (POST), Learning Domain No. 23-Crimes in Progress, Chapter 2: Basic Tactical Considerations, Tactical Approach</u>: Peace officers should always be aware of surrounding objects or areas that may be utilized for cover or concealment.

<u>Cover</u>:
- Anything that may stop or deflect an opponent's bullets.
- Should be used when involved in an armed encounter if possible.
- The type of cover will depend on the type of weapon, (knife, firearm, shotgun, rifle).

<u>Examples of Cover:</u>
- Cement block or brick walls.
- Buildings.
- Portion of the vehicle with the engine block.
- Trees.

In addition, it is my opinion that SFPD Sergeant Hugh Hall failed to provide supervision, command and control of the incident.  It is my opinion that Sergeant Hugh Hall should have directed Officers to a position of cover.

<u>In addition, I base my opinion on the following facts and testimony in this matter</u>:
- According to Officer Charles August, he has not received any training that he should walk towards an individual armed with a knife, (<u>Deposition Transcript of Charles August, Page 41</u>).
- According to Officer Charles August, he agrees that he should seek cover when feasible if a person is armed with a knife because it decreases the likelihood to having to use force, (<u>Deposition Transcript of Charles August, Page 41</u>).

On-Scene Consulting

- According to Sergeant Steven Pomatto, he would have preferred Officers to take cover and the current SFPD curriculum emphasizes more supervisory scene control with Sergeants directing officers into position and handling crowd control, (Report on the Officer-Involved Shooting Death of Mario Woods, by George Gascon, District Attorney, Independent Investigations Bureau, dated May 24, 2018, Page 23).

I base my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

3. It is my opinion that the Defendants failed to initially determine that Mr. Mario Woods was mentally ill or experiencing a mental crisis. Throughout the United States and in California, law enforcement agencies have recognized and trained their officers in multiple ways to safely interact with subjects such as Mr. Woods who are suffering from a mental illness or experiencing a mental crisis. Such contacts are extremely common in police work, and inappropriate tactics frequently lead to bad results, as they did here. The objective is to avoid unnecessary injury and or death. The underlying principle is reverence for human life.  These correct and reasonable include methods such as: recognize cues and other indicators to make appropriate decisions regarding intervention strategies, time to assess the situation, calm the situation, request additional and equipment, provide reassurance that the officers are there to help, give the person time to calm down, move slowly, eliminate emergency lights and reduce environmental distractions.  In addition, there should be only one contact officer to initiate dialogue and to provide directions and if necessary commands so not to confuse the subject by giving multiple and possible conflicting commands.  These correct and reasonable methods are well known and proven effective for the safety and welfare of both Peace Officers and the public.

California Police Officer Standards and Training (POST), Learning Domain No. 37, Chapter 4-Persons with Mental Illness, (4-16):

**Field Contacts:**

**Action:**

**Calm the Situation:**
- Take time to assess the situation.
- Provide reassurance that officers are there to help.
- If possible give the person time to calm down.
- Move slowly.
- When possible, eliminate emergency lights and sirens and disperse any crowd that may have gathered.
- Reduce environmental distractions such as radio or television noise.
- Assume a quiet nonthreatening manner when approaching and conversing with the individual.
- If possible, avoid physical contact if no violence or destructive acts have taken place.

On-Scene Consulting

- If possible, explain intended actions before taking action.

**Communicate:**
- Keep sentences short.
- Determine if the person is taking medication.
- Talk with the individual in an attempt to determine what is bothering that person.
- Acknowledge the persons feelings.
- Ask the person if he or she is hearing voices and, if so, what they are saying.
- Avoid topics that may agitate the person.
- Allow time for the person to consider questions and be prepared to repeat them.
- Do not mock the person or belittle his or her behavior.

**Do Not Make Threats:**
- Do not threaten the individual with arrest or in any other manner.
- Threats may create additional fright, stress, or potential aggression.

In addition, I base my opinion S.F.P.D, Department Bulletin A, 13-120, 6/17/13, "Response to Mental Health Calls with Armed Suspects," (CCSF Woods 002812).

Officers shall promptly request a supervisor to respond to an incident that involves the following:

1.  A call of an armed person who appears to be suffering from a mental illness or is in apparent altered mental status, or

2.  When on-viewing or arriving at the scene of a call and learning the incident involves an armed person who appears to be suffering from a mental illness or is in an apparent altered mental status.

