UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GWENDOLYN WOODS,

Plaintiff,

v.

CITY AND COUNTY OF SAN
FRANCISCO, et al.,

Defendants.

Case No. 3:15-cv-05666-WHO

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT AND DENYING
ADMINISTRATIVE MOTIONS TO
SEAL**

Re: Dkt. Nos. 97, 116, 125

## INTRODUCTION

26-year-old Mario Woods was shot and killed by five San Francisco police officers on December 2, 2015, at approximately 4:30 in the afternoon. Bystander videos show well over a dozen police officers on scene, nine forming a perimeter around Woods as he stood with his back against a building. He refused multiple orders to drop the knife he was carrying, and officers deployed pepper spray, rubber bullets, and bean bag projectiles to force him into compliance. When Woods began moving toward a gap in the perimeter of officers surrounding him, the knife still by his side, officers shot him at least 20 times.

Gwendolyn Woods, the mother of Mario Woods, brings this suit against the City and County of San Francisco ("the City") and officers Charles August, Nicholas Cuevas, Winson Seto, Antonio Santos, and Scott Phillips (collectively, "defendants") alleging liability under 42 U.S.C. section 1983, California's Bane Act, and negligence law. Defendants filed this motion for summary judgment on all claims, and I heard argument on September 26, 2018. I now GRANT defendants' motion for summary judgment concerning the federal causes of action and DENY it as to the state law claims.

# BACKGROUND

## I. Report of Stabbing

At 4:01 p.m. on December 2, 2015, a police radio dispatch described a stabbing incident. Deposition of Brandon Thompson ("Thompson Depo."), Hannawalt Decl. Ex. R [Dkt. No. 115-18] at 28:5–6; Deposition of Jessie Ortiz ("Ortiz Depo."), Hannawalt Decl. Ex. M [Dkt. No. 115-13] at 24:24–25:1. The victim was being treated at the hospital for an arm wound. Deposition of Marcel Gardner, Hannawalt Decl. Ex. K [Dkt. No. 115-11] at 62:13–16; Deposition of Scott Phillips ("Phillips Depo."), Hannawalt Decl. Ex. T [Dkt. No. 115-20] at 14:24–15:2. Officers received a description of a black male suspect with light skin who was wearing a black jacket, tan pants, and a hat. Deposition of Winson Seto ("Seto Depo."), Hannawalt Decl. Ex. Q [Dkt. No. 115-17] at 45:18–24.

## II. August and Thompson's Initial Contact with Woods

August and Thompson saw Woods, who matched the description[1] of the stabbing suspect, standing at a bus stop near the corner of 3rd and Fitzgerald Streets. Deposition of Charles August ("August Depo."), Hannawalt Decl. Ex. P [Dkt. No. 115-16] at 61:23–25; Thompson Depo. at 31:10–11, 17–19. They pulled their patrol car over and got out. August Depo. at 62:23–25, 63:2–4; Thompson Depo. at 39:15. Before the officers had said anything, Woods said, "I'm not going with you." August Depo. at 63:17–21; *see* Thompson Depo. at 40:22–24.

Woods then revealed that he had a kitchen knife with a four-and-a-half-inch blade in his possession. August Depo. at 64:23; Thompson Depo. at 39:15–17; Check Decl. Exs. E, F [Dkt. Nos. 116-10, 116-11] (photos of knife with ruler). The knife was down by Woods's side, pointed forward. August Depo. at 65:9–10. Woods did not raise or swing it at the officers. *Id.* at 65:11–21.

August took out his gun and pointed it at Woods. *Id.* at 64:23; Thompson Depo. at 39:19. Woods then said, "You're going to have to squeeze that," or, "You better squeeze that motherfucker and kill me." August Depo. at 64:23–25; Thompson Depo. at 41:22–24.

---

[1] Seto estimated that Woods was about 5'8" or 5'9" and 140 pounds. Seto Depo. at 45:18. The ME Report confirms that he was 5'9" and weighed 156 pounds. ME Report 4.

United States District Court
Northern District of California

1    This initial interaction lasted only seconds.  Thompson Depo. at 58:3–6.  Thompson then

2    broadcasted on the police radio that he and August had located the suspect, who had a knife.  *Id.* at

3    43:18–19.  He requested units with less lethal rounds.  *Id.* at 43:22–23.

4    **III. Turning the Corner onto Keith Street**

5    Woods walked away from the officers toward 3rd Street.  *Id.* at 39:19–23; August Depo. at

6    66:15–16.  The officers followed about 15 feet behind Woods as he turned the corner onto Keith

7    Street, a short block that runs adjacent to 3rd Street.  August Depo. at 66:25–67:2.

8    There are conflicting accounts of an interaction just after Woods, August, and Thompson

9    turned onto Keith Street.  Thompson testified that Woods paused and looked as if he was "coming

10   back, starting towards [August]."  Thompson Depo. at 60:9–14.  Thompson testified, and a

11   bystander video confirms, that he called for August to "back up."  Thompson Depo. at 60:12–13;

12   *see* Burris Decl. Ex. 28 [Dkt. No. 123-28] ("Rivera Video").  Thompson radioed that the suspect

13   was charging or advancing toward his partner.  Thompson Depo. at 60:15–18; Deposition of

14   Antonio Santos ("Santos Depo."), Hannawalt Decl. Ex. N [Dkt. No. 115-14] at 144:23–25;

15   Deposition of Nicholas Cuevas ("Cuevas Depo."), Hannawalt Decl. Ex. U [Dkt. No. 115-21] at

16   32:3–10, 55:2–7 ("[I]n the radio transmission [] Officer Thompson said that [Woods] had charged

17   the officers twice. In my mind I believed he tried to stab officers two times.").