The supervisor shall acknowledge the request on the radio, promptly respond to the scene and monitor the radio while en-route.  Upon arrival at the scene, the supervisor shall assume command of the incident.

Members are reminded of the requirements in DGO 5.02, I.C.1.b which reads, in part:

However, **an officer may not discharge a firearm at a person who presents a danger only to him or herself,** and there is no reasonable cause to believe that the person poses an imminent danger or death or serious bodily to the officer or any other person.

In addition, I base my opinion on the following facts and testimony in this matter:
- According to Officer Charles August, he agrees that he should not escalate the situation to where he has to use force, (Deposition Transcript of Charles August, Page 29).
- According to Officer Charles August, he agrees that it's easier to the person that your giving commands to understand one person instead of multiple people, (Deposition Transcript of Charles August, Page 40).
- According to Officer Scott Phillips, there were multiple officers giving commands, (Deposition Transcript of Officer Scott Phillips, Page 55).

On-Scene Consulting

- According to Officer Winston Seto, Mr. Woods did not seem right.  It could have been drug related, alcohol or an altered mental status, (Deposition Transcript of Officer Winston Seto, Page 51).
- According to Officer Winston Seto, in an ideal situation to have better control, have one person give commands, (Deposition Transcript of Officer Winston Seto, Page 68).
- According to Officer Charles August, he nor his partner Officer Thompson told any of the people in the area to get back once Mr. Woods took out the knife, (Deposition Transcript of Charles August, Page 66).
- According to Officer Brandon Thompson, he is not sure if he requested a supervisor, (Deposition Transcript of Brandon Thompson, Page 44).
- According to Officer Antonio Santos, he heard more than (1) officer giving commands to Mr. Woods, (Deposition Transcript of Antonio Santos, Page 159).

4.  It is my opinion that a reasonable law enforcement officer acting consistent with standard police practices would have determined based on Mr. Mario Woods' statements, "You are not taking me today," and "You better squeeze that motherfucker and kill me," (San Francisco Police Department Incident Report, Statement by Brandon L. Thompson, #153), that he was suicidal and a danger to self.  It is my opinion that the Defendants in this matter failed to recognize that Mr. Mario Woods was suicidal and a danger to self.  In addition, it is my opinion that Officer Brandon Thompson never advised Dispatch or officers at scene or responding to the scene of the suicidal comments made by Woods.  In addition, it is my opinion that Officer Winston Seto failed to advise Dispatch or officers at scene or responding to the scene of the suicidal comments made by Woods.  I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 37, Chapter 4-Persons with Mental Illness, (4-18):

**Lanterman-Petris-Short Act:**

The Lanterman-Petris Short Act (LPS) was established in 1968 with the intent of reforming commitment laws pertaining to mental health treatment.  The laws related to LPS are noted in the California Welfare and Institutions Code, beginning with Welfare and Institutions (W & IC) Section 5150.

**Danger to Self:**  Danger to self as a result of a mental illness typically means the presence of suicidal thoughts, *statements,* or behaviors.

Indicators that might lead an officer to believe that a person may be in danger to self, include, but are not limited to the individual's:
- Words or actions that imply an intent to commit suicide or inflict bodily harm on self.
- Statements or action implying a specific plan to commit suicide or inflict harm on self.
- Plans and the means available or within that individual's ability to carry out.

In addition, I base my opinion on the following facts and testimony in this matter:
- According to Officer Charles August, he agrees that Mr. Woods made suicidal statements, (Deposition Transcript of Charles August, Page 57).

On-Scene Consulting

- According to Officer Scott Phillips, he never heard Officer Thompson advise over the radio that Mr. Woods made comments that he wanted to kill himself, (Deposition Transcript of Officer Scott Phillips, Page 23).
- According to Officer Scott Phillips, he never heard Officer Thompson or anyone else state that Mr. Woods expressed a suicidal ideation, (Deposition Transcript of Officer Scott Phillips, Page 69).
- According to Officer Winston Seto, he heard Mr. Woods make statements about having to shoot him or something and that statement may have been suicidal in nature, (Deposition Transcript of Officer Winston Seto, Pages 55-56).
- According to Officer Winston Seto, he did not advise Dispatch of Mr. Woods statements about having to shoot him and he did not hear anyone else advised Dispatch, (Deposition Transcript of Officer Winston Seto, Page 59).
- According to Officer Brandon Thompson, Mr. Woods stated, "You better squeeze that motherfucker and kill me," (Deposition Transcript of Brandon Thompson, Page 41).