18   August testified that he did not see Woods charge at anyone at any point.  August Depo. at

19   69:18–20.  The Rivera Video and MUNI footage show Woods turning around and appearing to

20   speak to August, but not charging.  Rivera Video at 0:02–04; Shaikh Decl. Ex. A [Dkt. No. 108-1]

21   ("MUNI Videos").  August further testified that Woods never swiped at anyone with the knife or

22   verbally threatened anyone.  August Depo. at 69:21–70:13.

23   **IV. At Least Nine Officers Form Perimeter around Woods**

24   Woods resumed walking south on Keith toward Gilman with August and Thompson

25   following him.  Thompson Depo. at 58:20–25, 59:11–15; Deposition of Shaun Navarro ("Navarro

26   Depo."), Hannawalt Decl. Ex. L [Dkt. No. 115-12] at 105:6, 11.  During this time, pedestrians

27   were crossing the intersection near 3rd and Gilman.  Ortiz Depo. at 33:19–24.  Additional people

28   were on the MUNI platform at 3rd and Fitzgerald, where a bus had just parked.  *Id.* at 33:6–9,

United States District Court
Northern District of California

United States District Court
Northern District of California

56:17–19; *see* MUNI Videos.

When Woods, August, and Rivera were about half way down Keith Street, additional officers began arriving from Gilman in response to the radio call.  August Depo. at 71:19–23; Rivera Video at 0:15; Deposition of Dean Hall, Hannawalt Decl. Ex. S [Dkt. No. 115-19] at 35:2–9.  Woods turned back toward August and Thompson and dropped his backpack and drink on the ground.  Rivera Video at 0:17–20; Deposition of Ruben Rivera ("Rivera Depo."), Hannawalt Decl. Ex. O [Dkt. No. 115-15] at 49:9–11; Check Decl. Ex A (photo of backpack).  According to one bystander, a MUNI operator, he "act[ed] confrontational," waving his arms and gesturing.  Rivera Depo. at 49:5–6, 22–24.  The bystander heard him say, "Fuck you. Come and get it." *Id.* at 55:25–56:2, 57:5–7.

One officer exited his patrol car armed with a 40-millimeter extended range impact weapon ("ERIW") with rubber bullets.  Navarro Depo. at 97:11–16; *see* Check Decl. Ex. G (photo of rubber bullet).  He ordered Woods to drop the knife and fired a round of rubber bullets below the waist when Woods failed to comply.  *Id.* at 106:1–4.  Woods took a few steps back toward Fitzgerald Street and backed up against a building.  *See id.* at 107:12–14; Rivera Video at 0:25–34.

At least nine officers[2] then formed a half-circle "perimeter" around Woods, who stood against the buildings.  *See* August Depo. at 68:9–10, 14–16, 69:1, 6; Rivera Video at 0:33.  Woods was inside the perimeter for about 38 seconds.  Rivera Video at 0:33–1:11.  Nearly all of the officers had their guns drawn.[3]  *See* Burris Decl. Ex. 19 [Dkt. No. 123-19] ("Phillips Homicide Statement") at 14:42:30–42; Shaikh Decl. Ex. A.  The officers repeatedly yelled commands for Woods to drop the knife and get down on the ground.  August Depo. at 76:13–16, 77:18–20; Ortiz Depo. at 46:21–25, Santos Depo. at 159:11–13; Seto Depo. at 47:17–20; Phillips Depo. at 29:19–25; Cuevas Depo. at 49:15–17.  Bystanders near the MUNI bus also yelled at Woods to drop the

---

[2] The officers in the semi-circle who directly engaged with Woods were August, Cuevas, Seto, Santos, Phillips, Ortiz, Navarro, Thompson, and Traw.  The videos appear to show a tenth officer in the perimeter.

[3] Officers were armed with weapons including firearms, ERIWs, pepper spray, 21-inch extendable wooden batons, and knives.  *See* Ortiz Depo. 15:18–25, 16:1–6; Santos Depo. at 157:1–9.  In their patrol vehicles were flash bangs, rifles, and additional ERIWs.  Santos Depo. at 157: 5–7.  Patrol officers are required to wear bulletproof vests.  Ortiz Depo. at 16:15–18.

United States District Court
Northern District of California

knife.  Phillips Depo. at 34:21–25; Burris Decl. Ex. 22 [Dkt. No. 123-22] ("Cell Phone Video 2");

Rivera Video.  Seto heard Woods say something like, "You are going [to] have to shoot me."  Seto

Depo. at 46:19–20.

Three officers continued to deploy less lethal weapons in an attempt to make Woods

comply.  *See* Navarro Depo. at 108:9–10, 18–19.  The officer with the 40-millimeter ERIW fired

three more rounds.  Navarro Depo. at 109:9–17; August Depo. at 75:23–25.  Each shot made

contact.  Navarro Depo. at 110:3–7; *see* Medical Examiner's Report ("ME Report"), Burris Decl.

Ex. 4 [Dkt. No. 123-4] at 13 (documenting injuries consistent with the impact of less lethal

rounds).  Another officer stepped within two yards of Woods and sprayed him with pepper spray

for two to four seconds.  Ortiz Depo. at 48:10–17, 53:23–24; August Depo. at 73:22–25.  A third

officer hit Woods with the 870 ERIW, a bean bag projectile.  Santos Depo. at 194:24–25, 195:1;

Check Decl. Ex. H (photo of bean bag projectile).