5.  It is my opinion that a reasonable law enforcement officer acting consistent with standard police practices would have requested the San Francisco Police Department's Crisis Intervention Team (CIT) to respond to the scene.  It is my opinion that the Defendants in this matter failed to request the CIT to respond to the scene and should have immediately request the CIT once Officer Thompson, Officer Seto or any other officer that heard Mr. Mario Woods make suicidal statements or appear to be mentally ill and or experiencing a mental crisis.  I base my opinion on the San Francisco Police Department General Order, DGO 5.2.1, "The Crisis Intervention Team (CIT) Response to Person in Crisis Calls for Service, dated 12/21/16." The San Francisco Police Department's highest priority is safeguarding the life, dignity and liberty to all persons.  Officers shall demonstrate this commitment in their daily interactions with the community they are sworn to protect and serve.  The Department is committed to accomplishing this mission by using rapport-building communication, crisis intervention, and de-escalation principles whenever feasible, before resorting to force.

1.  POLICY: It is the Department's policy to develop, implement and incorporate the CIT program within the district stations daily operations in a manner that prepares members to respond to persons in crisis incidents and, as a team, formulate a plan, establish rapport, and use de-escalation tactics (including tactical repositioning and creating time and distance), whenever possible.  The goal of this order is to safely resolve person in crisis incidents without the use of force, whenever possible, and to refer persons in crisis to community mental health service providers or other resources, as appropriate

In addition, I base my opinion on my law enforcement experience with the Los Angeles Police Department (LAPD) while assigned to: Patrol, Vice, Detectives, and Special Weapons and Tactics (SWAT).  The utilization of a mental health professional at the onset of an incident such as this incident can be an invaluable tool.  The Los Angeles Police Department Mental Evaluation Unit (MEU) responds to thousands of similar incidents on an annual basis and supports uniformed personnel by providing valuable insight and information.   Lastly, I base my

## On-Scene Consulting

opinion on my opinion on my twenty-eight-year law enforcement career where I have utilized the services of LAPD's Mental Evaluation Unit on hundreds of incidents to effectively resolve the situation.

6. It is my opinion that a reasonable officer acting consistent with standard police practices would not have resorted to using any force on Mr. Woods, but instead, would have immediately utilized defusing techniques upon their arrival.  Defusing is a process of reducing the potential for violence and bringing emotional level to a manageable level to restore order. The primary objective is to calm the person so that a conversation can take place and the use of force can be avoided.  It is my opinion that the Defendants failed to utilize defusing techniques and effective active listening skills so to bring Mr. Woods' emotions under control and to ascertain what transpired prior to his arrival.

In addition, I base my opinion on San Francisco Crisis Intervention Training: Overview, Goals, and Values, (CCSF Woods 002642-2807).

De-escalation Techniques for People in Crisis:

TACT: Tone, Atmosphere, Communication, Time:

1. Tone

   - Be calm and non-confrontational.
   - Remain patient, attentive and reassuring during the entire contact.
   - Avoid taking what may have be said to you personally.

2. Atmosphere

   - Reduce distractions if possible.
   - Maintain personal space and move slowly.
   - Observe verbal and non-verbal cues.

3. Communication

   - Speak in calmly and slowly; repeat yourself.
   - Ask one question at a time.
   - Make your actions and expectations clear.

4. Time

   - Slow down.
   - Assess the problem and develop a plan.
   - Give the person time to vent (It could diffuse the incident).

On-Scene Consulting

In addition, I base my opinion on: S.F.P.D. Department Bulletin, A 15-06, "Avoiding the Lawful but Awful Use of Force, dated 04/27/15, (CCSF Woods 001039).

Department Bulletin 13-120 requires officers to create time, distance, and establish a rapport with people in crisis who are only a danger to themselves.  Officers should consider creating time, distance, and establishing a rapport as an alternative to using force in every other circumstance; whenever it would be safe to do so.  When an officer is able to decrease his/her exposure to a threat by creating time and distance, the officer will need less force to overcome the decreased level of risk and thereby increase his/her level of safety.