Some officers said they did not create a containment plan or decide on a leader.  Navarro

Depo. at 116:5–7, 118:5–10 ("I wouldn't describe anybody at the incident at the time of the

shooting as being lead officer."); *see* Phillips Homicide Statement at 14:38:47–50 (agreeing that

the situation "naturally evolved").  Another said the plan was to contain the situation with less

lethal rounds and that August and Thompson were the "primary officers" because they first made

contact with Woods.  Santos Depo. at 179:9–13, 180:1, 175:5–6 ("I believe everybody knew the

plan was we need to contain him.").

August testified that he spoke to Woods in a low tone of voice while Woods was in the

perimeter.  August Depo. at 77:1–4, 2–22.  He told Woods to "just put the knife down" and "let's

not do it this way."  *Id.* at 77:1–4.  August also testified that many people were yelling at the time

that he lowered his voice to speak.  *Id.* at 77:15–22.

## V. Woods's Reaction to the Less Lethal Rounds

Some officers reported that the less lethal options seemed to leave Woods "fairly unfazed."

Seto Depo. at 74:12–16; *see* Phillip 14:39:14–16; Seto Depo. at 51:4–18 (testifying Woods

seemed "not right" because of his abnormal responses to the less lethal rounds); Phillips Depo. at

61:8–19 (testifying Woods's level of pain tolerance was unusual).  They did not cause Woods to

comply with officers' commands to drop the knife.  Cuevas Depo. at 47:23–48:9.

Videos show that the less lethal rounds caused Woods to drop to the ground on all fours. After seven seconds on all fours and then his knees, he stood up.  Rivera Video at 0:39–47.  He paused, then turned to face the officers with his back against the building.  *Id.* at 0:47–0:52.  He gesticulated and appeared to be speaking to officers, which some officer accounts confirm.  Burris Decl. Ex. 20 [Dkt. No. 123-20] ("Cell Phone Video 1") at 0:52–56; Santos Depo. at 194:5–7; Cuevas Depo. at 48:14–18.  Woods then squatted down, still gesturing and speaking to the officers.  Rivera Video at 0:57–1:04; August Depo. at 76:5.

Many officers noted that Woods's behavior was unusual, and some believed he was under the influence of drugs or alcohol.  *See* Santos Depo. at 184:1–3; Ortiz Depo. at 59:15–20; Phillips Depo. at 61:23–25; Seto Depo. at 51:4–18; Cuevas Depo. at 45:8–11.  Santos said he had a "frantic demeanor" and believed he was intoxicated but not experiencing a mental health crisis. Santos Depo. at 162:3, 184:1–3.  Seto said he might have been acting strangely because of a medical condition, and he perceived Woods's statements as possibly suicidal.  Seto Depo. at 51:4– 18, 55:20–56:4.  A blood toxicology revealed methamphetamine and other drugs in Woods's system.  ME Report 18.

## VI. Officers Shoot Woods At Least 20 Times

After approximately 38 seconds in the perimeter, Woods began moving down Keith Street back toward Fitzgerald.  Rivera Video at 0:33–1:11.  Accounts differ regarding the roughly four seconds between Woods beginning to move and August firing the first shot.  *See* Rivera Video at 1:08–1:11; August Depo. at 88:19–89:4.

### A. August's Account

August testified that after the less lethal rounds and pepper spray, Woods began walking toward him, still holding the knife by his side.  August Depo. at 80:11–16.  The knife was pointing forward toward August, but Woods did not raise it.  *Id.* at 84:20–23.  Woods walked without a limp.  *Id.* at 78:5–8.  He said to August that he "was going to have to shoot him."  *Id.* at 80:6–7.

As Woods began to move, August side stepped to the left "to put a barrier between Mario and the people that [he] could hear behind [him]."  *Id.* at 78:19–23.  August's back was to the

people who had gathered near a MUNI bus. *Id.* at 78:19–23. When he side-stepped, August placed himself in front of Woods. *Id.* at 93:19–94:3.

August testified that he shot Woods in defense of himself and in defense of the civilians behind him. *Id.* at 98:9–10, 14–19. Woods was a stabbing suspect, he had failed to surrender or drop the knife, and he was "closing the distance at a fast pace" after he had "started to pick up the pace." *Id.* at 84:2–9, 98:2–10. August did not warn Woods before he shot. *Id.* at 84:17–19.

### B. Cuevas's Account

Cuevas testified that he fired to protect August, himself, and the people by the MUNI bus when Woods began walking toward a gap in the perimeter. Cuevas Depo. at 52:24–53:5, 53:7–10. Woods "walked directly at" August with the knife in his hand, and Cuevas could "only assume [Woods] was going to use that knife as a weapon." *Id.* at 50:13–14, 51:1–3. He did not remember giving a warning before he fired. *Id.* at 74:1–3.

### C. Seto's Account

Seto testified that he fired because he perceived Woods as an imminent threat against August. Seto Depo. at 142:23–143:2. After Woods began moving and August began backpedaling, Seto saw that "the distance [between them] was closing." *Id.* at 79:15–24. Woods did not comply with orders to stop, and he continued advancing toward August with "a quick forward motion." *Id.* at 80:1–6, 83:2–8.