In addition, I base my opinion on the following facts and testimony in this matter:
- According to Sergeant Steven Pomatto, officers are trained to contain the suspect and to create, "time and distance," to stay at a distance from the suspect (and if possible, to place obstacles such as cars or trees between them) to slow down the interaction and allow time to gain compliance, (Report on the Officer-Involved Shooting Death of Mario Woods, by George Gascon, District Attorney, Independent Investigations Bureau, dated May 24, 2018, Page 21).
- Sergeant Hall radioed, "Time and Distance, Move Back, Initiate Dialogue, (Report on the Officer-Involved Shooting Death of Mario Woods, by George Gascon, District Attorney, Independent Investigations Bureau, dated May 24, 2018).
- According to Officer Charles August, he agrees that when communicating with a person who has a weapon its time and distance, (Deposition Transcript of Charles August, Page 28).
- According to Officer Charles August, he agrees that you should keep your distance and give yourself a reactionary time, (Deposition Transcript of Charles August, Page 29).

Lastly, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

7.  It is my opinion that a reasonable law enforcement officer acting consistent with standard police practices would have continued to use less than lethal force options in the event that Mr. Mario Woods would not comply and drop the knife and or attempted to walk away from the officers.  I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 20-Use of Force.

**Chapter 2-Force Options (20.02. E03)**
**Subject's Actions:**

**Active Resistance-** Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away, or verbally signaling and intention to avoid or prevent being taken into or retained in custody.

**Possible Force Option(s)-**
- Use of devices to secure compliance and ultimately gain control over the situation.

In addition, I base my opinion on: <u>San Francisco Police Department General Order 5.01, Rev. 10/04/95,</u>

I. <u>POLICY:</u>

<u>C.</u>  Officers are permitted to use whatever force is reasonable and necessary to protect others or themselves, but no more.

In addition, I base my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

8.  It is my opinion that a reasonable officer acting consistent with standard police practices and outlined in the <u>California Commission on Peace Officers Standards and Training, Student Materials, Learning Domain, No. 20, Use of Force, Version 3.3, Pages 3-4</u>, would have given a verbal warning to Mr. Mario Woods that he/they was/were going to fire his/their service weapon. The Supreme Court applied the reasonableness test set forth in the Fourth Amendment (Tennessee v. Garner), "*some warning be given prior to the use of deadly force where feasible…*"

It is my opinion that San Francisco by San Francisco Police Department Police Officers Charles August (#<u>1115</u>), Antonio Santos (#<u>2474</u>), Winston Seto (#<u>2370</u>), Scott Phillips (#<u>1707</u>) and Nicholas Cuevas (#2295), should have given a verbal warning to Mr. Mario Woods and a reasonable opportunity to comply with the verbal command prior to firing their service weapon.

In addition, I base my opinion on <u>San Francisco Police Department General Order, 5.02, Revised 3/16/11, Use of Firearms, Verbal Warning</u>: If feasible, and if doing so would not increase the danger to the officer or others, an officer shall give a verbal warning to submit to authority of the officer before discharging a firearm.

<u>In addition, I base my opinion on the following facts and testimony in this matter</u>:
- According to Officer Charles August, he did not warn Mr. Woods that he was going to shoot him, (<u>Deposition Transcript of Charles August, Page 84</u>).
- According to Officer Scott Phillips, he only gave Mr. Woods a command when he arrived and not before firing his service weapon, (<u>Deposition Transcript of Officer Scott Phillips, Page 74</u>).
- According to Witness Ruben Rivera, he did not hear any of the officers say, "Drop the knife or I will shoot you," (<u>Deposition Transcript of Ruben Rivera, Page 48</u>).

Lastly, I base my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

On-Scene Consulting

9.  It is my opinion that a reasonable officer acting consistent with standard police practices would not have used lethal force in this matter.  I base my opinion on <u>San Francisco Police Department General Order, 5.02, Revised 3/16/11, Use of Firearms</u>:

C. <u>DISCHARGE OF FIREARMS</u>

1. <u>PERMISSABLE CIRCUMSTANCES</u>:

a.  In self-defense when an officer has reasonable cause to believe that he or she is in imminent danger of death or serious bodily injury.

b.  In defense of another person when the officer has reasonable cause to believe that the person is in imminent danger of death or serious bodily injury. However, an officer may not discharge a firearm at a person who presents a danger only to him or herself, and there is no reasonable cause to believe that the person poses an imminent danger of death or serious bodily injury to the officer or any other person.