### D. Santos's Account

Santos testified that he fired in defense of August. Santos Depo. at 207:22–23. He saw Woods as a threat because he appeared intoxicated, he had stabbed someone, he was holding a knife, he was refusing to comply, and the less lethal rounds had not been effective. *Id.* at 207:10–17. He was six to eight feet from August and advancing, and he "easily could have stabbed" him. *Id.* at 221:18–19, 222:14–15, 223:1–2.

### E. Phillips's Account

Phillips testified that he fired because Woods was an imminent threat to August. Phillips Depo. at 46:11–12. When Woods began walking after the less lethal rounds, he had a "slight limp." *Id.* at 46:3. Phillips could "see determination in [Woods's] face that he was not going to

United States District Court
Northern District of California

1   give up." *Id.* at 46:18–19.  When Woods was within four to five feet of August, Phillips decided

2   to open fire.  *Id.* at 45:16–20.

3   ### F. Non-Defendant Officers' Accounts

4   One officer testified that Woods was walking "a little bit faster than a normal walk, maybe

5   a brisk walk." Navarro Depo. at 131:10–12.  Another testified that Woods was walking in a way

6   that was "still very aggressive" and that he looked "very agitated." Ortiz Depo. at 63:12–16.  He

7   was making "quick movements."  *Id.* at 66:1–6.

8   ### G. Video Accounts

9   Videos cast doubt on the fficer accounts that Woods was moving quickly or speeding up

10   when officers shot him.  They seem to show him take four slow steps with his right shoulder up

11   against the building, walking with a heavy limp.  *See* Rivera Video.  The knife was in Woods's

12   right hand, on the building side.  Santos Depo. at 218:19–21; Phillips. Depo. at 78:20–22. August

13   was to his left.  Rivera Video at 1:10–12.

14   August, Cuevas, Seto, Santos, and Phillips shot Woods at least 20 times.[4]  ME Report 12.

15   ### LEGAL STANDARD

16   Summary judgment on a claim or defense is appropriate "if the movant shows that there is

17   no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

18   law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

19   the absence of a genuine issue of material fact with respect to an essential element of the non-

20   moving party's claim, or to a defense on which the non-moving party will bear the burden of

21   persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has

22   made this showing, the burden then shifts to the party opposing summary judgment to identify

23   "specific facts showing there is a genuine issue for trial."  *Id.*  The party opposing summary

24   judgment must present affirmative evidence from which a jury could return a verdict in that

25   party's favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

26   On summary judgment, the court draws all reasonable factual inferences in favor of the

27

28   ───────────────
[4] The Medical Examiner identified an additional possible bullet graze on Woods's cheek.  ME Report at 13.

*United States District Court*
*Northern District of California*

8

1    non-movant. *Id.* at 255.  In deciding the motion, "[c]redibility determinations, the weighing of the

2    evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a

3    judge." *Id.*  However, conclusory and speculative testimony does not raise genuine issues of fact

4    and is insufficient to defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594

5    F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

7         Defendants move for summary judgment on the grounds that there is no genuine issue of

8    material fact as to the following issues:  (1) officers' use of force was reasonable under the Fourth

9    Amendment; (2) officers are entitled to qualified immunity for the Fourth Amendment claims; (3)

10   plaintiff presents no evidence that officers had a purpose to harm Woods under the Fourteenth

11   Amendment; (4) plaintiff presents no evidence that the City should be liable under *Monell*; (5)

12   plaintiff cannot make out the elements of a Bane Act claim; and (6) officers were not negligent

13   because the force they used was reasonable.

## I. SECTION 1983 CLAIMS AGAINST OFFICERS

15        A cause of action for violation of the Constitution by a person acting under color of state

16   law is brought under 42 U.S.C. § 1983.  *Gomez v. Toledo*, 446 U.S. 635, 639 (1980).  To

17   successfully assert a section 1983 claim, plaintiff must demonstrate that the action (1) occurred

18   "under color of state law" and (2) resulted in the deprivation of a constitutional or federal statutory

19   right.  *Leer v. Murphy*, 844 F.2d 628, 632–33 (9th Cir. 1988) (citations omitted).  The parties do

20   not dispute that the defendants acted under color of state law, but they argue whether the officers

21   used excessive force or are otherwise entitled to qualified immunity.

## A. Fourth Amendment—Excessive Force Claims

23        Under the Fourth Amendment, the amount of force used by law enforcement officers must

24   be objectively reasonable when viewed in light of the totality of the circumstances.  *Tennessee v.*

25   *Garner*, 471 U.S. 1, 7–8 (1985).  Determining the objective reasonableness of a particular use of

26   force involves a three-step inquiry.  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  After first

27   assessing the type and amount of force inflicted, the court should determine the government's

28   interests at stake by looking to "(1) the severity of the crime at issue, (2) whether the suspect

United States District Court
Northern District of California

posed an immediate threat to the safety of the officers or others, and (3) whether the suspect

actively resisted arrest or attempted to escape." *Maxwell v. Cty. of San Diego*, 697 F.3d 941, 951

(9th Cir. 2012). These factors are non-exhaustive. *Id.* The Ninth Circuit has added "the

availability of alternative methods of capturing or subduing a suspect." *Smith v. City of Hemet*,

394 F.3d 689, 703 (9th Cir. 2005).

The final step is to balance the degree of force used against the government interest at

stake to determine if the force used was "greater than is reasonable under the circumstance."

*Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002). "The reasonableness of a particular use of

force must be judged from the perspective of a reasonable officer on the scene, rather than with the

20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This determination is normally a question

for the jury because it requires "resolution of disputed questions of fact and determinations of

credibility, as well as on the drawing of inferences." *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir.