The basis in determining whether force is "unreasonable" shall be consistent with the Supreme Court decision of Graham v. Connor, 490 U.S. 386 (1989).  When an officer uses deadly force in self-defense, standard police practices and most agencies polices dictate that the officer must be facing what is reasonably believed to be an imminent or immediate threat of death or serious bodily injury.

<u>I base my opinion on my review of the videos and the following below facts and testimony</u>:

- According to Officer Charles August, there is a possibility that if a person is hit with a bean bag, they are going to try to get away to avoid being hit again, (<u>Deposition Transcript of Charles August, Page 43</u>).
- According to Officer Scott Phillips, he never observed Mr. Woods make any stabbing motions with the knife, (<u>Deposition Transcript of Officer Scott Phillips, Page 30</u>).
- According to Officer Scott Phillips, he did not hear Mr. Woods threaten any officer, (<u>Deposition Transcript of Officer Scott Phillips, Page 69</u>).
- According to Officer Scott Phillips, he did not see Mr. Woods lunge at Officer August before he fired, (<u>Deposition Transcript of Officer Scott Phillips, Page 69</u>).
- "Just prior to Officer August shooting, Woods appeared to be walking with his hands down and the knife is not visible in the video.  Both of Woods' arms are down, suggesting that Woods, is not pointing or lunging at anyone with a knife," (<u>Report on the Officer-Involved Shooting Death of Mario Woods, by George Gascon, District Attorney, Independent Investigations Bureau, dated May 24, 2018, Page 14</u>).
- "When Officer Cuevas heard gunshots, he also fired his weapon," (<u>Report on the Officer-Involved Shooting Death of Mario Woods, by George Gascon, District Attorney, Independent Investigations Bureau, dated May 24, 2018, Page 18</u>).
- "After reviewing the video, Officer Cuevas stated that it appeared that Officer August stepped in Mr. Woods' path," (<u>Report on the Officer-Involved Shooting Death of Mario Woods, by George Gascon, District Attorney, Independent Investigations Bureau, dated May 24, 2018, Page 17</u>).

On-Scene Consulting

- According to Witness Ruben Rivera, he did not see Mr. Woods stab towards anyone with the knife, (Deposition Transcript of Ruben Rivera, Pages 27-28).
- According to Witness Ruben Rivera, he did not hear Mr. Woods threaten anyone or run towards anyone, (Deposition Transcript of Ruben Rivera, Page 28).
- According to Witness Ruben Rivera, Mr. Woods looked dazed and disoriented when he walked away, (Deposition Transcript of Ruben Rivera, Page 30).
- According to Witness Ruben Rivera, when Mr. Woods was shot and killed, he did not see Mr. Woods waving or moving the knife in any manner, (Deposition Transcript of Ruben Rivera, Page 79).
- According to Witness Ruben Rivera, when Mr. Woods was shot and killed with 22 bullets, he did not see the knife in his hand, (Deposition Transcript of Ruben Rivera, Page 48).
- According to Officer Antonio Santos, Mr. Woods was not threatening any of the officers verbally at scene, (Deposition Transcript of Antonio Santos, Page 192).
- According to Officer Antonio Santos, he does not recall Mr. Woods raising a knife and swinging it at anybody at scene, (Deposition Transcript of Antonio Santos, Page 192).
- According to Officer Antonio Santos, he had not seen Mr. Woods move the knife, strike out with the knife in any way toward any officer, (Deposition Transcript of Antonio Santos, Page 200).
- According to Officer Antonio Santos, at the moment that he fired, he did not see the knife and he did not see Mr. Woods raise or move the knife, (Deposition Transcript of Antonio Santos, Page 205).
- According to Officer Winston Seto, he did not fire because Mr. Woods lunged Officer August, (Deposition Transcript of Officer Winston Seto, Page 91).
- According to Officer Winston Seto, Mr. Woods did not make any threats against the officers, (Deposition Transcript of Officer Winston Seto, Page 59).
- According to Officer Winston Seto, he did not see Mr. Woods make any sort of stabbing motions in the direction of any of the officers during this incident, (Deposition Transcript of Officer Winston Seto, Page 97).
- According to Officer Brandon Thompson, he does not recall if Mr. Woods lunged at Officer August, (Deposition Transcript of Brandon Thompson, Page 56).
- According to Officer Charles August, Mr. Woods did not raise the knife prior to the shooting, (Deposition Transcript of Charles August, Page 84).
- According to Officer Charles August, he made a decision in his mind prior to shooting Mr. Woods that if Mr. Woods got within 10 feet from him, he would fire.  According to Officer August, he shot Mr. Woods when he was within 10 feet from him.  In addition, Officer August stated that he did not warn Mr. Woods that he was going to shoot him, (Deposition Transcript of Charles August, Pages 83-84).