2002) ("[E]xcessive force claims typically boil down to an evaluation of the various accounts of

the same events. Thus, the circumstances surrounding those events may be critical to a jury's

determination of where the truth lie."); *see Liston v. County of Riverside*, 120 F.3d 965, 976 (9th

Cir. 1997) (noting this determination is "ordinarily a question of fact for the jury"). Accordingly,

"summary judgment should be granted sparingly." *Maxwell*, 697 F.3d at 951.

Defendants argue that officers' use of force was reasonable under the totality of the

circumstances because Woods had stabbed someone earlier, had a knife,[5] refused to comply with

officers' orders to drop it, appeared unaffected by alternative methods of gaining compliance, and

came within ten feet of August. Mot. 10–11. Plaintiff argues that a jury could conclude that

Woods was not an imminent threat because he never verbally threatened officers or lifted the knife

from his side but rather was limping away, "dazed and disoriented," at the time he was shot.

Oppo. 19–20.

**1. Nature and Quality of Intrusion**

August, Cuevas, Seto, Santos, and Phillips shot Woods 20 times and killed him. Deadly

---

[5] Defendants argue in their opening motion that "it is undisputed Woods brandished an eight-inch knife." Mot. 9. The evidence does not support this contention. *See* August Depo. at 69:21–70:13.

1  force is an intrusion of the greatest degree.

2  **2. Government Interest**

3  a. Severity of Crime

4  Woods was suspected of stabbing someone in the arm, which is a felony.  *See* Cal. Penal

5  Code § 245(a)(1).  He matched the description of the stabbing suspect and was carrying a knife.

6  b. Immediacy of Threat to Officers or Others

7  "The most important factor under Graham is whether the suspect posed an immediate

8  threat to the safety of the officers or others."  *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir.

9  2010).  In analyzing this factor, "judges should be cautious about second-guessing a police

10  officer's assessment, made on the scene, of the danger presented by a particular situation."

11  *Ryburn v. Huff*, 565 U.S. 469, 477 (2012).

12  Defendants argue that Woods was a threat because he had stabbed someone earlier in the

13  day, had a knife, refused orders to drop the knife and get on the ground, remained noncompliant

14  even after the use of less lethal rounds, and was moving toward August.  Mot. 9.

15  Viewing the evidence in the light most favorable to the plaintiff, there are genuine disputes

16  of material fact regarding the threat that officers faced.  A reasonable jury could conclude that

17  Woods did not pose "an imminent threat of violence" at the time when officers shot and killed

18  him.  *See Ryburn*, 132 S. Ct. at 990.  Woods had never raised the knife or made verbal threats of

19  harm.  He was surrounded by at least nine police officers, many with guns trained on him.  The

20  video accounts raise doubts about officers' accounts of the speed at which Woods was moving

21  when he was shot.  A jury could find that Woods was injured and limping slowly away from the

22  less lethal rounds rather than toward August in a threatening way.  Finally, based on his unusual

23  behavior and statements like, "You're going to have to shoot me," a jury could conclude that

24  Woods was in distress and was a threat only to himself.

25  c. Actively Resisting or Evading Arrest

26  When August and Thompson first approached Woods in uniform, he said to them, "I'm not

27  going with you today."  Woods refused numerous commands to drop the knife and get on the

28  ground.  The scene was chaotic and fast moving, but there is no evidence that Woods failed to hear

United States District Court
Northern District of California

11

1  or understand the orders.

2         d. Availability of Alternative Methods

3         Officers are not required to use "the least intrusive means of responding to an exigent

4  situation; they need only act within that range of conduct we identify as reasonable." *Scott v.*

5  *Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).  But, "police are required to consider what other tactics

6  if any were available to effect the arrest." *Bryan*, 630 F.3d at 831 (internal quotation marks and

7  formatting omitted).  The availability of alternative measures factors into the reasonableness

8  inquiry.  *See id.*

9         Defendants argue that they exhausted alternative measures to force Woods into compliance

10  before resorting to deadly force.  Mot. 10.  Viewing the evidence in the light most favorable to the

11  plaintiff, a jury could conclude that officers should have attempted more alternatives before

12  shooting Woods.  Unique to this case, there were well over a dozen officers on scene, with at least

13  nine in the direct vicinity of Woods.  Each officer had multiple additional weapons, including

14  wooden batons.  Given Woods's size, 5'9" and 156 pounds, a reasonable jury could find that the

15  police could and should have overpowered him rather than killing him.

16         **3. Balancing**

17         Defendants have presented evidence that may well lead a jury to determine that the force

18  they used was reasonable; however, that evidence is insufficient to take this question out of the

19  hands of the jury.  There remain key disputed facts that, in the totality of the circumstances, could

20  lead a jury to conclude that Woods did not present an imminent threat at the time that he was shot.

21  My job at this stage is not to make credibility determinations or to weigh facts, but to determine

22  whether the force used was reasonable as a matter of law such that no reasonable jury could find

23  for the plaintiff.  I cannot.