In addition, based on my review of the videos in this matter, Mr. Mario Woods fell or was falling to the ground after the first two rounds were fired.  Based on my review of the videos in this matter, Mr. Woods fell or was falling as an additional (24) rounds were fired.  In addition, it is my opinion that Officers are responsible for each time they fire their hand gun and only in Immediate Defense of Life.

On-Scene Consulting

In addition, I base my opinion on: Members are reminded of the requirements in DGO 5.02, I.C.1.b which reads, in part:

However, **an officer may not discharge a firearm at a person who presents a danger only to him or herself,** and there is no reasonable cause to believe that the person poses an imminent danger or death or serious bodily to the officer or any other person.

I base my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 20-Use of Force.

**Considerations Regarding the Use of Deadly Force**

The use of deadly force is the most serious decision a peace officer may ever have to make. Such a decision should be guided by *the reverence for human life* and, used only when other means of control are unreasonable or have been exhausted. Reverence for life is the foundation on which deadly force rests. Deadly force is always the last resort used in the direst of circumstances. The authority to use deadly force is an awesome responsibility given to police officers by the people who expect them to exercise that authority judiciously. In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

Officers are trained at the POST Basic academy that the use of force must meet an "*Objectively Reasonable"* standard. The following quote from POST typifies the training (emphasis added): *"A reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner." (Learning Domain #20; "Introduction to the Use of Force," pages 1-4).

Further, POST teaches in the basic curriculum regarding the legislative and community expectations regarding their powers of arrest and use of force by POST certified police officers:

"The criminal justice system gives law enforcement two extraordinary powers:"
1. The power of arrest and
2. The power to use deadly force.

"The authority to do so does not come from the rule of an authoritarian dictator. Rather it comes from the will and consent of the people who *put their trust in law enforcement to use that power with the utmost care and restraint.* Therefore, it is important to emphasize that peace officers do with the utmost care and restraint, *not confer* "*police powers*" *on themselves*. These powers come to the criminal justice system from the people they serve. (Learning Domain #2: "Criminal Justice System," page s 1-4, Emphasis added).

## On-Scene Consulting

Additionally, an entire chapter in POST Learning Domain #20 is devoted to the "Consequences of Unreasonable Force."

**"Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate." Also, POST specifies that there are a number of key factors that can affect which force option is approved and appropriate under the concept of the "totality of the circumstances." (Learning Domain #20 "Use of Force," Chapter 2).

POST training specifies that the use of force under the "totality of the circumstances" be only justified on the basis of an "objectively reasonable" standard.  In other words, per the POST requirements, officers are not justified in any use of force based upon "subjective" fear.  The requirements are taught in detail throughout the POST Basic Curriculum (as required by law).

The POST standard of "Reasonable Fear" is defined as: *A controlled and legitimate fear or mechanism that is necessary for officer safety based on actually perceived circumstances.*  POST defines "Unreasonable Fear" as: *Generated in the officer's mind with no direct correlation to facts and situations.* (Learning Domain #20, Chapter 5, Emphasis added).  Officers are also taught that POST requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger." (Learning Domain #20, Chapter 3).

10.  It is my opinion that San Francisco Police Department Police Officers Charles August (#1115), Antonio Santos (#2474), Winston Seto (#2370), Scott Phillips (#1707) and Nicholas Cuevas (#2295), use of lethal force violated their training and caused the death of Mr. Mario Woods, including but not limited to for the following reasons:

- Highest level of force a Police Officer can use.
- This was not an immediate Defense of Life situation.
- Must be a last resort before using lethal force.
- Must be the direst of circumstances.
- Deadly force is likely to cause great bodily injury or death.
- Must show a reverence for human life.
- There were other reasonable measures available.
- All other reasonable measures were not exhausted.
- Warnings when feasible that deadly force will be used.
- Officers are responsible for every shot.
- Subjective Fear is insufficient.
- Over reaction is excessive force.