24  **B. Officers Are Entitled to Qualified Immunity**

25         Defendants argue that they are entitled to the protection of qualified immunity because no

26  "clearly established law" shows that their actions violated the Fourth Amendment.  "The doctrine

27  of qualified immunity protects government officials from liability for civil damages insofar as

28  their conduct does not violate clearly established statutory or constitutional rights of which a

United States District Court
Northern District of California

reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted).  "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted).  The Supreme Court has repeatedly "reiterate[d] the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'"  *White v. Pauly*, 137 S. Ct. 548, 662 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).  Rather, "clearly established law must be particularized to the facts of the case." *Id.* (internal quotation marks and citation omitted).  While a case need not be "directly on point" to show that a right is clearly established, it must make the question "beyond debate."  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

"[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted).  The Supreme Court has "repeatedly [] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson*, 555 U.S. at 232.  However, "[i]f a genuine issue of material fact exists that prevents a determination of qualified immunity at summary judgment, the case must proceed to trial." *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003).  "Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness."  *Kisela*, 138 S. Ct. at 1153.  Defendants bear the burden to prove they are entitled to qualified immunity.  *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005).

The appropriate inquiry is "whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the situation [he] confronted." *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015).  Plaintiff argues that the 2011 Ninth Circuit case *Glenn v. Washington County* clearly established that deadly force is unreasonable when an individual is "not actively threatening anyone with a knife or trying to provoke a confrontation."  Oppo. 23–24; *see Glenn v. Washington Cty.*, 673 F.3d 864, 879 (9th Cir. 2011).  In *Glenn*, the Ninth Circuit reversed the district court's grant of summary judgment in favor of defendant police officers but did hold that the officers' use of force violated the Fourth Amendment.  *See id.*  As such, that case cannot serve

1    as clearly established law that put defendants on notice.

2         The recent Supreme Court case *Kisela v. Hughes* compels me to find that Defendants are

3    entitled to qualified immunity.  138 S. Ct. at 1154.  In that case, police responded to a call from

4    neighbors that a woman, the plaintiff, had been behaving erratically and hacking a tree with a

5    kitchen knife.  *Id.* at 1151.  When officers arrived, they saw the plaintiff, still carrying a kitchen

6    knife by her side, walk within six feet of her roommate.  *Id.*  A locked chain-link fence separated

7    the police from both women.  *Id.*  The plaintiff appeared calm, but she did not acknowledge the

8    officers' presence or obey at least two orders to drop the knife.  *Id.*  Believing she was a threat to

9    her roommate and having only seconds to assess the situation, one officer shot her four times.  *Id.*

10   at 1153.  The woman had committed no crime.  *Id.* at 1155 (Sotomayor, J., dissenting).

11        The factual scenario in this case is quite similar to *Kisela*.  Both Woods and the plaintiff

12   held kitchen knives by their sides, though neither raised them or threatened anyone with them.

13   Both had been behaving erratically.  Neither obeyed officers' orders to drop the knives.  Officers

14   had little time to assess the situation, though here they had about two minutes compared to the

15   mere seconds officers had in *Kisela*.  Finally, here defendants believed Woods had stabbed

16   someone that same day, whereas the plaintiff in *Kisela* had committed no crime.

17        *Kisela* controls.  Defendants are entitled to qualified immunity on the plaintiff's Fourth

18   Amendment claims.  Defendants' motion for summary judgment is GRANTED as to the first

19   cause of action.

20   **C. Fourteenth Amendment—Substantive Due Process Claims**

21        Plaintiff brings a cause of action under the Fourteenth Amendment for loss of familial

22   relationship.  Second Amended Complaint ("Second Am. Compl.") [Dkt. No. 48] ¶¶ 39–40; *see*

23   *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998), *as amended* (Nov.

24   24, 1998) (noting parents and children of the decedent may assert such claims after a killing by

25   law enforcement).  The Fourteenth Amendment's substantive due process clause protects against

26   "government power arbitrarily and oppressively exercised."  *Cty. of Sacramento v. Lewis*, 523

27   U.S. 833 (1998).  "The Supreme Court has made it clear . . . that only official conduct that shocks

28   the conscience is cognizable as a due process violation."  *Porter v. Osborn*, 546 F.3d 1131, 1137

United States District Court
Northern District of California

14

1    (9th Cir. 2008) (internal quotation marks omitted).  "The relevant question . . . is whether the

2    shocks the conscience standard is met by showing . . . deliberate indifference or requires a more

3    demanding showing [of] a purpose to harm [decedent] for reasons unrelated to legitimate law

4    enforcement objectives."  *Id.*

5         Defendants contend the proper standard is a purpose to harm and that summary judgment

6    is appropriate because defendants had no such purpose unrelated to legitimate law enforcement

7    objectives.  Mot. 14.  Plaintiff's opposition did not address defendants' Fourteenth Amendment

8    arguments.  Defendants' motion for summary judgment is thus GRANTED as to the second cause

9    of action.

10   **II. SECTION 1983 CLAIM AGAINST THE CITY**

11        Local governments "can be sued directly under [section] 1983 for monetary, declaratory,

12   or injunctive relief where . . . the action that is alleged to be unconstitutional implements or

13   executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated

14   by that body's officers."  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978).

15   "There are three ways to show a policy or custom of a municipality: (1) by showing a

16   longstanding practice or custom which constitutes the 'standard operating procedure' of the local

17   government entity; (2) by showing that the decision-making official was, as a matter of state law, a

18   final policymaking authority whose edicts or acts may fairly be said to represent official policy in

19   the area of decision; or (3) by showing that an official with final policymaking authority either

20   delegated that authority to, or ratified the decision of, a subordinate."  *Menotti v. City of Seattle*,

21   409 F.3d 1113, 1147 (9th Cir. 2005) (internal quotation marks omitted).