I base my opinion on my twenty-eight- year law enforcement career where as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

11.  It is my opinion that a reasonable officer acting consistent with standard police practices should have been able to identify that Mr. Mario Woods was attempting to provoke a "Suicide by Cop" incident.  Law enforcement officers are trained to assess the situation, secure the scene,

On-Scene Consulting

establish rapport with the subject, determine the main problem and then utilize crisis intervention skills, guided by their knowledge, training experience and judgment and common sense to bring the incident to a non-violent resolution.  Law enforcement officers are taught strategies such as:

- Ask about immediate needs.
- Offer realistic optimism.
- Comply with reasonable request.
- Provide reassurance.

Based upon my review of the fact and testimony in this matter, it is my opinion that the officers involved in this incident were aware and failed to utilize the aforementioned strategies to bring this incident to a non-violent resolution.  In addition, I base my opinion on I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team and specifically "Suicide by Cop" incidents.

12.  It is my opinion that the San Francisco Police Department failed to issue, certify and provide ongoing training with an Electronic Control Device X-26 Taser to their sworn law enforcement officers prior to this incident. The X26 Taser is a less than lethal weapon used to temporarily immobilize subjects.  The Taser is deployed from a maximum effective range of 21-25 feet and used as an additional tool to control a physically resistive, aggressive, or violent subject that poses a threat of physical harm to his/herself, to the officer or to other persons or property.

## **My Qualifications for Reviewing this Case:**

My opinions are based on my education, training and experience.  Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent GS-1811.  Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC)-6-month academy, I was employed by the United States Customs Service and assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale narcotic smuggling and money laundering operations.

I was assigned to the United States Customs Service Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989.  While in the Los Angeles Police Department Academy, I was selected by the staff to be my Recruit Class Leader.  Upon my graduation from the LAPD Academy, I was assigned to 77th Division.  In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), and Northeast Division C.R.A.S.H (Gang Detail).  I was selected to Operations Central Bureau C.R.A.S.H., where I worked a plain clothes detail targeting specific gangs throughout Operations Central Bureau which included Rampart Division, Hollenbeck Division, Central Division, and Northeast Division.

# On-Scene Consulting

I applied and was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds. *I received the Purple* Heart in 2010 for the injures associated with being ambushed.  Upon return from my injuries, I attended mandated Field Training Officer (FTO) School and was assigned as a Field Training Officer at Wilshire Division.  I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident, while working with a Probationary Police Officer who had recently graduated from the Los Angeles Police Academy.

I was promoted to the rank of Detective and attended Basic Detective School.  Upon completion of Basic Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section (FES), where I functioned as an investigator in an undercover capacity.  As a Detective I wrote and served search and arrest warrants to include large-scale multiple search warrant services. I addition, I managed and utilized Confidential Reliable Informants (CRI's) during hundreds of street-level narcotic transactions and search warrant services.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division.  Prior to my assignment, I attended mandated Basic Supervisor School.  In conjunction with Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training.  The training focused on team building, leadership, and decision making.  While assigned to Hollenbeck Division, I conducted roll call training daily on numerous subject matters to include: Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training. I directly supervised a Watch of Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents.  I conducted audits, personnel investigations, Standard Based Assessments (Ratings), Use of Force Investigations, administrative projects, and prepared commendations for officer's field performance.  While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group.  I directly supervised (14) Police Officers and Detectives assigned to the Unit.  Our unit worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in the Division.  In addition, I provided and supervised uniformed assistance with Operations Central Bureau Narcotics during street level narcotic transactions as well as during narcotic related search warrants.  I provided ongoing mandated Department Training as well tactical, firearms, less than lethal and search warrant tactics training to the Officers and Detectives.  As a Unit, we prepared and served numerous search warrants.  I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the of the service.  I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was selected to be loaned to Internal Affairs, Headquarters Section.  I investigated personnel complaints that were too large in scope for a geographical Division.  At the conclusion of my loan, I was selected to Management Services Division, Special Projects,

On-Scene Consulting

and Office of the Chief of Police.  I completed numerous in-depth staff projects for review by the Chief of Police.  In addition, I was assigned with conducting research and editing the 2000 LAPD Department Manual.