22        "Liability for improper custom may not be predicated on isolated or sporadic incidents; it

23   must be founded upon practices of sufficient duration, frequency[,] and consistency that the

24   conduct has become a traditional method of carrying out policy."  *Trevino v. Gates*, 99 F.3d 911,

25   918 (9th Cir. 1996).  "[T]he inadequacy of police training may serve as the basis for [section]

26   1983 liability only where the failure to train amounts to deliberate indifference to the rights of

27   persons with whom the police come into contact."  *City of Canton, Ohio v. Harris*, 489 U.S. 378,

28   388 (1989).

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1    The City argues that plaintiff failed to show any evidence of a longstanding practice or

2    custom, a failure to train or discipline, ratification of officers' conduct, or causation.  Mot. 16–19.

3    Plaintiff's opposition did not address defendants' *Monell* arguments.  The City's motion for

4    summary judgment is thus GRANTED as to the third cause of action.

5    **III. CALIFORNIA CIVIL CODE SECTION 52.1—BANE ACT CLAIMS**

6    Defendants argue that plaintiff's Bane Act claims fail because they did not violate the

7    Fourth Amendment as a matter of law and because the plaintiff cannot show specific intent.

8    The Bane Act, California Civil Code section 52.1, prohibits all people from interfering "by

9    threat, intimidation, or coercion . . . with the exercise or enjoyment by any individual or

10    individuals of rights secured by the Constitution or laws of the United States, or of the rights

11    secured by the Constitution or laws of this state."  Cal. Civ. Code § 52.1(a).  Under this law,

12    plaintiffs can collect damages from individuals who violate their constitutional rights.  *Reese v.*

13    *Cty. of Sacramento*, 888 F.3d 1030, 1044 (9th Cir. 2018).

14    Even where officers are entitled to qualified immunity in the face of alleged violations of

15    the Fourth Amendment, they may remain liable for damages under the Bane Act.  *See Reese v.*

16    *Cty. of Sacramento*, 888 F.3d 1030, 1038–39, 1045 (9th Cir. 2018) (affirming qualified immunity

17    on a Fourth Amendment excessive force claim but reversing summary judgment on a Bane Act

18    claim based on the same facts).  Relying on state court authority, the Ninth Circuit recently held

19    that the threat, intimidation, or coercion alleged under the Bane Act need not be "transactionally

20    independent" from the alleged constitutional violation.  *Id.* at 1043; *see Cornell v. City & Cty. of*

21    *San Francisco*, 17 Cal. App. 5th 766, 799 (Ct. App. 2017), *as modified* (Nov. 17, 2017), *review*

22    *denied* (Feb. 28, 2018) ("[T]he use of excessive force can be enough to satisfy the 'threat,

23    intimidation or coercion' element of Section 52.1.").

24    In addition to a Fourth Amendment violation, the Bane Act requires a showing that an

25    officer had "a specific intent to violate the arrestee's right to freedom from unreasonable

26    seizure."  *Reese*, 888 F.3d at 1043, (quoting *Cornell*, 17 Cal. App. 5th at 801).  The plaintiff must

27    show that the officer "intended not only the force, but its unreasonableness, its character as more

28    than necessary under the circumstances."  *Reese*, 888 F.3d at 1045 (internal quotation marks

1   omitted).  Reckless disregard is sufficient to show specific intent.  *Id.*; *see S.T. by & through*

2   *Niblett v. City of Ceres*, No. 116CV01713LJOSAB, 2018 WL 4193192, at *14 (E.D. Cal. Aug. 31,

3   2018) (holding that a jury could find that officers acted with reckless disregard for a decedent's

4   rights when they shot him in the back as he fled).

5        Defendants argue that plaintiff's Bane Act claims fail on both elements.  For the first

6   element, defendants again argue that officers' use of deadly force was reasonable as a matter of

7   law.  But as I outlined above, there are disputed facts that could lead a reasonable jury to conclude

8   the defendants' actions violated the Fourth Amendment.

9        For the second element, defendants argue that the plaintiff has not produced any evidence

10   that officers had a specific intent to violate Woods's Fourth Amendment rights.  Mot. 20; *see*

11   *Losee v. City of Chico*, No. 16-16541, 2018 WL 3016891, at *2 (9th Cir. June 18, 2018) (granting

12   summary judgment on the Bane Act claim where plaintiff produced no evidence of the defendant's

13   intent to use more force than necessary under the circumstances).  Plaintiff argues that a

14   reasonable jury could find specific intent based on the "aggressive" escalation and use of deadly

15   force despite the fact that Woods never brandished the knife or threatened officers or bystanders.

16   Oppo. 25.

17        Viewed in the light most favorable to plaintiff, a jury could find that defendants "intended

18   not only the force, but its unreasonableness, its character as more than necessary under the

19   circumstances."  *See Reese*, 888 F.3d at 1045 (internal quotation marks omitted).  Videos show

20   that officers significantly outnumbered Woods, who had neither brandished the knife nor made

21   verbal threats, but rather made statements a fact finder could infer were suicidal.  A jury could find

22   that Woods was injured and moving slowly at the moment officers shot him.  These facts could be

23   sufficient to allow a jury to conclude that by escalating to deadly force in such a situation, officers

24   acted with reckless disregard for Woods's rights.

25        As noted above, defendants have presented evidence that, pending the resolution of factual

26   disputes, could show their use of force was tied to legitimate concerns about the safety of officers

27   and bystanders rather than an intent to violate Woods's rights.  This question is properly resolved

28   by a jury.  Defendants' motion for summary judgment on the Bane Act claims is DENIED.