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I applied and was selected as a Sergeant II at 77th Division Vice.  I directly supervised ten undercover officers and four uniformed officers.  I provided all facets of training to the officers assigned to Vice at that time to include: Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations training, Surveillance training, and any other training deemed necessary by my Area Commanding Officer.  I conducted audits, personnel investigations, administrative projects, Use of Force Investigations and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force.  I conducted Use of Force audits on Specialized Units in Central and South Bureaus. I reported directly to the Office of the Chief of Police. I assisted with the completion of final document presented to the Board of Inquiry overseeing the Rampart Corruption Task Force.

In 2000, I applied and was selected to Metropolitan Division K9 Platoon as a Sergeant II+1.  I directly supervised (18) K9 Handlers.  Metro K9 conducted K9 Operations for the entire Department covering all Patrol Divisions and Specialized Units.  I provided all facets of training to the K9 Officers to include: K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer.  In addition, I taught K9 Operations at in-service training, Watch Commander School, Field Training Officer (FTO) School, and Basic Detective School.   While at K9, I investigated and completed K9 contacts (bite investigations), personnel complaints, Use of Force Investigations. In addition, I directed and was directly involved in Use of Force incidents.  I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I directly supervised sixty SWAT Officers with (6) other SWAT Sergeants and (2) Lieutenants.  I conducted and facilitated all facets of SWAT training to include: Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, SAGE, MX-26 Taser) on a monthly basis.  In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast rope, Aerial Platform Shooting).  I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing).  I was the Supervisor-in-Charge of the Crisis Negotiation Team.  I provided on-going crisis negotiation training, mental health training, de-briefs, 40-hour POST Certified Crisis Negotiation Team (CNT) School, and suicide prevention training.  I worked in conjunction with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and the Didi Hirsch Suicide Prevention Center.  In addition, I assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

On-Scene Consulting

During this time, I was selected as the sole LAPD SWAT representative to respond to Mumbai India with Counter-Terrorism following the terrorist attack in November 2008.  I taught use of force, tactics and SWAT deployment to 250 Mumbai Special Tactical Police Officers.  Upon my return, I assisted with the development of multiple venue/multiple attacker tactics.

In June 2010, I retired from the Los Angeles Police Department with 20 years in service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career.  During my tenure with the LAPD, I received over 100 Commendations to include: The Medal of Valor, Purple Heart and the Police Star.

From June 2010 through April 2013, I was the Vice President of Security Operations at Caruso Affiliated in Los Angeles, CA.  My responsibilities included: Identified and conducted Risk and Vulnerability Assessments for all Caruso Affiliated Developments, projected developments/investments, and residences.  Utilized strategic-level analysis from the intelligence community, law enforcement and the private sector.  Ensured a coordinated ability to identify and monitor potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated.  Mitigated expected threats.  Utilized preplanned, coordinated actions in response to infrastructure warnings or incidents.  Responded to hostilities. Identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include: on-site security personnel, local law enforcement, medical and fire rescue and relevant investigative agencies.  Conducted all facets of security training for the company and employees.  Formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests.  Conducted ongoing audits and internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's Department where I conducted all facets of patrol service to include: calls for service, self-initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention Center (RPDC). Processed and monitored inmate population from initial intake, housing, court, transportation and release. Conducted searches of inmate population as well as the facility on an ongoing basis. Utilized experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. Provided information to gang detail. Functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors. Attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. Attended on-going training to include: Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical incident or suicide.

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza.  Conducted and or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous

## On-Scene Consulting

Materials and Internal Theft.  Conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats.  Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants.  Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.


From March 2016 to September 5, 2017, I was the Director of Security at L&R Group of Companies.  Identified and conducted Risk and Vulnerability Assessments for all L&R Group of Companies developments and projected developments throughout the United States. Conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals.  Ensured all Security Professionals were compliant with BSIS security training and licensing.  Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft.  Conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats.  Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants.  Coordinated all security efforts to ensure safety at Special Events.  Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis as well as respective law enforcement agencies throughout the United States on security matters.

Attached are my curriculum vitae, listing of testimony and fee schedule.

Scott A. DeFoe