United States District Court
Northern District of California

United States District Court
Northern District of California

## IV. NEGLIGENCE—WRONGFUL DEATH CLAIMS

Plaintiff brings wrongful death claims against the five individual defendant officers alleging they negligently caused Woods's death.  Second Am. Compl. ¶¶ 48–52.

"[A]n officer's lack of due care can give rise to negligence liability for the intentional shooting death of a suspect."  *Munoz v. Olin*, 24 Cal. 3d 629, 634 (1979).  "Claims of excessive force under California law are analyzed under the same standard of objective reasonableness used in Fourth Amendment claims."  *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1232 (9th Cir. 2013).  Under California law, "tactical and preshooting actions" are relevant to determine whether the officers' conduct was reasonable under the totality of the circumstances.  *Young Han v. City of Folsom*, 695 F. App'x 197, 199 (9th Cir. 2017).

Defendants first renew their arguments under the Fourth Amendment.  As outlined above, there are genuine disputes of material facts regarding the threat that Woods posed to officers and bystanders on the day he was shot.

Next, defendants argue that negligence liability cannot attach because California law authorized defendants to use reasonable means to arrest Woods, and the shooting was reasonable because of Woods's conduct.  Mot. 22; *see Hernandez v. City of Pomona*, 46 Cal. 4th 501, 518 (2009).  Defendants are correct that California Penal Code section 835 authorized defendants to pursue and arrest Woods for assault with a deadly weapon.  Cal. Penal Code § 245(a)(1); *Hernandez*, 46 Cal. 4th at 518.  But the law still obligated defendants to use only *reasonable* force in that pursuit.  *Hernandez*, 46 Cal. 4th at 518–19.  In *Hernandez*, the California Supreme Court found that the plaintiff was collaterally estopped from raising a negligence theory of liability when a jury had already found that officers reasonably believed the suspect posed an immediate threat.  *Id.* at 520.  Here, no jury has made such a determination, and I cannot do so as a matter of law.

Finally, defendants argue that they are immune from suit under California Penal Code section 196, California Government Code section 821.6, and California Government Code section 820.6.  Immunity under section 196 applies only to justifiable homicides, or those in "circumstances which reasonably create a fear of death or serious bodily harm to the officer or to another."  *See Foster v. City of Fresno*, 392 F. Supp. 2d 1140, 1159 (E.D. Cal. 2005) (internal

1    quotation marks and citations omitted).  This question awaits jury determination.  Immunity under

2    section 821.6 applies only to conduct during "investigation[s] in preparation for judicial

3    proceedings," and at issue here is officer conduct during an arrest.  *See Phillips v. City of*

4    *Fairfield*, 406 F. Supp. 2d 1101, 1118 (E.D. Cal. 2005).  Immunity under section 820.6 does not

5    apply here because defendants were not acting to *enforce* a statute that was later found

6    unconstitutional, invalid, or inapplicable.  *Thomas v. Dillard*, 212 F. Supp. 3d 938, 948 (S.D. Cal.

7    2016).

8         Accordingly, defendants' motion for summary judgment as to state law negligence liability

9    is DENIED.

10   **V. MOTIONS TO SEAL**

11        Defendants seek to file under seal 16 documents, photos, and videos on the basis that they

12   are part of the SFPD Homicide Investigation file and subject to a protective order I issued on May

13   9, 2016.  Defendants' Mot. to Seal [Dkt. No. 116] 4; Stipulated Protective Order [Dkt. No. 39].

14   Plaintiff also filed a motion to seal officers' homicide statements on the same basis, at the request

15   of Defendants' counsel.  *See* Plaintiff's Mot. to Seal [Dkt. No. 125] 2; Buelna Decl. [Dkt. No.

16   125-1] ¶ 4.

17        A party seeking to seal court records must overcome a strong presumption in favor of the

18   public's right to access those records.  *See Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172,

19   1178 (9th Cir. 2006).  The Ninth Circuit imposes the "compelling reasons" standard dispositive

20   pleadings, including motions for summary judgment.  *Id.* at 1179.  Supporting declarations must

21   "'articulate [ ] reasons supported by specific factual findings'" to warrant sealing.  *Id.* at 1178; *see*

22   *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096–97 (9th Cir. 2016) (requiring a

23   court to explain its findings "without relying on hypothesis or conjecture").  Under the Civil Local

24   Rule 79-5, "[r]eference to a stipulation or protective order that allows a party to designate certain

25   documents as confidential is not sufficient to establish that a document, or portions thereof, are

26   sealable."  CIVIL L.R. 79-5(d)(1)(A).

27        Defendants submitted a declaration that relied only on the protective order as a basis for

28   sealing:  "These documents are also subject to the Court's protective order of May 9, 2016 . . .

United States District Court
Northern District of California

Defendants designated these documents confidential and sealable as the records were produced from an ongoing SFPD Homicide investigation file of the shooting death of Mario Woods." Hannawalt Decl. ¶¶ 19–20.  As both the Civil Local Rules and my Standing Order make clear, a protective order alone is insufficient to justify sealing.  Both motions to seal are DENIED.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART:

1. Defendants' motion for summary judgment is GRANTED as to the first, second, and third causes of action.

2. Defendants' motion for summary judgment is DENIED as to the fourth, fifth, and sixth causes of action.

3. Because the remaining causes of action were brought only against the individual officers, the City is DISMISSED.

**IT IS SO ORDERED.**

Dated: October 9, 2018

William H. Orrick
United States District Judge